**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>Plaintiffs and Relator,<br>v.<br>NOVARTIS PHARMACEUTICALS CORPORATION,<br><br>Defendant. | Case No. 11 Civ. 0071 (PGG) |
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br>v.<br>NOVARTIS PHARMACEUTICALS CORPORATION,<br><br>Defendant. | |

**CORRECTED DECLARATION OF MÓNICA P. FOLCH IN SUPPORT OF THE UNITED STATES OF AMERICA'S MOTION TO COMPEL**

I, Mónica P. Folch, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1. I am an Assistant United States Attorney in the Office of Preet Bharara, United States Attorney for the Southern District of New York, assigned to represent the United States in this matter. I am familiar with the proceedings herein, and I make this declaration in support of the Government's Motion to Compel.

2. In its Amended Complaint, the United States (the "Government") alleges that, from January 2002 through at least November 2011, Novartis, through its so-called speaker

1

program events,[1] engaged in a nationwide kickback scheme to induce doctors to write prescriptions for ten of Novartis's cardiovascular ("CV") drugs, and thereby violated the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, and caused false claims for reimbursement to be submitted to federal healthcare programs in violation of the False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A)-(B). The ten drugs at issue in this case are Lotrel, Valturna, Starlix, Diovan, Diovan HCT, Tekturna, Tekturna HCT, Exforge, Exforge HCT, and Tekamlo (the "Covered Drugs").

**The Government's Discovery Requests**

3. The Government served its first set of discovery requests on Novartis on September 20, 2013. A true and correct copy of those requests are attached hereto as Exhibit A. The Government's First Set of Requests for Documents sought the following categories of documents, among others:

   a. The Government's Document Request No. 8 sought documents identifying the event speaker, the event topic, the event attendee(s), the event location, as well as materials used or distributed during the events, event sign-in sheets, and receipts or invoices associated with the events, among other documents.

   b. The Government's Document Request Nos. 2 through 5 separately sought documents pertaining to Novartis employees "with responsibilities concerning Speaker Programs or Other Promotional Activities relating to the Covered Drugs," including their performance evaluations; their communications in connection with speaker program activities; their compensation structure; their duties and expectations in connection with

---

[1] The Government's references to "speaker programs" and "speaker program events" include Novartis's so-called "roundtable" events, events during which doctors purportedly discussed the efficacy of Novartis drugs over a meal paid for by Novartis (often at a high-end restaurant).

the promotion of the Covered Drugs; and their training in connection with speaker programs.

  c. A number of the Government's other Document Requests, including Nos. 1, 7, 11, 12, and 14, sought other relevant categories of Novartis records, including policies and procedures governing Novartis's speaker program events; audits or analyses of Novartis's speaker program events; training materials provided to health care providers who served as speakers; documents concerning the recruitment of health care providers to serve as speakers; and complaints regarding promotional events.

4. After the Government served these requests, the parties agreed to a partial stay of discovery pending resolution of Novartis's motion to dismiss. During that period, only a limited categories of documents were produced.

5. Novartis served its responses and objections on December 8, 2014, after the Court denied its motion to dismiss. A true and correct copy of that document is attached hereto as Exhibit B. Novartis responded to the Government's Document Requests as follows:

  a. In response to the Government's Document Request No. 8, Novartis raised various objections regarding the breadth of the request, but agreed to conduct a reasonable search and produce responsive documents.

  b. In response to the Government's Document Request Nos. 2 through 5, Novartis again raised various objections regarding the breadth of the requests, but agreed to conduct a search, "of the files of a reasonable number of individuals likely to have documents or information responsive" to the request and to produce responsive documents.

   c. In response to the Government's Document Request Nos. 1, 6, 7, 11, 12, and 14, Novartis raised various objections regarding the breadth of the request, but agreed to conduct a reasonable search and produce responsive documents.

