# EXHIBIT 13

**Page 1**

```
 1   UNITED STATES DISTRICT COURT
 2   SOUTHERN DISTRICT OF NEW YORK
 3   ----------------------------------x
 4   UNITED STATES OF AMERICA, the States
 5   of CALIFORNIA, COLORADO, CONNECTICUT,
 6   DELAWARE, FLORIDA, GEORGIA, HAWAII,
 7   ILLINOIS, INDIANA, IOWA, LOUISIANA,      Case Number
 8   MASSACHUSETTS, MICHIGAN, MINNESOTA,      11 Civ. 0071 (PGG)
 9   MONTANA, NEVADA, NEW HAMPSHIRE,
10   NEW JERSEY, NEW MEXICO, NEW YORK,
11   NORTH CAROLINA, OKLAHOMA, RHODE ISLAND,
12   TENNESSEE, TEXAS, VIRGINIA, WASHINGTON
13   and WISCONSIN; the DISTRICT OF COLUMBIA,
14   the CITY OF CHICAGO and ex rel. OSWALD
15   BILOTTA,
16         Plaintiffs and Relator,
17       -against-
18   NOVARTIS PHARMACEUTICALS CORPORATION,
19         Defendant.
20   ----------------------------------x
21         November 29, 2016, 9:38 a.m.
22         Deposition of DAVID HOLLASCH
23             lipka.com, inc.
24              888.lipka.com
25           transcripts@lipka.com
```

**Page 2**

```
 1   A P P E A R A N C E S:
 2
 3   U.S DEPARTMENT OF JUSTICE
 4   U.S. ATTORNEY'S OFFICE
 5   SOUTHERN DISTRICT OF NEW YORK
 6   Attorneys for Plaintiff
 7       86 Chambers Street
 8       New York, New York 10007
 9   BY: JENNIFER JUDE, ESQ.
10
11   SHEPHERD FINKELMAN MILLER & SHAH, LLP.
12   Attorneys for Relator, Oswald Bilotta
13       65 Main Street
14       Chester, Connecticut 06412
15   BY: EMILY C. FINESTONE, ESQ.
16
17   CRAVATH SWAINE & MOORE, LLP.
18   Attorneys for Defendant and the Witness
19       Worldwide Plaza
20       825 Eighth Avenue
21       New York, New York 10019-7475
22   BY: BENJAMIN GRUENSTEIN, ESQ.
23       KIMBERLY M. JEFFERS, ESQ.
24
25
```

**Page 3**

```
 1   A P P E A R A N C E S (Continued):
 2
 3   SKADDEN ARPS SLATE MEAGHER & FLOM, LLP.
 4   Attorneys for the Witness
 5       4 Times Square
 6       New York, New York 10036
 7   BY: STEVEN R. GLASER, ESQ.
 8       YOOSUN KOH, ESQ.
 9
10
11
12
13   ALSO PRESENT:
14   SARA M. ZAUSMER, ESQ. Novartis Services, Inc.
15   JOE BARRION, Videographer
```

**Page 4**

```
 1                November 29, 2016
 2                New York, New York
 3                      ---
 4            THE VIDEOGRAPHER: Good
 5   morning. Today's date is November 29, 2016.
 6   The time is exactly 9:38 a.m.
 7            My name is Joe Barrion, I'm a
 8   videographer representing the court reporting
 9   firm lipka.com, incorporated. Your court
10   reporter today is Frank Bas, who is also
11   representing lipka.com.
12            The case before us today is
13   the United States of America, et al.,
14   versus Novartis Pharmaceuticals Corporation,
15   filed in the United States District Court,
16   Southern District of New York, Case No. 11
17   Civ. 0071(PGG).
18            The witness today is David
19   Hollasch.
20            Will counsel please identify
21   yourselves and state whom you represent?
22            MS. JUDE: Jennifer Jude from
23   the U.S. Attorney's Office for the United
24   States.
25            MR. GLASER: Steven Glaser and
```

