# EXHIBIT 19

# MiniScript

of the deposition of

## Natalie Nelson-Ling
(Volume I)

Taken October 21, 2016

in the matter

United States of America; the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, Washington and Wisconsin; the District of Columbia, the City of Chicago and ex rel. Oswald Bilotta,

v

**Novartis Pharmaceuticals Corporation**
Case Number: 11 CIV 0071 (PGG)



lipka.com inc.

Offices in Manhattan, Washington, D.C., Atlanta, New Orleans, Chicago, San Diego, Los Angeles, San Francisco, Portland, Seattle
Depositions Covered All Points In Between!

888.lipka.com
866.lipka.fax
transcripts@lipka.com
www.lipka.com

```
 1  UNITED STATES DISTRICT COURT
 2  SOUTHERN DISTRICT OF NEW YORK
 3  ----------------------------------x
 4  UNITED STATES OF AMERICA, the States
 5  of CALIFORNIA, COLORADO, CONNECTICUT,
 6  DELAWARE, FLORIDA, GEORGIA, HAWAII,
 7  ILLINOIS, INDIANA, IOWA, LOUISIANA,      Case Number
 8  MASSACHUSETTS, MICHIGAN, MINNESOTA,      11 Civ. 0071 (PGG)
 9  MONTANA, NEVADA, NEW HAMPSHIRE,
10  NEW JERSEY, NEW MEXICO, NEW YORK,
11  NORTH CAROLINA, OKLAHOMA, RHODE ISLAND,
12  TENNESSEE, TEXAS, VIRGINIA, WASHINGTON
13  and WISCONSIN; the DISTRICT OF COLUMBIA,
14  the CITY OF CHICAGO and ex rel. OSWALD
15  BILOTTA,
16          Plaintiffs and Relator,
17      -against-
18  NOVARTIS PHARMACEUTICALS CORPORATION,
19          Defendant.
20  ----------------------------------x
21       October 21, 2016, 10:09 am
22   Deposition of NATALIE ELAINE NELSON-LING
23           lipka.com, inc.
24             888.lipka.com
25          transcripts@lipka.com

                                              Page 1
```

```
 1  A P P E A R A N C E S:
 2
 3  U.S DEPARTMENT OF JUSTICE
 4  U.S. ATTORNEY'S OFFICE
 5  SOUTHERN DISTRICT OF NEW YORK
 6      Attorneys for Plaintiffs
 7      86 Chambers Street
 8      New York, New York 10007
 9  BY:   JENNIFER JUDE, ESQ.
10
11  CRAVATH SWAINE & MOORE, LLP.
12  Attorneys for Defendant
13      Worldwide Plaza
14      825 Eighth Avenue
15      New York, New York 10019-4775
16  BY:   BENJAMIN GRUENSTEIN, ESQ.
17  AND:  OLIVER ROCOS, ESQ.
18
19  SKADDEN ARPS SLATE MEAGHER & FLOM, LLP.
20  Attorneys for The Witness
21      4 Times Square
22      New York, New York 10036
23  BY:   STEVEN R. GLASER, ESQ.
24  AND:  YOOSUN KOH, ESQ.
25

                                              Page 2
```

```
 1  A P P E A R A N C E S  (Continued):
 2
 3  SHEPHERD FINKELMAN MILLER & SHAH, LLP.
 4  Attorneys for Relator, Oswald Bilotta
 5      65 Main Street
 6      Chester, Connecticut 06412
 7  BY:   LAURIE RUBINOW, ESQ.
 8
 9
10  ALSO PRESENT:
11      SARA M. ZAUSMER, Director,
12        Novartis Services, Inc.
13      ROBERT CALVERT, The Videographer
14      NICK LUSSIER, Paralegal,
15        Shepherd Finkelman Miller & Shah, LLP.
16
17
18
19
20
21
22
23
24
25

                                              Page 3
```

```
 1              INDEX
 2  Witness: Natalie Elaine Nelson-Ling      Page
 3  By: Ms. Jude                              8
 4  By: Mr. Gruenstein                      242
 5  By: Ms. Jude                            264
 6
 7           E X H I B I T S
 8  Nelson-Ling Exhibit                     Page
 9  GX-1      Natasha Nelson's LinkedIn      43
10           Profile
11  GX-2      Document Bates stamped        145
12           NPCLSV_LIT003486097 through
13           NPCLSV_LIT003486142
14  GX-3      Slide presentation entitled   181
15           "2008 Audit of Sales
16           Representatives Interactions
17           With Healthcare Professionals"
18           Bates stamped
19           NPCLSV_LIT0001591473 through
20           NPCLSV_LIT001490)
21  GX-4      Document Bates stamped        204
22           NPCLSV_LIT66834049 through
23           NPCLSV_LIT66834054
24
25  (CONTINUED)

                                              Page 4
```

**Page 37**

1  to keep track of its speaker bureau, where the
2  money was being spent, what was being done, for
3  many reasons; ranging from, it was their money
4  and, you know, it was fiscally responsible.
5  They wanted to make certain that the company was
6  ethically responsible.
7      They wanted the speaker bureau to
8  be effective.  You know, all the kinds of
9  information that Cindy was in charge of
10 collecting, all went to a corporate goal of
11 spending the money right, doing the right thing,
12 getting information out to doctors, so that they
13 could know how to treat their patients with
14 Novartis drugs, and so that doctors could
15 understand, also, the medical side of the
16 disease that the Novartis drugs treated.  And
17 so, a very important component was the medical
18 education.
19     Q.   Within Novartis, were there other
20 departments or bodies, besides the ethics and
21 compliance department, that had a responsibility
22 for making sure that Novartis's promotional
23 events complied with the law?
24     A.   If I understand what you're asking,
25 everyone at Novartis was responsible for making

**Page 38**

1  certain that -- that they complied with the law.
2  So I can't name you individual departments.
3      Q.   Were there other departments,
4  besides ethics and compliance, that had that as
5  their primary role?
6      A.   The law department would have.  And
7  there were probably other departments that I --
8  I can't think of right now.
9      Q.   And just to make sure we're on the
10 same page.  Could you define what you understand
11 a speaker program to be?
12     A.   A speaker program is a promotional
13 program in which a physician -- in which a
14 healthcare provider, be it a physician, a nurse
15 practitioner, a pharmacist, has been carefully
16 trained and hired to present the promotional
17 review committee approved deck, and, based upon
18 their training, provide clinical information and
19 be able to answer pertinent questions.
20     Q.   You said provide clinical
21 information and be able to answer pertinent
22 questions.  Is there a particular audience part
23 of the definition of speaker program?
24     A.   The audience would be to other
25 HCPs.

