# EXHIBIT 66

**Execution Version**

# PHARMACY BENEFIT MANAGEMENT SERVICES AGREEMENT

**by and among**

**WellPoint, Inc., on behalf of itself and its Designated Affiliates**
**and**

**Express Scripts, Inc., on behalf of itself and its subsidiaries**

**THIS PHARMACY BENEFIT MANAGEMENT SERVICES AGREEMENT** ("Agreement") is dated as of December 1, 2009, by and among WellPoint, Inc., on behalf of itself and its Designated Affiliates (hereinafter referred to collectively as "WellPoint"), and Express Scripts, Inc., on behalf of itself and its subsidiaries ("PBM") (collectively, WellPoint and PBM are referred to as the "Parties," and each separately as a "Party").

## RECITALS

**WHEREAS,** WellPoint offers health benefit plans in the group, individual, and federal market places;

**WHEREAS**, WellPoint desires to retain PBM to provide certain pharmacy benefit management services, as more fully set forth in this Agreement, with respect to such health plans;

**WHEREAS,** PBM desires to provide WellPoint certain pharmacy benefit management services, as set forth in this Agreement, with respect to health plans;

**NOW, THEREFORE,** in consideration of the terms and conditions set forth in this Agreement, the Parties agree as follows:

1. **DEFINITIONS**

   1.1 **"Affiliate"** shall mean any entity controlling or controlled by or under common control with a Party, at the time of execution of the Agreement and any time thereafter, where "control" is defined as (a) the ownership of at least fifty percent (50%) of the equity or beneficial interest of such entity, or (b) any other entity with respect to which such Party has significant management or operational responsibility (even though such Party may own less than fifty percent (50%) of the equity of such entity).

   1.2 **"Assistance Event"** shall mean an insourcing occurrence or termination of this Agreement.

1.3    **"Association"** shall mean the Blue Cross Blue Shield Association, an association of independent Blue Cross and Blue Shield Companies.

1.4    **"Average Wholesale Price" or "AWP"** shall mean the average wholesale price of a prescription drug as established and reported by the Pricing Source.  The applied AWP of a drug shall be the AWP for the actual eleven (11) digit National Drug Code ("NDC"), drug specific, quantity appropriate to the actual package size dispensed to a Covered Individual and submitted by a Network Pharmacy, mail order Pharmacy, or Specialty Pharmacy at the time that the prescription is filled.  For mail order prescription drugs, PBM shall not use AWPs of licensed re-packagers where the data source identifies an AWP price greater than the AWP price reported by the pharmaceutical manufacturer.  PBM shall update AWP data no less than weekly.

1.5    **"Brand"** shall mean the marks, symbols or logos of the Association.

1.6    **"Brand Drug"** shall mean a prescription drug product that is not a Generic Drug.

1.7    **"Brand Regulations"** shall mean any and all rules promulgated by the Association that set standards regarding the use of any Blue Cross and Blue Shield products, services, programs, marks, symbols or logos.

1.8    **"Claim"** shall mean an electronic or paper request for reimbursement as a result of a Pharmacy (or other provider in a manner described in Section 1.51 hereof) dispensing a Covered Prescription to a Covered Individual.

1.9    **"Compound Drug"** shall mean a mixture of two or more ingredients when at least one of the ingredients in the preparation is a federal legend drug or state restricted drug in a therapeutic amount.  It excludes the addition of only water or flavoring to any preparation.

1.10   **"Contract Quarter"** means, throughout the term of this Agreement, the three (3) month period (or portion thereof) commencing on the Effective Date and each January 1, April 1, July 1 or October 1 thereafter.

1.11   **"Contract Year"** means, throughout the term of this Agreement, the twelve (12) month period (or portion thereof) commencing on the Effective Date and each January 1 thereafter.

1.12   **"Cost Share"** shall mean, with respect to Covered Services, an amount which a Covered Individual is required to pay under the terms of the applicable Plan.  Such payment may be referred to as an allowance, coinsurance, copayment, deductible, penalty or other Covered Individual payment responsibility, and may be a fixed amount or a percentage of applicable payment for Covered Services rendered to the Covered Individual.

2

1.13 **"Coverage Document"** shall mean a written document, and any addenda or endorsements that provide for administrative services by WellPoint, and describe the benefits, services, exclusions, limitations and conditions that are available for or applicable to coverage under the applicable Plan's prescription drug benefit program. Prior to implementation of any Plan pursuant to this Agreement, WellPoint shall complete PBM's standard set-up forms, which when completed and signed by WellPoint, will describe the essential benefit elements of the Coverage Document, including, but not limited to, the coverage rules adopted by the Plan sponsor.  PBM shall use these completed set-up forms for purposes of administering a Plan's prescription drug program.

1.14 **"Covered Individual"** shall mean an individual who is eligible, as determined by WellPoint, to receive Covered Services under a Plan.

1.15 **"Covered Quantity"** shall mean a quantity of a Covered Prescription as allowed by law and the Plan and authorized by a prescriber.

1.16 **"Covered Refill"** shall mean refills of a Covered Quantity of a Covered Prescription as allowed by law and the Plan and authorized by a prescriber.

1.17 **"Covered Service"** or **"Covered Prescriptions"** shall mean any medically necessary drugs, devices, supplies, equipment, and other items (which may include insulin, disposable insulin syringes, and other diabetic supplies) dispensed to a Covered Individual for which such Covered Individual is entitled to receive in accordance with and subject to the terms and conditions (including any Covered Quantity, Covered Refill, or other limiting provisions) of the applicable Plan, including all services usually and customarily rendered by a Pharmacy in the normal course of business, including but not limited to dispensing, counseling, and product consultation.

1.18 **"Delegated Organization Policy and Procedure Manual"** or **"Delegation Manual"** shall mean the manual furnished by WellPoint to PBM which describes WellPoint's policies and procedures and sets forth NCQA/URAC standards to be followed by PBM for those activities that WellPoint has delegated to PBM under this Agreement.

1.19 **"Designated Affiliates"** shall mean an Affiliate of WellPoint that receives services from PBM pursuant to this Agreement.  The initial Designated Affiliates as of the Effective Date are identified in Exhibit M.  WellPoint shall, following the Effective Date and throughout the Term promptly: (i) update Exhibit M to include any such future Designated Affiliate; and (ii) coordinate execution of a written instrument between the parties to amend Exhibit M accordingly.  WellPoint shall ensure absolutely, be responsible for and liable for the performance of any and all obligations (monetary or otherwise) of the Designated Affiliates (and any such Designated Affiliates's successors and assigns) in connection with, and under, this

3

CONFIDENTIAL INFORMATION        Subject to Protective Order        NOVARTIS-USAO-0140422

Agreement.  In no event shall WellPoint take any position (legal or otherwise) inconsistent whatsoever with the intent of the foregoing sentence.

1.20   **"Dispensing Fee"** shall mean the amount charged by PBM to WellPoint and Covered Individuals for professional services rendered by a licensed pharmacist for providing Covered Services to Covered Individuals.

1.21   **"Duplicate Claim"** shall mean a Claim that has the same Pharmacy, Covered Individual, date of service, prescription number and NDC as another Claim.

1.22   **"Effective Date"** shall mean December 1, 2009.

1.23   **"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended from time to time, and regulations issued thereunder from time to time by the Department of Labor.

1.24   **"FEHBP"** shall mean the Federal Employees Health Benefits Program.

1.25   **"Formulary"** shall mean any continually updated list and classification of approved prescription drugs based on a review of their clinical efficacy, safety, uniqueness and cost effectiveness.

1.26   **"Generic Drug"** shall mean a prescription drug, whether identified by its chemical, proprietary, or non-proprietary name that is accepted by the U.S. Food and Drug Administration as therapeutically equivalent and interchangeable with drugs having an identical amount of the same active ingredient.  For purposes of the Net Effective Discount Guarantee for Generic Drugs, the Generic Drug determination will be made by PBM, for all of its clients, using indicators from the Pricing Source on the basis of PBM's standard proprietary brand/generic algorithm, a copy of which will be provided to WellPoint upon request.  PBM shall consult with WellPoint concerning, and provide thirty (30) days' (or such other period of time if thirty (30) days is not feasible, but in all cases promptly) prior written notice of, any change in such brand/generic algorithm.  PBM shall provide written notice of changes (i.e., additions or deletions) to the list of Generic Drugs within thirty (30) days of any such changes to the list.

1.27   **"Government Entity"** shall mean the United States of America, the states, counties, municipalities, any district, department, agency, or other political division thereof, or any political subdivision of any of the foregoing, and any court or instrumentality having or exercising jurisdiction over either of the Parties.

1.28   **"HIPAA"** shall mean the Health Insurance Portability and Accountability Act of 1996 and regulations issued thereunder from time to time.

4

**1.29**   **"Implementation"** shall mean the migration of in-force WellPoint business to PBM, addition to new Plans sold or business acquired and the implementation of new benefits for existing benefits.

**1.30**   **"Ingredient Cost Charge"** shall mean the ingredient cost portion of the amount charged by PBM to WellPoint and Covered Individuals for a prescription drug at the time PBM bills WellPoint.

**1.31**   **"MAC List"** means a list of prescription drug products identified as readily available as Generic Drugs, generally equivalent to a Brand Drug (in which case the Brand Drug may also be on the MAC List) and which are deemed to require pricing management due to the number of manufacturers, utilization and pricing volatility. PBM shall provide WellPoint with a list of the drugs on the MAC List quarterly. Whether a Claim processes at the generic Ingredient Cost Charge is subject to the Covered Prescription's inclusion on the MAC List and the application of "dispensed as written" protocols and Plan defined plan design and coverage policies.  PBM represents and warrants that it will apply a comprehensive, low-cost MAC List to WellPoint throughout the Term of the Agreement as evidenced by the MAC report provided by PBM to WellPoint periodically.  PBM represents and warrants that at least ninety percent (90%) of all submitted or utilized Generic Drugs will be on the MAC List.  PBM will, consistent with its standard policies, include biologic prescription drugs on the MAC List if the FDA has attached an AB rating (or then comparable rating) to the biologic prescription drug and upon availability of such biologic prescription drug in the marketplace, and will work with WellPoint to develop a program to promote the use of such biologic prescription drugs.

**1.32**   **"Mail Order Pharmacy Services"** shall mean the dispensing of prescription drugs and products through PBM's licensed mail order Pharmacy.

**1.33**   **"Manufacturer Administrative Fee"** shall mean the fees paid to PBM by pharmaceutical manufacturers pursuant to a contract between PBM and the pharmaceutical manufacturer and directly in connection with PBM's administering, invoicing, allocating and collecting the Rebates under PBM's Rebate program.

**1.34**   **"Maximum Reimbursement Amount"** or **"MRA"** is the price charged to WellPoint for a prescription drug product on PBM's MAC List.

**1.35**   **"Medically Necessary"** or **"Medical Necessity"** shall mean the prescription drug(s) that a physician, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms, and that is (1) in accordance with generally accepted standards of medical practice; (2) clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury or disease; and (3) not primarily for the convenience of the patient, physician, or other health care provider, and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the

CONFIDENTIAL INFORMATION         Subject to Protective Order                     NOVARTIS-USAO-0140424

diagnosis or treatment of that patient's illness, injury or disease.  For these purposes, "generally accepted standards of medical practice" shall mean the standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, physician specialty society recommendations and the view of physicians practicing in relevant clinical areas and any other relevant factors, along with any other materials or compendia required by law or accreditation standard.

1.36    **"Net Effective Discount Guarantee"** shall mean the average annual aggregate AWP discount guarantees as determined in accordance with Exhibit A.

1.37    **"Net Effective Dispensing Fee Guarantee"** shall mean the average annual aggregate Dispensing Fee guarantees as determined in accordance with Exhibit A.

1.38    **"Network Pharmacy"** shall mean a Pharmacy (including PBM's mail order Pharmacy and Specialty Pharmacies) that has: (a) met the credentialing and re-credentialing standards of PBM and the applicable requirements of federal or state law; (b) contracted as an independent contractor directly with PBM or is operated by PBM or one of its Affiliates; and (c) agreed to accept discounted rates or fees as payment in full for Covered Prescriptions provided to Covered Individuals, subject to applicable Cost Share.