**Discovery Negotiations Commence: the February 3, 2015 Meet and Confer**

  6. The parties held their first discovery-related meet and confer by telephone on February 3, 2015. During that conference, the parties reviewed each of Novartis's responses to the Government's document requests and began the process of working to resolve Novartis's objections. Specifically, the Government discussed its need for basic information regarding the events, including the dates, locations and topics of events; the names of the doctors at each event; the amounts spent at each event; the honorarium paid to each speaker; and the name of the sales representative who organized each event (collectively, the "Speaker Program Data"), as well as the core documentation associated with each event, including event invitations sent to doctors, event sign-in or attendance sheets, educational materials that were purportedly distributed or shown to attendees, receipts for expenses incurred at these events, including meals and honorarium paid, and documentation sufficient to show the sales representative who organized such event (collectively, the "back-up documentation"). The parties also discussed the Government's request for prescription-writing data for the Covered Drugs (the "IMS Data"). Finally, the parties separately addressed Novartis's search for ESI in its employee's files. More specifically, the parties discussed the following three issues:

   a. With regard to the Speaker Program and IMS Data, the Government informed Novartis that it sought data for all Novartis events about the Covered Drugs from 2001 through the present. Novartis objected to the Government's proposed time period as over-inclusive and argued that it should not be required to produce data for

certain drugs during certain years because a settlement release applied to claims related to those drugs during that period.

      b.      As to the event back-up documentation, the Government told Novartis that it was not seeking such documents for all Novartis events about the Covered Drugs, but only for those events attended by doctors the Government would later identify as having attended sham events (based on the full set of Speaker Program Data).

      c.      Separate from each of the above discussions, the parties discussed the identification of appropriate custodians whose email accounts and hard drives would be searched for documents responsive to the Government's discovery requests. To that end, the Government proposed providing Novartis with a list of doctors who participated in Novartis sham events from which Novartis would identify associated sales representatives and managers who would serve as custodians ("sales force custodians"). The parties agreed that they would collaborate on appropriate search terms for electronic searches of the chosen custodians' files.

**The February 19, 2015 Meet and Confer**

7.      The parties held a second telephonic meet and confer on February 19, 2015, during which they further discussed the three discovery issues raised during the last call:

      a.      With respect to the Speaker Program and IMS Data discovery, the parties further discussed their disagreement regarding the temporal scope of that discovery and the application of the settlement release. The Government noted that the parties would need to resolve this issue in short order, because without the full set of Speaker Program Data—data essential for the identification of sham events—it would not be able to move forward much of the outstanding discovery.

5

  b. The parties also discussed the identification of events for which the Government would seek back-up documentation. Counsel for Novartis objected to the Government's request for back-up documentation to the extent it captured documents for events not alleged to be shams. Novartis proposed that the Government identify the specific events for which it sought back-up documentation.

  c. With regard to ESI custodian searches, again addressed separately from the Government's requests for back-up documentation and for Speaker Program and IMS Data, Novartis expressed concern regarding the burden associated with identifying custodians through a list of doctors, arguing that it could lead to thousands of custodians. As an alternative, Novartis proposed that the Government provide a list of sham events from which the parties could identify associated sales representatives and managers to serve as custodians.

**The Parties' Email Negotiations in March 2015 Result in an Agreement Regarding Back-Up Documentation**

  8. Approximately two weeks later, on March 6, 2015, the Government followed up by email on some of the issues discussed at the February 19 meet and confer. A true and correct copy of that email is attached hereto as Exhibit C. The email addressed the following issues:

  a. With regard to the Speaker Program and IMS Data, the Government reiterated its position that data for events held between 2001 and 2014 was discoverable.

  b. As to sales force custodian ESI searches, the Government restated its preference for choosing custodians by identifying doctors who attended Novartis sham events.

   c.  With regard to back-up documentation, the Government agreed to Novartis's proposal that the Government "identify[] the specific events for which back-up materials will be produced."