**Page 5**

1   Yoosun Koh from Skadden Arps Slate Meagher
2   & Flom, LLP., on behalf of Mr. Hollasch.
3           MR. GRUENSTEIN: Benjamin
4   Gruenstein of Cravath Swaine & Moore for
5   Novartis.
6           MS. JEFFERS: Kimberly Jeffers
7   from Cravath Swaine & Moore.
8           MS. ZAUSMER: Sara Zausmer,
9   Novartis Services Inc.
10          MS. FINESTONE: Emily Finestone
11  from Shepherd Finkelman Miller & Shah on
12  behalf of the Relator.
13          MR. GLASER: Jen, just before
14  we start I want to put on the record the
15  agreement that we had that in order to comply
16  with the seven-hour limit you are going to
17  take five hours and 50 minutes or less, I'll
18  then take up to an hour, and then you'll have
19  ten minutes for redirect.
20          MS. JUDE: Thank you.
21          THE VIDEOGRAPHER: Will the
22  court reporter please swear in the witness?
23              _ _ _
24  D A V I D   H O L L A S C H,
25  called as a witness, having been first duly

**Page 6**

1   sworn, was examined and testified
2   as follows:
3   EXAMINATION BY
4   MS. JUDE:
5       Q.  Good morning. Please state
6   your name and home address for the record.
7       A.  My name is David Hollasch. I
8   live at 19 Holecomb Drive in Hillsborough,
9   New Jersey.
10      Q.  Good morning, Mr. Hollasch.
11      A.  Good morning.
12      Q.  This is the first time we've
13  met, is that correct?
14      A.  That is correct.
15      Q.  My name is Jen Jude, I am an
16  Assistant U.S. Attorney at the U.S. Attorney's
17  Office for the Southern District of New York,
18  and I represent the United States in this
19  lawsuit that we've brought against Novartis
20  Pharmaceuticals Corporation.
21          During today's deposition I am
22  going to be asking you a series of questions
23  which you are required to answer under oath.
24  But before we get to those I am going to go
25  over a few ground rules for deposition.

**Page 7**

1           DAVID HOLLASCH
2       A.  Okay.
3       Q.  So, as you can see, the court
4   reporter is taking down everything that you
5   and I say, so I ask that to make his job
6   easier you wait until I finish the end of my
7   question before you start the beginning of
8   your answer. Sometimes people anticipate what
9   I am going to say and start answering earlier,
10  but just so he can have a clean record try to
11  leave a pause there in between my questions
12  and your answers. Okay?
13      A.  Sure.
14      Q.  Okay. And please also give a
15  verbal response to every question, because he
16  can't take down like head nods and shakes of
17  the head.
18      A.  Okay.
19      Q.  Okay. If at any time you don't
20  understand one of my questions let me know
21  that you don't understand it and I will
22  rephrase it, but if you answer it I am going
23  to assume that you did understand it. Okay?
24      A.  Okay.
25      Q.  And if you want to take a break

**Page 8**

1           DAVID HOLLASCH
2   at any time just let me know, we'll go off the
3   record. I just ask that you wait until you
4   answer the question that's pending before we
5   take a break.
6       A.  Okay.
7       Q.  Okay. Great. Is there any
8   reason why you believe you may not be able to
9   respond fully and truthfully to the questions
10  that I pose to you today?
11      A.  No.
12      Q.  Have you ever been deposed
13  before?
14      A.  No.
15      Q.  Have you ever given testimony
16  in court before?
17      A.  No.
18      Q.  What did you do to prepare for
19  today's deposition?
20      A.  Just had a, two days of
21  meetings with my counsel.
22      Q.  Which days were those?
23      A.  Yesterday, and I would have to
24  check the calendar for the other day.
25      Q.  Approximately how long ago?

DAVID HOLLASCH

Q. So Mr. Hollasch, the bottom email, the last one in this exhibit, is an email from you to Cynthia Cetani, Beth Margerison and Marty Putenis, cc'ing Natasha Nelson, from March 11, 2009. And the subject is "Out of Office Program Attendees." And in this email you reference "our speaker program audits." Is that a reference to the 2008 audit of speaker programs?