**Page 39**

1      Q.   Does that mean healthcare
2  providers?
3      A.   It does.
4      Q.   What do you understand a roundtable
5  to be?
6      A.   A roundtable is, as I understand
7  it, when the doctors are -- are sitting around a
8  table, as opposed to somebody standing up and
9  presenting, and I think it's -- it's less
10 formal.
11     Q.   Does it have the other
12 characteristics of the speaker program?
13     A.   It could.  I was not involved in
14 auditing, monitoring or doing investigations,
15 that I recall, where I got into the detailed
16 aspects of what a roundtable was.
17     Q.   While you were at Novartis, did
18 someone else have responsibility for
19 investigations, auditing and monitoring of
20 roundtables?
21     A.   No.  It would have been me.
22     Q.   So if you weren't doing it, then no
23 one was doing it?
24     A.   Investigations, I do not recall me
25 having a case regarding an investigation of a

**Page 40**

1  roundtable.  We audited speaker programs
2  randomly, and I don't remember any of us going,
3  randomly picking something that turned out to be
4  a roundtable, and I'm not the best one to ask on
5  whether we ever did an audit about a roundtable,
6  because I just don't remember any more.
7      Q.   Who would be the best one to ask
8  about that?
9      A.   It would probably be David
10 Hollasch.
11     Q.   So sitting here today, you don't
12 remember doing any investigations, any auditing
13 or any monitoring while at Novartis that was
14 focused on a roundtable event?
15         MR. GRUENSTEIN:  Objection, lacks
16 foundation.  Assumes there were roundtable
17 events during this period.
18     A.   I must have, but I cannot recall.
19     Q.   Okay.  So that's a -- let me repeat
20 my question.
21         So sitting here today, you don't
22 recall doing any investigations, auditing or
23 monitoring of roundtable events?
24         MR. GRUENSTEIN:  Same objection.
25     A.   I don't recall right now.  If you

**Page 49**

1  experience working at Daiichi Sankyo.
2      Q.   Is there anything in particular
3  about your experience working at Daiichi Sankyo
4  that led you to add speaker programs to Novartis
5  as a risk assessment list?
6      A.   I would say that the CIA that
7  Daiichi Sankyo signed in January of 2015
8  reflected many of the issues that we had been
9  seeing at Daiichi Sankyo, which left me without
10 any specific knowledge or hints even within the
11 industry to put that at the top of my list.
12     Q.   Could you describe in general terms
13 what those issues were?
14     A.   The issues at Daiichi Sankyo?
15     Q.   Yes.
16     A.   The issues at Daiichi Sankyo
17 concerned meal costs, promotional decks,
18 locations, those kinds of areas.  And so, when I
19 went to Novartis, without having any specific
20 knowledge of Novartis, we simply added in that
21 we would do -- randomly attend 45 speaker
22 programs within, basically, the period of Q3
23 20 -- no, 2008.
24     Q.   Was that the audit that was later
25 called the 2008 audit of interactions with HCPs?

**Page 50**

1      A.   I believe so.
2      Q.   Let's look back at GX-1.  Do you
3  see where it says, "Revised and strengthened the
4  compliance investigations systems and
5  protocols"?
6      A.   No.
7      Q.   On the second line.
8      A.   Oh.  Okay.  Mid-sentence?
9      Q.   Yes.
10     A.   "Revised and strengthened the
11 compliance investigations systems and
12 protocols."  Yes, I see it.
13     Q.   Could you describe what
14 specifically you did for Novartis?
15     A.   When I arrived at Novartis, they
16 had a person in the compliance department that
17 was doing investigations.  She was very behind
18 in her investigations, and I revised how we
19 would do investigations, the priorities for
20 addressing them, the time lines for handling
21 them, and I made it my -- my job to teach people
22 that received a complaint from someone to say
23 things like, thank you for bringing this to our
24 attention, I'm going to refer it to compliance,
25 and I taught people to refer the complaints to

**Page 51**

1  me within 24 hours; so that, within a very short
2  time frame, I could be able to call people and
3  start doing the investigation.
4      Q.   That person who was in charge of
5  investigations when you arrived, that you just
6  referred to, was that Maria Woods?
7      A.   Yes.
8      Q.   Can you describe what you mean by,
9  she was very behind?
10     A.   When I came to Novartis, they
11 didn't have a good system for counting and
12 tracking complaints, and Maria's office was
13 filled with file folders.  So we took those file
14 folders, and one by one went through, and, to
15 the extent we could investigate them, we did.
16 If we had to close them out because the
17 employees were no longer there, we did; but we
18 went through all the file folders that we found.
19     Q.   Approximately how many
20 investigations was Ms. Woods handling at the
21 time that you arrived?
22     A.   I don't know how many she was
23 handling.  I know that there were hundreds of
24 file folders.
25     Q.   Does each of those file folders

**Page 52**

1  relate to an individual investigation or more
2  than one investigation?
3      A.   Generally, one investigation.
4  Maybe two.  But, generally one.
5      Q.   Was Ms. Woods the only employee at
6  Novartis who had a responsibility for doing
7  investigations at the time that you arrived?
8      A.   I don't think she was the only
9  employee in charge of doing investigations.  She
10 was the only employee that worked for Julie Kane
11 that was doing investigations.
12     Q.   So she had a backlog of several
13 hundred investigations, is that correct?
14     A.   Yes.
15     Q.   And, what ended up happening to all
16 of those investigations?
17     A.   We opened them, read them,
18 investigated them, and either closed them out
19 because the people were gone.  Investigated
20 them.  They were either substantiated, not
21 substantiated, unable to substantiate, but, we
22 resolved every single one of them.
23     Q.   Approximately what portion of them
24 were mooted by the fact that the employee was
25 gone?