1.39    **"NCQA"** shall mean the National Committee for Quality Assurance, an accreditation program for managed care organizations.

1.40    **"Other Manufacturer Revenues"** shall mean any monetary amount that is to be remitted to PBM or its Affiliates from a pharmaceutical manufacturer pursuant to a written agreement between PBM or its Affiliates or agent of PBM or its Affiliates and such pharmaceutical manufacturer or agent of the pharmaceutical manufacturer which may or may not be based on the utilization of specific products processed for a Covered Individual.  Other Manufacturer Revenues shall include any other administrative fees, fees for data, or fees for Formulary management communications or other clinical services paid by pharmaceutical manufacturers to PBM. Notwithstanding the foregoing, Other Manufacturer Revenues shall not include Pharma Revenue, Rebates or Manufacturer Administrative Fees as defined herein.

1.41    **"Paid Claim"** shall mean a Claim that meets coverage requirements and is subsequently paid.  All Claims with an associated Rejected Claim, Reversed Claim, or Duplicate Claim shall not be considered Paid Claims and are excluded from the financial and/or service fee considerations.

1.42    **"PBM Agents"** shall mean the agents, subcontractors and representatives of the PBM.

1.43    **"Pharma Revenue"** shall mean Rebates and Manufacturer Administrative Fees.

6

1.44 **"Pharmacy"** means a retail, mail order, or Specialty Pharmacy whose license is in good standing with the appropriate licensing or governing body of the applicable government authority.

1.45 **"Plan"** shall mean any group or individual benefit plan issued or administered by WellPoint, including but not limited to group health plans subject to ERISA, state and local government plans, and plans offered through Medicare, Medicaid or FEHBP, which receive prescription drug benefits under this Agreement.

1.46 **"Pricing Source"** shall mean First DataBank or other nationally recognized third-party pricing source selected by PBM for all of its clients. PBM shall consult with WellPoint concerning, and provide thirty (30) days' prior written notice of, any change in the Pricing Source. Pricing Source changes shall be subject to the price adjustment provisions in Section 5.4(e). PBM shall not utilize more than one (1) Pricing Source hereunder and shall use the same updated national drug file for invoicing WellPoint and for paying Network Pharmacies.

1.47 **"Rebate"** shall mean the contractual retrospective formulary rebates that are paid to PBM from a pharmaceutical manufacturer pursuant to a written agreement between PBM and such pharmaceutical manufacturer that is negotiated independently by PBM with such pharmaceutical manufacturer, and directly attributable to the utilization of certain pharmaceuticals by Covered Individuals. Rebates shall not include Manufacturer Administrative Fees, Other Manufacturer Revenues, and any other administrative fees, fees for data, or fees for Formulary management communications or other clinical services paid by pharmaceutical manufacturers, or any other fees paid to PBM or its Affiliates, should they exist.

1.48 **"Rejected Claim"** shall mean a Claim that is not paid.

1.49 **"Reversed Claim"** shall mean a Claim that initially is paid but a subsequent Claim with the same Pharmacy, Covered Individual, prescription number, and NDC was submitted for reversal of payment.

1.50 **"Single Source Generic Drugs"** shall mean those Generic Drugs which are provided by only one pharmaceutical manufacturer, including an authorized Generic Drug. Single Source Generic Drugs shall cease to be considered Single Source Generic Drugs at such time as multiple manufacturers or distributors of the Generic Drug exist, or after the first six (6) months from the day of the first Generic Drug approval as reported by the Pricing Source, whichever comes first. PBM shall provide WellPoint with the list of Single Source Generic Drugs quarterly.

1.51 **"Specialty Drug"** shall mean those injectable and non-injectable drugs typically having one or more of several key characteristics, including but not limited to: frequent dosing adjustments and intensive clinical monitoring to decrease the potential for drug toxicity and increase the probability for beneficial treatment outcomes; intensive patient training and compliance assistance to facilitate

7

therapeutic goals; limited or exclusive product availability and distribution; specialized product handling and/or administration requirements and/or cost in excess of $500 for a 30-day supply.  PBM's current Specialty Drug list is attached hereto as <u>Exhibit</u> F.  PBM shall update such list of Specialty Drugs as new drugs are brought to market and will consult with and add drugs at the reasonable request of the WellPoint Specialty Steering Committee.  Notwithstanding the foregoing, WellPoint acknowledges and agrees that PBM shall price all such additional drugs consistent with its standard practices, acting reasonably and in good faith.  All such updates shall be made available to WellPoint and Plans in a timely manner.  Specialty Drug shall not include specialty drugs obtained through a physician or any other provider other than a Network Pharmacy, unless WellPoint is able to transmit a Claim for such specialty drug in an electronic manner consistent with this Agreement.

1.52    **"Specialty Pharmacy"** shall mean a Network Pharmacy that provides Specialty Drugs to Covered Individuals.  Notwithstanding the foregoing, WellPoint agrees that except for those limited instances where WellPoint is contractually obligated with one or more of its providers to provide access to Specialty Drugs through the provider's owned or operated specialty pharmacy (e.g., an academic medical center) (a "WellPoint-Contracted Specialty Pharmacy"), or where PBM is unsuccessful in securing access to limited distribution or other Specialty Drugs, WellPoint and the Plans shall use PBM's wholly-owned Specialty Pharmacy ("PBM's Specialty Pharmacy") as the exclusive provider of Specialty Drugs.  WellPoint agrees to administer benefit designs for its Plans accordingly to the extent permitted by law.  Nothing herein shall be deemed to restrict or limit in any manner WellPoint's or the Plans' ability to contract directly with Specialty Pharmacies (or specialty pharmacies) to provide specialty pharmacy services which are covered under the Plan's medical benefit, rather than the pharmacy benefit.

1.53    **"Term"** shall mean the period beginning on the Effective Date and continuing until the later of: (i) ten (10) years from the Effective Date, or (ii) December 31, 2019.

1.54    **"Transition Assistance Period"** shall mean each period of time, as agreed to by WellPoint and PBM, after the commencement of an Assistance Event, during which period PBM shall provide Transition Assistance Services.

1.55    **"Transition Assistance Services"** shall mean (a) services as described in Section 6.4 provided by PBM (including the terminated, insourced, or expired services and, in each case, any replacements thereof or supplements thereto), to the extent WellPoint requests such services during a Transition Assistance Period, (b) PBM's cooperation with WellPoint or any third party designated by WellPoint in the transfer of the services (or replacement or supplemental services) to WellPoint or a third party and (c) any services described in Section 6.4 which are requested by WellPoint in order to facilitate the transfer of services (or replacement or supplemental services) to WellPoint or a third party.

8

1.56 **"Transition Services Agreement"** shall mean that certain Transition Services Agreement by and between WellPoint and PBM, dated December 1, 2009.

1.57 **"URAC"** shall mean an accreditation program for pharmacy benefit management entities.

1.58 **"Usual and Customary (U&C) Charge"** shall mean the amount a regular cash-paying customer pays a Pharmacy for a pharmaceutical good or service and is submitted to PBM. PBM shall require Network Pharmacies to submit their Usual and Customary Charges with all Claim submissions.

1.59 **"Usual and Customary (U&C) Claim"** shall mean a Claim where the Ingredient Cost Charge plus the Dispensing Fee is greater than or equal to the Usual and Customary Charge for a Pharmacy for a pharmaceutical good or service. These Claims will be excluded from Brand Drug and Generic Drug Net Effective Discount Guarantees. The calculation for the identification of these Claims will be as follows: Usual and Customary Claim Calculation: U&C – (Ingredient Cost Charge + Dispensing Fee) = Less than or equal to "0" (zero).

## 2.    DUTIES AND AUTHORITY OF WELLPOINT

### 2.1   Offer Drug Benefits to Plans.

(a)   WellPoint will offer to Plans the prescription drug benefits administered by the PBM pursuant to this Agreement. WellPoint will be the entity that enters into the Coverage Documents with a Plan or sponsor(s) of such Plan, and such Coverage Documents may make available other WellPoint products and services.

(b)   WellPoint will have exclusive authority and responsibility for account management of all Plans. PBM shall, at the request of WellPoint, support WellPoint's account management teams in the support of WellPoint's Plans, including cooperating with, and supporting, Plan audits.

(c)   WellPoint shall provide Covered Individuals with access to websites which will provide the Covered Individual with various services, information and tools related to the pharmacy benefit. PBM shall provide WellPoint, at no additional charge, with web support and assistance, including PBM's web tools, content and enhancements currently in place and those developed in the future. PBM will provide such services in accordance with all applicable provisions of this Agreement, including, but not limited to, Exhibit L. PBM will ensure that all Covered Individuals have access to all of PBM's functionality and services. PBM will also ensure that Covered Individuals do not have direct access to PBM's website and are redirected to the WellPoint or Plan site, in a manner specified or approved by WellPoint. Initially, WellPoint and PBM shall provide Covered Individuals with single sign-on

9

link(s) from their respective Plan sites (i.e., Anthem.com) to an express-scripts.com co-branded site. The co-branding shall consist of the PBM's logo and the applicable Plan logo. In addition, PBM will work with WellPoint on the development of an integrated approach, wherein the Covered Individual would have access to PBM's functionality and services within the architecture of the Plan site. The parties shall make a good faith effort to continue the development of an integrated approach and implement as soon as reasonably possible, in a timeframe and manner consistent with the release of WLP/Anthem next generation website and the planned migrations to ESI systems.

(d)     WellPoint will produce and distribute ID cards which shall include PBM's bin number and customer service number to Covered Individuals.

**2.2     Furnish Data to PBM**. WellPoint shall provide eligibility, enrollment and other data reasonably necessary for PBM to perform its obligations under this Agreement as determined by the Parties ("WellPoint Data") via electronic media transfer in a form mutually agreeable to the Parties (the "Eligibility File"), and on a periodic basis as agreed between the Parties. In the event PBM knows or has reason to know that the WellPoint Data is inaccurate or incomplete, PBM shall notify WellPoint of the same as soon as feasible. WellPoint shall be responsible for payment to PBM for all Claims during the period of the Covered Individual's eligibility as indicated on the Eligibility File, including for retroactively termed Covered Individuals, except in the event of PBM's error in loading and/or administering the Eligibility File. All right, title and interest in and to all WellPoint Data related to the Covered Individuals provided by WellPoint to PBM hereunder shall be owned exclusively by WellPoint. WellPoint grants PBM and PBM's respective suppliers, during the Term, an irrevocable, non-exclusive, royalty-free right and license to use the WellPoint Data (i) in connection with performance of its obligations under this Agreement, and (ii) in the aggregate and de-identified form, for PBM's own research purposes (not for purposes of data sales), so long as such research purposes are consistent with applicable law. Notwithstanding the foregoing, PBM will not use, for such research purposes, the data of WellPoint clients for which WellPoint has provided PBM written notice that such use is not permitted by the terms of WellPoint's agreement with such client.

**2.3     Regulatory Compliance**. WellPoint, at its own cost, shall (i) obtain and maintain all federal, state, and local licenses, permits, certificates, and other regulatory approvals that are necessary for WellPoint to perform its obligations under this Agreement and shall supply evidence of such licensure, compliance and certifications to PBM upon request; (ii) comply with all applicable laws in offering the prescription drug benefits to Plans and performing its obligations under this Agreement, including, but not limited to, all federal or state laws relating to fraudulent, abusive, or unlawful practices connected in any way with the provision of health care items or services, cost reporting requirements, or the billing for or claims for reimbursement for such items or services provided to a beneficiary of any state, federal, or other

10

CONFIDENTIAL INFORMATION          Subject to Protective Order          NOVARTIS-USAO-0140429

governmental health care or health insurance program or any non-governmental health care plan or health insurance arrangement; and (iii) use best efforts to provide promptly to PBM, but not later than ten (10) business days after receipt by WellPoint (or such longer period of time as reasonable under the circumstances, but in all cases promptly), information regarding potentially adverse material inquiries received by WellPoint, which are directly related to WellPoint's performance of this Agreement, from accreditation agencies or governmental authorities, subject to applicable confidentiality constraints.