9. Novartis responded on March 18, 2015. A true and correct copy of that email is attached hereto as Exhibit D.[2] Consistent with the parties' discovery-related communications up to that point, Novartis addressed each of the types of discovery under negotiation separately:

   a.  With regard to the Speaker Program and the IMS Data, Novartis again expressed its view that that the data produced should be limited to a shorter time period and that the settlement release was applicable.

   b.  As to custodian ESI searches, Novartis argued that the Government's doctor-focused approach would be unduly burdensome. Novartis again proposed that the Government agree to identify sales force custodians "by reference to the events the Government alleged to be shams, or a subset thereof."

   c.  With regard to back-up documentation, Novartis wrote: "Thank you for agreeing to identify the specific events for which you would like NPC to produce back-up materials." With that, the Government understood that Novartis had agreed to provide back-up documentation for the specific events the Government would identify as sham events. In this communication, Novartis did not qualify its agreement, or raise any objection with respect to potential burdens that might be associated with the production of such documents. In light of this, and the nature of the documents sought, the Government was left with the impression that back-up documentation were stored in in

---

[2] To avoid burdening the court with voluminous exhibits, the Government has produced only the email cited as an exhibit while redacting previous emails in the thread.

7

one or more central repositories within Novartis, and were therefore not difficult to access.

**The April 3, 2015 Email and Meet and Confer**

10. The parties agreed to meet on April 3, 2015. Shortly before the parties' scheduled meeting, Novartis sent the Government an email outlining a unilateral protocol that Novartis had already begun implementing "to identify and collect documents located at NPC's headquarters that are responsive . . . to certain of the Government's pending document requests." Novartis attached a list of eighteen custodians from Novartis headquarters and the search strings that it had already begun running on those custodians' files. Novartis had not previously mentioned this protocol to the Government or given the Government an opportunity to negotiate its terms.

11. A few hours later, at the meet and confer, the parties again addressed the three types of discovery the parties had been negotiating since February: the Speaker Program and IMS Data, the back-up documentation, and the ESI custodian searches.

    a. With regard to the Speaker Program and IMS Data, the parties continued to try to negotiate the applicable date ranges.

    b. As to the back-up documentation, although the parties had already agreed that Novartis would produce back-up documentation for events designated by the Government as sham events, the Government proposed that it would not seek back-up documentation for any events that were the subject of a prior settlement between Novartis and the United States, in exchange for Novartis's agreement to produce the Speaker Program and IMS Data for 2001 through 2014.

    c. With regard to the ESI custodian searches, to accommodate Novartis's claims of burden, the Government agreed to Novartis's proposed approach of identifying sales force custodians based on the sham events they organized, rather than the

8

Government's preferred approach of using doctors to identify custodians. The parties agreed that Novartis would identify the sales representatives and sales managers associated with the events listed in the Amended Complaint, and the parties would use those potential custodians as a starting point for negotiating what the total number of sales force custodians to be used in ESI custodian searches.

12. On April 22, 2015, Novartis rejected the Government's April 3 compromise and reiterated its position that it would not produce Speaker Program Data for the time period sought by the Government.

**The Government's May 8, 2015 Email and Novartis's Response**

13. On May 8, 2015, the Government again addressed, among other discovery issues, Novartis's proposed protocol for conducting ESI searches of Novartis headquarters custodians and the identification of sales force custodians. With regard to the latter issue, the Government noted that it agreed to use specific events to identify sales force custodians, "in an effort to accommodate the burden arguments [Novartis] put forward regarding the use of health care providers as the method for identifying sales representative custodians" despite the fact that it was "not [the Government's] preferred method of identifying sales representative and sales manager custodians." The Government proposed that the parties agree to a total number of 300 sales representative custodians, and the Government agreed to provide Novartis with a list of events that would be used to identify the associated sales representatives.