A. Yes.

Q. And you say: "Many attendees did not indicate any degree, specialty or address, and they will be followed up on as well. Several of the auditors noted apparent family members of the speaker in attendance and the sign-in sheets for those programs did reveal a few attendees who clearly are non-HCPS."

Does that describe the results of the 2008 audit?

A. Yes.

Q. And below that you wrote: "Natasha and I believe the policy should clearly state that non-HCPs should be

Page 165

DAVID HOLLASCH

prohibited from attending speaker programs and sales representatives should be provided guidance on how to handle the issue when a speaker brings his spouse or office manager to a program."

Why did you come to that conclusion?

A. Because there's no purpose, or there's no reason why they should be at the program. The program is geared to educate health care professionals about the product and how to use it, you know, in treating patients, and if you're not an HCP, what's the point of you coming to the program.

Q. Do you see the bottom paragraph, where you wrote: "I will be following up today by sending the file of all the potential attendees at speaker programs who appear to be non-HCPs to Niral for Concerto lookup and I will let you know the extent of this issue."

A. Right.

Q. Do you know what the extent of that issue was?

Page 166

DAVID HOLLASCH

A. I mean, off the top of my head, no. I mean, I sent it to Niral so he could go through and look up all of these people in Concerto and see if they had a profile for them. Because a lot of these people, I mean, we could do some of that, and we tried doing that during the audit, but if, you know, say Dr. Jim Johnson brings Nancy Johnson to a program, I mean, there's plenty of Nancy Johnsons in the metropolitan area so I wouldn't assume. I guess we sent this list to Niral so he could say if there was, in fact, a contact already established in Concerto for Nancy Johnson.

Q. Do you see the email above the response from Mr. Putenis where he writes: "I agree that we need to tighten things here, but the solution is not so simple"?

A. Right.

Q. Do you remember having any back and forth with Mr. Putenis or others about the non-legitimate attendee issue at speaker programs?

A. Yes. I mean, I recall Marty,

Page 167

DAVID HOLLASCH

you know -- Marty was -- Marty was tough on -- any time we tried to make change, you know, he was always hesitant, resistant. You know, just one of those people, I guess, who didn't like change or whatever reason. But, you know, I tried to -- to me, I mean, it was pretty simple. Right? There are people that should be there to learn or people who shouldn't be there. The question that I agree with him that's not simple is you have a program and then you're trying to decide which HCP is appropriate to go to that program. That I could agree with him. That's not so simple.

Q. Was there any change to the controls, system controls in place as they related to legitimate or non-legitimate attendees at speaker programs while you were at Novartis?

A. Yes. Eventually there was a change to -- to, if I remember right, a couple of process-related changes.

So one, there was what was called an HCP matrix or degree matrix or

Page 168

## Page 241

1  DAVID HOLLASCH
2  A. Right.
3  Q. And it appears that she
4  suggests that it be added, the sentence,
5  "'Ethics & Compliance policy requires that
6  meals associated with interactions with
7  physicians be provided on an occasional basis,
8  and as such, frequent participation by these
9  same attendees should be reviewed.'"
10  A. Okay. I'm sorry. I've just
11  been flipping back and forth. So I'm looking
12  at the dashboard again. I just want to make
13  sure it's -- so this is looking at -- and
14  you're right -- this is looking at speaker
15  event attendance. Your question again is?
16  Q. Yeah. Do you agree with her,
17  this portion of her email that her addition
18  that "'Ethics & Compliance policy requires
19  that meals associated with interactions with
20  physicians be provided on an occasional basis,
21  and as such, frequent participation by the
22  same attendees should be reviewed,'"
23  presumably by the FLMs?
24  MR. GRUENSTEIN: Objection.
25  A. I mean, I think her -- I look