---

**Page 61**

1  rewrite this differently.  So we talked to him
2  about how you might write this, or things that
3  you might add to it.
4      Q.    Were you attempting to reduce
5  ambiguity on the policies?
6      A.    In my view, I was.
7      Q.    Did you find the policies that
8  Marty had written to be ambiguous?
9      A.    I found the policies that Marty had
10  written were understood better by non-lawyers
11  than lawyers, and understood better by some
12  people than others.  I found that it was a mixed
13  bag.
14      Q.    Did they -- strike that.  Did the
15  policies that Marty had written related to
16  healthcare compliance leave room for
17  interpretation?
18          MR. GRUENSTEIN:  Objection;
19  leading.
20      A.    Yes.  He viewed policies like a
21  constitution.  I viewed -- I viewed policies
22  like a set of rules that you have for your kids.
23  You know, you brush your teeth, you do this.
24  And my understanding of rules are that it's
25  specific like that.  Wake up in the morning and

---

**Page 62**

1  brush your teeth, make up your bed, be dressed
2  in clothes that match.  You know, specifics,
3  right?
4          Marty -- Marty -- Marty felt that
5  the rule would be, wake up in the morning, get
6  ready and come down.  And it's just two
7  different philosophies.  It's not that his
8  philosophy was bad or my philosophy was bad.
9  It's just that we had different philosophies on
10  how to get to the same place of getting the kid
11  downstairs.
12          MR. GRUENSTEIN:  Maybe you have
13  different types of children.
14          THE WITNESS:  Yeah, we probably
15  did.
16      Q.    Did you and David Hollasch advise
17  Mr. Putenis on policy changes because you felt
18  it would make the policies more effective?
19          MR. GRUENSTEIN:  Objection,
20  mischaracterizes the word advise.
21      A.    I felt, based upon what I saw
22  during the Q3 2008 audits, that other people
23  that worked for Novartis shared my view on
24  having a difficulty understanding the compliance
25  policy, and, based upon that, I talked to Marty,

---

**Page 63**

1  and eventually went over Marty's head to Julie
2  Kane to effect different training and
3  definitions on policies.
4      Q.    Why did you have to go above
5  Marty's head to Julie Kane to do that?
6      A.    Because Marty and I -- Marty had a
7  different philosophy than I did, that's all it
8  was.  It was a philosophical difference.  And
9  Julie Kane was our supervisor.  And, if I
10  couldn't reach agreement with Marty, then Marty
11  and I went together to Julie, and eventually we
12  created training that defined items that I felt
13  had not been as clear before, because of the
14  difference in philosophy on how to write a
15  policy.
16      Q.    What did you observe during that Q3
17  audit that led you to your belief that others
18  had difficulty understanding the policies?
19      A.    That is a question that has many,
20  many parts to it, so let me try to parse it out.
21  In the Q3 audit, we did 42 ride-alongs and
22  attended, randomly, 45 different speaker
23  programs.  The things that we saw were -- on
24  speaker programs, let's start there.
25          People didn't understand how to run

---

**Page 64**

1  a speaker program to reflect the financial
2  controls that Novartis management wanted.
3  People didn't think about some of the easy
4  controls, such as, count the number of heads,
5  compare it to how many meals you've been charged
6  for, a simple thing, but, in our audit we found
7  routinely the restaurants were sneaking in one,
8  two, three extra meals.
9          If you haven't counted heads, if
10  you don't get the receipt at the end and count
11  the number of meals, it's easy to have -- to be
12  cheated.
13          Of all the findings from our audit,
14  that was, I think, the one that upset management
15  the most, because they wanted a tight financial
16  control.
17          For speaker programs, we found that
18  it wasn't clear that the speaker had to use the
19  promotional review committee approved deck
20  without changes; changes being adding, deleting,
21  modifying the deck.  They didn't understand that
22  what the Novartis policy said was, have a room
23  conducive to a medical discussion.  People
24  interpreted that as everything from a room with
25  four walls, to a unique table in the middle of a

Page 65

 1  busy restaurant.
 2       And, because the policy was written
 3  as a constitution, each person was their own
 4  state, and each person had their own
 5  interpretation of how they were complying. So
 6  that's just examples on speaker programs.
 7  There's more speaker programs, but, let me move
 8  to ride-alongs and try to explain that.
 9       One of the things we were looking
10  at in the ride-alongs was, did the training that
11  was done, did it transfer and translate
12  practically into reps knowing what to do. And
13  so, we were checking things like, did the sales
14  rep provide indication and limitations of use,
15  safety; did they provide fair balance, advise of
16  the black box warning on, for example, Diovan,
17  did they have a full and fair promotional
18  discussion with the physician, with the
19  healthcare provider. We were looking at those
20  kinds of things.
21       And, basically, what David and I
22  had done was that, we wanted to make certain
23  that we were singing from the same hymnal. And
24  so, before we did any of these ride-alongs or
25  attended speaker programs, we came up with

Page 66

 1  checklists that we used, so that we always
 2  looked at exactly the same things, and during
 3  the ride-along checked it off. Did they say the
 4  indication? Check yes, check no.
 5       Did they say the limitations of
 6  use? Yes, no. Did they give a piece of ISI?
 7  Yes, no. Did they use a promotional detail
 8  piece? Yes. If so, what was it?
 9       Now, so that we were looking at
10  exactly the same thing. So that, whether it was
11  David going out or me going out, Rebecca going
12  out, no matter who it was, we came up with the
13  same answers, and so that gave us consolidated
14  information.
15     Q.   Before you did that Q3 audit with
16  those checklists, had Novartis done an audit of
17  speaker programs before?
18     A.   I do not know.
19     Q.   You created those checklists for
20  the audit?
21     A.   Yes.
22     Q.   So those checklists -- at least no
23  one used your checklist before you?
24     A.   Nobody used our checklist before.
25          THE WITNESS: Could I take a break?