**2.4   Benefits Design**.  WellPoint shall consult with PBM concerning modifications to benefits design, which shall include consideration of the impact of any such modification to the respective economic position of each Party.  To the extent that any such plan design modification would have the effect of materially lowering the amount of Pharma Revenue paid to PBM, WellPoint agrees that it shall only implement such plan design modification after the Parties have mutually agreed to an equitable adjustment to the Pharma Revenue guarantees as necessary to maintain PBM's contracted economic position as of the Effective Date.  Subject to the foregoing, WellPoint shall retain discretion and control regarding benefit design decisions with respect to Plans.

**2.5   Formulary Design**.

(a)   WellPoint shall consult with PBM on a regular basis concerning modifications to Formulary design, which shall include consideration of the impact of any such modification to the respective economic position of each Party.  To the extent that any such Formulary design modification would have the effect of materially lowering the amount of Pharma Revenue paid to PBM, WellPoint agrees that it shall only implement such Formulary design modification after the Parties have mutually agreed to an equitable adjustment to the Pharma Revenue guarantees as necessary to maintain PBM's contracted economic position as of the Effective Date.  Subject to the foregoing, WellPoint shall retain discretion and control with respect to all Formulary designs.

(b)   WellPoint is the sole owner of the Formularies which are administered on its behalf by PBM.  WellPoint maintains all right, title, and interest in the Formularies, as updated and amended from time to time, and such Formularies shall be considered the work product of WellPoint.  For all non-material changes to the Formulary, WellPoint shall provide notice to PBM of Formulary changes within thirty (30) business days after formulary change determinations.  For all Formulary changes that would have the effect of materially lowering the amount of Pharma Revenue paid to PBM, Section 2.5(a) above shall control (i.e., any such change shall not be made until the process set forth in Section 2.5(a) above is concluded).  PBM shall cease using such Formularies upon termination of this Agreement for any reason.  PBM shall have no right to use any Formulary developed by WellPoint after the termination of this Agreement for any reason.

11

**2.6**   **P&T and VA Committees**.   Throughout the Term of this Agreement, WellPoint shall maintain its own Pharmacy and Therapeutic ("P&T") and Value Assessment ("VA") committees.   WellPoint will control all P&T and VA committee processes and functions including, without limitation, the continued use of WellPoint's Health Technologies Assessment Guidelines and clinical appraisal Clinical Review Committee ("CRC") process.

**2.7**   **Right to Negotiate Rebates**.   WellPoint shall have the right to observe and participate in PBM's client-select option negotiations with pharmaceutical manufacturers applicable to this Agreement, should they occur.   In general, PBM will utilize its standard proprietary Rebate processes and contracts with respect to this Agreement in order to maximize efficiencies.   WellPoint may at any time propose to PBM that PBM enter into a client-select Rebate or similar option with a pharmaceutical manufacturer.   PBM shall work with WellPoint in good faith to enter into a client-select option with that pharmaceutical manufacturer on commercially reasonable terms and conditions and pursuant to PBM's current processes.

**2.8**   **Approval and Distribution of Materials to Plans**.   WellPoint shall review and approve (which approval shall not be unreasonably withheld) any and all communications (written, electronic or otherwise) to Plans, Covered Individuals, WellPoint contracted providers (nothing in the foregoing shall be construed to grant WellPoint review and approval rights with respect to PBM's communications with PBM contracted Network Pharmacies), or other WellPoint stakeholders relating to prescription drug services provided under this Agreement and shall have the authority to distribute directly, or direct the PBM to distribute on its behalf, such materials. PBM shall comply with all applicable Brand Regulations, as directed by WellPoint, in connection with its preparation and distribution of communications under this Agreement.

**2.9**   **Administrative Fees, Pricing and Other Costs**.   WellPoint shall pay PBM compensation for Claims (other than amounts that are reasonably disputed) according to the Claims payment method described in Exhibit C.   WellPoint shall pay the administrative and other fees set forth in Section 5 and Exhibit A (other than amounts that are reasonably disputed) according to the administrative service fee payment method described in Exhibit C.

**2.10**   **Pricing Differential.**

   (a)      WellPoint reserves the right to offer its Plans a network reimbursement rate and/or Rebate payment that is different from the Net Effective Discount Guarantees, Net Effective Dispensing Fee Guarantees and Pharma Revenue Guarantees set forth in this Agreement, provided that WellPoint shall provide such disclosures to Plans as may be required by applicable law or as it otherwise deems appropriate under the circumstances.   Such pricing differentials shall include, but not be limited to, Brand Drug and Generic Drug

12

discounts, Specialty Drug discounts, Dispensing Fees, access fees, administrative fees, and Pharma Revenue payments for Prescription Drugs dispensed at retail, mail and specialty Network Pharmacies. Further, such pricing differentials may include any or all of WellPoint's lines of business, including without limitation any group, individual, Medicare, Medicaid or FEHBP customers.

(b) Upon request from WellPoint, and on a Plan by Plan basis, PBM shall load the pricing received from WellPoint at the Plan level prior to the implementation of the effective date of such pricing. The Plan level pricing shall be included in the Claims Detail Layout file provided by PBM to WellPoint. Such Claims Detail Layout file shall be used by WellPoint to invoice its Plans. Additionally, PBM shall reconcile the Plan level pricing with the contract pricing no less than monthly and provide WellPoint with a credit on the next invoice immediately following such reconciliation.

**2.11    Complaints/Appeals and Grievances**. WellPoint shall be responsible for all Plan, provider and Covered Individual grievances and appeals.

**2.12    Access to Eligibility System**. WellPoint will provide PBM personnel access to its eligibility system for the purpose of addressing customer service calls. In addition, WellPoint will be responsible for providing appropriate training to PBM personnel relating to its online system.

**2.13    Prior Authorization/ Utilization Review/Specialty Care Management**. WellPoint shall delegate certain utilization management and Specialty Drug care management functions (hereinafter referred to collectively as "Delegated Functions") to the PBM with respect to Plans and Covered Individuals as described in Exhibit G or WellPoint's Specialty Drug Care Management Guidelines ("Specialty Guidelines"), as appropriate. Such activities will be implemented in accordance with WellPoint's prior authorization and Specialty Guidelines (including Specialty Drug dose management guidelines which specify that the medication dosage billed to the Covered Individual shall be consistent with WellPoint's and standard medical practice guidelines for dosage) and as detailed in Exhibit G or the Specialty Guidelines, as appropriate. WellPoint may revoke or modify this delegation at any time and to any extent during the Term of this Agreement.

**2.14    Pharmacy and Therapeutics Programs, Clinical Programs and Services**. WellPoint shall have the authority to offer existing and new pharmacy and therapeutics programs and clinical programs and services (collectively, "Programs") to Plans and Covered Individuals. WellPoint shall provide P&T drug monographs to its Plans. WellPoint shall consult with PBM regarding the potential operational efficiencies related to such Programs. PBM agrees to provide consulting and technical support in the development, improvement and implementation of such Programs and to administer such Programs.

13

2.15    **Insourcing of PBM Duties and Authority**.  WellPoint may insource any of the duties and authority allocated to PBM under this Agreement only pursuant to the process provided for in this Section 2.15.  Prior to insourcing any such duties, WellPoint shall identify issues with regard to PBM's performance of any such duties under this Agreement for resolution by the Joint Operating Pharmacy Committee pursuant to the procedures provided for in Section 4.1.  Any such issue must rise to the level of non-performance by PBM such that it would provide a basis for termination by WellPoint under Section 6.2(a).  If such issues are not resolved by the Joint Operating Pharmacy Committee, WellPoint may insource services performed by PBM under this Agreement solely to the extent necessary to resolve the issues identified by WellPoint.  The Parties agree that, to the extent WellPoint exercises such authority, the Parties will in good faith negotiate a revision to the economic terms of the Agreement to preserve the Parties' relative economics prior to WellPoint's exercise of such authority.  Upon WellPoint's request, PBM shall provide Transition Assistance Services with respect to any such insourced or resourced Services as provided in Section 6.4(a) through (c).

2.16    **WellPoint Systems.**

(a)    WellPoint will retain ownership over certain current information systems that support WellPoint's affiliated pharmacy benefit management business as set forth in the separate Transition Services Agreement.   Until WellPoint's business is fully migrated over to PBM's systems and operations, WellPoint shall continue to provide support services pursuant to the terms of the Transition Services Agreement.   Notwithstanding WellPoint's provision of such support services under the Transition Services Agreement, PBM shall not be relieved of its duties under this Agreement, except that during the migration of WellPoint's business over to PBM's systems and operations, PBM shall not be subject to the performance guarantees set forth on Exhibit D or Exhibit I (except as mandated by CMS and at such CMS mandated levels) for groups and individuals, covered under Plans, that are not fully migrated to PBM's systems and operations.  Penalties for missed performance guarantees for fully migrated groups and individuals shall be prorated based on the percentage of lives fully migrated to PBM's systems and operations.  Groups and individuals will be migrated to the following PBM systems during the transition: (1) adjudication platform; (2) call center systems; (3) order processing systems; and (4) fulfillment management systems.  When a group or individual is fully migrated to all four (4) of these PBM systems ("Completed Migration"), the PBM shall thereafter by held accountable under the following operational performance guarantees for such migrated groups and individuals during the transition:

-    Account Management Services
-    Member Customer Service
-    Pharmacy Customer Service
-    Pharmacy Network

14

- Retail Claims Processing
- Mail Order Services
- Reporting
- Generic Dispensing Rates
- Miscellaneous Services
- Utilization Management
- Medicare Part D

(b)     Implementation Services guarantees are calculated every six (6) months following the Effective Date. At each such period, the Implementation Services guarantees will be calculated in the aggregate for those groups and individuals that have been fully migrated to PBM systems and operations. This measurement process (i.e., every six (6) months) will continue until every group and individual served by a Plan is fully migrated to PBM's systems and operations. Any penalties that may be due as a result of PBM failing to meet the Implementation Services guarantees will be prorated based on the percentage of lives fully migrated to PBM's systems during any such six (6) month period.

(c)     Once WellPoint's business is fully migrated over to PBM's systems and operations, as mutually agreed to by the parties acting in good faith, the performance guarantees set forth on Exhibit D and Exhibit I shall thereafter be of full force and effect.

(d)     Notwithstanding anything in this Agreement to the contrary, in no event shall WellPoint's right to terminate this Agreement pursuant to Section 6.2(a) as a result of a Material PG Breach by PBM be of any force or effect until such time as WellPoint's business is fully migrated over to PBM's systems and operations as determined by the Parties pursuant to Section 2.16(c) above.

**2.17    Certain Consideration.**  WellPoint agrees to provide to PBM certain payments in accordance with the provisions of Exhibit O.

**3.      DUTIES AND AUTHORITY OF PBM**

**3.1    Administrative Services.**

(a)     PBM shall provide the administrative services (including the Implementation support services) to WellPoint, Plans and Covered Individuals set forth in this Agreement. To the extent services to be performed by PBM are not more fully described in this Agreement the Parties agree to execute an addendum to the Agreement to reflect the rights and obligations of the Parties with respect to those services. WellPoint shall cooperate with PBM's performance of the administrative services to be provided by PBM pursuant to this Agreement. PBM shall perform these services on behalf of WellPoint in a prudent and expert manner in accordance with this Agreement and all applicable laws.

15

(b)    Except to the extent that, following the Effective Date, WellPoint elects to implement programs or additional services (with PBM administrative fees agreed to by the Parties), the fees set forth in Exhibit A shall include all of the fees and compensation to be paid by WellPoint for the administrative services set forth in this Agreement.  PBM agrees that it shall not impose any additional fee for any services during the Term of this Agreement without the prior written consent of WellPoint.