14. On June 16, 2015, Novartis "tentatively" agreed to the Government's proposal of using certain events the Government identified as shams to choose 300 sales representative custodians, and to designate the managers who supervised those sales representative custodians as sales manager custodians. Novartis conditioned its agreement on a number of factors, including that the searches would be targeted to capture documents concerning the specific event

9

in question using a unique search string for each sham event that consisted of terms like Novartis's unique Event ID number and the last name of each doctor invited to attend the event.

**The Government Seeks a Court Order Compelling the Production of the Speaker Program and IMS Data**

15. On June 19, 2015, the Government filed a pre-motion conference letter requesting a conference in connection with an anticipated motion to compel the Speaker Program and IMS Data that it had requested. (ECF No. 126.)

16. On July 29, 2015, the Court ordered Novartis to produce such Speaker Program and IMS Data "as to all ten drugs at issue in this case for the time period between January 1, 2002 and November 30, 2011." (ECF No. 130 at 9.)

17. The Government did not receive any of the Speaker Program data that Novartis was ordered to produce until September 9, 2015. The Government received the IMS data in November 2015.

**The Parties' Continued Negotiations and Final Resolution of the ESI Sales Force Protocol**

18. On July 15, 2015, the Government sent Novartis an email responding to several outstanding discovery issues. With regard to the sales force ESI protocol, the Government informed Novartis that it would not agree to limit searches in the files of sales representatives and managers to searches for information regarding particular events ("event-specific" searches). The Government made clear that its "interest in [the sales force] records goes beyond documents specifically concerning the limited number of events that we are using to identify a potential custodian group."

19. In response to a request for further clarification of the Government's position with respect to ESI searches from sales force custodians, the Government stated on July 20, 2015, that, while it was interested in documents found in the sales force custodians' files that related to

specific sham events—including emails between Novartis employees regarding those specific events—it also sought documents in those files regarding Novartis's speaker programs generally (through "general" searches).  The Government also noted that while it was not seeking event-specific information for all events organized by a particular custodian, it was entitled to information regarding sham events organized (or supervised) by particular custodians, and that it would negotiate appropriate search terms with Novartis to obtain event-specific documents.

20. In July 2015, the parties agreed on the general parameters of the sales force ESI protocol.  First, the parties reached an agreement on the process for identifying the relevant custodians.  The Government would provide an initial list of events to Novartis, which Novartis would use to identify the associated sales representatives and their managers until the process yielded 300 distinct sales representatives.  Second, Novartis agreed that it would conduct two separate types of searches in the files of sales force custodians identified through this process, "general" searches and "event-specific" searches concerning the sham events organized or supervised by those custodians.

21. A true and correct copy of the list of the search string that the parties agreed would be used to conduct the general searches for the sales force custodians is attached as Exhibit E.

22. The event-specific searches would be conducted for each of the sham events associated with that sales representative, as identified to Novartis by the Government, and would include the following search strings: "(1) the speaker program Event ID; (2) the last name of the speaker program speaker; (3) the last name of every HCP [health care practitioner] invited to attend the speaker program, as reflected on the 'participant tab' in the Reports Central data, whether or not that HCP actually attended the event (*i.e.*, including those HCPs listed as 'no

11

show,' 'declined' and 'invited'); (4) a search term [to be agreed upon, which will be] derived from the title of the speaker program topic to be presented; (5) the name of the venue where the event was held; (6) the Covered Drug(s) to be discussed at the event within three words of the term 'program' or 'event'; and (7) the term (('speaker' or 'dinner') w/5 (program))."

23.     Subsequently, because Novartis argued that test runs of the agreed-upon "general" searches strings were capturing many millions of responsive documents, the Government agreed to reduce the number of proposed sales representative custodians to 250.

24.     On December 29, 2015, the Government responded to Novartis's complaints that the general searches of the 250 sales force custodians would yield too many potentially responsive documents. The Government stated that, in light of the scope of the case and the narrowness of its proposed search strings, its proposal was reasonable, but, "so that document discovery can be completed forthwith, we will agree to reduce the number of previously agreed-upon sales representative custodians from 250 to 150," a drastic reduction expected to nearly halve the number of documents the Government would receive from the sales force discovery.