## Page 242

1  DAVID HOLLASCH
2  at the scenario check and the question there,
3  and I agree with -- I guess her comment is, I
4  think, asking for greater clarification in the
5  edit to that, about how many people you're
6  checking to look for. Right? It says check
7  if the same speaker and/or participants are
8  attending repeatedly. And I'm not sure if
9  she's trying to say give them a number of how
10  frequent, or -- I mean, she doesn't reference
11  a number, but how frequent. I mean, I think
12  this goes back to the comment I made earlier
13  about occasional or a frequency. I mean,
14  there has to be a number or something attached
15  to that, that can be measured.
16  Q. Was there any number in
17  Novartis's policies provided for frequency
18  with which an HCP could attend an event?
19  A. I mean, first, I don't believe
20  so. And then I think ultimately there was a
21  number that was agreed upon, but I can't
22  remember if that number was per year or per
23  therapeutic area or per product.
24  Q. Do you agree that frequency of
25  attendance of an event is something that

## Page 243

1  DAVID HOLLASCH
2  should be reviewed by either someone in
3  compliance or a first-line manager?
4  MR. GRUENSTEIN: Objection.
5  A. Yes, I agree it should be
6  reviewed. Because the point is they're
7  supposed to go there and learn about an event,
8  and for them to go more than -- for them to go
9  to an excessive number of programs is
10  inappropriate.
11  Q. And how would you define
12  "excessive"?
13  MR. GRUENSTEIN: Objection.
14  A. Again, you have to define the
15  criteria. Is it excessive per therapeutic
16  area or per product? I mean, I know from my
17  own experiences, in talking with speakers,
18  talking with HCPs at programs, sometimes they
19  like to go to a program, the same program with
20  a different speaker who might have a different
21  outlook on the product. It might be a better
22  presenter. Sometimes they go to a
23  presentation and they have a poor presenter of
24  the materials. Right? And maybe they say,
25  oh, this person's a renowned or a known, I

## Page 244

1  DAVID HOLLASCH
2  don't want to say expert in the field, but a
3  much greater known speaker. And they say,
4  well, let me see if I can learn from this
5  speaker. He may go to a more prestigious --
6  or he may work at a more prestigious hospital
7  or clinic, or whatever the case may be.
8  Q. Do you think that there should
9  be a limit on the number of times an HCP can
10  attend the same program with a different
11  speaker every time?
12  MR. GRUENSTEIN: Objection.
13  A. I think there should be -- me
14  personally, I think there should be a limit on
15  the number of times an HCP goes to the same
16  program per year. Because if I want to go to
17  a program in February and then I want to go to
18  another program on the same topic in November,
19  I might have forgotten about it, or I might
20  not have used it. I might say maybe I want to
21  learn about that again. I don't think there's
22  an issue with that.
23  But if I want to go to a
24  program, the same program every month and I'm
25  an HCP, the rep should say I'm not going to --

**Page 261**

1           DAVID HOLLASCH
2    give you another document to be marked as the
3    next exhibit, Hollasch Exhibit 13.
4                ---
5           (Exhibit Hollasch GX-13, Email
6    chain, Bates NPCLSV_LIT001574885 through 4887
7    was marked for identification)
8                ---
9    BY MS. JUDE:
10       Q.   And this starts with 001574885
11   through 4886 with an Excel spreadsheet
12   attached, which is 4887.
13           And do you remember conducting
14   a series of audits in Tampa, Florida?
15       A.   I recall doing -- I conducted
16   one speaker program audit in Tampa and a
17   number of -- or two -- two interviews the
18   following day.  It was related to an
19   investigation of Dr. Serrano and some of the
20   sales representatives who had hosted speaker
21   programs of his or had called upon him during
22   their sales activities.
23       Q.   And what do you recall about
24   the audit of his speaker program in Tampa?
25       A.   So it was a speaker program