Page 67

 1          MS. JUDE: Yes. Absolutely.
 2          THE VIDEOGRAPHER: This marks the
 3  end of tape number 1. We are going off the
 4  record. The time is 11:40.
 5          (Off the record)
 6          THE VIDEOGRAPHER: Here marks the
 7  beginning of tape number 2. We are back on the
 8  record. The time is 11:56.
 9     Q.   Okay. So, Ms. Nelson-Ling, you
10  said earlier that one of the things that led you
11  to put speaker programs on your risk assessment
12  outline when you got to Novartis was your
13  experience at Daiichi Sankyo with respect to
14  meal costs, promotional decks and venues. Do
15  you remember saying that?
16     A.   Yes.
17     Q.   So when you conducted that Q3 audit
18  while you were at Novartis, you found issues
19  with respect to those three things, is that
20  right?
21     A.   Yes.
22     Q.   Okay. Was there anything else that
23  led you to put speaker programs on your risk
24  assessment outline, other than your experience
25  at Daiichi Sankyo, and also the trainings that

Page 68

 1  you said that you did at food, drug and law
 2  trainings, et cetera?
 3     A.   Not that I recall specifically. It
 4  was really my experience and the training,
 5  trainings at FDLI, and also our outside counsel
 6  have these, you know, conferences every so
 7  often. A half day conference in New York City,
 8  and you go in and they train on important
 9  topics.
10     Q.   So after the results for that --
11  from that -- let's start over again. After the
12  results from that Q3 audit came in, did you
13  continue to think that speaker programs belonged
14  on that risk assessment list?
15     A.   Yes.
16     Q.   And why was that?
17     A.   We found issues that we needed to
18  remediate.
19     Q.   What else was on that list besides
20  speaker programs?
21     A.   What do you mean? I don't
22  understand the question.
23     Q.   So my understanding of the risk
24  assessment list that you were describing, was
25  that it listed things that the organization had

**Page 137**

1   what a speaker program is up to the
2   representatives?
3           MR. GRUENSTEIN:  Objection;
4   leading.
5       A.   I felt that it did because,
6   philosophically, I believe in set rules.
7   Philosophically, other people, particularly
8   Marty, felt that everyone knows what a place
9   that's conducive to a medical education, you
10  know, medical discussion means.
11          It was a problem with
12  interpretation.  And I think that there were
13  some sales reps that are more like me than
14  Marty, and, when I read conducive to a medical
15  discussion, heavens, most of my medical
16  discussions are in 4 by 4 rooms talking to a
17  doctor, like this (indicating), you know.
18  That's certainly not where you want to hold a
19  speaker program, you know.
20          It depends upon the interpretation.
21  I disagreed with many of the sales reps'
22  interpretation.
23      Q.   Did you think that many of the
24  sales reps were not complying with the
25  guidelines based on the interpretation they had

**Page 138**

1   chosen?
2           MR. GRUENSTEIN:  Objection;
3   leading.
4       A.   No.  I think that the people that
5   interpreted the guideline felt that what they
6   were doing was okay.
7       Q.   I'm wondering what you thought of
8   what they were doing, whether it was okay or
9   not?
10      A.   I thought that what they were doing
11  was not okay.
12      Q.   How many speaker program audits did
13  you or your team do in Tampa, approximately?
14      A.   At this time, I do not recall.  I
15  know that we looked at the documentation from
16  many programs.  I know that we attended the one
17  program.  I don't know if we attended other
18  programs, because, if we did, nothing
19  interesting happened.
20      Q.   I'm trying to get a sense relative
21  to the 45 that you did in the Q3, approximately
22  how large the Tampa audit was?
23      A.   It would have been two to three
24  sales reps, two to three programs, most.
25      Q.   Did the audit that your team did in

**Page 139**

1   Tampa look at anything related to a Dr. ▮?
2       A.   Yes, it did.
3       Q.   What do you know about Dr. ▮?
4           MR. GRUENSTEIN:  Objection; vague.
5       Q.   Strike that.  What actions --
6   strike that again.  What about Dr. ▮ did
7   your team look at when they did the audit in
8   Tampa?
9       A.   We went to a speaker program, had
10  Dr. ▮ ▮, a Tampa based, I think
11  cardiologist, a Tampa based physician, who was
12  hired to give a speaker program, promotional
13  program, educational deck presentation to a
14  group of HCPs.
15          We had done some investigations
16  talking to sales reps, talking to the sales rep
17  looking at documents regarding the sales rep
18  that was doing the fishing boat programs.  We
19  went to the program that Dr. ▮ was
20  supposed to be speaking at.
21          We got there.  They were sitting at
22  a large table in the middle of a restaurant with
23  no SlideDeck, eating maybe their salads, and we
24  fixed it.
25      Q.   Well, just so we have something

**Page 140**

1   more specific on the record, can you tell me
2   what you mean by, "we fixed it"?
3       A.   We made him go out and get his
4   computer, present the slides.  We had been
5   alerted by one of the sales reps that Dr. --
6   that the doctor liked to take an extra meal to
7   go.  We -- I monitored the liquor.  I didn't let
8   anything get to the table, no matter whether it
9   was ordered or not, and I had David Hollasch sit
10  next to Mrs. ▮ during the program and
11  watch her advance the slides and listen to the
12  presentation.
13      Q.   Was Mrs. ▮ a healthcare
14  professional herself?
15      A.   She purported to be.
16      Q.   Do you know whether she actually
17  was?
18      A.   A health -- she may have been.
19      Q.   Did anyone check to see whether she
20  was?
21      A.   We did.
22      Q.   And do you remember whether she was
23  now or --
24      A.   A healthcare professional could be
25  somebody that works in the doctor's office.  And

## Page 145

```
1    Anti-Kickback Statute with the scenario that I
2    gave to you, with the spouse who works in the
3    office?
4           MR. GRUENSTEIN:  Objection;
5    leading.  As if God cares about the
6    Anti-Kickback Statute.
7       A.   If the person doesn't get anything
8    out of the educational exchange, then I think an
9    educational exchange hasn't -- hasn't occurred.
10      Q.   So is that a yes or a no, with
11   respect to the Anti-Kickback Statute?
12          MR. GRUENSTEIN:  Objection to form.
13      A.   I think that if they don't get --
14   if they're not capable of getting anything from
15   it, and that would have to be individual, and
16   based upon the individual deck and the
17   individual itself, then I think it has a
18   potential to be an Anti-Kickback.
19      Q.   I'm going to mark another exhibit
20   for you.  This is going to be Nelson-Ling GX-2.
21          (Nelson-Ling Exhibit GX-2, Document
22   Bates stamped NPCLSV_LIT003486097 through
23   NPCLSV_LIT003486142, marked for identification.)
24          MS. JUDE:  And, for the record,
25   this is Bates stamped NPCLSV_LIT003486097
```