**3.2**    **Regulatory Compliance**.

(a)    During the Term of this Agreement, PBM shall, at its own cost:  (i) obtain and maintain all federal, state, and local licenses, permits, certificates, and other regulatory approvals that are necessary for PBM to perform its obligations under this Agreement, including any state law requirements imposed upon WellPoint, Plans, or PBM that relate to PBM's contracting with Network Pharmacies, and shall supply evidence of such licensure, compliance and certifications to WellPoint upon request; (ii) comply with all applicable laws in performing its obligations under this Agreement, including, but not limited to, all federal or state laws relating to fraudulent, abusive or unlawful practices connected in any way with the provision of health care items or services, cost reporting requirements, or the billing for or claims for reimbursement for such items or services provided to a beneficiary of any state, federal or other governmental health care or health insurance program or any non-governmental health care plan or health insurance arrangement; and (iii) use best efforts to provide promptly to WellPoint, but not later than ten (10) business days after receipt by PBM (or such longer period of time as reasonable under the circumstances, but in all cases promptly), information regarding potentially adverse material inquiries received by PBM from accreditation agencies, governmental authorities, or pharmaceutical manufacturers regarding PBM services delivered pursuant to this Agreement subject to applicable confidentiality constraints.  Without limiting the generality of the foregoing, PBM shall, in the timeframe set forth above, forward to WellPoint all Department of Insurance complaints received by PBM, with respect to services provided under this Agreement, for response by WellPoint.  PBM shall cooperate fully with WellPoint in responding to such complaints, including providing all information reasonably necessary, and to the extent PBM has such information, for WellPoint to respond to Department of Insurance complaints.  From time to time legislative bodies, boards, departments or agencies may enact or issue laws, rules, or regulations pertinent to this Agreement, and, subject to Section 16.3, PBM agrees to abide by all said laws, rules, or regulations to the extent applicable.

(b)    PBM represents and warrants that at the time of entering into this Agreement, neither it nor its Affiliates nor any of their employees, contractors, subcontractors or agents are ineligible persons identified on the General

16

Services Administration's List of Parties Excluded from Federal Programs (available through the internet at http://www.epls.gov/ or its successor) and the Health and Human Services Department/Office of Inspector General ("HHS/OIG") List of Excluded Individuals/Entities (available through the internet at http://www.oig.hhs.gov/fraud/exclusions.asp or its successor), or as otherwise designated by the federal government.  If PBM or any employees, subcontractors or agents thereof becomes an ineligible person after entering into this Agreement or otherwise fails to disclose its ineligible person status, PBM shall have an obligation to:  (1) immediately notify WellPoint of such ineligible person status upon PBM becoming aware of such status through initial and periodic checks, and (2) within ten (10) days of such notice, remove such individual from responsibility for, or involvement with, the PBM's business operations related to this Agreement.

**3.3    Pharmacy Network**.

(a)    **Retail Network**.  PBM shall arrange through Network Pharmacies for the reasonable availability (more specifically described in Exhibit D) in number and geographic coverage to Covered Individuals of Covered Prescriptions from a network of Pharmacies and shall, during the entire period this Agreement is in effect, maintain a network of Network Pharmacies of sufficient size to meet the needs of the Plans and Covered Individuals.  PBM will use its best efforts to incorporate all Pharmacies that have been in WellPoint's Pharmacy network (including WellPoint's open specialty pharmacy network) so long as such Pharmacies meet PBM's standard terms and conditions for contracting, including PBM's credentialing requirements, and will also incorporate PBM's mail order Pharmacy into the PBM's network as Network Pharmacies no later than the Effective Date of this Agreement.  PBM shall not use the Brands in contracting with the Pharmacies in such network.  PBM shall give WellPoint at least thirty (30) days' advance notice (or such lesser days' notice if the provision of thirty (30) days' notice is not feasible under the circumstances, but in such case, PBM shall be obligated to provide as reasonable amount of notice as feasible) of any material change in the network.

(b)    PBM shall require its Network Pharmacies to be contractually obligated to meet PBM's credentialing and re-credentialing standards including, but not limited to, maintenance of licensure and malpractice insurance, and shall meet the applicable requirements of federal and state law.  PBM shall periodically monitor the continued compliance of Network Pharmacies with its standards and shall take appropriate action, which may include termination, suspension or placement in a probationary status, if a Network Pharmacy fails to comply.

(c)    PBM shall provide on-line, real time, accurate and updated Network Pharmacy information to WellPoint.

17

CONFIDENTIAL INFORMATION        Subject to Protective Order        NOVARTIS-USAO-0140436

(d)     WellPoint may require PBM to terminate any specific Network Pharmacy from the Pharmacy networks serving WellPoint and its Plans.

(e)     WellPoint may from time to time propose to PBM that PBM include a Pharmacy or group of Pharmacies in the Pharmacy Network.  PBM shall use its best efforts to enter into a pharmacy contract with such Pharmacy, based on PBM's standard terms and conditions.   If PBM is unable to execute a pharmacy contract with the Pharmacy within sixty (60) days thereafter, WellPoint may, with PBM's approval, have reasonable participation in the negotiations with that Pharmacy in order for PBM to enter into an agreement with that Pharmacy based upon PBM's standard terms and conditions.

(f)     Upon request from WellPoint, PBM shall create a custom retail Pharmacy network at no charge to WellPoint.

(g)     **Relationship of PBM and Network Pharmacies**.   PBM represents and warrants that it has contracted with Network Pharmacies, as independent contractors of PBM, to provide the prescription drug services described in this Agreement.  Neither WellPoint nor PBM shall be responsible or liable for any claims that may arise from the provision of prescription drug services to Covered Individuals by the Network Pharmacies.  PBM shall disclose to WellPoint the extent to which the Network Pharmacies include entities owned by, or affiliated with, PBM.

(h)     **Hold Harmless**.   Prior to providing to a Covered Individual any of the benefits or services to which such Covered Individual is or may be entitled under a Plan, Network Pharmacies shall be required to collect from the Covered Individual the amount of any applicable Cost Share.  Additionally, Network Pharmacies shall not recover any unpaid balances (over the Cost Share) due Network Pharmacies from such Covered Individuals, but are instead required to recover any unpaid balances from WellPoint or the PBM only.

(i)     PBM will perform computerized system audits of all retail Network Pharmacy Claims under the Plan.  In addition, during the Term of this Agreement, PBM will perform focused desk audits, telephone audits, and on-site field audits of retail Network Pharmacies selected by PBM consistent with PBM's standard Network Pharmacy audit compliance procedures to examine the selected retail Network Pharmacy's compliance with its agreement with PBM.  PBM will, from time to time, but at least semiannually, report to WellPoint the results of its auditing efforts.  PBM agrees to credit or refund to WellPoint one hundred percent (100%) of any applicable funds recovered due to Pharmacy audits.

18

(j)      Notwithstanding the foregoing, PBM acknowledges and agrees that WellPoint may contract directly with Network Pharmacies for immunization services which are covered under the Plan's medical benefit, rather than the pharmacy benefit.

**3.4     Furnish Data to WellPoint**.   PBM shall provide such data to WellPoint or its designees as WellPoint may reasonably request, including without limitation prescription data feeds to Resolution Health, Inc., Health Management Corporation, and HealthCore.  Such data shall be provided via electronic media transfer in a form mutually agreeable to the Parties, and on a periodic basis as agreed between the Parties.

**3.5     Eligibility & Information Systems.**

(a)      PBM agrees to accept WellPoint's current eligibility format, and shall provide real time on-line updates to WellPoint.  Further, PBM will process multiple eligibility files per day as supplied to PBM by WellPoint.  PBM will confirm eligibility files and changes received electronically from WellPoint within twelve (12) hours of receipt, and shall apply and activate the same in the PBM system within twenty-four (24) hours of receipt seven (7) days a week. Manually submitted eligibility changes will be applied to the system within two (2) business days of receipt.  PBM will perform a full file comparison of the WellPoint eligibility data on a monthly basis.

(b)      WellPoint shall be responsible for determining the eligibility of any Covered Individual for Covered Prescriptions.   Upon the request of a Network Pharmacy, PBM shall verify the eligibility of Covered Individuals, based upon the information provided to PBM by WellPoint.

(c)      PBM will reasonably accommodate transmission of historical and current WellPoint member and group eligibility.  PBM will confirm that all Plan, Covered Individual eligibility, and Claims data are loaded correctly by PBM. PBM will accept (from multiple source systems) and apply daily Covered Individual eligibility data, and all updates to include additions and deletions, at no additional cost to WellPoint.  PBM will provide back-end error reporting on eligibility submissions within twenty-four (24) hours of submission by WellPoint, electronically.

(d)      PBM will provide WellPoint personnel with online real-time access to its eligibility system for the purpose of changing, deleting, or adding members to the PBM system, at no cost to WellPoint.   In addition, PBM will be responsible for providing unlimited training, as determined by WellPoint, on its online system to WellPoint personnel, at no cost to WellPoint.

19

(e)    PBM will provide on-line management reports with real time Claims data in the standardized file layout acceptable to WellPoint.

(f)    PBM shall provide a call center for Network Pharmacies and Covered Individuals. PBM or its subcontractors shall not provide the call center or customer services provided to Covered Individuals and Network Pharmacies through an offshore entity without WellPoint's prior written approval, which shall not be unreasonably withheld. PBM shall acquire one or more designated toll free numbers for the call center. In the event of a termination of the Agreement, the toll free numbers shall remain the sole property of WellPoint.

(g)    PBM will apply its usual and customary policies and practices to concurrent DUR edits upon approval from WellPoint, which DUR edits shall be customized and supplemented in accordance with Section 3.9(c) hereof, provide customizable messaging to enhance clinical outcomes and ensure member safety at WellPoint's reasonable request, customize its practices at the reasonable request of WellPoint, and assist WellPoint in WellPoint's performance of similar activities. PBM will use its usual and customary policies and practices in testing all eligibility, Claims, benefit plans, clinical programs and system platforms and will customize its practices at the reasonable request of WellPoint. PBM will support a monitored sign-off process during the conversion process as well as for system change initiatives that may take place during the term of the contract. PBM will provide the ability to transmit data from and to its site via a secured direct transmission line or any other federally approved means of data transmission, at no additional cost to WellPoint. PBM will identify eligibility and billing testing strategies for the conversion and for ongoing system changes.

(h)    PBM is liable for reconciling any and all incorrect payments due to Plans not being set up correctly and/or errors in eligibility administration made by PBM for the Term of this Agreement.

(i)    Subject to the remaining terms of this Agreement, PBM shall administer any and all of the current Plan designs, including the administration of accumulators, in use by WellPoint as provided herein.

(j)    PBM shall provide support for WellPoint's e-prescribing programs and initiatives and shall be responsible for any Rx Hub transaction fees.

**3.6**    **Invoice WellPoint**. PBM shall invoice WellPoint for Paid Claims according to the Claims payment method described in Exhibit C. PBM shall invoice WellPoint for the administrative and other fees set forth in Section 5 and Exhibit A according to the administrative service fee payment method described in Exhibit C.

20

**3.7**   **Claims Processing Services**.

(a)   PBM shall process Claims in real time consistent with applicable law, including ERISA and any other applicable state or federal law.

(b)   PBM shall provide to WellPoint daily accumulator files for each of WellPoint's systems and in accordance with WellPoint's specifications for each system.

(c)   With respect to Plans subject to ERISA, PBM will comply with the applicable Plan terms, ERISA and the regulations thereunder regarding Claims appeals. PBM will forward all appeals and related information received to WellPoint within five (5) business days of receipt. PBM shall arrange prompt payment of benefits if the initial denial is not affirmed by WellPoint. PBM shall have no responsibility for Plan, provider or Covered Individual grievances and appeals.

(d)   PBM shall enter into its electronic on-line Claims adjudication system certain Plan design information necessary for PBM to perform automated Claims processing services in accordance with this Agreement, including information regarding Cost Share, Covered Individual out-of-pocket maximums, benefit maximums and any other features of the Plan design to be used in processing Claims. PBM will instruct Network Pharmacies to transmit certain information to PBM when a Covered Individual presents a Plan identification card. PBM will transmit to Network Pharmacies the Claim status; the Cost Share amount (if applicable); and any applicable drug utilization review messaging or other messages that are part of the Claims adjudication process.

(e)   PBM shall process Claims under this Agreement in accordance with the terms hereof.

(f)   PBM will perform electronic, telephone, and on-site audits of Network Pharmacies to determine compliance with their pharmacy agreements. PBM will attempt recovery of identified overpayments to Network Pharmacies through offset, demand or other reasonable means; provided that PBM will not be required to institute litigation. Recovered overpayments shall be credited to WellPoint.