**The Government's October 21, 2015 Email Explicitly States Its Understanding that Back-Up Documents Are to Be Separately Produced**

25.     At the same time as the parties were negotiating the protocol for the Novartis sales force, the parties were also continuing discussions regarding searches of headquarters custodians. After three rounds of running hit reports using different proposed search strings, the Government reluctantly proposed, in October 21, 2015, that the parties eliminate entirely three search strings previously proposed by the Government (numbers 4, 5, and 6).[3] The Government explicitly noted that its proposal to eliminate two of the search strings was "conditioned upon our

---

[3] In its October 21 email, the Government inadvertently referred to search string 4, 5, and 6. The Government intended instead to propose eliminating search strings 2, 3, and 4. In its next proposal of search strings to be applied to headquarters custodians, the Government proposed to eliminate the correct search strings (2, 3, and 4).

understanding that, as to any events that the government identifies as a potential sham event, the parties have already agreed that Novartis will provide the Government with the backup data for such event, which will include the presentation slides and sign-in sheets." A true and correct copy of that email is attached hereto as Exhibit F.

26. On November 3, 2015, Novartis replied by email and objected to the Government's revised search strings and asked that the Government consider adopting Novartis's proposed search strings. Novartis did not dispute or otherwise respond to the Government's representation that the parties had already agreed that Novartis would provide the back-up documentation.

27. In a fifth attempt to address Novartis's burden concerns, on November 4, 2015, the Government proposed eliminating a different set of search strings (2, 3, and 4, while retaining search strings 5 and 6), calculating that this would result in a reduction of approximately 450,000 hits. Cutting search strings 3 and 4, which requested documents related to the slide decks, handouts, invitations, and sign-in sheets used at events, was consistent with the Government's expectation, stated in its October 21, 2015 email, and not disputed by Novartis in its response, that the Government would be provided with these materials for all sham events consistent with its prior agreement with Novartis.

28. On December 23, 2015, the Government argued in an email to Novartis that the search strings in the Government's November 4 proposal were reasonable, particularly as they yielded only approximately 100,000 more hits against the sample set than Novartis's own proposal for electronic searches did. The Government noted that to achieve this result it "has agreed to eliminate entirely search string regarding important issues such as speaker program training, as well as search strings regarding the slide decks and sign-in sheets used at speaker

13

programs for the Subject Drugs." However, as a compromise, the Government agreed to eliminate an additional entire search string from its November 4 proposal, to reduce the burden to Novartis even further. On January 11, 2016, the parties reached agreement with respect to the Government's compromise proposal as to headquarters custodian ESI discovery, *i.e.*, Novartis agreed to search the files of 48 headquarters custodians using the search strings that the Government proposed on December 23.

29. A true and correct copy of the search strings that the parties agreed to use in connection with the ESI searches of the headquarters custodians (but including search strings 1, 2, 3, and 4, which the parties ultimately agreed to delete), is attached as Exhibit G.

**Having Finally Received and Processed the Speaker Program Data, the Government Provides Novartis with Its List of Sham Events**

30. Having received eight years' worth of Speaker Program Data from Novartis in September, the Government reviewed the information to identify sham events. On November 27, 2015, the Government sent Novartis a list of 79,236 events it alleged to be shams.

31. On December 23, 2015, the Government sent an email to Novartis noting that Novartis was obligated to provide the back-up documentation for each of the sham events the Government had identified, based on the parties' previous agreement. A true and correct copy of that email is attached hereto as Exhibit H.

32. Novartis responded on January 11, 2016, expressing concern regarding the Government's request for "back-up materials" for more than 79,000 events, which Novartis claimed "was never part of the parties' agreed-upon discovery protocol."