**Page 262**

1            DAVID HOLLASCH
2    audit that we did not give advance notice to,
3    it was done by myself and another member of
4    the ethics and compliance department.  His
5    name was Rich Eschle.  And so we went to the
6    venues, and Rich and I, you know, I took the
7    lead, and Rich accompanied me.  I went to the
8    hostess and I asked what was the private room
9    that Novartis had for this night for the
10   speaker program, and the hostess says -- you
11   know, she checked.
12           She said, I don't have a
13   private room for you.
14           And I said, well, do you know
15   who the representative is and, you know, where
16   are they sitting.
17           She said, sure, I'll take you
18   over there.
19           I said, no, just tell me where
20   he is, if you could just, you know -- and my
21   back was to the room.  I said, can you just
22   give us a general idea of where he is and
23   where he's sitting.
24           As she said it, Rich could look
25   and, you know -- so we saw who it was.  And

**Page 263**

1            DAVID HOLLASCH
2    then we thanked her.  Then Rich and I went
3    over to the bar and, you know, we sat in the
4    bar area for probably about 15 minutes.  I
5    think the program was set to start, you know,
6    at the top of the hour.  I don't know if it
7    was 7 o'clock or 8 o'clock or whatever.  But
8    Rich and I waited at the bar until about a
9    quarter after.
10           And then we went over to the
11   table and we announced ourselves as, you know,
12   employees from Novartis, and showed them our
13   IDs and said we're here to audit the speaker
14   program.
15           And when we met the
16   participants of the program there was no
17   computers at the table, there were some
18   appetizers at the table, there was drinks at
19   the table, there was Dr. Serrano, his wife,
20   and if I believe right, I think four other HCP
21   attendees.
22           So we stayed for the program.
23   One of the representatives ran out to their
24   car, got their computer, came back in and gave
25   it to Dr. Serrano's wife.  She booted it up,

**Page 264**

1            DAVID HOLLASCH
2    got to the slide deck and then gave him the
3    computer, and then he started his presentation
4    through the materials.
5            The rep sent a sign-in sheet
6    around and, you know, the program.
7    Dr. Serrano went through the slide deck and
8    asked questions and answers.  At the end of
9    the program, you know, we talked to the
10   representatives and then left.
11       Q.   So is it your opinion that your
12   presence at the speaker program was the reason
13   that there was an educational presentation
14   that was presented later on that night?
15           MR. GRUENSTEIN:  Objection.
16       A.   I mean, in my opinion there
17   clearly was no intent to have a discussion.
18   From the time they sat down until the time
19   that we announced ourselves there was no
20   computers, there was no slide decks, there was
21   no -- the food with the meal had already been
22   started to serve.  I mean, the program was
23   scheduled to start at 7 p.m.  It was already a
24   quarter after -- 7 or 8, I can't remember, and
25   it was already 15 minutes into it, and usually

DAVID HOLLASCH

these programs, you know, they start on time, or start shortly thereafter.

But usually the first thing, you go into a program, speakers are usually one of the first attendees, goes early, sets up all the -- you know, the host representative may be there, put out some prescribing information pamphlets on the table. You know that the program is going to occur.

Q. Besides this audit of Dr. Serrano's dinner in Tampa, did you conduct any other surprise audits while you were at Novartis?

A. No.

Q. On GX-13, in Rebecca Miller's email on the bottom of the first page she writes: "David, I have filled out your spreadsheet for 2009 for the speaker. I have the HCPs that only attended once hidden, as well as the cancelled programs. I plan on taking a look at 2008 next, but let me know if you would like me to look at anything else first."

Page 265

DAVID HOLLASCH

And she writes, "Observations so far. Out of 34 programs in 2009," and then there's a list of several attendees' names with the number of times that they attended programs of Dr. Serrano's --

A. Right.

Q. -- which seems to reflect the results and the attached spreadsheet. Did you direct Ms. Miller to perform this analysis?