## Page 146

```
1    through 6142.  It's a very long email chain.
2    The topmost email is dated September 19, 2011.
3       Q.   I want to direct you to an email on
4    the page that ends in 6112.  It's the little
5    number in the bottom right-hand corner.
6           Do you see the email that says,
7    from Natasha Nelson to Julie Kane, cc'ing three
8    people, subject "Employee Interview Notice Re:
9    Interviews in Tampa"?
10          Tell me when you find that.
11      A.   Okay.
12      Q.   Are you on the page that ends 6112?
13      A.   Yes.
14      Q.   I'm going to read the email that
15   I'm referring to into the record.  It says --
16   it's from you, right, on March 4, 2010?
17      A.   Correct.
18      Q.   "Julie, I'd like to review the
19   decision reached yesterday and our marching
20   orders for Tampa.  The tactics for dealing with
21   the employees and the notice they'll receive of
22   their interviews on Friday are a concern for me.
23   I recommend that we do not give them more than a
24   night's notice to the employees in Tampa prior
25   to their Friday interviews.  If the employees
```

## Page 147

```
1    know they are under scrutiny, it is likely that
2    the Thursday dinner will be cancelled or handled
3    outside their norm.  What do you recommend we
4    do?"
5           Do you remember what this email is
6    about?
7       A.   It's about the ▓▓▓▓▓▓▓ and the mini
8    audit that we did down in Tampa.
9       Q.   Then I'm going to direct you to the
10   next page, the one that ends in 6111.
11          So Julie has replied to you, that
12   email is redacted, and then you respond back to
13   her on March 4, 2010:
14          "Julie, David and I discussed the
15   MO for the Tampa work and recommend that we:  1)
16   attend without notice the speaker program on the
17   18th of March (arrive 15 minutes after program
18   start and simply tell Chris Tilberg that he has
19   a surprise audit by E&C) -- fly in and out."
20          Why did you recommend this approach
21   to Julie Kane?
22      A.   To avoid having the speaker program
23   be cancelled.
24      Q.   And why were you concerned that it
25   would be cancelled?
```

## Page 148

```
1       A.   Because people fear internal
2    audit-type events.
3       Q.   On that first email I read to you,
4    it says, "If the employees know they're under
5    scrutiny, it is likely the Thursday dinner will
6    be cancelled or handled outside their norm."
7       A.   Right.
8       Q.   What did you mean by "handled
9    outside their norm"?
10      A.   I believe that we had information
11   that they -- this was the same area where the
12   woman sales rep was doing the speaker programs
13   on the fishing boats, and we had, I don't
14   remember if it was notice from a male sales rep
15   that something strange was going on or -- I
16   don't remember how we kind of started to get
17   into this, but, we suspected that Dr. ▓▓▓▓▓▓
18   might not give a presentation.
19          So we didn't want them to have
20   notice because we didn't want them -- we didn't
21   want to fly all the way to Tampa and then get a
22   totally in compliance program, if that's what
23   their -- not what their norm was.
24      Q.   Is it a best practice, when doing
25   an audit of a speaker program, to give no
```

## Page 193

1  for Novartis?
2      A.   It depends what Novartis knew and
3  how they educated.  It depends upon more facts.
4      Q.   Would it violate the Anti-Kickback
5  Statute for a Novartis employee, for that
6  employee to pay an honorarium to a physician
7  speaker if that speaker did not actually deliver
8  a presentation?
9           MR. GRUENSTEIN: Objection; lacks
10 foundation.
11     A.   If -- is this going back to what
12 you were saying before, to induce the doctor to
13 write for Medicaid and Medicare?
14     Q.   Yes.  All my questions in this line
15 of questioning, please assume that there's a
16 federal healthcare entity paying.
17     A.   Okay.  So the question is, in a
18 Medicare -- if a Novartis employee paid a bribe,
19 like gave a $200 gift check to a physician to
20 get them to prescribe for a Medicare, Medicaid
21 patient a Novartis drug?  Yes.
22     Q.   And if a Novartis employee paid the
23 speaker an honorarium for an event at which the
24 speaker did not actually speak, would that
25 violate the Anti-Kickback Statute?

## Page 194

1           MR. GRUENSTEIN: Objection.  Are we
2  assuming that inducement caveat that you had
3  before?
4           MS. JUDE:  No.
5      A.   Oh, you're not assuming the
6  inducement?  I thought you were assuming the
7  inducement for all the questions.
8      Q.   I'll start over.
9      A.   I'm sorry, I'm getting a little
10 tired.
11     Q.   We'll take another break soon.
12     A.   Okay.
13     Q.   Okay.  Would a Novartis employee
14 violate the Anti-Kickback Statute if the
15 employee paid an honorarium to a speaker for an
16 event at which the speaker did not give any
17 presentation?
18          MR. GRUENSTEIN: Objection; lacks
19 foundation.
20     A.   If they used -- if the -- if the
21 reason that they paid the honorarium was to get
22 the speaker to write prescriptions for Medicaid
23 and Medicare, yes.
24     Q.   Would your answer be the same if
25 that speaker delivered an abbreviated speech and

## Page 195

1  spent most of the time at the event socializing
2  with the other doctors?
3           MR. GRUENSTEIN: Objection; lacks
4  foundation.
5      A.   It would depend upon what they
6  presented.  So, for example, you have to have
7  indication, limitations of use, safety, all
8  right, you have to talk about the black box
9  warning, you have to have some promotional
10 content, all right.  If they give core
11 information, you probably could have a shorter
12 speech.  I don't know how fast the person's
13 talking, I don't know what -- you know, there's
14 facts that you'd have to look into.
15          But if you're asking is it
16 prohibited for, after a legitimate speaker
17 program, for people to talk or laugh or network
18 with people, I don't think it is.
19     Q.   That's definitely not what I'm
20 asking.
21     A.   Oh, okay.
22          MR. GRUENSTEIN:  It did sound like
23 what the question was.  Maybe you should read
24 the question back.
25          MS. JUDE:  Yeah, we can read the

## Page 196

1  question back.
2      A.   I didn't answer it.  I thought I
3  was answering it.  I'm sorry, what was it again?
4      Q.   Let me reframe it.  Would it
5  present an Anti-Kickback Statute concern to you,
6  as a compliance officer, if a Novartis employee
7  paid an honorarium to a physician speaker who
8  delivered a 15-minute long presentation, and
9  spent the majority of a speaker event
10 socializing with the other HCPs at the event?
11          MR. GRUENSTEIN:  I'm going to
12 object.
13     A.   It would depend upon the facts, but
14 that would be something that I would look into
15 to get more facts on.  And the facts, as you
16 stated it, is enough for a trigger to
17 investigate it.
18     Q.   Is it enough for a trigger to
19 investigate if the speaker repeatedly speaks to
20 the same group of doctors on the same drug and
21 the same topic?
22          MR. GRUENSTEIN: Objection; lacks
23 foundation.
24     A.   Yes.  It -- it would be a trigger
25 to investigate.  The issue that I had at

---

**Page 197**

Novartis is that I didn't know how to figure out who all the attendees were, unless I was there.