(g)   If PBM determines that, through its error (e.g., PBM processed eligibility incorrectly or incorrectly set up benefit design), it has paid any Covered Individual on a manually submitted Claim less than the Covered Individual is entitled to under the Coverage Document, PBM shall adjust the underpayment consistent with its standard policies. If PBM determines that, through its error, it has overpaid any Network Pharmacy or paid benefits not covered under the terms of a Coverage Document, PBM shall, at its own expense, recover the overpayment or incorrect payment and credit WellPoint

21

accordingly.  In addition, PBM also performs electronic, telephone, and on-site audits of Network Pharmacies.  PBM will attempt recovery of identified overpayments through offset, demand or other reasonable means; provided that PBM will not be required to institute litigation.  One hundred percent (100%) of recovered overpayments shall be credited to WellPoint.

(h)     For WellPoint claims processed and paid prior to the Effective Date and for Runout Claims (as defined in Exhibit I, Section 4.1.10) processed by PBM and paid after the Effective Date, PBM shall provide the following audit support:   (1) regulatory and accreditation audit support for Part D and commercial business; and (2) customer audit support for commercial business only.  WellPoint shall provide all information necessary for such audits (or access to such information) to the extent PBM does not have such information, and WellPoint shall reimburse PBM's reasonable actual FTE costs incurred in providing such audit support services.  WellPoint shall be solely liable for all audit recoveries or regulatory actions resulting therefrom.

**3.8     Appeals and Grievances/Complaints**.

(a)     PBM shall provide support and recommendations to WellPoint in connection with the grievance and appeal responsibility retained by WellPoint pursuant to Section 2.11 of this Agreement and shall provide to WellPoint all information reasonably necessary for WellPoint to respond to such grievances and appeals, to the extent PBM has such information.

(b)     PBM shall be responsible for assisting WellPoint with Covered Individual complaints and providing periodic reporting to WellPoint regarding such complaints in a manner reasonably specified by WellPoint in its discretion.

**3.9     Clinical Services, Utilization Management, Quality Safety Programs**.

(a)     **WellPoint Pharmacy and Therapeutics Programs, Clinical Programs, and Services**.  PBM shall administer and support the WellPoint-owned Pharmacy policy, pharmacy and therapeutics programs, clinical programs, and other services as directed by WellPoint pursuant to Section 2.14.

(b)     **Clinical Services**.   At the direction and advance written approval of WellPoint, subject to PBM fees as agreed to by the Parties, if any, PBM will provide to WellPoint its pharmaceutical care consultation programs, Covered Individual compliance programs and other programs designed to ensure proper drug utilization, encourage the use of cost-effective medications, and encourage the use of mail service, if applicable.  These programs may include mailings to Covered Individuals with active prescriptions for targeted drug products or drug classes or to let Covered Individuals know that they may qualify for participation in a clinical trial program.  Such mailings may include Covered Individual and drug specific information and/or general

22

educational material.  PBM agrees to reasonably modify the clinical services it provides in order to coordinate them with other clinical services provided by WellPoint.

(c)     **PBM Concurrent and Retrospective DUR Services**.  At the direction and prior written approval of WellPoint, PBM will provide its automated concurrent DUR programs for Claims that are adjudicated at the point of sale in the Pharmacy and its retrospective DUR services.  PBM will from time to time consult with WellPoint concerning its concurrent DUR programs and may implement customized changes to such programs if such changes are mutually agreed to by the parties.  In addition, PBM agrees to customize and supplement its retrospective DUR services as requested by WellPoint.  In certain instances, a Claim that is denied or otherwise rejected by the system may actually represent appropriate drug therapy as determined by the applicable physician or pharmacist in his/her professional judgment.  In these instances, the pharmacist will exercise his/her professional judgment to either (i) dispense the prescribed drugs at the Covered Individual's expense or (ii) call PBM and PBM is authorized to override the denial edit.  Clinical and quality of care issues detected by some DUR edits do not affect Claim payment but result in transmission of a warning or alert message transmitted at the time of dispensing to the pharmacist as part of the Paid Claim response from PBM.  Network Pharmacies are directed to review the messages as they are received and to use their professional judgment as to whether action is required.

(d)     **DUR Limitations**.  The information generated in connection with DUR services is intended as a supplement to, and not as a substitute for, the knowledge, expertise, skill, and judgment of physicians, pharmacists, or other health care providers in providing patient care.  Providers are individually responsible for acting or not acting upon information generated and transmitted through the DUR services, and for performing services in each jurisdiction consistent with the scope of their licenses.  Except as set forth in paragraph (b) above, in performing DUR services, PBM will not, and is not required by this Agreement to, deny Claims or require physician, pharmacist, or patient compliance with any norm or suggested drug regimen, or in any way substitute PBM's judgment for the professional judgment or responsibility of the physician or pharmacist.

(e)     PBM represents and warrants that it will update DUR databases on an ongoing and timely basis to reflect changes in available standards for pharmaceutical prescribing.

(f)     **Switching Programs**.  WellPoint shall consult with PBM concerning PBM's implementation and administration of WellPoint-developed switching programs.PBM shall review all such WellPoint-developed programs to ensure compliance with PBM's policies and applicable law.  As mutually agreed to

23

following PBM's review, PBM shall implement and administer WellPoint-developed switching programs. Prior to the implementation of any PBM switching programs, PBM shall obtain WellPoint's written consent. In offering such drug switching programs, PBM shall comply with WellPoint's Formulary alternative rules.

**3.10   Support Formulary, Benefits Design, and P&T and VA Committee**.

(a)     PBM shall provide consulting, technical and analytical support as requested by WellPoint to support WellPoint's Formulary administration, benefit design and P&T and VA Committee functions for both Specialty Drugs and products payable under the medical or pharmacy benefits specified in this Agreement.

(b)     Subject to Sections 2.4 and 2.5 above, PBM agrees to administer the Formulary and benefit design decisions of WellPoint.

**3.11   Prior Authorization/ Utilization Review/Specialty Care Management**. PBM shall conduct the Delegated Functions (as defined in Section 2.13) in accordance with this Agreement. Such activities will be implemented in accordance with WellPoint's prior authorization, drug utilization review or specialty care management guidelines and as detailed in Exhibit G or Specialty Guidelines, as appropriate. PBM shall not make any substantive changes to WellPoint's prior authorization, drug utilization review or specialty care management guidelines without WellPoint's prior review and approval. PBM agrees to perform the Delegated Functions during the hours of operations set forth in Exhibit G and the reviews will be completed within the turnaround timeframes set forth in Exhibit G. PBM acknowledges and agrees that WellPoint may revoke this delegation of any Delegated Functions at any time and to any extent during the term of this Agreement.

(a)     **Licensing and Compliance**. At all times during the term of this Agreement, PBM, PBM Agents and PBM's employees shall be and remain licensed and certified in accordance with all applicable state and federal laws and regulations (including those applicable to utilization review), and shall comply with and abide by all state, federal and local laws and regulations relating to the provision of pharmacy benefit services to Covered Individuals. PBM shall supply evidence of such licensure, compliance and certifications to WellPoint upon request. At all times during the term of this Agreement, PBM, when applicable, shall:  (i) maintain itself in good professional standing; and (ii) maintain all required professional credentials and meet all continuing education requirements necessary to retain its agents or employees professional designation.

(b)     **Permits**. PBM has obtained, and will maintain in good standing, all licenses, permits and other necessary or appropriate governmental approvals (collectively, the "Permits") to perform its duties hereunder. PBM has complied with all conditions and requirements imposed by the Permits, and

24

PBM has not received any notice of, and has no reason to believe, that any governmental authority intends to cancel or terminate any of the Permits or that valid grounds for such cancellation or termination exist. Each Permit is valid and in full force and effect, and will not be terminated or adversely affected by the transactions contemplated hereby. PBM agrees to obtain Utilization Management ("UM") licensure in all states where WellPoint's Utilization Review ("UR") agent (Anthem Utilization Management Services, Inc.- AUMSI.) has obtained UR licensure.

(c)  **Compliance**.  PBM's Delegated Function processes will comply with all applicable federal, state, and local laws, rules and regulations, and NCQA/URAC accreditation standards; including without limitation the applicable utilization review requirements in the states where the Covered Individual's Coverage Document is issued or delivered. PBM agrees to comply with any state law that exerts extraterritorial jurisdiction of their UM regulations for members residing in their state, regardless of where the Coverage Document is issued or delivered.

(d)  **Licensure and Clinical Staff Requirements**.  PBM warrants and represents, to the best of its knowledge that each nurse or pharmacist providing Delegated Functions is and will continue to be, as long as the delegation of services remains in effect, the holder of a currently valid, unrestricted license to practice nursing or pharmacy under applicable state law, to the extent the function warrants such license.

(e)  **PBM's Medical Management System**.  PBM agrees to supply WellPoint reasonable access to its proprietary application for processing prior authorization requests, to the extent necessary to facilitate the services contemplated by this Agreement.

**3.12  Group/Member/Intermediary Communication**.

(a)  Except as necessary to perform services pursuant to this Agreement, PBM will not communicate with Plans, Covered Individuals, or Plan intermediaries (including, without limitation, consultants, brokers, or third party administrators) regarding the drug benefit and their services under the Plan without WellPoint's prior written approval, which approval will not be unreasonably withheld. Any such communications will be in the normal course of PBM's services under this Agreement and will not involve solicitation or marketing communications. All such communications shall be compliant with Brand Regulations as applicable, and subject to review and approval by WellPoint.

(b)  PBM will provide all the Plan and Covered Individual communication materials, in English and shall meet any state's applicable foreign language requirements (including detailed Formulary migration materials), to WellPoint

25

to review prior to distribution to ensure a successful transition/communications campaign. PBM will provide multiple toll-free telephone lines necessary to meet WellPoint's business requirements, IVR, Internet support and implementation management, including website support, to assist WellPoint, Plans and Covered Individuals with eligibility and benefits verification, location of Network Pharmacies and other related concerns. Upon request from WellPoint, PBM will mail all transition and on-going maintenance communication materials, including but not limited to ID cards and welcome packets, to Plans and/or Covered Individuals on an agreed-upon schedule either electronically or manually.

(c)     PBM will log all customer service complaints, issues and resolutions and provide them to WellPoint on a weekly basis, per a mutually agreed upon format. PBM will initiate and/or provide member issue resolution within twenty-four (24) hours of receipt of an issue. PBM will support specific Plan and Covered Individual inquiries to its Customer Service and web site. PBM will provide multiple dedicated toll-free numbers as needed for WellPoint's business requirements for inquiries and a Post Office Box for Plans and Covered Individuals to send paper Claims at no cost to WellPoint. PBM will setup a transfer connect system.

**3.13    Rebate Contracting and Administration**.

(a)     In general, PBM will utilize its standard proprietary Rebate processes and contracts with respect to this Agreement in order to maximize efficiencies and value. PBM shall pay WellPoint Pharma Revenue amounts as provided in Section 5.3 and Exhibit A, and will provide the Pharma Revenue reports listed in Exhibit B. In administering PBM's Rebate program under this Agreement, PBM shall use its best efforts to process, invoice, and collect promptly all Rebates from pharmaceutical manufacturers pursuant to PBM's agreements with manufacturers.

(b)     PBM's Affiliate, NextRx, maintains written agreements with pharmaceutical manufacturers relating to the payment of Pharma Revenue for WellPoint utilization. PBM shall maintain any such NextRx Pharma Revenue agreements or shall renegotiate its own Pharma Revenue agreements with the same pharmaceutical manufacturers, or shall maintain PBM's own Pharma Revenue agreements with the same pharmaceutical manufacturers in a manner such that (i) WellPoint will not be required to repay any Rebate amounts previously paid to WellPoint or to pay any penalty with respect to such Rebate amounts, and (ii) WellPoint will be paid Rebate amounts due to WellPoint for prescription drugs purchased prior to the Effective Date of this Agreement but not yet paid. The foregoing is contingent upon: (i) WellPoint's continued compliance with the terms and conditions of NextRx's obligations, to the extent applicable to WellPoint, under any such Pharma Revenue agreements; and (ii) WellPoint not making any Formulary decisions that result in non-

26

compliance or breach of any such Pharma Revenue agreements.