33. On January 12, 2016, the Government responded that it was "confused by [Novartis's] assertion that the parties had not agreed to a discovery protocol regarding the back-up documentation for speaker programs. This issue was discussed in our first meet and confer

back in February 2015, at which time Novartis objected to the Government's document requests to the extent they sought back-up data for all Novartis speaker programs relating to the Covered Drugs. Novartis proposed instead that back-up data would be provided only for a subset of specified events to be identified by the Government. [The Government] agreed to this protocol in an email sent on . . . March 6, 2015, and this agreement was confirmed in [Novartis's] responsive email of March 18, 2015."

34. On January 21, 2016, Novartis wrote that it was "not categorically refusing to respond to [the back-up documentation] request" but would provide the Government with a response the following week.

35. On January 29, 2016, Novartis provided its first substantive response to the Government's December 29, 2016 request for the back-up documentation. A true and correct copy of that email is attached hereto as Exhibit I.

36. In that email, Novartis stated its position that it was absolved from searching outside of sales force and headquarters employees' files by the parties' negotiation of protocols for performing searches on those files: "[a]t no point during the negotiation of that protocol did the Government ever mention that the documents to be produced pursuant thereto would constitute only a part of the discovery that NPC was expected to provide—or mention that the balance would involve NPC providing back-up information for over 79,000 events." It then proposed the following:

> a. Novartis agreed to produce the receipts, attendance documentation sheets, and event invitations associated with each event that took place after 2008, which Novartis stated are stored in a central database.

15

  b. As to events that took place before 2008, Novartis stated that "[b]ecause [it] used multiple vendors to process receipts during this time period, [it] would have to search in multiple locations" including in files in its possession from its many vendors and in the files of some of its sales representatives.  Novartis agreed to produce receipts in its possession from two of its vendors.  As to the first vendor, its receipts are on several CDs (but are not internally ordered by event ID numbers), and Novartis stated that it is "investigating the best way to produce these materials to you."  As to receipts from the second vendor, it stated, "we are still working to determine how best to produce" those receipts.

  c. As to all other documentation for pre-2008 events, Novartis stated that "[w]e are already searching for attendance documentation sheets and event invitations in the email files of those specific NPC sales representatives identified as part of the event-specific discovery protocol" and that it would not search sales representatives' files for such documentation "in part because we currently understand that, during much (if not all) of this pre-2008 time period, attendance documentation sheets were generally not required.  Similarly, there was no policy requiring the use of formal event invitations (let alone that such invitations be maintained)."

  d. As to speaker program slide decks Novartis agreed to "conduct an organizational search of NPC headquarters for all speaker program slide decks for subject drugs that were used during the relevant time period . . . and produce those materials to you."

  e. As to documents concerning speaker program violations, Novartis noted that it had previously produced "an export of an NPC database, showing alleged

16

violations that occurred at NPC speaker programs" and would use that export "to locate alleged violations that occurred at speaker programs for subject drugs, and produce . . . the reports of investigations and final dispositions related to those alleged incidents."

37.     On February 2, 2016, the Government sent an email making clear that the parties had agreed at the beginning of discovery that the Government would receive the back-up documentation as to all of the events at issue in the case. The Government pointed out that this agreement "was reached separate and apart from the negotiated protocols regarding e-discovery, which is to be obtained from an extremely limited subset of sales representatives and other custodians." The Government agreed to Novartis's proposal as to slide decks, "so long as it obtains a copy of each slide deck that was purportedly shown at any of the speaker programs at issue in this case" and the same as to the printed materials purportedly distributed at roundtable events.

38.     On February 9, 2016, Novartis responded to the Government's request for back-up documentation and stated its position that "the vast majority of the back-up information was to be located through the event-specific discovery protocol." According to Novartis, the emails exchanged by the parties at the beginning of discovery "reflect the parties' general agreement leading into negotiation of the protocol that the Government would 'identify the specific events for which back-up materials would be produced,' provided that the number of events was workable." Novartis also stated that to respond to the Government's request for back-up information for the 79,236 events would require searching the email files of more than 5,000 sales representatives. Novartis then stated that it was withdrawing its January 29 compromise and would not provide "any additional 'back-up information' for the 79,236 events" and would raise the issue with the Court if the Government did not withdraw its request.