A. Yes.

Q. And why did you do that?

A. I mean, this was -- I can't recall -- I can't recall exactly how this investigation with Dr. Serrano started. I'm not sure if Natasha said to me, hey, pull all of the speaker programs for this doctor and, you know, let's analyze that. I do know at one point in time I was asked to pull all of the speaker programs in the data and start looking at it, and I had started doing that, and then I was told to stop it, and, you know, just the direction was don't worry about it -- don't do any more work on it. You know, let's

Page 266

DAVID HOLLASCH

just move on to other things.

And then it was months later, probably -- I mean, I'm guessing probably maybe eight, nine months later, it was like, you know that investigation we started on Dr. Serrano, we need to start that up again, and that's high priority, we need to get it done as soon as possible.

Q. Do you know the cause of that delay of --

A. No, I don't.

Q. And why did you ask Ms. Miller to count the number of times that these particular individuals attended Dr. Serrano's programs?

A. I think when I first started looking at the first couple of programs for him I saw there were similar attendees at all of the programs. So that was one of the things I wanted to look at: Out of how many programs we had, how many of the same people went to those programs.

Q. And why did you want to look at whether the same people went to Dr. Serrano's

Page 267

DAVID HOLLASCH

programs multiple times?

A. I mean, I thought it was a risk, or certainly an inappropriate, to me, activity for someone to go to 25 out of 34 programs that the same speaker held.

Q. Did you draw any conclusion about the appropriateness of Dr. Serrano's programs from the observations that Rebecca Miller put in her email?

MR. GRUENSTEIN: Objection; vague.

A. No, I didn't draw any conclusions other than that, you know, the attendees -- the pattern of attendees looked highly unusual.

Q. The spreadsheet that's attached, do you know where Ms. Miller got the data about these events that she input into the spreadsheet?

A. Yes. The data she got was all from AHM. I think I started this spreadsheet based upon exporting the data from AHM, and then most of these column headings I probably created -- I mean, they were part of what

Page 268

**David Hollasch**

11/29/2016          Volume I

---

**Page 305**

```
 1              DAVID HOLLASCH
 2   they do it.  And one of the key things, you
 3   know, you do a walk-through of a process and
 4   take a transaction and walk it through the
 5   system, how it's processed, how it's recorded,
 6   how it's captured.
 7           And one of the things I always
 8   directed them to is, you know:  What are your
 9   thoughts on this?  Do you think it can be done
10   differently, a better way?
11           You know, it gives process
12   owners an opportunity to really vent, or
13   sometimes they have great ideas that get shot
14   down, and sometimes those are ideas that, when
15   heard from an independent party, management's
16   more receptive to, and then you can help push
17   a proposal through that ultimately winds up
18   benefiting the company.
19       Q.   And if the company recognizes
20   that there are ways to improve its policies,
21   let's say, to benefit the company, does that
22   mean that its prior policies were bad?
23           MS. JUDE:  Objection.
24       A.   No.  I mean, to me it doesn't
25   mean they were bad.  You know, policies are
```

---

**Page 306**

```
 1              DAVID HOLLASCH
 2   created at a point in time, and there's always
 3   opportunity for improvement.  You know, it all
 4   depends on who created the policies and how
 5   often they're reviewed.  You might have had
 6   people in charge of policies that, you know,
 7   have tight deadlines, and they do it fast and
 8   then it's done.  Or you might have companies
 9   that spend an excessive amount of time going
10   through, revising policies, and then it's
11   issued, and then because it takes so long to
12   get it changed they decide we're not changing
13   it for another year or two.
14       Q.   After you did the 2008 audit
15   you recognized that there were some areas for
16   improvement, is that correct?
17       A.   Yes.
18       Q.   And how did you recognize that
19   there was that need for improvement?
20       A.   I mean, just through -- through
21   looking at the process, common sense.  You
22   know, sometimes things are not in -- sometimes
23   people aren't given instructions on how to do
24   their jobs, so they do the best they can, but,
25   you know, again, they may be new to -- new to
```