Q. And --

A. So the question you're asking me, I couldn't at that time investigate because I didn't know how or if it was possible within the system for me to pull the attendees. There must have been some way to pull attendees, but it was not something that, in Q3 of 2008, we included on our checklist.

Q. If you had been able to pull the names of the attendees at events, what would you have done with those names?

A. It would have been something else --

MR. GRUENSTEIN: Objection; calls for speculation.

A. It could have been something else that we could have audited.

Q. What about the scenario of the same group of doctors attending the same events causes a trigger for an investigation for you?

MR. GRUENSTEIN: Objection; calls for speculation.

A. Well, again, it's audience fatigue.

---

**Page 198**

But one of the advantages that I have now is that the Government has brought suits in which they've alerted people to this. And so, it wasn't on my checklist back in 2008, but you can bet your bottom dollar it's on my checklist now. You know what I mean?

I used to think of it as audience fatigue, but now it's an issue that people look at. So when I look at it from today to try to formulate an answer for what I was thinking about in 2008, I kind of think that it's something I should have looked at, but I didn't even know how to pull that information. It wasn't -- it wasn't included on the checklist.

Q. Do you know whether anyone else at Novartis had access to that information at the time that you were there?

A. The only person that -- the only kinds of people that would have had access to that would have been people that were in the -- in the Cindy Cetani line, you know. We -- we got information -- we would request information that we wanted. But, in 2008, you know, it sounds stupid now, but we weren't -- we didn't think about, you know, having specific findings

---

**Page 199**

on audience fatigue or what, at the time, we would have called audience fatigue.

Q. At what point does audience fatigue set in?

MR. GRUENSTEIN: Objection.

A. My rule of thumb, for years, has been two of the same deck per quarter, but I also factor into it that, you know, you can take one deck, but if a lipidologist is giving it versus a cardiologist versus, you know, a pediatric cardiologist is giving it, it gets a different flavor; and so part of it depends upon who the speaker is.

Q. If there are three different speakers giving the same deck -- strike that. If there's a different speaker each time --

A. Yeah.

Q. -- after how many events on the same deck should an attendee stop going?

MR. GRUENSTEIN: Objection. Are you asking what she thinks now or what she thought in 2008?

Q. I am asking what you think now.

MR. GRUENSTEIN: Objection; relevance.

---

**Page 200**

A. What I think now is that two per quarter, eight max per year, and, at more than two per quarter, I would investigate it. At more than -- hopefully, I would start the investigation before it got to eight, but, at eight, I would have some sort of a computer trigger that would trigger that there had been eight.

Q. Would you put in any intermediate triggers to alert you to the repeat attendance?

A. Two. Two every quarter.

Q. And I just asked you about what you think for a limit now.

What did you think about for a limit at the time you worked at Novartis?

MR. GRUENSTEIN: Objection; lacks foundation.

A. I really probably didn't have as defined a view as I do now, but that's based upon the fact that there are -- there are, you know, CIAs out there now that help us figure out what to do, that define what compliance should look like, I didn't have that back in 2008, on the number of times you can attend the same deck. And so, I think that -- what I think I --

```
 1   drop my children off at school, I tended to be,
 2   if not the first one, pretty much the first one
 3   in the office and the last one back.  And so, I
 4   had more hours than was maybe typical, so I
 5   could handle more investigations.  But the
 6   volume of investigations we had and the
 7   requirement to have a witness to be able to take
 8   notes and to -- to, you know, be a neutral
 9   listener, required us to have people and have
10   space.
11           One of the things that Novartis did
12   which was very accommodating was that, they
13   hired a number of temps, such as Andrew
14   Gallinger, who was a highly intelligent, highly
15   educated person, who came in to be my witness.
16           When we had that first real lot of
17   investigations that we had to do to catch up on
18   the Maria Woods, I was able to hire two interns
19   that literally helped, were my witness in
20   investigations, set up the interviews, took the
21   notes, wrote them up as a draft.  You know, I
22   think that they gave me a lot of resources.
23           Would I have liked to have more?
24   Sure.  Maybe I would have left before 7 o'clock
25   at night, you know.  Did I get the work done?  I
```
Page 221

```
 1   frame.
 2           My goal always was that, any
 3   complaint that came in, we touched it within
 4   three days.  Sometimes a touch was looking at it
 5   and going, oh, come on, you know, this does
 6   not -- this is low priority, this is, you know,
 7   two people that don't get along, as opposed to
 8   some sort of a compliance issue.  This is an HR
 9   issue as opposed to something else.
10           I hope we mostly met our goal.  I
11   hope that when we touched issues and read it
12   quickly to triage it that we didn't make
13   mistakes.  I can't tell you that we didn't make
14   mistakes.  But I can tell you that everybody
15   tried to touch something within three days.
16           MS. JUDE:  I'm going to mark
17   another exhibit for you, which is Nelson-Ling
18   GX-5.
19           (Nelson-Ling Exhibit GX-5, Document
20   Bates stamped NPCLSV_LIT1574840 through
21   NPCLSV_LIT1574843, marked for identification.)
22       Q.   This is Bates stamped ending in
23   1574840 through 4843, and the top email is from
24   David Hollasch, it's a Novartis email address to
25   his Comcast email address, and he's forwarding
```
Page 223

```
 1   got the work done.
 2       Q.   During the time you were at
 3   Novartis, was there ever a time that red flags
 4   about a particular event or sales representative
 5   were raised, but, due to lack of manpower, you
 6   were not able to investigate?
 7       A.   If a red flag was raised, I like to
 8   think that we got to each one, but we would get
 9   through a red flag in three days.  So, for
10   example, this Dr. ▒▒▒▒ guy who calls up and
11   goes, I'm calling the FDA, that would be a red
12   flag and you'd call him back right away.  Which
13   is one of the reasons that you see, when I wrote
14   this thing up, I called him back at, you know,
15   and it listed the time, to show that, you know,
16   I called the dude back, you know, as quick as
17   possible, and I called him back, apparently, by
18   myself, which shows, you know, how quickly, you
19   know, we responded.
20           You know, there were issues which
21   you saw that would be red flags, yellow flags.
22   You know, however, we didn't flag it, but we
23   were -- clearly were not so rigid that, you
24   know, something that looked to be critically
25   important, we didn't look into in a fast time
```
Page 222

```
 1   other emails.
 2           On the second page, I want to
 3   direct you to the email in the middle that's
 4   from David Hollasch on February 1, 2010 to you.
 5   Do you see that one?
 6       A.   In the middle?
 7       Q.   Yeah, the second page, where it
 8   says Natasha --
 9       A.   Oh.
10       Q.   So David writes, "Natasha, the
11   responsibility for speaker infraction follow-up
12   should reside with Marketing or CSO, and I
13   recommend that E&C not get involved even for a
14   short time, as I don't think we budgeted the
15   money to assume this responsibility.  I could be
16   wrong, as I was not involved with the budgeting
17   process.  Can you send me details on our budget
18   for consultants?  Since the budget was cut, I
19   need to start developing an exit plan for Bob,
20   Roberto and/or Rebecca."
21           Then on the next email, which is on
22   the first page, you write back, "I have nothing
23   on the budget at all.  Julie told me that we got
24   the same as 2009.  Cindy said we got cut; I
25   asked Cindy for it but got nothing."
```
Page 224