(c)     If any NextRx Pharma Revenue agreement that PBM maintains pursuant to Section 3.13(b) above or otherwise, prior to the orderly transfer by PBM of the rebating function to its own Rebate contracts and processes, prohibits PBM from sharing or otherwise paying an amount equal to all or any portion of Manufacturer Administrative Fees related to utilization invoiced under such NextRx Pharma Revenue agreements, WellPoint acknowledges and agrees that, notwithstanding anything in this Agreement to the contrary, PBM shall not be required to include (and shall not be in breach of this Agreement for not including) any such amounts in the eighty percent 80% (commercial) or 90% (Part D) Pharma Revenue amounts to be paid to WellPoint pursuant to Sections 5.3(c) and (d) hereunder.  Nothing in this Section 3.13 shall affect the Commercial or Part D Pharma Revenue Per Branded Claim Guarantees set forth in Exhibit A.

**3.14    Reports to WellPoint and WellPoint Plans**.

(a)     Prior to Completed Migration (as defined in Section 2.16(a)), PBM will provide to WellPoint, with respect to services provided by PBM for groups and individuals that have not yet fully migrated to PBM's systems, the reports that are listed on Exhibit B except to the extent that any such report would contain confidential and proprietary PBM information, including, but not limited to, PBM's contracted Network Pharmacy rates or PBM's licensed mail order Pharmacy or Specialty Pharmacy acquisition rates.  Thereafter, with respect to services provided by PBM for groups and individuals that have achieved Completed Migration, PBM will provide its standard reporting and will provide WellPoint access to its standard on-line reporting tools.  In no event will the reporting and access to on-line reporting tools provided by PBM to WellPoint hereunder be any less than the reporting and access provided to any other PBM client. For reporting after Completed Migration, PBM shall also comply with the opening paragraph of Exhibit B.

(b)     PBM will provide to WellPoint any other reports not specifically contemplated in this Agreement (custom or ad hoc reports) or shall customize PBM's standard reports as WellPoint shall from time to time reasonably request at no charge to WellPoint for the first 1,500 hours of related programming annually.  Custom or ad hoc reporting requiring additional programming shall be subject to such fees as mutually agreed to by the parties in writing. This Section 3.14(b) shall not apply to necessary changes, as mutually agreed to by the parties acting in good faith, to accommodate CMS reporting requirements imposed on WellPoint or its Plans.

**3.15    Finance and Analytical Support and General Consulting**.  As requested by WellPoint, PBM shall provide general consulting assistance to WellPoint with respect to cost projections, benefit design issues, Formulary, underwriting, legal, and

27

regulatory compliance, and other similar Plan matters at no cost to WellPoint.  Such services shall be available to support WellPoint's responsibilities with respect to benefits design, Formulary design, sales and marketing, account management and development and implementation of Pharmacy and Therapeutics programs and Clinical Services.

**3.16   Compliance with Brand Regulations**.  PBM shall comply with all Brand Regulations of the Association in connection with its provision of services under this Agreement

**3.17   Programming Services**.

(a)    To the extent that WellPoint retains additional third party administrators or other service providers that require additional programming by PBM such arrangements shall be programmed free of charge.

(b)    PBM, at its own cost, will provide for WellPoint's approval, a systems specification document and requirements document outlining all programming needs and changes to accurately administer a Plan's benefit program design.

(c)    PBM shall provide tracking reports for all clinical programs implemented to demonstrate outcomes impact.

**3.18   Fee Disclosures**.  PBM will, as reasonably requested, provide to WellPoint or any Plan information that may be necessary for WellPoint or such Plan to satisfy its requirements under ERISA, or any other federal or state law or regulation, including information necessary to complete annual reports required to be filed with the Department of Labor, to the extent PBM possesses such information.

**3.19   Notice to WellPoint of Regulatory Inquiries and Claims Against PBM**.  PBM shall notify WellPoint in writing of:  (i) all material claims, investigations and inquiries that may materially impact PBM's ability to perform its obligations under this Agreement, whether in writing or orally ("Inquiries") by any Government Entity, pharmaceutical manufacturer, attorney, or other individual, including, without limitation, providing related press releases to WellPoint before general distribution whenever not prohibited by federal, state, and local rules, laws, or regulations; provided, however, that the term Inquiries does not include consumer reports, complaints, or grievances processed by PBM in the ordinary course and that are not material to PBM's performance of its obligations under this Agreement; and (ii) any material Inquiry from any Government Entity or material litigation that relates to PBM's general business practices or operations, in each case as soon as reasonably practicable.  PBM shall, from time to time, furnish WellPoint with regular and timely updates regarding the status of each Inquiry.  If PBM's response to any Inquiry specifically involves WellPoint in any manner, then PBM shall provide WellPoint with at least three (3) business days to comment before PBM provides a response, and

28

CONFIDENTIAL INFORMATION        Subject to Protective Order              NOVARTIS-USAO-0140447

PBM shall consider in good faith all of WellPoint's comments before providing a response.

**3.20** **Support WellPoint FEHBP Contract Administration**. PBM agrees to participate in WellPoint's FEHBP program and to provide WellPoint any information necessary to support WellPoint's continued participation and future applications to participate as a sponsor of drug benefits under the FEHBP. PBM's specific responsibilities and duties under this Section 3.20 are set forth in Exhibit H. All services performed by PBM for WellPoint as part of the administration of its FEHBP product service line shall be in accordance with those requirements adopted by the Office of Personnel Management ("OPM") as part of its administration of the FEHBP and any other applicable laws and regulations. Requirements under FEHBP laws and regulations shall supersede any contrary or inconsistent agreement between the Parties set forth in this Agreement. Any changes made by OPM to FEHBP law and regulations shall be automatically incorporated herein. To the extent such changes have a material negative financial impact to PBM hereunder, the Parties will agree to an appropriate adjustment to the fees paid by WellPoint to PBM. All services shall be furnished by PBM in compliance with any contract between WellPoint, on behalf of its FEHBP product service line, and OPM for participation in the FEHBP program. PBM acknowledges and agrees that in accordance with the terms of such contract, WellPoint shall have the ultimate responsibility for ensuring the services performed are in compliance with the administration of its FEHBP product service line.

**3.21** **Support WellPoint Government Services/Medicare Part D and Medicaid Administration**. PBM agrees to participate in WellPoint's Senior and State Sponsored Business Programs and to provide WellPoint any information and services provided for under this Agreement necessary to support WellPoint's continued participation and future applications to participate as a sponsor of drug benefits for Medicare and Medicaid. Such support shall include all contractual obligations for WellPoint's Senior Sponsored Business Programs, as described and set forth in Exhibit I, all contractual obligations for WellPoint's State Sponsored Business, as described and set forth in Exhibits J-1 through J-7, and all contractual obligations for WellPoint's provision of services under the Kentucky Access program, as described and set forth in Exhibit P. PBM shall comply with all applicable state Medicaid laws, as applicable, and shall abide by Exhibits J-1 through J-7, which contain the specific contractual provisions applicable to Medicaid programs administered by WellPoint that are required to be included in any subcontract entered into by WellPoint in connection with such Medicaid programs, to the extent the terms therein are applicable to the pharmacy benefit management services provided by PBM hereunder. All services performed by PBM for WellPoint under this Section 3.21 shall be in accordance with those requirements adopted by the Centers for Medicare & Medicaid Services ("CMS") and any other applicable federal or state laws and regulations. Requirements under Medicare and Medicaid laws and regulations shall supersede any contrary or inconsistent agreement between the Parties set forth in this Agreement. Any changes made by CMS to Medicare law and regulations and any changes made to Medicaid law and regulations shall be automatically incorporated

29

herein.  To the extent such changes have a material negative financial impact to PBM hereunder, the Parties will agree to an appropriate adjustment to the fees paid by WellPoint to PBM.

**3.22   Dedicated   Management   Support   Team/Account   Management   and Implementation Support.**

(a)    During the term of this Agreement, PBM shall, at its own cost:  (i) maintain the Dedicated Management Support Team to perform its obligations under this Agreement; (ii) operate the Dedicated Management Support Team to support all of WellPoint's business segments and geographic structure; (iii) maintain the Dedicated Management Support Team fully operational during the Term of this Agreement;  The Dedicated Management Support Team shall have the necessary knowledge and experience to support all WellPoint business lines and shall include, but not be limited to:

i)       Executive Contact (who shall report to the President/CEO or Executive Vice President)
ii)      Account Manager
iii)     Account Executive and Team
iv)      Sales Contact
v)       Clinical Pharmacist
vi)      Data Analyst
vii)     Legal Contact
viii)    Operational/Functional Liaison
ix)      IT/Other
x)       New Client Implementation Expert
xi)      Client Advocate/Client Support Center
xii)     Other as mutually agreed to by the Parties

(b)    WellPoint has the right to review, meet with and reasonably approve the lead individual in each of the following roles:  Executive Contact, Clinical Pharmacist, New Client Implementation Expert, and Account Manager proposed by PBM to service WellPoint.  PBM agrees not to change the lead individual assigned to the roles of Executive Contact, Clinical Pharmacist, New Client Implementation Expert, or Account Manager without the reasonable prior consent from WellPoint, unless a promotional opportunity or employment termination is the reason for the change.

(c)    PBM will provide no less than four (4) annual in-person account team reviews to WellPoint on the utilization and performance of the WellPoint prescription drug program.  The reviews will also include cost saving recommendations (with return on investments) and suggestions to implement such recommendations.

30

(d)     PBM shall hire, maintain and supervise the personnel necessary to perform PBM's duties under this Agreement.  PBM also may retain accountants, attorneys or other service providers it deems necessary to fulfill its duties under this Agreement, the costs of which shall not be billed to WellPoint, unless WellPoint has specifically consented in writing to pay the same.

(e)     In the event any key account management team personnel assigned by PBM to perform services for WellPoint pursuant to this Agreement are terminated or re-assigned, PBM shall notify WellPoint as early as feasible in advance of such termination or re-assignment.

(f)     PBM will provide at least annually an executive review/strategy session with executive level participation from PBM on the performance of and future direction of WellPoint's prescription drug program.

(g)     PBM will provide training to the appropriate personnel at WellPoint on the processes, procedures, and capabilities pre and post implementation, at no cost to WellPoint.

(h)     PBM will provide training to the appropriate personnel at WellPoint on the processes, procedures, and capabilities of the PBM for the duration of the Agreement, at no cost to WellPoint.

(i)     The Parties will agree upon responsibilities relative to the Implementation and PBM shall consult with WellPoint concerning the account management process upon execution of the Agreement.

(j)     PBM will provide the necessary data and support to WellPoint for the identified third party to perform a pre-audit of, including but not limited to, system set-ups, Plan designs, eligibility, and adjudication rules thirty (30) days prior to the Effective Date.

(k)     PBM shall provide appropriate assistance and support for consultation on clinical programs, formulary analysis, and clinical plan of record (POR) development.

(l)     PBM shall provide appropriate assistance and support for sales support including, but not limited to, RFP development, market intelligence, preparation of finalist presentations, sales training, etc.

(m)     PBM shall provide appropriate assistance and support for operational, client/member services issue resolution.

(n)     PBM shall provide appropriate assistance and support for new clients or contract renewal change implementation.

31

CONFIDENTIAL INFORMATION          Subject to Protective Order

NOVARTIS-USAO-0140450

(o)     PBM shall provide appropriate assistance and support for client retention and introduction of new products to Plans.

(p)     PBM shall provide all other duties as reasonably necessary to support the WellPoint relationship.

**3.23    Information Technology and Standards**.  PBM represents and warrants that its information systems shall comply with the requirements and standards set forth in Exhibit K.

**3.24    Fraud Detection Activities**.   PBM shall be responsible for specific activities designed to prevent, detect, investigate, and remediate potential or existing member and provider fraud in connection with the services to be provided by PBM under this Agreement.  PBM shall implement those activities that it determines are best suited to attain this goal, but at a minimum PBM's fraud and abuse detection activities shall include the following components:

(a)     **Claims Monitoring**.  PBM shall perform a quarterly review of Claims to identify potential fraudulent patterns in Paid Claims data, which shall include for Medicare Part D services, using retrospective drug utilization tools, including retrospective review programs for drugs that may be abused and for patients taking multiple medications (polypharmacy).  Such retrospective drug utilization tools may also be implemented by PBM with respect to non-Medicare Part D services as requested by WellPoint, and for the Claim sample size requested by WellPoint, subject to a $0.01 per Claim fee.

(b)     **Cooperate and Support Investigations**.  PBM shall cooperate and support any investigations that are identified through any channel.

(c)     **Train Employees to Detect Fraudulent Claims**.  PBM shall train all Claims processors to detect suspicious Claims.