39.     On February 16, 2016, Novartis emailed the Government and reiterated its position that it had withdrawn its January 29 compromise and would not provide "any back-up documentation (or other discovery, for that matter) for events falling outside the protocol."  A true and correct copy of that email is attached hereto as Exhibit J.  To account for the fact that Novartis had recently (and for the first time) informed the Government that much of the back-up documentation existed in databases outside of these custodians' files (and thus could not have been captured by the ESI protocols even if that was their purpose), Novartis stated that "based on what we have learned as discovery has continued, we now believe that receipts are better found in the Gelco and Acclaris [vendors] files that we previously described to you.  Consequently, for each of the pre-2008 events that you identify pursuant to the parties' event-specific discovery protocol, we will search the Gelco and Acclaris files for . . . the expense reports and receipts belonging to the sales representative who likely organized that event.  For post-2008 events [for which back-up documentation are in a central database] we will . . . produce to you whatever back-up materials . . . reside in that database for each event."  "To be clear, we will do that only for the events that are covered by the parties' event-specific discovery protocol."

40.     On February 26, 2016, the Government informed Novartis that it was formulating a compromise in an effort to settle the parties' dispute over the back-up documentation.  On March 11, 2016, the Government proposed the following:

   a.     That Novartis produce the following information that the Government understands will be of minimal burden to produce:  the back-up documentation for post-2007 events that exist in the central database Novartis has referenced; any copies of presentation materials (slide decks or roundtable handouts) that Novartis located by doing an organizational search of its headquarters as Novartis proposed on January 29;

accounting or financial documents sufficient to identify the amount and date of honoraria paid to doctors in connection with events on the Covered Drugs during the relevant period; the CDs from Novartis's vendors that it previously mentioned to the Government (which need not be organized, just produced in its current form); and any reports of investigations and final dispositions related to speaker program event violations that Novartis locates pursuant to the process it described in its January 29 email.

      b.      In addition, Novartis would either (1) agree to enter into a stipulation as to the event-specific information reflected in the Novartis's Speaker Program Data or (2) provide back-up documentation for 25,000 additional events.

      c.      The Government also made clear that its proposal was "contingent on [Novartis's] agreement that Novartis will not rely upon any internal Novartis event-specific documents beyond those that the parties agree will be produced in response to the Government's discovery requests."

41.    On March 22, 2016, Novartis rejected the Government's compromise proposal and informed the Government that it intended to move for a protective order. Novartis filed its pre-motion letter later that day. (ECF No. 141.)

42.    On March 31, 2016, Novartis, in response to the Government's inquiry as to whether it was Novartis's position that it was under no obligation to search it files for documents responsive to the Government's discovery requests except for the files of the custodians the parties had identified pursuant to their two ESI custodian protocols, informed the Government it "is willing—where appropriate—to be flexible about the application of the parties' agreed-upon discovery protocol, so long as we remain within the bounds of that agreement" and noted that "as discovery has progressed in this matter, we have come to understand that there are better

repositories of event receipts than the email files of the sales representatives." Novartis also informed the Government that it would provide the personnel files "which may contain information responsive to the Government's First Document Requests Nos. 2 and 4-5" for each sales force custodian identified through the parties' sales force custodian ESI protocol.

      I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 18, 2016
       New York, New York

                        *s/ Mónica P. Folch*
                        MÓNICA P. FOLCH
                        Assistant United States Attorney
                        86 Chambers St., 3rd Floor
                        New York, NY 10007
                        Telephone:  (212) 637-2663
                        Email:  monica.folch@usdoj.gov