---

**Page 307**

```
 1              DAVID HOLLASCH
 2   the industry, new to their jobs, they might be
 3   right out of school hired and don't know how
 4   to do things yet, and they're trained by
 5   people, and maybe they're not trained
 6   effectively.  You know, you have an
 7   opportunity to help them improve their
 8   performance.
 9       Q.   Would you agree that Novartis's
10   compliance function had experienced compliance
11   personnel when you arrived?
12       A.   Yes.
13       Q.   Did that include Julie Kane?
14       A.   Yes.
15       Q.   Did that include Natasha
16   Nelson-Ling?
17       A.   Yes.
18       Q.   The issues that you identified
19   in the 2008 audit, for example, that not all
20   slides were being read in a speaker program,
21   how were you able to identify that issue when
22   experienced compliance people had not been
23   able to identify it before?
24       A.   Well, I don't think I was the
25   only one who identified that.  I mean, when
```

---

**Page 308**

```
 1              DAVID HOLLASCH
 2   the audit started, it started before I joined
 3   the company.  So I'm sure somebody else had
 4   seen that issue as well.
 5       Q.   But is it fair to say that the
 6   way the company was able to see the issue was
 7   by performing the audit?
 8       A.   Yes.  That's correct.
 9       Q.   Okay.  I want to focus on this
10   issue of not all slides being read at speaker
11   programs for a second.
12           You testified that it was your
13   recommendation that the slide deck should get
14   shorter and that all slides should be read, is
15   that correct?
16       A.   That's correct.
17       Q.   And who within compliance
18   disagreed with that?
19       A.   I mean, I don't think anybody
20   disagreed that the slides were long.  I mean,
21   and it should -- I think the disagreement was
22   about every slide needed to be reviewed or
23   not.  I think there was initial push-back or
24   disagreement from Marty Putenis about, you
25   know, the need to revise the decks as far as
```

### Page 309

DAVID HOLLASCH
what slides need to be presented or not.
Q. And what was your understanding of what Marty's thinking was?
A. I mean, Marty's thinking was, you know, the brand teams and -- the brand teams I think who developed all of the slide decks, and the medical teams, put in there a lot to cover, and as long as the HCPs covered key parts, you know, that was sufficient.
Q. Did you think that Marty was operating in good faith when he made that argument?
A. Yes.
Q. Did you think that Marty was insensitive to compliance concerns when he made that argument?
A. You know, it's hard to judge going back, that happened so long ago, but I do -- I do recall, I thought he was being unreasonable in that I think the requests we made were valid and, you know, were trying to help shorten the slide deck, make it easier for the speaker, make it easier for the attendees and make it easier for everybody.

### Page 310

DAVID HOLLASCH
Why are we getting push-back.
Q. And why did you think Marty was pushing back?
A. He's just one of those people I think that are resistant to change. Maybe it was his decision, you know, about the slide deck and, you know, he didn't feel we were appropriate to challenge his expertise.
Q. The debate that you were having internally about the slide decks, in your mind did that have anything to do with whether Novartis was in compliance with the anti-kickback statute?
A. No.
Q. Did you think Marty was being insensitive to Novartis's compliance with the anti-kickback statute when he was saying, you know, you didn't have to shorten the slides or make the doctors read every slide?
MS. JUDE: Objection; confusing.
A. I mean, related to the slides, I don't think there was any intent of Marty, you know, to violate any kickback statutes or

### Page 311

DAVID HOLLASCH
anything.
Q. You testified that if you looked at the compliance policies in connection with the procedures that the sales reps had, that together it would be, I think your words were more than effective.
Do you remember saying that?
A. Yes.
Q. Tell me what you meant by that.
A. I meant by that, if you're a representative and you're tasked with hosting a program and you want to say, all right, what are the rules and guidelines that I need to follow, and your district manager says, here, here are the compliance policies, read them, and then here's all the documentation related to the speaker program system and the process that's developed by the commercial support organization, read all of that and then talk to me after that, and I'll walk you through how to use the system and how to have a program, I think if the representatives read all of that, I mean, myself, my team read it, we went through, any questions we had we wrote