**Page 225**

1  Do you remember this exchange?
2  A. Yes.
3  Q. Do you know what ultimately
4  happened to the budget?
5  A. The budget was cut. This was not
6  under Julie Kane. This was when Cindy Cetani
7  took over.
8  Q. What was the budget that was cut
9  for?
10 A. It was cut for people to do
11 investigations and auditing, and for us to
12 have -- it was -- it was all our extra hands --
13 many of our extra hands being cut.
14 Q. Did this affect the number of
15 investigations that Novartis was able to do?
16         MR. GRUENSTEIN: Objection;
17 leading.
18 A. This was at the time period where
19 it was clear I was no longer going to be working
20 at Novartis, and I can't tell you what happened
21 with investigations after I left.
22 Q. When did it become clear to you
23 that you were going to be leaving Novartis?
24 A. In probably 2009.
25 Q. And what prompted that realization

**Page 226**

1  for you?
2  A. Mid-2009, Julie told me that I was
3  not going to get the chief compliance officer
4  position, that it was going to go to another,
5  and it was clear at that point that we weren't
6  accomplishing as much as one would hope in
7  remediating for something on facts that were
8  from Q3 2008.
9  Q. How did it become clear to you at
10 that point that compliance was not accomplishing
11 as much as you or others had hoped?
12 A. We were still giving the same
13 speech. We were still giving iterations of
14 GX-3.
15 Q. By saying you're still giving
16 iterations of the same speech, are you saying
17 that you're not moving forward or are you saying
18 something else?
19 A. I was saying it wasn't moving
20 forward.
21 Q. And, what was the status of
22 remediating the problems that the audit had
23 uncovered?
24 A. We made a number of positive steps.
25 David Hollasch and I actually did training on

**Page 227**

1  the operating unit level in a number of the
2  different operating units. They formed --
3  Novartis management formed committees to
4  implement the remediation, many committees, that
5  met constantly, discussing the same thing
6  constantly, and we talked about it constantly.
7         Now, Ludwig's get it done
8  overnight, it was a year past.
9  Q. I just want to make sure I
10 understand. So you were focusing that answer on
11 constantly discussing the same thing. Was there
12 any action that was being implemented at the
13 time that these discussions were happening?
14 A. Yes. David Hollasch and I actually
15 gave this presentation at the operating units.
16 We enforced on it, we did ride-alongs on it, we
17 -- we worked very hard to bring this
18 multidisciplinary remediation through all the
19 different functional groups. It was important
20 to get the buy-in of legal, of Marty, of Cindy.
21 It was many, many meetings, everyone with the
22 goal to remediate Q3 2008 issues.
23 Q. Are you familiar with the term
24 speak-up culture?
25 A. Yes.

**Page 228**

1  Q. What does that mean?
2  A. Speak-up culture was -- there were
3  a couple of different things that we did to try
4  to get the message out, you know, to speak up,
5  to file a complaint. And, one of the things
6  that we did is, Julie let me spend money to go
7  to a vendor who gave us a little, like, Rubik's
8  Cube-type thing, it was a toy that you could
9  play with, and it advertised speaking up, and it
10 advertised the hotline and it talked about doing
11 the right thing.
12         I don't know if I have any of them
13 any more, it's hard to explain, but it could
14 open, it could fold, it was a toy, and we got
15 thousands of those to be able to hand out to
16 people, you know, when they did training, to try
17 to impress upon them the importance of speaking
18 up if you see that people aren't following the
19 remediation training.
20 Q. Did Novartis have a speak-up
21 culture?
22         MR. GRUENSTEIN: Objection; vague.
23 A. I don't know.
24 Q. Do you think that the efforts with
25 the Rubik's Cube to popularize about speaking up

### Page 253

1 going to the speaker program, yes, to learn
2 about Novartis products, but also to ask the
3 question about a kind of patient and to talk --
4 and the doctor could talk about it.
5     A lot of the discussions that
6 happened afterwards, where there were medical
7 discussions, a lot of times it would be those,
8 or it would be people exchanging, you know,
9 their kind of case experiences.
10    Q.   I believe you testified that even
11 when the presentations were 15 minutes, they
12 could still be 15 minutes of education, is that
13 correct?
14    A.   They could.
15        MS. JUDE:  Objection; misstates
16 testimony.
17    A.   Potentially could, yeah.
18    Q.   And could that still be valuable to
19 a doctor?
20        MS. JUDE:  Objection; calls for
21 speculation.
22    A.   It could.
23    Q.   You also testified about some work
24 that you did in Tampa, do you recall that?
25    A.   Yes.