(d)     **WellPoint Member Hot Line**.   PBM shall cooperate with WellPoint's maintenance of and shall assist in the investigation of allegations of Plan, Covered Individual, or provider fraud received through WellPoint's Member Hotline.   Further, PBM shall refer appropriate cases to WellPoint's Fraud Investigation Unit.

(e)     **Educate Members About Fraud**.  PBM shall cooperate with WellPoint's provision of educational materials to Plans and Covered Individuals concerning what constitutes fraud (e.g., providing false employer group and/or group membership information; sharing ID card with a non-member; using ID card after benefits terminated).

**3.25    Empire HealthChoice HMO, Inc.**  In providing services to WellPoint's Designated Affiliate Empire HealthChoice HMO, Inc. ("Empire") under (i) the Management

CONFIDENTIAL INFORMATION          Subject to Protective Order                    NOVARTIS-USAO-0140451

Services Agreement dated as of the date hereof between Empire, Diversified NY IPA, Inc., and Express Scripts Utilization Management Company, and (ii) the IPA Agreement dated as of the date hereof between Empire and Diversified NY, IPA, Inc. (collectively, the "Empire Agreements"), PBM shall also abide by all terms and requirements of this Agreement, except to the extent any specific term or requirement of the Empire Agreements conflicts with the terms or requirements of this Agreement, as reasonably determined by WellPoint, in which case such specific term or requirement of the Empire Agreements shall control solely as they relate to PBM's provision of services to Empire. By way of example and not limitation, PBM's provision of services to Empire shall be in compliance with Section 3.13 of this Agreement (Rebate Contracting and Administration), Section 3.14 and Exhibit B of this Agreement (Reporting to WellPoint and WellPoint Plans), the Pharma Revenue Guarantees, Net Effective Discount Guarantees and Net Effective Dispensing Fee Guarantees set forth in Exhibit A of this Agreement, and the performance guarantees set forth in Exhibit D of this Agreement, and Claims attributable to services provided to Empire shall be included for purposes of Section 2.17 and Exhibit O of this Agreement. The fees and compensation due to PBM by WellPoint under the Empire Agreements shall constitute the full compensation due to PBM with respect to all services PBM provides to Empire under both the Empire Agreements and this Agreement, with the exception of amounts retained by PBM in accordance with Article V hereof, and under no circumstance shall PBM be paid more than one administrative fee per Claim nor more than one fee or charge for the same service under the Empire Agreements and this Agreement. WellPoint and PBM acknowledge and agree that it is their explicit intent that such compensation will match the compensation that PBM would receive if such services were being provided exclusively under the terms of this Agreement, and the parties agree that the Empire Agreements shall be administered accordingly. If this Agreement is terminated for any reason, PBM shall agree to termination of the Empire Agreements effective on the same date as termination of this Agreement, subject only to any prior regulatory notice required under the Empire Agreements.

4. **DUTIES OF WELLPOINT AND PBM**

4.1 **Joint Pharmacy Operating Committee**. The Parties shall jointly establish a Joint Pharmacy Operating Committee ("Committee") to oversee the operation of this Agreement, enhance communications between the Parties, and attempt to resolve disputes between the Parties. Each Party shall appoint three or four members to the Committee. The Committee shall meet as frequently as required by WellPoint, but no less frequently than quarterly. Meetings of the Committee will be convened by WellPoint and the agenda for such meetings will be set by WellPoint after consulting with PBM. Any disputes that cannot be resolved by the Committee will be referred by the Committee to senior management for further review and consideration.

4.2 **Service Level Agreement**. PBM shall provide the Information Technology Support Services, with respect to any PBM system that WellPoint utilizes to service Covered Individuals, as set forth in the Service Level Agreement attached hereto as Exhibit L

CONFIDENTIAL INFORMATION        Subject to Protective Order                NOVARTIS-USAO-0140452

(the "Service Level Agreement").  The performance guarantees that apply to system availability along with the penalties for such services are set forth in Exhibit D under System Availability.

5.    **PRICING, COMPENSATION AND PAYMENTS TO PBM**

5.1    **Payment of Administrative and Other Fees**.  WellPoint shall pay PBM the administrative and other fees pursuant to the terms set forth in Exhibit A in the time and manner specified in Exhibit C.  In the event of any overpayment by WellPoint to PBM or nonpayment of any amounts to be paid by PBM to WellPoint hereunder (including, without limitation, Pharma Revenue), PBM acknowledges and agrees that WellPoint reserves the right of offset with regard to any payments due to PBM under this Agreement.  In the event of any overpayment to WellPoint by PBM of Pharma Revenue amounts or nonpayment by WellPoint of any fees or other amounts due to PBM hereunder, WellPoint acknowledges and agrees that PBM reserves the right to offset any such PBM overpayment or WellPoint nonpayment with Pharma Revenue amounts otherwise due to WellPoint under this Agreement.

5.2    **Disclosure of Certain Financial Matters**.

(a)    In addition to the fees paid to PBM by WellPoint, PBM and PBM's wholly-owned subsidiaries derive margin from fees and revenue in one or more of the ways as further described in the Financial Disclosure to PBM Clients set forth in Exhibit N hereto ("Financial Disclosure").  In negotiating any of the fees and revenues described in the Financial Disclosure or in this Agreement, PBM and PBM's wholly-owned subsidiaries act on their own behalf, and not for the benefit of or as agents for WellPoint, any Plan, or Covered Individuals.  PBM and PBM`s wholly-owned subsidiaries retain all proprietary rights and beneficial interest in such fees and revenues described in the Financial Disclosure and, accordingly, WellPoint acknowledges that neither it, nor any Plan, nor any Covered Individual, has a right to receive, or possesses any beneficial interest in, any such fees or revenues, except as otherwise provided herein.  Nothing in the Financial Disclosure is intended to supersede any of the specific financial terms and conditions agreed to under this Agreement.

(b)    PBM agrees that it shall not enter into any agreement with a pharmaceutical manufacturer that will reduce the Pharma Revenue, Rebate or Manufacturer Administrative Fee amounts WellPoint otherwise would receive under the terms of this Agreement in exchange for an increase in Other Manufacturer Revenues or other amounts received by PBM or its Affiliates, without appropriate compensation to WellPoint.

5.3    **Pharmacy Revenue Guarantees and Payments**.

(a)    **In General**.  Pharma Revenue related to Brand Drug Claims shall be guaranteed and paid to WellPoint in accordance with the terms of this

34

Agreement.   PBM shall notify pharmaceutical manufacturers with whom PBM has Pharma Revenue contracts of PBM's contractual relationship with WellPoint and the Effective Date of this Agreement.

(b)      Covered Individual submitted and subrogation Claims, OTC products, Claims older than one hundred and eighty (180) days, Claims through 340B pharmacies, claims for one hundred percent (100%) copayment (cash and carry) Plans not offered in connection with a health plan benefit, and other similar Claims may not be eligible for Rebates.

(c)      **Commercial**.   Subject to Section 3.13(c) above, PBM shall pay WellPoint eighty percent (80%) of the Pharma Revenue collected on Brand Drug Claim prescriptions filled, during each calendar quarter hereunder, within one hundred and fifty (150) days of the end of such calendar quarter.   Subject to Section 3.13(c) above, PBM shall also pay WellPoint eighty percent (80%) of the residual Pharma Revenue, if any, on such Brand Drug Claims related to such calendar quarter, which are collected by PBM in subsequent calendar quarters.   On an annual basis, PBM shall reconcile the Commercial Pharma Revenue Per Branded Claim Guarantees set forth in Exhibit A within one hundred and eighty (180) days of each calendar year and shall credit WellPoint for any deficit in one or both Commercial Pharma Revenue Per Branded Claim Guarantees on the next invoice immediately following the reconciliation.   Notwithstanding the foregoing, PBM may use a surplus in one of the Commercial Pharma Revenue Per Branded Claim Guarantees (Retail or Mail) to reduce a deficit in the other Commercial Pharma Revenue Per Branded Claim Guarantee hereunder.   Notwithstanding anything in this Section 5.3(c) or otherwise in this Agreement to the contrary, the Parties acknowledge and agree that no Pharma Revenue guarantees shall apply for 2009.

(d)      **Part D**.   Subject to Section 3.13(c) above, PBM shall pay WellPoint ninety percent (90%) of the Pharma Revenue collected on Brand Drug Claim prescriptions filled, during each calendar quarter hereunder, within one hundred and fifty (150) days of the end of such calendar quarter.   Subject to Section 3.13(c) above, PBM shall also pay WellPoint ninety percent (90%) of residual Pharma Revenue, if any, on such Brand Drug Claims related to such calendar quarter, which are collected by PBM in subsequent quarters.   On an annual basis, PBM shall reconcile the Part D Pharma Revenue Per Branded Claim Guarantees set forth in Exhibit A within one hundred and eighty (180) days of each calendar year and shall credit WellPoint for any deficit in one or both Part D Pharma Revenue Per Branded Claim Guarantees on the next invoice immediately following the reconciliation.   Notwithstanding the foregoing, PBM may use a surplus in one of the Part D Pharma Revenue Per Branded Claim Guarantees (Retail or Mail) to reduce a deficit in the other Part D   Pharma   Revenue   Per   Branded   Claim   Guarantee   hereunder. Notwithstanding anything   in   this   Section   5.3(d)   or   otherwise   in   this

35

Agreement to the contrary, the Parties acknowledge and agree that no Pharma Revenue guarantees shall apply for 2009.

(e)     PBM retains all right, title and interest to any and all actual Pharma Revenues received from pharmaceutical manufacturers; PBM will pay WellPoint amounts equal to the Pharma Revenue amounts due to WellPoint, as specified in this Agreement, from PBM's general assets (neither WellPoint, nor Plans, nor Covered Individuals retain any beneficial interest in PBM's general assets). WellPoint acknowledges and agrees that neither it, nor any Plan, nor any Covered Individual will have a right to interest on, or the time value of, any actual Pharma Revenue payments received by PBM from pharmaceutical manufacturers.   No Pharma Revenue amounts will be paid until this Agreement is executed by WellPoint.   PBM will have the right to delay payment of Rebate amounts (up to an amount as reasonably necessary to cover anticipated Claims reimbursements and other administrative fees due to PBM by WellPoint) to allow for final adjustments upon termination of this Agreement.

(f)     WellPoint acknowledges that it may be eligible for Pharma Revenue under this Agreement only so long as WellPoint, or its Affiliates, or its agents do not contract directly or indirectly with anyone else for: (i) discounts, utilization limits, Rebates, Manufacturer Administrative Fees, or other financial incentives on pharmaceutical products related to Formulary programs for Claims processed by PBM pursuant to this Agreement; or (ii) prescription drug specific adherence or compliance programs, without the prior written consent of PBM.   If WellPoint contracts directly or indirectly with a pharmaceutical manufacturer in violation of the foregoing (i) and (ii), then, without limiting PBM's right to other remedies, PBM may immediately withhold any Pharma Revenue earned by, but not yet paid to, WellPoint as necessary to prevent duplicative rebates on Covered Prescriptions.   To the extent WellPoint knowingly negotiates and/or contracts for discounts or Pharma Revenue on Claims for Covered Prescriptions without prior written approval of PBM, such activity will be deemed to be a material breach of this Agreement, entitling PBM to suspend payment of Pharma Revenue hereunder and to renegotiate the terms and conditions of this Agreement.   Nothing herein shall be deemed to prevent WellPoint from establishing and maintaining relationships with pharmaceutical manufacturers which involve community wellness programs, clinical research services, rebates on claims covered under the medical benefit, and, within the context of a comprehensive medical program, member wellness programs, quality improvement programs, and adherence and compliance programs.

**5.4     Pharmacy Claim Charges**.

(a)     For all prescription drug Claims, PBM shall apply the pricing guarantees and reconciliation provisions set forth in Exhibit A.   For purposes of Exhibit A,

36

prescription drugs that are provided to Plans described in Sections 3.20 and 3.21, other than Medicare Part D Plans, will be treated as Commercial Drugs.