### Page 312

DAVID HOLLASCH
down, what does this mean, give me clarification, you know, I mean, it was easy for us to decipher what should be done or what shouldn't be done.
Q. In Government Exhibit 3 you were asked a lot of questions about this document, and I'll give you a second to find it.
A. Okay.
Q. The second sentence says: "I feel this way because there has been plenty of evidence to demonstrate that current policies and practices are inadequate."
How does what you're saying here square with what you just said, that the policies and procedures together were more than effective?
A. Because part of any process, right, there's a review, and our processes happen in how they're supposed to be. Here what's inadequate is there was no review of activities that happened. Right? So when we looked at speaker programs and how they're done, right, the control

**Page 317**

           DAVID HOLLASCH
     A.  I'm talking about a control
that at the end of the meal somebody would --
somebody is assigned the responsibility to
review the receipt for reasonableness with
what was consumed.  So if you're the host
representative you know that there's eight
attendees, you know that there's eight
entrTes, you know that there's X amount of
drinks, you know that there should be eight
desserts, eight appetizers, or sometimes
there's appetizer platters, you know, but
within the details, you look at it.
           Like if you're a -- and this is
the direction that we gave to the brand teams,
to the business unit leads.  You know, we're
not trying to turn all the field
representatives into forensic accountants.
We're trying to make it reasonable.  You go
out to dinner with your family, you have four
people.  You make sure there's four entrTes.
You don't pay for seven, right?  The same
thing as when you go out to eat with your
family or your boyfriend, girlfriend, spouse.
The same thing applies when you go out to eat

**Page 318**

           DAVID HOLLASCH
with the company.
     Q.  So this was an issue with the
financial controls?
     A.  Yes.
     Q.  Did you have an understanding
as to why Novartis would want those controls
to be in place?
     A.  Well, when we want to save
money, or any company wants to save money and
not be double-charged, triple-charged or, you
know, billed for items that weren't consumed.
     Q.  And that was your concern as
well?
     A.  Sure.
     Q.  When you were talking about the
2008 audit you said that there was a lack of
basic controls, and the two things that you
mentioned were first this issue of AHM being
the one looking at receipts, and the other
related to sales calls, people I guess keeping
track of their sales calls.  Do you recall
that?
     A.  Right.
           MS. JUDE:  Objection;

**Page 319**

        1  DAVID HOLLASCH
mischaracterizes the testimony.
BY MR. GRUENSTEIN:
     Q.  Did that second issue, sales
calls, did that relate at all to speaker
programs?
     A.  No.  Sales calls and speaker
programs are two different things.
     Q.  Okay.  You testified that there
was push-back when you recommended that
district managers monitor speaker programs
after the 2008 audit.  Do you recall saying
that?
     A.  I recall saying, I don't know
if I used the term monitor, but I said review
the records of their representatives.
     Q.  And who pushed back on that?
     A.  I mean, there was -- I remember
talking about that in meetings, and a lot of
push-back was from many of the attendees
saying, you know, it's never going to fly with
sales.  You know, district managers are
burdened with a lot of work already and this
is just too much to add to that.
     Q.  During those discussions was

**Page 320**

           DAVID HOLLASCH
there any reference to, if we don't do this,
will we not be in compliance with the
anti-kickback statute?
     A.  I don't believe we ever talked
about the anti-kickback statute.  I mean, our
concerns -- I mean, for that objection, my
proposal to handle it was, listen, you know,
they're not reviewing 60 programs a month.
You know, each representative holds, what,
two, three programs a month, maybe the top
performers own five.  And I, said you know
what we're asking them to do?  Pull the
receipt, pull the sign-in sheet.  Look at the
two.  Are they reasonable -- or do they match.
Go through number of attendees, number of
entrTes.  Is there bottles of wine or, you
know, 70, $80 bottles of wine that might be
perceived as lavish.  Things like that.  We
said it's not, again, turning you into
forensic accountants.  It's a quick
reasonableness check.
     Q.  And again --
     A.  I said if you spend ten minutes
per program, that would be a lot.