### Page 255

1     A.   It was someone from Cravath, and I
2 think her name was Nina Dillon, something like
3 that.
4     Q.   Was also WilmerHale involved,
5 that's another law firm?
6     A.   I know WilmerHale.  I don't
7 recall Wilmer -- I don't recall people other
8 than Cravath.
9     Q.   That's the way I like it, that
10 people should only remember Cravath.  For good
11 things, though.
12        Did Cravath assist in the
13 investigation?
14    A.   As I recall, the answer is yes.
15    Q.   By hiring -- strike that.  Did you
16 believe that Novartis was taking the allegations
17 about Dr. ▮▮▮▮ seriously?
18        MS. JUDE:  Objection.
19    A.   I was taking it seriously.
20    Q.   What were you doing to show that
21 you were taking it seriously?
22    A.   Acting upon it, taking people down
23 to Tampa, more than one person.
24    Q.   And what was the outcome of the
25 investigation, if you recall?

### Page 254

1     Q.   Was that involving Dr. ▮▮▮▮?
2     A.   Yes.
3     Q.   Now, was that a run-of-the-mill
4 audit or was that an internal investigation?
5     A.   It was a combo of the two.
6     Q.   Let me ask the question slightly
7 differently.  What led you to look into
8 Dr. ▮▮▮▮, if you recall?
9     A.   I'm not sure I recall.  If you want
10 me to guess, I am guessing.
11    Q.   No guessing.  Not necessary.
12    A.   All right.
13    Q.   Unless your lawyer wants you to
14 guess.  But I don't want you to guess.
15    A.   Okay.
16    Q.   Do you recall that there was a
17 letter that was sent to Novartis about
18 Dr. ▮▮▮▮?
19    A.   No, I don't.
20    Q.   Are you aware -- let me strike
21 that.  When you looked into -- strike that.
22 When you investigated Dr. ▮▮▮▮, did you do it
23 with an outside counsel?
24    A.   Yes.
25    Q.   Who was the outside counsel?

### Page 256

1     A.   The outcome is that it was turned
2 over to outside counsel.
3     Q.   To further investigate, is that
4 correct?
5     A.   I do not know.
6     Q.   Are you aware that Dr. ▮▮▮▮ was
7 taken off of the speaker list?
8        MS. JUDE:  Objection; leading.
9     A.   I did not know.
10    Q.   Would you be happy to hear that
11 Dr. ▮▮▮▮ was taken off the speaker list?
12    A.   I would be.
13    Q.   You also talked about New Haven.
14 Was that just -- was that an audit or an
15 investigation?
16    A.   It was an audit.
17    Q.   And there, I believe you testified,
18 you found no issues?
19    A.   I do not recall finding issues.
20    Q.   And then either North Carolina or
21 South Carolina, was that an audit or
22 investigation?
23    A.   Audit.
24    Q.   And again, I believe you testified
25 that you didn't recall finding any issues?

**Page 265**

1  that -- that you pay the speaker for is the
2  ability to be able to answer questions, so you
3  send the speakers new articles, you send them
4  FAQs, so that they can answer frequently asked
5  questions, and do it in a succinct and logical
6  manner.  So I think that there was the intention
7  there.
8       Q.    Did anyone at Novartis explain to
9  you, when you were hired, why they wanted to
10 jump start their auditing, monitoring and
11 investigations department?
12      A.    Julie explained to me when I was
13 hired that they had a gap in investigations and
14 they hadn't done auditing and monitoring, and we
15 had a successful program at Daiichi Sankyo, and
16 she basically wanted to transplant the
17 department so that the auditing and monitoring
18 system that we created at Daiichi Sankyo could
19 be made Novartis-like.
20      Q.    And when you said earlier that you
21 wouldn't have been surprised to learn that 100
22 people were working on implementing the
23 remediation following the 2008 Q3 audit, you
24 don't know whether it was 100 or fewer than 100,
25 right?

**Page 266**

1       A.    I don't know, you know, and I
2  didn't say that they were working on it full
3  time.
4       Q.    That was going to be my next
5  question.
6       A.    There was a number -- so, for
7  example, in each operating unit, the VP
8  designated a person to be in charge of getting
9  the remediation implemented through the OU, so
10 that person was working on it.
11           People in Cindy Cetani's elongated
12 group, meaning that they worked on speaker
13 programs, things like that, those people worked
14 on the remediation.  People in ethics and
15 compliance worked on it.  Other, you know,
16 managers were given checklists to work on it.
17 There were a number of different people that
18 were assigned the job to help implement the
19 remediation.
20      Q.    So when you were estimating the
21 number of people who might have worked on the
22 remediation, was that estimate the number of
23 people who would have touched on it in some way?
24      A.    Yes.
25      Q.    And not the number of people who

**Page 267**

1  would have been dedicating the majority of their
2  time to that, correct?
3       A.    Correct.  Correct.  There was no
4  person hired to only do this remediation.
5       Q.    There was no employee at Novartis
6  whose full-time job was remediation?
7       A.    Correct.
8           MS. JUDE:  That's it.
9           THE WITNESS:  Okay.
10          MR. GRUENSTEIN:  Just make sure
11 that Mr. Glaser doesn't have any clarifying
12 questions.
13          MR. GLASER:  I have no questions.
14 Thank you.
15          THE VIDEOGRAPHER:  This marks the
16 end of tape 5.  We are going off the record.
17 The time is 6:43.
18
19          (Whereupon, the deposition
20 concluded at 6:43 p.m.)
21
22
23              - - -
24
25

**Page 268**

1              C E R T I F I C A T E
2
3  STATE OF NEW YORK      ) ss.
4  COUNTY OF NEW YORK     )
5
6       I, ROBERTA CAIOLA, a Shorthand Reporter
7  and Notary Public within and for the State of
8  New York, do hereby certify:
9       That NATALIE ELAINE NELSON-LING, the
10 witness whose deposition is hereinbefore set
11 forth, was duly sworn by me and that such
12 deposition is a true record of the testimony
13 given by the witness.
14      I further certify that I am not related to
15 any of the parties to this action by blood or
16 marriage, and that I am in no way interested in
17 the outcome of this matter.
18      In witness whereof, I have hereunto set my
19 hand on this date, October 23, 2016.
20          (SIGNED ELECTRONICALLY)
21          ROBERTA CAIOLA
22          STATE OF NEW YORK
23          (My commission expires April 2018)
24
25