(b)     Commercial Drugs:   Subject to the guarantee reconciliation provisions in Exhibit A, WellPoint shall pay PBM the lower of (1) the Pharmacy's Usual and Customary Charge (U&C), except for PBM's owned or affiliated Specialty Pharmacy or PBM's owned or affiliated mail order Pharmacy, (2) MRA plus Dispensing Fee, or (3) the Ingredient Cost Charge (for Specialty Drugs filled through PBM's Specialty Pharmacy, the Ingredient Cost Charge will be at the rates set forth on Exhibit F, as amended from time to time, with no Dispensing Fee) plus Dispensing Fee; less the amount of any Cost Share paid by a Covered Individual as provided under Section 5.5.

(c)     Part D:   Subject to the guarantee reconciliation provisions in Exhibit A, WellPoint shall pay PBM the lower of (1) the Pharmacy's Usual and Customary Charge (U&C), except for PBM's owned or affiliated Specialty Pharmacy or PBM's owned or affiliated mail order Pharmacy, (2) PBM's actual negotiated discount rates and dispensing fees with the Network Pharmacy, except for PBM's owned or affiliated Specialty Pharmacy or PBM's owned or affiliated mail order Pharmacy, or (3) the Ingredient Cost Charge (for Specialty Drugs filled through PBM's Specialty Pharmacy, the Ingredient Cost Charge will be at the rates set forth on Exhibit F, as amended from time to time, with no Dispensing Fee) plus Dispensing Fee; less the amount of any Cost Share paid by a Covered Individual as provided under Section 5.5.

(d)     For WellPoint-Contracted Specialty Pharmacies (as defined in Section 1.53), WellPoint shall pay PBM the lower of (1) the Pharmacy's Usual and Customary Charge (U&C), or (2) the actual negotiated discount rates and dispensing fees with the WellPoint Contracted Specialty Pharmacy.

(e)     In the event that there are court or government imposed or industry-wide or pricing source initiated changes in the AWP reporting source or source changes in the methodology used for calculating AWP, including, without limitation, changes in the mark-up factor used in calculating AWP (collectively, the "AWP Changes"), WellPoint shall negotiate in good faith with PBM to effect a modification to the terms of any financial relationship between the Parties that relate to AWP such that the value of AWP for the purpose of such relationship(s) shall have the same economic equivalence in the aggregate to the value used by the Parties prior to the AWP Change. For purposes of this Section 5.4(e), having the same economic equivalence in the aggregate to the value used by the Parties prior to the AWP Change means that the relevant financial terms, including, but not limited to, the Ingredient Cost Charge of a particular drug will be the same under any new methodology as it was immediately before the AWP Change.

37

**5.5    Cost Share.**

(a)    For Brand Drugs dispensed at all Network Pharmacies, the Covered Individual will be charged the lower of (1) the applicable Cost Share as set forth in the Coverage Document, (2) the Pharmacy's Usual and Customary Charge (U&C), except for PBM's owned or affiliated Specialty Pharmacy or PBM's owned or affiliated mail order Pharmacy, (3) the Ingredient Cost Charge plus Dispensing Fee, or (4) PBM's actual negotiated discount rate with the Pharmacy (provided that this number (4) shall only apply in those cases where PBM and WellPoint have mutually agreed that number (4) is a legal requirement for Cost Share determination purposes under applicable law or regulation). If such Cost Share is a coinsurance, stated as a percentage, then the applicable percentage would be applied to the lower of items (2), (3) and (4) above.

(b)    For Generic Drugs dispensed at all Network Pharmacies, the Covered Individual will be charged the lower of (1) the applicable Cost Share as set forth in the Coverage Document, (2) the Pharmacy's Usual and Customary Charge (U&C), except for PBM's owned or affiliated Specialty Pharmacy or PBM's owned or affiliated mail order Pharmacy, (3) the Ingredient Cost Charge plus Dispensing Fee, (4) MRA plus Dispensing Fee, or (5) PBM's actual negotiated discount rate with the Pharmacy (provided that this number (5) shall only apply in those cases where PBM and WellPoint have mutually agreed that number (5) is a legal requirement for Cost Share determination purposes under applicable law or regulation). If such Cost Share is a coinsurance, stated as a percentage, then the applicable percentage would be applied to the lower of items (2), (3), (4) and (5) above.

(c)    For Specialty Drugs dispensed at all Network Pharmacies, the Covered Individual will be charged the lower of (1) the applicable Cost Share as set forth in the Coverage Document, (2) the Pharmacy's Usual and Customary Charge (U&C), except for PBM's owned or affiliated Specialty Pharmacy or PBM's owned or affiliated mail order Pharmacy, (3) the Ingredient Cost Charge plus Dispensing Fee (except for Specialty Drugs dispensed through PBM's Specialty Pharmacy, in which case there is no Dispensing Fee), (4) MRA plus Dispensing Fee (except for Specialty Drugs dispensed through PBM's Specialty Pharmacy, in which case there is no Dispensing Fee), or (5) PBM's actual negotiated discount rate with the Pharmacy (provided that this number (5) shall only apply in those cases where PBM and WellPoint have mutually agreed that number (5) is a legal requirement for Cost Share determination purposes under applicable law or regulation). If such Cost Share is a coinsurance, stated as a percentage, then the applicable percentage would be applied to the lower of items (2), (3), (4) and (5) above.

CONFIDENTIAL INFORMATION        Subject to Protective Order        NOVARTIS-USAO-0140457

5.6 **Periodic Pricing Review**.  WellPoint or a third party consultant retained by WellPoint will conduct a market analysis every three (3) years during the Term of this Agreement to ensure that WellPoint is receiving competitive benchmark pricing.  In the event WellPoint or its third party consultant determines that such pricing terms are not competitive, WellPoint shall have the ability to propose renegotiated pricing terms to PBM and WellPoint and PBM agrees to negotiate in good faith over the proposed new pricing terms.  Notwithstanding the foregoing, to be effective any new pricing terms must be agreed to by PBM in writing.

5.7 **Implementation Credit**

(a) Subject to the terms and conditions of this Section 5.7, PBM will provide to WellPoint up to two dollars ($2.00) per New Covered Individual to reimburse the actual, fair market value of Qualified Implementation Expenses actually incurred by WellPoint with respect to such New Covered Individuals (the "Implementation Credit"), subject to submission of adequate documentation to support reimbursement as described in Section 5.7(b).  For example, if five (5) million New Covered Individuals were added to WellPoint's plan membership during Contract Year 2011, the maximum amount of the Implementation Credit for such Contract Year would be ten million dollars ($10,000,000).  WellPoint may use the implementation credit amounts set forth above to cover the fair market value of expenses for projects requiring joint resources.

For purposes of this Section 5.7:

"New Covered Individual" shall mean, with respect to a particular Contract Year, a Covered Individual who: (i) was not a Covered Individual on the Effective Date or prior to such Contract Year; (ii) becomes a Covered Individual during such Contract Year; and (iii) was not covered by a WellPoint health plan for which PBM served as the pharmacy benefit manager immediately before becoming a Covered Individual.  For purposes of clarity, a Covered Individual may qualify as a New Covered Individual only once during the Term, and only with respect to one Contract Year.

"Qualified Implementation Expenses" shall mean documented expenses that are directly related to implementing the pharmacy benefit for a New Covered Individual, such as the costs of ID cards, IT programming, formulary letters, member communications, and benefit set-up quality assurance.

(b) Subject to 5.7(a) above, WellPoint shall invoice PBM for the Qualified Implementation Expenses incurred by WellPoint within one hundred and eighty (180) days of incurring the applicable expense, which invoice will be accompanied by detailed information regarding the New Covered Individuals and adequate documentation evidencing such Qualified Implementation Expenses in a format mutually agreed by the Parties.  PBM shall remit

39

amounts due under this Section 5.7 to WellPoint within ninety (90) days of PBM's receipt of such documentation.

(c)     By submitting an invoice pursuant to this Section 5.7, WellPoint shall be deemed to represent and warrant to PBM that: (i) it will use the Implementation Credit payment only as reimbursement for its actual expenses incurred in implementing the transition of the New Covered Individuals to PBM as described on such invoice; (ii) that the applicable project or activity described on such invoice was actually performed or provided; and (iii) the amount of the reimbursement sought pursuant to such invoice is equal to or less than the reasonable, fair market value of actual, legitimate and necessary expenses actually incurred by WellPoint to implement the pharmacy benefit for the New Covered Individuals.  WellPoint will comply with all applicable Medicare, Medicaid and other federal and state cost reporting requirements with respect to any expenses, items and services reimbursed under this Section 5.7.

(d)     No more than once in any 12-month period, PBM will have the right to audit the books and records of WellPoint on-site, during normal business hours and after giving reasonable advance notice, for the purposes of ensuring and verifying WellPoint's compliance with the terms of this Section 5.7.

6.     **TERM AND TERMINATION**

6.1     **Term**.  This Agreement shall commence on the Effective Date and shall continue for the Term, as specified in Section 1.53.  Subject to the remaining provisions of this Section 6, the Agreement shall continue after the Term for successive one-year terms unless terminated upon provision of written notice at least one hundred and eighty (180) days prior to the end of the then-current term.

6.2     **Termination**.  Notwithstanding Section 6.1, the Agreement may be terminated during the Term as follows:

(a)     Subject to Section 16.5, either Party may terminate this Agreement if the other Party fails to comply with a material term of this Agreement and such failure is not cured within sixty (60) days' written notice to the other Party.  For purposes of this Section 6.2(a), failure to comply with a material term of this Agreement shall include PBM's failure to meet any two (2) or more of the following performance guarantee categories set forth in Exhibit D for any two (2) consecutive calendar quarters (a "Material PG Breach"): (i) Implementation Services (collectively, the items under the "Implementation Services" category set forth on Exhibit D), (ii) Member Satisfaction Survey (item #7 (Member Satisfaction Survey for Members Utilizing the Pharmacy Benefit) under the "Member Customer Service" category set forth on Exhibit D), (iii) Pharmacy Access (item #3 under the "Pharmacy Network" category

40

CONFIDENTIAL INFORMATION          Subject to Protective Order          NOVARTIS-USAO-0140459

set forth on Exhibit D), or (iv) Retail Claims Processing (collectively, the items under the "Retail Claims Processing" category set forth on Exhibit D). In determining whether PBM has failed to meet either the Implementation Services or the Retail Claims Processing performance guarantee categories referenced above for purposes of this Section 6.2(a), for each such performance guarantee category, PBM shall be deemed to have failed to meet the category for purposes of this Section 6.2(a) if PBM fails to meet two (2) or more of the individual performance guarantees within such category for two (2) or more consecutive calendar quarters.  WellPoint shall have a right to terminate this Agreement with ninety (90) days' written notice to PBM of a Material PG Breach if PBM has failed to cure such Material PG Breach within such ninety (90) day period (i.e., the cure period for a Material PG Breach shall be ninety (90) days versus the sixty (60) day cure period for any other breach of a material term of this Agreement by either party).  During the first sixty (60) day period following PBM's notice of a Material PG Breach, PBM shall have the right to submit a remediation plan to WellPoint for WellPoint's consideration.  Section 16.5 shall not apply in the case of a termination for a Material PG Breach.

(b)     Either Party may terminate this Agreement if the non-terminating Party becomes insolvent, assigns all or any part of its assets for the benefit of creditors, or upon the filing of any petition in bankruptcy, voluntary or involuntary.

**6.3     Post-Termination Services**.  If this Agreement is terminated for any reason, then, if requested by WellPoint, Claims for services rendered prior to the effective date of the termination shall be administered and processed by PBM per the terms of this Agreement for a run-out period of twelve (12) months following the termination, unless a shorter period is agreed to by the Parties.  Performance guarantees and penalties, as listed on Exhibit D and Exhibit I, shall also remain in effect throughout any run-out period.

**6.4     Transition upon Termination.**

(a)     In the event WellPoint elects to extend the performance of this Agreement for up to twelve (12) months beyond the termination or expiration of this Agreement for purposes of facilitating the transfer of services from PBM to another vendor, both WellPoint and PBM shall continue to perform all of their respective obligations in accordance with this Agreement during this period (including, but not limited to, WellPoint's fee payment obligations) and provide Transition Assistance Services in accordance with a written transition plan.  The transition plan shall include (1) a description of the information systems operations being transitioned; (2) a description of the methods and procedures, personnel and organization PBM will use to perform the Transition Assistance Services; (3) a schedule of transition activities and timelines for completion; (4) a detailed description of the respective roles of

41