# EXHIBIT 103

# HEALTH MANAGEMENT ASSOCIATES

_____

August 13, 2017

Christopher B. Harwood, Esq.
Co-Chief, Civil Frauds Unit
U.S. Attorney's Office, Southern District of New York
One St. Andrews Plaza
New York, NY 10007

Re:    *US v. Novartis Pharmaceuticals Corporation, 11 Civ. 0071 (PGG)*

## I.    SCOPE OF ENGAGEMENT

I was engaged by the United States Attorney's Office for the Southern District of New York to review Medicaid provider agreements and related records, and provide a report outlining the Medicaid program ("the Program") and its provider and regulatory requirements, including the extent to which providers are required to follow and certify compliance with the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b ("AKS"), in order to participate in and receive payment under the Program.  The scope of my services includes discussing the Program, its funding and regulatory structure, provider enrollment and certification requirements, and the claims submission process among other aspects of the Program.  In performing this work, I reviewed, among other things, documents that all states require providers to complete in order to participate in and receive payment under their respective Medicaid Programs.  In addition to serving as an expert witness in this case, I may also serve as a summary witness in connection with matters that fall within the scope of my engagement.

In performing this work, I reviewed the above-referenced documents as well as other documents and information that I believed to be appropriate and sufficient to form my opinions, including other guidance on provider participation in and payment under the Program.  I also relied on my own personal knowledge of the Program, which largely was gained during the course of the employment identified below.

## II.    QUALIFICATION OF EXPERT

I understand that in providing this Report, I must set forth my qualifications.  Attached is a copy of my résumé.

I am currently a consultant specializing in health care, primarily relating to state programs such as Medicaid.  I provide consultation to a wide range of clients on many Medicaid-related issues and as a result have continued to stay knowledgeable on Medicaid Program requirements, both current and historical.  I have been a consultant since January 2009.

1

Prior to becoming a consultant, I worked for the State of California's Medicaid Program ("Medi-Cal") for 32 years. I served as an executive appointee with the State of California for over 21 years of this time (from approximately 1986 through 2008), with over 12 years as California's Medicaid Director or Deputy Medicaid Director (from approximately 1996 through 2008). When I retired from the State of California at the end of 2008, I was the Chief Deputy Director of Health Care Programs for the Department of Health Care Services ("DHCS") as well as California's Medicaid Director.

At the time of my retirement in 2008, I managed a budget of over $37 billion and a workforce of approximately 2,000 employees. During the last 12 years of my employment (while I was the Medicaid Director or Deputy Medicaid Director), I had responsibility for setting policy for Medi-Cal, operation of the Medi-Cal payment systems (provider enrollment and claims processing), operation of the state's prior authorization system, operation of the Medi-Cal drug program, oversight of the Medi-Cal Managed Care program, development and implementation of various federal waivers, and numerous other parts of the Program.

During most of my tenure working for the state I had extensive involvement, responsibility and leadership in managing the provider enrollment and certification process and claims processing systems in California, the California Medicaid Management Information Systems ("MMIS"). This work began in 1977 and included increasing responsibility in designing, developing and operating California's MMIS. In February 1993, I took over responsibility for managing these processes for California and retained that responsibility until December 2008, when I retired from the state. On several occasions during my tenure, I led work by the state to update and revise the process by which California enrolled and certified providers in its Program.

During most of my tenure working for California, I also had considerable involvement in Medicaid on a national level, which gave me insight into how the Program worked across the various states. I have worked with the federal government on, among other things, federal Medicaid legislation, Medicaid regulations, requirements for state MMISs, and State Medicaid Directors' letters. For over four years I was also an officer of the National Association of State Medicaid Directors, including serving as its Vice-Chair for several years, with my tenure ending at the end of 2008. During my work with the National Association of State Medicaid Directors, I became extensively involved in the operation of the Program as a whole on a national level and the operation of many state Medicaid Programs. Throughout my tenure working for California, I gained an understanding of the aspects of the Program that were required of all state Medicaid Programs and what were optional parts of the Program.

In my earlier work during the mid-1990s, I was a member of the federal Systems Development Technical Advisory Group, which worked with the federal government on developing requirements for the operation of state MMISs. The federal government establishes

requirements for state MMISs that consist of six subsystems.  One of the six subsystems in the MMIS is the Provider Subsystem, which includes both the computer systems and processes, including provider agreements, for enrolling providers in state Medicaid Programs.  Another subsystem is the Claims Processing Subsystem, which performs all of the pre-payment controls, edits and audits[1] that are put in place to ensure that only valid claims are paid.  During my tenure on the Systems Development Technical Advisory Group, I had extensive experience with the states and the federal government on what was required before providers would be allowed to participate in Medicaid, including the requirement to have a provider agreement, and what were the appropriate edits and audits to be put in place in the claims processing system.

I have a Master's Degree in Public Administration from the University of Southern California and a Bachelor's Degree from the University of Iowa.

## III.   FINDINGS

### A.  Background

The description of the Medicaid Program provided in this section is accurate going back decades, including the period from when I began my employment as a state employee in the California Medicaid Program to date, and it therefore includes the sub-period I understand to be relevant to this matter, 2002 through 2011 (the "litigation period").

The Program is operated by all 50 states, as well as the District of Columbia.[2]  The 50 states and the District of Columbia are hereinafter referred to as "State(s)" in this Report.

As a condition of participating in the Program, States agree to follow the federal laws and regulations that govern the Program, in return for which the federal government agrees to provide funding for a percentage of state Medicaid expenditures pursuant to a formula known as the Federal Medical Assistance Percentage ("FMAP").[3]  Each State and the federal government enter into an agreement, known as the Medicaid State Plan that sets forth how the Program will operate in that State.  The State Plan describes how that State administers its Program, as well

---

[1] Edits are computer checks that verify information on a Medicaid claim such as determining whether a provider is eligible to be paid under the state's Medicaid program.  Audits are computer checks that verify information on the claim against information in prior claims history including such checks as whether the service has already been paid (duplicate claim) or determining if there is some other anomaly (for example performing unnecessary repeat procedures).

[2] The program also operates in the U.S. Territories, whose individual Medicaid Programs were not within the scope of my review and are not addressed in this Report.

[3] *See, e.g.*, 42 U.S.C. § 1396a (identifying requirements that States have to meet to participate in the Medicaid Program); 42 C.F.R. § 430.35 (providing that the federal government will withhold payment from States for noncompliance with federal requirements).

as the federal requirements the State agrees to follow.[4]  In order to claim federal Medicaid funds, States must routinely certify that their expenditures are in accordance with federal law, federal policies and the State Plan.[5]

In addition to complying with the federal regulatory structure governing Medicaid, States also operate the Program as governed by their State laws and regulations.  For a State to obtain federal funding for its Program, State laws must be consistent with federal requirements.[6]

Both federal law and the State Plan establish requirements that States must meet in enrolling providers to participate in their Medicaid Programs.  This includes federal regulation 42 C.F.R. § 431.107 ("Required Provider Agreement"), which establishes that each Medicaid agency must have an agreement with each provider or organization furnishing services under the Program. States are required to agree to this provision in their State Plan.[7]

Programs can operate with a number of delivery systems including systems where the State organizes and operates its own system and directly enrolls and pays providers (commonly called the "fee for service" model) and systems where the State contracts with a health plan or other organization that in turn enrolls and pays providers (commonly called the "managed care" model).

---

[4] By federal statute, each State Plan is required to include language reflecting the State's agreement to comply with specified federal requirements.  *See* 42 U.S.C. § 1396a.  For example, federal law requires that each State Plan include a provision whereby the State agrees to "make such reports, in such form and containing such information, as [the federal government] may from time to time require."  42 U.S.C. § 1396a(a)(6).  Two such reports are mandated by 42 C.F.R. § 430.30, which requires each State to submit to the federal government quarterly reports on Form CMS-37 and Form CMS-64 that set forth the State's (1) estimate of its quarterly expenditures under the Medicaid Program and (2) actual quarterly expenditures under the Medicaid Program, respectively.  42 C.F.R. § 430.30(b), (c).  The federal government uses those reports to determine the amount of federal funding to which the State is entitled for each quarter.  *See id.*  In connection with each quarterly report of actual expenditures submitted during the litigation period (*i.e.*, each Form CMS-64), the federal government required a representative of the State to certify that the report included only those expenditures "that are allowable in accordance with applicable implementing federal, state, and local statutes, regulations, policies, and the state plan."  *See* Form CMS-64; NOVARTIS-USAO-0181146, NOVARTIS-USAO-0181390, NOVARTIS-USAO-0181642, NOVARTIS-USAO-0181207, NOVARTIS-USAO-0181453, NOVARTIS-USAO-0181725, NOVARTIS-USAO-0181268, NOVARTIS-USAO-0181516, NOVARTIS-USAO-0181329, and NOVARTIS-USAO-0181579.  The referenced "applicable implementing federal . . . . statutes, regulations [and] policies" include the AKS.  A State representative also had to certify to the same language set forth above as part of each quarterly report of estimated expenditures from 2003 onward.  *See* Form CMS-37; NOVARTIS-USAO-0180992, NOVARTIS-USAO-0181052, NOVARTIS-USAO-0181112, NOVARTIS-USAO-0181007, NOVARTIS-USAO-0181007, NOVARTIS-USAO-0181129, NOVARTIS-USAO-0181022, NOVARTIS-USAO-0181082, NOVARTIS-USAO-0181037, and NOVARTIS-USAO-0181097.  The quarterly report of estimated expenditures for 2002 included a different certification, which also encompassed the AKS.  *See* NOVARTIS-USAO-0180992.

[5] *See id.*
[6] *See* 42 C.F.R. § 430.35.
[7] 42 CFR § 431.107(b).

Generally, under the fee for service model, the State directly reimburses providers a fee for every service they provide.  States may, however, directly reimburse providers, typically physicians, in alternative methods including paying on a per-member, per-month basis or through a monthly case management fee.  Under the fee for service model, as a condition of participating in the Program, the State will require providers to sign an application for enrollment into the Program, a separate contract or agreement governing their participation in the Program, or both (collectively, "provider agreement").  In the fee-for-service context, such provider agreements are created by the State and are referred to herein as "State provider agreements."

In addition to requiring that every provider providing services under the Medicaid Program have a provider agreement in place, federal law also imposes additional requirements on providers who participate in the Medicaid Program as does each State in their laws, regulations and provider manuals.[8]  These rules govern how providers participate in the Program.  To participate in the Program, in the fee-for-service context, every State requires providers to sign a State provider agreement in which the providers agree to a number of Program requirements.  Through these agreements and other documents, every State, in some manner, requires providers to certify, as a condition of participating in the Medicaid Program and receiving payment under the Program, that they will abide by applicable federal and state law and other requirements.  Some States include in these State provider agreements language whereby providers expressly agree to comply with the federal Anti-Kickback Statute while others include language whereby providers more broadly agree to comply with federal law, which includes the Anti-Kickback Statute.  As Medicaid and the States are governed both by federal law and State law and as the federal government provides at least one-half the funding for the Program, federal law, including the AKS, is fundamental to the Program.

While they vary in format, the State provider agreements apply both to individual providers who prescribe drugs[9] and pharmacies.  Upon submission, a completed provider agreement is reviewed and approved by the State or its fiscal agent to confirm that the provider meets Program requirements.  Provider agreements begin on their effective date and continue until the State terminates or suspends the provider from the Program or the provider withdraws from the Program.  Some States require providers to periodically re-submit provider agreements.  For States that do not require this, these agreements have no end date and once an agreement becomes effective, the agreement remains in place and effective.

---

[8] For example, federal law imposes record-keeping requirements, requires that the provider provide records upon audit or investigation, imposes disclosure requirements, and requires that the provider give the state its National Provider Identifier ("NPI") and include that number on claims submissions.  42 C.F.R. § 431.107(b).  As discussed below, federal law also prohibits the payment of kickbacks, 42 U.S.C. § 1320a-7b.

[9] Providers who prescribe drugs include physicians or any healthcare professional authorized to prescribe medication to patients.

Physicians and some other prescribing providers may participate in the Medicaid Program either as an individual provider or as part of a provider group, which consists of multiple members in the group (rendering providers). Each rendering provider in a group must sign his or her own State provider agreement.

The State provider agreement also provides key information that the States use for payment, including the provider's location, the address or bank to which payment is to be made, and tax identification number. The States or their fiscal agents will enter this provider payment information into their respective Provider Master File. Every claim submitted for payment in connection with services provided to a Medicaid enrollee in the fee-for-service context is edited against the information in the Provider Master File to determine if the provider is, among other things, eligible to be paid for the service for which payment is sought and then to obtain critical payment information such as what address or bank to send payment, information that must be in place for the provider to be paid.

In the fee-for-service context, submission of a State provider agreement is the only way for a prescribing provider or pharmacy to have their information entered into the provider Master File and hence is the only way that a physician, pharmacy, or other provider can receive reimbursement from the State. The fact that a payment to a provider was made means that the provider has a completed and approved State provider agreement on file with the State, which was used to provide the information necessary for provider payment.

States will also require providers who want to bill the Program in an electronic manner in the fee-for-service context to complete an application for electronic billing. Electronic billing has become the main method of billing the Program. During the litigation period the vast majority of physicians and all pharmacies billed electronically.

Once a provider is enrolled in the Program and has a completed State provider agreement in place, it is able to provide services to Medicaid fee-for-service enrollees and be reimbursed for those services that are provided in accordance with Program policies adopted by the federal government and the State. Subject to the limits of federal law (which requires some mandatory services but also allows for optional services), States can decide which services they cover and what kinds of utilization controls exist for those services. States establish payment rates for each service, which are subject to federal review and approval.

In the fee-for-service model, upon providing allowable services to people enrolled in Medicaid, providers with a completed State provider agreement on file may then bill the State or its fiscal agent for covered Medicaid services provided to Medicaid enrollees. These billings occur via a claim, which is either submitted on paper or electronically. The Program processes hundreds of millions of claims every year. The State or its fiscal agent will subject the claim to a range of

prepayment edits and audits, price the claim for payment, and reimburse the provider for those services that meet federal and state Medicaid requirements. Every claim is edited and audited by the State's computer system to ensure it meets Program requirements, including ensuring that the provider is on the provider Master File (which means the provider has executed a State provider agreement) and that the provider meets all other requirements for payment.

While claims are subject to a range of computer reviews, this review is in large part to confirm that the provider has submitted the required information and entered into the required State provider agreement. In authorizing payment on particular claims, States rely on the certifications and information that providers provide in their State provider agreements and in connection with the submission of individual claims. Providing accurate information and making truthful representations in the State provider agreement is fundamental to ensuring that Medicaid fee-for-service claims meet the requirements of the Program.

As set forth above, because every State requires that a provider submit a State provider agreement before the State will pay that provider for providing services to a Medicaid fee-for-service enrollee, the existence of a claim paid to a prescribing provider or pharmacy means that that provider has gone through the process of signing and submitting a completed provider agreement and has an effective provider agreement in place.

Delivery systems where the State contracts with a third-party health plan (Medicaid Managed Care Organization) or other third-party entity that in turn enrolls and pays providers differ from the above-described fee-for-service model. Under this "managed care" model, providers still must meet state and federal requirements for participation in the Program, and are subject to State and federal laws pertaining to the Medicaid Program (including the AKS); however, not all States require that a provider sign a State provider agreement as condition of participating as a provider in their respective managed care program. States that I have been able to confirm require providers to sign a State provider agreement as a condition of participating in their managed care program are identified below in Part III.C, and include Arizona, Georgia, Illinois, Kentucky, Minnesota, Mississippi, North Carolina, Pennsylvania, South Carolina, Tennessee, and Indiana in part (as to prescribing physicians).[10]

### B.  Certifications Of Compliance With The Anti-Kickback Statute

My opinions/conclusions set forth in this section apply in the fee-for-service context and for the above-referenced States in the Managed Care context, to the extent the opinions/conclusions

---

[10] As with all of my findings/opinions in this Report, I reserve the right to supplement the above list to the extent additional relevant information becomes available to me.

are based on the language of State provider agreements and other, related documents that States required providers to sign as a condition of participating in the Program.

In connection with my engagement for this matter, I reviewed State Medicaid provider agreements and other documents for all 50 states and the District of Columbia, for pharmacies, physicians, and other providers to confirm that these providers certified compliance with the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, as a condition of their participation in and receipt of payment under the States' Medicaid Programs. I looked for any statements wherein the provider either specifically certified compliance with the AKS or more generally agreed to comply with and/or be subject to applicable federal requirements. Such requirements include the AKS. During this process, I reviewed thousands of pages of documentation provided directly by the States. I also reviewed agreements provided directly by pharmacies.

My review of the State provider agreements and related documents included provider agreements that were specific to physicians and/or other prescribers, provider agreements that were specific to pharmacies, and "general" provider agreements that applied to all providers including physicians, other prescribers and pharmacies. It has been my experience, both during the time I was employed by Medi-Cal and through the present time that many States elect to use the same template "general" provider agreement for all providers including pharmacies, other prescribers, and physicians, but some states use different template agreements for pharmacies and physicians /other prescribers.

In addition to State provider agreements, for some States I also reviewed separate agreements for submitting claims electronically, for receiving payments by electronic funds transfer and for submitting paper claims. At all times relevant to this case, most physicians and all pharmacies billed electronically.

If a pharmacy was reimbursed in connection with its dispensation of a prescription for the drug in question by a State, this reimbursement meant that the pharmacy had previously completed a State provider agreement.

However, States varied on whether they required all prescribers who merely prescribed drugs to Medicaid enrollees (as opposed to who also sought reimbursement from the State for providing services to such enrollees) to have had an approved State provider agreement on file. Although not all States required this of prescribing providers during the litigation period, from my experience, most providers who prescribed medication to Medicaid enrollees during the litigation period would have been enrolled in their States' Medicaid Program and have had an approved State provider agreement on file. Prescribing providers generally want reimbursement for the services they provide (office visits, testing, diagnosis, medical case management, prescribing, etc.) and the sole means to obtain reimbursement from Medicaid in the fee-for-

service context and for the above-referenced States in the Managed Care context is to execute a State provider agreement. This would almost certainly be the case for any physician who repeatedly prescribed drugs to Medicaid enrollees, because such a prescriber would want and/or need Medicaid reimbursement for repeatedly providing services to Medicaid enrollees. As a general matter, providers simply cannot afford to treat large numbers of Medicaid enrollees without reimbursement.

Accordingly, if a doctor or other prescriber (or his or her group/practice) was reimbursed in connection with his or her treatment of a patient, this reimbursement meant that he or she had previously executed a State provider agreement.[11]

For this litigation, I primarily reviewed State provider agreements and other documents that were in effect during the litigation period, 2002-2011. I also reviewed some State provider agreements and other documents that were in effect prior to the litigation period. However, for the tasks for which I was retained, it was unnecessary for me to review any additional provider agreements or other documents, including any additional provider agreements or other documents that were in effect prior to the litigation period. This is because, as demonstrated below in Part III.C, across all of the States, and across the many versions of the State provider agreements and other documents that I reviewed for the States, every State consistently, in some manner, required providers who sought to participate in and seek reimbursement from Medicaid to certify compliance with federal requirements, and such certifications encompassed compliance with the AKS. Moreover, it is my experience that this certification requirement for the States goes back decades.

It is my opinion for purposes of this case, and it has been my experience, that the requirement that providers comply with all federal requirements applicable to the Medicaid Program, including the AKS, as a condition of their participation in and payment under the Medicaid Program is and, at all times relevant to this case, always has been a clear part of the Medicaid Program.[12] Similarly, at all times relevant to this case, it has been the case that if a provider fails

---

[11] The provider who provides services to a Medicaid enrollee is often referred to as the rendering provider, while the provider or medical group under whose name a claim is submitted to Medicaid for reimbursement is often referred to as the billing provider. In connection with a single claim for reimbursement, there may be a different provider listed as the rendering provider and the billing provider. This will often be the case where the rendering provider works as part of a group or practice. At all times relevant to this case, for a State to have paid a claim submitted through Medicaid, both the rendering provider and the billing provider had to be enrolled in the State Medicaid Program and have an effective State provider agreement in place. Further, when the rendering provider prescribes a medication, that provider is referred to as a prescribing provider.

[12] The requirement that providers comply with all federal requirements applicable to the Medicaid Program, including the AKS, as a condition of their participation in and payment under each State's Medicaid Program was equally applicable to providers participating in fee-for-service and managed care programs. However, as explained herein, not all States required providers participating in managed care programs to execute a State provider agreement.

to comply with the AKS and a claim is thereafter submitted to Medicaid in connection with services rendered by that provider, the claim is not payable.  This was well understood by me throughout my employment at Medi-Cal, and should have been well understood by anyone involved in or familiar with the Medicaid Program.

My conclusion that providers -- including physicians, other prescribers and pharmacies -- were required to comply with all federal requirements applicable to the Medicaid Program, including the AKS, as a condition of their participation in and payment under the Medicaid Program is consistent with my observation that, during the litigation period, the State provider agreements across all States required providers to agree to comply with all federal Medicaid requirements.

Similarly, my conclusion that providers were required to comply with all federal laws applicable to the Medicaid Program, including the AKS, as a condition of their participation in and payment under the Medicaid Program is also supported by the federal and state laws governing the Program.  With respect to the relevant federal laws, at all times relevant to this case, they included, for example, the requirement that (1) each State submit a Form CMS-64 in connection with the State's request for federal funding to reimburse it for a portion of its expenditures under the Program; and (2) as a part of each such submission, a representative from the State certify that the expenditures were "allowable in accordance with applicable implementing federal, state, and local statutes, regulations, policies, and the state plan."[13]  The AKS is encompassed within the referenced "applicable implementing federal . . . statutes, regulations, [and] policies."

With respect to the relevant state laws, during the time period relevant to this case, many States had in place statutes reiterating the requirement that providers and other participants in the Medicaid program comply with all federal Medicaid requirements.[14]  Moreover, many States had also enacted state analogues to the federal AKS, further reinforcing the prohibition on the payment or acceptance of kickbacks in connection with the provision of services to Medicaid enrollees.[15]  I have included examples of States that fall within the above categories, and to the extent necessary, could supplement this Report to include an exhaustive listing of such States.

Accordingly, based on my personal experiences and a review of State provider agreements and other state and federal authorities, it is my opinion that, at all times relevant to this case, physician and pharmacy providers in all States were required to comply with all federal laws applicable to the Medicaid Program, including the AKS, as a condition of their participation in and payment under the Medicaid Program.

---

[13] *See* 42 U.S.C. § 1396a(a)(6); 42 C.F.R. § 430.30(b), (c); Form CMS-64.
[14] *See Exhibit A*.
[15] *See Exhibit B*.

### C.   Individual State Certification Requirements[16]

### ALABAMA

The Medicaid Provider Enrollment application that a provider[17] had to sign before participating in the State of Alabama's Program[18] required a provider to agree to the following:

> "As a condition for participation as a provider under the Alabama Medicaid Program (MEDICAID), the provider (Provider) agrees to comply with all terms and conditions of this Agreement."

> "§1.1. This Agreement is deemed to include . . . all State and Federal laws and regulations."

> "§1.2.3. This Agreement is subject to all state and federal laws and regulations relating to fraud and abuse in health care and the Medicaid program."

Provider Agreement.[19]

Further a representative of the Alabama Program signed a declaration that the documents cited in this section of the Report represent "…true and correct copies of all iterations of the agreements that Alabama entered into with physicians and pharmacies that were in effect during the period January 1, 2002, through December 31, 2011."[20]

---

[16] Throughout this section I cite language from various State provider agreements and other documents.  While this is a comprehensive review and I have cited sufficient language to support my conclusions, I did not necessarily include all relevant language from the documents I cited and I may rely on additional language in the documents cited to support my conclusions.

[17] Unless otherwise specified, when the term "provider" is used in this Part III.C, it refers to prescribing providers, physician providers, and pharmacy providers. To the extent a particular State requires prescribing/physician providers and pharmacy providers to sign different template provider agreements, this Report will expressly state that that is the case.  If this Report does not make such a statement in connection with a particular State (as in the case of Alabama), the State requires prescribing providers, physician providers and pharmacies to sign the same template provider agreement.  A discussion of a provider agreement without designation of provider type refers to the State's general provider agreement.

[18] Unless otherwise specified, any assertion in this Part III.C that a provider must sign a State provider agreement before participating in a particular State's Medicaid Program applies to the fee-for-service context.

[19] NOVARTIS-USAO-0178543 and 44, January 2002; NOVARTIS-USAO-0178538 and 39, July 2002; NOVARTIS-USAO-0178533 and 34, January 2003; NOVARTIS-USAO-0178528 and 29, October 2003; NOVARTIS-USAO-0178523 and 24, February 2004; NOVARTIS-USAO-0178518 and 19, March 2004; NOVARTIS-USAO-0178578 and 79, November 2004; NOVARTIS-USAO-0178573 and 74, February 2008; NOVARTIS-USAO-0178568 and 69, August 2008; NOVARTIS-USAO-0178558 and 59, May 2009; NOVARTIS-USAO-0178563 and 64, July 2009; NOVARTIS-USAO-0178553 and 54, April 2010; NOVARTIS-USAO-0178548 and 49, May 2011.

[20]  NOVARTIS-USAO-0178516, February 15, 2017.

Because the AKS is federal law relating to fraud and abuse in health care and the Medicaid program, by certifying that they will comply with such law, Providers certified that they will comply with the AKS.[21]

## ALASKA

The Medicaid Provider Enrollment application that a provider had to sign before participating in the State of Alaska's Program required a provider to agree to the following:

> "To abide by federal Medicaid regulations and regulations of the Alaska Division of Medical Assistance pertaining to the furnishing of services or items and claiming of payment under Alaska's Medical Assistance programs:
>
> 1. For Medicaid, Alaska regulations 7 AAC 43.005 - 7 AAC 43.990 and federal regulations Title 42 of the Code of Federal Regulations (CFR); and
>
> 2. For CAMA, Alaska regulations 7 AAC 48.500 - 7 AAC 48.900."
>
> "….I certify that my practice/business is in compliance with all federal and state laws, policies, and rules, including the Health Insurance Portability and Accountability Act of 1996 (HIPPA)."

Alaska Medical Assistance Program, Provider Enrollment Form.[22]

Further a representative of the Alaska Program confirmed by e-mail that the documents cited in this section of the Report "represent all iterations of the agreements that Alaska entered into with physicians and pharmacies during the period January 2002 through December 2011."[23]

Because the AKS is federal Medicaid law and is reflected in federal Medicaid regulations, by certifying that they will comply with such laws/regulations, Providers certified that they will comply with the AKS.

---

[21] This Report identifies language in the documents I cite that support my conclusion that, through the provider agreements and other documents, providers in each State certified that they will comply with the AKS. However, there may be other language in these documents that support my conclusion, and I reserve the right to rely on such other language or on additional language in additional documents that I may obtain.

[22] NOVARTIS-USAO-0136013, April 2002; NOVARTIS-USAO-0136021, June 2003; NOVARTIS-USAO-0136031, April 2004; NOVARTIS-USAO-0136041, November 3, 2008; NOVARTIS-USAO-0136052, February 1, 2010; NOVARTIS-USAO-0136035, April 2004; NOVARTIS-USAO-01360350136045, November 3, 2008; NOVARTIS-USAO-0136047, August 17, 2009; NOVARTIS-USAO-0136056, February 1,2010. The following documents contain language that is similar -- and functionally identical in all material respects -- but not exactly the same as the quoted text: NOVARTIS-USAO-0136021; NOVARTIS-USAO-0136031; NOVARTIS-USAO-0136041; and NOVARTIS-USAO-0136052.

[23] NOVARTIS-USA0-0181860, December 2, 2016.

## ARKANSAS

The Contract to Participate in the Arkansas Medical Assistance Program that a provider had to sign before participating in the State's Program required a provider to agree to the following:

> "Provider, in consideration of the covenants therein, agrees: . . . [t]o conform to all Medicaid requirements covered in Federal or State laws, regulations or manuals."

> "The signature of the Provider or the person with the legal authority to bind the Provider on this contract certifies the Provider understands that payment and satisfaction of these claims will be made from Federal and State funds, and that any false claims, statements, or documents, or concealment of material fact, may be prosecuted under applicable Federal and State laws."

Contract to Participate in the Arkansas Medical Assistance Program.[24]

The Primary Care Physician Participation Agreement in the Arkansas Medical Assistance Program that a provider had to sign before participating in the State's Program similarly required a provider to agree to the following:

> "The Provider in consideration of the material benefits to be derived, and the rules and regulations of the Medicaid Program, agrees as follows:"

> "A.  To be a Medicaid enrolled Physician provider and comply with all pertinent Medicaid policies, regulations, and State Plan standards."

Primary Care Physician Participation Agreement in the Arkansas Medical Assistance Program.[25]

Further a representative from the Arkansas Program signed a declaration that the documents cited in this section of the Report represent "...true and correct copies of all iterations of the agreements that Arkansas entered into with physicians and pharmacies that were in effect during the period January 1, 2002, through December 31, 2011."[26]

Because the AKS is a Medicaid requirement covered in Federal law and is reflected in pertinent Medicaid policies and regulations, by certifying that they will conform with such law, policies and regulations, Providers certified that they will comply with the AKS.

---

[24] NOVARTIS-USAO-0168580 and 81, September 2008.

[25] NOVARTIS-USAO-0168827, January 1, 2010; NOVARTIS-USAO-0168828, April 2007; NOVARTIS-USAO-0168830, August 2001; NOVARTIS-USAO-0136085, October 15, 2008.

[26] NOVARTIS-USAO-0168832, October 12, 2016.

## ARIZONA

The State of Arizona's Medicaid Provider Participation Agreement that a provider had to sign before participating in the State's Program required a provider to agree to the following:

> "PROVIDER AGREES"

> "4. To comply with all applicable Federal and State laws and regulations."

Provider Participation Agreement Between Arizona Health Care Cost Containment System Administration (AHCCCSA).[27]

A revised version of the State of Arizona's Medicaid Provider Participation Agreement similarly required a provider to agree to the below language, which was encompassed in the above-cited version's "comply with all applicable Federal and State laws and regulations" language:

> "The following terms and conditions apply both to services provided on a fee-for-service basis and services provided through a Program Contractor or Health Plan."

> "6. The Provider shall comply with all federal, State and local laws, rules, regulations, standards and executive orders governing performance of duties under this Agreement, without limitation to those designated within this Agreement."

> "13. By signing this Agreement, the Provider certifies that it has not engaged in any violation of the Medicare Anti-Kickback statute (42 USC §§1320a-7b). . . ."

Provider Participation Agreement Between Arizona Health Care Cost Containment System Administration (AHCCCSA).[28]

Another revised version of the State of Arizona's Medicaid Provider Participation Agreement similarly required a provider to agree to the following:

> "The agreement between AHCCCS and the Provider... to govern (1) the registration and payment for the health care services provided by the Provider to fee-for service eligible persons..., (2) the registration for a Provider to participate and deliver health care services to eligible persons who are enrolled with a Contractor,..."

> "Therefore, in consideration of the covenants contained in this Agreement:"

---

[27] NOVARTIS-USAO-0157557, April 1996.
[28] NOVARTIS-USAO-0136106 and 107, August 2000.

"6. The Provider shall comply with all federal, state and local laws, rules, regulations, standards, and executive orders governing performance of duties under this Agreement, without limitation to those designated within this Agreement."

Provider Participation Agreement Between Arizona Health Care Cost Containment System Administration (AHCCCSA).[29]

The Arizona Group Biller Participation Agreement that is used by physician groups contains analogous language.[30]  The group biller agreement is used by medical groups to enroll in the Program.

Further a representative of the Arizona Program signed a declaration that the documents cited in this section of the Report represent "…true and correct copies of all iterations of the agreements that AHCCCS entered into with physicians and pharmacies that were in effect during the period January 1, 2002, through December 31, 2011."[31]

In Arizona, providers were required to certify compliance with federal law, including the AKS, as a condition of participating in both fee-for-service and managed care models.  Starting in 2000, the above-referenced provider agreements expressly state that they apply to services provided on a fee-for-service basis or through a contractor, the latter being managed care contractors. Moreover, an e-mail from a representative of the Arizona Program confirms that:

- Pharmacies and physicians have to sign the state's provider agreement or enrollment application as a condition of participating as a provider under the state's managed care program, and
- That pharmacies and physicians are not allowed to contract with the state's Medicaid managed care plans if they do not have a signed provider agreement but otherwise meet the plan's credentialing requirements.[32]

Because the AKS is federal law, by certifying that they will comply with such law, Providers certified that they will comply with the AKS.

---

[29] NOVARTIS-USAO-0157559-60, 2011.

[30] NOVARTIS-USAO-0136103-104, April 1996; NOVARTIS-USAO-0157555, see item 10, April 1996.

[31] NOVARTIS-USAO-0157552, October 4, 2016.

[32] NOVARTIS-USAO-0181848.

## CALIFORNIA

The Provider Agreement for the State of California that a provider had to sign before participating in the State's Program required a provider to agree to the following:

> "2. Provider agrees to comply with all applicable provisions of Chapters 7 and 8 of the Welfare and Institutions Code. . . .  Provider further agrees to comply with all federal laws and regulations governing and regulating Medicaid providers."

> "3. Provider agrees that it shall not engage in conduct inimical to the public health, morals, welfare and safety of any Medi-Cal beneficiary, or the fiscal integrity of the Medi-Cal program."

> "14. Provider agrees that it shall not engage in or commit fraud and abuse.  'Fraud' . . . includes any act that constitutes fraud under applicable federal or state law."

> "18. Provider agrees that it shall not offer, give, furnish, or deliver any rebate, refund, commission preference, patronage dividend, discount, or any other gratuitous consideration, in connection with the rendering of health care services to any Medi-Cal beneficiary.  Provider further agrees that it shall not solicit, request, accept, or receive, any rebate, refund, commission preference, patronage dividend, discount, or any other gratuitous consideration in connection with the rending of health care services to any Medi-Cal beneficiary.  Provider further agrees that it will not take any other action or receive any other benefit prohibited by state or federal law."[33]

Later versions of the document change the numbering but not wording of the above-quoted provisions.[34]

Further a representative of the California Program signed a declaration that the documents cited in this section of the Report represent "…true and correct copies of all versions of the Medi-Cal Provider Agreements (State Form 6203) that California entered into with physicians and pharmacies that were in effect during the period January 1, 2002, through December 31, 2011."[35]

---

[33] NOVARTIS-USAO-0157564 and 66, January 2006; NOVARTIS-USAO-0157588 and 90, July, 2007; NOVARTIS-USAO-0157596 and 98, March 2007; NOVARTIS-USAO-0157605-07, May 2005; NOVARTIS-USAO-0157612-14, July 2004. The following documents contain language that is similar -- and functionally identical in all material respects -- but not exactly the same as the text quoted here: NOVARTIS-USAO-0157619-21, September 2002; NOVARTIS-USAO-0157626-28, September 2003.

[34] NOVARTIS-USAO-0157580-83, February 2008; NOVARTIS-USAO-0157572-75, November 2011.

[35] NOVARTIS-USAO-0157563, October 6, 2016.

Because the AKS is a federal statute governing and regulating Medicaid providers, by certifying that they will comply with such law, providers certified that they will comply with the AKS. Moreover, California has its own state-law version of the AKS. Thus, by certifying compliance with state law, Providers certify compliance with this statute as well.

## COLORADO

The Medicaid Provider Participation Agreement for the State of Colorado that a provider had to sign to participate in the State's Program required a provider to agree to the following:

> "A. Provider will comply with all applicable provisions of the Social Security Act, as amended; federal or state laws, regulations, and guidelines; and Department rules."

Provider Participation Agreement, Provider Participation.[36]

Further a representative of the Colorado Program signed a declaration that the documents cited in this section of the Report represent "…sample agreements that Colorado was able to locate for the purpose of this certification, entered into with physicians and pharmacies during the period of January 1, 2002, through December 31, 2011."[37]   These "sample agreements" are all consistent with one another and consistent with the language I would expect to be and understand to have been included in the provider agreements of the various states, including Colorado.

Because the AKS is a federal law, as well as a provision of the Social Security Act, by certifying that they will comply with such law and provisions, Providers certified that they will comply with the AKS.

## CONNECTICUT

The Connecticut Provider Agreement that a provider had to sign to participate in the State's Program required a provider to agree to the following:

> "1. Follow the laws, rules, regulations, policies, and amendments which govern the Connecticut Medical Assistance Program as specified by the Federal

---

[36] NOVARTIS-USAO-0157649, August 2006; NOVARTIS-USAO-0157741, November 2010; NOVARTIS-USAO-0157755, August 9, 2015; NOVARTIS-USAO-0175645, June 2008, signed September 7, 2010, Humana Pharmacy Inc.; NOVARTIS-USAO-0175689, June 2008, signed September 27, 2010, Humana Pharmacy Inc.

[37] NOVARTIS-USAO-0157765, October 6, 2016

Government and State of Connecticut, including, but not limited to, the standards for participation and the making of payments."

State of Connecticut Provider Agreement[38]

Another version of the agreement similarly required the provider to agree to comply with federal law:

"2. To abide by and comply with all federal and state statutes, regulations, and policies pertaining to Provider's participation in the Connecticut Medical Assistance Program, as may be amended from time to time."

Connecticut Department of Social Services Provider Enrollment Agreement.[39]

Further a representative of the Connecticut Program signed a declaration that these documents represent "…true and correct copies of all iterations of the agreements that Connecticut entered into with physicians and pharmacies that were in effect during the period January 1, 2002, through December 31, 2011."[40]

Because the AKS is a law governing the Connecticut Program as specified by the Federal Government and a statute that pertains to Medicaid, by certifying that they will abide by such law, Providers certified that they will comply with the AKS.

## DELAWARE

The Contract for Items or Services Delivered to Delaware Medical Assistance Program Eligibles that a provider had to sign before participating in the State's Program required a provider to agree to the following:

"1. Applicable Laws and Regulations

The Provider agrees, as a participant in the programs under the authority of the Delaware Medical Assistance Program (DMAP), to abide by the rules, regulations, policies and procedures of the DMAP, and to comply with all the terms, conditions, and requirements as set forth herein. . . .  The Provider also understands that penalties may be imposed for failure to observe the terms of the Social Security Act."

---

[38] NOVARTIS-USAO-0136176, not dated.

[39] NOVARTIS-USAO-0136180, not dated.

[40] NOVARTIS-USAO-0158081, September 19, 2016.

"3. Payment for Items or Services

. . . The Provider shall not solicit, charge, accept, or receive any money, gift or other consideration from a DMAP eligible or from any other person on behalf of the eligible for any service or item allowable under the DMAP. . . ."

Contract for Items or Services Delivered to Delaware Medical Assistance Program Eligibles.[41]

Further a representative of Connecticut signed a declaration that these documents represent "…true and correct copies of all iterations of the agreements that Connecticut entered into with physicians and pharmacies that were in effect during the period January 1, 2002, through December 31, 2011."[42]

Moreover, the Point-of-Sale Certification Agreement completed by pharmacies that bill electronically required those providers to agree with the following:

"8. All covered drugs for which reimbursement is claimed will be provided in accordance with all Delaware State and Federal laws and regulations pertaining to the Delaware Medical Assistance Program (DMAP)."

Point-of-Sale Certification Agreement.[43]

All pharmacies billed electronically during the relevant period.

Because the AKS is one of the federal statutes that comprise the Social Security Act, by agreeing to comply with and be subject to the terms of such statutes, Providers agreed to comply with the AKS. Further, because the AKS is a Federal law that pertains to the Delaware Program, pharmacies certified that all drugs for which they claimed reimbursement would be provided in accordance with the AKS.

## DISTRICT OF COLUMBIA

The Medicaid Provider Agreement that a provider had to sign before participating in the District's Program required a provider to agree to the following:

"C. To satisfy all requirements of the Social Security Act, as amended, and be in full compliance with the standards prescribed by Federal and State standards."

---

[41] NOVARTIS-USAO-0158172-73, not dated.

[42] NOVARTIS-USAO-0158102, October 7, 2016.

[43] NOVARTIS-USAO-0158104, March, 2010.

That "[i]f the Department determines that a provider has failed to comply with the applicable Federal or District law or rule, . . . the Department may do all of the following:

> A.  Withhold all or part of the providers' payments . . . ."

Medicaid Provider Agreement.[44]

Further a representative of the District of Columbia signed a declaration that this document represents "…a true and correct copy of the only iteration of the provider agreement that DHCF or the District entered into with physicians and pharmacies that was in effect during the period January 1, 2002, through December 31, 2011."[45]

Because the AKS is one of the federal statutes that comprise the Social Security Act and is an applicable federal standard, by certifying they will satisfy the requirements of such statutes, Providers certified they will comply with the AKS.

## FLORIDA

The Medicaid Provider Enrollment Application that a provider had to sign before participating in the State's Program required a provider to agree to the following:

> "I further understand that false claims, statements, documents, or concealment of material facts may be prosecuted under applicable federal and state laws."

Florida Medicaid Provider Enrollment Application[46]

Further, the Enrollment Application specified that all providers were required to receive payments by Electronic Fund Transfer (EFT):

> "All Florida Medicaid Providers **must** be on the EFT system to receive payments."

Florida Medicaid Provider Enrollment Application[47]

The Enrollment Application also contained a form pertaining to EFT that a provider had to sign before participating in the State's Program, and that form specified:

---

[44] NOVARTIS-USAO-0172805 and 08, not dated.

[45] NOVARTIS-USAO-0172801-02, November 8, 2016.

[46] NOVARTIS-USAO-0136236, December 2004; NOVARTIS-USAO-0178618, AHCA Form 2200-0003, December 2002; NOVARTIS-USAO-0178639, AHCA Form 2200-0003, December 2004.

[47] NOVARTIS-USAO-0180809, AHCA Form 2200-0003, July 1999; NOVARTIS-USAO-0136236, December 2004; NOVARTIS-USAO-0178618, AHCA Form 2200-0003, December 2002; NOVARTIS-USAO-0178639, AHCA Form 2200-0003, December 2004.

"**This form must be completed by individual Medicaid provider applicants, provider groups, or businesses who will be billing Medicaid directly for services.**"

"I understand that this electronic funds transfer/payment will be from federal and state funds and that any falsification or concealment or a material fact involving the deposit may be prosecuted under federal and state laws."

Florida Medicaid Provider Enrollment Application[48]

Further, the Electronic Claims Submission Agreement that a provider had to sign to submit claims electronically in the State of Florida's Program required a provider to agree to the following:

"7. Providers must abide by all Federal and State statutes, rules, regulations, and manuals governing the Florida Medicaid Program."

Electronic Claims Submission Agreement.[49]

Most physicians billed electronically during the relevant period.

Similarly, the Medicaid Pharmacy Point of Service Provider Certification Agreement that a pharmacy had to sign to submit claims electronically in the State of Florida's Program required a provider to agree to the following:

"8. The Provider shall abide by all Federal and State statutes, rules, regulations, and manuals governing the Florida Medicaid Program..."

Medicaid Pharmacy Point of Service Provider Certification Agreement.[50]

All pharmacies billed electronically during the relevant period.

Further a representative of Florida sent an email stating:

---

[48] NOVARTIS-USAO-0180808, AHCA Form 2200-0003, July 1999; NOVARTIS-USAO-0136236, December 2004; NOVARTIS-USAO-0178618, AHCA Form 2200-0003, December 2002; NOVARTIS-USAO-0178639, AHCA Form 2200-0003, December 2004.

[49] NOVARTIS-USAO-0178598, AHCA Form 2200-0003, July 1999. The following documents contain language that is similar -- and functionally identical in material respects -- but not exactly the same as the text quoted here: NOVARTIS-USAO-0178618, AHCA Form 2200-0003, December 2002; NOVARTIS-USAO-0178635, AHCA Form 2200-0003, December 2004.

[50] NOVARTIS-USAO-0178600, AHCA Form 2200-0003, July 1999. The following documents contain language that is similar -- and functionally identical in material respects -- but not exactly the same as the text quoted here: NOVARTIS-USAO-0178618, AHCA Form 2200-0003, December 2002; NOVARTIS-USAO-0178635, AHCA Form 2200-0003, December 2004.

"Post, June 26, 2008, all applications are submitted online via the Medicaid Web Portal. There are no printed versions of applications post that date. The July 1999 version was in effect until the December 2002 version. December 2002 version was in effect until the December 2004 version. December 2004 version was in effect until July 2008 when we moved to an online application product."[51]

The AKS is a federal statute governing the Florida Program, and by agreeing that they would abide by or be subject to prosecution under federal law, Providers represented that they would comply with the AKS.

## GEORGIA

The Statement of Participation that a provider had to sign before participating in the State's Program required a provider to agree to the following:

"5... a. That Provider and every person or agent acting on his behalf shall abide by all Federal and State statutes, rules and regulations governing the Georgia Medicaid Program and those conditions set out in any Provider Statement of Participation agreement entered into by and between the Provider and the Department of Medical Assistance (DMA)."

Georgia Medical Assistance Program Statement of Participation.[52]

Another version of the Statement of Participation that a provider had to sign to participate in the State of Georgia's Program similarly required a provider to agree to the following:

"In consideration for any services the undersigned Provider elects to render pursuant to this Statement of Participation, the Department [of Medical Assistance of the State of Georgia] shall reimburse for such claims, and in such amounts, as meet the provisions of . . . applicable federal and state laws, regulations promulgated by the U.S. Department of Health and Human Services, . . . and the applicable terms and conditions for receipt of Medical Assistance published in the Department's Policies and Procedures Manuals and amendments thereto. . . ."

Georgia Medical Assistance Program Statement of Participation.[53]

---

[51] NOVARTIS-USAO-0182721, August 10, 2017.

[52] NOVARTIS-USAO-0173786-87, January 1996, signed by Longs Drugs, January 21, 2002.

[53] NOVARTIS-USAO-0158234, April 2003.  The following document contains language that is similar (and functionally identical in material respects) but not exactly the same as the text quoted here: NOVARTIS-USAO-0136240, signed January 29, 2007.

Other versions of the Statement of Participation that a provider was required to sign to participate in the State of Georgia's Program required a provider to agree to the following terms and conditions, which for purposes here, are substantively identical to the terms referenced above:

> "2A. Legal Compliance. Provider shall comply with all of the Department's requirements applicable to the category(ies) of service in which Provider participates under this Statement of Participation, including Part I, Part II and the applicable Part III manuals."

> "4A. Claim Submission; Certification of Claims. Provider shall submit claims for Covered Services rendered to eligible Medicaid recipients in the form and format designated by the Department. For each claim submitted by or on behalf of a Provider, Provider shall certify each claim for truth, accuracy and completeness, and shall be responsible for research and correction of all billing discrepancies without cost to the Department. This provision shall survive termination or expiration of this Statement of Participation for any reason."

> "4D. Reimbursement for Covered Services. Reimbursement for Covered Services performed shall be made in a form and format designated by the Department. Payment shall be made in conformity with the provisions of the Medicaid program, applicable federal and state laws, rules and regulations promulgated by the U.S. Department of Health and Human Services and the State of Georgia, and the Department's Policies and Procedures manuals in effect on the date the service was rendered. . . . Provider agrees that the Department shall not reimburse any claim, or portion thereof, for services rendered prior to the effective date of enrollment indicated by the Department or for which federal financial participation is not available."

> "Provider acknowledges that payment of claims submitted by or on behalf of Provider will be from federal and state funds, and the Department may withhold, recoup or recover payments as a result of Provider's failure to abide by the Department's requirements. This provision shall survive termination or expiration of this Statement of Participation for any reason."

Statement of Participation, Department of Community Health, Division of Medical Assistance.[54]

---

[54] NOVARTIS-USAO-0158234 at 240-242, January 1996; NOVARTIS-USAO-0173558-60, April 2003, signed by Eldercare, April 10, 2014.

Further, a representative of Georgia signed a declaration stating that "[b]etween 2002 and 2011, physicians and pharmacies that provided services submitted a Statement of Participation in this state," and these documents represent "… true and correct copies of all iterations of the Statement of Participation[] the Georgia Department of Community Health entered into with physicians and pharmacies that were in effect during the period January 1, 2002, through December 31, 2011."[55]

Moreover, the Electronic Funds Transfer Agreement that a provider had to sign to bill the State of Georgia's Program electronically required a provider to agree to the following:

> "1. <u>Legal Compliance</u>. Provider shall abide by all federal and state laws governing the Medicaid program."

Georgia Electronic Funds Transfer Agreement.[56]

All pharmacies billed Medicaid programs electronically during the relevant period, as did the vast majority of physicians.

An e-mail dated February 9, 2017 from a representative of Georgia that confirms that:

> "In Georgia, pharmacies and physicians have to sign a provider agreement (called a "Statement of Participation") as a condition of participating as a provider in the managed care program.  They are not allowed to contract with the CMOs if they haven't done so."[57]

The Georgia provider agreement thus applied to both the fee for service program and its managed care program.

Because the AKS is a requirement for the State of Georgia and a federal statute pertaining to Medicaid, by agreeing to abide by federal law and/or that payment would be made in conformity with applicable federal statutes, Providers agreed to comply with the AKS.  Moreover, as a condition of billing the State electronically, all pharmacy providers certified that they would comply with all laws governing the Medicaid Program, which included the AKS.

---

[55] NOVARTIS-USAO-0158216, October 18, 2016.
[56] NOVARTIS-USAO-0158194, dated May 30, 2002; NOVARTIS-USAO-0158195, January 2005; NOVARTIS-USAO-0158196, July 2006, NOVARTIS-USAO-0158197, January 2005, dated August 7, 2008; NOVARTIS-USAO-0158198, dated September 29, 2010; NOVARTIS-USAO-0173809, signed by Longs Drugs, dated January 21, 2002.
[57] NOVARTIS-USAO-0182782, February 9, 2017.

## HAWAII

The Hawaii State Medicaid Program Provider Agreement that a provider had to sign before participating in the State's Program required a provider to agree to the following:

> "1. I/We agree to abide by the applicable provisions of the Hawaii State Medicaid Program . . . and applicable provisions set forth in the Code of Federal Regulations (C.F.R.) related to the Medical Assistance Program. Upon certification by the Hawaii State Medicaid Program, I/We also agree to abide by the policies and procedures contained in the Hawaii State Medicaid Manual."

> "6. … I/We am aware that it is violation of Federal law to accept or require additional payments over and beyond those established by the Hawaii State Department of Human Services for services rendered under the Hawaii State Medicaid Program."

Hawaii State Medicaid Program Provider Agreement and Condition of Participation.[58]

Further a representative from Hawaii confirmed in an e-mail that the documents received from Hawaii "represent[] all iterations of the agreements that Hawaii entered into with physicians and pharmacies during the period February 2002 through December 2011."[59]

Because the AKS is a federal statute pertaining to Medicaid, and because its effectuating regulations likewise pertain to Medicaid, by certifying they will abide by applicable provisions of the Code of Federal Regulations, Providers certified that they will comply with the AKS.

## IDAHO

The Idaho Medicaid Provider Agreement that a provider had to sign before participating in the State's Program required a provider to agree to the following:

> "1. **Compliance**.
>
> To provide services in accordance with all applicable provisions of statutes, rules and federal regulations governing the reimbursement of services and items under Medicaid in Idaho, including…"

---

[58] NOVARTIS-USAO-0175216 and 17, February 2002; NOVARTIS-USAO-0175231 and 32, October 2002; NOVARTIS-USAO-0168838-39, April 2003; NOVARTIS-USAO-0136264-65, April 2008; NOVARTIS-USAO-0168851-52, April 2008.
[59] NOVARTIS-USA0- 01 81983, November 29, 2016.

Idaho Medicaid Provider Agreement[60]

A later version of the Idaho Medicaid Provider Agreement similarly required a provider to agree to the following:

"1.  Compliance.

> To provide services in accordance with all applicable provisions of statutes, rules and federal regulations governing the reimbursement of services and Items under Medicaid in Idaho…"

> "The Provider acknowledges that it is aware of the False Claims Act (sections 3729 through 3733 of title 31, United States Code).  In addition, any provider that either receives or makes annual Medicaid payments of at least five- million dollars ($5,000,000), acknowledges that they are required to comply with Title 42, United States Code Section 1396a(a), paragraph (68) as amended by the Deficit Reduction Act of 2005.  The provider specially acknowledges its responsibility regarding employee education about the False Claims Act and state laws pertaining to civil or criminal penalties for false claims and statements and whistleblower protections under such laws."

Idaho Medicaid Provider Agreement[61]

Further a representative of Idaho Medicaid signed a declaration that these documents represent "…true and correct copies of all iterations of the agreements that Idaho entered into with physicians that were in effect during the period January 1, 2002, through December 31, 2011."[62]

Because the AKS is a federal statute pertaining to Medicaid, and because its effectuating regulations likewise pertain to Medicaid, by certifying they will abide by statutes, rules and federal regulations governing Medicaid, Providers certified that they will comply with the AKS.

<u>**ILLINOIS**</u>

The Agreement for Participation in the Illinois Medical Assistance Program that a provider had to sign before participating in the State's Program required a provider to agree to the following:

---

[60] NOVARTIS-USAO-0136291, May 21, 2003; NOVARTIS-USAO-0158294, May 21, 2003; NOVARTIS-USAO-0136295, February 7, 2007.

[61] NOVARTIS-USAO-0136295, February 7, 2007; NOVARTIS-USAO-0158297, February 7, 2007; NOVARTIS-USAO-0158300, June 2010; NOVARTIS-USAO-0158303, June 2011; NOVARTIS-USAO-0136303, June 2011; NOVARTIS-USAO-0175730, signed October 8, 2010, Humana Pharmacy Inc.

[62] NOVARTIS-USAO-0158292, October 5, 2016.

"1. The Provider agrees, on a continuing basis, to comply with all current and future program policy and billing provisions as set forth in the applicable Department of Public Aid Medical Assistance Program rules and handbooks."

"3. The Provider agrees, on a continuing basis, to comply with Federal standards specified in Title XIX of the Social Security Act and with all other applicable Federal and State laws and regulations."

"6. The Provider agrees to be fully liable for the truth, accuracy and completeness of all claims submitted electronically or on hard copy to the Department for payment."… "Any submittal of false or fraudulent claim or claims or any concealment of a material fact may be prosecuted under applicable Federal and State laws."

Agreement for Participation in the Illinois Medical Assistance Program.[63]

Further a representative of Illinois Medicaid signed a declaration that these documents represent "…true and correct copies of each revision of the agreement that HFS used during the period January 1, 2002, through December 31, 2011."[64]

In Illinois, providers were required to certify compliance with federal law, including the AKS, as a condition of participating in both fee-for-service and managed care models.  An e-mail from a representative of the Illinois Program, dated February 23, 2017, confirms that:

- Pharmacies and physicians have to sign the state's provider agreement or enrollment application as a condition of participating as a provider under the state's managed care program, and

- That pharmacies and physicians are not allowed to contract with the state's Medicaid managed care plans if they do not have a signed provider agreement but otherwise meet the plan's credentialing requirements.[65]

Because the AKS is a federal statute pertaining to Medicaid and is part of the Social Security Act, by certifying they will abide by such law, Providers certified that they will comply with the AKS.

---

[63] NOVARTIS-USAO-0175173, December 2000, note sections 3 and 6 were renumbered 4 and 7; NOVARTIS-USAO-175175, June 2004; NOVARTIS-USAO-175177, August 2006; NOVARTIS-USAO-175180, June 2009.

[64] NOVARTIS-USAO-0175171, November 21, 2016.

[65] NOVARTIS-USAO-0181849.

## INDIANA

The Indiana Medicaid Provider Agreement that a provider had to sign before participating in the State's Program required a provider to agree to the following:

> "By execution of this Agreement, the undersigned entity ("Provider") requests enrollment as a provider of Medicaid covered services and/or supplies to Indiana Medicaid recipients, and as a condition of enrollment, Provider agrees: . . ."

> > "2. To abide by and comply with all federal and state statutes and regulations pertaining to the Medicaid Program, as they may be amended from time to time."

> > "5. To provide Medicaid-covered services and/or supplies for which federal financial participation is available for Medicaid recipients pursuant to all applicable federal and state statutes and regulations."

> > "13. To submit claims that can be documented by Provider as being strictly for . . . compensation that Provider is legally entitled to receive."

Indiana Health Coverage Programs (IHCP) Provider Agreement.[66]

Another version of the Indiana Medicaid Provider Agreement similarly required a provider to agree to the following:

> "By execution of this Agreement, the undersigned entity ("Provider") requests enrollment as a provider of Medicaid-covered and Children's Health Insurance Program (CHIP)-covered services and/or supplies to Indiana Medicaid and Indiana CHIP recipients, and as a condition of enrollment, Provider agrees: . . ."

> > "2. To abide by and comply with all federal and state statutes and regulations pertaining to the Medicaid Program or CHIP, as they may be amended from time to time."

> > "5. To provide Medicaid-covered and CHIP-covered services and/or supplies for which federal financial participation is available for Medicaid

---

[66] NOVARTIS-USAO-0178680 and 81, not dated, note section 13 is numbered section 12 in this document; NOVARTIS-USAO-0136318-319, December 17, 1996; NOVARTIS-USAO-0175780-81, April 2009, signed September 10, 2010, Humana Pharmacy Inc. (contains language that is similar -- and functionally identical in material respects -- but not exactly the same).

recipients pursuant to all applicable federal and state statutes and regulations."

"13. To submit claims that can be documented by Provider as being strictly for . . . compensation that Provider is legally entitled to receive."

Medicaid Provider Agreement/Children's Health Insurance Program Provider Agreement.[67]

Other versions of the Indiana Health Coverage Programs (IHCP) Provider Agreement similarly required a provider to agree to the following:

"By execution of this Agreement, the undersigned entity ("Provider") requests enrollment as a provider in the Indiana Health Coverage Programs. As an enrolled provider in the Indiana Health Coverage Programs, the undersigned entity agrees to provide Medicaid-covered . . . services and/or supplies to Indiana Medicaid . . . members. As a condition of enrollment, this agreement cannot be altered and the Provider agrees to all of the following: . . ."

"2. To comply with all federal and state statutes and regulations pertaining to the Medicaid Program or CHIP, as they may be amended from time to time."

"5. To provide Medicaid-covered and CHIP-covered services and/or supplies for which federal financial participation is available for Medicaid and CHIP members pursuant to all applicable federal and state statutes and regulations."

"14. To be responsible and accountable for the completion, accuracy, and validity of all claims filed under the provider number issued, including claims filed by the Provider, the Provider's employees, or the Provider's agents. Provider understands that the submission of false claims, statements, and documents or the concealment of material fact may be prosecuted under the applicable Federal and/or State law."

"17. To submit claims that can be documented by Provider as being strictly for . . . compensation that Provider is legally entitled to receive."

---

[67] NOVARTIS-USAO-0178672-73, not dated; NOVARTIS-USAO-0178684-85 (contains language that is similar -- and functionally identical in material respects -- but not exactly the same and has different numbering), May, 2001; NOVARTIS-USAO-0178676- 77, January, 2003 (contains language that is similar -- and functionally identical in material respects -- but not exactly the same and has different numbering).

Indiana Health Coverage Programs (IHCP) Provider Agreement.[68]

Still other versions of the Indiana Health Coverage Programs (IHCP) Provider Agreement similarly required a provider to agree to the following:

> "By execution of this Agreement, the undersigned entity ("Provider") requests enrollment as a provider in the Indiana Health Coverage Programs. As an enrolled provider in the Indiana Health Coverage Programs, the undersigned entity agrees to provide Medicaid-covered . . . services and/or supplies to Indiana Medicaid . . . members. As a condition of enrollment, this agreement cannot be altered and the Provider agrees to all of the following: . . ."

>> "2. To comply with all federal and state statutes and regulations pertaining to the Medicaid Program or CHIP [Indiana Health Coverage Programs] as they may be amended from time to time."

>> "5. To provide Medicaid-covered and CHIP-covered services and/or supplies for which federal financial participation is available for Medicaid and CHIP members pursuant to all applicable federal and state statutes and regulations."

>> "13. To be individually responsible and accountable for the completion, accuracy, and validity of all claims filed under the provider number issued, including claims filed by the Provider, the Provider's employees, or the Provider's agents. Provider understands that the submission of false claims, statements, and documents or the concealment of material fact may be prosecuted under the applicable Federal and/or State law."

>> "16. To submit claims that can be documented by Provider as being strictly for . . . compensation that Provider is legally entitled to receive."

Indiana Health Coverage Programs (IHCP) Provider Agreement.[69]

---

[68] NOVARTIS-USAO-0178653-54, September 2004; NOVARTIS-USAO-0178644-45, October, 2007; NOVARTIS-USAO-0136326-327, October 1, 2007.

[69] NOVARTIS-USAO-0136330-331, May 2001; NOVARTIS-USAO-0178667-68, March 2006, note there are slight insignificant wording changes; NOVARTIS-USAO-0178688-89, April 2009, note there are slight insignificant wording and numbering changes; NOVARTIS-USAO-0178649-50, April 2011, note there are slight insignificant wording changes; NOVARTIS-USAO-0136314-315, April 1, 2011; NOVARTIS-USAO-0136322-323, August 2010, note sections 13 and 16 are numbered 14 and 17; NOVARTIS-USAO-0136334-335, April 1, 2009, note sections 13 and 16 are numbered 14 and 17; NOVARTIS-USAO-0178658- 59, December 2011, note there are slight insignificant wording changes.

Further a representative of Indiana Medicaid signed a declaration that these documents represent "…true and correct copies of all iterations of the agreements that Indiana entered into with physicians and pharmacies that were in effect during the period January 1, 2002, through December 31, 2011."[70]

Moreover, an e-mail dated February 13, 2017 from a representative of Indiana confirms that:

> "At all times during the relevant time period (1/1/2002 – 11/30/2011), all physicians who sought to be a provider under our Medicaid managed care programs were and continue to be required to enroll first as a provider in the Indiana Health Coverage Program, i.e. FFS Medicaid, and only then could they apply to become a provider in one or more of the Indiana Medicaid managed care programs.
>
> From 1/1/2002 to 12/31/2009, I cannot provide information as to whether pharmacies could be MCE providers without having submitted an application to be an Indiana Health Coverage provider.
>
> From 1/1/2010 to May 30, 2014, pharmacy services were carved out of the managed care programs, meaning that during that period of time all pharmacy claims were FFS."
>
> Currently all providers must be IHCP providers before applying to become a MCE provider.[71]

Accordingly, the Indiana agreement applies to both the fee for service program (for all providers) and its managed care program (for physicians) during the relevant period.

Because the AKS is a federal statute pertaining to Medicaid, by certifying they will abide by such federal law, Providers certified that they will comply with the AKS.

## IOWA

The Medicaid Provider Agreement that a provider had to sign before participating in the State's Program required a provider to agree to the following:

> "That I understand that payment and satisfaction of claims will be from federal and state funds and that any false claims, statements and documents of

---

[70] NOVARTIS-USAO-0178692, January 24, 2017.

[71] NOVARTIS-USAO-0182789, February 13, 2017.

concealment of a material fact may be prosecuted under applicable federal and state laws."

Iowa Medicaid Provider Agreement, Form 470-2965, §4.[72]

Later versions of the Medicaid Provider Agreement required a provider to agree to the following language:

> "1.4.  To comply with applicable Federal and State laws, rules and written policies to the Iowa Medicaid program, including but not limited to Title XIX of the Social Security Act (as amended), the code of Federal Regulations (CFR), the provisions of the Code of Iowa and rules of the Iowa Department of Administrative Services and written Department policies, including but not limited to policies contained in the Iowa Medicaid Provider Manual, and the terms of this Agreement."

Iowa Medicaid Provider Agreement, Form 470-2965.[73]

Further a representative of Iowa Medicaid signed a declaration that these documents represent "…true and correct copies of all iterations of the agreements that the state of Iowa entered into with physicians and pharmacies that were in effect during the period January 1, 2002, through December 31, 2011[.] Iowa did not have separate agreements for physicians or pharmacies."[74]

Because the AKS is a federal statute pertaining to Medicaid, by agreeing to comply with applicable federal law and/or to be subject to prosecution under applicable federal law for submitting false claims or concealing material facts, Providers agreed to comply with the AKS.

## KANSAS

The Provider Agreement that a provider had to sign before participating in the State's Program required a provider to agree to the following:

> "**1. Rules, Regulations, Policies**
>
> The provider agrees to participate in the Kansas Medical Assistance Program and to comply with all applicable requirements for participation as set forth in federal and state statutes and regulations, and Program policies, within the authorities of such statutes and regulations, of the SRS Adult & Medical Services Commission (AMS) as published in the Kansas Medical Assistance Program Provider Manuals

---

[72] NOVARTIS-USAO-0158278, August 1998.

[73] NOVARTIS-USAO-0158280, January 2007 and NOVARTIS-USAO-0158286, July 2007.
[74] NOVARTIS-USAO-0158277, October 5, 2016.

and Bulletins. The provider also agrees to comply with all state and federal laws and regulations applicable to services delivered and professional activities."

**"14. Fraud**

The provider agrees that payment of claims is from federal and/or state funds, and that any false claims, statements or documents or concealment of a material fact may be prosecuted under applicable federal or state laws. The provider acknowledges that the submission of a false claim, cost report, document or other false information, charging the recipient for covered services except for authorized spenddown and co-payment, and giving or taking of a kickback or bribe in relationship to covered services are crimes which are prosecutable under applicable federal and/or state laws. Among such applicable laws is K.S.A. 21-3844 et. seq. and amendments thereto (the Kansas Medicaid Fraud Control Act)."

Kansas Medical Assistance Program Provider Agreement.[75]

Another version of the Provider Agreement required a provider to agree to the following terms and conditions:

**"1. Rules, Regulations, Policies**

The provider agrees to participate in the Kansas Medical Assistance Program (KMAP) and to comply with all applicable requirements for participation as set forth in federal and state statutes and regulations, and Program policies, within the authorities of such statutes and regulations, of the SRS Health Care Policy (HCP) as published in the KMAP Provider Manuals and Bulletins. The provider also agrees to comply with all state and federal laws and regulations applicable to services delivered and professional activities."

**"14. Fraud**

The provider agrees that payment of claims is from federal or state funds, or both, and that any false claims, statements or documents or concealment of a material fact may be prosecuted under applicable federal or state laws. The provider acknowledges that the submission of a false claim, cost report, document or other false information, charging the recipient for covered services except for authorized spenddown and co-payment, and giving or taking of a kickback or bribe in relationship to covered services are crimes which are prosecutable under

---

[75] NOVARTIS-USAO-0175239-42, August 1998; NOVARTIS-USAO-0136343 and 346, September 2007; NOVARTIS-USAO-0136338 and 341, September 2007.

applicable federal and state laws.  Among such applicable laws is K.S.A. 21-3844 et. seq. and amendments thereto (the Kansas Medicaid Fraud Control Act)."

Kansas Medical Assistance Program Provider Agreement.[76]

Further on December 12, 2016 a representative of Kansas Medicaid confirmed in an e-mail that the documents received "represent all iterations of the agreements that Kansas entered into with physicians and pharmacies during the period January 2002 through December 2011."[77]

Because the AKS is a federal statute pertaining to Medicaid that must be complied with as a condition of participation in the Medicaid Program and that is applicable to services delivered under the Program, by certifying they will abide by such federal law, Providers certified that they will comply with the AKS.

## KENTUCKY

The Provider Agreement that a provider had to sign before participating in the State's Program required a provider to agree to the following:

> "I certify that I have read and understand the "Medicaid Rules, Regulation, Policy and 42USC 1320a-7b" (pp. 6-8) to the best of my ability. I agree to abide by the Medicaid Program terms and conditions listed in this document, and I hold a license/certification to provide service corresponding to the information above and for which this agreement applies."

Commonwealth of Kentucky provider agreement.[78]

Another version of the Kentucky Provider Agreement required a provider to agree to the following terms and conditions:

> "I certify that I have read and understand the "Medicaid Rules, Regulation, Policy and 42USC 1320a-7b" (pp. 6-8) to the best of my ability. I agree to abide by the Medicaid Program terms and conditions listed in this document, and I hold a license/certification to provide service corresponding to the information above and for which this agreement applies."

---

[76] NOVARTIS-USAO-0136348 and 50, September 2003; NOVARTIS-USAO-0136343 and 346, September 2007; NOVARTIS-USAO-0136338 and 341, September 2007 (contains language that is similar -- and functionally identical in material respects -- but not exactly the same); NOVARTIS-USAO-0175853-56, September 2007, signed October 5, 2010, Humana Pharmacy Inc. (contains language that is similar -- and functionally identical in material respects -- but not exactly the same).

[77] NOVARTIS-USA0- 0182044, December 12, 2016.

[78] NOVARTIS-USAO-0158365, April 2001; NOVARTIS-USAO-0158458, September 2002.

"(2). The provider agrees to provide covered services to Medicaid, KenPAC and KCHIP recipients in accordance with all applicable federal and state laws, regulations, policies and procedures relating to the provision of medical services according to Title XIX, Title VI, the approved Waivers for Kentucky and, for those providers participating in the Partnership, all applicable provisions of the pertinent contract for managed care and policies and procedures duly adopted by the governing board of the Partnership applicable to provider and recipients of Title XIX services."

"(7).D. Payment and satisfaction of claims will be from federal and state funds and that any false claims, statements, or documents or concealment of falsification of a material fact, may be prosecuted under applicable federal and state law."

Commonwealth of Kentucky Department for Medicaid Services and/or Kentucky Health Care Partnership Provider Application.[79]

Further a representative of Kentucky Medicaid signed a declaration that these documents represent "…true and correct copies of all iterations of the agreements that DMS [Kentucky's Department for Medicaid Services] entered into with physicians and pharmacies that were in effect during the period January 1, 2002, through December 31, 2011."[80]

An e-mail dated February 23, 2017 from a Kentucky representative confirms that:

- Pharmacies and physicians have to sign the state's provider agreement or enrollment application as a condition of participating as a provider under the state's managed care program, and
- That pharmacies and physicians are not allowed to seek reimbursement from Medicaid unless a provider contracts with the state.[81]

Based on the e-mail, the Kentucky agreement clearly applies to both the fee for service program and its managed care program.

The AKS is found in 42 U.S.C. § 1320a-7b, and by certifying that they have read and understand the "Medicaid Rules, Regulation, Policy and 42USC 1320a-7b" and will abide by the terms and conditions listed in that document, Providers certified that they will comply with the AKS.

---

[79] NOVARTIS-USAO-0158380-81, April 2004; NOVARTIS-USAO-0158415-16, May 2005; NOVARTIS-USAO-0158432-33, November 2006; NOVARTIS-USAO-0158527-28, July 2007; NOVARTIS-USAO-0158546-47, July 2007; NOVARTIS-USAO-0136361-62, July 2010; NOVARTIS-USAO-0158467-68, July 2010; NOVARTIS-USAO-0158480-81, July 2010.

[80] NOVARTIS-USAO-0158277, October 5, 2016.

[81] NOVARTIS-USAO-0181852.

## LOUISIANA

The Provider Agreement Enrollment Form that a provider had to sign before participating in the State's Program required a provider to agree to the following:

> "5. I agree to abide by the Federal and State Medicaid laws, regulations and program instructions that are applicable to the provider type for which I am enrolled. I understand that the payment of a claim by Medicaid is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions;

> "6. I agree to conduct my activities/actions in accordance with the Medical Assistance Program Integrity Law . . . as required to protect the fiscal and programmatic integrity of the medical assistance programs;"

> "16. The Deficit Reduction Act of 2005, Section 6032 Implementation. As a condition of payment for goods, services and supplies provided to recipients of the Medicaid Program, providers and entities must comply with the False Claims Act employee training and policy requirements in 1902(a)(68) of the Social Security Act, set forth in that subsection and as the Secretary of the US Department of Health and Human Services may specify."

Enrollment Packet for the Louisiana Medical Assistance Program (PE-50 Addendum).[82]

Another version of the Provider Agreement Enrollment Form from January 2009 required a provider to agree to the following terms and conditions:

> "The Deficit Reduction Act of 2005, Section 6032 Implementation. As a condition of payment for goods, services and supplies provided to recipients of the Medicaid Program, providers and entities must comply with the False Claims Act employee training and policy requirements in 1902(a)(68) of the Social Security Act, set forth in that subsection and as the Secretary of the US Department of Health and Human Services may specify."

Enrollment Packet for the Louisiana Medical Assistance Program (PE-50 Addendum), ¶19.[83]

---

[82]NOVARTIS-USAO-0136365-66, not dated; NOVARTIS-USAO-0136367-68, not dated.

[83] NOVARTIS-USAO-0136370, January 1, 2009; NOVARTIS-USAO-0136372, January 1, 2009; NOVARTIS-USAO-0136374, January 1, 2009.

In addition to the Provider Agreement Enrollment Form, a pharmacy that wanted to bill electronically was required to sign the Medicaid Pharmacy Point-of Sale Agreement, which required a provider to agree to the following terms and conditions:

> "8. The Provider shall abide by all Federal and State statutes, rules, regulations and manuals and provider updates governing the Louisiana Medicaid Program…."

Medicaid Pharmacy Point-of Sale Agreement.[84]

All pharmacies billed electronically during the relevant period and would have signed this agreement.

Further, a representative of Louisiana signed a declaration that these documents represent "… true and correct copies of all iterations of the agreements that Louisiana entered into with physicians and pharmacies that were in effect during the period January 1, 2002, through December 31, 2011."[85]

Because the AKS is a federal statute pertaining to Medicaid and reflects a policy requirement of the U.S. Department of Health and Human Services, by agreeing to abide by such federal law and/or policy requirements, Providers agreed to comply with the AKS.  Moreover, by certifying that they would abide by federal statutes governing the Louisiana Program in connection with the electronic billing process, pharmacies again certified that they would comply with the AKS.

## **MAINE**

The Provider Agreement that a provider had to sign before participating in the State's Program required a provider to agree to the following:

> "2.   The Provider/Supplier shall provide services supplies or equipment…in accordance with the provisions contained herein,…in Title XIX of the Social Security Act, and in all other laws, rules, and regulations of the Department, State of Maine, or of the U.S. Department of Health and Human Services."

> "3. The content of this Agreement is based on Federal and State statutes and regulations pertaining to the provision of health services under the Title XIX

---

[84] NOVARTIS-USAO-0158568, October 2002, signed October 25, 2002; NOVARTIS-USAO-0158572, October 2003, signed September 30, 2003; NOVARTIS-USAO-0158576, October 2004, signed October 8, 2004; NOVARTIS-USAO-0158581, October 2005, signed November 4, 2005; NOVARTIS-USAO-0158586, October 2006, signed October 10, 2006; NOVARTIS-USAO-0158592, October 2007, signed October 19, 2007; NOVARTIS-USAO-0158607, October 2010, signed October 24, 2010; NOVARTIS-USAO-0158613, October 2011, signed October 10, 2011.

[85] NOVARTIS-USAO-0158618, October 6, 2016.

MaineCare Program MHP.  Any provision of this agreement, which is contrary to said statutes or regulations, is void."

"28. Any change in Federal or State law or regulation that conflicts with or modifies any term of this Agreement will automatically become a part of this Agreement on the date such a change in statute or regulation becomes effective."

MaineCare/Maine Health Program Provider Agreement.[86]

Another version of the Provider Agreement similarly required the provider to agree to the following terms and conditions:

"1. Members--The Provider/Supplier shall provide services supplies or equipment...in accordance with the provisions contained herein,...in Title XIX and XXI of the Social Security Act, and in all other applicable laws, rules, and regulations of the Department, State of Maine, or of the U.S. Department of Health and Human Services."

"27. Any change in Federal or State law or regulation that conflicts with or modifies any term of this Agreement will automatically become a part of this Agreement on the date such a change in statute or regulation becomes effective."

Maine Provider/Supplier Agreement, at (2), (27).[87]

Another version of the Provider Agreement similarly required a provider to agree to the following terms and conditions:

"1. Members--The Provider/Supplier shall provide services supplies or equipment...in accordance with the provisions contained herein,...in Title XIX and XXI of the Social Security Act, and in all other applicable laws, rules, and regulations of the Department, State of Maine, or of the U.S. Department of Health and Human Services."

"27. Any change in Federal or State law or regulation that conflicts with or modifies any term of this Agreement will automatically become a part of this Agreement on the date such a change in statute or regulation becomes effective."

Maine Provider/Supplier Agreement.[88]

---

[86] NOVARTIS-USAO-0158620 and 24, not dated.

[87] NOVARTIS-USAO-0158629 and 33, not dated.

[88] NOVARTIS-USAO-0158638 and 42, not dated.

Another version of the Provider Agreement similarly required a provider to agree to the following terms and conditions:

"**1. Conditions of Participation**. As a condition of participation or continued participation as a provider in MaineCare, the Provider agrees to comply with the provisions of the Federal and State laws and regulations related to Medicaid, the provisions of the MaineCare Benefits Manual . . . ."

"**2. Changes in Federal or State Laws or Regulations**.

a) Any change in Federal or State law or regulation that conflicts with or modifies any term of this Agreement will automatically become a part of this Agreement on the date such a change in statute or regulation becomes effective."

"**5. Certification**.

a) The Provider . . . certifies that at the time that this Agreement is certified neither it nor its employees, group members or agents has engaged in any activities prohibited by 42 U.S.C. § 1320a-7b . . . ."

"d) The Provider understands that engaging in activities prohibited by 42 U.S.C. § 1320a-7b may result in sanctions or termination of this Agreement, in accordance with applicable Federal and State laws and regulations."

"**7. Prohibition of Rebate, Refund, or Discount (Kickbacks)**

b) The Provider will not solicit, request, accept or receive any rebate, refund, commission, preference, patronage dividend, discount or any other gratuitous consideration with the rendering of services to any Member or take any other action or receive any other benefit prohibited by 42 U.S.C. § 1320a-7b or the MBM."

"**9. Deficit Reduction/False Claims Act**.

The Provider will comply with Section 6032 of the Deficit Reduction Act of 2005, codified at 42 U.S.C. § 1396a (a) (68), and the requirements of the False Claims Act 31 U.S.C. § 3729 et seq."

MaineCare/Medicaid Provider Agreement.[89]

Another version of the Provider Agreement similarly required a provider to agree to the following terms and conditions:

"**1. Conditions of Participation**. As a condition of participation or continued participation as a provider in MaineCare, the Provider agrees to comply with the provisions of the Federal and State laws and regulations related to Medicaid, the provisions of the MaineCare Benefits Manual . . . ."

"**2. Changes in Federal or State Laws or Regulations**.

a) Any change in Federal or State law or regulation that conflicts with or modifies any term of this Agreement will automatically become a part of this Agreement on the date such a change in statute or regulation becomes effective."

"**5. Certification**.

"d) The Provider understands that engaging in activities prohibited by 42 U.S.C. § 1320a-7b may result in sanctions or termination of this Agreement, in accordance with applicable Federal and State laws and regulations."

"**7. Prohibition of Rebate, Refund, or Discount (Kickbacks)**

b) The Provider will not solicit, request, accept or receive any rebate, refund, commission, preference, patronage dividend, discount or any other gratuitous consideration with the rendering of services to any Member or take any other action or receive any other benefit prohibited by 42 U.S.C. § 1320a-7b or the MBM."

"**10. Deficit Reduction/False Claims Act**.

---

[89] NOVARTIS-USAO-0158647, 49-50, not dated; NOVARTIS-USAO-0175865-67, November 1, 2010, signed on January 4, 2011, Humana Pharmacy Inc.; NOVARTIS-USAO-0175985-87, November 1, 2010, signed November 5, 2010, Humana Pharmacy Inc.; NOVARTIS-USAO-0176104-06, November 1, 2010, signed November 5, 2010, Humana Pharmacy Inc. (contains language that is similar -- and functionally identical in material respects -- but not exactly the same).

> The Provider will comply with Section 6032 of the Deficit Reduction Act of
> 2005, codified at 42 U.S.C. § 1396a (a) (68), and the requirements of the
> False Claims Act 31 U.S.C. § 3729 et seq."

MaineCare/Medicaid Provider Agreement.[90]

Further a representative of Maine signed a declaration that these documents represent "…true and correct copies of all iterations of the agreements that Maine entered into with physicians and pharmacies that were in effect during the period January 1, 2002, through December 31, 2011."[91]

Because the AKS is a federal statute pertaining to Medicaid and is reflected in regulations of the U.S. Department of Health and Human Services, by certifying they will comply with such law, including by agreeing to provide services in accordance with the Social Security Act and HHS regulations and, in later years, by agreeing to the application of 42 U.S.C. § 1320a-7b specifically, Providers certified that they will comply with the AKS.

## MARYLAND

The Provider Agreement that a provider had to sign before participating in the State's Program required a provider to agree to the following:

> "….to provide covered services to Medicaid-eligible individuals in accordance
> with applicable federal and State law."

Maryland Provider Agreement for Participation in the Title XIX Program.[92]

Further in an email dated December 15, 2016, a representative from Maryland confirmed that the documents received from Maryland represent "the only provider enrollment forms in effect between 2002 and 2011."[93]

Because the AKS is a federal statute pertaining to Medicaid, by certifying they will comply with such law, Providers certified that they will comply with the AKS.

---

[90] NOVARTIS-USAO-0158660-62, not dated.

[91] NOVARTIS-USAO-0158670, October 5, 2016.

[92] NOVARTIS-USAO-0136377, not dated, signed February 21, 1997; NOVARTIS-USAO-0176130, signed March 31, 2008, Humana Pharmacy Inc. (contains language that is similar -- and functionally identical in material respects -- but not exactly the same).

[93] NOVARTIS-USA0-0182075.

## MASSACHUSETTS

The Provider Agreement that a provider had to sign before participating in the State's Program required a provider to agree to the following:

> "The Provider agrees . . . [t]o comply with all state and federal statutes, rules, and regulations applicable to the Provider's participation in MassHealth."

MassHealth Provider Agreement.[94]

Further on November 21, 2016, a representative of the Commonwealth of Massachusetts, confirmed in an e-mail that the documents received from Massachusetts "represent all iterations of the agreements that Massachusetts entered into with physicians and pharmacies during the period of January 2002, through December 2011."[95]

Because the AKS is a federal statute pertaining to Medicaid, by certifying they will comply with such law, Providers certified that they will comply with the AKS.

## MICHIGAN

The Provider Agreement that a provider had to sign before participating in the State's Program required a provider to agree to the following:

> "In applying for enrollment as a provider in the Medical Assistance Program (and programs for which the Medical Services Administration (MSA) is the fiscal intermediary), I represent and certify as follows: . . ."

>> "2. Before billing any medical services I render, I will read the Medical Assistance Program provider manual from the Michigan Department of Community Health (MDCH).  I will also agree to comply with the 1) terms and conditions of participation noted in the manual and 2) MDCH's policies and procedures for the Medical Assistance Program contained in the manual, manual updates, provider bulletins and other program notifications."

>> "8. I agree to comply with all policies and procedures of the Medical Assistance Program when billing for services rendered…"

---

[94]NOVARTIS-USAO-0136375, September 1997.

[95] NOVARTIS-USA0-0182066, November 21, 2016.

Medical Assistance Provider Enrollment Agreement.[96]

Another version of the Provider Agreement required a provider to agree to the following terms and conditions:

> "In applying for enrollment as a provider or trading partner with First Health Services Corporation (FHSC) (and programs for which the Michigan Department of Community Health (MDCH) is the fiscal intermediary), I represent and certify as follows: . . ."
>
>> "13. This Agreement shall be governed by the laws of the State of Michigan and applicable federal law including, but not limited to, the Health Insurance Portability and Accountability Act of 1996 (HIPAA)."

Pharmacy Provider Enrollment & Trading Partner Agreement Conditions and Provisions (MSA-1626).[97]

Other versions of the Provider Agreement similarly state:

> "In applying for enrollment as a provider or trading partner with First Health Services Corporation (FHSC) (and programs for which the Michigan Department of Community Health (MDCH) is the fiscal intermediary), I represent and certify as follows: . . ."
>
> "15. This Agreement shall be governed by the laws of the State of Michigan and applicable federal law including, but not limited to, the Health Insurance Portability and Accountability Act of 1996 (HIPAA)."

---

[96] NOVARTIS-USAO-0158677, April 1998; NOVARTIS-USAO-0158721, April 1998; NOVARTIS-USAO-0158681, October 2001, note there are title changes in the introductory paragraph; NOVARTIS-USAO-0158725, October 2001, note there are title changes in the introductory paragraph.

[97] NOVARTIS-USAO-0136529, November 2003 (contains language that is similar -- and functionally identical in material respects -- but not exactly the same); NOVARTIS-USAO-0158684, November 2003 (contains language that is similar -- and functionally identical in material respects -- but not exactly the same); NOVARTIS-USAO-0158697, March 2005; NOVARTIS-USAO-0136446, March 2005.

Pharmacy Provider Enrollment & Trading Partner Agreement Conditions and Provisions (MSA-1626 (03-05));[98] Medical Assistance Provider Enrollment & Trading Partner Agreement.[99]

Further a representative of Michigan signed a declaration that these documents represent "…true and correct copies of all iterations of the agreements that Michigan entered into with physicians and pharmacies that were in effect during the period January 1, 2002, through December 31, 2011."[100]

Because the AKS is a federal statute pertaining to Medicaid and it is a policy of the Michigan Program (as with all State Programs) to require compliance with applicable federal law, by agreeing to comply with and/or be governed by such law/policies, Providers agreed to comply with the AKS.

## MINNESOTA

The Provider Agreement that a provider had to sign before participating in the State's Program required a provider to agree to the following:

> "[T]he Provider agrees to . . . [c]omply with all federal and state statutes and rules relating to the delivery of services to Individuals and to the submission of claims for such services."

Minnesota Health Care Programs Provider Agreement.[101]

---

[98] NOVARTIS-USAO-0158741, August 2007, note section 15 language is included in section 13; NOVARTIS-USAO-0158758-59, March 2008; NOVARTIS-USAO-0158767-68, May 2008; NOVARTIS-USAO-0158749-50, November 2003; NOVARTIS-USAO-0136454-55, August 2007; NOVARTIS-USAO-0136463-64, March 2008; NOVARTIS-USAO-0136472-73, May 2008; NOVARTIS-USAO-0136481-82, July 2010; NOVARTIS-USAO-0158776-77, July 2010; NOVARTIS-USAO-0158785-86, August 2010; NOVARTIS-USAO-0158795-96, April 2011 (contains language that is similar -- and functionally identical in material respects -- but not exactly the same); NOVARTIS-USAO-0136490-91, August 2010 (contains language that is similar -- and functionally identical in material respects -- but not exactly the same); NOVARTIS-USAO-0136500-010-01, April 2011 (contains language that is similar -- and functionally identical in material respects -- but not exactly the same).

[99] NOVARTIS-USAO-0158728, November 2003; NOVARTIS-USAO-0158735, November 2003.

[100] NOVARTIS-USAO-0158672, September 19, 2016.

[101] NOVARTIS-USAO-0136547, May 24, 2007; NOVARTIS-USAO-0170690, February 4, 2011; NOVARTIS-USAO-0170688, not dated; NOVARTIS-USAO-0170683, August 1998; NOVARTIS-USAO-0170684, not dated; NOVARTIS-USAO-0170686, not dated; NOVARTIS-USAO-0170694, not dated; NOVARTIS-USAO-0176164, not dated, signed September 7, 2010, Humana Pharmacy Inc.

Further on November 30, 2016 a representative of Minnesota, confirmed in an e-mail that the documents received from Minnesota "are the only documents that would have been signed between 2002-2011."[102]

An e-mail dated February 23, 2017 from of Minnesota confirms that:

- Pharmacies and physicians have to sign the state's provider agreement or enrollment application as a condition of participating as a provider under the state's managed care program, and
- That pharmacies and physicians are not allowed to contract with the state's Medicaid managed care plans if they do not have a signed provider agreement but otherwise meet the plan's credentialing requirements.[103]

Based on the e-mail, the Minnesota agreement applies to both the fee for service program and its managed care program.

Because the AKS is a federal statute pertaining to the delivery of services to Medicaid enrollees, by certifying they will comply with such law, Providers certified that they will comply with the AKS.

## MISSISSIPPI

The Participation Agreement that a provider had to sign before participating in the State's Program required a provider to agree to the following:

> "The Medicaid Provider Agrees . . . [t]o abide by federal and state laws and regulations affecting delivery of services."

Mississippi Medicaid Assistance Participation Agreement § C, ¶2.[104]

Further on November 22, 2016 a representative of the State of Mississippi confirmed in an e-mail that the documents received from Mississippi "represent all iterations of the agreements that Mississippi entered into with physicians and pharmacies during the period of January 2003 through December 2011."[105]

An e-mail dated February 23, 2017 from a representative of Mississippi confirms that:

---

[102] NOVARTIS-USA0-0182095, November 30, 2016.

[103] NOVARTIS-USAO-0181854.

[104] NOVARTIS-USAO-0136553, not dated.

[105] NOVARTIS-USA0-0182152, November 22, 2016.

- Pharmacies and physicians have to sign the state's provider agreement or enrollment application as a condition of participating as a provider under the state's managed care program, and

- That pharmacies and physicians are not allowed to contract with the state's Medicaid managed care plans if they do not have a signed provider agreement but otherwise meet the plan's credentialing requirements.[106]

Based on the e-mail, the Mississippi agreement applies to both the fee for service program and its managed care program.

Because the AKS is a federal statute pertaining to the delivery of services under Medicaid, by certifying they will comply with such law, Providers certified that they will comply with the AKS.

## MISSOURI

The Participation Agreement that a provider had to sign before participating in the State's Program required a provider to agree to the following:

"1. . . . I will comply with the Medicaid manual, bulletins, rules and regulations as required by the Division of Medical Services and the United States Department of Health and Human Services in the delivery of services and merchandise and in submitting claims for payment.  I understand that in my field of participation I am not entitled to Medicaid reimbursement if I fail to so comply, and that I can be terminated from the program for failure to comply."

"7. Medicaid participation under this agreement may be terminated…Such reason(s) could include the provider being in violation of . . . (c) rules regulations, policies or procedures of the Division of Medical Services. . . .  The provider must be in compliance with all other applicable state or federal laws or regulations. Violation of any law or regulation may result in this agreement being terminated immediately upon mailing of written notice from the Division of Medical Services [.]"

Missouri Department of Social Services, Division of Medical Services Participation Agreement for Prescribed Drugs (Pharmacy);[107] Missouri Department of Social Services, Division of Medical

---

[106] NOVARTIS-USAO-0181856, February 23, 2017.

[107] NOVARTIS-USAO-0158813, February 1998, signed June 9, 2000, the title of this document does not include the word "(Pharmacy)"; NOVARTIS-USAO-0158815, signed  May 7, 2002; NOVARTIS-USAO-0158804, not dated, signed January 9, 2002; NOVARTIS-USAO-0158805, July 2002, signed July 2, 2003; NOVARTIS-USAO-0158806, September 2000, signed July 14, 2003 (contains language that is similar  -- and functionally identical in material respects -- but not exactly the same); NOVARTIS-USAO-0158807, July 2002, signed June 7, 2005; NOVARTIS-USAO-0158808, July

Services Participation Agreement for Physician Services;[108] Missouri Department of Social Services, Division of Medical Services Missouri Medicaid Provider Agreement Form;[109] Missouri Department of Social Services, Division of Medical Services Title XIX Participation Agreement for Medical Services.[110]

Further on November 21, 2016 a representative of Missouri confirmed in an e-mail that the documents received from Missouri "represent all iterations of the agreements that Missouri entered into with physicians and pharmacies during the period January 2002, through December 2011."[111]

Because the AKS is a federal statute pertaining to Medicaid and is reflected in federal regulations adopted by the U.S. Department of Health and Human Services, by agreeing to comply with such law and regulations, Providers agreed to comply with the AKS.

## MONTANA

The Provider Agreement that a provider had to sign before participating in the State's Program required a provider to agree to the following:

> "The Provider hereby agrees to comply with all applicable laws, rules and written policies pertaining to the Montana Medicaid Program (Medicaid), including but not limited to Title XIX of the Social Security Act, the Code of Federal Regulations (CFR), Montana Codes Annotated (MCA), Administrative Rules of Montana (ARM) and written Department of Public Health and Human Services (Department) policies, including but not limited to policies contained in the Medicaid provider manuals, and the terms of this document."

---

2002, signed July 13, 2006; NOVARTIS-USAO-0158809, July 2002, signed August 13, 2007; NOVARTIS-USAO-0158810, July 2002, signed September 23, 2008; NOVARTIS-USAO-0158811, July 2002, signed July 13, 2009; NOVARTIS-USAO-0158812, July, 2002, signed August 4, 2010; NOVARTIS-USAO-0136551, July 2002, signed December 20, 2005.

[108] NOVARTIS-USAO-0158840, January 2001, signed March 8, 2010.

[109] NOVARTIS-USAO-0158823-24, November 13, 2006, signed November 14, 2006; NOVARTIS-USAO-0158828-29, July 23, 2007; NOVARTIS-USAO-0158835-37, July 6, 2009, signed July 12, 2009; NOVARTIS-USAO-0158832-33, October 6, 2008, signed October 16, 2008.

[110] NOVARTIS-USAO-0158816-17, February 14, 2003, signed February 14, 2003; NOVARTIS-USAO-0158818, May 6, 2004, signed May 12, 2004; NOVARTIS-USAO-0158820-21, September 29, 2005, signed October 7, 2005.

[111] NOVARTIS-USA0-0182111, November 21, 2016.

Montana Medicaid Provider Enrollment Agreement and Signature Page;[112] Montana Medicaid Provider Enrollment Agreement and Signature Page for Individual Enrollments, at 4.[113]

Further a representative of Montana signed a declaration that these documents represent "...true and correct copies of the agreements that DPHHS [the Montana Department of Public Health and Human Services] entered into with physicians and pharmacies that were in effect during the period January 1, 2002, through December 31, 2011."[114]

Because the AKS is a federal statute pertaining to Medicaid, and is included in the Social Security Act and reflected in the Code of Federal Regulations, by certifying they will comply with such law, Providers certified that they will comply with the AKS.

## NEBRASKA

The Provider Agreement that a provider had to sign before participating in the State's Program required a provider to agree to the following:

> "I agree to participate as a provider in the Nebraska Medical Assistance Program, and assure the Nebraska Health and Human Services System:
>
> - That the policies and procedures of the Nebraska Health and Human Services System in the administration of the Nebraska Medical Assistance Program will be followed. . . .
>
> - That any false claims (including claims submitted electronically), statements, documents, or concealment of material fact may be prosecuted under applicable State or Federal laws (42 CFR 455.18).
>
> I certify the information on this form is true, accurate, and complete."

Medical Assistance Provider Agreement, at 2.[115]

---

[112] NOVARTIS-USAO-0136555, not dated; NOVARTIS-USAO-0158844, March 2002; NOVARTIS-USAO-0158848, not dated; NOVARTIS-USAO-0158855, not dated (contains language that is similar -- and functionally identical in material respects -- but not exactly the same); NOVARTIS-USAO-0158860, February 2013; NOVARTIS-USAO-0176196, not dated, signed October 5, 2010, Humana Pharmacy Inc.

[113] NOVARTIS-USAO-0136560, January 2005.

[114] NOVARTIS-USAO-0158843-44, October 24, 2016.

[115] NOVARTIS-USAO-0136618, February 1994, signed June 14, 1995; NOVARTIS-USAO-0136619, October 1998, signed February 12, 2002; NOVARTIS-USAO-0136620, May 2004, signed September 13, 2004; NOVARTIS-USAO-0136621, July 2008, signed February 3, 2011.

Further on December 1, 2016 a representative of Nebraska confirmed in an e-mail that the documents received from Nebraska show "the terms of agreement for all provider agreements for the specified period" (i.e., January 1, 2002, through December 31, 2011).[116]

Because the AKS is a federal statute pertaining to Medicaid and it is a policy of the Nebraska Program (as with all State Programs) to require compliance with applicable federal law, by agreeing to follow such policies and be subject to prosecution under such law, Providers agreed to comply with the AKS.

## **NEW HAMPSHIRE**

The Provider Agreement that a provider had to sign before participating in the State's Program required a provider to agree to the following:

> "I agree that I will comply with the requirements of Section 1902(a)(68) of the Social Security Act regarding Employee Education About False Claims Recovery and that I have a responsibility to self identify if I qualify as an "entity" and if I have met the $5,000,000 annual threshold amount, as described in the Act."

> "I agree to abide by all rules, regulations, billing manuals, and bulletins promulgated by the US Department of Health and Human Services, the State of NH, or the NH Department of Health and Human Services pertaining to the provision of care or services under NH Title XIX and the claiming of payments for those services."

Provider Participation Agreement at 2.[117]

Other versions of the Provider Agreement for an entity that had a Federal Employer ID Number[118] required a provider to agree to the following terms and conditions:

> "Section 6, Providers who choose to submit electronic claims-related transactions must be aware that payment of claims will be from Federal and State funds, and that any falsification or concealment of material fact may be prosecuted under Federal and State laws.  Furthermore, providers must understand and agree to the following:…

> • Abide by all Federal and State statutes, rules, regulations and manuals governing the NH Title XIX Program."

---

[116] NOVARTIS-USA0-0182157, December 1, 2016.

[117] NOVARTIS-USAO-01548864, June 2012; NOVARTIS-USAO-0136626, August 2010.

[118] NOVARTIS-USAO-0136630, not dated.

- "Section 9, 5. I understand that payment of all claims will be from federal and state funds and that any falsification or concealment of a material fact, may be prosecuted under federal and state laws."

New Hampshire Title XIX Medicaid/Healthy Kids Gold Program, Enrollment Application Group Provider.[119]

The same language is in the application for providers who do not have a Federal Employer ID Number, the application for an additional service location for a group provider, and the application for an additional service location for an individual provider.  New Hampshire Title XIX Medicaid/Healthy Kids Gold Program, Enrollment Application Individual Provider, no page number;[120] New Hampshire Title XIX Medicaid/Healthy Kids Gold Program, Additional Service Location Form, Group Provider, no page number;[121] New Hampshire Title XIX Medicaid/Healthy Kids Gold Program, Additional Service Location Form, Individual Provider, no page number.[122]

Further the signature pages for the Group and Individual applications state the following:

"5. I understand that payment of all claims will be from federal and state funds and that any falsification or concealment of a material fact, may be prosecuted under federal and state laws"

New Hampshire Title XIX Medicaid/Healthy Kids Gold Program, Group Application Signature Page and Individual Application Signature Page, no page number.[123]

Further on November 22, 2016 a representative of New Hampshire confirmed in an e-mail that the documents received from New Hampshire "represent all iterations of the agreements that New Hampshire entered into with physicians and pharmacies during the period of January 2002 through December 2011."[124]

Because the AKS is a federal statute pertaining to Medicaid and is reflected in regulations promulgated by the U.S. Department of Health and Human Services relating to the provision of care under the Program, by certifying they will comply with such law and regulations, Providers certified that they will comply with the AKS.  By agreeing to be subject to prosecution under federal law (which includes the AKS) for any falsification or concealment of material fact in

---

[119] NOVARTIS-USAO-0136637 and 42, not dated.

[120] NOVARTIS-USAO-0136652 and 57, not dated.

[121] NOVARTIS-USAO-0136666 and 69, not dated.

[122] NOVARTIS-USAO-0136678 and 81, not dated.

[123] NOVARTIS-USAO-0136685, April 19, 2010; NOVARTIS-USAO-0136687, April 19, 2010.

[124] NOVARTIS-USA0-0182167, November 22, 2016.

connection with providing services under the Program, Providers also agreed to comply with the AKS.

## **NEW JERSEY**

The Provider Agreement that a provider had to sign before participating in the State's Program required a provider to agree to the following:

> "Provider agrees:
>
>> (1) To comply with all applicable State and Federal laws, policies, rules and regulations . . . ."

Provider Agreement Between New Jersey Division of Medical Assistance and Health Services And [Provider].[125]

Further, a separate Pharmaceutical Provider Application stated the following:

> "41. There are federal and state statutes and regulations governing kickbacks and referral practices which may apply to the applicant and to those individuals and entities listed in this application. These statutes and regulations include, but are not limited to: The Federal Medicare and Medicaid Anti-Kickback Statute (42 U.S.C. 1320a-7b(b));…"

New Jersey Division of Medical Assistance and Health Services Pharmaceutical Provider Application, ¶3.[126]

Further on November 17, 2016 a representative of New Jersey confirmed in an e-mail that these documents "represent all iterations of the agreements that New Jersey entered into with physicians and pharmacies during the period January 2002 through December 2011."[127]

Because the AKS is a federal statute pertaining to Medicaid, by certifying they will comply with such law, Providers certified that they will comply with the AKS. Similarly, by agreeing to be subject to the AKS, pharmacy Providers separately agreed to comply with the AKS.

---

[125] NOVARTIS-USAO-0136708, June 2006; NOVARTIS-USAO-0158878, June 2006; NOVARTIS-USAO-0159042, June 2006; NOVARTIS-USAO-0158123, April, 2003; NOVARTIS-USAO-0158144, November, 2007; NOVARTIS-USAO-0158194, July, 2010.

[126] NOVARTIS-USAO-0136701, December 2009; NOVARTIS-USAO-0158980, December 2009.

[127] NOVARTIS-USA0-0182174, November 17, 2016.

## NEW MEXICO

The Provider Agreement that a provider had to sign before participating in the State's Program required a provider to agree to the following

The "Medicaid Provider Shall:

> 1.1    Abide by all federal, state, and local laws, rules, and regulations, including but not limited to those laws, regulations, and policies applicable to providers of medical services under Title XIX (Medicaid) and Title XXI (SCHIP) of the Social Security Act and other health care programs administered by HSD."

> "1.11 …Submission of false claims or fraudulent representation may subject the provider to termination, criminal investigation and charges, and other sanctions specified in the MAD Provider Program Manual."

> "7.3 Provider status may be terminated immediately, without notice, in instances in which the health and safety of clients in institutions are deemed to be in immediate jeopardy; are subject to an immediate or serious threat; or when it has been demonstrated, on the basis of reliable evidence, that a provider has committed fraud, abuse[.]"

"BY SIGNATURE, THE PROVIDER AGREES TO ABIDE BY AND BE HELD TO All FEDERAL. STATE, AND LOCAL LAWS, RULES, AND REGULATIONS, INCLUDING, BUT NOT LIMITED TO THOSE PERTAINING TO MEDICAID AND THOSE STATED HEREIN. BY SIGNATURE, THE PROVIDER SOLEMNLY SWEARS UNDER PENALTY OF PERJURY THAT THE INFORMATION GIVEN IS TRUE AND ACCURATE."

Provider Participation Agreement.[128]

Further a representative of New Mexico signed a declaration that these documents represent "…true and correct copies of all iterations of the agreements that New Mexico entered into with physicians and pharmacies that were in effect during the period January 1, 2002, through December 31, 2011."[129]

---

[128] NOVARTIS-USAO-0136808-11, March 2000; NOVARTIS-USAO-0136821-24, November 2000; NOVARTIS-USAO-0136814-17, September 2003; NOVARTIS-USAO-0176229-32, September 2003, signed October 2010, Humana Pharmacy Inc.; NOVARTIS-USAO-0136802-05, November 2002.

[129] NOVARTIS-USAO-0175288, November 16, 2016.

Because the AKS is a federal statute applicable to providers of services under Medicaid, by certifying they will comply with such law, Providers certified that they will comply with the AKS.

## **NEW YORK**

Since 2006, the Provider Certification that a provider had to sign to participate in the State's Program required a provider to agree to the following[130]:

> "As of [date of the certification], all claims submitted electronically or on paper to the State's Medicaid fiscal agent . . .  will be subject to the following certification. . . ."

>> "I (or the entity) have furnished or caused to be furnished the care, services, and supplies itemized and done so in accordance with applicable federal and state laws and regulations . . . ."

>> "All statements, data and information transmitted are true, accurate and complete to the best of my knowledge; no material fact has been omitted. I understand that payment and satisfaction of this claim will be from federal, state and local public funds and that I may be fined and/or prosecuted under applicable federal and state laws for any violation of the terms of this certification including but not limited to false claims, statements or documents, or concealment of a material fact . . . ."

>> "In submitting claims under this agreement I understand and agree that I (or the entity) shall be subject to and bound by all rules, regulations, policies, standards, fee codes and procedures of the New York State Department of Health and the Office of the Medicaid Inspector General as set forth in statute or title 18 of the Official Compilation of Codes, Rules and Regulation of New York State and other publications of the Department, including eMedNY Provider Manuals and other official bulletins of the Department."

Certification Statement for Provider Billing Medicaid.[131]

---

[130] Throughout the relevant period, New York required providers to sign certifications for the purposes of billing Medicaid, either by signing the Provider Certification form that is quoted immediately below or, prior to 2006, by signing certifications when submitting claims, either electronically or in paper form.  Language from these certifications is quoted in this section.

[131] NOVARTIS-USAO-0159526, December 2006, dated July 20, 2007; NOVARTIS-USAO-0159530, September 2006; NY 00010, December 2010; NOVARTIS-USAO-0159535, March 5, 2007; NY 00008, August 21, 2006; NOVARTIS-USAO-0159549, March 6, 2008; NOVARTIS-USAO-0159550, September 30, 2009; NOVARTIS-USAO-0159560, March

During the relevant time period, but prior to 2006, a provider electronically billing the New York State Medicaid program was required to sign a Provider Certification that required the provider to agree to the following terms and conditions:

> "As of [date of the certification], all claims electronically submitted to the State's Medicaid fiscal agent . . .  will be subject to the following certification. . . ."

>> "I (or the entity) have furnished or caused to be furnished the care, services, and supplies itemized and done so in accordance with applicable federal and state laws and regulations . . . ."

>> "All statements, data and information transmitted are true, accurate and complete to the best of my knowledge; no material fact has been omitted. I understand that payment and satisfaction of this claim will be from federal, state and local public funds and that I may be prosecuted under applicable federal and state laws for any false claims, statements or documents or concealment of a material fact . . . ."

>> "In submitting claims under this agreement I understand and agree that I (or the entity) shall be subject to and bound by all rules, regulations, policies, standards, fee codes and procedures of the New York State Department of Social Services as set forth in title 18 of the Official Compilation of Codes, Rules and Regulations of New York State and other publications of the Department, including Management Information System Provider Manuals and other official bulletins of the Department."

Certification Statement for Provider Utilizing Electronic Billing.[132]

At all times relevant to this case, most physicians and all pharmacies billed electronically.

Prior to 2006, a provider which billed the State of New York's Medicaid Program on paper was required to sign the following certification agreeing to the following terms and conditions:

---

15, 2011; NOVARTIS-USAO-0159561, January 23, 2012; NOVARTIS-USAO-0159571, February 29, 2010; NY 00011, October 2011; there are some minor insignificant wording differences across these agreements, but they are not material to the language I cite or the conclusions in my report.

[132] NOVARTIS-USAO-0159536, July 1, 2002; NY 00004, November 2003; NY 00005, June 2004; NY 00007, September 6, 2005; NY 00003, November 2002; NY 00009, August 2008; NOVARTIS-USAO-0159542, January 14, 2004; NOVARTIS-USAO-0159547, February 15, 2002; NOVARTIS-USAO-0159553, September 3, 2003; NOVARTIS-USAO-0159568, February 23, 2005; NOVARTIS-USAO-0159578, Allerton Park Pharmacy, September 4, 2002; NOVARTIS-USAO-0159579, Allerton Park Pharmacy, September 8, 2003; NOVARTIS-USAO-0159580, Allerton Park Pharmacy, August 30, 2004. 3

"Provider certifies that:. . . ."

> "I (or the entity) have furnished or caused to be furnished the care, services, and supplies itemized and done so in accordance with applicable federal and state laws and regulations . . . ."

> "All statements, data and information transmitted are true, accurate and complete to the best of my knowledge; no material fact has been omitted. I understand that payment and satisfaction of this claim will be from federal, state and local public funds and that I may be fined and/or prosecuted under applicable federal and state laws for any violation of the terms of this certification including but not limited to false claims, statements or documents, or concealment of a material fact . . . ."

> "By making this claim I understand and agree that I (or the entity) shall be subject to and bound by all rules, regulations, policies, standards, fee codes and procedures of the United States Department of Health and Human Services, New York State Department of Health..."

Certification Pharmacy Claim Form.[133]

I reviewed numerous other certifications that fall within one of the above three categories of documents and required the pharmacies to agree to the same or functionally identical language.[134]

---

[133] NOVARTIS-USAO-0159860, dated October 1996.

[134] NOVARTIS-USAO-0159581, Allerton Park Pharmacy, September 12, 2008; NOVARTIS-USAO-0159582, Allerton Park Pharmacy, September 12, 2008; NOVARTIS-USAO-0159583, Allerton Park Pharmacy, September 31, 2009; NOVARTIS-USAO-0159584, Allerton Park Pharmacy September 13, 2010; NOVARTIS-USAO-0159585, Allerton Park Pharmacy, August 12, 2011; NOVARTIS-USAO-0159586, Allerton Park Pharmacy, August 17, 2012; NOVARTIS-USAO-0159587, Allerton Park Pharmacy, July 15, 2013; NOVARTIS-USAO-0159589, Esther Pharmacy Inc., March 28, 2002; NOVARTIS-USAO-0159590, Esther Pharmacy Inc., March 19, 2003; NOVARTIS-USAO-0159591, Esther Pharmacy Inc., March 22, 2004; NOVARTIS-USAO-0159592, Esther Pharmacy Inc.; NOVARTIS-USAO-0159593, Esther Pharmacy Inc., March 17, 2008; NOVARTIS-USAO-0159594, Esther Pharmacy Inc., March 21, 2009; NOVARTIS-USAO-0159595, Esther Pharmacy Inc., April 2, 2009; NOVARTIS-USAO-0159596, Esther Pharmacy Inc., March 22, 2010; NOVARTIS-USAO-0159597, Esther Pharmacy Inc., March 18, 2011; NOVARTIS-USAO-0159598, Esther Pharmacy Inc., March 31, 2011; NOVARTIS-USAO-0159599, Esther Pharmacy Inc., March 16, 2012; NOVARTIS-USAO-0159600, Esther Pharmacy Inc., March 20, 2013; NOVARTIS-USAO-0159601, Esther Pharmacy Inc., March 18, 2013; NOVARTIS-USAO-0159602, Esther Pharmacy Inc., April 4, 2013; NOVARTIS-USAO-0159604, Kings-Thriftway Drugs Inc., March 14, 2002; NOVARTIS-USAO-0159605, Kings-Thriftway Drugs Inc., March 19, 2003; NOVARTIS-USAO-0159606, Kings-Thriftway Drugs Inc., March 11, 2004; NOVARTIS-USAO-0159607, Kings-Thriftway Drugs Inc., March 23, 2005; NOVARTIS-USAO-0159608, Kings-Thriftway Drugs Inc., October 6, 2005; NOVARTIS-USAO-0159609, Kings-Thriftway Drugs Inc., March 19, 2008; NOVARTIS-USAO-0159610, Kings-Thriftway Drugs Inc., April 23, 2008; NOVARTIS-USAO-0159611, Kings-Thriftway Drugs Inc., September 24, 2008; NOVARTIS-USAO-

---

0159612, Kings-Thriftway Drugs Inc., April 6, 2009; NOVARTIS-USAO-0159613, Kings-Thriftway Drugs Inc., March 16, 2009; NOVARTIS-USAO-0159614, Kings-Thriftway Drugs Inc., March 23, 2009; NOVARTIS-USAO-0159615, Kings-Thriftway Drugs Inc., September 25, 2009; NOVARTIS-USAO-0159616, Kings-Thriftway Drugs Inc., March 23, 2010; NOVARTIS-USAO-0159617, Kings-Thriftway Drugs Inc., March 23, 2010; NOVARTIS-USAO-0159618, Kings-Thriftway Drugs Inc., March 24, 2010; NOVARTIS-USAO-0159619, Kings-Thriftway Drugs Inc., September 24, 2010; NOVARTIS-USAO-0159620, Kings-Thriftway Drugs Inc., February 3, 2011; NOVARTIS-USAO-0159621, Kings-Thriftway Drugs Inc., March 14, 2011; NOVARTIS-USAO-0159622, Kings-Thriftway Drugs Inc., August 23, 2011; NOVARTIS-USAO-0159623, Kings-Thriftway Drugs Inc., December 21, 2011; NOVARTIS-USAO-0159624, Kings-Thriftway Drugs Inc., March 12, 2012; NOVARTIS-USAO-0159626, Rite Aid of New York Inc. #3888, March 1, 2002; NOVARTIS-USAO-0159627, Rite Aid of New York Inc. #3888, March 19, 2003; NOVARTIS-USAO-0159628, Rite Aid of New York Inc. #3888, March 1, 2004; NOVARTIS-USAO-0159629, Rite Aid of New York Inc. #3888, March 5, 2005; NOVARTIS-USAO-0159630, Rite Aid of New York Inc. #3888, December 14, 2007; NOVARTIS-USAO-0159631, Rite Aid of New York Inc. #3888, December 28, 2007; NOVARTIS-USAO-0159632, Rite Aid of New York Inc. #3888, March 1, 2008; NOVARTIS-USAO-0159633, Rite Aid of New York Inc., December 9, 2008; NOVARTIS-USAO-0159634, Rite Aid of New York Inc. #3888, February 20, 2008; NOVARTIS-USAO-0159635, Rite Aid of New York Inc., December 30, 2008; NOVARTIS-USAO-0159636, Rite Aid of New York Inc, February 6, 2009; NOVARTIS-USAO-0159637, Rite Aid of New York Inc., January 28, 2010; NOVARTIS-USAO-0159638, Rite Aid of New York Inc., December 29, 2010; NOVARTIS-USAO-0159639, Rite Aid of New York Inc., January 14, 2011; NOVARTIS-USAO-0159640, Rite Aid of New York Inc., January 9, 2012; NOVARTIS-USAO-0159641, Rite Aid of New York Inc., January 3, 2013; NOVARTIS-USAO-0159643, Rite Aid of New York Inc. #3774, January 9, 2002; NOVARTIS-USAO-0159644, Rite Aid of New York Inc. #3774, January 7, 2003; NOVARTIS-USAO-0159645, Rite Aid of New York Inc. #3774, January 20, 2004; NOVARTIS-USAO-0159646, Rite Aid of New York Inc. #3774, January 4, 2005; NOVARTIS-USAO-0159647, Rite Aid of New York Inc. #3774, January 3, 2008; NOVARTIS-USAO-0159648, Rite Aid of New York Inc., December 29, 2008; NOVARTIS-USAO-0159649, Rite Aid of New York Inc., December 8, 2009; NOVARTIS-USAO-0159650, Rite Aid of New York Inc., January 18, 2012; NOVARTIS-USAO-0159651, Rite Aid of New York Inc., January 5, 2011; NOVARTIS-USAO-0159652, Rite Aid of New York Inc., January 7, 2013; NOVARTIS-USAO-0159654, Stanley Getty Corp., March 8, 2002; NOVARTIS-USAO-0159655, Stanley Getty Corp., March 3, 2003; NOVARTIS-USAO-0159656, Stanley Getty Corp., February 26, 2004; NOVARTIS-USAO-0159657, Stanley Getty Corp., March 7, 2005; NOVARTIS-USAO-0159658, Stanley Getty Corp., February 18, 2008; NOVARTIS-USAO-0159659, Stanley Getty Corp., March 5, 2009; NOVARTIS-USAO-0159660, Stanley Getty Corp., March 2, 2010; NOVARTIS-USAO-0159661, Stanley Getty Corp., March 1, 2011; NOVARTIS-USAO-0159662, Stanley Getty Corp., February 24, 2012; NOVARTIS-USAO-0159663, Stanley Getty Corp., March 14, 2013; NOVARTIS-USAO-0159665, Three Js Pharmacy Inc., July 30, 2002; NOVARTIS-USAO-0159666, Three Js Pharmacy Inc., September 17, 2002; NOVARTIS-USAO-0159667, Three Js Pharmacy Inc., August 6, 2003; NOVARTIS-USAO-0159668, Three Js Pharmacy Inc., September 11, 2003; NOVARTIS-USAO-0159669, Three Js Pharmacy Inc., August 20, 2004; NOVARTIS-USAO-0159670, Three Js Pharmacy Inc., October 7, 2004; NOVARTIS-USAO-0159671, Three Js Pharmacy Inc., October 20, 2007.  The following documents cited in the footnote contain language that is similar -- and functionally identical in material respects -- but not exactly the same as the text quoted here. NOVARTIS-USAO-0159542, NOVARTIS-USAO-0159547, NOVARTIS-USAO-0159590, NOVARTIS-USAO-0159591, NOVARTIS-USAO-0159592, NOVARTIS-USAO-0159589, NOVARTIS-USAO-0159535, NOVARTIS-USAO-0159536, NOVARTIS-USAO-0159553, NOVARTIS-USAO-0159568, NOVARTIS-USAO-0159578, NOVARTIS-USAO-0159579, NOVARTIS-USAO-0159580, NOVARTIS-USAO-0159604, NOVARTIS-USAO-0159605, NOVARTIS-USAO-0159606, NOVARTIS-USAO-0159607, NOVARTIS-USAO-0159608, NOVARTIS-USAO-0159609, NOVARTIS-USAO-0159610, NOVARTIS-USAO-0159611, NOVARTIS-USAO-0159626, NOVARTIS-USAO-0159627, NOVARTIS-USAO-0159628, NOVARTIS-USAO-0159629, NOVARTIS-USAO-0159630, NOVARTIS-USAO-0159643, NOVARTIS-USAO-0159644, NOVARTIS-USAO-0159645, NOVARTIS-USAO-0159646, NOVARTIS-USAO-0159647, NOVARTIS-USAO-0159654, NOVARTIS-USAO-0159655, NOVARTIS-USAO-0159656, NOVARTIS-USAO-0159657, NOVARTIS-USAO-0159665, NOVARTIS-USAO-0159666, NOVARTIS-USAO-0159667, NOVARTIS-USAO-0159668, NOVARTIS-USAO-0159669, NOVARTIS-USAO-0159670.

Because the AKS is a federal statute pertaining to Medicaid, by certifying they have furnished services in accordance with such law and are subject to prosecution under such law, Providers certified that they were in compliance with the AKS.

## NEVADA

The Provider Application that a provider had to sign before participating in the State's Program required a provider to agree to the following:

> "1.1 To adhere to professional standards and levels of Service as set forth in all applicable local, state and federal laws, statues, rules and regulations as well as administrative policies and procedures set forth by the Division relating to the Provider's performance under this Contract and to indemnify and defend the Division from all negligent or intentional acts of the Provider, its agents and employees."

Nevada Medicaid and Nevada Check Up Provider Contract.[135]

Further a representative of Nevada signed a declaration that these documents represent "…true and correct copies of all iterations of the agreements that Nevada entered into with physicians and pharmacies that were in effect during the period January 1, 2002, through December 31, 2011."[136]

Because the AKS is a federal statute pertaining to Medicaid, by certifying they will comply with such law, Providers certified that they will comply with the AKS.

## NORTH CAROLINA

The Provider Agreement that a provider had to sign before participating in the State's Program required a provider to agree to the following:

> "A.1. Comply with federal and state laws, regulations, state reimbursement plan and policies governing the services authorized under the Medicaid Program and this agreement (including, but not limited to, Medicaid provider manuals and Medicaid bulletins published by the Division of Medical Assistance and/or its fiscal agent)."

---

[135] NOVARTIS-USAO-0159213, April 2003; NOVARTIS-USAO-0159216, September 2003; NOVARTIS-USAO-0159219, February 2004; NOVARTIS-USAO-0159222, August 12, 2005; NOVARTIS-USAO-0159225, January 5, 2006; NOVARTIS-USAO-0159228, March 3, 2007; NOVARTIS-USAO-0159231, June 1, 2009; NOVARTIS-USAO-0176214, June 1, 2009, signed September 7, 2010, Humana Pharmacy Inc.; NOVARTIS-USAO-0159235, December 2010.
[136] NOVARTIS-USAO-0159212, September 20, 2016.

"B.1. Payment of claims is from State, Federal and County funds and any false claims, false statements or documents, or misrepresentation or concealment of material fact may be prosecuted by applicable State and/or Federal law."

"C.6. To not offer or provide any discount, rebate, refund, or any other similar unearned gratuity for the purpose of soliciting the patronage of Medicaid clients."

North Carolina Division of Medical Assistance Medicaid Participation Agreement.[137]

A later version of the Provider Agreement that a provider was required to sign to participate in North Carolina's Program required a provider to agree to the following terms and conditions:

"3. …The Provider agrees to operate and provide services in accordance with all federal and state laws, regulations, and rules…"

"5. …The Provider agrees…. k. That payment and satisfaction of claims will be from federal and state funds.  l. That claims are subject to the Medical Assistance Provider False Claims Act and the federal False Claims Act."

North Carolina Department of Health and Human Services Provider Administrative Participation Agreement.[138]

Another later version of the North Carolina Provider Agreement required a provider to agree to the following terms and conditions:

"3. Governing Law and Venue

This Agreement is required by 42 CFR § 431.107 and shall be governed by the following (hereinafter referred to as the "Controlling Authority"):

(a) Title XIX of the Social Security Act and its implementing regulations, the North Carolina State Plan for Medical Assistance, and any Title XIX waivers authorized by the Centers for Medicare and Medicaid Services (CMS); and…"

"5. …The Provider agrees…. k. That payment and satisfaction of claims will be from federal and state funds.  l. That claims are subject to the Medical Assistance Provider False Claims Act (Part 7, Article 2, Chapter 108A of the General Statutes),

---

[137] NOVARTIS-USAO-0178716, 18 and 20, September 2003, signed October 7, 2003; NOVARTIS-USAO-0136565-67, September 2003, signed October 7, 2003; NOVARTIS-USAO-0174636-38, September 2003, signed by Physicians Pharmacy Alliance, January 25, 2005.

[138] NOVARTIS-USAO-0136580-81, not dated, signed December 10, 2009; NOVARTIS-USAO-0178708-10, August, 2009.

the North Carolina False Claims Act, Chapter 1, Article 51 of the North Carolina General Statutes (N.C.G.S. §§1-601 through 617), and the federal False Claims Act."

North Carolina Department of Health and Human Services Provider Administrative Participation Agreement.[139]

In addition, the State's Electronic Claims Submission (ESA) Agreement states:

"The Provider of Medical Care ("Provider") under the Medicaid Program in consideration of the right to submit claims by paperless means rather than by, or in addition to, the submission of paper claims agrees that it will abide by the following terms and conditions:

1. The Provider shall abide by all Federal and State statutes, rules, regulations and policies (including, but not limited to: the Medicaid State Plan, Medicaid Manuals, and Medicaid bulletins published by the Division of Medical Assistance (DMA) and/or its fiscal agent) of the Medicaid Program, and the conditions set out in any Provider Participation Agreement entered into by and between the Provider and DMA.

2. Provider's signature electing electronic filing shall be binding as certification of Provider's intent to file electronically and its compliance with all applicable statutes, rules, regulations and policies governing electronic claims submission. The Provider agrees to be responsible for research and correction of all billing discrepancies. Any false statement, claim or concealment of or failure to disclose a material fact may be prosecuted under applicable federal and/or state law (P.L. 95-142 and N.C.G.S. 108A-63), and such violations are punishable by fine, imprisonment and/or civil penalties as provided by law.

5. … For purposes of compliance with this agreement and the laws, rules, regulations and policies applicable to Medicaid providers, the acts and/or omissions of Provider's staff or any entity acting on its behalf for electronic submission of the Provider's claims shall be deemed those of the Provider, including any acts and/or omissions in violation of Federal and State criminal and civil false claims statutes."

---

[139] NOVARTIS-USAO-0178728,30, August 2010; NOVARTIS-USAO-0136592,94, March 24, 2011.

North Carolina Department of Health And Human Services Division of Medical Assistance Electronic Claims Submission (ECS) Agreement.[140]

At all times relevant to this case, most physicians and all pharmacies billed electronically.

Further a representative of North Carolina signed a declaration that these documents represent "…true and correct copies of examples of physician and pharmacy provider agreements that North Carolina entered into with physicians and pharmacies that were in effect from 2003 through 2011."[141]

Lastly a representative of North Carolina sent an email stating the following:

> "In follow up to your questions regarding whether a physician/pharmacy needs to sign a provider agreement to provide services for a NC Managed Care Organization, physicians must sign a provider agreement with the State to provide services through the MCO (including mental health services). There is no MCO pharmacy benefit in NC so this question does not apply to pharmacies. In addition to the State Medicaid application, physicians must also enroll with the MCO to provide services."[142]

Because the AKS is a federal statute pertaining to Medicaid, as well as a provision of the Social Security Act, by agreeing that they will comply with and/or be subject to such law, Providers agreed to comply with the AKS.

## NORTH DAKOTA

The Pharmacy Provider Agreement that a pharmacy had to sign before participating in the State's Program required a pharmacy to agree to the following:

> "**8. Payment When Made**…C….Pharmacy understands that any computer billing that contains any falsification or concealment of a material fact may be prosecuted under state and federal laws"

North Dakota Department of Human Services/Medical Services Pharmacy Agreement/Medical Services Program, at 1.[143]

---

[140] NOVARTIS-USAO-0178694, May, 2000; NOVARTIS-USAO-0136562, not dated, signed October 7, 2003; NOVARTIS-USAO-0136573, October 2006; NOVARTIS-USAO-0136587, August, 2009; NOVARTIS-USAO-0174664, August, 2009 signed by Physicians Pharmacy Alliance, January 14, 2011.

[141] NOVARTIS-USAO-0178706, February 22, 2017.

[142] NOVARTIS-USA0-0182623, March 6, 2017.

[143] NOVARTIS-USAO-0136610, December 2003; NOVARTIS-USAO-0176499, December 2003.

The Provider Agreement that a non-pharmacy provider had to sign before participating in the State's Program required a provider to agree to the following:

> "1. …The provider further agrees that it will comply with the provisions of Sections 3, 8, 9, and 15 of the Medicare-Medicaid Anti-Fraud and Abuse Amendments of 1977 (P.L. 95-142) and all requirements imposed thereunder by regulations of the Department of Health and Human Services (42 CFR Parts 431 and 455)…"

> "8. Provider acknowledges and understands that payment and satisfaction of claims submitted to the state agency for services provided individuals eligible for the North Dakota Medicaid Program will be from federal and state funds and that any false claims, statements, or documents, or concealment of material fact, may be prosecuted under applicable federal or state laws."

North Dakota Department of Human Services, Medical Services Division Medicaid Program Provider Agreement.[144]

Another version of the above-quoted Provider Agreement required a provider to agree to the following terms and conditions:

> "**2. Compliance**.  As a condition to participation in the North Dakota Medicaid Program, provider agrees that it will comply with all applicable provisions of statute, rules, and federal regulations governing reimbursement of services and items under Medicaid in North Dakota, including the current applicable Medicaid Provider Handbook…"

North Dakota Department of Human Services, Medical Services Division Medicaid Program Provider Agreement.[145]

Further a representative of North Dakota signed a declaration that these documents represent "…true and correct copies, to the best of my knowledge, of all retained iterations of the agreements that North Dakota entered into with physicians and pharmacies that were in effect during the period January 1, 2002, through December 31, 2011."[146]

---

[144] NOVARTIS-USAO-0136615-16, August 2003; NOVARTIS-USAO-0136617, September 1999, second page is missing; NOVARTIS-USAO-0176496, September 1999, second page is missing; NOVARTIS-USAO-0176497, August 2003.

[145] NOVARTIS-USAO-0136608, November 2010; NOVARTIS-USAO-0176501, November 2010; NOVARTIS-USAO-0136612, January 2011; NOVARTIS-USAO-0176503, January 2011.

[146] NOVARTIS-USAO-0176494, December 13, 2016.

Because the AKS is a federal law pertaining to Medicaid and is reflected in regulations of the U.S. Department of Health and Human Services, by agreeing to be subject to such law or regulations and/or to comply with such law or regulations, Providers agreed to comply with the AKS.

## OHIO

The Provider Agreement that a provider had to sign before participating in the State's Program required a provider to agree to the following:

> "This provider agreement is a contract between the Ohio Department of Job and Family Services (the Department) and the undersigned provider of medical assistance services in which the Provider agrees to comply with the terms of this provider agreement, state statutes, Ohio Administrative Code rules, and Federal statutes and rules . . . ."

Ohio Medicaid Provider Agreement Health Plans Provider Enrollment Application / Agreement.[147]

Further a representative of Ohio signed a declaration that these documents represent "…true and correct copies of all iterations of the agreements that ODM [the Ohio Department of Medicaid] entered into with physicians and pharmacies that were in effect during the period January 1, 2002, through December 31, 2011."[148]

Because the AKS is a federal statute pertaining to Medicaid, by certifying they will comply with such law, Providers certified that they will comply with the AKS.

## OKLAHOMA

The general Provider Agreement that a provider had to sign before participating in the State's Program required a provider to agree to the following:

> "4.1 (c) PROVIDER shall comply with all applicable statutes, regulations, policies, and properly promulgated rules of OHCA, with special attention to 42 United States Code (USC) §1396r-8(g)(2)(A)(ii), in providing any product pursuant to this Agreement. . . ."

---

[147] NOVARTIS-USAO-0136856, April 2002; NOVARTIS-USAO-0159279, April, 2002; NOVARTIS-USAO-0136862, October 2007; NOVARTIS-USAO-0150253, September 2008; NOVARTIS-USAO-0176269, September, 2008, signed September 7, 2010, Humana Pharmacy Inc.; NOVARTIS-USAO-0136876, April 2002; NOVARTIS-USAO-0136890, September 2008.

[148] NOVARTIS-USAO-0159240, September 30, 2016.

"4.3 (e) Satisfaction of all claims will be from federal and state funds.  Any false claims, statements, or documents, or any concealment of a material fact may be prosecuted under applicable federal or state laws."

"5.1 The parties to this Agreement acknowledge and expect that over the term of this Agreement laws may change. Specifically, the parties acknowledge and expect (i) federal Medicaid statutes and regulations, (ii) state Medicaid statutes and rules, (iii) state statutes and rules governing practice of health-care professions, and (iv) any other laws cited in this contract may change. The parties shall be mutually bound by such changes."

"5.2 Provider shall comply with and certifies compliance with: . . .

   p) Federal False Claims Act, 31 U.S.C. §3729-3733; 31 U.S.C. 3801."

General Provider Agreement.[149]

The physician Provider Agreement that a physician had to sign before participating in the State's Program required a provider to agree to the following:

"4.1 (e) Satisfaction of all claims will be from federal and state funds.  Any false claims, statements, or documents, or any concealment of a material fact may be prosecuted under applicable federal or state laws."

"5.0 The parties to this Agreement acknowledge and expect that over the term of this Agreement laws may change. Specifically, the parties acknowledge and expect (i) federal Medicaid statutes and regulations, (ii) state Medicaid statutes and rules, (iii) state statutes and rules governing practice of health-care professions, and (iv) any other laws cited in this contract may change. The parties shall be mutually bound by such changes."

Physician Provider Agreement.[150]

A revised physician Provider Agreement similarly required a provider to agree to the following:

---

[149] NOVARTIS-USAO-0136987-90, 2008-20112009 (language that is similar-- and functionally identical in material respects --  but not exactly the same as the text quoted here); NOVARTIS-USAO-0159282-86, 2009 (language that is similar -- and functionally identical in material respects -- but not exactly the same as the text quoted here); NOVARTIS-USAO-0159372-76, 2011; NOVARTIS-USAO-0159290-94, 2011.

[150] NOVARTIS-USAO-0159384-85, not dated; NOVARTIS-USAO-0159391-92, 2004-2006.

"4.3 (e) Satisfaction of all claims will be from federal and state funds.  Any false claims, statements, or documents, or any concealment of a material fact may be prosecuted."

"5.1 The parties to this Agreement acknowledge and expect that over the term of this Agreement laws may change. Specifically, the parties acknowledge and expect (i) federal Medicaid statutes and regulations, (ii) state Medicaid statutes and rules, (iii) state statutes and rules governing practice of health-care professions, and (iv) any other laws cited in this contract may change. The parties shall be mutually bound by such changes."

Physician Provider Agreement.[151]

Furthermore, the pharmacy Provider Agreement that a pharmacy had to sign before participating in the State's Program required a provider to agree to the following:

"8. (a) The parties to this Agreement acknowledge and expect that over the term of this Agreement laws may change. Specifically, the parties acknowledge and expect (1) federal Medicaid statutes and regulations, (2) state Medicaid statutes and rules, (3) state statutes and rules governing practice of health-care professions, may change. Such changes shall bind the parties."

Pharmacy Provider Agreement.[152]

A revised pharmacy Provider Agreement similarly required a provider to agree to the following:

"4.1 (d) Satisfaction of all claims will be from federal and state funds.  Any false claims, statements, or documents, or any concealment of a material fact may be prosecuted under applicable federal or state laws."

"5.0 The parties to this Agreement acknowledge and expect that over the term of this Agreement laws may change. Specifically, the parties acknowledge and expect (i) federal Medicaid statutes and regulations, (ii) state Medicaid statutes and rules, (iii) state statutes and rules governing practice of health-care professions, and (iv) any other laws cited in this contract may change. The parties shall be mutually bound by such changes."

Pharmacy Provider Agreement.[153]

---

[151] NOVARTIS-USAO-0159417-18, 2007-2009.

[152] NOVARTIS-USAO-0159343, September 13, 1999.

[153] NOVARTIS-USAO-0159361-62, June 2008.

Another revised pharmacy Provider Agreement similarly required a provider to agree to the following:

"4.3 (e) Satisfaction of all claims will be from federal and state funds.  Any false claims, statements, or documents, or any concealment of a material fact may be prosecuted."

"5.1 The parties to this Agreement acknowledge and expect that over the term of this Agreement laws may change. Specifically, the parties acknowledge and expect (i) federal Medicaid statutes and regulations, (ii) state Medicaid statutes and rules, (iii) state statutes and rules governing practice of health-care professions, and (iv) any other laws cited in this contract may change. The parties shall be mutually bound by such changes."

"§5.2 Provider shall comply with and certifies compliance with: . . .

        p) The Federal False Claims Act, 31 U.S.C. §3729-3733; 31 U.S.C. 3801."

Pharmacy Provider Agreement.[154]

A further version of the pharmacy Provider Agreement similarly required a provider to agree to the following:

"4.1 (c) PROVIDER shall comply with all applicable statutes, regulations, policies, and properly promulgated rules of OHCA, with special attention to 42 United States Code (USC) §1396r-8(g)(2)(A)(ii), in providing any product pursuant to this Agreement. . . ."

"4.3 (e) Satisfaction of all claims will be from federal and state funds.  Any false claims, statements, or documents, or any concealment of a material fact may be prosecuted."

"5.1 The parties to this Agreement acknowledge and expect that over the term of this Agreement laws may change. Specifically, the parties acknowledge and expect (i) federal Medicaid statutes and regulations, (ii) state Medicaid statutes and rules, (iii) state statutes and rules governing practice of health-care professions, and (iv) any other laws cited in this contract may change. The parties shall be mutually bound by such changes."

"5.2 Provider shall comply with and certifies compliance with: . . .

---

[154] NOVARTIS-USAO-0159368-69, 2008-2011.

p) The Federal False Claims Act, 31 U.S.C. §3729-3733; 31 U.S.C. 3801."

Pharmacy Provider Agreement.[155]

Further a representative of Oklahoma signed a declaration that these documents represent "…true and correct copies of all iterations of the agreements that Oklahoma entered into with physicians and pharmacies that were in effect during the period January 1, 2002, through December 31, 2011."[156]

The AKS is a federal statute pertaining to Medicaid, and by agreeing to comply with and/or be bound by such law, Providers agreed to comply with the AKS.

## OREGON

The Provider Agreement that a provider had to sign before participating in the State's Program required a provider to agree to the following:

"**5. Compliance with applicable laws**

To comply with federal, state and local laws and regulations applicable to the care, services, equipment or supply and this agreement..."

Provider Enrollment Agreement.[157]

Further a representative of Oregon signed a declaration that this document represents "…true and correct copies of iterations of the agreements that Oregon entered into with physicians and pharmacies that were in effect during the period January 1, 2002, through December 31, 2011."[158]

Because the AKS is a federal statute pertaining to Medicaid, by certifying they will comply with such law, Providers certified that they will comply with the AKS.

## PENNSYLVANIA

The Provider Agreement that an outpatient provider had to sign before participating in the State's Program required a provider to agree to the following:

---

[155] NOVARTIS-USAO-0136987-90, 2008-2011.

[156] NOVARTIS-USAO-0159422, October 20, 2016.

[157] NOVARTIS-USAO-0170641, July 2008, dated February 11, 2009.

[158] NOVARTIS-USAO-0170631, October 28, 2016.

"2. The Provider shall comply with all applicable State and Federal laws, regulations, and policies which pertain to participation in the Pennsylvania Medical Assistance Program."

Provider Agreement for Outpatient Providers.[159]

The Provider Agreement that a pharmacy had to sign before participating in the State's Program required a provider to agree to the following:

"A. The Provider agrees to participate in the Pennsylvania Medical Assistance Program (the "Program"), and in the course of such participation to comply with all federal and Pennsylvania laws generally and specifically governing participation in the Program. The foregoing include but are not limited to: 42 U.S.C. § 1396 et seq., 62 P.S. §§441-451, 42 C.F.R. §§431-481 and the regulations adopted by the Department of Public Welfare (the "Department"). The Provider agrees to be knowledgeable of and to comply with applicable rules, regulations, rates and fee schedules promulgated under such laws and any amendments thereto."

Provider Agreement for Pharmacies and Medical Suppliers, § 1(A).[160]

Further a representative of Pennsylvania signed a declaration that these documents represent "...true and correct copies of all iterations of the agreements I located that were entered into between the Department of Public Welfare and physicians and pharmacies during the period January 1, 2002, through December 31, 2011."[161]

An e-mail dated February 10, 2017 from a representative of Pennsylvania confirms that:

- Pharmacies and physicians have to sign the state's provider agreement or enrollment application as a condition of participating as a provider under the state's managed care program, and
- That pharmacies and physicians are not allowed to contract with the state's Medicaid managed care plans if they do not have a signed provider agreement but otherwise meet the plan's credentialing requirements.[162]

---

[159] NOVARTIS-USAO-0159424, not dated, signed August 1, 2002; NOVARTIS-USAO-0159425, not dated, signed June 3, 2007; NOVARTIS-USAO-0159427, not dated, signed December 3, 2009; NOVARTIS-USAO-0159428, not dated, signed July 20, 2010.

[160] NOVARTIS-USAO-0159431, not dated but hand annotated March 8, 2002; NOVARTIS-USAO-0159435, not dated but hand annotated March 8, 2002, signed May 29, 2007.

[161] NOVARTIS-USAO-0170631, October 28, 2016.

[162] NOVARTIS-USAO-0181858.

Based on the e-mail, the Pennsylvania agreement clearly applies to both the fee for service program and its managed care program.

Because the AKS is a federal statute pertaining to participation in the Medicaid Program, by certifying they will comply with such law, Providers certified that they will comply with the AKS.

### RHODE ISLAND

The Provider Agreement that providers had to sign before participating in the State's Program required a provider to agree to the following:

"_____(Provider) with the understanding that participation in the Rhode Island Department of Human Services Medical Assistance Program hereafter, "DHS" or "RIMAP" is voluntary, agrees to the following:

1. To follow all laws, rules, regulations, policies and amendments that govern the Rhode Island Medical Assistance Program as specified by the Federal Government and the State of Rhode Island."

Provider Agreement Form.[163]

An updated version of the Provider Agreement required a provider to agree to the following:

"I, the Provider with the understanding that participation in the Rhode Island Executive Office of Health and Human Services Medical Assistance Program hereafter, "EOHHS" or "RIMAP" is voluntary, agrees to the following:

1. To follow all laws, rules, regulations, certification standards, policies and amendments including but not limited to the False Claims Act and HIPPA, that govern the Rhode Island Medical Assistance Program as specified by the Federal Government and the State of Rhode Island.  Suspected violations must be reported by the Provider to EOHHS, its fiscal agent, or the Medicaid Fraud Control Unit of the Rhode Island Attorney General's Office."

Rhode Island Executive Office of Health and Human Services Provider Agreement Form.[164]

Further a representative from Rhode Island signed a declaration that these documents represent "…true and correct copies of all iterations of the agreements that Rhode Island entered into with

---

[163] NOVARTIS-USAO-0168861, not dated.

[164] NOVARTIS-USAO-0168864, Updated January 2011.

physicians and pharmacies that were in effect during the period January 1, 2002, through December 31, 2011."[165]

Because the AKS is a federal law governing Medicaid, by certifying they will comply with such law, Providers certified that they will comply with the AKS.

## **SOUTH CAROLINA**

The Medicaid Enrollment form that a physician had to sign before participating in the State's Program required a provider to agree to the following:

- "That all services rendered and claims submitted shall be in compliance with all applicable federal and state laws and regulations and in accordance with SCDHHS policies, procedures and Medicaid Provider Manuals"

- "That Medicaid reimbursement (payment of claims) is from state and federal funds and that any falsification (false claims, statement or documents) or concealment of material fact may be prosecuted under applicable state and federal laws."

Medicaid Enrollment Data, Individual Physician, M.D., or D.O.[166]

Similarly, the Medicaid Enrollment form that a pharmacy had to sign before participating in the State's Program required a provider to agree to the following:

- "That all services rendered and claims submitted shall be in compliance with all applicable federal and state laws and regulations and in accordance with SCDHHS policies, procedures and Medicaid Provider Manuals"

- "That Medicaid reimbursement (payment of claims) is from state and federal funds and that any falsification (false claims, statement or documents) or concealment of material fact may be prosecuted under applicable state and federal laws."

Medicaid Enrollment Data, Pharmacy, Agreement.[167]

---

[165] NOVARTIS-USAO-0168871, September 25, 2016.

[166] NOVARTIS-USAO-0137005, May 2006; NOVARTIS-USAO-0159448, May 2000; NOVARTIS-USAO-0159450, July 2006.

[167] NOVARTIS-USAO-0159454, March 1999; NOVARTIS-USAO-0174694, May 2006, signed by Physicians Pharmacy Alliance, Inc., April 12, 2010; NOVARTIS-USAO-0137008, May 2006; NOVARTIS-USAO-0159457, May 2008.

Moreover, an additional agreement that providers had to sign to be paid electronically included the following agreement:

> "I (we) understand that credit entries to the account of the above named payee are done with the understanding that payment will be from federal and/or state funds and that any false claims, statements or documents or concealments of a material fact, may be prosecuted under applicable federal or state laws."

Authorization agreement for Electronic Funds transfer.[168]

During the relevant period, all pharmacies and most physicians billed electronically.

Further a representative from South Carolina signed a declaration that these documents represent "…true and correct copies of all iterations of the agreements that SCDHHS [the South Carolina Department of Health and Human Services] entered into with physicians and pharmacies that were in effect during the period January 1, 2002, through December 31, 2011."[169]

An e-mail dated February 14, 2017 from a representative of South Carolina states as follows:

> "1.    Do pharmacies and physicians have to sign your state's provider agreement or enrollment application as a condition of participating as a provider under your managed care program?
>
> Ans.  In order for the MCO's to contract with in-state providers including pharmacies and physicians the providers must be enrolled with SC Medicaid.
>
> 2.    Are pharmacies and physicians allowed to contract with your state's Medicaid managed care plans if they have not signed a state provider agreement but otherwise meet the plan's credentialing requirements?
>
> Ans.  No, in order to sign contracts with the MCO the in-state provider must be enrolled with Medicaid.  Below is the cite from the contract.  Thanks.
>
> > Provider Enrollment
> >
> > The CONTRACTOR shall:
> >
> > > Ensure that all individuals and entities within its provider network that provide medical services to Medicaid patients are enrolled with the

---

[168] NOVARTIS-USAO-0159442, February 2, 2003; NOVARTIS-USAO-0159443, December 12, 2005; NOVARTIS-USAO-0159444, January 1, 2009; NOVARTIS-USAO-0159445, January 2011.

[169] NOVARTIS-USAO-0159438, October 3, 2016.

Department as Qualified Medicaid Providers. For specific requirements on Provider Enrollment refer to the Department's website at: https://www.scdhhs.gov/ProviderRequirements."[170]

Based on that e-mail, the South Carolina's agreement clearly applies to both the fee for service program and its managed care program.

Because the AKS is a federal statute pertaining to Medicaid, by certifying they will comply with such law and agreeing that they are subject to prosecution under such law for any false statements or omissions, Providers certified that they will comply with the AKS.

## SOUTH DAKOTA

The Provider Agreement that provider had to sign before participating in the State's Program required a provider to agree to the following:

"3. Provider agrees to comply with all Federal and State laws, regulations and rules applicable to Provider's participation in the medical assistance program."

Provider Agreement To Participate in the South Dakota Medical Assistance Program.[171]

Further on November 21, 2016 a representative from South Dakota confirmed in an e-mail that the documents received from South Dakota "represent all iterations of the agreements that South Dakota entered into with physicians and pharmacies during the period of January 2002 through December 2011."[172]

Because the AKS is a federal statute pertaining to Providers' participation in Medicaid, by certifying they will comply with such law, Providers certified that they will comply with the AKS.

## TENNESSEE

The Provider Agreements that pharmacy providers were required to sign in the non-Managed Care setting to participate in the State of Tennessee's Program required a provider to agree to the following terms and conditions:

"**Section 6.1: Laws, Regulations and Licenses**. Participating pharmacies shall maintain all federal, state, and local licenses, certifications, and permits, without

---

[170] NOVARTIS-USAO-0181859.

[171] NOVARTIS-USAO-0175290, May 2004; NOVARTIS-USAO-0137010, September 2006, signed October 11, 2007; NOVARTIS-USAO-0137012, April 2010, signed November 10, 2010.

[172] NOVARTIS-USA0-0182522, November 21, 2016.

restriction, required to provide Pharmaceutical Services to TennCare enrollees and shall comply fully with all applicable laws and regulations."

"**Section 6.3: Compliance with Legal Regulations**: Both TennCare and Pharmacy agree to recognize and abide by all state and federal laws, regulations and guidelines applicable to the scope of services provided or anticipated to be provided by this Agreement, including the Tennessee state plan, 42 CFR 431.107, 42 CFR 455 subpart B, and Section 1200-13-1-.05(1)(a)."

"**Section 6.4: Incorporation by Reference of Federal and State Law/Regulation**: By reference, this agreement incorporates all applicable federal and state laws and regulations and any applicable court orders or consent decrees, and any and all revisions of such laws or regulations shall automatically be incorporated into the Participation Agreement as they become effective."

Pharmacy Participation Agreements.[173]

A representative of Tennessee signed a declaration that these documents represent "…a true and correct copy of the form agreement that TennCare [Tennessee's Medicaid Program] entered into with pharmacies, which was in effect, to the best of my knowledge, during the period of January 1, 2002, through October 1, 2008," as well as "true and correct copies of the agreements TennCare required SXC [the pharmacy benefit manager Tennessee utilized from October 1, 2008 through December 31, 2011, to manage pharmacy benefits for portions of TennCare] to execute with contracted pharmacies that provided services in the state in effect through October 1, 2008 through December 31, 2011."[174]

Further, between 2002 and 2011, under its managed care model, Tennessee entered into Contractor Risk Agreements (CRAs) and amendments to CRAs with Managed Care Organizations

---

[173] NOVARTIS-USAO-0168885, signed November 29, 2000 (contains language that is similar -- and functionally identical in material respects -- but not exactly the same as the text quoted here); NOVARTIS-USAO-0168926-27, September 24, 2010; NOVARTIS-USAO-0168955-56, August 12, 2008; NOVARTIS-USAO-0169005-07, November 18, 2010; NOVARTIS-USAO-0169044-46, November 23, 2010; NOVARTIS-USAO-0169086-87, November 18, 2010; NOVARTIS-USAO-0169129-30, September 24, 2010 (contains language that is similar -- and functionally identical in material respects -- but not exactly the same as the text quoted here); NOVARTIS-USAO-0169181-82, January 7, 2011 (contains language that is similar -- and functionally identical in material respects -- but not exactly the same as the text quoted here); NOVARTIS-USAO-0169220-21, June 22, 2011; NOVARTIS-USAO-0169302-03, July 28, 2011 (contains language that is similar -- and functionally identical in material respects -- but not exactly the same as the text quoted here).

[174] NOVARTIS-USAO-0168872-73, October 19, 2016.

(MCOs) to administer portions of TennCare, and an early iteration of a CRA dated July 1, 2001 required the MCO to agree as follows:

> "2.18. **Provider Agreements** … 2.18. bb. Provide that the agreement incorporates by reference all applicable federal and state laws, TennCare rules and regulations or court orders, and revisions of such laws or regulations shall automatically be incorporated into the agreement, as they become effective."

Contractor Risk Agreement.[175]

Other CRAs required the MCO to agree to the following:

> "2.12.9.42 Specify both the CONTRACTOR and the provider agree to recognize and abide by all state and federal laws, regulations and guidelines applicable to the CONTRACTOR and the provider.  Provide that the agreement incorporates by reference all applicable federal law and state laws, TennCare rules and regulations, consent decrees or court orders, and revisions of such laws, regulations, consent decrees or court orders shall automatically be incorporated into the provider agreement, as they become effective."

Contractor Risk Agreement.[176]

Other iterations of the CRAs contain the same language.[177]

The CRA named East/West CRA – May 19, 2008 required the MCO to agree to the following:

> "2.12.7.32 Require the provider to comply with fraud and abuse requirements described in Section 2.20 of this Agreement."

> "2.20.1.4 The CONTRACTOR shall comply with all federal and state requirements regarding fraud and abuse, including but not limited to Sections 1128, 1156, and 1902 (a)(68) of the Social Security Act."

Contractor Risk Agreement.[178]

Similarly, a CRA dated August 15, 2006 required the MCOs to agree as follows:

---

[175] NOVARTIS-USAO-0180228-30, July 1, 2001.

[176] NOVARTIS-USAO-0122075, signed August 12, 2009 and effective September 1, 2009; NOVARTIS-USAO-0122521, signed March 23, 2010 and effective March 1, 2010; NOVARTIS-USAO-0122876, signed March 23, 2010 and effective March 1, 2010.

[177] NOVARTIS-USAO-0179452, not dated; NOVARTIS-USAO-0179004, not dated.

[178] NOVARTIS-USAO-0179811, May 19, 2008; NOVARTIS-USAO-0179849, May 19, 2008.

"2.12.7.34 Specify both the CONTRACTOR and the provider agree to recognize and abide by all state and federal laws, regulations and guidelines applicable to the CONTRACTOR and the provider.   Provide that the agreement incorporates by reference all applicable federal law and state laws, TennCare rules and regulations, consent decrees or court orders, and revisions of such laws, regulations, consent decrees or court orders shall automatically be incorporated into the provider agreement as they become effective."

Contractor Risk Agreement.[179]

Another CRA for the Middle Grand Region required the MCO to agree to the following language:

"2.12.9.63 The provider, subcontractor or any other entity agrees to abide by the Medicaid laws, regulations and program instructions that apply to the provider. The provider, subcontractor or any other entity understands that payment of a claim by TennCare or a TennCare Managed Care Contractor and/or Organization is conditioned upon the claim and underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and is conditioned on the provider's, subcontractor's or any other entity's compliance with all applicable conditions of participation in Medicaid.  The provider, subcontractor or any other entity understands and agrees that each claim the provider, subcontractor or any other entity submits to TennCare or a TennCare Managed Care Contractor and/or Organization constitutes a certification that the provider, subcontractor or any other entity has complied with all applicable Medicaid laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), in connection with such claims and the services provided therein."

Contractor Risk Agreement.[180]  Another CRA contains the same language.  [181]

A final CRA required MCOs to agree to the following language:

"2.18, **Provider Agreements** … 2.18 bb, Specify both the CONTRACTOR and the provider agree to recognize and abide by all state and federal laws, regulations, and guidelines applicable to the health plan.   Provide that the agreement incorporates by reference all applicable federal law and state laws, TennCare rules

---

[179] NOVARTIS-USAO-0180532, August 15, 2006.

[180] NOVARTIS-USAO-0179251, not dated.

[181] NOVARTIS-USAO-0179680, not dated.

and regulations or court orders, and revisions of such laws, regulations or court orders shall automatically be incorporated into the provider agreement as they become effective."

Contractor Risk Agreement.[182]

Further, a representative of Tennessee signed a declaration stating that "Between 2002 and 2011, Tennessee entered into Contractor Risk Agreements ("CRAs") with Managed Care Organizations ("MCOs") contracted by the state to administer portions of the TennCare program. The CRAs required the MCOs to include specific provisions in the provider agreements executed between the MCOs and the physicians that provided services in the state."  The representative certified that the documents attached to that declaration, which are cited above, represent "…true and correct copies of the template CRAs and Amendments that Tennessee entered into with the MCOs that were in effect during the period January 1, 2002, through December 31, 2011."[183]

Lastly another representative of Tennessee signed a declaration stating that "Between 2002 and 2011, Tennessee entered into agreements with [MCOs] to administer portions of the state's Medicaid Program," that "[t]he MCOs entered into agreements with providers who deliver healthcare services in the state," and that the documents attached to her declaration, which are also cited above, represent "…true and correct copies of template agreements that the TennCare Oversight Division approved for various MCOs to enter into with physicians and pharmacies during the period January 1, 2002, through December 31, 2011."[184]

Whether in the MCO or the non-MCO setting, the above-cited agreements required MCOs, pharmacies, and/or other providers to agree to comply with and/or be subject to applicable federal law.  Because the AKS is a federal statute pertaining to Medicaid, by agreeing to comply with and/or be subject to such law, Providers agreed to comply with the AKS.

## TEXAS

The Provider Agreement that a provider had to sign before participating in the State's Program required a provider to agree to the following:

"1.1… Provider agrees to comply with all of the requirements of the Provider Manual, as well as all state and federal laws and amendments, governing or regulating Medicaid. Provider is responsible for ensuring that employees or agents

---

[182] NOVARTIS-USAO-0178801, not dated.

[183] NOVARTIS-USAO-0168874-75, October 20, 2016.

[184] NOVARTIS-USAO-0168876, October 24, 2016.

acting on behalf of the Provider comply with all of the requirements of the Provider Manual and all state, federal law, amendments governing and regulating Medicaid and all pertinent Texas Administrative Code (TAC) references, to include, but not limited to, Title 1, Part 15, Chapter 371, §§371.1 – 371.1741 related to waste, abuse and fraud."

"1.2.3 The Agreement is subject to all state and federal laws and regulations relating to fraud, abuse, and waste in health care and the Medicaid program."

HHSC Medicaid Provider Agreement.[185]

Because the AKS is a federal law governing or regulating Medicaid, by certifying they will comply with such law, Providers certified that they will comply with the AKS.

## UTAH

The Provider Agreement that a provider had to sign before participating in the State's Program required a provider to agree to the following:

"3. Policy, Rules, Regulations: Be aware of and comply with policies and procedures in the provider manual and MIBs in effect when the service is rendered. … PROVIDER will comply with all appropriate and applicable state and federal rules and regulations."

Provider Enrollment/Recertification Agreement.[186]

Because the AKS is a federal rule applicable to Medicaid and is reflected in federal Medicaid regulations, by certifying they will comply with such rules and regulations, Providers certified that they will comply with the AKS.

## VERMONT

The Provider Agreement that a provider had to sign before participating in the State's Program required a provider to agree to the following:

---

[185] NOVARTIS-USAO-0169710-11, October 23, 2003; NOVARTIS-USAO-0169776 and 77, September 17, 2007; NOVARTIS-USAO-0169829-30, January 1, 2010; NOVARTIS-USAO-0176322-23, January 1, 2010, signed by Humana Pharmacy Inc., not dated; NOVARTIS-USAO-0169866-67, June 13, 2011; NOVARTIS-USAO-0169938-39, November 15, 2011; NOVARTIS-USAO-0137027-28, October 23, 2003; NOVARTIS-USAO-0137070-71, September 17, 2007; NOVARTIS-USAO-0137076-77, June 13, 2011.

[186] NOVARTIS-USAO-0176336, March 1, 2002, Humana Pharmacy Inc., October 12, 2010; NOVARTIS-USAO-0176354, March 1, 2002, Humana Pharmacy Inc., October 12, 2010.

"1. To conform to all applicable Federal and State laws and regulations..."

Provider Enrollment/Recertification Agreement.[187]

Another version of the Provider Agreement similarly required a provider to agree to the following terms and conditions:

"1. To conform to all applicable Federal and State laws and regulations including Title VI of the 1964 Civil Rights Act, the Rehabilitation Act of 1973 as amended, the Americans with Disabilities Act, and Vermont Agency of Human Services Policy…"

CONDITIONS OF PARTICIPATION, PROVIDER ENROLLMENT/RECERTIFICATION AGREEMENT.[188]

Further on November 21, 2016 a representative from Vermont confirmed in an e-mail that "the sample provider agreements . . . received from Vermont are representative of all iterations of the agreements that Vermont entered into with physicians and pharmacies during the period January 2002 through December 2011."[189]

Because the AKS is a federal statute applicable to Medicaid, by certifying they will comply with such law, Providers certified that they will comply with the AKS.

## VIRGINIA

The Provider Agreement that a provider had to sign before participating in the State's Program required a provider to agree to the following:

"8. The provider agrees to comply with all applicable state and federal laws, as well as administrative policies and procedures of VMAP as from time to time amended."

---

[187] NOVARTIS-USAO-0159476, signed August 13, 2001; NOVARTIS-USAO-0159477, January 1, 2002, signed July 5, 2002; NOVARTIS-USAO-0176373.

[188] NOVARTIS-USAO-0137102, July 2009; NOVARTIS-USAO-0159472, February 17, 2012; NOVARTIS-USAO-0159473, January 29, 2010.

[189] NOVARTIS-USA0-0182549, November 21, 2016.

Commonwealth of Virginia Department of Medical Assistance Services Medical Assistance Program Participation Agreement;[190] Commonwealth of Virginia Department of Medical Assistance Services Medical Assistance Program Physician Participation Agreement.[191]

Further on February 24, 2017 a representative from Virginia confirmed in an e-mail that "the language regarding provider compliance with all applicable state and federal laws can be found in all Virginia Medicaid provider agreements, including Physician Participation Agreements in 2002 to 2011."[192]

Because the AKS is a federal statute applicable to Medicaid, by certifying they will comply with such law, Providers certified that they will comply with the AKS.

## WASHINGTON

The Provider Agreement that a provider had to sign before participating in the State's Program required a provider to agree to the following:

> "1....The Provider is subject to and shall comply with all federal and state laws, rules, and regulations and all program policy provisions, including department numbered memoranda, billing instructions, and other associated written department issuances in effect at the time the service is rendered, which are incorporated into this Agreement by this reference."

Core Provider Agreement (DSHS 09-048).[193]

Further a representative of Washington signed a declaration that these documents represent "...true and correct copies of all iterations of the agreements that Washington entered into with physicians and pharmacies that were in effect during the period January 1, 2002, through December 31, 2011."[194]

Because the AKS is a federal statute applicable to Medicaid, by certifying they will comply with such law, Providers certified that they will comply with the AKS.

---

[190] NOVARTIS-USAO-0159459, January 10, 2002; NOVARTIS-USAO-0159460, January 1, 2003; NOVARTIS-USAO-0159461, October 1, 2004; NOVARTIS-USAO-0159462, July 6, 2005; NOVARTIS-USAO-0159463, September 11, 2006; NOVARTIS-USAO-0159464, February 23, 2007; NOVARTIS-USAO-0159465, January 1, 2008; NOVARTIS-USAO-0159466, May 20, 2009; NOVARTIS-USAO-0159467, February 22, 2010; NOVARTIS-USAO-0159468, October 3, 2011.

[191] NOVARTIS-USAO-0137100, not dated.

[192] NOVARTIS-USA0-0182534, February 21, 2017.

[193] NOVARTIS-USAO-0137104, October 2008; NOVARTIS-USAO-0159483, June 2002; NOVARTIS-USAO-0159486, August 2006; NOVARTIS-USAO-0159489, October 2008; NOVARTIS-USAO-0137104, October 2008.

[194] NOVARTIS-USAO-0159482, September 23, 2016.

**WEST VIRGINIA**

The Provider Enrollment Application a provider had to sign before participating in the State's Program required a provider to agree to the following:

> "1. The Provider hereby agrees to comply with all applicable laws, rules and written policies pertaining to the West Virginia Medicaid Program (Medicaid), including but not limited to Title XIX and Title XXI (Children's Health Insurance) of the Social Security Act, the Code of Federal Regulations, the West Virginia State Plan, the Department of Health and Human Resources Bureau for Medical Services (Department/Bureau), written manuals, program instructions, policies and this document."

> "13. The Provider agrees that all claims for services will be medically necessary to the health of the specific patient and were furnished personally by the Provider or an employee under his/her direction.  The Provider agrees to comply with the provisions of 42 C.F.R. §447.10.  The Provider further certifies that all information listed on a claim for reimbursement from Medicaid is true, accurate and complete."

> "I understand that payment of any claims will be from Federal and State funds, and that any falsification, or concealment of a material fact may be prosecuted under Federal and State laws."

WV Medicaid Provider Enrollment Agreement and Signature.[195]

Further a representative from West Virginia signed a declaration that these documents represent "…true and correct copies of the iterations of the agreements that West Virginia entered into with physicians and pharmacies that were in effect during the period January 1, 2002, through December 31, 2011 which are currently in the custody of BMS [West Virginia's Bureau for Medical Services]."[196]

Because the AKS is a federal law applicable to Medicaid, and is included in the Social Security Act and reflected in the Code of Federal Regulations, by certifying they will comply with such law and regulations, Providers certified that they will comply with the AKS.

---

[195] NOVARTIS-USAO-0137152-53, not dated; NOVARTIS-USAO-0170359-60, August 2001, signed February 27, 2004; NOVARTIS-USAO-0170422-23, July 11, 2004, signed July 26, 2004 (contains language that is similar -- and functionally identical in material respects -- but does not include the false claims statement quoted here); NOVARTIS-USAO-0170372-74, February 10, 2012; NOVARTIS-USAO-0170391-92, April 29, 2009; NOVARTIS-USAO-0170410-11, June 4, 2010.

[196] NOVARTIS-USAO-0170361, October 27, 2016.

## WISCONSIN

The general Provider Agreement that a provider had to sign before participating in the State's Program required a provider to agree to the following:

> "2. Provider acknowledges that certain terms, conditions, and restrictions that are either listed in this section, set forth in applicable law, or available to the Provider through Wisconsin Medicaid govern its participation as a provider in Wisconsin Medicaid, and that by submitting claims as a Wisconsin Medicaid provider, the Provider becomes subject to those terms, conditions, and restrictions...The Provider further acknowledges that all applicable terms, conditions, and restrictions govern the Provider's participation in Wisconsin Medicaid, regardless whether the Provider has actual knowledge of those terms, conditions, and restrictions."

> "5. The Provider acknowledges that any statement made in this document or in the provider application process constitutes a statement or representation of a material fact knowingly and willfully made or caused to be made by Provider in an application for a benefit or payment, or made for use in determining rights to such benefit or payment, that is, within the meaning of s. 49.49(1) and (4m), Wis. Stats., which, if false, subjects the Provider to criminal or other penalties."

Wisconsin Medicaid Provider Agreement and Acknowledgement of Terms of Participation.[197]

The Provider Agreement that a pharmacy had to sign to participate in the State of Wisconsin Program required a provider to agree to the following terms and conditions:

> "1. Provider shall comply with all federal laws, including laws relating to Title XIX of the Social Security Act,..."

Wisconsin Medicaid Program Provider Agreement (Pharmacy Provider).[198]

The Provider Agreement that an individual and most clinics, groups or agency providers was required to sign to participate in the State of Wisconsin Program similarly required a provider to agree to the following terms and conditions:

---

[197]NOVARTIS-USAO-0137113,15, February 2009; NOVARTIS-USAO-0159503 and NOVARTIS-USAO-0159510, February 2009; NOVARTIS-USAO-0137116, February 2009.

[198] NOVARTIS-USAO-0159495, July 2002; NOVARTIS-USAO-0159492, March 2005.

> "1. Provider shall comply with all federal laws, including laws relating to Title XIX of the Social Security Act,…"

Wisconsin Medicaid Program Provider Agreement (Standard: for individual and most clinic/group/agency providers).[199]

A later version of the Provider Agreement that an individual and most clinics, groups or agency providers was required to sign required a provider to agree to the following terms and conditions:

> "2, a. Provider is subject to certain requirements and restrictions under state and federal laws in addition to those referenced in Section 1, above,…"

Wisconsin Medicaid Program Provider Agreement (Standard: for individual and most clinic/group/agency providers).[200]

Further a representative from Wisconsin signed a declaration that these documents represent "…true and correct copies of all iterations of the agreements that Wisconsin entered into with physicians and pharmacies that were in effect during the period January 1, 2002, through December 31, 2011."[201]

Because the AKS is a federal law applicable to Medicaid, by agreeing to comply with and/or subject to such law, Providers agreed to comply with the AKS.

## **WYOMING**

The Provider Agreement that a provider had to sign before participating in the State's Program required a provider to agree to the following:

> "5. A. Comply with applicable state and federal law, including: the Social Security Act (42 U.S.C. § 1396 et seq.); the Wyoming Medical Assistance and Service Act (Wyo. Stat. § 42-4-101 et seq.); the regulations of the Centers for Medicare & Medicaid Services (CMS); the United States Department of Health and Human Services (HHS) (42 CFR Subchapter C); section 6032 of the Deficit Reduction Act of 2005 (Employee Education About False Claims Recovery); and the Wyoming Department of Health (WDH) Wyoming Medicaid Rules and policies."

> "6. A.  EqualityCare reimbursement is from state and federal funds and that any falsification of claims, statements or documents, or any concealment of material

---

[199] NOVARTIS-USAO-0159498, March 2005.

[200] NOVARTIS-USAO-0159502, May 2007; NOVARTIS-USAO-0159505, January 2008.

[201] NOVARTIS-USAO-0159511, September 29, 2016.

fact is a violation of state and federal laws, and any person who falsifies or conceals a material fact may be subject to criminal prosecution."

"J. i. The Provider certifies and warrants that no gratuities, kickbacks or contingency fees were paid in connection with this Agreement, nor were any fees, commissions, gifts, or other considerations made contingent upon the signing of this Agreement."

Wyoming EqualityCare Provider Participation Agreement pages 1-3.[202]

A later version of the document similarly required a provider to agree to the following:

"5. A. Comply with applicable state and federal law, including: the Social Security Act (42 U.S.C. § 1396 et seq.); the Wyoming Medical Assistance and Service Act (Wyo. Stat. § 42-4-101 et seq.); the regulations of the Centers for Medicare & Medicaid Services (CMS); the United States Department of Health and Human Services (HHS) (42 CFR Subchapter C); section 6032 of the Deficit Reduction Act of 2005 (Employee Education About False Claims Recovery); and the Wyoming Department of Health (WDH) Wyoming Medicaid Rules and policies."

"6. A.  Medicaid reimbursement is from state and federal funds and that any falsification of claims, statements or documents, or any concealment of material fact is a violation of state and federal laws, and any person who falsifies or conceals a material fact may be subject to criminal prosecution."

"J. i. The Provider certifies and warrants that no gratuities, kickbacks or contingency fees were paid in connection with this Agreement, nor were any fees, commissions, gifts, or other considerations made contingent upon the signing of this Agreement."

Wyoming Medicaid Provider Participation Agreement pages 1-3.[203]

Another version of the document similarly required a provider to agree to the following:

"3. I am familiar with and agree to abide by the State/Federal laws, regulations, and program instructions that apply to my provider type. … I understand that payment of a claim by State/Federal health care program is conditioned on the claim and the underlying transaction complying with such laws, regulations and

---

[202]NOVARTIS-USAO-0137160-62, January 2007; NOVARTIS-USAO-0159522-25, April 2010; NOVARTIS-USAO-0137156-59, October 2012.

[203]NOVARTIS-USAO-0137156-58, October 2010; NOVARTIS-USAO-0178388-90, signed October 25,2010, Humana Pharmacy Inc. Note there are slight, insignificant wording differences between the cited documents.

program instructions (including the anti-kickback statute and the Stark law) and on a provider being in compliance with any applicable conditions of participation in any federal health care program."

Provider Enrollment Certification.[204]

Notably, the Point of Sale Agreement for billing electronically required providers to certify that:

"3. The provider shall safeguard Federal/State Programs against abuse in its utilization of claims entry through P.O.S."

Point of Sale Agreement.[205]

Further, a representative of Wyoming, confirmed in an e-mail that the documents received from Wyoming "represent all iterations of the agreements that Wyoming entered into with physicians and pharmacies during the period January 2002 through December 2011."[206]

Because the AKS is a federal statute applicable to Medicaid, by certifying they will comply with such law, Providers certified that they will comply with the AKS.

## IV.    CONCLUSION

Based on my decades of experience with the Medicaid program and the materials I reviewed for purposes of this case, at all times relevant to this case, each State had a State provider agreement requiring providers to agree to follow federal law, which includes the AKS. This conclusion is logical as federal law is fundamental to the Program. Indeed, federal law provides the foundation for how the Medicaid Program operates in each State, including how physicians, other prescribers, and pharmacies interact with the Program. As each State is responsible to operate its Medicaid Program in accordance with federal law, States must ensure and pass along to providers the requirement that they operate and comply with federal law, including the AKS. Since each State administers its own program, it is not surprising that the actual words used for the State provider agreements vary from State to State and over time, but they all include operative language whereby providers represent that they will comply with federal law.

In sum, at all times relevant to this case, it has been a requirement of each State that all providers participating in the Medicaid Program comply with all federal requirements applicable to the Program, including the AKS, as a condition of their participation in and payment under the

---

[204] NOVARTIS-USAO-0178387, signed October 25, 2010, Humana Pharmacy Inc.

[205] NOVARTIS-USAO-0178392, signed October 25, 2010, Humana Pharmacy Inc.

[206] NOVARTIS-USA0-0182565, November 22, 2016.

Program.  This requirement is reflected in the State provider agreements and other documents I reviewed and cited herein.

## V.    DATA AND INFORMATION CONSIDERED IN FORMING MY OPINIONS

In preparing my opinions, I reviewed and considered the extensive documents provided by the States reflecting their provider agreements and related documents.  Those documents and other materials that I considered in forming my opinions are cited in the footnotes in this report.  In addition to the documents cited in the footnotes of this Report, I also considered the statutes attached as Exhibits A and B to this Report, a few additional emails received from the States that are being produced with this Report, as well as the State of California's Medicaid state plan, and in particular those sections of the plan related to the provider agreement.[207]

## VI.    EXHIBITS THAT WILL BE USED TO SUMMARIZE OR SUPPORT THEM

The documents and other sources of information identified in my Report may be used as exhibits or to create summary exhibits that will be used to summarize and support my opinions.

## VII.    PUBLICATIONS AUTHORED IN THE PREVIOUS TEN YEARS

I have prepared, either as the author or coauthor, the following papers for publication either in journals or to be presented on the Internet:

- "States' Need for Economic Relief for Medicaid, February 2009", Author, Policy & Practice (19426828); Feb 2009, Vol. 67, Issue 1, p. 20

- "Care Coordination for California's Children and Youth with Special Health Care Needs: Building Blocks from other States, June 26, 2014", Coauthor, http://lpfch-cshcn.org/publications/research-reports/care-coordination-for-californias-children-and-youth-with-special-health-care-needs-building-blocks-from-other-states/

- "Transitioning the California Children's Services Program to a New System of Care: Stakeholder Issues and Considerations", May 14, 2014, Coauthor, http://lpfch-cshcn.org/publications/research-reports/transitioning-the-california-childrens-services-program-to-a-new-system-of-care-stakeholder-issues-and-considerations/

- "Financing County Medi-Cal Eligibility and Enrollment in California", July 2012, Coauthor, http://www.chcf.org/publications/2012/07/financing-county-medical#ixzz36Kq0sZQO

---

[207] Section 4.13, Required Provider Agreement, http://www.dhcs.ca.gov/formsandpubs/laws/Documents/StatePlan%20Section%204.13.pdf.

- "Financing Medi-Cal's Future: The Growing Role of Health Care-Related Provider Fees and Taxes", April 28, 2012, Coauthor, http://www.chcf.org/~/media/Files/PDF/M/MediCalProviderFees.pdf

- "The Promise and Potential of Medicaid Managed Care", February 2012, Coauthor, http://www.thinkwellpoint.com/insights/promise-and-potential-medicaid-managed-care

- "Medicaid Section 1115 Demonstration Waivers: Comparing California, Massachusetts, and New York, October 2009", Coauthor, www.chcf.org/publications/2009/10/medicaid-section-1115-demonstration-waivers-comparing-california-massachusetts-and-new-york#ixzz36KygeGDk

- "Considerations for Redesign of the California Children's Services (CCS) Program", September 2009, Author, www.dhcs.ca.gov/provgovpart/Documents/Waiver%20Renewal/Considerations%20for%20Redesign%20of%20the%20CCS%20Program.pdf

- "Medicaid and State Budgets, for National Governor's Association", September 1, 2010, Author, http://www.nga.org/files/live/sites/NGA/files/pdf/1008BUDGETCALLROSENSTEIN.PDF

- "Medicaid's Continuing Crunch in a Recession", February, 2010, Coauthor, for Kaiser Family Foundation, no longer on the Kaiser Family Foundation web site

- "Assessing Opportunities for Health Homes in California", October 2011, Coauthor, for Department of Health Care Services, no longer on Department's web site

I also wrote a health care related Letter to the Editor, in my private capacity, entitled "Start-up Problems at the Health Exchanges" that was published in the New York Times on October 16, 2013.

**VIII.    CASES DURING THE PREVIOUS FOUR YEARS, IN WHICH I HAVE TESTIFIED AS AN EXPERT AT TRIAL OR DEPOSITION**

I served as an expert witness and was deposed in the following cases:

Mary-Ellen Hardin v. Community Dental Services, Inc., Orange County Superior Court, deposition on July 20, 2011.

United States ex rel. Trinh v. North East Medical Systems, Civil No. 10-1904 CW (N.D. Cal.), deposition on August 6, 2014.

U.S. ex rel. Kester v. Novartis Pharmaceuticals Corporation, 11 Civ. 8196 (CM), deposition on July 16, 2015.

Children's Hospital Central California v. Blue Cross of California, Et Al, Madera County Superior Court, deposition on February 17, 2016

Sutter Health v. Celtic Insurance Company, dba California Health and Wellness Plan, Judicial Arbitration and Mediation Services Arbitration, JAMS Reference No. 1130006642, June 23, 2017.

Case Number:  13-0430, Pomona Valley Hospital Medical Center, Provider No. 05-0231, Department of Health and Human Services, Provider Reimbursement Review Board, August 17, 2017.

**COMPENSATION**

The compensation to Health Management Associates for this Report and the testimony of Mr. Rosenstein is based on an hourly rate of $450, and lower rates for other staff performing support activities.  Our compensation is not contingent on my findings/opinions or on the result of this proceeding.  No final billing has been submitted as of the time this report was provided to the Defendant.

**RESERVATION**

I reserve the right to revise my findings/opinions should additional information become available to me prior to trial.

Sincerely,

Stan Rosenstein
Principal Advisor

# STAN ROSENSTEIN

Principal Advisor, Consultant

Education

      Masters of Public Administration - University of Southern California,

      Bachelor of General Studies - University of Iowa

Professional History

Principal Advisor, January 2009 to Present

      Mr. Rosenstein specializes in Medicaid Programs and other public sector health care financing and purchasing and is a subcontractor to Health Management Associates.  He provides excellent research and consulting services on health care financing and delivery systems, health care purchasing, Medicare dual coverage, long term care, managed care, health care reform, and national and California health care policy.  Mr. Rosenstein also has significant experience in the Medicaid intergovernmental transfer programs including managed care.

CALIFORNIA DEPARTMENT OF HEALTH CARE SERVICES, DIRECTOR'S OFFICE, July 1, 2007 to December 22, 2008

      Chief Deputy Director, Health Care Programs. Responsible for management of all health care programs in the Department of Health Care Services including the Medi-Cal program (California's Medicaid Program), Children's Medical Services, and Primary Care and Rural Health.  These programs provide medical care to over 10 million Californians operating through both the Medi-Cal fee-for-service and managed care programs, providing care to children with qualifying conditions through the California Children's Program, and operating a number of other programs designed to improve the health of Californians and to support the State's health care safety net.  Served as the California Medicaid Director and the lead representative of the State for Medi-Cal.

CALIFORNIA DEPARTMENT OF HEALTH SERVICES, MEDICAL CARE SERVCIES, October 1996 to June 30, 2007
**Deputy Director:**  May 2003 to June 2007
**Assistant Deputy Director:**  October 1996 to May 2003
**Acting Deputy Director:**  November 1999 to July 2000 and February 2003 to May 2003

1

Stan Rosenstein

Responsible for management of the Medi-Cal program that provides health care services to 6.7 million Californians each month.  Responsibilities include: financing over $37 billion dollars of health care services in the State, oversight and management of both the fee-for-service and managed care delivery systems; management of the Medi-Cal program staff which includes approximately 1,700 state staff, with an operating budget of more than $200 million and over 1,200 contract staff; policy development and program administration; implementation of initiatives to improve the delivery of health care to Californians; development and review of proposals to modify health care financing; extensive State budget and legislative work including providing numerous hours of Legislative testimony; extensive federal legislative and regulatory experience; implementation of major healthcare systems; and extensive work with various health care constituency groups.  For nearly five years of this time, served as the California Medicaid Director and the lead representative of the State.

CALIFORNIA DEPARTMENT OF HEALTH SERVICES, PAYMENT SYSTEMS DIVISION, February 1993 to October 1996

Division Chief responsible for the management and establishment of policy for the California Medicaid Management Information Systems and the Medi-Cal third party liability collection and cost avoidance program.  Responsibilities include: managing and enhancing the Medi-Cal claims processing contracts and systems; paying fee-for-service Medi-Cal and other health program providers; enrolling providers into the Medi-Cal program and performing provider relations; managing the Medi-Cal dental program; and managing of the third party liability program.

CALIFORNIA DEPARTMENT OF HEALTH SERVICES, MEDI-CAL PROCUREMENT PROJECT, April 1986 to July 1993

Executive Project Director responsible for conducting large scale procurements and managing a branch responsible for the Medi-Cal claims processing system. Responsibilities include: managing the procurement of several large scale contracts for the Medi-Cal program; implementing Medi-Cal policy in the fee-for-service program; developing and implementing system enhancements in the Medi-Cal program; and the successful transition of Medi-Cal claims processing responsibility to a new contractor.

CALIFORNIA DEPARTMENT OF HEALTH SERVICES, SECTION CHIEF-VARIOUS SECTIONS,  September 1985 to April 1986 and November 1983 to April 1985

As Section Chief managed various sections in the Medi-Cal program.

SELECTED INVOLVEMENT & APPOINTMENTS

Former-National Association of State Medicaid Directors, Vice Chair and member of the Executive Committee.

2

Stan Rosenstein

Numerous presentations and testimony at California State Legislature and with Congressional staff

Invited Speaker at numerous state and national conferences and quoted in newspapers numerous times

3

Stan Rosenstein

# EXHIBIT A

## *2004 Regs., Conn. State Agencies § 17b-262-526*

2004 Connecticut Administrative Code Archive

***REGULATIONS OF CONNECTICUT STATE AGENCIES   > TITLE 17B SOCIAL SERVICES >
DEPARTMENT OF SOCIAL SERVICES  >  REQUIREMENTS FOR PROVIDER ENROLLMENT IN THE
CONNECTICUT MEDICAL ASSISTANCE PROGRAM***

## Notice

**Deleted:** ~~Red text with a strikethrough~~

## Sec. 17b-262-526. General provider requirements

To maintain enrollment in the Connecticut Medical Assistance Program, a provider shall abide by all federal and state statutes regulations and operational procedures promulgated by the department which govern the Medical Assistance Program and shall:

**(1)** abstain from discriminating or permitting discrimination against any person or group of persons on the basis of race, color, religious creed, age, marital status, national origin, sex, mental or physical disability, or sexual orientation pursuant to ~~Title 45 of the Code of Federal Regulations (CFR), Part 80, sections 80.3 and 80.4~~ *45 CFR 80.3* and *45 CFR 80.4*;

**(2)** accept as payment in full either the department's payment or a combination of department, third party payment, and any authorized client copayment which is no more than the department's schedule of payment, except with regard to the department's obligations for payment of Medicare coinsurance and deductibles;

**(3)** agree to pursue and exhaust all of a client's third party resources prior to submitting claims to the department for payment; to report any and all third party payments; to acknowledge the department as the ~~payor~~ payer of last resort; and to assist in identifying other possible sources of third party liability for which a legal obligation for payment of all or part of the Medical Assistance Program goods or services furnished exists;

**(4)** be qualified to furnish Medical Assistance Program goods or services; be currently certified and enrolled in the Medicare program if required by any federal or state statutes or regulations which govern the Medical Assistance Program goods or services furnished by a provider under the provider's assigned type and specialty;

**(5)** meet and adhere to all applicable licensing, accreditation, and certification requirements and all applicable state and local zoning and safety requirements pertaining to the provider's assigned type and specialty in the jurisdiction where the Medical Assistance Program goods or services are furnished;

**(6)** meet and adhere to any additional department requirements, after enrollment, promulgated in conformance with federal and state statutes, regulations and operational procedures which govern the provider's assigned provider type and specialty;

**(7)** maintain a specific record for each client eligible for Medical Assistance Program payment including, but not limited to: name; address; birth date; Medical Assistance Program identification number; pertinent diagnostic information and x-rays; current and all prior treatment plans prepared by the provider;

Case 1:11-cv-00071-PGG   Document 237-105   Filed 08/31/18   Page 93 of 312

Page 2 of 2

2004 Regs., Conn. State Agencies § 17b-262-526

pertinent treatment notes signed by the provider; documentation of the dates of service; and other requirements as provided by federal and state statutes and regulations pursuant to *42 CFR 482.61*, and, to the extent such requirements apply to a provider's licensure category, record requirements set forth in chapter iv of the Connecticut Public Health Code (sections 19-13-D1 to 19-13-D105 of the Regulations of Connecticut State Agencies). Such records and information shall be made available to the department upon request;

**(8)** maintain all required documentation for at least five years or longer as required by state or federal law or regulation in the provider's file subject to review by authorized department personnel. In the event of a dispute concerning goods or services provided, documentation shall be maintained until the end of the dispute, for five years, or the length of time required by state or federal law or regulation, whichever is greatest. Failure to maintain and provide all required documentation to the department upon request shall result in the disallowance and recovery by the department of any future or past payments made to the provider for which the required documentation is not maintained and not provided to the department upon request, as permitted by state and federal law;

**(9)** notify the department in writing of all substantial changes in information which were provided on the application submitted to the department for provider enrollment or reenrollment in the Medical Assistance Program;

**(10)** disclose, in accordance with *42 CFR 455.106*, any information requested by the department regarding the identity of any person who has ownership or a controlling interest in the provider's business who has been convicted of a criminal offense related to that person's involvement in Medicare or the Medical Assistance Program;

**(11)** furnish all information relating to the provider's business ownership, as well as transactions with subcontractors, in accordance with federal and state statutes and regulations;

**(12)** not deny goods or services to a client solely on the basis of the client's inability to meet a copayment; and

**(13)** agree to participate in studies of access, quality and outcome conducted by the department or its agents. The department shall reimburse providers for costs above and beyond nominal costs incurred by such participation.

# History

New section, published in Conn. Law Journal, April 13, 1999, effective February 8, 1999; amendment published in Conn. Law Journal September 16, 2003, effective July 29, 2003

REGULATIONS OF CONNECTICUT STATE AGENCIES

**End of Document**

West's Florida Statutes Annotated
   Title XXX. Social Welfare (Chapters 409-434)
      Chapter 409. Social and Economic Assistance (Refs & Annos)

This section has been updated. Click here for the updated version.

West's F.S.A. § 409.907

409.907. Medicaid provider agreements

Effective: December 17, 2001 to June 6, 2002

The agency may make payments for medical assistance and related services rendered to Medicaid recipients only to an individual or entity who has a provider agreement in effect with the agency, who is performing services or supplying goods in accordance with federal, state, and local law, and who agrees that no person shall, on the grounds of handicap, race, color, or national origin, or for any other reason, be subjected to discrimination under any program or activity for which the provider receives payment from the agency.

(1) Each provider agreement shall require the provider to comply fully with all state and federal laws pertaining to the Medicaid program, as well as all federal, state, and local laws pertaining to licensure, if required, and the practice of any of the healing arts, and shall require the provider to provide services or goods of not less than the scope and quality it provides to the general public.

(2) Each provider agreement shall be a voluntary contract between the agency and the provider, in which the provider agrees to comply with all laws and rules pertaining to the Medicaid program when furnishing a service or goods to a Medicaid recipient and the agency agrees to pay a sum, determined by fee schedule, payment methodology, or other manner, for the service or goods provided to the Medicaid recipient. Each provider agreement shall be effective for a stipulated period of time, shall be terminable by either party after reasonable notice, and shall be renewable by mutual agreement.

(3) The provider agreement developed by the agency, in addition to the requirements specified in subsections (1) and (2), shall require the provider to:

(a) Have in its possession at the time of signing the provider agreement, and maintain in good standing throughout the period of the agreement's effectiveness, a valid professional or facility license pertinent to the services or goods being provided, as required by the state or locality in which the provider is located, and the Federal Government, if applicable.

(b) Maintain in a systematic and orderly manner all medical and Medicaid-related records that the agency requires and determines are relevant to the services or goods being provided.

(c) Retain all medical and Medicaid-related records for a period of 5 years to satisfy all necessary inquiries by the agency.

(d) Safeguard the use and disclosure of information pertaining to current or former Medicaid recipients and comply with all state and federal laws pertaining to confidentiality of patient information.

(e) Permit the agency, the Attorney General, the Federal Government, and the authorized agents of each of these entities access to all Medicaid-related information, which may be in the form of records, logs, documents, or computer files, and

Case 1:11-cv-00071-PGG   Document 237-105   Filed 08/31/18   Page 95 of 312

other information pertaining to services or goods billed to the Medicaid program, including access to all patient records and other provider information if the provider cannot easily separate records for Medicaid patients from other records.

(f) Bill other insurers and third parties, including the Medicare program, before billing the Medicaid program, if the recipient is eligible for payment for health care or related services from another insurer or person, and comply with all other state and federal requirements in this regard.

(g) Promptly report any moneys received in error or in excess of the amount to which the provider is entitled from the Medicaid program, and promptly refund such moneys to the agency.

(h) Be liable for and indemnify, defend, and hold the agency harmless from all claims, suits, judgments, or damages, including court costs and attorney's fees, arising out of the negligence or omissions of the provider in the course of providing services to a recipient or a person believed to be a recipient.

(i) At the option of the agency, provide proof of liability insurance and maintain such insurance in effect for any period during which services or goods are furnished to Medicaid recipients.

(j) Accept Medicaid payment as payment in full, and prohibit the provider from billing or collecting from the recipient or the recipient's responsible party any additional amount except, and only to the extent the agency permits or requires, copayments, coinsurance, or deductibles to be paid by the recipient for the services or goods provided. The Medicaid payment-in-full policy does not apply to services or goods provided to a recipient if the services or goods are not covered by the Medicaid program.

(4) A provider agreement shall provide that, if the provider sells or transfers a business interest or practice that substantially constitutes the entity named as the provider in the provider agreement, or sells or transfers a facility that is of substantial importance to the entity named as the provider in the provider agreement, the provider is required to maintain and make available to the agency Medicaid-related records that relate to the sale or transfer of the business interest, practice, or facility in the same manner as though the sale or transaction had not taken place, unless the provider enters into an agreement with the purchaser of the business interest, practice, or facility to fulfill this requirement.

(5) The agency:

(a) Is required to make timely payment at the established rate for services or goods furnished to a recipient by the provider upon receipt of a properly completed claim form. The claim form shall require certification that the services or goods have been completely furnished to the recipient and that, with the exception of those services or goods specified by the agency, the amount billed does not exceed the provider's usual and customary charge for the same services or goods.

(b) Is prohibited from demanding repayment from the provider in any instance in which the Medicaid overpayment is attributable to error of the department [1] in the determination of eligibility of a recipient.

(c) May adopt, and include in the provider agreement, such other requirements and stipulations on either party as the agency finds necessary to properly and efficiently administer the Medicaid program.

(6) A Medicaid provider agreement may be revoked, at the option of the agency, as the result of a change of ownership of any facility, association, partnership, or other entity named as the provider in the provider agreement. A provider shall give the agency 60 days' notice before making any change in ownership of the entity named in the provider agreement as the provider.

(7) The agency may require, as a condition of participating in the Medicaid program and before entering into the provider agreement, that the provider submit information, in an initial and any required renewal applications, concerning the professional, business, and personal background of the provider and permit an onsite inspection of the provider's service location by agency staff or other personnel designated by the agency to perform this function. As a continuing condition of participation in the Medicaid program, a provider shall immediately notify the agency of any current or pending bankruptcy filing. Before entering into the provider agreement, or as a condition of continuing participation in the Medicaid program, the agency may also require that Medicaid providers reimbursed on a fee-for-services basis or fee schedule basis which is not cost-based, post a surety bond not to exceed $50,000 or the total amount billed by the provider to the program during the current or most recent calendar year, whichever is greater. For new providers, the amount of the surety bond shall be determined by the agency based on the provider's estimate of its first year's billing. If the provider's billing during the first year exceeds the bond amount, the agency may require the provider to acquire an additional bond equal to the actual billing level of the provider. A provider's bond shall not exceed $50,000 if a physician or group of physicians licensed under chapter 458, chapter 459, or chapter 460 has a 50 percent or greater ownership interest in the provider or if the provider is an assisted living facility licensed under part III of chapter 400. The bonds permitted by this section are in addition to the bonds referenced in s. 400.179(4)(d)[2]. If the provider is a corporation, partnership, association, or other entity, the agency may require the provider to submit information concerning the background of that entity and of any principal of the entity, including any partner or shareholder having an ownership interest in the entity equal to 5 percent or greater, and any treating provider who participates in or intends to participate in Medicaid through the entity. The information must include:

(a) Proof of holding a valid license or operating certificate, as applicable, if required by the state or local jurisdiction in which the provider is located or if required by the Federal Government.

(b) Information concerning any prior violation, fine, suspension, termination, or other administrative action taken under the Medicaid laws, rules, or regulations of this state or of any other state or the Federal Government; any prior violation of the laws, rules, or regulations relating to the Medicare program; any prior violation of the rules or regulations of any other public or private insurer; and any prior violation of the laws, rules, or regulations of any regulatory body of this or any other state.

(c) Full and accurate disclosure of any financial or ownership interest that the provider, or any principal, partner, or major shareholder thereof, may hold in any other Medicaid provider or health care related entity or any other entity that is licensed by the state to provide health or residential care and treatment to persons.

(d) If a group provider, identification of all members of the group and attestation that all members of the group are enrolled in or have applied to enroll in the Medicaid program.

(8)(a) Each provider, or each principal of the provider if the provider is a corporation, partnership, association, or other entity, seeking to participate in the Medicaid program must submit a complete set of his or her fingerprints to the agency for the purpose of conducting a criminal history record check. Principals of the provider include any officer, director, billing agent, managing employee, or affiliated person, or any partner or shareholder who has an ownership interest equal to 5 percent or more in the provider. However, a director of a not-for-profit corporation or organization is not a principal for purposes of a background investigation as required by this section if the director: serves solely in a voluntary capacity for the corporation or organization, does not regularly take part in the day-to-day operational decisions of the corporation or organization, receives no remuneration from the not-for-profit corporation or organization for his or her service on the board of directors, has no financial interest in the not-for-profit corporation or organization, and has no family members with a financial interest in the not-for-profit corporation or organization; and if the director submits an affidavit, under penalty of perjury, to this effect to the agency and the not-for-profit corporation or organization submits an affidavit, under penalty of perjury, to this effect to the agency as part of the corporation's or organization's

Medicaid provider agreement application. Notwithstanding the above, the agency may require a background check for any person reasonably suspected by the agency to have been convicted of a crime. This subsection shall not apply to:

1. A hospital licensed under chapter 395;

2. A nursing home licensed under chapter 400;

3. A hospice licensed under chapter 400;

4. An assisted living facility licensed under chapter 400.

5. A unit of local government, except that requirements of this subsection apply to nongovernmental providers and entities when contracting with the local government to provide Medicaid services. The actual cost of the state and national criminal history record checks must be borne by the nongovernmental provider or entity; or

6. Any business that derives more than 50 percent of its revenue from the sale of goods to the final consumer, and the business or its controlling parent either is required to file a form 10-K or other similar statement with the Securities and Exchange Commission or has a net worth of $50 million or more.

(b) The agency shall submit the fingerprints to the Department of Law Enforcement. The department shall conduct a state criminal-background investigation and forward the fingerprints to the Federal Bureau of Investigation for a national criminal-history record check. The cost of the state and national criminal record check shall be borne by the provider.

(c) The agency may permit a provider to participate in the Medicaid program pending the results of the criminal record check. However, such permission is fully revocable if the record check reveals any crime-related history as provided in subsection (10).

(d) Proof of compliance with the requirements of level 2 screening under s. 435.04 conducted within 12 months prior to the date that the Medicaid provider application is submitted to the agency shall fulfill the requirements of this subsection. Proof of compliance with the requirements of level 1 screening under s. 435.03 conducted within 12 months prior to the date that the Medicaid provider application is submitted to the agency shall meet the requirement that the Department of Law Enforcement conduct a state criminal history record check.

(9) Upon receipt of a completed, signed, and dated application, and completion of any necessary background investigation and criminal history record check, the agency must either:

(a) Enroll the applicant as a Medicaid provider no earlier than the effective date of the approval of the provider application; or

(b) Deny the application if the agency finds that it is in the best interest of the Medicaid program to do so. The agency may consider the factors listed in subsection (10), as well as any other factor that could affect the effective and efficient administration of the program, including, but not limited to, the current availability of medical care, services, or supplies to recipients, taking into account geographic location and reasonable travel time; the number of providers of the same type already enrolled in the same geographic area; and the credentials, experience, success, and patient outcomes of the provider for the services that it is making application to provide in the Medicaid program.

(10) The agency may consider whether the provider, or any officer, director, agent, managing employee, or affiliated person, or any partner or shareholder having an ownership interest equal to 5 percent or greater in the provider if the provider is a corporation, partnership, or other business entity, has:

(a) Made a false representation or omission of any material fact in making the application, including the submission of an application that conceals the controlling or ownership interest of any officer, director, agent, managing employee, affiliated person, or partner or shareholder who may not be eligible to participate;

(b) Been or is currently excluded, suspended, terminated from, or has involuntarily withdrawn from participation in, Florida's Medicaid program or any other state's Medicaid program, or from participation in any other governmental or private health care or health insurance program;

(c) Been convicted of a criminal offense relating to the delivery of any goods or services under Medicaid or Medicare or any other public or private health care or health insurance program including the performance of management or administrative services relating to the delivery of goods or services under any such program;

(d) Been convicted under federal or state law of a criminal offense related to the neglect or abuse of a patient in connection with the delivery of any health care goods or services;

(e) Been convicted under federal or state law of a criminal offense relating to the unlawful manufacture, distribution, prescription, or dispensing of a controlled substance;

(f) Been convicted of any criminal offense relating to fraud, theft, embezzlement, breach of fiduciary responsibility, or other financial misconduct;

(g) Been convicted under federal or state law of a crime punishable by imprisonment of a year or more which involves moral turpitude;

(h) Been convicted in connection with the interference or obstruction of any investigation into any criminal offense listed in this subsection;

(i) Been found to have violated federal or state laws, rules, or regulations governing Florida's Medicaid program or any other state's Medicaid program, the Medicare program, or any other publicly funded federal or state health care or health insurance program, and been sanctioned accordingly;

(j) Been previously found by a licensing, certifying, or professional standards board or agency to have violated the standards or conditions relating to licensure or certification or the quality of services provided; or

(k) Failed to pay any fine or overpayment properly assessed under the Medicaid program in which no appeal is pending or after resolution of the proceeding by stipulation or agreement, unless the agency has issued a specific letter of forgiveness or has approved a repayment schedule to which the provider agrees to adhere.

(11) Before signing a provider agreement and at the discretion of the agency, other provisions of this section notwithstanding, an entity may become eligible to receive payment from the Medicaid program at the time it first furnishes services or goods, if:

(a) The services or goods provided are otherwise compensable;

(b) The entity meets all other requirements of a Medicaid provider at the time the services or goods were provided; and

(c) The entity agrees to abide by the provisions of the provider agreement effective from the date the services or goods were provided.

**Credits**

Amended by Laws 2000, c. 2000-163, § 16, eff. July 1, 2000; Laws 2000, c. 2000-256, § 53, eff. July 1, 2000; Laws 2001, c. 2001-377, § 6, eff. Dec. 17, 2001.

Footnotes

1     As amended by Laws 1996, c. 96-417, § 5. The amendment by Laws 1996, c. 96-387, § 2, uses the words "agency error" instead of the words "error of the department".

2     The reference to FSA § 400.179(4)(d) may have been intended to be to FSA § 400.179(5)(d)(4).

West's F. S. A. § 409.907, FL ST § 409.907

Current with chapters from the 2017 First Regular Session of the 25th Legislature in effect through July 7, 2017

**End of Document**        © 2017 Thomson Reuters. No claim to original U.S. Government Works.

## *2004 89 Ill. Adm. Code 140.12*

2004 Illinois Administrative Code Archive

**ILLINOIS ADMINISTRATIVE CODE   >   TITLE 89. SOCIAL SERVICES   >   CHAPTER I. DEPARTMENT OF PUBLIC AID  >  SUBCHAPTER d. MEDICAL PROGRAMS  >  PART 140. MEDICAL PAYMENT  >  SUBPART B. MEDICAL PROVIDER PARTICIPATION**

# § 140.12 Participation Requirements for Medical Providers

The provider shall agree to:

**a)** Verify eligibility of recipients prior to providing each service;

**b)** Allow recipients the choice of accepting or rejecting medical or surgical care or treatment;

**c)** Provide supplies and services in full compliance with all applicable provisions of State and federal laws and regulations pertaining to nondiscrimination and equal employment opportunity including but not limited to:

    **1)** Full compliance with Title VI of the Civil Rights Act of 1964, which prohibits discrimination on the basis of race, color or national origin;

    **2)** Full compliance with Section 504 of the Rehabilitation Act of 1973 and 45 CFR 84, which prohibit discrimination on the basis of handicap; and

    **3)** Without discrimination on the basis of religious belief, political affiliation, sex, age or disability;

**d)** Comply with the requirements of applicable federal and State laws and not engage in practices prohibited by such laws;

**e)** Hold confidential, and use for authorized program purposes only, all Medical Assistance information regarding recipients;

**f)** Furnish to the Department, in the form and manner requested by it, any information it requests regarding payments for providing goods or services, or in connection with the rendering of goods or services or supplies to recipients by the provider, his agent, employer or employee;

**g)** Make charges for the provision of services and supplies to recipients in amounts not to exceed the provider's usual and customary charges and in the same quality and mode of delivery as are provided to the general public;

**h)** Accept as payment in full the amounts established by the Department.

    **1)** If a provider accepts an individual eligible for medical assistance from the Department as a Medicaid recipient, such provider shall not bill, demand or otherwise seek reimbursement from that individual or from a financially responsible relative or representative of the individual for any service for which reimbursement would have been available from the Department if the provider had timely and properly billed the Department. For purposes of this subsection, "accepts" shall be deemed to include:

        **A)** an affirmative representation to an individual that payment for services will be sought from the Department;

        **B)** an individual presents the provider with his or her medical card and the provider does not indicate that other payment arrangements will be necessary; or

**C)** billing the Department for the covered medical service provided an eligible individual.

**2)** If an eligible individual is entitled to medical assistance with respect to a service for which a third party is liable for payment, the provider furnishing the service may not seek to collect from the individual payment for that service if the total liability of the third party for that service is at least equal to the amount payable for that service by the Department.

**i)** Accept assignment of Medicare benefits for public aid recipients eligible for Medicare, when payment for services to such persons is sought from the Department;

**j)** Complete an MCH (Maternal and Child Health) Primary Care Provider Agreement in order to participate in the Maternal and Child Health Program (see Section 140.924(a)(1)(D)); and

**k)** In the case of long term care providers, assume liability for repayment to the Department of any overpayment made to a facility regardless of whether the overpayment was incurred by a current owner or operator or by a previous owner or operator. Liability of current and previous providers to the Department shall be joint and several. Recoveries by the Department under this Section may be made pursuant to Sections 140.15 and 140.25. A current or previous owner or lessee may request from the department a list of all known outstanding liabilities due the Department by the facility and of any known pending Department actions against a facility that may result in further liability. For purposes of this Section,

"overpayment" shall include, but not be limited to:

**1)** Amounts established by final administrative decisions pursuant to *89 Ill. Adm. Code 104*;

**2)** Overpayments resulting from advance C-13 payments made pursuant to Section 140.71

**3)** Liabilities resulting from nonpayment or delinquent payment of assessments pursuant to Sections 140.82, 140.84 and 140.94; and

**4)** Amounts identified during past, pending or future audits that pertain to audit periods prior to a change in ownership and are conducted pursuant to Sections 140.30 and 140.590. Liability of current owners or operators for amounts identified during such audits shall be as follows:

**A)** For past audits (audits completed before changes in ownership), liability shall be the amount established by final administrative decision.

**B)** For pending audits (audits initiated, but not completed, prior to the change in ownership), liability shall be limited to the lesser of the amounts established by final administrative decision or two months of service revenue. Two months of service revenue is defined as the most recent two months of Medicaid patient days multiplied by the total Medicaid rate in effect on the date the new owner or operator is enrolled in the Program as a provider by the Department. The Medicaid rate in effect on the date of enrollment shall be used even if that rate is subsequently changed.

**C)** For future audits (audits initiated after the change in ownership but pertaining to an audit period prior to a change in ownership), liability shall be limited as described in subsection (k)(4)(B) of this Section.

# History

**SOURCE:**

Amended at 18 Ill. Reg. 3620, effective February 28, 1994.

Amended at 19 Ill. Reg. 7919, effective June 5, 1995.

Editorial correction August 18, 1995.

2004 89 Ill. Adm. Code 140.12

Amended at 22 Ill. Reg. 7024, effective April 1, 1998.

Amended at 24 Ill. Reg. 18320, effective December 1, 2000.

ILLINOIS ADMINISTRATIVE CODE

**End of Document**

## *2004 K.A.R. § 30-5-59*

2004 Kansas Administrative Code Archive

*KANSAS ADMINISTRATIVE REGULATIONS   >  AGENCY 30 DEPARTMENT OF SOCIAL AND REHABILITATION SERVICES >  ARTICLE 5. PROVIDER PARTICIPATION, SCOPE OF SERVICES, AND REIMBURSEMENTS FOR THE MEDICAID (MEDICAL ASSISTANCE) PROGRAM*

# 30-5-59. Provider participation requirements.

The following shall be prerequisites for participation in and payment from the medicaid/medikan program. Any provider of services to foster care consumers, adoption support consumers, Kan Be Healthy consumers, or other consumers who have special needs may be excluded from these prerequisites if the secretary determines that a medically necessary item of durable medical equipment or a medically necessary service can be cost-efficiently obtained only from a provider not otherwise eligible to be enrolled within the current program guidelines. (a) Enrollment. Each participating provider shall perform the following:

**(1)** Submit an application for participation in the medicaid/medikan program on forms prescribed by the secretary of the Kansas department of social and rehabilitation services;

**(2)** obtain and maintain professional or department-specified credentials determined by the secretary in the jurisdiction where the service is provided and for the time period when the service is provided and, if applicable, be certified, licensed, or registered by the appropriate professional credentialing authority;

**(3)** notify the Kansas department of social and rehabilitation services if any of the original information provided on the application changes during the term of participation in the medicaid/medikan program;

**(4)** after completing the necessary application forms and receiving notice of approval to participate from the department, enter into and keep a provider agreement with the Kansas department of social and rehabilitation services;

**(5)** notify the Kansas department of social and rehabilitation services when a change of provider ownership occurs, submit new ownership information on forms for application for participation in the medicaid/medikan program, and receive approval from the department for participation as a new provider before reimbursement for services rendered to medicaid/medikan program consumers is made;

**(6)** locate a consumer service representative who is available 24 hours per day and a business in Kansas or a border city that is accessible, in accordance with the applicable Americans with disabilities act guidelines, to the general public between the hours of 9:00 a.m. and 5:00 p.m. at a minimum, excluding weekends and state and federal holidays, if applying to be a durable medical equipment or medical supply provider. Any pharmacy located in Kansas or a border city that has a medical provider number may enroll as a durable medical equipment provider even if no storefront is present; and

**(7)** be located in Kansas or a border city if applying to be a pharmacy, unless the pharmacy is providing services to children in the custody of the secretary of the Kansas department of social and rehabilitation services or to program cunsumers in emergency situations. The only exceptions to this requirement shall be the following:

**(A)** A pharmacy that is an approved contractor with the Kansas department of health and environment as a supplier of intravenous blood fraction products. This exception shall apply only to reimbursement for the intravenous blood fraction products; and

**(B)** a mail order pharmacy that serves medicaid consumers with a primary payor other than medicaid.

**(b)** Denial of application. If an application for participation in the medicaid/medikan program is denied, the applicant shall be notified in writing by the department.

**(c)** Continuing participation. Each participating provider shall perform the following:

**(1)** Comply with applicable state and federal laws, regulations, or other program requirements;

**(2)** comply with the terms of the provider agreement;

**(3)** submit accurate claims or cost reports;

**(4)** submit claims only for covered services provided to consumers;

**(5)** engage in ethical and professional conduct;

**(6)** provide goods, services, or supplies that meet professionally recognized standards of quality;

**(7)** submit a new application for participation in the medicaid/medikan program if a claim has been submitted for payment and if at least 18 months have elapsed since a previous claim for payment was submitted; and

**(8)** refund any overpayment to the program within a period of time specified by the secretary or lose eligibility to participate.

**(d)** Recordkeeping. Each participating provider shall perform the following:

**(1)** Maintain and furnish within the time frame specified in a request any information for five years from the date of service that the Kansas department of social and rehabilitation services, its designee, or any other governmental agency acting in its official capacity may request to ensure proper payment by the medicaid/medikan program, to substantiate claims for medicaid/medikan program payments, and to complete determinations of medicaid/medikan program overpayments. This information shall include the following:

**(A)** Fiscal, medical, and other recordkeeping systems;

**(B)** matters of the provider's ownership, organization, and operation, including documentation as to whether transactions occurred between related parties;

**(C)** documentation of asset acquisition, lease, sale, or other action;

**(D)** franchise or management arrangements;

**(E)** matters pertaining to costs of operation;

**(F)** amounts of income received, by source and purpose; and

**(G)** a statement of changes in financial position;

**(2)** use standardized definitions, accounting, statistics, and reporting practices that are widely accepted in the provider's field;

**(3)** permit the Kansas department of social and rehabilitation services, its designee, or any other governmental agency acting in its official capacity to examine any records and documents that are necessary to ascertain information pertinent to the determination of the proper amount of a payment due from the medicaid/medikan program; and

**(4)** agree to repay overpayment determinations resulting from the use of sampling techniques.

**(e)** Payment. Each participating provider shall meet the following conditions:

**(1)** Accept as payment in full, subject to audit when applicable, the amount paid by the medicaid/medikan program for covered services;

2004 K.A.R. § 30-5-59

**(2)** not assign medicaid/medikan program claims or grant a power of attorney over or otherwise transfer right to payment for these claims except as set forth in 42 CFR 447.10, revised July 24, 1996, which is adopted by reference;

**(3)** not charge medicaid/medikan program consumers for services denied for payment by the medicaid/medikan program because the provider has failed to meet a program requirement including prior authorization;

**(4)** not charge any medicaid/medikan program consumer for noncovered services unless the provider has informed the consumer, in advance and in writing, that the consumer is responsible for noncovered services;

**(5)** not charge medicaid/medikan program consumers for services covered by the program, with the exception of claims liable to spenddown or copayment;

**(6)** submit claims for payment on claim forms approved and prescribed by the secretary; and

**(7)** be subject to the payment limitations specified in K.A.R. 30-5-70.

**(f)** Provider participation in the medicaid/medikan program may be disallowed for any of the reasons set forth in K.A.R. 30-5-60.

## Statutory Authority

Authorized by and implementing K.S.A. 39-708c

## History

### Effective

May 1, 1981; amended May 1, 1985; amended May 1, 1986; amended May 1, 1988; amended July 1, 1989; amended Oct. 1, 1989; amended, T-30-12-28-89, Jan. 1, 1990; amended, T-30-2-28-90, Feb. 28, 1990; amended Aug. 1, 1990; amended Jan. 7, 1991; amended May 1, 1992; amended May 3, 1993; amended Dec. 30, 1994; amended April 1, 1995; amended Oct. 1, 2000; amended Jan. 1, 2004; amended Dec. 10, 2004.

KANSAS ADMINISTRATIVE REGULATIONS

**End of Document**

## *2002 La. R.S. 46:437.11*

2002 Louisiana Code Archive

*LOUISIANA STATUTES, ANNOTATED BY LEXISNEXIS (TM)  >  LOUISIANA REVISED STATUTES > TITLE 46. PUBLIC WELFARE AND ASSISTANCE  >  CHAPTER 3. PUBLIC ASSISTANCE  > PART VI-A. MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW  >  SUBPART A. GENERAL PROVISIONS*

# § 437.11 Provider agreements

**A.** The department shall make payments from medical assistance programs funds for goods, services, or supplies rendered to recipients to any person who has a provider agreement in effect with the department, who is complying with all federal and state laws and rules pertaining to the medical assistance programs, and who agrees that no person shall be subjected to discrimination under the medical assistance programs because of race, creed, ethnic origin, sex, age, or physical condition.

**B.** Each provider agreement shall require the health care provider to comply fully with all federal and state laws and rules pertaining to the medical assistance programs, to licensure, if required, and the practice of medicine, osteopathy, surgery, and midwifery. The provider agreement shall require the health care provider to provide goods, services, or supplies only if medically necessary and that are within the scope and quality of standard care.

**C.** Each provider agreement shall be a voluntary contract between the department and the health care provider in which the health care provider agrees to comply with federal and state laws and rules pertaining to the medical assistance programs when furnishing goods, services, or supplies to a recipient and the department agrees to pay a sum, determined by fee schedule, payment methodology, or other method, for the goods, services, or supplies provided to the recipient. However, a provider agreement shall not be construed to be a contract for the purposes of *R.S. 42:1113(D)*.

**D.**

   **(1)** Unless the provider agreement is terminated by the secretary for cause as provided in Paragraph (2) of this Subsection, a health care provider agreement shall be effective for a stipulated period of time, shall be terminable by either party thirty days after receipt of written notice, and shall be renewable by mutual agreement.

   **(2)** The secretary may terminate a provider agreement immediately and without written notice if a health care provider is the subject of a sanction or of a criminal, civil, or departmental proceeding.

**E.** Each health care provider who has a provider agreement with the department shall receive at least one provider number but may receive more than one provider number.

LOUISIANA STATUTES, ANNOTATED BY LEXISNEXIS (TM)

## *2002 ALM GL ch. 118E, § 36*

2002 Massachusetts Code Archive

***ANNOTATED LAWS OF MASSACHUSETTS  >  PART I. ADMINISTRATION OF THE GOVERNMENT > TITLE XVII. PUBLIC WELFARE  >  CHAPTER 118E. DIVISION OF MEDICAL ASSISTANCE***

## § 36. Providers Eligible to Participate in Program.

Participation in the medical assistance programs established under this chapter shall be limited to providers of services who have not been convicted of larceny or fraud or any other crime in connection with such services, or the billing therefor and who:

**(1)** indicate their intention to the division to so participate;

**(2)** present evidence, satisfactory to the division, of their qualifications to provide such services;

**(3)** agree to accept, as payment in full, the amounts paid in accordance with the fee schedules provided for under this chapter;

**(4)** agree to comply with all laws, rules and regulations governing the operation of the programs;

**(5)** agree to be responsible for all overpayments owed to the division, including, in the case of transfer of ownership, the overpayments of any and all previous owners.

If any individual or entity has an ownership interest in more than one institutional provider, the division may offset any monetary liability of such individual or entity to the division under this section or otherwise from any amounts the division owes to any such institutional provider. Any individual or entity having an ownership interest in an institutional provider shall be liable to the division for all monetary liabilities of such provider to the division to the extent of such individual's or entity's ownership interest. For purposes of this paragraph, an "ownership interest" shall include both direct ownership interests and ownership interests in any entity which has an ownership interest in an institutional provider, and an "institutional provider" shall mean any entity which participates in any medical assistance program under this chapter as a provider of nursing facility services or acute, chronic, or rehabilitation hospital services.

## History

1993, 161, § 17; 1995, 38, § 136; 1996, 151, § 273; 1998, 194, § 175

ANNOTATED LAWS OF MASSACHUSETTS
Copyright © 2017 Matthew Bender & Company, Inc., one of the LEXIS Publishing ™ companies All rights reserved

**End of Document**

## *2004 MONT. ADMIN. R. 37.85.401*

2004 Montana Administrative Code Archive

***ADMINISTRATIVE RULES OF MONTANA   >  TITLE 37: DEPARTMENT OF PUBLIC HEALTH AND HUMAN SERVICES  >  CHAPTER 85: GENERAL MEDICAID SERVICES  >  SUB-CHAPTER 4: PROVIDER REQUIREMENTS***

# 37.85.401 PROVIDER PARTICIPATION

**(1)** As a condition of participation in the Montana medicaid program all providers must comply with all applicable state and federal statutes, rules and regulations, including but not limited to federal regulations and statutes found in Title 42 of the Code of Federal Regulations and the United States Code governing the medicaid program and all applicable Montana statutes and rules governing licensure and certification.

## Statutory Authority

(Sec. 53-6-113, MCA; IMP, Sec. 53-2-201, 53-6-101, 53-6-111, 53-6-113 and 53- 6-141, MCA; NEW, 1980 MAR p. 1491, Eff. 5/16/80; AMD, 1997 MAR p. 474, Eff. 3/11/97; TRANS, from SRS, 2000 MAR p. 479.)

ADMINISTRATIVE RULES OF MONTANA

End of Document

## *2004 8.302.1.11 NMAC*

2004 New Mexico Administrative Code Archive

*NEW MEXICO ADMINISTRATIVE CODE  >  TITLE 8. SOCIAL SERVICES  >  CHAPTER 302. MEDICAID GENERAL PROVIDER POLICIES PART 1. GENERAL PROVIDER POLICIES*

# § 8.302.1.11. PROVIDER RESPONSIBILITIES AND REQUIREMENTS

Providers who furnish services to medicaid recipients agree to comply with all federal and state laws and regulations relevant to the provision of medical services, including but not limited to, Title XIX of the Social Security Act, the Medicare and Medicaid Anti-Fraud Act, the Health Insurance Portability and Accountability Act (HIPAA), and the state Medicaid Fraud Act. Providers also agree to conform to MAD policies and instructions as specified in this manual and its appendices, as updated.

**A.** Eligibility determination: Providers must verify that services they furnish are provided to eligible recipients.

**(1)** Providers may verify eligibility through several mechanisms, including using an automated voice response system, contacting the medicaid fiscal agent contractor eligibility help desk, contracting with a medicaid eligibility verification system (MEVS) vendor, or contracting with a medicaid magnetic swipe card vendor. Providers must verify that recipients are eligible and remain eligible for medicaid throughout periods of continued or extended services. By verifying client eligibility, a provider is informed of restrictions that may apply to a recipient's eligibility.

**(2)** A recipient becomes financially responsible for a provider claim if the recipient fails to furnish identification before service and MAD denies payment because of the resulting administrative error. Settlement of these claims is between the provider and recipient.

**B.** Requirements for updating information: Providers must furnish MAD or the MAD claims processing contractor with complete information on changes in their address, license, certification, board specialties, corporate name or corporate ownership, and a statement as to the continuing liability of the provider for any recoverable obligation to MAD which occurred or may have occurred prior to any sale, merger, consolidation, dissolution or other disposition of the health care provider or person. MAD or the MAD claims processing contractor must receive this information at least 60 days before the change. Any payment made by MAD based upon erroneous or outdated information is subject to recoupment.

**C.** Additional requirements: Providers must meet all other requirements stated in this manual, the billing instructions, manual revisions, supplements, signed application forms or reverification forms, as updated. MAD may require a letter of credit, a surety bond, or a combination thereof, from the health care provider. The letter of credit, surety bond or combination thereof may be required if any one of the following conditions is met:

**(1)** the health care provider is the subject of a state or federal sanction or of a criminal, civil, or departmental proceeding in any state;

**(2)** a letter of credit, surety bond, or any combination thereof is required for each health care provider in that category of health care provider; or

**(3)** the health care provider can not reasonably demonstrate that they have assumed liability and are responsible for paying the amount of any outstanding recoveries to MAD as the result of any sale, merger, consolidation, dissolution, or other disposition of the health care provider or person.

**(4)** the secretary determines that it is in the best interest of the medical assistance programs to do so, specifying the reasons.

## Statutory Authority

[2-1-95, 2-1-99; *8.302.1.11 NMAC*-- Rn, 8 NMAC 4.MAD.701.2 & A, 7-1-01; A, 7-1-03]

NEW MEXICO ADMINISTRATIVE CODE

Copyright © 2017 by The State of New Mexico and Matthew Bender & Company, Inc. A member of the LexisNexis. Group. All rights reserved.

**End of Document**

OAC 5101:3-1-172
Ohio Admin. Code § 5101:3-1-172
BALDWIN'S OHIO ADMINISTRATIVE CODE
5101. DEPARTMENT OF JOB AND FAMILY SERVICES
5101:3. DIVISION OF MEDICAL ASSISTANCE
CHAPTER 5101:3-1. GENERAL INFORMATION

Copr. West Group 2003 No Claim to U.S. Govt Works
Rules are current through December 31, 2002 Appendices are current through December 31, 2000

5101:3-1-172 PROVIDER AGREEMENT FOR PROVIDERS [EXCEPT LONG-TERM CARE FACILITIES AND MEDICAID CONTRACTING MANAGED CARE PLANS (MCPS)x

For purposes of this rule for the medicaid and the disability assistance medical programs, services and benefits are covered in accordance with the provisions set forth in division-level designation 5101:3 of the Administrative Code.

A valid provider agreement with medicaid will act as a provider agreement for participation in the medicaid and/or the disability assistance medical programs.

A provider agreement is a contract between the Ohio department of job and family services and a provider of medicaid covered services. By signing this agreement the provider agrees to comply with the terms of the provider agreement, Revised Code, Administrative Code, and federal statutes and rules; and the provider certifies and agrees:

(A) To render medical services as medically necessary for the patient and only in the amount required by the patient without regard to race, creed, color, age, sex, national origin, source(s) of payment, or handicap; submit claims only for services actually performed; and, bill the department for no more than the usual and customary fee charged other patients for the same service.

(B) To ascertain and recoup any third-party resource(s) available to the consumer prior to billing the department. The department will then pay any unpaid balance up to the lesser of the provider's billed charge or the maximum allowable reimbursement as set forth in division-level designation 5101:3 of the Administrative Code.

(C) To accept the allowable reimbursement for all covered services as payment-in-full and, except as required in paragraph (B) of this rule, will not seek reimbursement for that service from the patient, any member of the family, or any other person.

(D) To maintain all records necessary and in such form so as to fully disclose the extent of services provided and significant business transactions. The provider will maintain such records for a period of six years from the date of receipt of payment based upon those records or until any audit initiated within the six year period is completed.

(E) To furnish to the department, the secretary of the department of health and human services, or the Ohio medicaid fraud control unit or their designees any information maintained under paragraph (D) of this rule for audit and review purposes. Audits may use statistical sampling. Failure to supply requested records within thirty days shall result in withholding of medicaid or disability assistance medical payments and may result in termination from the medicaid and disability assistance medical programs.

(F) To inform the department within thirty days of any changes in licensure, certification, or registration status; ownership; specialty; additions, deletions, or replacements in group membership and hospital-based physician affiliations; and address.

(G) To disclose ownership and control information, and to disclose the identity of any person who has been convicted of a criminal offense related to medicare, medicaid, disability assistance medical, or Title XX services, as specified in rule 5101:3-1-17.3 of the Administrative Code.

(H) That neither the individual practitioner, nor the company, nor any owner, director, officer, or employee of the company, nor any independent contractor retained by the company, is currently subject to sanction under medicare,

medicaid, disability assistance medical, or Title XX; or, is otherwise prohibited from providing services to medicare, medicaid, disability assistance medical, or Title XX beneficiaries.

 (I) To follow the regulations and policies set forth in the appropriate edition of the medicaid handbook.

 (J) To provide to ODJFS, through the court of jurisdiction, notice of any bankruptcy action brought by the provider. Notice shall be mailed to: office of legal services, Ohio department of job and family services.

 (K) To comply with the appropriate advance directives requirements for hospitals, providers of home health care, personal care services, and hospices as specified in Chapter 3701-83 of the Administrative Code.

 (L) To comply with the confidentiality safeguards and the use and release of information regarding public assistance recipients as described in section 5101:27 of the Revised Code.


## CREDIT(S)

HISTORY: 2001-02 OMR 2830 (R-E), eff. 5-30-02; 1992-93 OMR 804 (A), eff. 1-1-93; 1987-88 OMR 265 (E), eff. 10-1-87

RC 119.032 rule review date(s): 5-30-07

<General Materials (GM) - References, Annotations, or Tables>


## HISTORICAL NOTES

Amendment Note: 5-30-02 Rescinded the existing rule and promulgated the new rule.


## CROSS REFERENCES

RC 5111.01, Participation in medical assistance program
RC 5111.02, Reimbursement of medical providers; rulemaking powers

## CODE OF FEDERAL REGULATIONS

42 CFR 431.107, Human services department, medical assistance program, required provider agreement


## NOTES OF DECISIONS AND OPINIONS

Billing of recipient 1
Recordkeeping 2

 1. Billing of recipient

 Where a provider agreed to file for medicaid benefits for a patient, whatever the provider's motivation or good faith, the provider must, as a matter of law, accept the patient as a medicaid patient, despite the fact that he had subsequently accepted payment directly from the patient. (Annotation from former 5101:3-1-55.) Sparks v. George A. Sawaya, M.D., Inc. (Franklin 1983) 9 Ohio App.3d 275, 459 N.E.2d 901, 9 O.B.R. 489.

 2. Recordkeeping

 A record of invoices may suffice to satisfy the requirement of the Ohio department of human services in a provider agreement that the provider maintain records necessary to "fully disclose" the extent of services provided, where the information contained in the invoices is sufficient and neither validation nor support is required. McBroom Eastside

Ambulance Service v. Ohio Dept. of Human Services (Franklin 1988) 53 Ohio App.3d 76, 558 N.E.2d 1039, cause dismissed 41 Ohio St.3d 703, 534 N.E.2d 1203.

---

**End of Document**        © 2017 Thomson Reuters. No claim to original U.S. Government Works.

## *2004 O.A.C. § 317:30-3-2.*

2004 Oklahoma Administrative Code Archive

*Oklahoma Administrative Code  >  TITLE 317. OKLAHOMA HEALTH CARE AUTHORITY  > CHAPTER 30. MEDICAL PROVIDERS-FEE FOR SERVICE  >  SUBCHAPTER 3. GENERAL PROVIDER POLICIES  >  PART 1. GENERAL SCOPE AND ADMINISTRATION*

## 317:30-3-2. Provider agreements

In order to be eligible for payment, providers must have on file with OHCA, an approved Provider Agreement. Through this agreement, the provider certifies all information submitted on claims is accurate and complete, assures that the State Agency's requirements are met and assures compliance with all applicable Federal and State regulations. These agreements are renewed annually with each provider.(1) The provider further assures compliance with Section 1352, Title 31 of the U.S. Code and implemented at 45 CFR Part 93 which provides that if payments pursuant to services provided under Medicaid are expected to exceed **$100,000.00, the provider certifies federal funds have not been used nor will they be used to influence the making or continuation of the agrreement to provide services under Medicaid. Upon request, the Authority will furnish a standard form to the provider for the purpose of reporting any non-federal funds used for influencing agreements.**

**(2) The provider assures in accordance with *31 USCA 6101,* Executive Order 12549, that they are not presently or have not in the last three years been debarred, suspended, proposed for debarment or declared ineligible by any Federal department or agency.**

**(3) For information regarding annual Provider Agreements or for problems related to a current agreement, contact the Oklahoma Health Care Authority, Provider Enrollment, P.O. Box 18299, Oklahoma City, Oklahoma 73154-0299, or call 1-800-871-9347 for out-of-state or 405-525-1092 from within the state.**

## Statutory Authority

**CHAPTER AUTHORITY:**

Federal Social Security Act, Title XIX; Oklahoma Health Care Authority Act, 63 O.S., § § 5003 through 5016; Titles XVIII and XIX; Child Health Act; Title V; Civil Rights Act of 1964; Rehabilitation Act of 1973 (Part 90); Age Discrimination Act of 1975; Education Amendments of 1972, Title IX; P.L. 88-352; P.L. 93-112; P.L. 99-456;*31 U.S.C.A. 6101;*Presidential Executive Orders 11246, 11375, and 12549;42 CFR, § § 405.2426, 431.54, 416.30-49, 440.130, 440.140, and 442 (Subparts E and G); 45 CFR, Part 93; 10 O.S., § 175.1; 56 O.S., § § 162.3, 164(c), and 175; 59 O.S., § 567.3(4); 63 O.S.Supp.1981, § § 1-1901 et seq.; 68 O.S.1981, § 1305

## History

**SOURCE:**

Added at 12 Ok Reg 751, eff 1-5-95; Added at 12 Ok Reg 3131, eff 7-27-95.

2004 O.A.C. § 317:30-3-2.

**CHAPTER SOURCE:**

Codified 7-27-95

Oklahoma Administrative Code
Copyright © 2017, State of Oklahoma

**End of Document**

## *2004 Or. Admin. R. 410-120-1260*

2004 Oregon Administrative Code Archive

***OREGON ADMINISTRATIVE RULES  >  CHAPTER 410 DEPARTMENT OF HUMAN SERVICES,
DEPARTMENTAL ADMINISTRATION AND MEDICAL ASSISTANCE PROGRAMS  >  DIVISION 120
MEDICAL ASSISTANCE PROGRAMS***

# 410-120-1260 Provider Enrollment

(1) This rule applies only to providers seeking reimbursement from OMAP, except as otherwise provided in OAR 410-120-1295.

(2) Signing the provider application constitutes agreement by performing and billing providers to comply with all applicable rules of the Medical Assistance Program and federal and state laws and regulations.

(3) A performing provider is the provider of a service or item. A billing provider is a person or business entity who/that submits claims on behalf of a performing provider. All references to "provider" in this and other rules of the Medical Assistance Program include both performing and billing providers.

(4) An individual or organization must meet applicable licensing and/or regulatory requirements set forth by Federal and State statutes, regulations, and rules to be enrolled and to bill as a provider. In addition, all providers of services within the State of Oregon must have a valid Oregon business license if such a license is a requirement of the state, federal, county or city government to operate a business or to provide services.

(5) An individual or organization that is currently subject to sanction(s) by the Medical Assistance Program or Federal government is not eligible for enrollment (see Provider Sanctions).

(6) A performing provider number will be issued to an individual or organization providing covered health care services or items upon:

(a) Completion of the application and submission of the required documents;

(b) The signing of the provider application by the provider or a person authorized by the provider to bind the organization or individual to compliance with these rules;

(c) Verification of licensing or certification. Loss of the appropriate licensure or certification will result in immediate disenrollment of the provider and recovery of payments made subsequent to the loss of licensure or certification;

(d) Approval of the application by OMAP or the Division responsible for enrolling the provider.

(7) Performing providers may be enrolled retroactive to the date services were provided to a Medical Assistance client if:

(a) The provider was appropriately licensed, certified and/or otherwise met all Medical Assistance Program requirements for providers at the time services were provided; and

(b) Services were provided less than 12 months prior to the date of application for Medical Assistance provider status.

(8) Issuance of a provider number establishes enrollment of an individual or organization as a provider for limited category (ies) of services for the Medical Assistance Program.

(9) If a provider changes address, business affiliation, licensure, ownership, certification, billing agents or Federal Tax Identification Number (TIN), the Office of Medical Assistance Programs must be notified in

2004 Or. Admin. R. 410-120-1260

writing within 30 days of the change. Failure to notify OMAP of a change of Federal Tax Identification Number may result in the imposing of a $ 50 fine. Changes in business affiliation, ownership, and Federal Tax Identification Number may require the submission of a new application. Payments made to providers who have not furnished such notification may be recovered.

**(10)** Providers of services outside the state of Oregon will be enrolled under the following conditions:

**(a)** The provider is appropriately licensed and/or certified and meets standards established within the provider's state for participation in the state's Medicaid program. Disenrollment from the other state's Medicaid program is a basis for disenrollment in the Oregon Medical Assistance Program;

**(b)** The provider bills only for services provided within the provider's scope of licensure or certification;

**(c)** For noncontiguous out-of-state providers, the services provided must be for a specific Oregon Medicaid client who is temporarily outside Oregon or the contiguous area of Oregon, or for foster care or subsidized adoption children placed out of state, or the provider is seeking Medicare deductible or coinsurance coverage for QMB clients;

**(d)** The services for which the provider bills are covered services under the Oregon Medical Assistance Program;

**(e)** Facilities, including but not restricted to hospitals, rehabilitative facilities, institutions for care of individuals with mental retardation, psychiatric hospitals, and residential care facilities, will be enrolled as providers only if the facility is enrolled as a Medicaid provider in the state in which the facility is located or is licensed as a facility provider of services by the State of Oregon;

**(f)** Out-of-state providers may provide contracted services per OAR 410-120-1880.

**(11)** Enrollment of Billing Providers:

**(a)** A person or business entity who/that submits claims to the Medical Assistance Program and/or receives payments from the Medical Assistance Program on the behalf of a professional provider (e.g., physician, physical therapist, speech therapist). The person/business entity must be enrolled with OMAP and meet all applicable federal regulations;

**(b)** A billing provider number will be issued only to billing providers billing on behalf of providers who have signed the provider enrollment form, who have met the licensure or other standards for enrollment as a provider and who have been delegated the authority to act on behalf of an the performing provider and to bill on behalf of the provider of service;

**(c)** A billing provider must maintain, and make available to the Medical Assistance Program, upon request, records indicating the billing provider's relationship with the provider of service;

**(d)** The Billing Provider must obtain signed confirmation from the performing provider that the Billing Provider has been authorized by the Performing Provider to submit claims. This authorization must be maintained in the Billing Provider's files for at least five years, following the submission of claims to OMAP;

**(e)** The billing provider fee must not be based on a percentage of the amount collected or whether or not they collect the subject's payment (42 CFR 447 subpart A).

**(12)** Enrollment of Locum Tenens:

**(a)** For purposes of this rule, a locum tenens means a substitute physician retained to take over another physician's professional practice while he/she is absent for reasons such as illness, vacation, continuing medical education, pregnancy, etc.

**(b)** Locum tenens are not required to enroll with OMAP. The absentee physician must bill with their individual Medicaid provider number and receive payment for covered services provided by the locum tenens physician. Services provided by the locum tenens must be billed with a modifier Q6.

**(13)** Reciprocal Billing Arrangements:

2004 Or. Admin. R. 410-120-1260

(a) For purposes of this rule, reciprocal billing arrangements are similar in nature to a locum tenens in that a substitute physician is retained to take over another physician's professional practice on an occasional basis if the regular physician is unavailable;

(b) Providers with reciprocal billing arrangements are not required to enroll with OMAP. The absentee physician must bill with their individual Medicaid provider number and receive payment for covered services provided by the substitute physician. The absentee physician identifies the services provided by the substitute physician by using modifier Q5;

(c) These requirements do not apply to substitute arrangements among physicians in the same medical practice when claims are submitted in the name of the billing provider or group name.

(14) Provider termination:

(a) The provider may terminate enrollment at any time. The request must be in writing, via certified mail, return receipt requested. The notice shall specify the provider number to be terminated and the effective date of termination. Termination of the provider enrollment does not terminate any obligations of the provider for dates of services during which the enrollment was in effect;

(b) OMAP provider terminations or suspensions may be for, but are not limited to the following reasons:

(A) Breaches of provider agreement;

(B) Failure to comply with the statutes, regulations and policies of the Department of Human Services, Federal or State regulations that are applicable to the provider.

(C) When no claims have been submitted in an 18-month period. The provider must reapply for enrollment.

(15) When one or more of the requirements governing a provider's participation in the Medical Assistance program are no longer met, the provider's Medical Assistance Program provider number may be immediately suspended. The provider is entitled to a contested case hearing as outlined in 410-120-1600 through 410-120-1840 to determine whether the provider's Medical Assistance Program number will be revoked.

(16) The provision of health care services or items to clients of the Medical Assistance Program is a voluntary action on the part of the provider. Providers are not required to accept all Medical Assistance clients seeking service.

(17) In the event of bankruptcy proceedings, the provider must immediately notify the Director of OMAP in writing.

[Publications: Publications referenced are available from the agency.]

## Statutory Authority

Stat. Auth.: ORS 409
Stats. Implemented: ORS 414.065

## History

Hist.: PWC 683, f. 7-19-74, ef. 8-11-784; PWC 803(Temp), f. & ef. 7-1-76; PWC 812, f. & ef. 10-1-76; AFS 5-1981, f. 1-23-81, ef. 3-1-81, Renumbered from 461-013-0060; AFS 33-1981, f. 6-23-81, ef. 7-1-81; AFS 47-1982, f. 4-30-82, f. 4-30-82 & AFS 52-1982, f. 5-28-82, ef. 5-1-82 for providers located in the geographical areas covered by the branch offices of North Salem, South Salem, Dallas, Woodburn, McMinnville, Lebanon, Albany and Corvallis, ef. 6-30-82 for remaining AFS branch offices; AFS 57-1982, f. 6-28-82, ef. 7-1-82; AFS 117-1982, f. 12-30-82, ef. 1-1-83; AFS 42-1983, f. 9-2-83, ef. 10-1-83; AFS 38-1986, f. 4-29-86, ef. 6-1-86; AFS 73-1989, f. & cert. ef. 12-7-89; HR 2-

2004 Or. Admin. R. 410-120-1260

1990, f. 2-12-90, cert. ef. 3-1-90, Renumbered from 461-013-0063, 461-013-0075 & 461-013-0180; HR 19-1990, f. & cert. ef. 7-9-90; HR 41-1991, f. & cert. ef. 10-1-91; HR 51-1991(Temp), f. 11-29-91, cert. ef. 12-1-91; HR 5-1992, f. & cert. ef. 1-16-92; HR 32-1993, f. & cert. ef. 11-1-93, Renumbered from 410-120-0020, 410-120-0040 & 410-120-0060; HR 31-1994, f. & cert. ef. 11-1-94; HR 5-1997, f. 1-31-97, cert. ef. 2-1-97; OMAP 20-1998, f. & cert ef. 7-1-98; OMAP 10-1999, f. & cert. ef. 4-1-99; OMAP 9-2001, f. 3-30-01, cert. ef. 4-1-01; OMAP 42-2002, f. & cert. ef. 10-1-02; OMAP 62-2003, f. 9-8-03, cert. ef.10-1-03; OMAP 67-2004, f. 9-14-04, cert. ef. 10-1-04

OREGON ADMINISTRATIVE RULES
Copyright © 2017 by The Oregon Secretary of State All Rights Reserved

**End of Document**

## *2004 Tenn. Comp. R. & Regs. R. 1200-13-13-.08*

2004 Tennessee Administrative Code Archive

***RULES AND REGULATIONS OF THE STATE OF TENNESSEE > RULES OF THE TENNESSEE DEPARTMENT OF HEALTH AND TENNESSEE DEPARTMENT OF ENVIRONMENT AND CONSERVATION > BUREAU OF MEDICAID > CHAPTER 1200-13-13 TENNCARE MEDICAID***

# 1200-13-13-.08 PROVIDERS

**(1)** Payment in full.

    **(a)** All MCC participating network providers must accept as payment in full for provision of covered services to TennCare enrollees, the amounts paid by the MCC plus any deductible or copayment required by the TennCare Program to be paid by the individual.

    **(b)** Any non-participating providers who provide TennCare Program covered services by authorization from an MCC must accept as payment in full for provision of covered services to TennCare enrollees, the amounts paid by the MCC plus any deductible or copayment required by the TennCare Program to be paid by the individual.

**(2)** In situations where a MCC authorizes a service to be rendered by a provider who is not a participating network provider with the MCC, payment to the provider shall be no less than eighty percent (80%) of the lowest rate paid by the MCC to equivalent participating network providers for the same service. For emergency services provided to an enrollee by a provider who is not a participating network provider, the MCC shall reimburse the provider at the rate of 100% of the lowest rate paid to the MCC's network providers. Emergency care to enrollees shall not require preauthorization.

**(3)** Participation in the TennCare program will be limited to providers who:

    **(a)** Accept, as payment in full, the amounts paid by the managed care contractor, including copays from the enrollee, or the amounts paid in lieu of the managed care contractor by a third party (Medicare, insurance, etc.);

    **(b)** Maintain Tennessee, or the State in which s/he practices, medical licenses and/or certifications as required by his/her practice, or licensure by the TDMHDD, if appropriate;

    **(c)** Are not under a federal Drug Enforcement Agency (DEA) restriction of his/her prescribing and/or dispensing certification for scheduled drugs (relative to physicians, osteopaths, dentists and pharmacists);

    **(d)** Agree to maintain and provide access to TennCare and/or its agent all TennCare enrollee medical records for five (5) years from the date of service or upon written authorization from TennCare following an audit, whichever is shorter;

    **(e)** Provide medical assistance at or above recognized standards of practice; and

    **(f)** Comply with all contractual terms between the provider and the managed care contractor and TennCare policies as outlined in federal and state rules and regulations and TennCare provider manuals and bulletins.

    **(g)** Failure to comply with any of the above provisions (a) through (f) may subject a provider to the following actions:

2004 Tenn. Comp. R. & Regs. R. 1200-13-13-.08

1. Sanctions set out in T.C.A. § 71-5-118. In addition, the provider may be subject to stringent review/audit procedures, which may include clinical evaluation of services and a prepayment requirement for documentation and justification for each claim.

2. The Bureau of TennCare may withhold or recover payments to managed care contractors in cases of provider fraud, willful misrepresentation, or flagrant non-compliance with contractual requirements and/or TennCare policies.

3. The Bureau of TennCare may refuse to approve or may suspend provider participation with a provider if any person who has an ownership or controlling interest in the provider, or who is an agent or managing employee of the provider, has been convicted of a criminal offense related to that person's involvement in any program established under Medicare, Medicaid or the US Title XX Services Program.

4. The Bureau of TennCare may refuse to approve or may suspend provider participation if it determines that the provider did not fully and accurately make any disclosure of any person who has ownership or controlling interest in the provider, or is an agent or managing employee of the provider and has been convicted of a criminal offense related to that person's involvement in any program under Medicare, Medicaid or the US Title XX Services Program since the inception of these programs.

5. The Bureau of TennCare shall refuse to approve or shall suspend provider participation if the appropriate State Board of Licensing or Certification fails to license or certify the provider at any time for any reason or suspends or revokes a license or certification.

6. The Bureau of TennCare shall refuse to approve or shall suspend provider participation upon notification by the US Office of Inspector General Department of Health and Human Services that the provider is not eligible under Medicare or Medicaid for federal financial participation.

7. The Bureau of TennCare may recover from a managed care contractor any payments made by an enrollee and/or his family for a covered service, in total or in part, except as permitted. If a provider knowingly bills an enrollee and/or his family for a covered service, in total or in part, except as permitted, the Bureau of TennCare may terminate the provider's participation in TennCare.

(4) Solicitations and Referrals.

(a) Managed care contractors and providers shall not solicit TennCare enrollees by any method offering as enticements other goods and services (free or otherwise) for the opportunity of providing the enrollee with TennCare covered services that are not medically necessary and/or that overutilize the TennCare program.

(b) A managed care contractor may request a waiver from this restriction in writing to TennCare. TennCare shall determine the value of a waiver request based upon the medical necessity and need for the solicitation. The managed care contractor may implement the solicitation only upon receipt of a written waiver approval from TennCare. This waiver is not transferable and may be canceled by TennCare upon written notice.

(c) TennCare payments for services related to a non-waivered solicitation enticement shall be considered by TennCare as a non-covered service and recouped. Neither the managed care contractor nor the provider may bill the enrollee for non-covered services recouped under this authority.

(d) A provider shall not offer or receive remuneration in any form related to the volume or value of referrals made or received from or to another provider.

(5) Providers may seek payment from a TennCare enrollee if the services are not covered by the TennCare program and the provider informed the enrollee the services were not covered prior to providing the service.

(6) Providers may not seek payment from a TennCare enrollee under the following conditions:

2004 Tenn. Comp. R. & Regs. R. 1200-13-13-.08

(a) The provider knew or should have known about the patient's TennCare eligibility or pending eligibility prior to providing services.

(b) The claim(s) submitted to TennCare or the enrollee's managed care contractor for payment was/were denied due to provider billing error or a TennCare claim processing error.

(c) The provider accepted TennCare assignment on a claim and it is determined that another payor paid an amount equal to or greater than the TennCare allowable amount.

(d) The provider failed to comply with TennCare policies and procedures or provided a service which lacks medical necessity or justification.

(e) The provider failed to submit or resubmit claims for payment within the time periods required by the managed care contractor or TennCare.

(f) The provider failed to ascertain the existence of TennCare eligibility or pending eligibility prior to providing non-emergency services. Even if the enrollee presents another form of insurance, the provider must determine whether the patient is covered under TennCare.

(g) The provider failed to inform the enrollee prior to providing a service not covered by TennCare that the service was not covered and the enrollee may be responsible for the cost of the service. Services which are non-covered by virtue of exceeding limitations are exempt from this requirement.

(h) The enrollee failed to keep a scheduled appointment(s).

(7) Providers may seek payment from a person whose TennCare eligibility is pending at the time services are provided if the provider informs the person that TennCare assignment will not be accepted whether or not eligibility is established retroactively.

(8) Providers may seek payment from a person whose TennCare eligibility is pending at the time services are provided. Providers may bill such persons at the provider's usual and customary rate for the services rendered. However, all monies collected for TennCare-covered services rendered during a period of TennCare eligibility must be refunded when a claim is submitted to TennCare if the provider agreed to accept TennCare assignment once retroactive TennCare eligibility was established.

(9) Providers of inpatient hospital services, outpatient hospital services, skilled nursing facility services, independent laboratory and x-ray services, hospice services, and home health agencies must be approved for Title XVIII-Medicare in order to be certified as providers under the TennCare Program; in the case of hospitals, the hospital must meet state licensure requirements and be approved by TennCare as an acute care hospital as of the date of enrollment in TennCare. Children's hospitals and State mental hospitals may participate in TennCare without having been Medicare approved; however, the hospital must be approved by the Joint Commission for Accreditation of Health Care Organizations as a condition of participation.

(10) Pharmacy providers may not waive pharmacy copayments for TennCare Standard enrollees as a means of attracting business to their establishments. This does not prohibit a pharmacy from exercising professional judgment in cases where an enrollee may have a temporary or acute need for a prescribed drug, but is unable, at that moment, to pay the required copayment.

(11) Providers shall not deny services for a Medicaid enrollee's failure to make copayments.

## Statutory Authority

T.C.A. §§ 4-5-202, 71-5-105, 71-5-109, Acts of 2003, Public Chapter 412, § 1(c), and Executive Order No. 23.

## History

2004 Tenn. Comp. R. & Regs. R. 1200-13-13-.08

**ADMINISTRATIVE HISTORY FOR THIS REGULATION:**

 Original rule filed September 30, 2002; to be effective December 14, 2002; however, on December 9, 2002, the House Government Operations Committee of the General Assembly stayed rule 1200-13-13-.08; new effective date February 12, 2003. Amendment by Acts of 2003, Public Chapter 412, § 1(c) filed and effective June 25, 2003. Amendment filed October 12, 2004; effective December 26, 2004.

RULES AND REGULATIONS OF THE STATE OF TENNESSEE

**End of Document**

## Chapter HSS 106

## PROVIDER RIGHTS AND RESPONSIBILITIES

| | | | |
|---|---|---|---|
| HSS 106.01 | Introduction (p. 97) | HSS 106.07 | Effects of suspension or involuntary termination (p. 116-1) |
| HSS 106.02 | General requirements for provision of services (p. 97) | HSS 106.08 | Intermediate sanctions (p. 116-2) |
| HSS 106.03 | Manner of preparing and submitting claims for reimbursement (p. 101) | HSS 106.09 | Departmental discretion to pursue monetary recovery (p. 116-3) |
| HSS 106.04 | Payment of claims for reimbursement (p. 107) | HSS 106.10 | Withholding payment of claims (p. 116-4) |
| HSS 106.05 | Voluntary termination from program participation (p. 111) | HSS 106.11 | Prepayment review of claims (p. 116-4) |
| HSS 106.06 | Involuntary termination or suspension from program participation (p. 111) | HSS 106.12 | Procedure, pleadings and practice (p. 116-5) |
| HSS 106.065 | Involuntary termination and alternative sanctions for home care providers (p. 115) | HSS 106.13 | Discretionary waivers and variances (p. 116-7) |

**HSS 106.01 Introduction.** In addition to provisions of chs. HSS 105 and 107 relating to individual provider types and the manner by which specified services are to be provided and paid for under medical assistance (MA), the participation of all providers certified under ch. HSS 105 to provide or claim reimbursement for services under the program shall be subject to the conditions set forth in this chapter.

History: Cr. Register, December, 1979, No. 288, eff. 2-1-80; am. Register, February, 1986, No. 362, eff. 3-1-86.

**HSS 106.02 General requirements for provision of services.** Providers shall comply with the following general conditions for participation as providers in the MA program:

(1) CERTIFICATION. A provider shall be certified under ch. HSS 105.

(2) COVERED SERVICES. A provider shall be reimbursed only for covered services specified in ch. HSS 107.

(3) RECIPIENT ELIGIBLE ON DATE OF SERVICE. A provider shall be reimbursed for a service only if the recipient of the service was eligible to receive MA benefits on the date the service was provided.

(4) COMPLIANCE WITH STATE AND FEDERAL REQUIREMENTS. A provider shall be reimbursed only if the provider complies with applicable state and federal procedural requirements relating to the delivery of the service.

(5) APPROPRIATE AND MEDICALLY NECESSARY SERVICES. A provider shall be reimbursed only for services that are appropriate and medically necessary for the condition of the recipient.

(6) PROVISION OF NON-COVERED SERVICES. If a provider determines that, to assure quality health care to a recipient, it is necessary to provide a non-covered service, nothing in this chapter shall preclude the provider from furnishing the service, if before rendering the service the provider advises the recipient that the service is not covered under the program and that, if provided, the recipient is responsible for payment.

(7) SERVICES TO RECIPIENTS WITH A PRIMARY PROVIDER. A provider other than the designated primary provider may not claim reimburse-

98      WISCONSIN ADMINISTRATIVE CODE
    HSS 106

ment for a service to an individual whose freedom to choose a provider
has been restricted under s. HSS 104.03 or 104.05 as indicated on the
recipient's MA identification card unless the service was rendered pursu-
ant to a written referral from the recipient's designated primary provider
or the service was rendered in an emergency. If rendered in an emer-
gency, the provider seeking reimbursement shall submit to the fiscal
agent a written description of the nature of the emergency along with the
service claim.

(8) REFUSAL TO PROVIDE MA SERVICES. A provider is not required to
provide services to a recipient if the recipient refuses or fails to present a
currently valid MA identification card. If a recipient fails, refuses or is
unable to produce a currently valid identification card, the provider may
contact the fiscal agent to confirm the current eligibility of the recipient.
The department shall require its fiscal agent to install and maintain ade-
quate toll-free telephone service to enable providers to verify the eligibil-
ity of recipients to receive benefits under the program.

(9) MEDICAL AND FINANCIAL RECORDKEEPING AND DOCUMENTATION.
(a) *Preparation and maintenance.* A provider shall prepare and maintain
truthful, accurate, complete, legible and concise documentation and
medical and financial records specified under this subsection, s. HSS
105.02 (6), the relevant provisions of s. HSS 105.02 (7), other relevant
sections in chs. HSS 105 and 106 and the relevant sections of ch. HSS 107
that relate to documentation and medical and financial recordkeeping
for specific services rendered to a recipient by a certified provider. In ad-
dition to the documentation and recordkeeping requirements specified in
pars. (b) to (d), the provider's documentation, unless otherwise specifi-
cally contained in the recipient's medical record, shall include:

1. The full name of the recipient;

2. The identity of the person who provided the service to the recipient;

3. An accurate, complete and legible description of each service
provided;

4. The purpose of and need for the services;

5. The quantity, level and supply of service provided;

6. The date of service;

7. The place where the service was provided; and

8. The pertinent financial records.

(b) *Medical record content.* A provider shall include in a recipient's
medical record the following written documentation, as applicable:

1. Date, department or office of the provider, as applicable, and pro-
vider name and profession;

2. Chief medical complaint or purpose of the service or services;

3. Clinical findings;

4. Diagnosis or medical impression;

5. Studies ordered, such as laboratory or x-ray studies;

6. Therapies or other treatments administered;

Register, June, 1994, No. 462

7. Disposition, recommendations and instructions given to the recipient, including any prescriptions and plans of care or treatment provided; and

8. Prescriptions, plans of care and any other treatment plans for the recipient received from any other provider.

(c) *Financial records.* A provider shall maintain the following financial records in written or electronic form:

1. Payroll ledgers, cancelled checks, bank deposit slips and any other accounting records prepared by the provider;

2. Billings to MA, medicare, a third party insurer or the recipient for all services provided to the recipient;

3. Evidence of the provider's usual and customary charges to recipients and to persons or payers who are not recipients;

4. The provider's appointment books for patient appointments and the provider's schedules for patient supervision, if applicable;

5. Billing claims forms for either manual or electronic billing for all health services provided to the recipient;

6. Records showing all persons, corporations, partnerships and entities with an ownership or controlling interest in the provider, as defined in 42 CFR 455.101; and

7. Employe records for those persons currently employed by the provider or who have been employed by the provider at any time within the previous 5 years. Employe records shall include employe name, salary, job qualifications, position description, job title, dates of employment and the employe's current home address or the last known address of any former employe.

(d) *Other documentation.* 1. The provider shall maintain documentation of all information received or known by the provider of the recipient's eligibility for services under MA, medicare or any other health care plan, including but not limited to an indemnity health insurance plan, a health maintenance organization, a preferred provider organization, a health insuring organization or other third party payer of health care.

2. The provider shall retain all evidence of claims for reimbursement, claim denials and adjustments, remittance advice, and settlement or demand billings resulting from claims submitted to MA, medicare or other health care plans.

3. The provider shall retain all evidence of prior authorization requests, cost reports and supplemental cost or medical information submitted to MA, medicare and other third party payers of health care, including the data, information and other documentation necessary to support the truthfulness, accuracy and completeness of the requests, reports and supplemental information.

(e) *Provider responsibility.* 1. Each provider is solely responsible for the truthfulness, accuracy, timeliness and completeness of claims, cost reports, prior authorization requests and any supplementary information relating to the provider's MA certification or reimbursement for services submitted to MA or to medicare or any other third party payer for

## 100 WISCONSIN ADMINISTRATIVE CODE
**HSS 106**

claims or requests for MA recipients, whether or not these claims, reports and requests are submitted on paper or in electronic form. This includes but is not limited to the truthfulness, accuracy, timeliness and completeness of the documentation necessary to support each claim, cost report and prior authorization request. The use or consent to use of a service, system or process for the preparation and submission of claims, cost reports or prior authorization requests, whether in electronic form or on paper, does not in any way relieve a provider from sole responsibility for the truthfulness, accuracy, timeliness and completeness of claims, cost reports, prior authorization requests and any supplementary information relating to the provider's MA certification and claims for reimbursement for services submitted to MA or to medicare or any other third party payer in the case of claims, reports or requests for MA recipients. The provider is responsible whether or not the provider is charged for the services, systems or processes and whether or not the department or its fiscal agent consents to the electronic preparation and submission of claims, cost reports, prior authorization requests and any supplementary information relating to the provider's MA certification and claims for reimbursement for services.

2. All records under pars. (a) to (d) shall be retained by a provider for a period of not less than 5 years, except that a rural health clinic provider shall retain the records for not less than 6 years. This period shall begin on the date on which the provider received payment from the program for the service to which the records relate. Termination of a provider's participation does not terminate the provider's responsibility to retain the records unless an alternative arrangement for record retention and maintenance has been established by the provider.

3. Providers are solely responsible for all costs associated with meeting the responsibilities under the provider agreement required under s. HSS 105.01 (3) (e) and the preparation and submission of claims, whether in electronic form or on paper, to MA or to medicare or other third party payers in the case of claims for MA recipients, regardless of the means or source of the preparation and submission. This includes but is not limited to claims preparation, acquisition or submission services and services which prepare, acquire or submit claims to payers, including but not limited to MA, on behalf of the provider, whether or not the provider or the provider's membership organization is charged for the preparation or submission of claims, and any other activity required under the provider agreement in accordance with s. HSS 105.01 (3) (e).

4. At the request of a person authorized by the department and on presentation of that person's credentials, a provider shall permit access to any requested records, whether in written, electronic, or micrographic form. Access for purposes of this subsection shall include the opportunity to inspect, review, audit and reproduce the records.

5. Except as otherwise provided under a contract between the department and providers or pre-paid health plans, and except for records requested by the peer review organization under contract with the department, all costs of reproduction by a provider of records under this subsection shall be paid by the department at the per-page rate for record reproduction established by the department under s. HSS 108.02 (4). Reproduction costs for records requested by the peer review organization shall be paid at the prevailing per-page rate for MA records established by that organization.

(f) *Condition for reimbursement.* Services covered under ch. HSS 107 are non-reimbursable under the MA program unless the documentation and medical recordkeeping requirements under this section are met.

(g) *Supporting documentation.* The department may refuse to pay claims and may recover previous payments made on claims where the provider fails or refuses to prepare and maintain records or permit authorized department personnel to have access to records required under s. HSS 105.02 (6) or (7) and the relevant sections of chs. HSS 106 and 107 for purposes of disclosing, substantiating or otherwise auditing the provision, nature, scope, quality, appropriateness and necessity of services which are the subject of claims or for purposes of determining provider compliance with MA requirements.

(10) NONDISCRIMINATION. Providers shall comply with the civil rights act of 1964, 42 USC 2000d et. seq., and s. 504 of the rehabilitation act of 1973, as amended. Accordingly, providers may not exclude, deny or refuse to provide health care services to recipients on the grounds of race, color, gender, age, national origin or handicap, nor may they discriminate in their employment practices.

(11) PROVISION OF NON-REIMBURSABLE COVERED SERVICES. A provider may not bill a recipient for covered services which are non-reimbursable under s. HSS 107.02 (2).

History: Cr. Register, December, 1979, No. 288, eff. 2-1-80; am. Register, February, 1986, No. 362, eff. 3-1-86; emerg. r. and recr. (9), eff. 7-1-92; r. and recr. (9), cr. (11), Register, February, 1993, No. 446, eff. 3-1-93; correction made in (10) under s. 13.93 (2m) (b) 7, Stats., Register, June, 1994, No. 462.

**HSS 106.03 Manner of preparing and submitting claims for reimbursement.** (1) FORMAT. (a) In this subsection, "billing service" means a provider or an entity under contract to a provider which provides electronic media billing or electronic billing transmission for one or more providers.

(b) A provider shall use claim forms prescribed or furnished by the department, except that a provider may submit claims by electronic media or electronic transmission if the provider or billing service is approved by the department for electronic claims submission. A billing service shall be approved in writing by the department based on the billing service's ability to consistently meet format and content specifications required for the applicable provider type. The department shall, upon request, provide a written format and the content specifications required for electronic media or electronic transmission billings and shall advise the provider or billing service of procedures required to obtain department approval of electronic billing.

(c) Upon the department's approval of the provider or the provider's billing service to submit claims through electronic media or electronic transmission billing, the provider shall sign an agreement to comply with the format, content and procedural requirements of the department.

(d) The department may at its discretion revoke its approval and rescind the agreement for electronic media or electronically transmitted claims submission at any time if the provider or billing service fails to fully comply with all of the department's instructions for submission of electronic media or electronically transmitted claims, or repeatedly submits duplicate, inaccurate or incomplete claims. The department may at its discretion revoke its approval and rescind the agreement under par.

102
HSS 106        WISCONSIN ADMINISTRATIVE CODE

(c) when the provider's claims repeatedly fail to provide correct and complete information necessary for timely and accurate claims processing and payment in accordance with billing instructions provided by the department or its fiscal agent.

(2) CONTENT. (a) In the preparation of claims, the provider shall use, as applicable, diagnosis, place of service, type of service, procedure codes and other information specified by the department under s. HSS 108.02 (4) for identifying services billed on the claim. The department shall inform affected providers of the name and source of the designated diagnosis and procedure codes.

(b) Claims shall be submitted in accordance with the claims submission requirements, claim forms instructions and coding information provided by the department.

(c) Whether submitted directly by the provider, by the provider's billing service or by another agent of the provider, the truthfulness, completeness, timeliness and accuracy of any claim are the sole responsibility of the provider.

(d) Every claim submitted shall be signed by the provider or by the provider's authorized agent, certifying to the accuracy and completeness of the claim and that services billed on the claim are consistent with the requirements of chs. HSS 101 to 108 and the department's instructions issued under s. HSS 108.02 (4). For claims submitted by electronic media or electronic transmission, the provider agreement under sub. (1) (c) substitutes for the signature required by this paragraph for each claims submission.

(3) TIMELINESS OF SUBMISSION. (a) A claim may not be submitted to MA until the recipient has received the service which is the subject of the claim and the requirements of sub. (7) have been met. A claim may not be submitted by a nursing home for a recipient who is a nursing home resident until the day following the last date of service in the month for which reimbursement is claimed. A claim may not be submitted by a hospital for a recipient who is a hospital inpatient until the day following the last date of service for which reimbursement is claimed.

(b) 1. To be considered for payment, a correct and complete claim or adjustment shall be received by the department's fiscal agent within 365 days after the date of the service except as provided in subd. 4 and par. (c). The department fiscal agent's response to any claim or adjustment received more than 365 days after the date of service shall constitute final department action with respect to payment of the claim or adjustment in question.

2. The provider is responsible for providing complete and timely follow-up to each claim submission to verify that correct and accurate payment was made, and to seek resolution of any disputed claims.

3. To ensure that submissions are correct and there is appropriate follow-up of all claims, providers shall follow the claims preparation and submission instructions in provider handbooks and bulletins issued by the department.

4. If a claim was originally denied or incorrectly paid because of an error on the recipient eligibility file, an incorrect HMO designation, an incorrect nursing home level of care authorization or nursing home patient liability amount, the department may pay a correct and complete

## *2011 Regs., Conn. State Agencies § 17b-262-526*

2011 Connecticut Administrative Code Archive

**REGULATIONS OF CONNECTICUT STATE AGENCIES   > TITLE 17b SOCIAL SERVICES >
DEPARTMENT OF SOCIAL SERVICES > REQUIREMENTS FOR PROVIDER ENROLLMENT IN THE
CONNECTICUT MEDICAL ASSISTANCE PROGRAM**

## Notice

**Deleted:** Red text with a strikethrough

## Sec. 17b-262-526. General provider requirements

To maintain enrollment in the Connecticut Medical Assistance Program, a provider shall abide by all federal and state statutes regulations and operational procedures promulgated by the department which govern the Medical Assistance Program and shall:

**(1)** abstain from discriminating or permitting discrimination against any person or group of persons on the basis of race, color, religious creed, age, marital status, national origin, sex, mental or physical disability, or sexual orientation pursuant to Title 45 of the Code of Federal Regulations (CFR), Part 80, sections 80.3 and 80.4 *45 CFR 80.3* and *45 CFR 80.4*;

**(2)** accept as payment in full either the department's payment or a combination of department, third party payment, and any authorized client copayment which is no more than the department's schedule of payment, except with regard to the department's obligations for payment of Medicare coinsurance and deductibles;

**(3)** agree to pursue and exhaust all of a client's third party resources prior to submitting claims to the department for payment; to report any and all third party payments; to acknowledge the department as the  payor  payer of last resort; and to assist in identifying other possible sources of third party liability for which a legal obligation for payment of all or part of the Medical Assistance Program goods or services furnished exists;

**(4)** be qualified to furnish Medical Assistance Program goods or services; be currently certified and enrolled in the Medicare program if required by any federal or state statutes or regulations which govern the Medical Assistance Program goods or services furnished by a provider under the provider's assigned type and specialty;

**(5)** meet and adhere to all applicable licensing, accreditation, and certification requirements and all applicable state and local zoning and safety requirements pertaining to the provider's assigned type and specialty in the jurisdiction where the Medical Assistance Program goods or services are furnished;

**(6)** meet and adhere to any additional department requirements, after enrollment, promulgated in conformance with federal and state statutes, regulations and operational procedures which govern the provider's assigned provider type and specialty;

**(7)** maintain a specific record for each client eligible for Medical Assistance Program payment including, but not limited to: name; address; birth date; Medical Assistance Program identification number; pertinent diagnostic information and x-rays; current and all prior treatment plans prepared by the provider;

Case 1:11-cv-00071-PGG   Document 237-105   Filed 08/31/18   Page 131 of 312
Page 2 of 2

2011 Regs., Conn. State Agencies § 17b-262-526

pertinent treatment notes signed by the provider; documentation of the dates of service; and other requirements as provided by federal and state statutes and regulations pursuant to *42 CFR 482.61*, and, to the extent such requirements apply to a provider's licensure category, record requirements set forth in chapter iv of the Connecticut Public Health Code (*sections 19-13-D1* to *19-13-D105 of the Regulations of Connecticut State Agencies*). Such records and information shall be made available to the department upon request;

**(8)** maintain all required documentation for at least five years or longer as required by state or federal law or regulation in the provider's file subject to review by authorized department personnel. In the event of a dispute concerning goods or services provided, documentation shall be maintained until the end of the dispute, for five years, or the length of time required by state or federal law or regulation, whichever is greatest. Failure to maintain and provide all required documentation to the department upon request shall result in the disallowance and recovery by the department of any future or past payments made to the provider for which the required documentation is not maintained and not provided to the department upon request, as permitted by state and federal law;

**(9)** notify the department in writing of all substantial changes in information which were provided on the application submitted to the department for provider enrollment or reenrollment in the Medical Assistance Program;

**(10)** disclose, in accordance with *42 CFR 455.106*, any information requested by the department regarding the identity of any person who has ownership or a controlling interest in the provider's business who has been convicted of a criminal offense related to that person's involvement in Medicare or the Medical Assistance Program;

**(11)** furnish all information relating to the provider's business ownership, as well as transactions with subcontractors, in accordance with federal and state statutes and regulations;

**(12)** not deny goods or services to a client solely on the basis of the client's inability to meet a copayment; and

**(13)** agree to participate in studies of access, quality and outcome conducted by the department or its agents. The department shall reimburse providers for costs above and beyond nominal costs incurred by such participation.

# History

New section, published in Conn. Law Journal, April 13, 1999, effective February 8, 1999; amendment published in Conn. Law Journal September 16, 2003, effective July 29, 2003

REGULATIONS OF CONNECTICUT STATE AGENCIES

**End of Document**

## *2011 Fla. Stat. § 409.907*

2011 Florida Code Archive

*LexisNexis ® Florida Annotated Statutes  >  TITLE 30. SOCIAL WELFARE (Chs. 409-430)  >
CHAPTER 409. SOCIAL AND ECONOMIC ASSISTANCE  >  PART III. MEDICAID*

# § 409.907. Medicaid provider agreements

The agency may make payments for medical assistance and related services rendered to Medicaid recipients only to an individual or entity who has a provider agreement in effect with the agency, who is performing services or supplying goods in accordance with federal, state, and local law, and who agrees that no person shall, on the grounds of handicap, race, color, or national origin, or for any other reason, be subjected to discrimination under any program or activity for which the provider receives payment from the agency.

(1) Each provider agreement shall require the provider to comply fully with all state and federal laws pertaining to the Medicaid program, as well as all federal, state, and local laws pertaining to licensure, if required, and the practice of any of the healing arts, and shall require the provider to provide services or goods of not less than the scope and quality it provides to the general public.

(2) Each provider agreement shall be a voluntary contract between the agency and the provider, in which the provider agrees to comply with all laws and rules pertaining to the Medicaid program when furnishing a service or goods to a Medicaid recipient and the agency agrees to pay a sum, determined by fee schedule, payment methodology, or other manner, for the service or goods provided to the Medicaid recipient. Each provider agreement shall be effective for a stipulated period of time, shall be terminable by either party after reasonable notice, and shall be renewable by mutual agreement.

(3) The provider agreement developed by the agency, in addition to the requirements specified in subsections (1) and (2), shall require the provider to:

(a) Have in its possession at the time of signing the provider agreement, and maintain in good standing throughout the period of the agreement's effectiveness, a valid professional or facility license pertinent to the services or goods being provided, as required by the state or locality in which the provider is located, and the Federal Government, if applicable.

(b) Maintain in a systematic and orderly manner all medical and Medicaid-related records that the agency requires and determines are relevant to the services or goods being provided.

(c) Retain all medical and Medicaid-related records for a period of 5 years to satisfy all necessary inquiries by the agency.

(d) Safeguard the use and disclosure of information pertaining to current or former Medicaid recipients and comply with all state and federal laws pertaining to confidentiality of patient information.

(e) Permit the agency, the Attorney General, the Federal Government, and the authorized agents of each of these entities access to all Medicaid-related information, which may be in the form of records, logs, documents, or computer files, and other information pertaining to services or goods billed to the Medicaid program, including access to all patient records and other provider information if the provider cannot easily separate records for Medicaid patients from other records.

(f) Bill other insurers and third parties, including the Medicare program, before billing the Medicaid program, if the recipient is eligible for payment for health care or related services from another insurer or person, and comply with all other state and federal requirements in this regard.

2011 Fla. Stat. § 409.907

**(g)** Promptly report any moneys received in error or in excess of the amount to which the provider is entitled from the Medicaid program, and promptly refund such moneys to the agency.

**(h)** Be liable for and indemnify, defend, and hold the agency harmless from all claims, suits, judgments, or damages, including court costs and attorney's fees, arising out of the negligence or omissions of the provider in the course of providing services to a recipient or a person believed to be a recipient.

**(i)** At the option of the agency, provide proof of liability insurance and maintain such insurance in effect for any period during which services or goods are furnished to Medicaid recipients.

**(j)** Accept Medicaid payment as payment in full, and prohibit the provider from billing or collecting from the recipient or the recipient's responsible party any additional amount except, and only to the extent the agency permits or requires, copayments, coinsurance, or deductibles to be paid by the recipient for the services or goods provided. The Medicaid payment-in-full policy does not apply to services or goods provided to a recipient if the services or goods are not covered by the Medicaid program.

**(4)** A provider agreement shall provide that, if the provider sells or transfers a business interest or practice that substantially constitutes the entity named as the provider in the provider agreement, or sells or transfers a facility that is of substantial importance to the entity named as the provider in the provider agreement, the provider is required to maintain and make available to the agency Medicaid-related records that relate to the sale or transfer of the business interest, practice, or facility in the same manner as though the sale or transaction had not taken place, unless the provider enters into an agreement with the purchaser of the business interest, practice, or facility to fulfill this requirement.

**(5)** The agency:

**(a)** Is required to make timely payment at the established rate for services or goods furnished to a recipient by the provider upon receipt of a properly completed claim form. The claim form shall require certification that the services or goods have been completely furnished to the recipient and that, with the exception of those services or goods specified by the agency, the amount billed does not exceed the provider's usual and customary charge for the same services or goods.

**(b)** Is prohibited from demanding repayment from the provider in any instance in which the Medicaid overpayment is attributable to error of the department in the determination of eligibility of a recipient.

**(c)** May adopt, and include in the provider agreement, such other requirements and stipulations on either party as the agency finds necessary to properly and efficiently administer the Medicaid program.

**(d)** May enroll entities as Medicare crossover-only providers for payment and claims processing purposes only. The provider agreement shall:

**1.** Require that the provider be able to demonstrate to the satisfaction of the agency that the provider is an eligible Medicare provider and has a current provider agreement in place with the Centers for Medicare and Medicaid Services.

**2.** Require the provider to notify the agency immediately in writing upon being suspended or disenrolled as a Medicare provider. If the provider does not provide such notification within 5 business days after suspension or disenrollment, sanctions may be imposed pursuant to this chapter and the provider may be required to return funds paid to the provider during the period of time that the provider was suspended or disenrolled as a Medicare provider.

**3.** Require the applicant to submit an attestation, as approved by the agency, that the provider meets the requirements of Florida Medicaid provider enrollment criteria.

**4.** Require the applicant to submit fingerprints as required by the agency.

**5.** Require that all records pertaining to health care services provided to each of the provider's recipients be kept for a minimum of 6 years. The agreement shall also require that records and any information relating to payments claimed by the provider for services under the agreement be delivered to the agency or the Office of the Attorney General Medicaid Fraud Control Unit when requested. If a provider does not provide such records and information when requested, sanctions may be imposed pursuant to this chapter.

**6.** Disclose that the agreement is for the purposes of paying and processing Medicare crossover claims only.

This paragraph pertains solely to Medicare crossover-only providers. In order to become a standard Medicaid provider, the requirements of this section and applicable rules must be met. This paragraph does not create an entitlement or obligation of the agency to enroll all Medicare providers that may be considered Medicare crossover-only providers in the Medicaid program.

**(e)** Providers that are required to post a surety bond as part of the Medicaid enrollment process are excluded for enrollment under paragraph (d) and must complete a full Medicaid application. The agency may establish additional criteria to promote program integrity.

**(6)** A Medicaid provider agreement may be revoked, at the option of the agency, as the result of a change of ownership of any facility, association, partnership, or other entity named as the provider in the provider agreement.

**(a)** In the event of a change of ownership, the transferor remains liable for all outstanding overpayments, administrative fines, and any other moneys owed to the agency before the effective date of the change of ownership. In addition to the continuing liability of the transferor, the transferee is liable to the agency for all outstanding overpayments identified by the agency on or before the effective date of the change of ownership. For purposes of this subsection, the term "outstanding overpayment" includes any amount identified in a preliminary audit report issued to the transferor by the agency on or before the effective date of the change of ownership. In the event of a change of ownership for a skilled nursing facility or intermediate care facility, the Medicaid provider agreement shall be assigned to the transferee if the transferee meets all other Medicaid provider qualifications. In the event of a change of ownership involving a skilled nursing facility licensed under part II of chapter 400, liability for all outstanding overpayments, administrative fines, and any moneys owed to the agency before the effective date of the change of ownership shall be determined in accordance with *s. 400.179*.

**(b)** At least 60 days before the anticipated date of the change of ownership, the transferor shall notify the agency of the intended change of ownership and the transferee shall submit to the agency a Medicaid provider enrollment application. If a change of ownership occurs without compliance with the notice requirements of this subsection, the transferor and transferee shall be jointly and severally liable for all overpayments, administrative fines, and other moneys due to the agency, regardless of whether the agency identified the overpayments, administrative fines, or other moneys before or after the effective date of the change of ownership. The agency may not approve a transferee's Medicaid provider enrollment application if the transferee or transferor has not paid or agreed in writing to a payment plan for all outstanding overpayments, administrative fines, and other moneys due to the agency. This subsection does not preclude the agency from seeking any other legal or equitable remedies available to the agency for the recovery of moneys owed to the Medicaid program. In the event of a change of ownership involving a skilled nursing facility licensed under part II of chapter 400, liability for all outstanding overpayments, administrative fines, and any moneys owed to the agency before the effective date of the change of ownership shall be determined in accordance with *s. 400.179* if the Medicaid provider enrollment application for change of ownership is submitted before the change of ownership.

**(7)** The agency may require, as a condition of participating in the Medicaid program and before entering into the provider agreement, that the provider submit information, in an initial and any required renewal applications, concerning the professional, business, and personal background of the provider and

2011 Fla. Stat. § 409.907

permit an onsite inspection of the provider's service location by agency staff or other personnel designated by the agency to perform this function. The agency shall perform a random onsite inspection, within 60 days after receipt of a fully complete new provider's application, of the provider's service location prior to making its first payment to the provider for Medicaid services to determine the applicant's ability to provide the services that the applicant is proposing to provide for Medicaid reimbursement. The agency is not required to perform an onsite inspection of a provider or program that is licensed by the agency, that provides services under waiver programs for home and community-based services, or that is licensed as a medical foster home by the Department of Children and Family Services. As a continuing condition of participation in the Medicaid program, a provider shall immediately notify the agency of any current or pending bankruptcy filing. Before entering into the provider agreement, or as a condition of continuing participation in the Medicaid program, the agency may also require that Medicaid providers reimbursed on a fee-for-services basis or fee schedule basis which is not cost-based, post a surety bond not to exceed $ 50,000 or the total amount billed by the provider to the program during the current or most recent calendar year, whichever is greater. For new providers, the amount of the surety bond shall be determined by the agency based on the provider's estimate of its first year's billing. If the provider's billing during the first year exceeds the bond amount, the agency may require the provider to acquire an additional bond equal to the actual billing level of the provider. A provider's bond shall not exceed $ 50,000 if a physician or group of physicians licensed under chapter 458, chapter 459, or chapter 460 has a 50 percent or greater ownership interest in the provider or if the provider is an assisted living facility licensed under chapter 429. The bonds permitted by this section are in addition to the bonds referenced in *s. 400.179(2)(d)*. If the provider is a corporation, partnership, association, or other entity, the agency may require the provider to submit information concerning the background of that entity and of any principal of the entity, including any partner or shareholder having an ownership interest in the entity equal to 5 percent or greater, and any treating provider who participates in or intends to participate in Medicaid through the entity. The information must include:

**(a)** Proof of holding a valid license or operating certificate, as applicable, if required by the state or local jurisdiction in which the provider is located or if required by the Federal Government.

**(b)** Information concerning any prior violation, fine, suspension, termination, or other administrative action taken under the Medicaid laws, rules, or regulations of this state or of any other state or the Federal Government; any prior violation of the laws, rules, or regulations relating to the Medicare program; any prior violation of the rules or regulations of any other public or private insurer; and any prior violation of the laws, rules, or regulations of any regulatory body of this or any other state.

**(c)** Full and accurate disclosure of any financial or ownership interest that the provider, or any principal, partner, or major shareholder thereof, may hold in any other Medicaid provider or health care related entity or any other entity that is licensed by the state to provide health or residential care and treatment to persons.

**(d)** If a group provider, identification of all members of the group and attestation that all members of the group are enrolled in or have applied to enroll in the Medicaid program.

**(8)** (a) Each provider, or each principal of the provider if the provider is a corporation, partnership, association, or other entity, seeking to participate in the Medicaid program must submit a complete set of his or her fingerprints to the agency for the purpose of conducting a criminal history record check. Principals of the provider include any officer, director, billing agent, managing employee, or affiliated person, or any partner or shareholder who has an ownership interest equal to 5 percent or more in the provider. However, a director of a not-for-profit corporation or organization is not a principal for purposes of a background investigation as required by this section if the director: serves solely in a voluntary capacity for the corporation or organization, does not regularly take part in the day-to-day operational decisions of the corporation or organization, receives no remuneration from the not-for-profit corporation or organization for his or her service on the board of directors, has no financial interest in the not-for-profit corporation or organization, and has no family members with a financial interest in the not-for-profit corporation or organization; and if the director submits an affidavit, under

penalty of perjury, to this effect to the agency and the not-for-profit corporation or organization submits an affidavit, under penalty of perjury, to this effect to the agency as part of the corporation's or organization's Medicaid provider agreement application. Notwithstanding the above, the agency may require a background check for any person reasonably suspected by the agency to have been convicted of a crime. This subsection does not apply to:

**1.** A hospital licensed under chapter 395;

**2.** A nursing home licensed under chapter 400;

**3.** A hospice licensed under chapter 400;

**4.** An assisted living facility licensed under chapter 429;

**5.** A unit of local government, except that requirements of this subsection apply to nongovernmental providers and entities contracting with the local government to provide Medicaid services. The actual cost of the state and national criminal history record checks must be borne by the nongovernmental provider or entity; or

**6.** Any business that derives more than 50 percent of its revenue from the sale of goods to the final consumer, and the business or its controlling parent is required to file a form 10-K or other similar statement with the Securities and Exchange Commission or has a net worth of $ 50 million or more.

**(b)** Background screening shall be conducted in accordance with chapter 435 and *s. 408.809*. The cost of the state and national criminal record check shall be borne by the provider.

**(c)** Proof of compliance with the requirements of level 2 screening under chapter 435 conducted within 12 months before the date the Medicaid provider application is submitted to the agency fulfills the requirements of this subsection.

**(9)** Upon receipt of a completed, signed, and dated application, and completion of any necessary background investigation and criminal history record check, the agency must either:

**(a)** Enroll the applicant as a Medicaid provider upon approval of the provider application. The enrollment effective date shall be the date the agency receives the provider application. With respect to a provider that requires a Medicare certification survey, the enrollment effective date is the date the certification is awarded. With respect to a provider that completes a change of ownership, the effective date is the date the agency received the application, the date the change of ownership was complete, or the date the applicant became eligible to provide services under Medicaid, whichever date is later. With respect to a provider of emergency medical services transportation or emergency services and care, the effective date is the date the services were rendered. Payment for any claims for services provided to Medicaid recipients between the date of receipt of the application and the date of approval is contingent on applying any and all applicable audits and edits contained in the agency's claims adjudication and payment processing systems. The agency may enroll a provider located outside the State of Florida if the provider's location is no more than 50 miles from the Florida state line, or the agency determines a need for that provider type to ensure adequate access to care; or

**(b)** Deny the application if the agency finds that it is in the best interest of the Medicaid program to do so. The agency may consider the factors listed in subsection (10), as well as any other factor that could affect the effective and efficient administration of the program, including, but not limited to, the applicant's demonstrated ability to provide services, conduct business, and operate a financially viable concern; the current availability of medical care, services, or supplies to recipients, taking into account geographic location and reasonable travel time; the number of providers of the same type already enrolled in the same geographic area; and the credentials, experience, success, and patient outcomes of the provider for the services that it is making application to provide in the Medicaid program. The agency shall deny the application if the agency finds that a provider; any officer, director, agent, managing employee, or affiliated person; or any

partner or shareholder having an ownership interest equal to 5 percent or greater in the provider if the provider is a corporation, partnership, or other business entity, has failed to pay all outstanding fines or overpayments assessed by final order of the agency or final order of the Centers for Medicare and Medicaid Services, not subject to further appeal, unless the provider agrees to a repayment plan that includes withholding Medicaid reimbursement until the amount due is paid in full.

**(10)** The agency may consider whether the provider, or any officer, director, agent, managing employee, or affiliated person, or any partner or shareholder having an ownership interest equal to 5 percent or greater in the provider if the provider is a corporation, partnership, or other business entity, has:

**(a)** Made a false representation or omission of any material fact in making the application, including the submission of an application that conceals the controlling or ownership interest of any officer, director, agent, managing employee, affiliated person, or partner or shareholder who may not be eligible to participate;

**(b)** Been or is currently excluded, suspended, terminated from, or has involuntarily withdrawn from participation in, Florida's Medicaid program or any other state's Medicaid program, or from participation in any other governmental or private health care or health insurance program;

**(c)** Been convicted of a criminal offense relating to the delivery of any goods or services under Medicaid or Medicare or any other public or private health care or health insurance program including the performance of management or administrative services relating to the delivery of goods or services under any such program;

**(d)** Been convicted under federal or state law of a criminal offense related to the neglect or abuse of a patient in connection with the delivery of any health care goods or services;

**(e)** Been convicted under federal or state law of a criminal offense relating to the unlawful manufacture, distribution, prescription, or dispensing of a controlled substance;

**(f)** Been convicted of any criminal offense relating to fraud, theft, embezzlement, breach of fiduciary responsibility, or other financial misconduct;

**(g)** Been convicted under federal or state law of a crime punishable by imprisonment of a year or more which involves moral turpitude;

**(h)** Been convicted in connection with the interference or obstruction of any investigation into any criminal offense listed in this subsection;

**(i)** Been found to have violated federal or state laws, rules, or regulations governing Florida's Medicaid program or any other state's Medicaid program, the Medicare program, or any other publicly funded federal or state health care or health insurance program, and been sanctioned accordingly;

**(j)** Been previously found by a licensing, certifying, or professional standards board or agency to have violated the standards or conditions relating to licensure or certification or the quality of services provided; or

**(k)** Failed to pay any fine or overpayment properly assessed under the Medicaid program in which no appeal is pending or after resolution of the proceeding by stipulation or agreement, unless the agency has issued a specific letter of forgiveness or has approved a repayment schedule to which the provider agrees to adhere.

**(11)** Before signing a provider agreement and at the discretion of the agency, other provisions of this section notwithstanding, an entity may become eligible to receive payment from the Medicaid program at the time it first furnishes services or goods, if:

**(a)** The services or goods provided are otherwise compensable;

**(b)** The entity meets all other requirements of a Medicaid provider at the time the services or goods were provided; and

2011 Fla. Stat. § 409.907

    **(c)** The entity agrees to abide by the provisions of the provider agreement effective from the date the services or goods were provided.

  **(12)** Licensed, certified, or otherwise qualified providers are not entitled to enrollment in a Medicaid provider network.

# History

*S. 36, ch. 91-282;  s. 3, ch. 94-251;  s. 2, ch. 96-387;  s. 5, ch. 96-417;  s. 1, ch. 97-290;  s. 16, ch. 2000-163;  s. 53, ch. 2000-256;  s. 6, ch. 2001-377;  s. 21, ch. 2002-400;  s. 20, ch. 2004-267;  s. 11, ch. 2004-270;  s. 53, ch. 2004-350;  s. 66, ch. 2005-2;  s. 8, ch. 2005-60;  s. 16, ch. 2005-133;  s. 12, ch. 2006-28, eff. July 1, 2006;  s. 82, ch. 2006-197, eff. July 1, 2006;  s. 137, ch. 2007-230, eff. July 1, 2007;  s. 12, ch. 2008-246, eff. July 1, 2008;  s. 12, ch. 2009-223, eff. July 1, 2009;  s. 25, ch. 2010-114, eff. Aug. 1, 2010;  s. 6, ch. 2010-156, eff. July 1, 2010;  s. 11, ch. 2011-135, eff. July 1, 2011.*

LexisNexis ® Florida Annotated Statutes

Copyright © 2017 by Matthew Bender & Company, Inc. a member of the LexisNexis Group. All rights reserved.

**End of Document**

*2011 89 Ill. Adm. Code 140.12*

2011 Illinois Administrative Code Archive

*ILLINOIS ADMINISTRATIVE CODE   > TITLE 89. SOCIAL SERVICES  >  CHAPTER I. DEPARTMENT OF HEALTHCARE AND FAMILY SERVICES  >  SUBCHAPTER d. MEDICAL PROGRAMS  >  PART 140. MEDICAL PAYMENT  >  SUBPART B. MEDICAL PROVIDER PARTICIPATION*

## § 140.12 Participation Requirements for Medical Providers

The provider shall agree to:

**a)** Verify eligibility of recipients prior to providing each service;

**b)** Allow recipients the choice of accepting or rejecting medical or surgical care or treatment;

**c)** Provide supplies and services in full compliance with all applicable provisions of State and federal laws and regulations pertaining to nondiscrimination and equal employment opportunity including but not limited to:

**1)** Full compliance with Title VI of the Civil Rights Act of 1964, which prohibits discrimination on the basis of race, color or national origin;

**2)** Full compliance with Section 504 of the Rehabilitation Act of 1973 and 45 CFR 84, which prohibit discrimination on the basis of handicap; and

**3)** Without discrimination on the basis of religious belief, political affiliation, sex, age or disability;

**d)** Comply with the requirements of applicable federal and State laws and not engage in practices prohibited by such laws;

**e)** Provide, and upon demand present documentation of, education of employees, contractors and agents regarding the federal False Claims Act *(31 USC 3729*-3733) that complies with all requirements of *42 USC 1396a*(a)(68).   Providers subject to this requirement include a governmental agency, organization, unit, corporation, partnership, or other business arrangement (including any Medicaid managed care organization, irrespective of the form of business structure or arrangement by which it exists), whether for-profit or not-for-profit, that receives or makes payments totaling at least $ 5 million annually;

**f)** Hold confidential, and use for authorized program purposes only, all Medical Assistance information regarding recipients;

**g)** Furnish to the Department, in the form and manner requested by it, any information it requests regarding payments for providing goods or services, or in connection with the rendering of goods or services or supplies to recipients by the provider, his agent, employer or employee;

**h)** Make charges for the provision of services and supplies to recipients in amounts not to exceed the provider's usual and customary charges and in the same quality and mode of delivery as are provided to the general public;

**i)** Accept as payment in full the amounts established by the Department.

**1)** If a provider accepts an individual eligible for medical assistance from the Department as a Medicaid recipient, such provider shall not bill, demand or otherwise seek reimbursement from that individual or from a financially responsible relative or representative of the individual for any service for which

2011 89 Ill. Adm. Code 140.12

reimbursement would have been available from the Department if the provider had timely and properly billed the Department.  For purposes of this subsection, "accepts" shall be deemed to include:

**A)** an affirmative representation to an individual that payment for services will be sought from the Department;

**B)** an individual presents the provider with his or her medical card and the provider does not indicate that other payment arrangements will be necessary; or

**C)** billing the Department for the covered medical service provided an eligible individual.

**2)** If an eligible individual is entitled to medical assistance with respect to a service for which a third party is liable for payment, the provider furnishing the service may not seek to collect from the individual payment for that service if the total liability of the third party for that service is at least equal to the amount payable for that service by the Department.

**j)** Accept assignment of Medicare benefits for public aid recipients eligible for Medicare, when payment for services to such persons is sought from the Department;

**k)** Complete an MCH (Maternal and Child Health) Primary Care Provider Agreement in order to participate in the Maternal and Child Health Program (see Section 140.924(a)(1)(D)); and

**l)** In the case of long term care providers, assume liability for repayment to the Department of any overpayment made to a facility regardless of whether the overpayment was incurred by a current owner or operator or by a previous owner or operator.  Liability of current and previous providers to the Department shall be joint and several.  Recoveries by the Department under this Section may be made pursuant to Sections 140.15 and 140.25.  A current or previous owner or lessee may request from the Department a list of all known outstanding liabilities due the Department by the facility and of any known pending Department actions against a facility that may result in further liability.  For purposes of this Section, "overpayment" shall include, but not be limited to:

**1)** Amounts established by final administrative decisions pursuant to *89 Ill.  Adm. Code 104*;

**2)** Overpayments resulting from advance C-13 payments made pursuant to Section 140.71;

**3)** Liabilities resulting from nonpayment or delinquent payment of assessments pursuant to Sections 140.82, 140.84 and 140.94; and

**4)** Amounts identified during past, pending or future audits that pertain to audit periods prior to a change in ownership and are conducted pursuant to Sections 140.30 and 140.590.  Liability of current owners or operators for amounts identified during such audits shall be as follows:

**A)** For past audits (audits completed before changes in ownership), liability shall be the amount established by final administrative decision.

**B)** For pending audits (audits initiated, but not completed prior to the change in ownership), liability shall be limited to the lesser of the amounts established by final administrative decision or two months of service revenue. Two months of service revenue is defined as the most recent two months of Medicaid patient days multiplied by the total Medicaid rate in effect on the date the new owner or operator is enrolled in the Program as a provider by the Department. The Medicaid rate in effect on the date of enrollment shall be used even if that rate is subsequently changed.

**C)** For future audits (audits initiated after the change in ownership but pertaining to an audit period prior to a change in ownership), liability shall be limited as described in subsection (k)(4)(B) of this Section.

# History

**SOURCE:**

Amended at 18 Ill. Reg. 3620, effective February 28, 1994.

Amended at 19 Ill. Reg. 7919, effective June 5, 1995.

Editorial correction August 18, 1995.

Amended at 22 Ill. Reg. 7024, effective April 1, 1998.

Amended at 24 Ill. Reg. 18320, effective December 1, 2000.

Amended by emergency rulemaking at 31 Ill. Reg. 1580, effective January 1, 2007,

   for a maximum of 150 days.

Amended at 31 Ill. Reg. 8485, effective May 30, 2007.

ILLINOIS ADMINISTRATIVE CODE

**End of Document**

## *2011 K.A.R. § 30-5-59*

2011 Kansas Administrative Code Archive

**KANSAS ADMINISTRATIVE REGULATIONS   >   AGENCY 30 DEPARTMENT OF SOCIAL AND REHABILITATION SERVICES  >   ARTICLE 5. PROVIDER PARTICIPATION, SCOPE OF SERVICES, AND REIMBURSEMENTS FOR THE MEDICAID (MEDICAL ASSISTANCE) PROGRAM**

# 30-5-59. Provider participation requirements.

The following shall be prerequisites for participation in and payment from the medicaid/medikan program. Any provider of services to foster care consumers, adoption support consumers, Kan Be Healthy consumers, or other consumers who have special needs may be excluded from these prerequisites if the secretary determines that a medically necessary item of durable medical equipment or a medically necessary service can be cost-efficiently obtained only from a provider not otherwise eligible to be enrolled within the current program guidelines. (a) Enrollment. Each participating provider shall perform the following:

**(1)** Submit an application for participation in the medicaid/medikan program on forms prescribed by the secretary of the Kansas department of social and rehabilitation services;

**(2)** obtain and maintain professional or department-specified credentials determined by the secretary in the jurisdiction where the service is provided and for the time period when the service is provided and, if applicable, be certified, licensed, or registered by the appropriate professional credentialing authority;

**(3)** notify the Kansas department of social and rehabilitation services if any of the original information provided on the application changes during the term of participation in the medicaid/medikan program;

**(4)** after completing the necessary application forms and receiving notice of approval to participate from the department, enter into and keep a provider agreement with the Kansas department of social and rehabilitation services;

**(5)** notify the Kansas department of social and rehabilitation services when a change of provider ownership occurs, submit new ownership information on forms for application for participation in the medicaid/medikan program, and receive approval from the department for participation as a new provider before reimbursement for services rendered to medicaid/medikan program consumers is made;

**(6)** locate a consumer service representative who is available 24 hours per day and a business in Kansas or a border city that is accessible, in accordance with the applicable Americans with disabilities act guidelines, to the general public between the hours of 9:00 a.m. and 5:00 p.m. at a minimum, excluding weekends and state and federal holidays, if applying to be a durable medical equipment or medical supply provider. Any pharmacy located in Kansas or a border city that has a medical provider number may enroll as a durable medical equipment provider even if no storefront is present; and

**(7)** be located in Kansas or a border city if applying to be a pharmacy, unless the pharmacy is providing services to children in the custody of the secretary of the Kansas department of social and rehabilitation services or to program cunsumers in emergency situations. The only exceptions to this requirement shall be the following:

**(A)** A pharmacy that is an approved contractor with the Kansas department of health and environment as a supplier of intravenous blood fraction products. This exception shall apply only to reimbursement for the intravenous blood fraction products; and

2011 K.A.R. § 30-5-59

**(B)** a mail order pharmacy that serves medicaid consumers with a primary payor other than medicaid.

**(b)** Denial of application. If an application for participation in the medicaid/medikan program is denied, the applicant shall be notified in writing by the department.

**(c)** Continuing participation. Each participating provider shall perform the following:

**(1)** Comply with applicable state and federal laws, regulations, or other program requirements;

**(2)** comply with the terms of the provider agreement;

**(3)** submit accurate claims or cost reports;

**(4)** submit claims only for covered services provided to consumers;

**(5)** engage in ethical and professional conduct;

**(6)** provide goods, services, or supplies that meet professionally recognized standards of quality;

**(7)** submit a new application for participation in the medicaid/medikan program if a claim has been submitted for payment and if at least 18 months have elapsed since a previous claim for payment was submitted; and

**(8)** refund any overpayment to the program within a period of time specified by the secretary or lose eligibility to participate.

**(d)** Recordkeeping. Each participating provider shall perform the following:

**(1)** Maintain and furnish within the time frame specified in a request any information for five years from the date of service that the Kansas department of social and rehabilitation services, its designee, or any other governmental agency acting in its official capacity may request to ensure proper payment by the medicaid/medikan program, to substantiate claims for medicaid/medikan program payments, and to complete determinations of medicaid/medikan program overpayments. This information shall include the following:

**(A)** Fiscal, medical, and other recordkeeping systems;

**(B)** matters of the provider's ownership, organization, and operation, including documentation as to whether transactions occurred between related parties;

**(C)** documentation of asset acquisition, lease, sale, or other action;

**(D)** franchise or management arrangements;

**(E)** matters pertaining to costs of operation;

**(F)** amounts of income received, by source and purpose; and

**(G)** a statement of changes in financial position;

**(2)** use standardized definitions, accounting, statistics, and reporting practices that are widely accepted in the provider's field;

**(3)** permit the Kansas department of social and rehabilitation services, its designee, or any other governmental agency acting in its official capacity to examine any records and documents that are necessary to ascertain information pertinent to the determination of the proper amount of a payment due from the medicaid/medikan program; and

**(4)** agree to repay overpayment determinations resulting from the use of sampling techniques.

**(e)** Payment. Each participating provider shall meet the following conditions:

**(1)** Accept as payment in full, subject to audit when applicable, the amount paid by the medicaid/medikan program for covered services;

(2) not assign medicaid/medikan program claims or grant a power of attorney over or otherwise transfer right to payment for these claims except as set forth in 42 CFR 447.10, revised July 24, 1996, which is adopted by reference;

(3) not charge medicaid/medikan program consumers for services denied for payment by the medicaid/medikan program because the provider has failed to meet a program requirement including prior authorization;

(4) not charge any medicaid/medikan program consumer for noncovered services unless the provider has informed the consumer, in advance and in writing, that the consumer is responsible for noncovered services;

(5) not charge medicaid/medikan program consumers for services covered by the program, with the exception of claims liable to spenddown or copayment;

(6) submit claims for payment on claim forms approved and prescribed by the secretary; and

(7) be subject to the payment limitations specified in *K.A.R. 30-5-70*.

(f) Provider participation in the medicaid/medikan program may be disallowed for any of the reasons set forth in *K.A.R. 30-5-60*.

## Statutory Authority

Authorized by and implementing *K.S.A. 39-708c*

## History

**Effective**

May 1, 1981; amended May 1, 1985; amended May 1, 1986; amended May 1, 1988; amended July 1, 1989; amended Oct. 1, 1989; amended, T-30-12-28-89, Jan. 1, 1990; amended, T-30-2-28-90, Feb. 28, 1990; amended Aug. 1, 1990; amended Jan. 7, 1991; amended May 1, 1992; amended May 3, 1993; amended Dec. 30, 1994; amended April 1, 1995; amended Oct. 1, 2000; amended Jan. 1, 2004; amended Dec. 10, 2004.

KANSAS ADMINISTRATIVE REGULATIONS

**End of Document**

## *2011 La. R.S. 46:437.11*

2011 Louisiana Code Archive

*LOUISIANA STATUTES ANNOTATED > LOUISIANA REVISED STATUTES > TITLE 46. PUBLIC WELFARE AND ASSISTANCE > CHAPTER 3. PUBLIC ASSISTANCE > PART 6-A. MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW > SUBPART A. GENERAL PROVISIONS*

# § 46:437.11. Provider agreements

**A.** The department shall make payments from medical assistance programs funds for goods, services, or supplies rendered to recipients to any person who has a provider agreement in effect with the department, who is complying with all federal and state laws and rules pertaining to the medical assistance programs, and who agrees that no person shall be subjected to discrimination under the medical assistance programs because of race, creed, ethnic origin, sex, age, or physical condition.

**B.** Each provider agreement shall require the health care provider to comply fully with all federal and state laws and rules pertaining to the medical assistance programs, to licensure, if required, and the practice of medicine, osteopathy, surgery, and midwifery. The provider agreement shall require the health care provider to provide goods, services, or supplies only if medically necessary and that are within the scope and quality of standard care.

**C.** Each provider agreement shall be a voluntary contract between the department and the health care provider in which the health care provider agrees to comply with federal and state laws and rules pertaining to the medical assistance programs when furnishing goods, services, or supplies to a recipient and the department agrees to pay a sum, determined by fee schedule, payment methodology, or other method, for the goods, services, or supplies provided to the recipient. However, a provider agreement shall not be construed to be a contract for the purposes of *R.S. 42:1113(D)*.

**D.**

    **(1)** Unless the provider agreement is terminated by the secretary for cause as provided in Paragraph (2) of this Subsection, a health care provider agreement shall be effective for a stipulated period of time, shall be terminable by either party thirty days after receipt of written notice, and shall be renewable by mutual agreement.

    **(2)** The secretary may terminate a provider agreement immediately and without written notice if a health care provider is the subject of a sanction or of a criminal, civil, or departmental proceeding.

**E.** Each health care provider who has a provider agreement with the department shall receive at least one provider number but may receive more than one provider number.

# History

*Acts 1997, No. 1142, § 2.*

LOUISIANA STATUTES ANNOTATED
Copyright © 2017 by Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

## *2011 ALM GL ch. 118E, § 36*

2011 Massachusetts Code Archive

***ANNOTATED LAWS OF MASSACHUSETTS  >  PART I ADMINISTRATION OF THE GOVERNMENT > TITLE XVII PUBLIC WELFARE  >  Chapter 118E Division of Medical Assistance***

# § 36. Providers Eligible to Participate in Program.

Participation in the medical assistance programs established under this chapter shall be limited to providers of services who have not been convicted of larceny or fraud or any other crime in connection with such services, or the billing therefor and who:

**(1)** indicate their intention to the division to so participate;

**(2)** present evidence, satisfactory to the division, of their qualifications to provide such services;

**(3)** agree to accept, as payment in full, the amounts paid in accordance with the fee schedules provided for under this chapter;

**(4)** agree to comply with all laws, rules and regulations governing the operation of the programs;

**(5)** agree to be responsible for all overpayments owed to the division, including, in the case of transfer of ownership, the overpayments of any and all previous owners.

If any individual or entity has an ownership interest in more than one institutional provider, the division may offset any monetary liability of such individual or entity to the division under this section or otherwise from any amounts the division owes to any such institutional provider. Any individual or entity having an ownership interest in an institutional provider shall be liable to the division for all monetary liabilities of such provider to the division to the extent of such individual's or entity's ownership interest. For purposes of this paragraph, an "ownership interest" shall include both direct ownership interests and ownership interests in any entity which has an ownership interest in an institutional provider, and an "institutional provider" shall mean any entity which participates in any medical assistance program under this chapter as a provider of nursing facility services or acute, chronic, or rehabilitation hospital services.

# History

*1993, 161, § 17*; *1995, 38, § 136*; *1996, 151, § 273*; *1998, 194, § 175*.

ANNOTATED LAWS OF MASSACHUSETTS

Copyright © 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group All rights reserved

## *2011 MONT. ADMIN. R. 37.85.401*

2011 Montana Administrative Code Archive

***ADMINISTRATIVE RULES OF MONTANA  > TITLE 37: PUBLIC HEALTH AND HUMAN SERVICES > CHAPTER 85: GENERAL MEDICAID SERVICES > SUB-CHAPTER 4: PROVIDER REQUIREMENTS***

# 37.85.401 PROVIDER PARTICIPATION

**(1)** As a condition of participation in the Montana medicaid program all providers must comply with all applicable state and federal statutes, rules and regulations, including but not limited to federal regulations and statutes found in Title 42 of the Code of Federal Regulations and the United States Code governing the medicaid program and all applicable Montana statutes and rules governing licensure and certification.

# Statutory Authority

(*Sec. 53-6-113, MCA*; IMP, *Sec. 53-2-201*,*53-6-101*,*53-6-111*,*53-6-113*and*53- 6-141, MCA*; NEW, 1980 MAR p. 1491, Eff. 5/16/80; AMD, 1997 MAR p. 474, Eff. 3/11/97; TRANS, from SRS, 2000 MAR p. 479.)

ADMINISTRATIVE RULES OF MONTANA

**End of Document**

## *2011 8.302.1.11 NMAC*

2011 New Mexico Administrative Code Archive

***NEW MEXICO ADMINISTRATIVE CODE  >  TITLE 8. SOCIAL SERVICES  >  CHAPTER 302.
MEDICAID GENERAL PROVIDER POLICIES >  PART 1. GENERAL PROVIDER POLICIES***

# § 8.302.1.11. PROVIDER RESPONSIBILITIES AND REQUIREMENTS

A provider who furnishes services to a medicaid eligible recipient agrees to comply with all federal and state laws, regulations, and executive orders relevant to the provision of services. A provider also must conform to MAD program rules and instructions as specified in this manual, its appendices, and program directions and billing instructions, as updated. A provider is also responsible for following coding manual guidelines and CMS correct coding initiatives, including not improperly unbundling or upcoding services. A provider must verify that individuals are eligible for a specific health care program administered by the HSD and its authorized agents, and must verify the eligible recipient's enrollment status at the time services are furnished. A provider must determine if an eligible recipient has other health insurance. A provider must maintain records that are sufficient to fully disclose the extent and nature of the services provided to an eligible recipient.

**A.** Eligibility determination: A provider must verify recipient eligibility prior to providing services and verify that the recipient remains eligible throughout periods of continued or extended services.

   **(1)** A provider may verify eligibility through several mechanisms, including using the automated voice response system, contacting MAD or designated contractor eligibility help desks, contracting with an eligibility verification system vendor, or contracting with a magnetic swipe card vendor.

   **(2)** An eligible recipient becomes financially responsible for a provider claim if the eligible recipient:

   **(a)** fails to identify himself as a MAD eligible recipient; or

   **(b)** fails to state that an eligibility determination is pending; or

   **(c)** fails to furnish MAD identification before the service is rendered and MAD denies payment because of the resulting inability of the provider to be able to file a claim timely; or

   **(d)** receives services from a provider that lacks MAD enrollment is not eligible to provide the services or that the provider does not participate in MAD programs.

**B.** Requirements for updating information: A provider must furnish MAD or the appropriate MAD claims processing contractor with complete information on changes in his address, license, certification, board specialties, corporate name or corporate ownership, and a statement as to the continuing liability of the provider for any recoverable obligation to MAD which occurred or may have occurred prior to any sale, merger, consolidation, dissolution or other disposition of the provider or person. MAD or the appropriate MAD claims processing contractor must receive this information at least 60 calendar days before the change. Any payment made by MAD based upon erroneous or outdated information is subject to recoupment or provider repayment. The provider must provide MAD with information, in writing, updating their provider participation agreement of any conviction of delineated criminal or civil offenses against the provider or parties with direct or indirect ownership or controlling interest within ten calendar days after the conviction.

**C.** Additional requirements: A provider must meet all other requirements stated in this manual, the billing instructions, manual revisions, supplements, and signed application forms or re-verification forms, as updated. MAD may require a letter of credit, a surety bond, or a combination thereof, from the provider.

2011 8.302.1.11 NMAC

The letter of credit, surety bond or combination thereof may be required if any one of the following conditions is met:

**(1)** the provider is the subject of a state or federal sanction or of a criminal, civil, or departmental proceeding in any state;

**(2)** a letter of credit, surety bond, or any combination thereof is required for each provider of a designated provider type;

**(3)** the provider cannot reasonably demonstrate that they have assumed liability and are responsible for paying the amount of any outstanding recoveries to MAD as the result of any sale, merger, consolidation, dissolution, or other disposition of the provider or person; or

**(4)** the secretary determines that it is in the best interest of MAD to do so, specifying the reasons.

## Statutory Authority

[2-1-95, 2-1-99; *8.302.1.11 NMAC*-- Rn, 8 NMAC 4.MAD.701.2 & A, 7-1-01; A, 7-1-03; A, 9-15-08]

NEW MEXICO ADMINISTRATIVE CODE
Copyright © 2017 by The State of New Mexico and Matthew Bender & Company, Inc. A member of the LexisNexis Group All rights reserved

**End of Document**

Baldwin's Ohio Administrative Code Annotated
    5101 Job and Family Services Department
        5101:3 Job and Family Services Department--Medical Assistance Division (Refs & Annos)
            Chapter 5101:3-1. General Information (Refs & Annos)

OAC 5101:3-1-17.2

5101:3-1-17.2 Provider agreement for providers

Currentness

Provisions of provider agreements for long term care nursing facilities are defined in Chapter 5101:3-3 of the Administrative Code. Provisions for provider agreements for medicaid contracting managed care plans are defined in Chapter 5101:3-26 of the Administrative Code.

A valid provider agreement with medicaid will act as a provider agreement for participation in the medicaid program. All medicaid provider applications must be submitted through the medicaid information technology system (MITS) web portal. Provider applications submitted in paper format will be returned to the provider unprocessed.

If a provider application requires additional supporting documentation by the department for the application process to be completed, the supporting documentation may be sent through the MITS web portal or sent to the department through regular mail service.

A provider agreement is a contract between the Ohio department of job and family services (ODJFS) and a provider of medicaid covered services. By signing this agreement the provider agrees to comply with the terms of the provider agreement, Revised Code, Administrative Code, and federal statutes and rules; and the provider certifies and agrees:

(A) To render medical services as medically necessary for the patient and only in the amount required by the patient without regard to race, creed, color, age, sex, national origin, source(s) of payment, or handicap; submit claims only for services actually performed; and, bill ODJFS for no more than the usual and customary fee charged other patients for the same service.

(B) To ascertain and recoup any third-party resource(s) available to the consumer prior to billing ODJFS. ODJFS will then pay any unpaid balance up to the lesser of the provider's billed charge or the maximum allowable reimbursement as set forth in division-level 5101:3 of the Administrative Code.

(C) To accept the allowable reimbursement for all covered services as payment-in-full, except as required in paragraph (B) of this rule. The provider will not seek reimbursement for that service, except as defined in rule 5101:3-1-09 of the Administrative Code, from the patient, any member of the family, or any other person.

(D) To maintain all records necessary and in such form so as to fully disclose the extent of services provided and significant business transactions. The provider will maintain such records for a period of six years from the date of receipt of payment based upon those records or until any audit initiated within the six year period is completed.

(E) To furnish to ODJFS, the secretary of the department of health and human services, or the Ohio medicaid fraud control unit or their designees any information maintained under paragraph (D) of this rule for audit and review purposes. Audits may use statistical sampling. Failure to supply requested records within thirty days shall result in withholding of medicaid payments and may result in termination from the medicaid program.

(F) To inform ODJFS within thirty days of any changes in licensure, certification, or registration status; ownership; specialty; additions, deletions, or replacements in group membership and hospital-based physician affiliations; and address.

(G) To disclose ownership and control information, and to disclose the identity of any person who has been convicted of a criminal offense related to medicare, medicaid, or services provided under Title XX of the Social Security Act (as in effect 12/07/2010) (Title XX), as specified in rule 5101:3-1-17.3 of the Administrative Code.

(H) That neither the individual practitioner, nor the company, nor any owner, director, officer, or employee of the company, nor any independent contractor retained by the company, is currently subject to sanction under medicare, medicaid, or Title XX; or, is otherwise prohibited from providing services to medicare, medicaid, or Title XX beneficiaries.

(I) To provide to ODJFS, through the court of jurisdiction, notice of any bankruptcy action brought by the provider. Notice shall be mailed to: office of legal services, Ohio department of job and family services.

(J) To comply with the appropriate advance directives requirements for hospitals, providers of home health care, personal care services, and hospices as specified in Chapter 3701-83 of the Administrative Code.

(K) To comply with the confidentiality safeguards and the use and release of information regarding public assistance recipients as described in section 5101.27 of the Revised Code.

(L) To comply with section 121.36 of the Revised Code and rule 5101:3-1-39 of the Administrative Code when providing home care services.

**Credits**
HISTORY: 2010-11 OMR pam. # 12 (A), eff. 8-2-11; 2005-06 OMR pam. #9 (A), eff. 3-27-06; 2005-06 OMR pam. #6 (A*), eff. 12-30-05; 2005-06 OMR pam. #2 (A), eff. 8-11-05; 2004-05 OMR pam. #3 (A), eff. 9-26-04; 2003-04 OMR 1384 (A), eff. 1-1-04; 2001-02 OMR 2830 (R-E), eff. 5-30-02; 1992-93 OMR 804 (A), eff. 1-1-93; 1987-88 OMR 265 (E), eff. 10-1-87.

RC 119.032 rule review date(s): 8-1-16; 9-20-10; 8-1-10; 9-1-09; 1-1-09; 5-30-07; 5-25-05; 7-12-04; 8-15-03

**Editors' Notes**

### HISTORICAL AND STATUTORY NOTES

**Amendment Note:** 8-2-11 Deleted "[except long-term care nursing facilities and medicaid contracting managed care plans (MCPs)] following "providers" in the section nameline; rewrote the first introductory paragraph; substituted "program" for "and/or the disability medical assistance programs" in the first sentence and added the second sentence in the former second paragraph; inserted the fourth introductory paragraph; deleted "or disability medical assistance" preceding "payments" and substituted "program" for "and disability medical assistance programs" in the second sentence of paragraph (E); deleted "disability medical assistance" following "medicaid,", subsituted "services provided under", inserted "of the Social Security Act (as in effect 12/07/2010) (Title XX)" for "services" in paragraph (G); and deleted "disability medical assistance," following "medicaid," twice in paragraph (H).

**Amendment Note:** 3-27-06 Deleted "designation" in the introductory paragraph and paragraph (B); substituted "5101:3-1-09" for "5101:3-9-09" in paragraph (C); and substituted "5101.27" for "5101:27" in paragraph (K).

**Amendment Note:** 8-11-05 Inserted "(ODJFS)" in the undesignated paragraph preceding paragraph (A); deleted paragraph (I), redesignating the remaining paragraphs; and substituted "ODJFS" for "the department" throughout.

**Amendment Note:** 9-26-04 Added paragraph (M).

**Amendment Note:** 1-1-04 Inserted "The provider" and "except as defined in rule 5101:3-9-09 of the Administrative Code" in paragraph (C), and made nonsubstantive changes.

Notes of Decisions (5)

Rules are complete through January 8, 2012; Appendices are current to February 28, 2010
©2012 Thomson Reuters

5101:3-1-17.2, OH ADC 5101:3-1-17.2

## *2011 O.A.C. § 317:30-3-2*

2011 Oklahoma Administrative Code Archive

*Oklahoma Administrative Code  >  TITLE 317. OKLAHOMA HEALTH CARE AUTHORITY  > CHAPTER 30. MEDICAL PROVIDERS-FEE FOR SERVICE  >  SUBCHAPTER 3. GENERAL PROVIDER POLICIES  >  PART 1. GENERAL SCOPE AND ADMINISTRATION*

# 317:30-3-2 Provider agreements

In order to be eligible for payment, providers must have on file with OHCA, an approved Provider Agreement. Through this agreement, the provider certifies all information submitted on claims is accurate and complete, assures that the State Agency's requirements are met and assures compliance with all applicable Federal and State regulations. These agreements are renewed annually with each provider.

**(1)** The provider further assures compliance with Section 1352, Title 31 of the U.S. Code and implemented at 45 CFR Part 93 which provides that if payments pursuant to services provided under Medicaid are expected to exceed $ 100,000.00, the provider certifies federal funds have not been used nor will they be used to influence the making or continuation of the agrreement to provide services under Medicaid. Upon request, the Authority will furnish a standard form to the provider for the purpose of reporting any non-federal funds used for influencing agreements.

**(2)** The provider assures in accordance with *31 USCA 6101,* Executive Order 12549, that they are not presently or have not in the last three years been debarred, suspended, proposed for debarment or declared ineligible by any Federal department or agency.

**(3)** For information regarding annual Provider Agreements or for problems related to a current agreement, contact the Oklahoma Health Care Authority, Provider Enrollment, P.O. Box 18299, Oklahoma City, Oklahoma 73154-0299, or call 1-800-871-9347 for out-of-state or 405-525-1092 from within the state.

## Statutory Authority

**CHAPTER AUTHORITY:**

Federal Social Security Act, Title XIX; Titles XVIII and XIX; Child Health Act; Title V; Civil Rights Act of 1964; Rehabilitation Act of 1973 (Part 90); Age Discrimination Act of 1975; Education Amendments of 1972, Title IX; P.L. 88-352; P.L. 93-112; P.L. 99-456; 31 U.S.C.A. 6101; Presidential Executive Orders 11246, 11375, and 12549; 42 CFR, §§ 405.2426,*431.54,* 416.30-49,*440.100*,*440.130*,*440.140*,*440.170*, and 442 (Subparts E and G); 45 CFR, Part 93;*10 O.S., §§ 175.1*and*1415.1*;*56 O.S., §§ 162.3*,*164(c)*, and*175*;*59 O.S., § 567.3(4)*;*63 O.S., §§ 1-1901*et seq. and 5003 through 5016; 68 O.S., § 1305; Laws 2002, c.470

## History

**SOURCE:**

 Added at 12 Ok Reg 751, eff 1-5-95 (emergency); Added at 12 Ok Reg 3131, eff 7-27-95.

2011 O.A.C. § 317:30-3-2

**CHAPTER SOURCE:**

Codified 7-27-95

Oklahoma Administrative Code
Copyright © 2017, State of Oklahoma

**End of Document**

## *2011 Or. Admin. R. 410-120-1260*

2011 Oregon Administrative Code Archive

*OREGON ADMINISTRATIVE RULES > CHAPTER 410 OREGON HEALTH AUTHORITY, DIVISION OF MEDICAL ASSISTANCE PROGRAMS > DIVISION 120 MEDICAL ASSISTANCE PROGRAMS*

# 410-120-1260 Provider Enrollment

(1) This rule applies only to Providers seeking reimbursement from the Division of Medical Assistance Programs (DMAP), except as otherwise provided in *OAR 410-120-1295* or 407.

(2) Signing the Provider Agreement enclosed in the application package constitutes agreement by Performing and Billing Providers to comply with all applicable DMAP Provider rules and federal and state laws and regulations.

(3) The Department of Human Services (DHS) requires compliance with the National Provider Identification (NPI) requirements in 45 CFR Part 142. Providers that obtain an NPI should update their records with DMAP Provider Enrollment. Provider applicants that have been issued an NPI must include that NPI number with the DMAP Provider enrollment application;

(4) A Performing Provider is the Provider of a service or item. A Billing Provider is an individual, agent, business, corporation, clinic, group, institution, or other entity who, in connection with the submission of claims to the Department, receives or directs the payment (either in the name of the Performing Provider or the name of the Billing Provider) from DHS on behalf of a Performing Provider and has been delegated the authority to obligate or act on behalf of the Performing Provider

(a) A Billing Provider is responsible for identifying to DMAP and keeping current the identification of all Performing Providers for whom they bill, or receive or direct payments. This identification must include the Providers' names, DHS Provider numbers, NPIs, and either the Performing Provider's Social Security Number (SSN) or Employer Identification Number (EIN). The SSN or EIN of the Performing Provider cannot be the same as the Tax Identification Number of the Billing Provider. In order to facilitate timely claims processing and claims payment consistent with applicable privacy and security requirements, DHS requires Billing Providers to be enrolled consistent with the Provider enrollment process described in section (7) of this rule. A Performing Provider's use of a Billing Provider that falls within the definition of a Billing Provider but that is not enrolled with DMAP will result in denial of claims or payment;

(b) If the Performing Provider uses electronic media to conduct transactions with the Department, or authorizes a Billing Provider to conduct such electronic transactions, the Performing Provider must comply with the DHS Electronic Data Interchange (EDI) rules, OAR 407-120-0100 through 407-120-0200. Enrollment as a Performing or Billing Provider is a necessary requirement for submitting electronic claims, but the Provider must also register as a Trading Partner and identify the EDI Submitter.

(5) To be enrolled and able to bill as a Provider, an individual or organization must meet applicable licensing and regulatory requirements set forth by federal and state statutes, regulations and rules, and must comply with all Oregon statutes and regulations for provision of Medicaid and SCHIP services. In addition, Providers of services within the State of Oregon must have a valid Oregon business license if such a license is a requirement of the state, federal, county or city government to operate a business or to provide services.

2011 Or. Admin. R. 410-120-1260

**(6)** An individual or organization that is currently subject to Sanction(s) by DMAP, another state's Medicaid program, or federal government is not eligible for enrollment (see OAR 410-120-1400, 407-120-0360 Provider Sanctions). In addition, individuals or organizations that apply for enrollment are subject to the following disclosure requirements:

**(a)** Before DMAP issues or renews a Provider number for Provider services, or at any time upon written request by DHS, the Provider must disclose to the Department the identity of any person who has been convicted of a criminal offense related to that person's involvement in any program under Medicare, Medicaid, or SCHIP program since the inception of those programs;

**(b)** A Medicaid Provider that is an entity other than an individual Practitioner or group of Practitioner's, must disclose certain information about ownership and control of the entity:

**(A)** The name and address of each person with an ownership or control interest in the Provider, or in any subcontractor in which the Provider has a direct or indirect ownership interest of 5 percent or more;

**(B)** Whether any of the persons so named is related to another as spouse, parent, child, sibling or other family members by marriage or otherwise; and

**(C)** The name of any other disclosing entity in which a person with an ownership or control interest in the disclosing entity also has an ownership or control interest;

**(c)** All Providers must agree to furnish to the Department or to the U.S. Department of Health and Human Services on request, information related to certain business transactions: A Provider must submit, within 35 days of the date of a request, full and complete information about the ownership of any subcontractor with whom the Provider has had business transactions totaling more than $ 25,000 during the 12-month period ending on the date of the request; and any significant business transactions between the Provider and any wholly owned supplier, or between the Provider and any subcontractor, during the 5-year period ending on the date of the request;

**(d)** DMAP may refuse to enter into or renew a Provider's enrollment agreement, or contract for Provider services, with a Provider if any person who has an ownership or control interest in the Provider, or who is an agent or managing employee of the Provider, has been convicted of a criminal offense related to that person's involvement in any program established under Medicare, Medicaid SCHIP or the Title XX services program;

**(e)** DMAP may refuse to enter into or may terminate a Provider enrollment agreement, or contract for Provider services, if it determines that the Provider did not fully and accurately make any disclosure required under this section (6) of this rule.

**(7)** Enrollment of Performing Providers. A DMAP assigned Performing Provider number will be issued to an individual or organization providing covered health care services or items upon:

**(a)** Completion of the application and submission of the required attachment, disclosure documents, and Provider Agreement.

**(b)** The signing of the Provider application by the Performing Provider or a person authorized by the Performing Provider to legally bind the organization or individual to compliance with these rules;

**(c)** Verification of licensing or certification. Loss of the appropriate licensure or certification will result in immediate disenrollment of the Provider and recovery of payments made subsequent to the loss of licensure or certification;

**(d)** Approval of the application package by DMAP or the DHS unit responsible for enrolling the Provider.

**(8)** Performing Providers may be enrolled retroactive to the date services were provided to a DMAP Client only if:

**(a)** The Provider was appropriately licensed, certified and otherwise met all DMAP requirements for Providers at the time services were provided; and

**(b)** Services were provided less than 12 months prior to the date the application for Provider status was received by DMAP as evidenced by the first date stamped on the paper claim(s) submitted with the application materials for those services, either manually or electronically;

**(c)** DMAP reserves the right to retroactively enroll the Provider prior to the 12 month period in (b) based upon extenuating circumstances outside the control of the Provider, consistent with federal Medicaid regulations, and with approval of the DMAP Provider Services Unit Manager.

**(9)** Issuance of a DHS assigned Provider number establishes enrollment of an individual or organization as a Provider for the specific category (ies) of services covered by the DMAP enrollment application. For example, a pharmacy Provider number applies to pharmacy services but not to Durable Medical Equipment, which requires a separate Provider application attachment and establishes a separate DHS assigned Provider number.

**(10)** Required Updates: A Provider is responsible for providing, and continuing to provide, to the Department accurate, complete and truthful information concerning their qualification for enrollment. An enrolled Provider must notify DMAP in writing of a material change in any status or condition that relates to their qualifications or eligibility to provide medical assistance services including but not limited to a change in any of the following information: address, business affiliation, licensure, certification, NPI, or Federal Tax Identification Number, or if the Provider's ownership or control information changes; or if the Provider or a person with an ownership or control interest, or an agent or managing employee of the Provider; and has been convicted of a criminal offense related to that person's involvement in any program under Medicare, Medicaid, or SCHIP services program. The Provider must notify DMAP of changes in any of this information in writing within 30 calendar days of the change.

**(a)** Failure to notify DMAP of a change of Federal Tax Identification Number for entities or a Social Security Number or Employer Identification Number for individual Performing Providers may result in the imposition of a $ 50 fine;

**(b)** In addition to section(10) (a) of this rule, if DMAP notifies a Provider about an error in Federal Tax Identification Number including Social Security Numbers or Employer Identification Numbers for individual Performing Providers, the Provider must supply the appropriate valid Federal Tax Identification Number within 30 calendar days of the date of the DMAP notice. Failure to comply with this requirement may result in DMAP imposing a fine of $ 50 for each such notice. Federal Tax Identification Number requirements described in this rule refer to any such requirements established by the Internal Revenue Service;

**(c)** Changes in business affiliation, ownership, NPI and Federal Tax Identification Number, ownership and control information, or criminal convictions may require the submission of a new application;

**(d)** Claims submitted by, or payments made to, Providers who have not furnished the notification required by this rule or to a Provider that has failed to submit a new application as required by DMAP under this rule may be denied or recovered.

**(11)** Enrollment of Out-of-State Providers: Providers of services outside the state of Oregon will be enrolled as a Provider under section (7) of this rule if they comply with the requirements of section (7) and under the following conditions:

**(a)** The Provider is appropriately licensed or certified and meets standards and is enrolled within the Provider's state for participation in the state's Medicaid program. Disenrollment or sanction from the other state's Medicaid program, or exclusion from any other federal or state health care program is a basis for disenrollment, termination or suspension from participation as a Provider in Oregon's medical assistance programs;

**(b)** Noncontiguous Out-of-State pharmacy Providers must be licensed by the Oregon Board of Pharmacy to provide pharmacy services in Oregon. In instances where clients are out of the state due to travel or other circumstances that prevent them from using a pharmacy licensed in Oregon, and prescriptions need to be filled, the pharmacy is required to be licensed in the State they are doing business where

the client filled the prescription, and must be enrolled with DHS in order to submit claims. Out-of-state internet or mail order, except the Department mail order vendor, prescriptions are not eligible for reimbursement;

**(c)** The Provider bills only for services provided within the Provider's scope of licensure or certification;

**(d)** For noncontiguous Out-of-State Providers, the services provided must be authorized, in the manner required under these rules for Out-of-State Services (*OAR 410-120-1180*) or other applicable DHS rules:

  **(A)** For a specific Oregon Medicaid Client who is temporarily outside Oregon or the contiguous area of Oregon; or

  **(B)** For foster care or subsidized adoption children placed out of state; or

  **(C)** The Provider is seeking Medicare deductible or coinsurance coverage for Oregon Qualified Medicare Beneficiaries (QMB) Clients.

**(e)** The services for which the Provider bills are covered services under the Oregon Health Plan (OHP);

**(f)** Facilities, including but not restricted to Hospitals, rehabilitative facilities, institutions for care of individuals with mental retardation, Psychiatric Hospitals, and residential care facilities, will be enrolled as Providers only if the facility is enrolled as a Medicaid Provider in the state in which the facility is located or is licensed as a facility Provider of services by the State of Oregon;

**(g)** Out-of-State Providers may provide contracted services per *OAR 410-120-1880*.

**(12)** Enrollment of Billing Providers:

**(a)** An individual or business entity that, in connection with the submission of claims to DMAP and receives or directs the payments from DMAP on the behalf of a professional Performing Provider (e.g., Physician, Physical Therapist, Speech Therapist) must be enrolled as a Billing Provider with DMAP and meet all applicable federal and state laws and regulations. A Billing Agent or Billing Service submitting claims or providing other business services on behalf of a Performing Provider but not receiving payment in the name of or on behalf of the Performing Provider does not meet the requirements for Billing Provider enrollment and is not eligible for enrollment as a Billing Provider;

**(b)** Billing Providers must complete an application for enrollment and submit all required documentation including a Provider Enrollment Agreement, consistent with the Provider enrollment process described in subsection (7), to obtain a DHS assigned Provider Number. A DHS assigned Billing Provider number will be issued only to Billing Providers that have a contract with an enrolled Performing Provider to provide services in connection with the submission of claims and receive or direct payments on behalf of the Performing Provider, and that have met the standards for enrollment as a Billing Provider including one of the following as applicable:

  **(A)** A corporate or business entity related to the Performing Provider under one of the relationships authorized by *42 CFR 447.10(g)* may have the authority to submit the Performing Provider enrollment application and supporting documentation on behalf of the Performing Provider. Such entities with the authority to provide services in connection with the submission of claims and obtain or direct payment on behalf of the Performing Provider must enroll as a Billing Provider;

  **(B)** Any other contracted Billing Agent or Billing Service (except as are described in section (12)(b) (A) of this rule) that has authority to provide services in connection with the submission claims and to receive or direct payment in the name of the Performing Provider pursuant to *42 CFR 447.10(f)*. Such entities with the authority to obtain or direct payment on behalf of the Performing Provider in connection with the submission of claims must enroll as a Billing Provider;

  **(C)** These Billing Provider enrollment requirements do not apply to the staff directly employed by an enrolled Performing Provider, rather than pursuant to a contractual arrangement. Nothing in this rule is meant to prevent an enrolled Performing Provider from submitting his or her own claims and

2011 Or. Admin. R. 410-120-1260

receiving payment in his or her own name. Notwithstanding this provision, if the Performing Provider is conducting electronic transactions, the DHS EDI rules will apply, consistent with section (4) of this rule.

**(c)** A Billing Provider must maintain, and make available to DMAP, upon request, records indicating the Billing Provider's relationship with the Provider of service;

**(d)** Prior to submission of any claims or receipt or direction of any payment from DMAP, the Billing Provider must obtain signed confirmation from the Performing Provider that the Billing Provider has been authorized by the Performing Provider to submit claims or receive or direct payment on behalf of the Performing Provider. This authorization, and any limitations or termination of such authorization, must be maintained in the Billing Provider's files for at least five years, following the submission of claims or receipt or direction of funds from DMAP;

**(e)** The Billing Provider fee must not be based on a percentage of the amount billed or collected or whether or not they collect the subject's payment (*42 CFR 447.10(f)*).

**(f)** If the Billing Provider is authorized to use electronic media to conduct transactions on behalf of the Performing Provider, the Performing Provider must register with the Department as a Trading Partner and authorize the Billing Provider to act as an EDI Submitter, as required in the Electronic Data Interchange (EDI) rules, OAR 407-120-0100 through 407-120-0200. Enrollment as a Billing Provider does not provide that authority. If the Performing Provider uses electronic media to conduct transactions, and authorizes a Billing Agent or Billing Service that is not authorized to receive reimbursement or otherwise obligate the Performing Provider, the Billing Agent or Billing Service does not meet the requirements of a Billing Provider. The Performing Provider and Billing Agent or Billing Service must comply with the DHS EDI rules, OAR 407-120-0100 through 407-120-0200.;

**(g)** Out-of-state Billing Providers may need to register with the Secretary of State and the Department of Revenue to transact business in Oregon pursuant to 407-120-0320(15)(f).

**(h)** All Billing Providers are required to notify DMAP, at the time of enrollment or within 30 days of any change, of the names of all Performing Providers and their DHS Provider Number, NPI number and the Social Security Number or Employer Identification Numbers of the Performing Providers. The Performing Provider's SSN or EIN is required pursuant to *42 CFR 433.37*, including federal tax laws at *26 USC 6041.* SSN's and EIN's provided pursuant to this authority are used for the administration of federal, state, and local tax laws and the administration of this program for internal verification and administrative purposes including but not limited to identifying the provider for payment and collection activities. In addition, this information is necessary for DHS to timely process and pay claims.

**(13)** Utilization of Locum Tenens:

**(a)** For purposes of this rule, a locum tenens means a substitute Physician retained to take over another Physician's professional practice while he or she is absent (i.e., absentee Physician) for reasons such as illness, vacation, continuing medical education, pregnancy, etc.

**(b)** Locum tenens are not required to enroll with DMAP; however, DMAP may enroll locum tenens Providers at the discretion of the Provider Services Manager if that Provider submits a complete enrollment application, especially in areas of the State underserved with medical Providers. In no instance may an enrolled absentee Physician utilize a substitute Physician who is, at that time, excluded from participation in or under Sanction by Medicaid or federally funded or federally assisted health programs.

**(c)** The absentee Physician must be an enrolled DMAP Provider and must bill with their individual DMAP assigned Provider number and receive payment for covered services provided by the locum tenens Physician. Services provided by the locum tenens must be billed with a modifier Q6:

**(A)** In entering the Q6 modifier, the absentee Physician is certifying that the services are provided by a substitute Physician identified in a record of the absentee Physician that is available for inspection, and are services for which the absentee Physician is authorized to submit a claim;

2011 Or. Admin. R. 410-120-1260

> (B) A Physician or other person who falsely certifies that the requirements of this section are met may be subject to possible civil and criminal penalties for fraud, and the enrolled Provider's right to receive payment or to submit claims may be revoked.

**(14)** Reciprocal Billing Arrangements:

> **(a)** For purposes of this rule, reciprocal billing arrangements are similar in nature to a locum tenens in that a substitute Physician is retained to take over another Physician's professional practice on an occasional basis if the regular Physician is unavailable (absentee Physician);

> **(b)** Providers with reciprocal billing arrangements are not required to enroll with DMAP; however, in no instance may an enrolled absentee Physician utilize a substitute Physician who is, at that time, excluded from participation in or under Sanction by Medicaid or federally funded or federally assisted health programs;

> **(c)** The absentee Physician must be an enrolled DMAP Provider and must bill with his or her individual DMAP assigned Provider number and receive payment for covered services provided by the substitute Physician. The absentee Physician identifies the services provided by the substitute Physician by using modifier Q5:

> > **(A)** In entering the Q5 modifier, the absentee Physician is certifying that the services are provided by a substitute Physician identified in a record of the absentee Physician that is available for inspection, and are services for which the absentee Physician is authorized to submit a claim.

> > **(B)** A Physician or other person who falsely certifies that the requirements of this section are met may be subject to possible civil and criminal penalties for fraud, and the enrolled Provider's right to receive payment or to submit claims may be revoked.

> **(d)** These requirements do not apply to substitute arrangements among Physicians in the same medical practice when claims are submitted in the name of the Billing Provider or group name. Nothing in this rules prohibits Physicians sharing call responsibilities from opting out of the reciprocal billing (substitute Provider) arrangement described in this rule and submitting their own claims for services provided, as long as all such physicians are themselves enrolled Performing Providers and as long as duplicate claims for services are not submitted.

**(15)** Provider Termination:

> **(a)** The Provider may terminate enrollment at any time. The request must be in writing, and signed by the Provider. The notice shall specify the DMAP assigned Provider number to be Terminated and the effective date of Termination. Termination of the Provider enrollment does not terminate any obligations of the Provider for dates of services during which the enrollment was in effect;

> **(b)** DMAP Provider Terminations or Suspensions may be for, but are not limited to the following reasons:

> > **(A)** Breaches of Provider agreement;

> > **(B)** Failure to comply with the statutes, regulations and policies of DHS, Federal or State regulations that are applicable to the Provider.

> > **(C)** When no claims have been submitted in an 18-month period. The Provider must reapply for enrollment.

**(16)** When a Provider fails to meet one or more of the requirements governing a Provider's participation in Oregon's medical assistance programs, the Provider's DMAP assigned Provider number may be immediately suspended. The Provider is entitled to a contested case hearing as outlined in 410-120-1600 through 410-120-1840 to determine whether the Provider's DMAP assigned number will be revoked.

**(17)** The provision of health care services or items to DMAP Clients is a voluntary action on the part of the Provider. Providers are not required to serve all DMAP Clients seeking service.

**(18)** In the event of bankruptcy proceedings, the Provider must immediately notify the DMAP Administrator in writing.

2011 Or. Admin. R. 410-120-1260

Publications: Publications referenced are available from the agency.

## Statutory Authority

**Statutory Authority:**

*ORS 409.010*,*409.025*,*409.040*,*409.050*&*409.110*
Statutes Implemented:*ORS 414.019*,*414.025*&*414.065*

## History

History: PWC 683, f. 7-19-74, ef. 8-11-784; PWC 803(Temp), f. & ef. 7-1-76; PWC 812, f. & ef. 10-1-76; AFS 5-1981, f. 1-23-81, ef. 3-1-81, Renumbered from 461-013-0060; AFS 33-1981, f. 6-23-81, ef. 7-1-81; AFS 47-1982, f. 4-30-82, f. 4-30-82 & AFS 52-1982, f. 5-28-82, ef. 5-1-82 for providers located in the geographical areas covered by the branch offices of North Salem, South Salem, Dallas, Woodburn, McMinnville, Lebanon, Albany and Corvallis, ef. 6-30-82 for remaining AFS branch offices; AFS 57-1982, f. 6-28-82, ef. 7-1-82; AFS 117-1982, f. 12-30-82, ef. 1-1-83; AFS 42-1983, f. 9-2-83, ef. 10-1-83; AFS 38-1986, f. 4-29-86, ef. 6-1-86; AFS 73-1989, f. & cert. ef. 12-7-89; HR 2-1990, f. 2-12-90, cert. ef. 3-1-90, Renumbered from 461-013-0063, 461-013-0075 & 461-013-0180; HR 19-1990, f. & cert. ef. 7-9-90; HR 41-1991, f. & cert. ef. 10-1-91; HR 51-1991(Temp), f. 11-29-91, cert. ef. 12-1-91; HR 5-1992, f. & cert. ef. 1-16-92; HR 32-1993, f. & cert. ef. 11-1-93, Renumbered from 410-120-0020, 410-120-0040 & 410-120-0060; HR 31-1994, f. & cert. ef. 11-1-94; HR 5-1997, f. 1-31-97, cert. ef. 2-1-97; OMAP 20-1998, f. & cert ef. 7-1-98; OMAP 10-1999, f. & cert. ef. 4-1-99; OMAP 9-2001, f. 3-30-01, cert. ef. 4-1-01; OMAP 42-2002, f. & cert. ef. 10-1-02; OMAP 62-2003, f. 9-8-03, cert. ef.10-1-03; OMAP 67-2004, f. 9-14-04, cert. ef. 10-1-04; OMAP 10-2005, f. 3-9-05, cert. ef. 4-1-05; OMAP 39-2005, f. 9-2-05, cert. ef. 10-1-05; OMAP 15-2006, f. 6-12-06, cert. ef. 7-1-06; DMAP 34-2008, f. 11-26-08, cert. ef. 12-1-08

OREGON ADMINISTRATIVE RULES
Copyright © 2017 by The Oregon Secretary of State All rights reserved.

**End of Document**

*2011 Tenn. Comp. R. & Regs. R. 1200-13-13-.08*

2011 Tennessee Administrative Code Archive

*RULES AND REGULATIONS OF THE STATE OF TENNESSEE   >   RULES OF THE TENNESSEE DEPARTMENT OF HEALTH, DEPARTMENT OF ENVIRONMENT AND CONSERVATION, AND DEPARTMENT OF FINANCE AND ADMINISTRATION > BUREAU OF TENNCARE; MEDICAID > CHAPTER 1200-13-13 TENNCARE MEDICAID*

# 1200-13-13-.08 PROVIDERS

**(1)** Payment in full.

    **(a)** All Participating Providers, as defined in this Chapter, must accept as payment in full for provision of covered services to TennCare enrollees, the amounts paid by the MCC plus any copayment required by the TennCare Program to be paid by the individual.

    **(b)** Any Non-Participating Providers who provide TennCare Program covered services by authorization from an MCC must accept as payment in full for provision of covered services to TennCare enrollees, the amounts paid by the MCC plus any copayment required by the TennCare Program to be paid by the individual.

    **(c)** Any Non-Participating Provider, as defined in this Chapter, who provides TennCare Program covered non-emergency services to TennCare enrollees without authorization from the enrollee's MCC does so at his own risk. He may not bill the patient for such services except as provided for in Rule 1200-13-13-.08(5).

    **(d)** Any Out-of-State Emergency Provider, as defined in this Chapter, who provides covered emergency services to TennCare enrollees in accordance with this Chapter must accept as payment in full the amounts paid by the MCC plus any copayment required by the TennCare Program.

**(2)** Non-Participating Providers.

    **(a)** In situations where a MCC authorizes a service to be rendered by a provider who is not a Participating Provider with the MCC, as defined in this Chapter, payment to the provider shall be no less than eighty percent (80%) of the lowest rate paid by the MCC to equivalent participating network providers for the same service.

    **(b)** Covered medically necessary outpatient emergency services, when provided to Medicaid managed care enrollees by non-contract hospitals in accordance with Section 1932(b)(2)(D) of the Social Security Act *(42 U.S.C.A. § 1396u-2*(b)(2)(D)), shall be reimbursed at seventy-four percent (74%) of the 2006 Medicare rates for these services. Emergency care to enrollees shall not require preauthorization.

    **(c)** Covered medically necessary inpatient hospital admissions required as the result of emergency outpatient services, when provided to Medicaid managed care enrollees by non-contract hospitals in accordance with Section 1932(b)(2)(B) of the Social Security Act *(42 U.S.C.A. § 1396u-2*(b)(2)(B)), shall be reimbursed at 57 percent of the 2008 Medicare Diagnostic Related Groups (DRG) rates (excluding Medical Education and Disproportionate Share components) determined in accordance with 42 CFR § 412 for those services. For DRG codes that are adopted after 2008, 57 percent of the rate from the year of adoption will apply. Such an inpatient stay will continue until no longer medically necessary or until the patient can be safely transported to a contract hospital or to another contract service, whichever comes first.

Case 1:11-cv-00071-PGG   Document 237-105   Filed 08/31/18   Page 163 of 312   Page 2 of 6

2011 Tenn. Comp. R. & Regs. R. 1200-13-13-.08

(d) Non-Participating Providers who furnish covered CHOICES services are reimbursed in accordance with Rule 1200-13-01-.05.

(3) Participation in the TennCare program will be limited to providers who:

(a) Accept, as payment in full, the amounts paid by the managed care contractor, including copays from the enrollee, or the amounts paid in lieu of the managed care contractor by a third party (Medicare, insurance, etc.);

(b) Maintain Tennessee, or the State in which they practice, medical licenses and/or certifications as required by their practice, or licensure by the TDMHDD, if appropriate;

(c) Are not under a federal Drug Enforcement Agency (DEA) restriction of their prescribing and/or dispensing certification for scheduled drugs (relative to physicians, osteopaths, dentists and pharmacists);

(d) Agree to maintain and provide access to TennCare and/or its agent all TennCare enrollee medical records for five (5) years from the date of service or upon written authorization from TennCare following an audit, whichever is shorter;

(e) Provide medical assistance at or above recognized standards of practice; and

(f) Comply with all contractual terms between the provider and the managed care contractor and TennCare policies as outlined in federal and state rules and regulations and TennCare provider manuals and bulletins.

(g) Failure to comply with any of the above provisions (a) through (f) may subject a provider to the following actions:

1. Sanctions set out in *T.C.A. § 71-5-118*. In addition, the provider may be subject to stringent review/audit procedures, which may include clinical evaluation of services and a prepayment requirement for documentation and justification for each claim.

2. The Bureau of TennCare may withhold or recover payments to managed care contractors in cases of provider fraud, willful misrepresentation, or flagrant noncompliance with contractual requirements and/or TennCare policies.

3. The Bureau of TennCare may refuse to approve or may suspend provider participation with a provider if any person who has an ownership or controlling interest in the provider, or who is an agent or managing employee of the provider, has been convicted of a criminal offense related to that person's involvement in any program established under Medicare, Medicaid or the US Title XX Services Program.

4. The Bureau of TennCare may refuse to approve or may suspend provider participation if it determines that the provider did not fully and accurately make any disclosure of any person who has ownership or controlling interest in the provider, or is an agent or managing employee of the provider and has been convicted of a criminal offense related to that person's involvement in any program under Medicare, Medicaid or the US Title XX Services Program since the inception of these programs.

5. The Bureau of TennCare shall refuse to approve or shall suspend provider participation if the appropriate State Board of Licensing or Certification fails to license or certify the provider at any time for any reason or suspends or revokes a license or certification.

6. The Bureau of TennCare shall refuse to approve or shall suspend provider participation upon notification by the US Office of Inspector General Department of Health and Human Services that the provider is not eligible under Medicare or Medicaid for federal financial participation.

7. The Bureau of TennCare may recover from a managed care contractor any payments made by an enrollee and/or his family for a covered service, in total or in part, except as permitted. If a provider

2011 Tenn. Comp. R. & Regs. R. 1200-13-13-.08

knowingly bills an enrollee and/or his family for a covered service, in total or in part, except as permitted, the Bureau of TennCare may terminate the provider's participation in TennCare.

**(4)** Solicitations and Referrals.

**(a)** Managed care contractors and providers shall not solicit TennCare enrollees by any method offering as enticements other goods and services (free or otherwise) for the opportunity of providing the enrollee with TennCare covered services that are not medically necessary and/or that overutilize the TennCare program.

**(b)** A managed care contractor may request a waiver from this restriction in writing to TennCare. TennCare shall determine the value of a waiver request based upon the medical necessity and need for the solicitation. The managed care contractor may implement the solicitation only upon receipt of a written waiver approval from TennCare. This waiver is not transferable and may be canceled by TennCare upon written notice.

**(c)** TennCare payments for services related to a non-waivered solicitation enticement shall be considered by TennCare as a non-covered service and recouped. Neither the managed care contractor nor the provider may bill the enrollee for non-covered services recouped under this authority.

**(d)** A provider shall not offer or receive remuneration in any form related to the volume or value of referrals made or received from or to another provider.

**(5)** Providers may seek payment from a TennCare enrollee only under the following circumstances. These circumstances apply to all TennCare providers, as defined in this Chapter, including those who are Out-of-Network Providers in a particular enrollee's MCC. These circumstances include situations where the enrollee may choose to seek an out-of-network provider for a specific covered service.

**(a)** If the services are not covered by the TennCare program and, prior to providing the services, the provider informed the enrollee that the services were not covered; or

**(b)** If the services are not covered because they are in excess of an enrollee's benefit limit and one of the following circumstances applies:

**1.** The provider determines effective on the date of service that the enrollee has reached his/her benefit limit for the particular service being requested and, prior to providing the service, informs the enrollee that the service is not covered and the service will not be paid for by TennCare. The source of the provider's information must be a database listed on the TennCare website as approved by TennCare on the date of the provider's inquiry.

**2.** The provider has information in his/her own records to support the fact that the enrollee has reached his/her benefit limit for the particular service being requested and, prior to providing the service, informs the enrollee that the service is not covered and will not be paid for by TennCare. This information may include:

**(i)** A previous written denial of a claim on the basis that the service was in excess of the enrollee's benefit limit for a service within the same benefit category as the service being requested, if the time period applicable to the benefit limit is still in effect; or

**(ii)** That the provider had previously examined the database referenced in part 1. above and determined that the enrollee had reached his/her benefit limit for the particular service being requested, if the time period applicable to that benefit limit is still in effect; or

**(iii)** That the provider had personally provided services to the enrollee in excess of his/her benefit limit within the same benefit category as the service being requested, if the time period applicable to that benefit period is still in effect; or

**(iv)** The enrollee's MCO has provided confirmation to the provider that the enrollee has reached his/her benefit limit for the applicable service.

Case 1:11-cv-00071-PGG   Document 237-105   Filed 08/31/18   Page 165 of 312

Page 4 of 6

2011 Tenn. Comp. R. & Regs. R. 1200-13-13-.08

3. The provider submits a claim for service to the appropriate managed care contractor (MCC) and receives a written denial of that claim on the basis that the service exceeds the enrollee's benefit limit. Thereafter, following informing the enrollee and within the remainder of the period applicable to that benefit limit, the provider may bill the enrollee for services within that same exhausted benefit category without having to submit, for repeated MCC denial, claims for those subsequent services. If the provider informed the enrollee prior to providing the service for which the claim was denied that the service would exceed the enrollee's benefit limit and would not be paid for by TennCare, the provider may bill the enrollee for that service.

4. The provider had previously taken the steps in parts 1., 2. or 3. above and determined that the enrollee had reached his/her benefit limit for the particular service being requested, if the time period applicable to the benefit limit is still in effect, and informs the enrollee, prior to providing the service, that the service is not covered and will not be paid for by TennCare.

(c) If the services are covered only with prior authorization and prior authorization has been requested but denied, or is requested and a specified lesser level of care is approved, and the provider has given prior notice to the enrollee that the services are not covered, the enrollee may elect to receive those services for which prior authorization has been denied or which exceed the authorized level of care and be billed by the provider for such services.

(6) Providers may not seek payment from a TennCare enrollee under the following conditions:

(a) The provider knew or should have known about the patient's TennCare eligibility or pending eligibility prior to providing services.

(b) The claim(s) submitted to TennCare or the enrollee's managed care contractor for payment was/were denied due to provider billing error or a TennCare claim processing error.

(c) The provider accepted TennCare assignment on a claim and it is determined that another payer paid an amount equal to or greater than the TennCare allowable amount.

(d) The provider failed to comply with TennCare policies and procedures or provided a service which lacks medical necessity or justification.

(e) The provider failed to submit or resubmit claims for payment within the time periods required by the managed care contractor or TennCare.

(f) The provider failed to ascertain the existence of TennCare eligibility or pending eligibility prior to providing non-emergency services. Even if the enrollee presents another form of insurance, the provider must determine whether the patient is covered under TennCare.

(g) The provider failed to inform the enrollee prior to providing a service not covered by TennCare that the service was not covered and the enrollee may be responsible for the cost of the service. Services which are non-covered by virtue of exceeding limitations are exempt from this requirement. Notwithstanding this exemption, providers shall remain obligated to provide notice to enrollees who have exceeded benefit limits in accordance with rule 1200-13-13-.11.

(h) The enrollee failed to keep a scheduled appointment(s).

(i) The provider is a TennCare Provider, as defined in this Chapter, but is not participating with a particular enrollee's MCC and is seeking to bill the enrollee as though the provider were a Non-TennCare Provider, as defined in this Chapter.

(7) Providers may seek payment from a person whose TennCare eligibility is pending at the time services are provided if the provider informs the person that TennCare assignment will not be accepted whether or not eligibility is established retroactively.

(8) Providers may seek payment from a person whose TennCare eligibility is pending at the time services are provided. Providers may bill such persons at the provider's usual and customary rate for the services rendered. However, all monies collected for TennCare-covered services rendered during a period of

2011 Tenn. Comp. R. & Regs. R. 1200-13-13-.08

TennCare eligibility must be refunded when a claim is submitted to TennCare if the provider agreed to accept TennCare assignment once retroactive TennCare eligibility was established.

(9) Providers of inpatient hospital services, outpatient hospital services, skilled nursing facility services, independent laboratory and x-ray services, hospice services, and home health agencies must be approved for Title XVIII-Medicare in order to be certified as providers under the TennCare Program; in the case of hospitals, the hospital must meet state licensure requirements and be approved by TennCare as an acute care hospital as of the date of enrollment in TennCare. Children's hospitals and State mental hospitals may participate in TennCare without having been Medicare approved; however, the hospital must be approved by the Joint Commission for Accreditation of Health Care Organizations as a condition of participation.

(10) Pharmacy providers may not waive pharmacy copayments for TennCare Standard enrollees as a means of attracting business to their establishments. This does not prohibit a pharmacy from exercising professional judgment in cases where an enrollee may have a temporary or acute need for a prescribed drug, but is unable, at that moment, to pay the required copayment.

(11) Providers shall not deny services for a Medicaid enrollee's failure to make copayments.

(12) All claims must be filed in accordance with the following:

   (a) Claims filed with an MCC must be submitted in accordance with the requirements and timeframes set forth in the MCC's contract.

   (b) All other fee-for-service claims for services delivered outside of the TennCare managed care program must be filed with the Bureau of TennCare as follows:

      1. All claims must be filed within one (1) year of the date of service except in the following circumstances:

         (i) Recipient eligibility was determined retroactively to the extent that filing within one (1) year was not possible. In such situations, claims must be filed within one (1) year after final determination of eligibility.

         (ii) If a claim filed with Medicare on a timely basis does not automatically cross over from the Medicare carrier to The Bureau, a TennCare claim may be filed within six (6) months of notification of payment or denial from Medicare.

      2. Should an original claim be denied, any resubmission or follow-up of the initial claim must be received within six (6) months from the date the original claim was filed. The Bureau will not process submissions received after the six (6) month time limit. The one exception is those claims returned due to available third party coverage. These claims must be submitted within sixty (60) days of notice from the third party resource.

      3. Should a correction document involving a suspended claim be sent to the provider, the claim will be denied if the correction document is not completed by the provider and returned to the Bureau within ninety (90) days from the date on the document.

      4. If claim is not filed within the above timeframes, no reimbursement may be made.

      5. Claims will be paid on a first claim approved - first claim paid basis.

      6. The Bureau will not reimburse providers for services for which there is no Federal Financial Participation.

## Statutory Authority

*T.C.A. §§ 4-5-202, 4-5-208, 4-5-209, 71-5-105, 71-5-109, 71-5-134,* Acts of 2003, Public Chapter 412, § 1(c), and Executive Order No. 23.

2011 Tenn. Comp. R. & Regs. R. 1200-13-13-.08

# History

**ADMINISTRATIVE HISTORY FOR THIS REGULATION:**

 Public necessity rule filed July 1, 2002; effective through December 13, 2002. Original rule filed September 30, 2002; to be effective December 14, 2002; however, on December 9, 2002, the House Government Operations Committee of the General Assembly stayed rule 1200-13-13-.08; new effective date February 12, 2003. Emergency rule filed December 13, 2002; effective through May 27, 2003. Amendment by Acts of 2003, Public Chapter 412, § 1(c) filed and effective June 25, 2003. Amendment filed October 12, 2004; effective December 26, 2004. Public necessity rule filed July 29, 2005; effective through January 10, 2006. Public necessity rule filed December 29, 2005; effective through June 12, 2006. Amendment filed October 27, 2005; effective January 10, 2006. Public necessity rule filed December 29, 2005, expired June 12, 2006. On June 13, 2006, affected rules reverted to status on December 28, 2005. Amendment filed March 31, 2006; effective June 14, 2006. Public necessity rule filed September 8, 2008; effective through February 20, 2009. Amendment filed December 5, 2008; effective February 18, 2009. Amendment filed February 25, 2009; effective May 11, 2009. Emergency rule filed March 1, 2010; effective through August 28, 2010. Amendment filed May 27, 2010; effective August 25, 2010. Emergency rule filed September 3, 2010; effective through March 2, 2011. Amendment filed December 2, 2010 to have been effective March 2, 2011 was stayed by the Government Operations Committee on March 2, 2011; new effective date March 29, 2011.

RULES AND REGULATIONS OF THE STATE OF TENNESSEE

**End of Document**

## *2011 Wis. Adm. Code DHS 106.02*

2011 Wisconsin Administrative Code Archive

**WISCONSIN ADMINISTRATIVE CODE   > DEPARTMENT OF HEALTH SERVICES > CHAPTER DHS 106 PROVIDER RIGHTS AND RESPONSIBILITIES**

## DHS 106.02 General requirements for provision of services.

Providers shall comply with the following general conditions for participation as providers in the MA program:

**(1) CERTIFICATION.** A provider shall be certified under ch. DHS 105.

**(2) COVERED SERVICES.** A provider shall be reimbursed only for covered services specified in ch. DHS 107.

**(3) RECIPIENT ELIGIBLE ON DATE OF SERVICE.** A provider shall be reimbursed for a service only if the recipient of the service was eligible to receive MA benefits on the date the service was provided.

**(4) COMPLIANCE WITH STATE AND FEDERAL REQUIREMENTS.** A provider shall be reimbursed only if the provider complies with applicable state and federal procedural requirements relating to the delivery of the service.

**(5) APPROPRIATE AND MEDICALLY NECESSARY SERVICES.** A provider shall be reimbursed only for services that are appropriate and medically necessary for the condition of the recipient.

**(6) PROVISION OF NON-COVERED SERVICES.** If a provider determines that, to assure quality health care to a recipient, it is necessary to provide a non-covered service, nothing in this chapter shall preclude the provider from furnishing the service, if before rendering the service the provider advises the recipient that the service is not covered under the program and that, if provided, the recipient is responsible for payment.

**(7) SERVICES TO RECIPIENTS WITH A PRIMARY PROVIDER.** A provider other than the designated primary provider may not claim reimbursement for a service to an individual whose freedom to choose a provider has been restricted under *s. DHS 104.03* or *104.05* as indicated on the recipient's MA identification card unless the service was rendered pursuant to a written referral from the recipient's designated primary provider or the service was rendered in an emergency. If rendered in an emergency, the provider seeking reimbursement shall submit to the fiscal agent a written description of the nature of the emergency along with the service claim.

**(8) REFUSAL TO PROVIDE MA SERVICES.** A provider is not required to provide services to a recipient if the recipient refuses or fails to present a currently valid MA identification card. If a recipient fails, refuses or is unable to produce a currently valid identification card, the provider may contact the fiscal agent to confirm the current eligibility of the recipient. The department shall require its fiscal agent to install and maintain adequate toll-free telephone service to enable providers to verify the eligibility of recipients to receive benefits under the program.

**(9) MEDICAL AND FINANCIAL RECORDKEEPING AND DOCUMENTATION.** (a) Preparation and maintenance. A provider shall prepare and maintain truthful, accurate, complete, legible and concise documentation and medical and financial records specified under this subsection, *s. DHS 105.02 (6)*, the relevant provisions of *s. DHS 105.02 (7)*, other relevant sections in chs. DHS 105 and 106 and the relevant sections of ch. DHS 107 that relate to documentation and medical and financial recordkeeping for specific services rendered to a recipient by a certified provider. In addition to the documentation and

recordkeeping requirements specified in pars. (b) to (d), the provider's documentation, unless otherwise specifically contained in the recipient's medical record, shall include:

**1.** The full name of the recipient;

**2.** The identity of the person who provided the service to the recipient;

**3.** An accurate, complete and legible description of each service provided;

**4.** The purpose of and need for the services;

**5.** The quantity, level and supply of service provided;

**6.** The date of service;

**7.** The place where the service was provided; and

**8.** The pertinent financial records.

**(b)** Medical record content. A provider shall include in a recipient's medical record the following written documentation, as applicable:

**1.** Date, department or office of the provider, as applicable, and provider name and profession;

**2.** Chief medical complaint or purpose of the service or services;

**3.** Clinical findings;

**4.** Diagnosis or medical impression;

**5.** Studies ordered, such as laboratory or x-ray studies;

**6.** Therapies or other treatments administered;

**7.** Disposition, recommendations and instructions given to the recipient, including any prescriptions and plans of care or treatment provided; and

**8.** Prescriptions, plans of care and any other treatment plans for the recipient received from any other provider.

**(c)** Financial records. A provider shall maintain the following financial records in written or electronic form:

**1.** Payroll ledgers, canceled checks, bank deposit slips and any other accounting records prepared by the provider;

**2.** Billings to MA, medicare, a third party insurer or the recipient for all services provided to the recipient;

**3.** Evidence of the provider's usual and customary charges to recipients and to persons or payers who are not recipients;

**4.** The provider's appointment books for patient appointments and the provider's schedules for patient supervision, if applicable;

**5.** Billing claims forms for either manual or electronic billing for all health services provided to the recipient;

**6.** Records showing all persons, corporations, partnerships and entities with an ownership or controlling interest in the provider, as defined in 42 CFR 455.101; and

**7.** Employee records for those persons currently employed by the provider or who have been employed by the provider at any time within the previous 5 years. Employee records shall include employee name, salary, job qualifications, position description, job title, dates of employment and the employee's current home address or the last known address of any former employee.

**(d) Other documentation.**

**1.** The provider shall maintain documentation of all information received or known by the provider of the recipient's eligibility for services under MA, medicare or any other health care plan, including but not limited to an indemnity health insurance plan, a health maintenance organization, a preferred provider organization, a health insuring organization or other third party payer of health care.

**2.** The provider shall retain all evidence of claims for reimbursement, claim denials and adjustments, remittance advice, and settlement or demand billings resulting from claims submitted to MA, medicare or other health care plans.

**3.** The provider shall retain all evidence of prior authorization requests, cost reports and supplemental cost or medical information submitted to MA, medicare and other third party payers of health care, including the data, information and other documentation necessary to support the truthfulness, accuracy and completeness of the requests, reports and supplemental information.

**(e) Provider responsibility.**

**1.** Each provider is solely responsible for the truthfulness, accuracy, timeliness and completeness of claims, cost reports, prior authorization requests and any supplementary information relating to the provider's MA certification or reimbursement for services submitted to MA or to medicare or any other third party payer for claims or requests for MA recipients, whether or not these claims, reports and requests are submitted on paper or in electronic form. This includes but is not limited to the truthfulness, accuracy, timeliness and completeness of the documentation necessary to support each claim, cost report and prior authorization request. The use or consent to use of a service, system or process for the preparation and submission of claims, cost reports or prior authorization requests, whether in electronic form or on paper, does not in any way relieve a provider from sole responsibility for the truthfulness, accuracy, timeliness and completeness of claims, cost reports, prior authorization requests and any supplementary information relating to the provider's MA certification and claims for reimbursement for services submitted to MA or to medicare or any other third party payer in the case of claims, reports or requests for MA recipients. The provider is responsible whether or not the provider is charged for the services, systems or processes and whether or not the department or its fiscal agent consents to the electronic preparation and submission of claims, cost reports, prior authorization requests and any supplementary information relating to the provider's MA certification and claims for reimbursement for services.

**2.** All records under pars. (a) to (d) shall be retained by a provider for a period of not less than 5 years, except that a rural health clinic provider shall retain the records for not less than 6 years. This period shall begin on the date on which the provider received payment from the program for the service to which the records relate. Termination of a provider's participation does not terminate the provider's responsibility to retain the records unless an alternative arrangement for record retention and maintenance has been established by the provider.

**3.** Providers are solely responsible for all costs associated with meeting the responsibilities under the provider agreement required under *s. DHS 105.01 (3) (e)* and the preparation and submission of claims, whether in electronic form or on paper, to MA or to medicare or other third party payers in the case of claims for MA recipients, regardless of the means or source of the preparation and submission. This includes but is not limited to claims preparation, acquisition or submission services and services which prepare, acquire or submit claims to payers, including but not limited to MA, on behalf of the provider, whether or not the provider or the provider's membership organization is charged for the

preparation or submission of claims, and any other activity required under the provider agreement in accordance with *s. DHS 105.01 (3) (e)*.

**4.** At the request of a person authorized by the department and on presentation of that person's credentials, a provider shall permit access to any requested records, whether in written, electronic, or micrographic form. Access for purposes of this subsection shall include the opportunity to inspect, review, audit and reproduce the records.

**5.** Except as otherwise provided under a contract between the department and providers or pre-paid health plans, and except for records requested by the peer review organization under contract with the department, all costs of reproduction by a provider of records under this subsection shall be paid by the department at the per-page rate for record reproduction established by the department under *s. DHS 108.02 (4)*. Reproduction costs for records requested by the peer review organization shall be paid at the prevailing per-page rate for MA records established by that organization.

**(f)** Condition for reimbursement. Services covered under ch. DHS 107 are non-reimbursable under the MA program unless the documentation and medical recordkeeping requirements under this section are met.

**(g)** Supporting documentation. The department may refuse to pay claims and may recover previous payments made on claims where the provider fails or refuses to prepare and maintain records or permit authorized department personnel to have access to records required under *s. DHS 105.02 (6)* or (7) and the relevant sections of chs. DHS 106 and 107 for purposes of disclosing, substantiating or otherwise auditing the provision, nature, scope, quality, appropriateness and necessity of services which are the subject of claims or for purposes of determining provider compliance with MA requirements.

**(10)** **NONDISCRIMINATION.** Providers shall comply with the civil rights act of 1964, *42 USC 2000d* et. seq., and s. 504 of the rehabilitation act of 1973, as amended. Accordingly, providers may not exclude, deny or refuse to provide health care services to recipients on the grounds of race, color, gender, age, national origin or handicap, nor may they discriminate in their employment practices.

**(11)** **PROVISION OF NON-REIMBURSABLE COVERED SERVICES.** A provider may not bill a recipient for covered services which are non-reimbursable under *s. DHS 107.02 (2)*.

**(12)** **REQUIREMENTS FOR DENTAL HYGIENIST SERVICES.** (a) 1. At least 20 days before a MA certified dental hygienist performs a service for a dental sealant program conducted by an entity specified under s. 447.06 (2) (a) 2., 3., and 5., Stats., the dental hygienist shall notify the contract agency for the Wisconsin Seal-A-Smile Dental Sealant program. Upon notification of the dental sealant program dates, the contract agency shall post the program dates on an Internet site. If the dental sealant program is rescheduled, notice may be provided closer to the date of the rescheduled program. If the dental hygienist provides a list of dates of the programs for which the dental hygienist will perform services during the year, the 20 day notice requirement for each event is waived.

**Note:** Dental hygienists are encouraged to work with dentists, when available, to assist in these programs.

**2.** An MA certified dental hygienist and any entity who employs or contracts with a MA certified dental hygienist under s. 447.06 (2) (a) 2., 3., and 5., Stats., or that uses the volunteer services of an MA certified dental hygienist shall maintain written documentation of all of the following:

**a.** The relationship between the dental hygienist and the entity.

**b.** Any referral of a patient who has a condition that cannot be treated within the dental hygienist scope of practice as defined under *s. 447.03, Stats.*, to a private dental practice; a federally qualified health center that provide dental services; a rural dental health clinic; a college or university that provides dental diagnostic and clinical services; or any other dental entity that employs, contracts with, or is under the supervision of a licensed dentist.

2011 Wis. Adm. Code DHS 106.02

    **c.** Consultation with a licensed dentist in a private dental practice; a federally qualified health center that provide dental services; a rural dental health clinic; a college or university that provides dental diagnostic and clinical services; or any other entity that employs, contracts with, or is under the supervision of a licensed dentist.

    **d.** The notification required under subd. 1.

      **(b)** Compliance with this subsection is subject to audit by the department and the legislature.

## History

**HISTORY:**

 Cr. Register, December, 1979, No. 288, eff. 2-1-80; am. Register, February, 1986, No. 362, eff. 3-1-86; emerg. r. and recr. (9), eff. 7-1-92; r. and recr. (9), cr. (11), Register, February, 1993, No. 446, eff. 3-1-93; correction made in (10) under s. 13.93 (2m) (b) 7., Stats., Register, June, 1994, No. 462; CR 05-033: cr. (12) Register August 2006 No. 608, eff. 9-1-06; corrections in (1), (2), (7), (9) (e) 3., 5., (f), (g) and (11) made under s. 13.92 (4) (b) 7., Stats., Register December 2008 No. 636.

WISCONSIN ADMINISTRATIVE CODE

**End of Document**

# EXHIBIT B

**For Educational Use Only**

§ 22-1-11. (Final placement and text of 2017 legislation is subject..., AL ST § 22-1-11

---

Code of Alabama
    Title 22. Health, Mental Health, and Environmental Control. (Refs & Annos)
        Subtitle 1. Health and Environmental Control Generally. (Refs & Annos)
            Chapter 1. General Provisions. (Refs & Annos)

Ala.Code 1975 § 22-1-11

§ 22-1-11. (Final placement and text of 2017 legislation is subject to editorial action
of the Code Commissioner) (Effective until June 1, 2017) Making false statement or
representation of material fact in claim or application for payments on medical benefits
from Medicaid Agency generally; kickbacks, bribes, etc.; exceptions; multiple offenses.

Currentness

(a) Any person who, with intent to defraud or deceive, makes, or causes to be made or assists in the preparation of any false statement, representation, or omission of a material fact in any claim or application for any payment, regardless of amount, from the Medicaid Agency, knowing the same to be false; or with intent to defraud or deceive, makes, or causes to be made, or assists in the preparation of any false statement, representation, or omission of a material fact in any claim or application for medical benefits from the Medicaid Agency, knowing the same to be false; shall be guilty of a felony and upon conviction thereof shall be fined not more than ten thousand dollars ($10,000) or imprisoned for not less than one nor more than five years, or both. The offense set out herein shall not be complete until the claim or application is received by the Medicaid Agency or the contractor with the Medicaid Agency or its successor.

(b) Any person who solicits or receives any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind:

(1) In return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by the Medicaid Agency or its agents, or

(2) In return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part by the Medicaid Agency, or its agents shall be guilty of a felony and upon conviction thereof, shall be fined not more than ten thousand dollars ($10,000) or imprisoned for not less than one nor more than five years, or both.

(c) Any person who offers or pays any remuneration including any kickback, bribe, or rebate directly or indirectly, overtly or covertly, in cash or in kind to any person to induce a person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by the Medicaid Agency or its agents, or to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part by the Medicaid Agency, or its agents, shall be guilty of a felony and upon conviction thereof shall be fined not more than ten thousand dollars ($10,000) or imprisoned for not less than one nor more than five years, or both.

---

§ 22-1-11. (Final placement and text of 2017 legislation is subject..., AL ST § 22-1-11

(d) Subsections (b) and (c) of this section shall not apply to a discount or other reduction in price obtained by a provider of services or other entity under Medicaid if the reduction in price is properly disclosed and appropriately reflected in costs claimed or charges made by the provider or entity to the Medicaid Agency or its agents, or any amount paid by an employer to an employee who has a bona fide employment relationship with employer for employment in the provision of covered items or services.

(e) Any two or more offenses in violation of this section may be charged in the same indictment in separate counts for each offense and the offense shall be tried together, with separate sentences being imposed for each offense for which the defendant is found guilty.

**Credits**
(Acts 1980, No. 80-539, p. 837, §§ 1-5; Acts 1996, No. 96-529, p. 738, § 1.)

Notes of Decisions (9)

Ala. Code 1975 § 22-1-11, AL ST § 22-1-11
Current through the end of the 2017 Regular Session

---

**End of Document** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.

West's Arkansas Code Annotated
  Title 20. Public Health and Welfare (Refs & Annos)
    Subtitle 5. Social Services (Chapters 75 to 86)
      Chapter 77. Medical Assistance (Refs & Annos)
        Subchapter 9. Medicaid Fraud False Claims Act (Refs & Annos)

A.C.A. § 20-77-902

§ 20-77-902. Liability for certain acts

Effective: July 31, 2017

Currentness

A person shall be liable to the State of Arkansas, through the Attorney General, for a civil penalty of three (3) times the amount of the damages if he or she:

(1) Knowingly makes or causes to be made any false statement or representation of a material fact in any claim, request for payment, or application for any benefit or payment under the Arkansas Medicaid Program;

(2) Knowingly makes or causes to be made any omission or false statement or representation of a material fact for use in determining rights to a benefit or payment under the Arkansas Medicaid Program;

(3) Having knowledge of the occurrence of any event affecting his or her initial or continued right to any benefit or payment or the initial or continued right to any benefit or payment of any other individual in whose behalf he or she has applied for or is receiving a benefit or payment, knowingly conceals or fails to disclose that event with an intent fraudulently to secure the benefit or payment either in a greater amount or quantity than is due or when no benefit or payment is authorized;

(4) Having made or submitted a claim, request for payment, or application to receive any benefit or payment for the use and benefit of another person and having received it, knowingly converts the benefit or payment or any part thereof to a use other than for the use and benefit of the other person;

(5) Knowingly presents or causes to be presented a claim for a physician's service for which payment may be made under the program and knows that the individual who furnished the service was not licensed as a physician;

(6) Knowingly solicits or receives any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind:

(A) In return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under the program; or

(B) In return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under the program;

(7)(A) Knowingly offers or pays any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind to any person to induce the person to:

(i) Refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under the program; or

(ii) Purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under the program.

(B) Subdivision (7)(A) of this section shall not apply to:

(i) A discount or other reduction in price obtained by a provider of services or other entity under the program if the reduction in price is properly disclosed and appropriately reflected in the costs claimed or charges made by the provider or entity under the program;

(ii) Any amount paid by an employer to an employee who has a bona fide employment relationship with the employer for employment in the providing of covered items or services;

(iii) Any amount paid by a vendor of goods or services to a person authorized to act as a purchasing agent for a group of individuals or entities who are furnishing services reimbursed under the program, if:

(a) The person has a written contract with each individual or entity which specifies the amount to be paid to the person, which amount may be a fixed amount or a fixed percentage of the value of the purchases made by each individual or entity under the contract; and

(b) In the case of an entity that is a Medicaid provider as defined in § 20-9-101, the person discloses, in the form and manner as the Director of the Department of Human Services requires, to the entity and upon request to the director the amount received from each vendor with respect to purchases made by or on behalf of the entity; or

(iv) Any payment practice specified by the director promulgated pursuant to applicable federal or state law;

(8) Knowingly makes or causes to be made or induces or seeks to induce any omission or false statement or representation of a material fact with respect to the conditions or operation of any institution, facility, or Medicaid provider in order that the institution, facility, or Medicaid provider may qualify to obtain or maintain any licensure or certification when the licensure or certification is required to be enrolled or eligible to deliver any healthcare goods or services to Medicaid recipients by state law, federal law, or the rules of the Arkansas Medicaid Program;

(9) Knowingly:

(A) Charges for any service provided to a patient under the program money or other consideration at a rate in excess of the rates established by the state; or

(B) Charges, solicits, accepts, or receives, in addition to any amount otherwise required to be paid under the program, any gift, money, donation, or other consideration other than a charitable, religious, or philanthropic contribution from an organization or from a person unrelated to the patient:

(i) As a precondition of admitting a patient to a hospital, nursing facility, or intermediate care facility for individuals with intellectual disabilities; or

(ii) As a requirement for the patient's continued stay in the hospital, nursing facility, or intermediate care facility for individuals with intellectual disabilities when the cost of the services provided therein to the patient is paid for in whole or in part under the program;

(10) Knowingly makes or causes to be made any omission or false statement or representation of a material fact in any application for benefits or for payment in violation of the rules, regulations, and provider agreements issued by the program or its fiscal agents;

(11) Knowingly:

(A) Participates, directly or indirectly, in the Arkansas Medicaid Program after having pleaded guilty or nolo contendere to or been found guilty of a charge of Medicaid fraud, theft of public benefits, or abuse of adults as defined in the Arkansas Criminal Code, § 5-1-101 et seq.; or

(B) As a certified health provider enrolled in the Arkansas Medicaid Program pursuant to Title XIX of the Social Security Act [1] or the fiscal agent of such a provider who employs, engages as an independent contractor, engages as a consultant, or otherwise permits the participation in the business activities of such a provider, any person who has pleaded guilty or nolo contendere to or has been found guilty of a charge of Medicaid fraud, theft of public benefits, or abuse of adults as defined in the Arkansas Criminal Code, § 5-1-101 et seq.;

(12) Knowingly submits any false documentation supporting a claim or prior payment to the Office of Medicaid Inspector General or the Medicaid Fraud Control Unit within the office of the Attorney General during an audit or in response to a request for information or a subpoena;

(13) Knowingly makes or causes to be made, or induces or seeks to induce, any material false statement to made to the Office of Medicaid Inspector General or the Medicaid Fraud Control Unit within the office of the Attorney General during an audit or in response to a request for information or a subpoena;

(14) Knowingly forges the signature of a doctor or nurse on a prescription or referral for healthcare goods or services or submits a forged prescription or referral for healthcare goods or services in support of a claim for payment under the Arkansas Medicaid Program;

(15) Knowingly places a false entry in a medical chart or medical record that indicates that healthcare goods or services have been provided to a Medicaid recipient knowing that the healthcare goods or services were not provided;

(16) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval to the Arkansas Medicaid Program;

(17) Knowingly makes, uses, or causes to be made or used a false record or statement that is material to a false or fraudulent claim to the Arkansas Medicaid Program;

(18) Knowingly:

(A) Makes, uses, or causes to be made or used a false record or statement that is material to an obligation to pay or transmit money or property to the Arkansas Medicaid Program; or

(B) Conceals or improperly avoids or decreases an obligation to pay or transmit money or property to the Arkansas Medicaid Program; or

(19) Conspires to commit a violation of this section.

## Credits

Acts of 1993, Act 1299, § 2, eff. April 23, 1993; Acts of 2003, Act 1163, § 1, eff. April 8, 2003; Acts of 2017, Act 978, § 9, eff. July 31, 2017.

Notes of Decisions (3)

Footnotes

1       42 U.S.C.A. §§1396 through 1396v.

A.C.A. § 20-77-902, AR ST § 20-77-902

The constitution and statutes are current through the ends of the 2017 Regular Session and the 2017 First Extraordinary Session of the 91st Arkansas General Assembly, and include changes made by the Arkansas Code Revision Commission received through July 14, 2017.

End of Document                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

HEALTH CARE—MEDICAID FRAUD FALSE CLAIMS, 1993 Arkansas Laws Act 1299...

Case 1:11-cv-00071-PGC Document 237-105 Filed 08/31/18 Page 180 of 312

1993 Arkansas Laws Act 1299 (H.B. 1959)

ARKANSAS 1993 SESSION LAWS
REGULAR SESSION OF THE 79TH GENERAL ASSEMBLY

Additions and deletions are not identified in this document.
Vetoed provisions within tabular material are not displayed.

Act 1299
H.B. 1959
HEALTH CARE—MEDICAID FRAUD FALSE CLAIMS

"AN ACT TO CREATE A MEDICAID FRAUD FALSE CLAIMS ACT."

Subtitle

"AN ACT TO CREATE A MEDICAID FRAUD FALSE CLAIMS ACT."

BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF ARKANSAS:

SECTION 1. Definitions.

(1) "Arkansas Medicaid Program" means the program authorized under Title XIX of the federal Social Security Act, which provides for payments for medical goods or services on behalf of indigent families with dependent children and of aged, blind, or disabled individuals whose income and resources are insufficient to meet the cost of necessary medical services;

(2) "Fiscal agent" means any individual, firm, corporation, professional association, partnership, organization, or other legal entity which, through a contractual relationship with the Department of Human Services, the State of Arkansas receives, processes, and pays claims under the Arkansas Medicaid Program;

(3) "Person" means any provider of goods or services or any employee of such provider, whether that provider be an individual, individual medical vendor, firm, corporation, professional association, partnership, organization, or other legal entity under the Arkansas Medicaid Program but which provides goods or services to a provider under the Arkansas Medicaid Program or its fiscal agents;

(4) "Medicaid recipient" means any individual on whose behalf any person claimed or received any payment or payments from the Arkansas Medicaid Program or its fiscal agents, whether or not any such individual was eligible for benefits under the Arkansas Medicaid Program;

(5) "Records" means all documents in any form including, but not limited to, medical documents and x-rays, prepared by any person for the purported provision of any goods or services to any Medicaid recipient;

(6) "Claim" means any written or electronically submitted request or demand for reimbursement made to the Arkansas Medicaid Program by any provider or its fiscal agents for each good or service purported to have been provided to any Medicaid recipient whether or not the State of Arkansas provides any or no portion of the money which is requested or demanded.

(7) "Knowing" or "knowingly" means an act or omission done voluntarily and intentionally, and not because of mistake or accident or other innocent reason.

SECTION 2. Liability for certain acts.

(a) A person shall be liable to the State of Arkansas, through the Attorney General, for a civil penalty and restitution if he:

(1) Knowingly makes or causes to be made any false statement or representation of a material fact in any application for any benefit or payment under the Medicaid Program; or

HEALTH CARE - MEDICAID FRAUD FALSE CLAIMS, 1993 Arkansas Laws Act 455...

Case 1:11-cv-00071-PGG  Document 237-105  Filed 08/31/18  Page 181 of 312

(2) At any time knowingly makes or causes to be made any false statement or representation of a material fact for use in determining rights to such benefit or payment; or

(3) Having knowledge of the occurrence of any event affecting his initial or continued right to any such benefit or payment, or the initial or continued right to any such benefit or payment of any other individual in whose behalf he has applied for or is receiving such benefit or payment, knowingly conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized; or

(4) Having made application to receive any such benefit or payment for the use and benefit of another and having received it, knowingly converts such benefit or payment or any part thereof to a use other than for the use and benefit of such other person; or

(5) Knowingly presents or causes to be presented a claim for a physician's service for which payment may be made under the Arkansas Medicaid Program and knows that the individual who furnished the service was not licensed as a physician; or

(6) Knowingly solicits or receives any remuneration including any kickback, bribe, or rebate directly or indirectly, overtly or covertly, in cash or in kind:

(i) In return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under the Arkansas Medicaid Program, or

(ii) In return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under the Arkansas Medicaid Program, or

(7) Knowingly offers or pays any remuneration including any kickback, bribe, or rebate directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person:

(i) To refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under the Arkansas Medicaid Program, or

(ii) To purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under the Arkansas Medicaid Program. Subdivisions (i) and (ii) shall not apply to:

(A) A discount or other reduction in price obtained by a provider of services or other entity under the Arkansas Medicaid Program if the reduction in price is properly disclosed and appropriately reflected in the costs claimed or charges made by the provider or entity under the Arkansas Medicaid Program; or

(B) Any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services; or

(C) Any amount paid by a vendor of goods or services to a person authorized to act as a purchasing agent for a group of individuals or entities who are furnishing services reimbursed under the Arkansas Medicaid Program if:

(I) The person has a written contract, with each such individual or entity, which specifies the amount to be paid the person, which amount may be a fixed amount or a fixed percentage of the value of the purchases made by each such individual or entity under the contract; and

(II) In the case of an entity that is a provider of services as defined in section A.C.A. 20–9–101, the person discloses in such form and manner as the Director of Human Services requires to the entity and, upon request, to the Director the amount received from each such vendor with respect to purchases made by or on behalf of the entity; and

(D) Any payment practice specified by the Director of Human Services promulgated pursuant to applicable federal or state law.

(8) Knowingly makes or causes to be made, or induces or seeks to induce the making of, any false statement or representation of a material fact with respect to the conditions or operation of any institution, facility, or entity in order that such institution, facility, or entity may qualify either upon initial certification or upon recertification as a hospital, rural primary care hospital, skilled nursing facility, nursing facility, intermediate care facility for the mentally retarded, home health agency, or other entity for which certification is required or with respect to information required pursuant to applicable federal and state law, rules, regulations and provider agreements;

HEALTH CARE - MEDICAID FRAUD FALSE CLAIMS, 1993 Arkansas Laws Act 9/299...

Case 1:11-cv-00071-PGG Document 237-105 Filed 08/31/18 Page 182 of 312

(9) Knowingly: (i) Charges, for any service provided to a patient under the Arkansas Medicaid Program, money or other consideration at a rate in excess of the rates established by the state, or

(ii) Charges, solicits, accepts, or receives, in addition to any amount otherwise required to be paid under the Arkansas Medicaid Program any gift, money, donation, or other consideration other than a charitable, religious, or philanthropic contribution from an organization or from a person unrelated to the patient as a precondition of admitting a patient to a hospital, nursing facility, or intermediate care facility for the mentally retarded, or as a requirement for the patient's continued stay in such a facility, when the cost of the services provided therein to the patient is paid for in whole or in part under the Arkansas Medicaid Program.

(10) Knowingly makes or causes to be made any false statement or representation of a material fact in any application for benefits or payment in violation of the rules, regulations and provider agreements issued by the Arkansas Medicaid Program or its fiscal agents.

SECTION 3. Civil penalties.

(a) It shall be unlawful for any person to commit any act prescribed by Section 2 of this chapter, and any person found to have committed any such act or acts shall be deemed liable to the State of Arkansas, through the Attorney General, for full restitution and for a civil penalty of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000) for each violation, plus three (3) times the amount of all payments judicially found to have been fraudulently received from the Arkansas Medicaid Program or its fiscal agents because of the act of that person, except that if the court finds the following:

(1) The person committing the violation of this act furnished officials of the Attorney General with all information known to such person about the violation within thirty (30) days after the date on which the defendant first obtained the information;

(2) Such person fully cooperated with any Attorney General investigation of such violation, and at the time the person furnished the Attorney General with the information about the violation, no criminal prosecution, civil action, or administrative action had commenced under this act with respect to the violation, and the person did not have actual knowledge of the existence of an investigation into such violation. The court may assess not more than two (2) times the amount of damages which the State sustained because of the act of the person.

(b) A person violating this act shall also be liable to the State of Arkansas for the costs of a civil action brought to recover any such penalty or damages.

(c) The entirety of any penalty, less any reward which may be determined by the court pursuant to this act, shall be credited to the General Revenues of the State of Arkansas.

(d) For actions under this act, the following shall apply:

(1) The enable the court to properly fix the amount of restitution, the Attorney General shall, after appropriate investigation, recommend an amount that would make the victim whole with respect to the money fraudulently received from the Arkansas Medicaid Program or its fiscal agents, the expense of investigation, and all other measurable monetary damages directly related to the cause of action.

(2) If the defendant disagrees with the recommendation of the Attorney General, he shall be entitled to introduce evidence in mitigation of the amount recommended.

SECTION 4. Disposition of offender.

(a) [1] For actions under this act, whether tried by the Court or the jury, the restitution and penalty shall be fixed by the Court.

SECTION 5. Civil investigative demands.

(a) If the Attorney General has reasonable cause to believe that a person has information or is in possession, custody or control of any document or other tangible object relevant or that would lead to the discovery of relevant information in an investigation to an investigation for violation of this article, the Attorney General may serve upon the person, before bringing any action in the circuit court, a written demand to appear and be examined under oath, to answer written interrogatories under oath and to produce the document or object for inspection and copying. The demand shall:

(1) Be served upon the person in the manner required for service of process in the State of Arkansas or by certified mail with return receipt requested.

(2) Describe the nature of the conduct constituting the violation under investigation.

HEALTH CARE - MEDICAID FRAUD FALSE CLAIMS, 1993 Arkansas Laws Act 1299...

Case 1:11-cv-00071-PGG Document 237-105 Filed 08/31/18 Page 183 of 312

(3) Describe the class or classes of documents or objects with sufficient definiteness to permit them to be fairly identified.

(4) Contain a copy of the written interrogatories.

(5) Prescribe a reasonable time at which the person must appear to testify, within which to answer the written interrogatories and within which the document or object must be produced, and advise the person that objections to or reasons for not complying with the demand may be filed with the Attorney General on or before that time.

(6) Specify a place for the taking of testimony or for production and designate a person who shall be custodian of the document or object.

(7) Contain a copy of subsections (b) and (c) of this section.

(b) If a person objects to or otherwise fails to comply with the written demand served upon him under subsection (a), the Attorney General may file an action in the circuit court for an order to enforce the demand. Venue for the action to enforce the demand shall be in Pulaski county. Notice of hearing the action to enforce the demand and a copy of the action shall be served upon the person in the same manner as that prescribed in the Arkansas Rules of Civil Procedure. If the court finds that the demand is proper, that there is reasonable cause to believe there may have been a violation of this chapter and that the information sought or document or object demanded is relevant to the violation, it shall order the person to comply with the demand, subject to modifications the court may prescribe. If the person fails to comply with such order, the court may issue any of the following orders until the person complies with such order:

(1) Adjudging the person in contempt of court.

(2) Granting injunctive relief against the person to whom the demand is issued to restrain the conduct which is the subject of the investigation.

(3) Granting such other relief as the court may deem proper.

(c) The court may award to the Attorney General costs and reasonable attorney fees as determined by the court against the person failing to obey the order. Upon motion by the person and for good cause shown, the court may make any further order in the proceedings that justice requires to protect the person from unreasonable annoyance, embarrassment, oppression, burden or expense.

(d) If the Attorney General determines that disclosure to the respondent of the evidence relied on to establish reasonable cause is not in the best interests of the investigation, he may request that the court examine the evidence in camera. If the Attorney General makes this request, the court may examine the evidence in camera and then make its determination.

(e) Any procedure, testimony taken, or material produced under this section shall be kept confidential by the Attorney General before bringing an action against a person under this chapter for the violation under investigation unless any of the following applies:

(1) Confidentiality is waived by the person whose testimony is disclosed.

(2) Confidentiality is waived by the person who produced to the Attorney General the material being disclosed.

(3) The testimony or material is disclosed solely to the person, or the person's attorney, who testified or provided the material to the Attorney General.

(4) Disclosure is authorized by court order.

(f) The Attorney General may disclose the testimony or material to an agency director of the State of Arkansas, the United States or any other state, or prosecuting attorney or United States Attorney.

(g) An investigator conducting an examination pursuant to this section may exclude from the place of examination any person, except the person being examined and person's counsel.

(h) Nothing in this section shall be construed to limit the Attorney General's authority to access provider records in accordance with existing provisions of the Arkansas Code.

SECTION 6. Order compelling testimony or production of evidence; immunity; contempt.

(a) In any proceeding or investigation under this act, if a person refuses to answer a question or produce evidence of any kind on the ground that he may be incriminated and if the Attorney General or prosecuting attorney requests the court in writing to order the person to answer the question or produce the evidence, the court may make this order and the person shall comply with the order. If the court denies the request, the court shall state its reasons for denial in writing. After complying, the testimony or evidence, or any information directly derived from the testimony or evidence, shall not be used against the person in any proceeding or prosecution of a crime or offense concerning which he gave an answer or produced evidence under the court order. Immunity obtained pursuant to this section does not exempt any person

HEALTH CARE - MEDICAID FRAUD FALSE CLAIMS, 1993 Arkansas Laws Act 239...

Case 1:11-cv-00071-PGG   Document 237-105   Filed 08/31/18   Page 184 of 312

from prosecution, penalty or forfeiture for any perjury, false swearing or contempt committed in answering, or failing to answer, or in producing, or failing to produce, evidence in accordance with the order.

(b) If a person refuses to testify after being granted immunity and after being ordered to testify as prescribed in subsection (a) of this section, he may be adjudged in contempt.

SECTION 7. False claims procedure.

(a) A subpoena requiring the production of documents or the attendance of a witness at an interview, or a trial or hearing conducted under this section may be served by the Attorney General or any duly authorized law enforcement officer in the State of Arkansas personally, telephonically or by registered or certified mail. In the case of service by registered or certified mail, such return shall be accompanied by the return post office receipt of delivery of such demand.

(b) A civil action under this section may not be brought more than:

(1) Five (5) years after the date on which the violation of this act is committed.

(c) In any action brought pursuant to this act, the State of Arkansas shall be required to prove all essential elements of the cause of action, including damages, by a preponderance of the evidence.

SECTION 8. False claims jurisdiction.

Any action under this act may be brought in the circuit court of the county where the defendant, or in the case of multiple defendants, any one defendant resides.

SECTION 9. Suspension of violators.

The Director of the Department of Human Services may suspend or revoke the provider agreement between the department and the person in the event the person is found guilty of violating the terms of this act.

SECTION 10. Injunctions against fraud.

Whenever it appears that any person is engaged or intends to engage in the transfer, conversion or destruction of assets, records or property in an effort to avoid detection of violations of this act the Attorney General may apply to the Chancery Court of Pulaski County or to the court in which the records or property are located to seize and impound the property. The application for ex parte order shall be in writing and furnish a reasonable basis for the granting of the proposed order and demonstrate that an emergency exists which would support the granting of the motion. If the order is granted, the respondent shall be served with a copy of the order seizing and impounding his records by the day following the issuance of the order. If the order is granted the respondent shall be granted a hearing no later than five (5) days after issuance of the order for the purpose of determining whether the order should be continued. The burden at all stages of the proceeding shall be upon the state to prove by preponderance of evidence the necessity of the order of seizure.

SECTION 11. Reward for the detection and punishment of Medicaid fraud.

(a) [2] The Court is authorized to pay a person such sums, not exceeding ten percent (10%) of the aggregate penalty recovered, or in any case not more than one hundred thousand dollars ($100,000), as it may deem just for information such person may have provided which led to the detecting and bringing to trial and punishment persons guilty of violating the Medicaid fraud laws.

(1) Upon disposition of any civil action relating to violations of this act in which a penalty is recovered, the Attorney General may petition the court on behalf of a person who may have provided information which led to the detecting and bringing to trial and punishment persons guilty of Medicaid fraud to award such person in an amount commensurate with the quality of information determined by the court to have been provided, in accordance with requirements of this act.

(2) If the Attorney General elects not to petition the court on behalf of such person, the person may petition the court on his own behalf.

(3) Neither the state nor any defendant within the action shall be liable for expenses which a person incurs in bringing an action under this section.

(4) Employee or fiscal agents charged with the duty of referring or investigating cases of Medicaid fraud who are employed by or contract with any governmental entity shall not be eligible to receive a reward under this subsection.

SECTION 12. Records.

(a) No potential Medicaid recipient shall be eligible for medical assistance unless he has, in writing, authorized the Director of the Department of Human Services to examine all records of his own, or of those receiving or having received Medicaid benefits through him, whether the receipt of such benefits would be allowed by the Arkansas Medicaid Program

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

HEALTH CARE - MEDICAID FRAUD FALSE CLAIMS, 1993 Arkansas Laws Act 1299...

Case 1:11-cv-00071-PGG Document 237-105 Filed 08/31/18 Page 185 of 312

or not, for the purpose of investigating whether any person may have violated this act, or for use or potential use in any legal, administrative, or judicial proceeding.

(b) No person shall be eligible to receive any payment from the Arkansas Medicaid Program or its fiscal agents unless that person has in writing, authorized the Director of the Department of Human Services to examine all records for the purpose of investigating whether any person may have committed the crime of Medicaid fraud, or for use or for potential use in any legal, administrative, or judicial proceeding.

(c) The Attorney General shall be allowed access to all records of persons and Medicaid recipients under the Arkansas Medicaid Program to which the Director of the Department of Human Services has access for the purpose of investigating whether any person may have violated this act, or for use or potential use in any legal, administrative, or judicial proceeding.

(d) Notwithstanding any other law to the contrary, no person shall be subject to any civil or criminal liability for providing access to records to the Director of the Department of Human Services, the Attorney General, or the prosecuting attorneys.

(e) Records obtained by the Director of the Department of Human Services or the Attorney General, pursuant to this chapter shall be classified as confidential information and shall not be subject to outside review or release by any individual except when records are used or potentially to be used by any government entity in any legal, administrative, or judicial proceeding.

(f) All persons under the Arkansas Medicaid Program are required to maintain at their or its principal place of Medicaid business all records at least for a period of five (5) years from the date of claimed provision of any goods or services to any Medicaid recipient.

(g) Any person found not to have maintained all records shall be guilty of a Class D felony if the unavailability of records impairs or obstructs a civil action pursuant to this act. Otherwise, the unavailability of records shall be a Class A misdemeanor.

SECTION 13. All provisions of this act of a general and permanent nature are amendatory to the Arkansas Code of 1987 Annotated and the Arkansas Code Revision Commission shall incorporate the same in the Code.

SECTION 14. If any provision of this act or the application thereof to any person or circumstance is held invalid, such invalidity shall not affect other provisions or applications of the act which can be given effect without the invalid provision or application, and to this end the provisions of this act are declared to be severable.

SECTION 15. All laws and parts of laws in conflict with this act are hereby repealed.

SECTION 16. EMERGENCY. It is hereby found and determined by the General Assembly that the Attorney General and the prosecuting attorneys are in need of specific legislation by which to eliminate fraud in the Arkansas Medicaid Program and that immediate passage of this act is necessary to protect the integrity of the program. Therefore, an emergency is hereby declared to exist, and this act, being necessary for the immediate preservation of the public peace, health and safety, shall be in full force and effect from and after its passage and approval.

[1] Original bill did not contain a subsection (b).

[2] Original bill did not contain a subsection (b).

Approved April 23, 1993.

AR LEGIS 1299 (1993)

   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.   6

§ 4-802. Penalties; prohibited acts., DC CODE § 4-802

---

> West's District of Columbia Code Annotated 2001 Edition
>  Division I. Government of District.
>   Title 4. Public Care Systems. (Refs & Annos)
>    Chapter 8. Medicaid Provider Fraud Prevention.

DC ST § 4-802

Formerly cited as DC ST 1981 § 3-702

§ 4-802. Penalties; prohibited acts.

Currentness

(a) A person shall be guilty of a misdemeanor punishable by a fine of not more than $500 or imprisonment not to exceed 1 year, or both, for each violation of the following prohibitions in this section.

(b) No one may, with intent to defraud, by means of a false claim, false statement, failure to disclose information, or other fraudulent scheme or device, obtain or attempt to obtain:

(1) Authorization to become or remain a provider;

(2) A higher rate of payment than that to which the person is entitled as a provider;

(3) Payment, as a provider, for items or services that the person knows or has reason to know were not provided as claimed;

(4) Payment which may not be made under the program under which the claim was made; or

(5) Payment submitted in violation of an agreement between the person and the District of Columbia.

(c) No one may solicit, accept, or agree to accept any type of remuneration for the following:

(1) Referring a recipient to a particular provider of any item or service or for which payment may be made under the District of Columbia Medicaid Program; or

(2) Recommending the purchase, lease, or order of any good, facility, service, or item for which payment may be made under the District of Columbia Medicaid Program.

§ 4-802. Penalties; prohibited acts., DC CODE § 4-802

(d) No one may confer, offer, or agree to confer or offer any type of remuneration for the conduct described in subsection (c) of this section.

(e) No one may charge, solicit, accept, or attempt to charge, solicit, accept or receive anything of value from a recipient or provider in addition to the amount of money payable under the District of Columbia ==Medicaid== Program.

(f) No one may solicit, receive, or attempt to solicit or receive anything of value as a precondition for admitting a recipient to a hospital, skilled nursing facility, intermediate care facility, or any other facility, or as a condition for providing any item or service to a recipient.

**Credits**
(Mar. 16, 1985, D.C. Law 5-193, § 3, 32 DCR 1010.)

**Editors' Notes**

<div align="center">CROSS REFERENCES</div>

==Fraud==, see § 22-3221.

Copyright (c) 2012 By the District of Columbia. Content previously published in the District of Columbia Official Code, 2001 Edition is used with permission. Copyright (c) 2017 Thomson Reuters.
DC CODE § 4-802
Current through July 11, 2017

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Roberts, John 7/20/2017

For Educational Use Only

§ 1005. Kickback schemes and solicitation, DE ST TI 31 § 1005

---

| |
|---|
| West's Delaware Code Annotated |
|   Title 31. Welfare |
|     Part I. In General |
|       Chapter 10. Fraudulent Acts |

31 Del.C. § 1005

§ 1005. Kickback schemes and solicitation

Currentness

(a) It shall be unlawful for any person to solicit or receive any remuneration (including kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind:

  (1) In return for referring an individual to a provider for the furnishing or arranging for the furnishing of any medical care or medical assistance for which payment may be made in whole or in part under any public assistance program; or

  (2) In return for purchasing, leasing, ordering or arranging for or recommending purchasing, leasing, or ordering any property, facility, service or item of medical care or medical assistance for which payment may be made in whole or in part under any public assistance program.

(b) It shall be unlawful for any person to offer or pay any remuneration (including any kickback, bribe or rebate) directly or indirectly, in cash or in kind to induce any other person:

  (1) To refer an individual to a provider for the furnishing or arranging for the furnishing of any medical care or medical assistance for which payment may be made in whole or in part under any public assistance program; or

  (2) To purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any property, facility, service, or item of medical care or medical assistance for which payment may be made in whole or in part under any public assistance program.

(c) It shall be unlawful for any provider to:

  (1) Charge, solicit, accept or receive for any service provided to a recipient, money or other consideration in addition to or at a rate in excess of the rates established by the State for such item or service; or

  (2) Charge, solicit or receive, in addition to any amount otherwise required to be paid by the State, any gift, money, donation, or other consideration (other than a charitable, religious or philanthropic contribution from an organization or from a person unrelated to the patient) as a precondition to admitting a patient to a hospital, skilled nursing facility

---

Roberts, John 7/20/2017

For Educational Use Only

§ 1005. Kickback schemes and solicitation, DE ST TI 31 § 1005

or intermediate care facility, or as a requirement for the patient's continued stay in such a facility, when the cost of services provided therein to the patient is paid for, in whole or in part, by the State.

(d) Subsections (a), (b) and (c) of this section shall not apply to:

(1) A discount or other reduction to price obtained by a provider under this chapter if the reduction in price is properly disclosed and appropriately reflected in the costs claimed or charges made by the provider; or

(2) Wages paid by an employer to an employee as part of a bona fide employment relationship; or

(3) Contracts between the State and a public or private agency where part of the agency's responsibility is referral of a person to a provider;

(4) Dividends based exclusively on a legitimate ownership interest;

(5) Fees for services actually rendered, provided that the fees are not made to induce referrals to the provider.

**Credits**
65 Laws 1986, ch. 345, § 2.

31 Del.C. § 1005, DE ST TI 31 § 1005
Current through 81 Laws 2017, chs. 1-44. Revisions to 2017 Acts by the Delaware Code Revisors were unavailable at the time of publication.

End of Document                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Roberts, John 7/20/2017
**For Educational Use Only**

456.054. Kickbacks prohibited, FL ST § 456.054

---

West's Florida Statutes Annotated
    Title XXXII. Regulation of Professions and Occupations (Chapters 454-493) (Refs & Annos)
    Chapter 456. Health Professions and Occupations: General Provisions (Refs & Annos)

West's F.S.A. § 456.054

456.054. **Kickbacks** prohibited

Effective: July 1, 2006

Currentness

(1) As used in this section, the term "**kickback**" means a remuneration or payment, by or on behalf of a provider of health care services or items, to any person as an incentive or inducement to refer patients for past or future services or items, when the payment is not tax deductible as an ordinary and necessary expense.

(2) It is unlawful for any health care provider or any provider of health care services to offer, pay, solicit, or receive a **kickback**, directly or indirectly, overtly or covertly, in cash or in kind, for referring or soliciting patients.

(3) Violations of this section shall be considered patient brokering and shall be punishable as provided in s. 817.505.

**Credits**

Laws 1992, c. 92-178, § 8; Laws 1996, c. 96-152, § 2; Fla.St.1996, Supp. § 455.237; Laws 1997, c. 97-261, § 79; Laws 1999, c. 99-204, § 8; Fla.St.1999, § 455.657. Renumbered as 456.054 by Laws 2000, c. 2000-160, § 78, eff. July 4, 2000. Amended by Laws 2006, c. 2006-305, § 6, eff. July 1, 2006.

**Editors' Notes**

### HISTORICAL AND STATUTORY NOTES

**Amendment Notes:**

"(1) As used in this section, the term "**kickback**" means a remuneration or payment back pursuant to an investment interest, compensation arrangement, or otherwise, by a provider of health care services or items, of a portion of the charges for services rendered to a referring health care provider as an incentive or inducement to refer patients for future services or items, when the payment is not tax deductible as an ordinary and necessary expense."

NOTES OF DECISIONS

**Pleadings**

Insurers pled with sufficient particularity claim that medical and legal referral service provider, health care provider, and related companies orchestrated fraudulent referral scheme to unlawfully collect automobile accident victims' personal injury protection and medical payment coverage benefits, in violation of Florida's Patient Brokering Act, Patient Self-Referral Act, Anti-**Kickback** Act, and Deceptive and Unfair Trade Practices Act (FDUTPA), where complaint alleged

---

Roberts, John 7/20/2017
For Educational Use Only

**456.054. Kickbacks prohibited, FL ST § 456.054**

relationships between co-defendants and roles played by each to conceal nature of those relationships in order to ensure continued supply of referrals to provider's clinics, and detailed each relevant claim by claim number, date, and amount. State Farm Mut. Auto. Ins. Co. v. Physicians Group of Sarasota, L.L.C., M.D.Fla.2014, 9 F.Supp.3d 1303. Federal Civil Procedure 🔑 636

West's F. S. A. § 456.054, FL ST § 456.054

Current with chapters from the 2017 First Regular Session of the 25th Legislature in effect through July 7, 2017

End of Document                              © 2017 Thomson Reuters. No claim to original U.S. Government Works.

HEALTH CARE PROVIDERS—REFERRALS—COST..., 1992 Fla. Sess. Law...

Case 1:11-cv-00071-PGG Document 237-105 Filed 08/31/18 Page 192 of 312

1992 Fla. Sess. Law Serv. Ch. 92-178 (C.S.S.B. 2264) (WEST)

FLORIDA 1992 SESSION LAW SERVICE
Twelfth Legislature, Second Regular Session

Additions are indicated by <<+ Text +>>; Deletions by
<<- Text ->>. Changes in tables are made but not highlighted.

Chapter 92–178
C.S.S.B. No. 2264
HEALTH CARE PROVIDERS—REFERRALS—COST CONTAINMENT

AN ACT relating to medical practice; repealing s. 458.331(1)(gg), F.S., relating to grounds for disciplinary action with respect to a health care provider who makes certain referrals; repealing s. 459.015(1)(k), F.S., relating to disciplinary grounds for osteopaths; repealing s. 460.413(1)(k), F.S., relating to disciplinary grounds for chiropractors; repealing s. 461.013(1)(j), F.S., relating to disciplinary grounds for podiatrists; repealing s. 463.016(1)(m), F.S., relating to disciplinary grounds for optometrists; repealing s. 466.028(1)(n), F.S., relating to disciplinary grounds for dentists; creating the "Patient Self–Referral Act of 1992"; providing legislative intent; providing definitions; prohibiting certain financial arrangements between referring health care providers and providers of health care services; providing for grounds for disciplinary action; providing penalties; providing an exception for specified radiation therapy facilities; providing for repeal; prohibiting kickbacks; prohibiting markups on charges for services rendered by another entity; requiring licensure of health care services; creating s. 407.60, F.S.; directing the Health Care Cost Containment Board to conduct an annual study of charges for radiation therapy procedures; empowering the Health Care Cost Containment Board to establish fees for radiation therapy procedures upon a finding that charges for such procedures exceed a specified amount; establishing a maximum fee schedule for radiation therapy procedures; providing penalties for exceeding a fee schedule; creating s. 407.61, F.S.; empowering the Health Care Cost Containment Board to conduct studies relating to health care provider referral patterns and to make recommendations to the Legislature and the Governor; authorizing the Health Care Cost Containment Board to require submission of data; specifying data elements; requiring a report; providing for repeal; amending s. 455.25, F.S., relating to disclosure of financial interests; providing a penalty; providing an appropriation; providing applicability; providing an effective date.

Be It Enacted by the Legislature of the State of Florida:

<< FL ST § 458.331 >>

Section 1. Paragraph (gg) of subsection (1) of section 458.331, Florida Statutes, is repealed.

<< FL ST § 459.015 >>

Section 2. Paragraph (k) of subsection (1) of section 459.015, Florida Statutes, is repealed.

<< FL ST § 460.413 >>

Section 3. Paragraph (k) of subsection (1) of section 460.413, Florida Statutes, is repealed.

<< FL ST § 461.013 >>

Section 4. Paragraph (j) of subsection (1) of section 461.013, Florida Statutes, is repealed.

<< FL ST § 463.016 >>

HEALTH CARE PROVIDERS—REFERRALS COST..., 1992 Fla. Sess. Law...

Case 1:11-cv-00071-PGG Document 237-105 Filed 08/31/18 Page 193 of 312

Section 5. Paragraph (m) of subsection (1) of section 463.016, Florida Statutes, is repealed.

<< FL ST 466.028 >>

Section 6. Paragraph (n) of subsection (1) of section 466.028, Florida Statutes, is repealed.

Section 7. [1] Financial arrangements between referring health care providers and providers of health care services.

**(1) Short title.**—This section shall be known and may be cited as the "Patient Self–Referral Act of 1992."

**(2) Legislative intent.**—It is recognized by the Legislature that the referral of a patient by a health care provider to a provider of health care services in which the referring health care provider has an investment interest represents a potential conflict of interest. The Legislature finds these referral practices may limit or eliminate competitive alternatives in the health care services market, may result in overutilization of health care services, may increase costs to the health care system, and may adversely affect the quality of health care. The Legislature also recognizes, however, that it may be appropriate for providers to own entities providing health care services, and to refer patients to such entities, as long as certain safeguards are present in the arrangement. It is the intent of the Legislature to provide guidance to health care providers regarding prohibited patient referrals between health care providers and entities providing health care services and to protect the citizens of Florida from unnecessary and costly health care expenditures.

**(3) Definitions.**—For the purpose of this section, the word, phrase, or term:

(a) "Board" means any of the following boards relating to the respective professions: the Board of Medicine as created in section 458.307, Florida Statutes; the Board of Osteopathic Medical Examiners as created in section 459.004, Florida Statutes; the Board of Chiropractic as created in section 460.404, Florida Statutes; the Board of Podiatric Medicine as created in section 461.004, Florida Statutes; the Board of Optometry as created in section 463.003, Florida Statutes; the Board of Pharmacy as created in section 465.004, Florida Statutes; and the Board of Dentistry as created in section 466.004, Florida Statutes.

(b) "Comprehensive rehabilitation services" means services that are provided by health care professionals licensed under part I or part III of chapter 468 or chapter 486 to provide speech, occupational, or physical therapy services on an outpatient or ambulatory basis.

(c) "Department" means the Department of Professional Regulation.

(d) "Designated health services" means, for purposes of this section, clinical laboratory services, physical therapy services, comprehensive rehabilitative services, diagnostic imaging services, and radiation therapy services.

(e) "Entity" means any individual, partnership, firm, corporation, or other business entity.

(f) "Fair market value" means value in arms length transactions, consistent with the general market value, and, with respect to rentals or leases, the value of rental property for general commercial purposes, not taking into account its intended use, and, in the case of a lease of space, not adjusted to reflect the additional value the prospective lessee or lessor would attribute to the proximity or convenience to the lessor where the lessor is a potential source of patient referrals to the lessee.

(g) "Group practice" means a group of two or more health care providers legally organized as a partnership, professional corporation, or similar association:

1. In which each health care provider who is a member of the group provides substantially the full range of services which the health care provider routinely provides, including medical care, consultation, diagnosis, or treatment, through the joint use of shared office space, facilities, equipment, and personnel;

2. For which substantially all of the services of the health care providers who are members of the group are provided through the group and are billed in the name of the group and amounts so received are treated as receipts of the group; and

3. In which the overhead expenses of and the income from the practice are distributed in accordance with methods previously determined by members of the group.

(h) "HCCCB" means the Health Care Cost Containment Board as created in section 407.01, Florida Statutes.

(i) "Health care provider" means any physician licensed under chapter 458, chapter 459, chapter 460, or chapter 461, Florida Statutes, or any health care provider licensed under chapter 463 or chapter 466, Florida Statutes.

(j) "Immediate family member" means a health care provider's spouse, child, child's spouse, grandchild, grandchild's spouse, parent, parent-in-law, or sibling.

(k) "Investment interest" means an equity or debt security issued by an entity, including, without limitation, shares of stock in a corporation, units or other interests in a partnership, bonds, debentures, notes, or other equity interests or debt instruments. Except for purposes of section 10 of this act, the following investment interests shall be excepted from this definition:

1. An investment interest in an entity that is the sole provider of designated health services in a rural area;

2. An investment interest in notes, bonds, debentures, or other debt instruments issued by an entity which provides designated health services, as an integral part of a plan by such entity to acquire such investor's equity investment interest in the entity, provided that the interest rate is consistent with fair market value, and that the maturity date of the notes, bonds, debentures, or other debt instruments issued by the entity to the investor is not later than October 1, 1996.

3. An investment interest in real property resulting in a landlord-tenant relationship between the health care provider and the entity in which the equity interest is held, unless the rent is determined, in whole or in part, by the business volume or profitability of the tenant or exceeds fair market value; or

4. An investment interest in an entity which owns or leases and operates a hospital licensed under chapter 395, Florida Statutes, or a nursing home facility licensed under chapter 400, Florida Statutes.

(l) "Investor" means a person or entity owning a legal or beneficial ownership or investment interest, directly or indirectly, including, without limitation, through an immediate family member, trust, or another entity related to the investor within the meaning of 42 C.F.R. subsection 413.17, in an entity.

(m) "Referral" means any referral of a patient by a health care provider for health care services, including, without limitation:

1. The forwarding of a patient by a health care provider to another health care provider or to an entity which provides or supplies designated health services or any other health care item or service; or

2. The request or establishment of a plan of care by a health care provider, which includes the provision of designated health services or other health care item or service.

3. Except for the purposes of section 10 of this act, the following orders, recommendations, or plans of care shall not constitute a referral by a health care provider:

a. By a radiologist for diagnostic imaging services;

b. By a physician specializing in the provision of radiation therapy services for such services;

c. By a medical oncologist for drugs and solutions to be prepared and administered intravenously to such oncologist's patient, as well as for the supplies and equipment used in connection therewith to treat such patient for cancer and the complications thereof;

d. By a cardiologist for cardiac catheterization services;

e. By a pathologist for diagnostic clinical laboratory tests and pathological examination services, if furnished by or under the supervision of such pathologist pursuant to a consultation requested by another physician; or

f. By a health care provider who is the sole provider or member of a group practice for designated health services or other health care items or services that are prescribed or provided solely for such referring health care provider's or group practice's own patients, and that are provided or performed by or under the direct supervision of such referring health care provider or group practice.

g. By a health care provider for services provided by an ambulatory surgical center licensed under chapter 395, Florida Statutes.

h. By a health care provider for diagnostic clinical laboratory services where such services are directly related to renal dialysis.

i. By a urologist for lithotripsy services.

j. By a dentist for dental services performed by an employee of or health care provider who is an independent contractor with the dentist or group practice of which the dentist is a member.

k. By a physician for infusion therapy services to a patient of that physician or a member of that physician's group practice.

l. By a nephrologist for renal dialysis services and supplies.

(n) "Rural area" means a county with a population density of no greater than 100 persons per square mile, as defined by the United States Census.

HEALTH CARE PROVIDERS—REFERRALS—COST..., 1992 Fla. Sess. Law...

Case 1:11-cv-00071-PGG Document 237-105 Filed 08/31/18 Page 195 of 312

**(4) Prohibited referrals and claims for payment.**—Except as provided in this section:

(a) A health care provider may not refer a patient for the provision of designated health services to an entity in which the health care provider is an investor or has an investment interest.

(b) A health care provider may not refer a patient for the provision of any other health care item or service to an entity in which the health care provider is an investor unless:

1. The provider's investment interest is in registered securities purchased on a national exchange or over-the-counter market and issued by a publicly held corporation:

a. Whose shares are traded on a national exchange or on the over-the-counter market; and

b. Whose total assets at the end of the corporation's most recent fiscal quarter exceeded $50 million; or

2. With respect to an entity other than a publicly held corporation described in subparagraph 1., and a referring provider's investment interest in such entity, each of the following requirements are met:

a. No more than 50 percent of the value of the investment interests are held by investors who are in a position to make referrals to the entity.

b. The terms under which an investment interest is offered to an investor who is in a position to make referrals to the entity are no different from the terms offered to investors who are not in a position to make such referrals.

c. The terms under which an investment interest is offered to an investor who is in a position to make referrals to the entity are not related to the previous or expected volume of referrals from that investor to the entity.

d. There is no requirement that an investor make referrals or be in a position to make referrals to the entity as a condition for becoming or remaining an investor.

3. With respect to either such entity or publicly held corporation:

a. The entity or corporation does not loan funds to or guarantee a loan for an investor who is in a position to make referrals to the entity or corporation if the investor uses any part of such loan to obtain the investment interest.

b. The amount distributed to an investor representing a return on the investment interest is directly proportional to the amount of the capital investment, including the fair market value of any preoperational services rendered, invested in the entity or corporation by that investor.

4. Each board and, in the case of hospitals, the Department of Health and Rehabilitative Services, shall encourage the use by licensees of the declaratory statement procedure to determine the applicability of this section or any rule adopted pursuant to this section as it applies solely to the licensee. Boards shall submit to the Department of Health and Rehabilitative Services the name of any entity in which a provider investment interest has been approved pursuant to this section, and the Department of Health and Rehabilitative Services shall adopt rules providing for periodic quality assurance and utilization review of such entities.

(c) No claim for payment may be presented by an entity to any individual, third-party payor, or other entity for a service furnished pursuant to a referral prohibited under this section.

(d) If an entity collects any amount that was billed in violation of this section, the entity shall refund such amount on a timely basis to the payor or individual, whichever is applicable.

(e) Any person that presents or causes to be presented a bill or a claim for service that such person knows or should know is for a service for which payment may not be made under paragraph (c), or for which a refund has not been made under paragraph (d), shall be subject to a civil penalty of not more than $15,000 for each such service to be imposed and collected by the appropriate board.

(f) Any health care provider or other entity that enters into an arrangement or scheme, such as a cross-referral arrangement, which the physician or entity knows or should know has a principal purpose of assuring referrals by the physician to a particular entity which, if the physician directly made referrals to such entity, would be in violation of this section, shall be subject to a civil penalty of not more than $100,000 for each such circumvention arrangement or scheme to be imposed and collected by the appropriate board.

(g) A violation of this section by a health care provider shall constitute grounds for disciplinary action to be taken by the applicable board pursuant to section 458.331(2), section 459.015(2), section 460.413(2), section 461.013(2), section 463.016(2), or section 466.028(2), Florida Statutes. Any hospital licensed under chapter 395, Florida Statutes, found in violation of this section shall be subject to the rules adopted by the Department of Health and Rehabilitative Services pursuant to section 395.0185(2), Florida Statutes.

(h) Any hospital licensed under chapter 395, Florida Statutes, that discriminates against or otherwise penalizes a health care provider for compliance with this act.

(i) The provision of paragraph (a) shall not apply to referrals to the offices of radiation therapy centers managed by an entity or subsidiary or general partner thereof, which performed radiation therapy services at those same offices prior to April 1, 1991, and shall not apply also to referrals for radiation therapy to be performed at no more than one additional office of any entity qualifying for the foregoing exception which, prior to February 1, 1992, had a binding purchase contract on and a nonrefundable deposit paid for a linear accelerator to be used at the additional office. The physical site of the radiation treatment centers affected by this provision may be relocated as a result of the following factors: acts of God; fire; strike; accident; war; eminent domain actions by any governmental body; or refusal by the lessor to renew a lease. A relocation for the foregoing reasons is limited to relocation of an existing facility to a replacement location within the county of the existing facility upon written notification to the Office of Licensure and Certification.

(j) A health care provider who meets the requirements of paragraphs (b) and (i) must disclose his investment interest to his patients as provided in s. 455.25.

Section 8.[2] Kickbacks prohibited.—

(1) As used in this section, the term "kickback" means a remuneration or payment back pursuant to an investment interest, compensation arrangement, or otherwise, by a provider of health care services or items, of a portion of the charges for services rendered to a referring health care provider as an incentive or inducement to refer patients for future services or items, when the payment is not tax deductible as an ordinary and necessary expense.

(2) It is unlawful for any health care provider or any provider of health care services to offer, pay, solicit, or receive a kickback, directly or indirectly, overtly or covertly, in cash or in kind, for referring or soliciting patients.

Section 9.[3] Markup on charges prohibited.—A health care provider may not charge an additional amount for services rendered by an entity outside of that provider's practice: However, a handling fee of no more than $2 may be charged as long as each charge is separately disclosed and itemized as part of the provider's bill for services.

Section 10.[4] Designated health care services; licensure required.—

(1) An entity, as defined in section 7 of this act, which furnishes designated health care services may not operate in this state unless licensed by the Department of Health and Rehabilitative Services pursuant to subsection (2).

(2) The department shall adopt rules for licensing requirements for designated health care services including, but not limited to, rules providing for:

(a) A licensure fee of not less than $400 and not more than $1,500 to be assessed annually;

(b) Parameters of quality with respect to the provision of ancillary services by respective entities;

(c) Periodic inspection of the facilities of an entity for the purpose of evaluating the premises, operation, supervision, and procedures of the entity to ensure compliance with quality parameters as established in department rules; and

(d) The submission by an entity of information on its ownership, including identification of the owners who are health care providers, as defined in section 455.251, Florida Statutes, and each investor's percentage of ownership.

Section 11. Section 407.60, Florida Statutes, is created to read:

<< FL ST § 407.60 >>

<<+407.60. Health Care Cost Containment Board duties+>>

<<+(1) The Health Care Cost Containment Board is directed to annually conduct a study of charges associated with the provision of radiation therapy procedures by all radiation therapy health care providers, including professional and technical components (hereafter cumulatively "procedures").+>>

<<+(2) If, at any time, the board determines that the average charge for radiation therapy procedures to persons who are not eligible for benefits under Title XVIII or Title XIX of the Social Security Act exceeds the Medicare limiting charge for radiation therapy procedures (20 percent above the fee schedule amount for nonparticipating physicians for calendar year 1992 and 15 percent above the fee schedule amount for nonparticipating physicians for calendar year 1993) as determined by the United States Secretary of the Department of Health and Human Services, the board is authorized to establish fee schedules for radiation therapy procedures as follows. The Health Care Cost Containment Board shall determine the

schedule of professional and technical charges for radiation therapy procedures for nonparticipating physicians under the Medicare program in 1993 in each of the four charge regions of the Medicare program in the State of Florida. This determination shall be completed by December 31, 1992. The maximum fees to be charged for radiation therapy procedures by any health care provider of such service in any setting during 1993 shall not exceed 115 percent of the fee schedule for radiation therapy procedures for nonparticipating physicians as established by the Medicare program for 1993. The professional and technical charges for radiation therapy procedures shall be increased or decreased for each year thereafter on an annual basis in accordance with the percentage adjustments made by the Medicare program for these procedures for nonparticipating physicians. This fee schedule shall apply to the technical and professional components of radiation therapy procedures and shall be applicable to all persons who are not eligible for benefits under Title XVIII or Title XIX of the Social Security Act.+>>

<<+(3) A radiation therapy health care provider, or applicant, may apply to the board for authority to charge a fee above the fee schedule set forth in subsection (2). The board may approve a fee schedule which is higher than the fee schedule established in subsection (2) upon a showing by an applicant that the applicant is an efficiently operated provider of radiation therapy services and that an increase in fees is needed in order for the applicant to achieve the following, in priority order from highest to lowest:+>>

<<+(a) To offset revenues lost due to the provision of documented charity care or Medicaid which exceeds the average level of such care provided by radiation therapy health care providers, or;+>>

<<+(b) To earn a reasonable rate of return as measured by the total margin, return on assets, return on equity, and debt service coverage;+>>

<<+The board may also set a fee schedule below the fee schedule established in subsection (2) if an applicant cannot justify to the satisfaction of the board that the fee schedule established in subsection (2) is needed in order to meet the review criteria of paragraphs (a) and (b). In no event shall the board approve a fee schedule which is higher than 125 percent of the fee schedule amount set for nonparticipating physicians by the United States Secretary of Health and Human Services.+>>

<<+(4) Any modification to an applicant's fee schedule established by the board pursuant to subsection (3) may be reviewed by the board upon the board's own initiative and revised effective 12 months after the effective date of the fee schedule approval.+>>

<<+(5) Any person who charges more than the fees authorized by this section shall be subject to an administrative fine not to exceed $5,000 per violation, to be fixed, imposed, and collected by the board. This section shall not apply to the not-for-profit research institute established by s. 240.512 or to the not-for-profit teaching hospitals authorized to be insured pursuant to s. 240.213.+>>

Section 12. Section 407.61, Florida Statutes, is created to read:

<< FL ST § 407.61 >>

<<+407.61. Board studies+>>

<<+The board is empowered to conduct data based studies and evaluations and to make recommendations to the Legislature and the Governor concerning exemptions, the effectiveness of limitations of referrals, restrictions on investment interests and compensation arrangements, and effectiveness of public disclosure. Such analysis may include, but not be limited to, utilization of services, cost of care, quality of care, and access to care.+>>

<<+(1) The board may require the submission by health care facilities, health care providers, and health insurers data necessary to carry out the board's duties.+>>

<<+(a) Such data may include, but are not limited to, ownership, Medicare and Medicaid, charity care, types of services offered to patients, revenues and expenses, patient encounter data, and such other data that are reasonably necessary to study utilization patterns and to study the impact of health care provider ownership interests in health care related entities on the cost, quality, and accessibility of health care.+>>

<<+(b) The board may collect such data from any health facility as a special study.+>>

<<+(2) Each facility identified in subsection (1) shall submit an accounting report to the board on forms prescribed in a rule and furnished by the board. The report shall include:+>>

<<+(a) A balance sheet detailing the assets, liabilities, and net worth.+>>

<<+(b) A statement of income and expenses.+>>

<<+(c) A statement of cash flows.+>>

<<+(d) Utilization and staffing and standard units of measure as prescribed by rules.+>>

<<+(3) The board shall report its findings to the Governor, the President of the Senate, the Speaker of the House of Representatives, the Senate Minority Leader, and the House Minority Leader by January 1, 1995. Such report shall include recommendations by the board regarding the need for additional legislation relating to health care provider self-referral practices.+>>

Section 13. Section 455.25, Florida Statutes, is amended to read:

<< FL ST § 455.25 >>

<<+(Substantial rewording of section. See s. 455.25, F.S., for present text.)+>>

455.25. Disclosure of financial interest by production

(1) A health care provider shall not refer a patient to an entity in which such provider is an investor unless, prior to the referral, the provider furnishes the patient with a written disclosure form, informing the patient of:

(a) The existence of the investment interest.

(b) The name and address of each applicable entity in which the referring health care provider is an investor.

(c) The patient's right to obtain the items or services for which the patient has been referred at the location or from the provider or supplier of the patient's choice, including the entity in which the referring provider is an investor.

(d) The names and addresses of at least two alternative sources of such items or services available to the patient.

(2) An entity may not provide items or services to a patient unless, before providing the item or service, the entity obtains the signature of the patient on a written disclosure form informing the patient of:

(a) The existence or nonexistence of any financial relationship with the health care provider who referred the patient;

(b) A schedule of typical fees for items or services usually provided by the entity or, if impracticable because of the nature of the treatment, a written estimate specific to the patient;

(c) The patient's right to obtain the items or services for which the patient has been referred at a location or from a supplier of the patient's choice, including an entity with which the referring health care provider may have a financial relationship; and

(d) The names, addresses, and telephone numbers of at least two reasonable alternative sources of such items or services available to the patient.

(3) The health care provider and the entity shall post a copy of their respective disclosure forms in conspicuous public places in the offices.

(4) A violation of this section shall constitute a misdemeanor of the first degree, punishable as provided in s. 775.082 or s. 775.083. In addition to any other penalties or remedies provided, a violation of this section shall be grounds for disciplinary action by the respective board.

Section 14. There is hereby appropriated to the Health Care Cost Containment Board 5 positions and $175,124 in recurring dollars and $66,478 in nonrecurring dollars from the Health Care Cost Containment Trust Fund in order to implement the provisions of sections 407.60 and 407.61, Florida Statutes, as created by this act.

Section 15. This act shall apply to referrals for designated health services made on or after the effective date of this act, provided that with respect to an investment interest acquired before May 1, 1992, paragraph (a) of subsection (4) of section 7 shall not apply to referrals for designated health services occurring before October 1, 1995, and provided, further, that paragraphs (b)–(g) of subsection (4) of section 7 shall be effective on July 1, 1992, and provided further, that with respect to a facility which is providing a designated health service or other health care items or service which received its certificate of occupancy and began providing that service at that facility after May 1, 1991, and before January 1,

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

HEALTH CARE PROVIDERS—REFERRALS—COST..., 1992 Fla. Sess. Law...

Case 1:11-cv-00071-PGG Document 237-105 Filed 08/31/18 Page 199 of 312

1992, section 7(4)(a)–(g) inclusive of this act shall not apply to referrals for such designated health services and other items or services occurring before October 1, 1996.

 Section 16. [5] Effective July 1, 1992, a fee schedule is imposed on all providers of designated health services. The fee schedule shall apply to all persons who receive such services who are not eligible for benefits under Title XVIII or XIX of the Social Security Act, and shall be limited to no more than 115 percent of the Medicare limiting charge for nonparticipating physicians for such services, including technical and professional components, as determined by the Secretary of the United States Department of Health and Human Services. The professional and technical charges for such procedures shall be increased or decreased for each year thereafter on an annual basis in accordance with the percentage adjustments made by the Medicare program for these procedures for nonparticipating physicians. Any person who charges more than the fees authorized by this section shall be subject to an administrative fine not to exceed $5,000 per violation, to be fixed, imposed, and collected by the appropriate licensing board. The application of this provision shall not apply to group practices as defined in this act or hospitals licensed pursuant to chapter 395, Florida Statutes.
 Section 17. This act shall take effect upon becoming a law.

Approved by the Governor April 8, 1992.

Filed in Office Secretary of State April 8, 1992.

 [1] Tentative assignment as 455.236.

 [2] Tentative assignment as 455.237.

 [3] Tentative assignment as 455.238.

 [4] Tentative assignment as 455.239.

 [5] Tentative assignment as 455.2555.

FL LEGIS 92-178

**End of Document** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

CRIMES AND OFFENSES—INSURANCE, 2006 Fla. Sess. Law Serv. Ch. 2006-305...

Case 1:11-cv-00071-RGC Document 237-105 Filed 08/31/18 Page 200 of 312

2006 Fla. Sess. Law Serv. Ch. 2006-305 (H.B. 561) (WEST)

FLORIDA 2006 SESSION LAW SERVICE
Nineteenth Legislature, Second Regular Session

Additions are indicated by Text; deletions by
Text . Changes in tables are made but not highlighted.

Chapter 2006–305
H.B. No. 561
CRIMES AND OFFENSES—INSURANCE

An act relating to offenses involving insurance; amending s. 316.068, F.S.; specifying information to be included in a crash report; creating a rebuttable presumption relating to the absence of certain information in such reports; amending s. 322.21, F.S.; providing an additional fee for certain offenses relating to insurance crimes; providing for deposit of the fee into the Highway Safety Operating Trust Fund; amending s. 322.26, F.S.; providing an additional circumstance relating to insurance crimes for mandatory revocation of a person's driver's license; amending s. 400.9935, F.S.; prohibiting medical directors from referring specified patients to certain clinics for specified medical examinations and tests; providing a definition; providing criminal penalties; requiring health care clinics to display signs containing certain information relating to insurance fraud; authorizing compliance inspections by the Division of Insurance Fraud; requiring clinics to allow inspection access; amending s. 440.105, F.S.; deleting the provision that a violation of a stop-work order is a misdemeanor of the first degree; making unlawful a failure to secure required workers' compensation insurance coverage; providing criminal penalties; amending s. 456.054, F.S.; revising the definition of the term "kickback" for criminal prosecution purposes; amending s. 624.15, F.S.; specifying violations of rules of the Department of Financial Services, Office of Insurance Regulation, or Financial Services Commission as misdemeanors; specifying a violation of emergency rules or orders as a felony of the third degree; providing penalties; providing for nonapplication to certain persons; amending s. 626.112, F.S.; providing a criminal penalty for knowingly transacting insurance without a license; amending s. 626.938, F.S.; revising provisions requiring a report and taxation of independently procured coverages; specifying nonauthorization of independent procurement of workers' compensation, life, or health insurance; amending s. 626.9891, F.S.; expanding authorization to impose administrative fines on insurers for failure to comply with certain anti-fraud plan or anti-fraud investigative unit description requirements; creating s. 626.9893, F.S.; authorizing the division to deposit certain revenues into the Insurance Regulatory Trust Fund; specifying accounting and uses of such revenues; providing for appropriation and use of such revenues; amending s. 627.4133, F.S.; providing a limitation on retroactive assumption of certain coverages and liabilities; amending s. 627.736, F.S.; requiring insurers to provide certain persons with notice of the department's Anti–Fraud Reward Program and the criminal violations that may be reported in pursuit of a reward; amending s. 627.7401, F.S.; specifying additional requirements for Financial Services Commission notification of an insured's rights; amending s. 627.912, F.S.; authorizing the office to impose fines; authorizing the office to adjust such fines under certain circumstances; amending s. 817.234, F.S.; revising provisions specifying material omission and insurance fraud; prohibiting scheming to create documentation of a motor vehicle crash that did not occur; providing a criminal penalty; amending s. 817.2361, F.S.; providing that creating, marketing, or presenting fraudulent proof of motor vehicle insurance is a felony of the third degree; amending s. 817.50, F.S.; specifying nonapplication of provisions specifying evidence of intent to defraud to certain investigative actions taken by law enforcement officers; amending s. 817.505, F.S.; providing an additional patient brokering prohibition, to which penalties apply; revising a definition; amending s. 843.08, F.S.; providing a criminal penalty for falsely assuming or pretending to be an officer of the Department of Financial Services; amending s. 932.7055, F.S.; requiring certain proceeds seized by the division under the Florida Contraband Forfeiture Act to be deposited into certain trust funds; providing severability; providing an effective date.

Case 1:11-cv-00071-RCC  Document 237-105  Filed 08/31/18  Page 201 of 312

Be It Enacted by the Legislature of the State of Florida:

Section 1. Subsection (2) of section 316.068, Florida Statutes, is amended to read:

<< FL ST § 316.068 >>

316.068. Crash report forms

 (2) Every crash report required to be made in writing must be made on the appropriate form approved by the department and must contain all the information required therein, including:
 (a) The date, time, and location of the crash;
 (b) A description of the vehicles involved;
 (c) The names and addresses of the parties involved;
 (d) The names and addresses of all drivers and passengers in the vehicles involved;
 (e) The names and addresses of witnesses;
 (f) The name, badge number, and law enforcement agency of the officer investigating the crash; and
 (g) The names of the insurance companies for the respective parties involved in the crash,

unless not available. The absence of information in such written crash reports regarding the existence of passengers in the vehicles involved in the crash constitutes a rebuttable presumption that no such passengers were involved in the reported crash. Notwithstanding any other provisions of this section, a crash report produced electronically by a law enforcement officer must, at a minimum, contain the same information as is called for on those forms approved by the department.
 Section 2. Subsection (8) of section 322.21, Florida Statutes, is amended to read:

<< FL ST § 322.21 >>

322.21. License fees; procedure for handling and collecting fees

 (8) Any person who applies for reinstatement following the suspension or revocation of the person's driver's license shall pay a service fee of $35 following a suspension, and $60 following a revocation, which is in addition to the fee for a license. Any person who applies for reinstatement of a commercial driver's license following the disqualification of the person's privilege to operate a commercial motor vehicle shall pay a service fee of $60, which is in addition to the fee for a license. The department shall collect all of these fees at the time of reinstatement. The department shall issue proper receipts for such fees and shall promptly transmit all funds received by it as follows:
 (a) Of the $35 fee received from a licensee for reinstatement following a suspension, the department shall deposit $15 in the General Revenue Fund and $20 in the Highway Safety Operating Trust Fund.
 (b) Of the $60 fee received from a licensee for reinstatement following a revocation or disqualification, the department shall deposit $35 in the General Revenue Fund and $25 in the Highway Safety Operating Trust Fund.

If the revocation or suspension of the driver's license was for a violation of s. 316.193, or for refusal to submit to a lawful breath, blood, or urine test, an additional fee of $115 must be charged. However, only one $115 fee may be collected from one person convicted of violations arising out of the same incident. The department shall collect the $115 fee and deposit the fee into the Highway Safety Operating Trust Fund at the time of reinstatement of the person's driver's license, but the fee may not be collected if the suspension or revocation is overturned. If the revocation or suspension of the driver's license was for a conviction for a violation of s. 817.234(8) or (9) or s. 817.505, an additional fee of $180 is imposed for each offense. The department shall collect and deposit the additional fee into the Highway Safety Operating Trust Fund at the time of reinstatement of the person's driver's license.
 Section 3. Subsection (9) is added to section 322.26, Florida Statutes, to read:

<< FL ST § 322.26 >>

CRIMES AND OFFENSES - INSURANCE, 2000 Fla. Sess. Law Serv. Ch. 2000-365...

Case 1:11-cv-00071-RCC  Document 237-105  Filed 08/31/18  Page 202 of 312

322.26. Mandatory revocation of license by department

 The department shall forthwith revoke the license or driving privilege of any person upon receiving a record of such person's conviction of any of the following offenses:

 (9) Conviction in any court having jurisdiction over offenses committed under s. 817.234(8) or (9) or s. 817.505.

  Section 4. Paragraph (h) is added to subsection (1) of section 400.9935, Florida Statutes, and subsection (13) is added to that section, to read:

<< FL ST § 400.9935 >>

400.9935. Clinic responsibilities

 (1) Each clinic shall appoint a medical director or clinic director who shall agree in writing to accept legal responsibility for the following activities on behalf of the clinic. The medical director or the clinic director shall:

 (h) Not refer a patient to the clinic if the clinic performs magnetic resonance imaging, static radiographs, computed tomography, or positron emission tomography. The term "refer a patient" means the referral of one or more patients of the medical or clinical director or a member of the medical or clinical director's group practice to the clinic for magnetic resonance imaging, static radiographs, computed tomography, or positron emission tomography. A medical director who is found to violate this paragraph commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

 (13) The clinic shall display a sign in a conspicuous location within the clinic readily visible to all patients indicating that, pursuant to s. 626.9892, the Department of Financial Services may pay rewards of up to $25,000 to persons providing information leading to the arrest and conviction of persons committing crimes investigated by the Division of Insurance Fraud arising from violations of s. 440.105, s. 624.15, s. 626.9541, s. 626.989, or s. 817.234. An authorized employee of the Division of Insurance Fraud may make unannounced inspections of a clinic licensed under this part as necessary to determine whether the clinic is in compliance with this subsection. A licensed clinic shall allow full and complete access to the premises to such authorized employee of the division who makes an inspection to determine compliance with this subsection.

  Section 5. Paragraph(a) of subsection (2) and paragraph (a) of subsection (4) of section 440.105, Florida Statutes, are amended to read:

<< FL ST § 440.105 >>

440.105. Prohibited activities; reports; penalties; limitations

 (2) Whoever violates any provision of this subsection commits a misdemeanor of the first degree, punishable as provided in s. 775.082 or s. 775.083.

 (a) It shall be unlawful for any employer to knowingly:

 1. Coerce or attempt to coerce, as a precondition to employment or otherwise, an employee to obtain a certificate of election of exemption pursuant to s. 440.05.

 2. Discharge or refuse to hire an employee or job applicant because the employee or applicant has filed a claim for benefits under this chapter.

 3. Discharge, discipline, or take any other adverse personnel action against any employee for disclosing information to the department or any law enforcement agency relating to any violation or suspected violation of any of the provisions of this chapter or rules promulgated hereunder.

 4. Violate a stop-work order issued by the department pursuant to s. 440.107.

 (4) Whoever violates any provision of this subsection commits insurance fraud, punishable as provided in paragraph(f).

 (a) It shall be unlawful for any employer to knowingly:

 1. Present or cause to be presented any false, fraudulent, or misleading oral or written statement to any person as evidence of compliance with s. 440.38.

CRIMES AND OFFENSES — INSURANCE, 2000 Fla. Sess. Law Serv. Ch. 2000-365 (...

Case 1:11-cv-00071-RGC   Document 237-105   Filed 08/31/18   Page 203 of 312

2. Make a deduction from the pay of any employee entitled to the benefits of this chapter for the purpose of requiring the employee to pay any portion of premium paid by the employer to a carrier or to contribute to a benefit fund or department maintained by such employer for the purpose of providing compensation or medical services and supplies as required by this chapter.

3. Fail to secure workers'payment of  compensation insurance coverage if required to do so by this chapter.

Section 6. Subsection(1) of section 456.054, Florida Statutes, is amended to read:

<< FL ST § 456.054 >>

456.054. Kickbacks prohibited

(1) As used in this section, the term "kickback" means a remuneration or paymentback pursuant to an investment interest, compensation arrangement, or otherwise , by or on behalf of a provider of health care services or items,of a portion of the charges for services rendered  to any persona referring health care provider  as an incentive or inducement to refer patients for past or future services or items, when the payment is not tax deductible as an ordinary and necessary expense.

Section 7. Section 624.15, Florida Statutes, is amended to read:

<< FL ST § 624.15 >>

624.15. General penalty

(1) Each willful violation of this code or rule of the department, office, or commission as to which a greater penalty is not provided by another provision of this code or rule of the department, office, or commission or by other applicable laws of this state is a misdemeanor of the second degree and is, in addition to any prescribed applicable denial, suspension, or revocation of certificate of authority, license, or permit, punishable as provided in s. 775.082 or s. 775.083. Each instance of such violation shall be considered a separate offense.

(2) Each willful violation of an emergency rule or order of the department, office, or commission by a person who is not licensed, authorized, or eligible to engage in business in accordance with the Florida Insurance Code is a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084. Each instance of such violation is a separate offense. This subsection does not apply to licensees or affiliated parties of licensees.

Section 8. Subsection (9) is added to section 626.112, Florida Statutes, to read:

<< FL ST § 626.112 >>

626.112. License and appointment required; agents, customer representatives, adjusters, insurance agencies, service representatives, managing general agents

(9) Any person who knowingly transacts insurance or otherwise engages in insurance activities in this state without a license in violation of this section commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

Section 9. Subsections (1), (2), and (9) of section 626.938, Florida Statutes, are amended to read:

<< FL ST § 626.938 >>

626.938. Report and tax of independently procured coverages

(1) Every insured who in this state procures or causes to be procured or continues or renews insurance from another state or country with an unauthorized foreign or alien insurer legitimately licensed in that jurisdiction, or any self-insurer who in this state so procures or continues excess loss, catastrophe, or other insurance, upon a subject of insurance resident, located, or to be performed within this state, other than insurance procured through a surplus lines agent pursuant to the Surplus Lines Law of this state or exempted from tax under s. 626.932(4), shall, within 30 days after the date such insurance was so procured, continued, or renewed, file a report of the same with the Florida Surplus Lines Service Office

CRIMES AND OFFENSES—INSURANCE, 2006 Fla. Sess. Law Serv. Ch. 2006-305...

Case 1:11-cv-00071-RGG   Document 237-105   Filed 08/31/18   Page 204 of 312

in writing and upon forms designated by the Florida Surplus Lines Service Office and furnished to such an insured upon request, or in a computer readable format as determined by the Florida Surplus Lines Service Office. The report shall show the name and address of the insured or insureds, the name and address of the insurer, the subject of the insurance, a general description of the coverage, the amount of premium currently charged therefor, and such additional pertinent information as is reasonably requested by the Florida Surplus Lines Service Office.

 (2) Any insurance on a risk located in this state in an unauthorized insurer legitimately licensed in another state or country procured through solicitations, negotiations, or an application~~, in whole or in part~~  occurring or made ~~outside~~within or from within  this state~~, or for which premiums in whole or in part are remitted directly or indirectly from within this state,~~  shall be deemed to be insurance procured, continued, or renewed in this state within the intent of subsection (1).

 (9) This section does not authorize independent procurement of workers' compensation insurance,~~apply as to~~  life insurance, or health insurance.

  Section 10. Subsection (7) of section 626.9891, Florida Statutes, is amended to read:

<< FL ST § 626.9891 >>

626.9891. Insurer anti-fraud investigative units; reporting requirements; penalties for noncompliance

 (7) If an insurer fails to timely submit a final acceptable anti-fraud plan or anti-fraud investigative unit description~~otherwise fails to submit a plan~~ , fails to implement the provisions of a plan or an anti-fraud investigative unit description, or otherwise refuses to comply with the provisions of this section, the department, office, or commission may:
 (a) Impose an administrative fine of not more than $2,000 per day for such failure by an insurer to submit an acceptable anti-fraud plan or anti-fraud investigative unit description, until the department, office, or commission deems the insurer to be in compliance;
 (b) Impose an administrative fine for failure by an~~upon the~~  insurer to implement or follow the provisions of an anti-fraud plan or anti-fraud investigative unit description~~a fraud detection and prevention plan that is deemed to be appropriate by the department and that must be implemented by the insurer~~ ; or
 (c) Impose the provisions of both paragraphs (a) and (b).
  Section 11. Section 626.9893, Florida Statutes, is created to read:

<< FL ST § 626.9893 >>

626.9893. Disposition of revenues; criminal or forfeiture proceedings

 (1) The Division of Insurance Fraud of the Department of Financial Services may deposit revenues received as a result of criminal proceedings or forfeiture proceedings, other than revenues deposited into the Department of Financial Services' Federal Equitable Sharing Trust Fund under s. 17.43, into the Insurance Regulatory Trust Fund. Moneys deposited pursuant to this section shall be separately accounted for and shall be used solely for the division to carry out its duties and responsibilities.
 (2) Moneys deposited into the Insurance Regulatory Trust Fund pursuant to this section shall be appropriated by the Legislature, pursuant to the provisions of chapter 216, for the sole purpose of enabling the division to carry out its duties and responsibilities.
 (3) Notwithstanding the provisions of s. 216.301 and pursuant to s. 216.351, any balance of moneys deposited into the Insurance Regulatory Trust Fund pursuant to this section remaining at the end of any fiscal year shall remain in the trust fund at the end of that year and shall be available for carrying out the duties and responsibilities of the division.
  Section 12. Subsection (4) of section 627.4133, Florida Statutes, is amended to read:

<< FL ST § 627.4133 >>

627.4133. Notice of cancellation, nonrenewal, or renewal premium

(4) Notwithstanding the provisions of s. 440.42(3), if cancellation of a policy providing coverage for workers' compensation and employer's liability insurance is requested by the insured, such cancellation shall be effective on the date the carrier sends the notice of cancellation to the insured. Any retroactive assumption of coverage and liabilities under a policy providing workers' compensation and employer's liability insurance may not exceed 21 days.

Section 13. Subsection (14) is added to section 627.736, Florida Statutes, to read:

<< FL ST § 627.736 >>

**(14) Fraud advisory notice.**—Upon receiving notice of a claim under this section, an insurer shall provide a notice to the insured or to a person for whom a claim for reimbursement for diagnosis or treatment of injuries has been filed, advising that:

(a) Pursuant to s. 626.9892, the Department of Financial Services may pay rewards of up to $25,000 to persons providing information leading to the arrest and conviction of persons committing crimes investigated by the Division of Insurance Fraud arising from violations of s. 440.105, s. 624.15, s. 626.9541, s. 626.989, or s. 817.234.

(b) Solicitation of a person injured in a motor vehicle crash for purposes of filing personal injury protection or tort claims could be a violation of s. 817.234, s. 817.505, or the rules regulating The Florida Bar and should be immediately reported to the Division of Insurance Fraud if such conduct has taken place.

Section 14. Subsection (1) of section 627.7401, Florida Statutes, is amended to read:

<< FL ST § 627.7401 >>

627.7401. Notification of insured's rights

(1) The commission, by rule, shall adopt a form for the notification of insureds of their right to receive personal injury protection benefits under the Florida Motor Vehicle No–Fault Law. Such notice shall include:

(a) A description of the benefits provided by personal injury protection, including, but not limited to, the specific types of services for which medical benefits are paid, disability benefits, death benefits, significant exclusions from and limitations on personal injury protection benefits, when payments are due, how benefits are coordinated with other insurance benefits that the insured may have, penalties and interest that may be imposed on insurers for failure to make timely payments of benefits, and rights of parties regarding disputes as to benefits.

(b) An advisory informing insureds that:

1. Pursuant to s. 626.9892, the Department of Financial Services may pay rewards of up to $25,000 to persons providing information leading to the arrest and conviction of persons committing crimes investigated by the Division of Insurance Fraud arising from violations of s. 440.105, s. 624.15, s. 626.9541, s. 626.989, or s. 817.234.

2. Pursuant to s. 627.736(5)(e)1., if the insured notifies the insurer of a billing error, the insured may be entitled to a certain percentage of a reduction in the amount paid by the insured's motor vehicle insurer.

(c) A notice that solicitation of a person injured in a motor vehicle crash for purposes of filing personal injury protection or tort claims could be a violation of s. 817.234, s 817.505, or the rules regulating The Florida Bar and should be immediately reported to the Division of Insurance Fraud if such conduct has taken place.

Section 15. Subsection (4) of section 627.912, Florida Statutes, is amended to read:

<< FL ST § 627.912 >>

627.912. Professional liability claims and actions; reports by insurers and health care providers; annual report by office

(4) There shall be no liability on the part of, and no cause of action of any nature shall arise against, any person or entity reporting hereunder or its agents or employees or the office or its employees for any action taken by them under this section. The office may~~shall~~ impose a fine of up to $250 per day per case, but not to exceed a total of $10,000 per case, against an insurer, commercial self-insurance fund, medical malpractice self-insurance fund, or risk retention group that violates the requirements of this section, except that the office may impose a fine of $250 per day per case, not to exceed a total of $1,000 per case, against an insurer providing professional liability insurance to a member of The Florida

CRIMES AND OFFENSES--INSURANCE; 2006 Fla. Sess. Law Serv. Ch. 2006-305...

Case 1:11-cv-00071-RCC   Document 237-105   Filed 08/31/18   Page 206 of 312

Bar, which insurer violates the provisions of this section. If a health care practitioner or health care facility violates the requirements of this section, it shall be considered a violation of the chapter or act under which the practitioner or facility is licensed and shall be grounds for a fine or disciplinary action as such other violations of the chapter or act. The office may adjust a fine imposed under this subsection by considering the financial condition of the licensee, premium volume written, ratio of violations to compliancy, and other mitigating factors as determined by the office.

Section 16. Paragraph (a) of subsection (7) and subsection (9) of section 817.234, Florida Statutes, are amended to read:

<< FL ST § 817.234 >>

817.234. False and fraudulent insurance claims

(7)(a) It shall constitute a material omission and insurance fraud, punishable as provided in subsection (11), for any service physician or other provider, other than a hospital, to engage in a general business practice of billing amounts as its usual and customary charge, if such provider has agreed with the insured patient or intends to waive deductibles or copayments, or does not for any other reason intend to collect the total amount of such charge. With respect to a determination as to whether a service physician or other provider has engaged in such general business practice, consideration shall be given to evidence of whether the physician or other provider made a good faith attempt to collect such deductible or copayment. This paragraph does not apply to physicians or other providers who waive deductibles or copayments or reduce their bills as part of a bodily injury settlement or verdict.

(9) A person may not organize, plan, or knowingly participate in an intentional motor vehicle crash or a scheme to create documentation of a motor vehicle crash that did not occur for the purpose of making motor vehicle tort claims or claims for personal injury protection benefits as required by s. 627.736. Any person who violates this subsection commits a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084. A person who is convicted of a violation of this subsection shall be sentenced to a minimum term of imprisonment of 2 years.

Section 17. Section 817.2361, Florida Statutes, is amended to read:

<< FL ST § 817.2361 >>

817.2361. False or fraudulent proof of motor vehicle insurance card

Any person who, with intent to deceive any other person, creates, markets, or presents a false or fraudulent proof of motor vehicle insurance card commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

Section 18. Subsection (2) of section 817.50, Florida Statutes, is amended to read:

<< FL ST § 817.50 >>

817.50. Fraudulently obtaining goods, services, etc., from a health care provider

(2) If any person gives to any health care provider in this state a false or fictitious name or a false or fictitious address or assigns to any health care provider the proceeds of any health maintenance contract or insurance contract, then knowing that such contract is no longer in force, is invalid, or is void for any reason, such action shall be prima facie evidence of the intent of such person to defraud the health care provider. However, this subsection does not apply to investigative actions taken by law enforcement officers for law enforcement purposes in the course of their official duties.

Section 19. Subsection (1) and paragraph (a) of subsection (2) of section 817.505, Florida Statutes, are amended to read:

<< FL ST § 817.505 >>

817.505. Patient brokering prohibited; exceptions; penalties

(1) It is unlawful for any person, including any health care provider or health care facility, to:

(a) Offer or pay any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, to induce the referral of patients or patronage to or from a health care provider or health care facility;

(b) Solicit or receive any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, in return for referring patients or patronage to or from a health care provider or health care facility; or

(c) Solicit or receive any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, in return for the acceptance or acknowledgement of treatment from a health care provider or health care facility; or

(d)(e)  Aid, abet, advise, or otherwise participate in the conduct prohibited under paragraph (a), or  paragraph (b), or paragraph (c).

(2) For the purposes of this section, the term:

(a) "Health care provider or health care facility" means any person or entity licensed, certified, or registered; required to be licensed, certified, or registered; or lawfully exempt from being required to be licensed, certified, or registered with the Agency for Health Care Administration or the Department of Health; any person or entity that has contracted with the Agency for Health Care Administration to provide goods or services to Medicaid recipients as provided under s. 409.907; a county health department established under part I of chapter 154; any community service provider contracting with the Department of Children and Family Services to furnish alcohol, drug abuse, or mental health services under part IV of chapter 394; any substance abuse service provider licensed under chapter 397; or any federally supported primary care program such as a migrant or community health center authorized under ss. 329 and 330 of the United States Public Health Services Act.

Section 20. Section 843.08, Florida Statutes, is amended to read:

<< FL ST § 843.08 >>

843.08. Falsely personating officer, etc

A person who falsely assumes or pretends to be a sheriff, officer of the Florida Highway Patrol, officer of the Fish and Wildlife Conservation Commission, officer of the Department of Environmental Protection, officer of the Department of Transportation, officer of the Department of Financial Services, officer of the Department of Corrections, correctional probation officer, deputy sheriff, state attorney or assistant state attorney, statewide prosecutor or assistant statewide prosecutor, state attorney investigator, coroner, police officer, lottery special agent or lottery investigator, beverage enforcement agent, or watchman, or any member of the Parole Commission and any administrative aide or supervisor employed by the commission, or any personnel or representative of the Department of Law Enforcement, and takes upon himself or herself to act as such, or to require any other person to aid or assist him or her in a matter pertaining to the duty of any such officer, commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084; however, a person who falsely personates any such officer during the course of the commission of a felony commits a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084; except that if the commission of the felony results in the death or personal injury of another human being, the person commits a felony of the first degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

Section 21. Paragraph (n) is added to subsection (6) of section 932.7055, Florida Statutes, to read:

<< FL ST § 932.7055 >>

932.7055. Disposition of liens and forfeited property

(6) If the seizing agency is a state agency, all remaining proceeds shall be deposited into the General Revenue Fund. However, if the seizing agency is:

(n) The Division of Insurance Fraud of the Department of Financial Services, the proceeds accrued pursuant to the provisions of the Florida Contraband Forfeiture Act shall be deposited into the Insurance Regulatory Trust Fund as

provided in s. 626.9893 or into the Department of Financial Services' Federal Equitable Sharing Trust Fund as provided in s. 17.43, as applicable.

Section 22. If any provision of this act or the application thereof to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the act which can be given effect without the invalid provision or application, and, to this end, the provisions of this act are declared severable.

Section 23. This act shall take effect July 1, 2006.

Approved by the Governor June 26, 2006.

Filed in Office Secretary of State June 26, 2006.

FL LEGIS 2006-305

---

**End of Document**                                                                © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Berlin, Meec 7/20/2017
For Educational Use Only

West's Kansas Statutes Annotated
   Chapter 21. Crimes and Punishments
      Kansas Criminal Code [2011 Codification]
         Article 59. Crimes Affecting Government Functions

K.S.A. 21-5928
Formerly cited as K.S.A. 21-3847

21-5928. Unlawful acts relating to the medicaid program

Currentness

(a) No recipient of medicaid benefits, family member of such recipient, or provider of medicaid services shall intentionally:

(1) Solicit or receive any remuneration, including but not limited to any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind:

(A) In return for referring or refraining from referring an individual to a person for the furnishing or arranging for the furnishing of any goods, service, item, facility or accommodation for which payment may be made, in whole or in part, under the medicaid program; or

(B) in return for purchasing, leasing, ordering or arranging for or recommending purchasing, leasing or ordering any goods, service, item, facility or accommodation for which payment may be made, in whole or in part, under the medicaid program;

(2) offer or pay any remuneration, including, but not limited to, any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person:

(A) To refer or refrain from referring an individual to a person for the furnishing or arranging for the furnishing of any goods, service, item, facility or accommodation for which payment may be made, in whole or in part, under the medicaid program; or

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any goods, service, item, facility or accommodation for which payment may be made, in whole or in part, under the medicaid program; or

(3) divide or share any funds illegally obtained from the medicaid program.

**Berin, Alec 7/20/2017**
**For Educational Use Only**

**21-5928. Unlawful acts relating to the medicaid program, KS ST 21-5928**

(b) No medicaid recipient shall intentionally trade a medicaid number for money or other remuneration, sign for services that are not received by the medicaid recipient or sell or exchange for value goods purchased or provided under the medicaid program.

(c) A violation of this section is a severity level 7, nonperson felony.

(d) This section shall not apply to a refund, discount, copayment, deductible, incentive or other reduction obtained by a provider in the ordinary course of business, and appropriately reflected in the claims or reports submitted to the medicaid program, or its fiscal agent, nor shall it be construed to prohibit deductibles, copayments or any other cost or risk sharing arrangements which are a part of any program operated by or pursuant to contracts with the medicaid program.

**Credits**
Laws 2010, ch. 136, § 153, eff. July 1, 2011.

Notes of Decisions (1)

K. S. A. 21-5928, KS ST 21-5928
Statutes are current through laws enacted during the 2017 Regular Session of the Kansas Legislature effective on or before June 22, 2017.

---

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

1996 Kansas Laws Ch. 267 (H.B. 2700)

KANSAS 1996 SESSION LAWS
REGULAR SESSION

Additions are indicated by <<+ Text +>>; deletions by
<<- Text ->>. Changes in tables are made but not highlighted.

CH. 267 (H.B. 2700)
West's No. 264

KANSAS MEDICAID FRAUD CONTROL ACT; CRIMES AND CRIMINAL
LAW—CONCURRENT OR CONSECUTIVE SENTENCES, PAROLE

AN ACT concerning crimes, punishment and criminal procedure; relating to parole; enacting the Kansas medicaid fraud control act; declaring certain acts to be crimes and providing penalties therefor; granting certain powers to and imposing certain duties upon the attorney general; placements of inmates, postrelease supervision; amending K.S.A. 21–3106, 21–4720 and 22–3717, as amended by section 8 of 1996 House Bill No. 2838, and K.S.A. 1995 Supp. 75–5217 and repealing the existing sections.

Be it enacted by the Legislature of the State of Kansas:

New Section 1. Sections 1 to 12, inclusive, and amendments thereto shall be known and may be cited as the Kansas medicaid fraud control act. The Kansas medicaid fraud control act shall be part of and supplemental to the Kansas criminal code.

New Sec. 2. As used in this act:

(a) "Attorney general" means the attorney general, employees of the attorney general or authorized representatives of the attorney general.

(b) "Benefit" means the receipt of money, goods, items, facilities, accommodations or anything of pecuniary value.

(c) "Claim" means an electronic, electronic impulse, facsimile, magnetic, oral, telephonic or written communication that is utilized to identify any goods, service, item, facility or accommodation as reimbursable to the Kansas medicaid program, or its fiscal agents, or which states income or expense and is or may be used to determine a rate of payment by the Kansas medicaid program, or its fiscal agent.

(d) "Fiscal agent" means any corporation, firm, individual, organization, partnership, professional association or other legal entity which, through a contractual relationship with the department of social and rehabilitation services and thereby, the state of Kansas, receives, processes and pays claims under the Kansas medicaid program.

(e) "Family member" means spouse, child, grandchild of any degree, parent, mother-in-law, father-in-law, grandparent of any degree, brother, brother-in-law, sister, sister-in-law, half-brother, half-sister, uncle, aunt, nephew or niece, whether biological, step or adoptive.

(f) "Medicaid program" means the Kansas program of medical assistance for which federal or state moneys, or any combination thereof, are expended as administered by the department of social and rehabilitation services, or its fiscal agent, or any successor federal or state, or both, health insurance program or waiver granted thereunder.

(g) "Medically necessary" means for the purposes of this act only, any goods, service, item, facility, or accommodation, that a reasonable and prudent provider under similar circumstances would believe is appropriate for diagnosing or treating a recipient's condition, illness or injury.

(h) "Person" means any agency, association, corporation, firm, limited liability company, limited liability partnership, natural person, organization, partnership or other legal entity, the agents, employees, independent contractors, and subcontractors, thereof, and the legal successors thereto, and any official, employee or agent of a state or federal agency having regulatory or administrative authority over the medicaid program.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.   1

(i) "Provider" means a person who has applied to participate in, who currently participates in, who has previously participated in, who attempts or has attempted to participate in the medicaid program, by providing or claiming to have provided goods, services, items, facilities or accommodations.

(j) "Recipient" means an individual, either real or fictitious, in whose behalf any person claimed or received any payment or payments from the medicaid program, or its fiscal agent, whether or not any such individual was eligible for benefits under the medicaid program.

(k) "Records" mean all written documents and electronic or magnetic data, including, but not limited to, medical records, X-rays, professional, financial or business records relating to the treatment or care of any recipient; goods, services, items, facilities or accommodations provided to any such recipient; rates paid for such goods, services, items, facilities or accommodations; and goods, services, items, facilities, or accommodations provided to nonmedicaid recipients to verify rates or amounts of goods, services, items, facilities or accommodations provided to medicaid recipients, as well as any records that the medicaid program, or its fiscal agents require providers to maintain.

(l) "Sign" means to affix a signature, directly or indirectly, by means of handwriting, typewriter, stamp, computer impulse or other means.

(m) "Statement or representation" means an electronic, electronic impulse, facsimile, magnetic, oral, telephonic, or written communication that is utilized to identify any goods, service, item, facility or accommodation as reimbursable to the medicaid program, or its fiscal agent, or that states income or expense and is or may be used to determine a rate of payment by the medicaid program, or its fiscal agent.

New Sec. 3. (a) Making a false claim, statement, or representation to the medicaid program is, knowingly and with intent to defraud, engaging in a pattern of making, presenting, submitting, offering or causing to be made, presented, submitted or offered:

(1) Any false or fraudulent claim for payment for any goods, service, item, facility, accommodation for which payment may be made, in whole or in part, under the medicaid program, whether or not the claim is allowed or allowable;

(2) any false or fraudulent statement or representation for use in determining payments which may be made, in whole or in part, under the medicaid program, whether or not the claim is allowed or allowable;

(3) any false or fraudulent report or filing which is or may be used in computing or determining a rate of payment for any goods, service, item, facility or accommodation, for which payment may be made, in whole or in part, under the medicaid program, whether or not the claim is allowed or allowable;

(4) any false or fraudulent statement or representation made in connection with any report or filing which is or may be used in computing or determining a rate of payment for any goods, service, item, facility or accommodation for which payment may be made, in whole or in part, under the medicaid program, whether or not the claim is allowed or allowable;

(5) any statement or representation for use by another in obtaining any goods, service, item, facility or accommodation for which payment may be made, in whole or in part, under the medicaid program, knowing the statement or representation to be false, in whole or in part, by commission or omission, whether or not the claim is allowed or allowable;

(6) any claim for payment, for any goods, service, item, facility, or accommodation, which is not medically necessary in accordance with professionally recognized parameters or as otherwise required by law, for which payment may be made, in whole or in part, under the medicaid program, whether or not the claim is allowed or allowable; or

(7) any wholly or partially false or fraudulent book, record, document, data or instrument, which is required to be kept or which is kept as documentation for any goods, service, item, facility or accommodation or of any cost or expense claimed for reimbursement for any goods, service, item, facility or accommodation for which payment is, has been, or can be sought, in whole or in part, under the medicaid program, whether or not the claim is allowed or allowable.

(8) Any wholly or partially false or fraudulent book, record, document, data or instrument to any properly identified law enforcement officer, any properly identified employee or authorized representative of the attorney general, or to any properly identified employee or agent of the department of social and rehabilitation services, or its fiscal agent, in connection with any audit or investigation involving any claim for payment or rate of payment for any goods, service, item, facility or accommodation payable, in whole or in part, under the medicaid program.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

(9) Any false or fraudulent statement or representation made, with the intent to influence any acts or decision of any official, employee or agent of a state or federal agency having regulatory or administrative authority over the Kansas medicaid program.

(b)(1) As defined by subsection (a)(1) through (a)(7), making a false claim, statement or representation to the medicaid program where the aggregate amount of payments illegally claimed is $25,000 or more is a severity level 7, nonperson felony.

(2) As defined by subsection (a)(1) through (a)(7), making a false claim, statement or representation to the medicaid program where the aggregate amount of payments illegally claimed is at least $500 but less than $25,000 is a severity level 9, nonperson felony.

(3) As defined by subsection (a)(1) through (a)(7), making a false claim, statement or representation to the medicaid program where the aggregate amount of payments illegally claimed is less than $500 is a class A misdemeanor.

(4) As defined by subsections (a)(8) and (a)(9), making a false claim, statement or representation to the medicaid program is a severity level 9, nonperson felony.

(c) In determining what is medically necessary pursuant to subsection (a)(6) of this section the attorney general may contract with or consult with qualified health care providers and other qualified individuals to identify professionally recognized parameters for the diagnosis or treatment of the recipient's condition, illness or injury.

New Sec. 4. (a) No person nor family member of such person shall:

(1) Knowingly and intentionally solicit or receive any remuneration, including but not limited to any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind:

(A) In return for referring or refraining from referring an individual to a person for the furnishing or arranging for the furnishing of any goods, service, item, facility or accommodation for which payment may be made, in whole or in part, under the medicaid program; or

(B) in return for purchasing, leasing, ordering or arranging for or recommending purchasing, leasing or ordering any goods, service, item, facility or accommodation for which payment may be made, in whole or in part, under the medicaid program.

(2) Knowingly and intentionally offer or pay any remuneration, including, but not limited to, any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person:

(A) To refer or refrain from referring an individual to a person for the furnishing or arranging for the furnishing of any goods, service, item, facility or accommodation for which payment may be made, in whole or in part, under the medicaid program; or

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any goods, service, item, facility or accommodation for which payment may be made, in whole or in part, under the medicaid program.

(b) A violation of this section is a severity level 7, nonperson felony.

(c) This section shall not apply to a refund, discount, copayment, deductible, incentive or other reduction obtained by a provider in the ordinary course of business, and appropriately reflected in the claims or reports submitted to the medicaid program, or its fiscal agent, nor shall it be construed to prohibit deductibles, copayments or any other cost or risk sharing arrangements which are a part of any program operated by or pursuant to contracts with the medicaid program.

New Sec. 5. (a) Failure to maintain adequate records is negligently failing to maintain such records as are necessary to disclose fully the nature of the goods, services, items, facilities or accommodations for which a claim was submitted or payment was received under the medicaid program, or such records as are necessary to disclose fully all income and expenditures upon which rates of payment were based under the medicaid program. Upon submitting a claim for or upon receiving payment for goods, services, items, facilities or accommodations under the medicaid program, a person shall maintain adequate records for five years after the date on which payment was received, if payment was received, or for five years after the date on which the claim was submitted, if payment was not received.

(b) Failure to maintain adequate records is a class A, nonperson misdemeanor.

New Sec. 6. (a) Destruction or concealment of records is intentionally destroying or concealing such records as are necessary to disclose fully the nature of the goods, services, items, facilities or accommodations for which a claim was submitted or payment was received under the medicaid program, or such records as are necessary to disclose fully all income and expenditures upon which rates of payment were based under the medicaid program. Upon submitting a claim

for or upon receiving payment for goods, services, items, facilities or accommodations under the medicaid program, a person shall not destroy or conceal any records for five years after the date on which payment was received, if payment was received, or for five years after the date on which the claim was submitted, if the payment was not received.

(b) Destruction or concealment of records is a severity level 9, nonperson felony.

New Sec. 7. Offers of repayment or repayment occurring after the filing of criminal charges of payments, goods, services, items, facilities or accommodations wrongfully obtained shall not constitute a defense to or ground for dismissal of criminal charges brought pursuant to this act.

New Sec. 8. (a) Any person convicted of a violation of this act, may be liable, in addition to any other criminal penalties provided by law, for all of the following:

(1) Payment of full restitution of the amount of the excess payments;

(2) payment of interest on the amount of any excess payments at the maximum legal rate in effect on the date the payment was made to the person for the period from the date upon which payment was made, to the date upon which repayment is made;

(3) payment of all reasonable expenses that have been necessarily incurred in the enforcement of this act, including, but not limited to, the costs of the investigation, litigation and attorney fees.

(b) All moneys recovered pursuant to subsection (a)(1) and (2), shall be paid and deposited in the state treasury and credited to the medicaid fraud reimbursement fund, which is hereby established in the state treasury. Moneys in the medicaid fraud reimbursement fund shall be divided and payments made from such fund to the federal government and affected state agencies for the refund of moneys falsely obtained from the federal and state governments.

(c) All moneys recovered pursuant to subsection (a)(3) shall be deposited in the state treasury and credited to the medicaid fraud prosecution revolving fund, which is hereby established in the state treasury. Moneys in the medicaid fraud prosecution revolving fund may be appropriated to the attorney general, or to any county or district attorney who has successfully prosecuted an action for a violation of this act and been awarded such costs of prosecution, in order to defray the costs of the attorney general and any such county or district attorney in connection with their duties provided by this act. No moneys shall be paid into the medicaid fraud prosecution revolving fund pursuant to this section unless the attorney general or appropriate county or district attorney has commenced a prosecution pursuant to this section, and the court finds in its discretion that payment of attorney fees and investigative costs is appropriate under all the circumstances, and the attorney general, or county or district attorney has proven to the court that the expenses were reasonable and necessary to the investigation and prosecution of such case, and the court approves such expenses as being reasonable and necessary.

New Sec. 9. (a) There is hereby created within the office of the attorney general a medicaid fraud and abuse division.

(b) The medicaid fraud and abuse division shall be the same entity to which all cases of suspected medicaid fraud shall be referred by the department of social and rehabilitation services, or its fiscal agent, for the purpose of investigation, criminal prosecution or referral to the district or county attorney for criminal prosecution.

(c) In carrying out these responsibilities, the attorney general shall have all the powers necessary to comply with the federal laws and regulations relative to the operation of the medicaid fraud and abuse division, the power to investigate, criminally prosecute violations of this act, the power to cross-designate assistant United States attorneys as assistant attorneys general, the power to issue, serve or cause to be issued or served subpoenas or other process in aid of investigations and prosecutions, the power to administer oaths and take sworn statements under penalty of perjury, the power to serve and execute in any county, search warrants which relate to investigations authorized by this act, and the powers of a district or county attorney.

New Sec. 10. (a) The attorney general shall be allowed access to all records which are held by a provider that are directly related to an alleged violation of this act and which are necessary for the purpose of investigating whether any person may have violated this act, or for use or potential use in any legal, administrative or judicial proceeding pursuant to the Kansas medicaid fraud control act.

(b) No person holding such records may refuse to provide the attorney general with access to such records on the basis that release would violate any recipient's right of privacy, any recipient's privilege against disclosure or use, or any professional or other privilege or right. The disclosure of patient information as required by this act shall not subject any provider to liability for breach of any confidential relationship between a patient and a provider. Notwithstanding

K.S.A. 60–427 and amendments thereto, there shall be no privilege preventing the furnishing of such information or reports as required by this act by any person.

New Sec. 11. The provisions of this act are not intended to be exclusive remedies and do not preclude the use of any other criminal or civil remedy.

New Sec. 12. If any section, subsection, paragraph or provision of this act shall be held to be invalid by any court for any reason, it shall be presumed that this act would have been passed by the legislature without such invalid section, subsection, paragraph or provision, and such finding or construction shall not in any way affect the remainder of this act.

Sec. 13. K.S.A. 21–3106 is hereby amended to read as follows:

<< KS ST § 21–3106 >>

21–3106. (1) A prosecution for murder may be commenced at any time.

(2) Except as provided by subsection <<-(6)->><<+(7)+>>, a prosecution for any of the following crimes must be commenced within five years after its commission if the victim is less than 16 years of age: (a) Indecent liberties with a child as defined in K.S.A. 21–3503 and amendments thereto; (b) aggravated indecent liberties with a child as defined in K.S.A. 21–3504 and amendments thereto; (c) enticement of a child as defined in K.S.A. 21–3509 and amendments thereto; (d) indecent solicitation of a child as defined in K.S.A. 21–3510 and amendments thereto; (e) aggravated indecent solicitation of a child as defined in K.S.A. 21–3511 and amendments thereto; (f) sexual exploitation of a child as defined in K.S.A. 21–3516 and amendments thereto; or (g) aggravated incest as defined in K.S.A. 21–3603 and amendments thereto.

(3) Except as provided in subsection <<-(6)->><<+(7)+>>, a prosecution for any crime must be commenced within 10 years after its commission if the victim is the Kansas public employees retirement system.

(4) Except as provided by subsection <<-(6)->><<+(7)+>>, a prosecution for rape, as defined in K.S.A. 21–3502 and amendments thereto, or aggravated criminal sodomy, as defined in K.S.A. 21–3506 and amendments thereto, must be commenced within five years after its commission.

<<+(5) Except as provided in subsection (7), a prosecution for any crime found in the Kansas medicaid fraud control act must be commenced within five years after its commission.+>>

<<-(5)->><<+(6)+>> Except as provided by subsection <<-(6)->><<+ (7)+>>, a prosecution for any crime not governed by subsections (1), (2), (3) <<-and->>, (4) <<+and (5)+>> must be commenced within two years after it is committed.

<<-(6)->><<+(7)+>> The period within which a prosecution must be commenced shall not include any period in which:

(a) The accused is absent from the state;

(b) the accused is concealed within the state so that process cannot be served upon the accused;

(c) the fact of the crime is concealed;

(d) a prosecution is pending against the defendant for the same conduct, even if the indictment or information which commences the prosecution is quashed or the proceedings thereon are set aside, or are reversed on appeal;

(e) an administrative agency is restrained by court order from investigating or otherwise proceeding on a matter before it as to any criminal conduct defined as a violation of any of the provisions of article 41 of chapter 25 and article 2 of chapter 46 of the Kansas Statutes Annotated which may be discovered as a result thereof regardless of who obtains the order of restraint; or

(f) whether or not the fact of the crime is concealed by the active act or conduct of the accused, there is substantially competent evidence to believe two or more of the following factors are present: (i) The victim was a child under 15 years of age at the time of the crime; (ii) the victim was of such age or intelligence that the victim was unable to determine that the acts constituted a crime; (iii) the victim was prevented by a parent or other legal authority from making known to law enforcement authorities the fact of the crime whether or not the parent or other legal authority is the accused; and (iv) there is substantially competent expert testimony indicating the victim psychologically repressed such witness' memory of the fact of the crime, and in the expert's professional opinion the recall of such memory is accurate and free of undue manipulation, and substantial corroborating evidence can be produced in support of the allegations contained in the complaint or information but in no event may a prosecution be commenced as provided in this section later than the date the victim turns 28 years of age. Corroborating evidence may include, but is not limited to, evidence the

defendant committed similar acts against other persons or evidence of contemporaneous physical manifestations of the crime. "Parent or other legal authority" shall include but not be limited to natural and stepparents, grandparents, aunts, uncles or siblings.

<<-(7)->><<+(8)+>> An offense is committed either when every element occurs, or, if a legislative purpose to prohibit a continuing offense plainly appears, at the time when the course of conduct or the defendant's complicity therein is terminated. Time starts to run on the day after the offense is committed.

<<-(8)->><<+(9)+>> A prosecution is commenced when a complaint or information is filed, or an indictment returned, and a warrant thereon is delivered to the sheriff or other officer for execution. No such prosecution shall be deemed to have been commenced if the warrant so issued is not executed without unreasonable delay.

Sec. 14. K.S.A. 21–4720 is hereby amended to read as follows:

<< KS ST § 21–4720 >>

21–4720. (a) The provisions of subsections (a), (b), (c), (d), (e) and (h) of K.S.A. 21–4608 and amendments thereto regarding multiple sentences shall apply to the sentencing of offenders for crimes committed on or after July 1, 1993, pursuant to the sentencing guidelines system as provided in this act. The mandatory consecutive requirements contained in subsections (c), (d) and (e) shall not apply if such application would result in a manifest injustice.

(b) The sentencing judge shall otherwise have discretion to impose concurrent or consecutive sentences in multiple conviction cases. <<+The sentencing judge shall state on the record if the sentence is to be served concurrently or consecutively.+>> <<-Whenever the record is silent as to the manner in which two or more sentences imposed at the same time shall be served, they shall be served concurrently, except as provided in subsections (c), (d) and (e) of K.S.A. 21–4608 and amendments thereto.->> In cases where consecutive sentences may be imposed by the sentencing judge, the following shall apply:

(1) When the sentencing judge imposes multiple sentences consecutively, the consecutive sentences shall consist of an imprisonment term which is the sum of the consecutive imprisonment terms, and a supervision term. The postrelease supervision term will be based on the longest supervision term imposed for any of the crimes.

(2) The sentencing judge must establish a base sentence for the primary crime. The primary crime is the crime with the highest crime severity ranking. An off-grid crime shall not be used as the primary crime in determining the base sentence when imposing multiple sentences. If sentences for off-grid and on-grid convictions are ordered to run consecutively, the offender shall not begin to serve the on-grid sentence until paroled from the off-grid sentence, and the postrelease supervision term will be based on the off-grid crime. If more than one crime of conviction is classified in the same crime category, the sentencing judge must designate which crime will serve as the primary crime. In the instance of sentencing with both the drug grid and the nondrug grid and simultaneously having a presumption of imprisonment and probation, the sentencing judge will use the crime which presumes imprisonment as the primary crime. In the instance of sentencing with both the drug grid and the nondrug grid and simultaneously having a presumption of either both probation or both imprisonment, the sentencing judge will use the crime with the longest sentence term within the grid block range as the primary crime.

(3) The base sentence is set using the total criminal history score assigned.

(4) The total prison sentence imposed in a case involving multiple convictions arising from multiple counts within an information, complaint or indictment cannot exceed twice the base sentence. This limit shall apply only to the total sentence, and it shall not be necessary to reduce the duration of any of the nonbase sentences imposed to be served consecutively to the base sentence. The postrelease supervision term will reflect only the longest such term assigned to any of the crimes for which consecutive sentences are imposed. Supervision periods will not be aggregated.

(5) Nonbase sentences will not have criminal history scores applied, as calculated in the criminal history I column of the grid, but base sentences will have the full criminal history score assigned.

(6) If the sentence for the primary crime is a prison term, the entire imprisonment term of the consecutive sentences will be served in prison.

(7) If the sentence for the consecutive sentences is a prison term, the postrelease supervision term is a term of postrelease supervision as established for the primary crime.

(8) If the sentence for the primary crime is a nonprison sentence, a nonprison term will be imposed for each crime conviction, but the nonprison terms shall not be aggregated or served consecutively even though the underlying prison sentences have been ordered to be served consecutively. Upon revocation of the nonprison sentence, the offender shall serve the prison sentences consecutively as provided in this section.

(c) The following shall apply for a departure from the presumptive sentence based on aggravating factors within the context of consecutive sentences:

(1) The court may depart from the presumptive limits for consecutive sentences only if the judge finds substantial and compelling reasons to impose a departure sentence for any of the individual crimes being sentenced consecutively.

(2) When a departure sentence is imposed for any of the individual crimes sentenced consecutively, the imprisonment term of that departure sentence shall not exceed twice the maximum presumptive imprisonment term that may be imposed for that crime.

(3) The total imprisonment term of the consecutive sentences, including the imprisonment term for the departure crime, shall not exceed twice the maximum presumptive imprisonment term of the departure sentence following aggravation.

Sec. 15. K.S.A. 22–3717, as amended by section 8 of 1996 House Bill No. 2838, is hereby amended to read as follows:

<< KS ST § 22–3717 >>

22–3717. (a) Except as otherwise provided by this section, K.S.A. 1993 Supp. 21–4628 prior to its repeal and K.S.A. 21–4635 through 21–4638 and amendments thereto, an inmate, including an inmate sentenced pursuant to K.S.A. 21–4618 and amendments thereto, shall be eligible for parole after serving the entire minimum sentence imposed by the court, less good time credits.

(b)(1) Except as provided by K.S.A. 21–4635 through 21–4638 and amendments thereto, an inmate sentenced to imprisonment for the crime of capital murder, or an inmate sentenced for the crime of murder in the first degree based upon a finding of premeditated murder, committed on or after July 1, 1994, shall be eligible for parole after serving 25 years of confinement, without deduction of any good time credits.

(2) Except as provided by subsection (b)(1) or (b)(4), K.S.A. 1993 Supp. 21–4628 prior to its repeal and K.S.A. 21–4635 through 21–4638, and amendments thereto, an inmate sentenced to imprisonment for an off-grid offense committed on or after July 1, 1993, shall be eligible for parole after serving 15 years of confinement, without deduction of any good time credits.

(3) Except as provided by K.S.A. 1993 Supp. 21–4628 prior to its repeal, an inmate sentenced for a class A felony committed before July 1, 1993, including an inmate sentenced pursuant to K.S.A. 21–4618 and amendments thereto, shall be eligible for parole after serving 15 years of confinement, without deduction of any good time credits.

(4) An inmate sentenced to imprisonment for a violation of subsection (a) of K.S.A. 21–3402 and amendments thereto committed on or after July 1, 1996, shall be eligible for parole after serving 10 years of confinement without deduction of any good time credits.

(c) Except as provided in subsection (e), if an inmate is sentenced to imprisonment for more than one crime and the sentences run consecutively, the inmate shall be eligible for parole after serving the total of:

(1) The aggregate minimum sentences, as determined pursuant to K.S.A. 21–4608 and amendments thereto, less good time credits for those crimes which are not class A felonies; and

(2) an additional 15 years, without deduction of good time credits, for each crime which is a class A felony.

(d)(1) Persons sentenced for crimes, other than off-grid crimes, committed on or after July 1, 1993, will not be eligible for parole, but will be released to a mandatory period of postrelease supervision upon completion of the prison portion of their sentence as follows:

(A) Except as provided in subparagraphs (C) and (D), persons sentenced for nondrug severity level 1 through 6 crimes and drug severity levels 1 through 3 crimes must serve 36 months, plus the amount of good time earned and retained pursuant to K.S.A. 21–4722 and amendments thereto, on postrelease supervision.

(B) Except as provided in subparagraphs (C) and (D), persons sentenced for nondrug severity level 7 through 10 crimes and drug severity level 4 crimes must serve 24 months, plus the amount of good time earned and retained pursuant to K.S.A. 21–4722 and amendments thereto, on postrelease supervision.

(C)(i) The sentencing judge shall impose the postrelease supervision period provided in subparagraph (d)(1)(A) or (d)(1)(B), unless the judge finds substantial and compelling reasons to impose a departure based upon a finding that the current crime of conviction was sexually violent or sexually motivated. In that event, departure may be imposed to extend the postrelease supervision to a period of up to 60 months.

(ii) If the sentencing judge departs from the presumptive postrelease supervision period, the judge shall state on the record at the time of sentencing the substantial and compelling reasons for the departure. Departures in this section are subject to appeal pursuant to K.S.A. 21–4721 and amendments thereto.

(iii) In determining whether substantial and compelling reasons exist, the court shall consider:

(a) Written briefs or oral arguments submitted by either the defendant or the state;

(b) any evidence received during the proceeding;

(c) the presentence report, the victim's impact statement and any psychological evaluation as ordered by the court pursuant to subsection (e) of K.S.A. 21–4714 and amendments thereto; and

(d) any other evidence the court finds trustworthy and reliable.

(iv) The sentencing judge may order that a psychological evaluation be prepared and the recommended programming be completed by the offender. The department of corrections or the parole board shall ensure that court ordered sex offender treatment be carried out.

(v) In carrying out the provisions of subparagraph (d)(1)(C), the court shall refer to K.S.A. 21–4718 and amendments thereto.

(vi) Upon petition, the parole board may provide for early discharge from the postrelease supervision period upon completion of court ordered programs and completion of the presumptive postrelease supervision period, as determined by the crime of conviction, pursuant to subparagraph (d)(1)(A) or (B). Early discharge from postrelease supervision is at the discretion of the parole board.

(vii) Persons convicted of crimes deemed sexually violent or sexually motivated, shall be registered according to the habitual sex offender registration act, K.S.A. 22–4901 through 22–4910 and amendments thereto.

(D) The period of postrelease supervision provided in subparagraphs (A) and (B) may be reduced by up to 12 months based on the offender's compliance with conditions of supervision and overall performance while on postrelease supervision. The reduction in the supervision period shall be on an earned basis pursuant to rules and regulations adopted by the secretary of corrections.

(E) In cases where sentences for crimes from more than one severity level have been imposed, the highest severity level offense will dictate the period of postrelease supervision. Supervision periods will not aggregate.

(2) As used in this section, "sexually violent crime" means:

(A) Rape, K.S.A. 21–3502, and amendments thereto;

(B) indecent liberties with a child, K.S.A. 21–3503, and amendments thereto;

(C) aggravated indecent liberties with a child, K.S.A. 21–3504, and amendments thereto;

(D) criminal sodomy, subsection (a)(2) and (a)(3) of K.S.A. 21–3505 and amendments thereto;

(E) aggravated criminal sodomy, K.S.A. 21–3506, and amendments thereto;

(F) indecent solicitation of a child, K.S.A. 21–3510, and amendments thereto;

(G) aggravated indecent solicitation of a child, K.S.A. 21–3511, and amendments thereto;

(H) sexual exploitation of a child, K.S.A. 21–3516, and amendments thereto;

(I) aggravated sexual battery, K.S.A. 21–3518, and amendments thereto;

(J) any conviction for a felony offense in effect at any time prior to the effective date of this act, that is comparable to a sexually violent crime as defined in subparagraphs (A) through (I), or any federal or other state conviction for a felony offense that under the laws of this state would be a sexually violent crime as defined in this section;

(K) an attempt, conspiracy or criminal solicitation, as defined in K.S.A. 21–3301, 21–3302, 21–3303, and amendments thereto, of a sexually violent crime as defined in this section; or

(L) any act which at the time of sentencing for the offense has been determined beyond a reasonable doubt to have been sexually motivated. As used in this subparagraph, "sexually motivated" means that one of the purposes for which the defendant committed the crime was for the purpose of the defendant's sexual gratification.

(e) If an inmate is sentenced to imprisonment for a crime committed while on parole or conditional release, the inmate shall be eligible for parole as provided by subsection (c), except that the Kansas parole board may postpone the inmate's parole eligibility date by assessing a penalty not exceeding the period of time which could have been assessed if the inmate's parole or conditional release had been violated for reasons other than conviction of a crime.

(f) If a person is sentenced to prison for a crime committed on or after July 1, 1993, while on probation, parole, conditional release or in a community corrections program, for a crime committed prior to July 1, 1993, and the person is not eligible for retroactive application of the sentencing guidelines and amendments thereto pursuant to K.S.A. 21–4724 and amendments thereto, the new sentence shall not be aggregated with the old sentence, but shall begin when the person is paroled or reaches the conditional release date on the old sentence. If the offender was past the offender's conditional release date at the time the new offense was committed, the new sentence shall not be aggregated with the old sentence but shall begin when the person is ordered released by the Kansas parole board or reaches the maximum sentence expiration date on the old sentence, whichever is earlier. The new sentence shall then be served as otherwise provided by law. The period of postrelease supervision shall be based on the new sentence, except that those offenders whose old sentence is a term of imprisonment for life, imposed pursuant to K.S.A. 1993 Supp. 21–4628 prior to its repeal, or an indeterminate sentence with a maximum term of life imprisonment, for which there is no conditional release or maximum sentence expiration date, shall remain on postrelease supervision for life or until discharged from supervision by the Kansas parole board.

(g) Subject to the provisions of this section, the Kansas parole board may release on parole those persons confined in institutions who are eligible for parole when: (1) The board believes that the inmate should be released for hospitalization, for deportation or to answer the warrant or other process of a court and is of the opinion that there is reasonable probability that the inmate can be released without detriment to the community or to the inmate; or (2) the secretary of corrections has reported to the board in writing that the inmate has satisfactorily completed the programs required by any agreement entered under K.S.A. 75–5210a and amendments thereto, or any revision of such agreement, and the board believes that the inmate is able and willing to fulfill the obligations of a law abiding citizen and is of the opinion that there is reasonable probability that the inmate can be released without detriment to the community or to the inmate. Parole shall not be granted as an award of clemency and shall not be considered a reduction of sentence or a pardon.

(h) The Kansas parole board shall hold a parole hearing during the month prior to the month an inmate will be eligible for parole under subsections (a), (b) and (c). At least the month preceding the parole hearing, the county or district attorney of the county where the inmate was convicted shall give written notice of the time and place of the public comment sessions for the inmate to any victim of the inmate's crime who is alive and whose address is known to the county or district attorney or, if the victim is deceased, to the victim's family if the family's address is known to the county or district attorney. Except as otherwise provided, failure to notify pursuant to this section shall not be a reason to postpone a parole hearing. In the case of any inmate convicted of a class A felony the secretary of corrections shall give written notice of the time and place of the public comment session for such inmate at least one month preceding the public comment session to any victim of such inmate's crime or the victim's family pursuant to K.S.A. 74–7338 and amendments thereto. If notification is not given to such victim or such victim's family in the case of any inmate convicted of a class A felony, the board shall postpone a decision on parole of the inmate to a time at least 30 days after notification is given as provided in this section. Nothing in this section shall create a cause of action against the state or an employee of the state acting within the scope of the employee's employment as a result of the failure to notify pursuant to this section. If granted parole, the inmate may be released on parole on the date specified by the board, but not earlier than the date the inmate is eligible for parole under subsections (a), (b) and (c). At each parole hearing and, if parole is not granted, at such intervals thereafter as it determines appropriate, the Kansas parole board shall consider: (1) Whether the inmate has satisfactorily completed the programs required by any agreement entered under K.S.A. 75–5210a and amendments thereto, or any revision of such agreement; and (2) all pertinent information regarding such inmate, including, but not limited to, the circumstances of the offense of the inmate; the presentence report; the previous social history and criminal record of the inmate; the conduct, employment, and attitude of the inmate in prison; the reports of such physical and mental examinations as have been made; comments of the victim and the victim's family; comments of the public; official comments; and capacity of state correctional institutions.

(i) In those cases involving inmates sentenced for a crime committed after July 1, 1993, the parole board will review the inmates proposed release plan. The board may schedule a hearing if they desire. The board may impose any condition they deem necessary to insure public safety, aid in the reintegration of the inmate into the community, or items not completed under the agreement entered into under K.S.A. 75–5210a and amendments thereto. The board may not advance or delay an inmate's release date. Every inmate while on postrelease supervision shall remain in the legal custody of the secretary of corrections and is subject to the orders of the secretary.

(j) Within a reasonable time after an inmate is committed to the custody of the secretary of corrections, a member of the Kansas parole board, or a designee of the board, shall hold an initial informational hearing with such inmate and other inmates.

(k) Before ordering the parole of any inmate, the Kansas parole board shall have the inmate appear before it and shall interview the inmate unless impractical because of the inmate's physical or mental condition or absence from the institution. Every inmate while on parole shall remain in the legal custody of the secretary of corrections and is subject to the orders of the secretary. Whenever the Kansas parole board formally considers placing an inmate on parole and no agreement has been entered into with the inmate under K.S.A. 75–5210a and amendments thereto, the board shall notify the inmate in writing of the reasons for not granting parole. If an agreement has been entered under K.S.A. 75–5210a and amendments thereto and the inmate has not satisfactorily completed the programs specified in the agreement, or any revision of such agreement, the board shall notify the inmate in writing of the specific programs the inmate must satisfactorily complete before parole will be granted. If parole is not granted only because of a failure to satisfactorily complete such programs, the board shall grant parole upon the secretary's certification that the inmate has successfully completed such programs. If an agreement has been entered under K.S.A. 75–5210a and amendments thereto and the secretary of corrections has reported to the board in writing that the inmate has satisfactorily completed the programs required by such agreement, or any revision thereof, the board shall not require further program participation. However, if the board determines that other pertinent information regarding the inmate warrants the inmate's not being released on parole, the board shall state in writing the reasons for not granting the parole. If parole is denied for an inmate sentenced for a crime other than a class A or class B felony <<+or an off-grid felony,+>> the board shall hold another parole hearing for the inmate not later than one year after the denial <<+unless the parole board finds that it is not reasonable to expect that parole would be granted at a hearing if held in the next three years or during the interim period of a deferral. In such case, the parole board may defer subsequent parole hearings for up to three years but any such deferral by the board shall require the board to state the basis for its findings.+>> If parole is denied for an inmate sentenced for a class A or class B felony <<+or an off-grid felony,+>> the board shall hold another parole hearing for the inmate not later than three years after the denial <<–and shall conduct an annual file review for such inmate. Written notice of such annual file review shall be given to the inmate. The provisions of this subsection shall not be applicable to inmates sentenced for crimes committed on or after July 1, 1993–>> <<+unless the parole board finds that it is not reasonable to expect that parole would be granted at a hearing if held in the next 10 years or during the interim period of a deferral. In such case, the parole board may defer subsequent parole hearings for up to 10 years but any such deferral shall require the board to state the basis for its findings.+>>

(l) Parolees and persons on postrelease supervision shall be assigned, upon release, to the appropriate level of supervision pursuant to the criteria established by the secretary of corrections.

(m) The Kansas parole board shall adopt rules and regulations in accordance with K.S.A. 77–415 et seq., and amendments thereto, not inconsistent with the law and as it may deem proper or necessary, with respect to the conduct of parole hearings, postrelease supervision reviews, revocation hearings, orders of restitution and other conditions to be imposed upon parolees or releasees. Whenever an order for parole or postrelease supervision is issued it shall recite the conditions thereof.

(n) Whenever the Kansas parole board orders the parole of an inmate or establishes conditions for an inmate placed on postrelease supervision, the board:

(1) Unless it finds compelling circumstances which would render a plan of payment unworkable, shall order as a condition of parole or postrelease supervision that the parolee or the person on postrelease supervision pay any transportation expenses resulting from returning the parolee or the person on postrelease supervision to this state to

answer criminal charges or a warrant for a violation of a condition of probation, assignment to a community correctional services program, parole, conditional release or postrelease supervision;

(2) to the extent practicable, shall order as a condition of parole or postrelease supervision that the parolee or the person on postrelease supervision make progress towards or successfully complete the equivalent of a secondary education if the inmate has not previously completed such educational equivalent and is capable of doing so; and

(3) may order that the parolee or person on postrelease supervision perform community or public service work for local governmental agencies, private corporations organized not-for-profit or charitable or social service organizations performing services for the community.

(o) If the court which sentenced an inmate specified at the time of sentencing the amount and the receipient of any restitution ordered as a condition of parole or postrelease supervision, the Kansas parole board shall order as a condition of parole or postrelease supervision that the inmate pay restitution in the amount and manner provided in the journal entry unless the board finds compelling circumstances which would render a plan of restitution unworkable. If the parolee was sentenced before July 1, 1986, and the court did not specify at the time of sentencing the amount and the recipient of any restitution ordered as a condition of parole, the parole board shall order as a condition of parole that the parolee make restitution for the damage or loss caused by the parolee's crime in an amount and manner determined by the board unless the board finds compelling circumstances which would render a plan of restitution unworkable. If the parolee was sentenced on or after July 1, 1986, and the court did not specify at the time of sentencing the amount and the recipient of any restitution ordered as a condition of parole or postrelease supervision, the parole board shall not order restitution as a condition of parole or postrelease supervision unless the board finds compelling circumstances which justify such an order.

(p) Whenever the Kansas parole board grants the parole of an inmate, the board, within 10 days of the date of the decision to grant parole, shall give written notice of the decision to the county or district attorney of the county where the inmate was sentenced.

(q) When an inmate is to be released on postrelease supervision, the secretary, within 30 days prior to release, shall provide the county or district attorney of the county where the inmate was sentenced written notice of the release date.

(r) Inmates shall be released on postrelease supervision upon the termination of the prison portion of their sentence. Time served while on postrelease supervision will vest.

(s) An inmate who is allocated regular good time credits as provided in K.S.A. 22–3725 and amendments thereto may receive meritorious good time credits in increments of not more than 90 days per meritorious act. These credits may be awarded by the secretary of corrections when an inmate has acted in a heroic or outstanding manner in coming to the assistance of another person in a life threatening situation, preventing injury or death to a person, preventing the destruction of property or taking actions which result in a financial savings to the state.

Sec. 16. K.S.A. 1995 Supp. 75–5217 is hereby amended to read as follows:

<< KS ST § 75–5217 >>

75–5217. (a) At any time during release on parole, conditional release or postrelease supervision, the secretary of corrections may issue a warrant for the arrest of a released inmate for violation of any of the conditions of release, or a notice to appear to answer to a charge of violation. Such notice shall be served personally upon the released inmate. The warrant shall authorize any law enforcement officer to arrest and deliver the released inmate to a place as provided by subsection (f). Any parole officer may arrest such released inmate without a warrant, or may deputize any other officer with power of arrest to do so by giving such officer a written arrest and detain order setting forth that the released inmate has, in the judgment of the parole officer, violated the conditions of the inmate's release. The written arrest and detain order delivered with the released inmate by the arresting officer to the official in charge of the institution or place to which the released inmate is brought for detention shall be sufficient warrant for detaining the inmate. After making an arrest the parole officer shall present to the detaining authorities a similar arrest and detain order and statement of the circumstances of violation. Pending hearing, as hereinafter provided, upon any charge of violation the released inmate shall remain incarcerated in the institution or place to which the inmate is taken for detention.

(b) Upon such arrest and detention, the parole officer shall notify the secretary of corrections, or the secretary's designee, within five days and shall submit in writing a report showing in what manner the released inmate had violated the

conditions of release. After such notification is given to the secretary of corrections, or upon an arrest by warrant as herein provided, and the finding of probable cause pursuant to procedures established by the secretary of a violation of the released inmate's conditions of release, the secretary shall cause the released inmate to be brought before the Kansas parole board, its designee or designees, for a hearing on the violation charged, under such rules and regulations as the board may adopt. <<+It is within the discretion of the Kansas parole board whether such hearing requires the released inmate to appear personally before the board when such inmate's violation results from a conviction for a new felony or misdemeanor.+>> Relevant written statements made under oath shall be admitted and considered by the Kansas parole board, its designee or designees, along with other evidence presented at the hearing. If the violation is established to the satisfaction of the Kansas parole board, the board may continue or revoke the parole or conditional release, or enter such other order as the board may see fit. Revocations of release of inmates who are on a specified period of postrelease supervision shall be for a 180–day period of confinement from the date of the revocation hearing before the board, if the violation does not result from a conviction for a new felony or misdemeanor. Such period of confinement may be reduced by not more than 90 days based on the inmate's conduct, work and program participating during the incarceration period. The reduction in the incarceration period shall be on an earned basis pursuant to rules and regulations adopted by the secretary of corrections.

 (c) If the violation does result from a conviction for a new felony or misdemeanor, upon revocation the inmate shall serve the entire remaining balance of the period of postrelease supervision even if the new conviction did not result in the imposition of a new term of imprisonment.

 (d) In the event the released inmate reaches conditional release date as provided by K.S.A. 22–3718 and amendments thereto after a finding of probable cause, pursuant to procedures established by the secretary of corrections of a violation of the released inmate's conditions of release, but prior to a hearing before the Kansas parole board, the secretary of corrections shall be authorized to detain the inmate until the hearing by the Kansas parole board. The secretary shall then enforce the order issued by the Kansas parole board.

 (e) If the secretary of corrections issues a warrant for the arrest of a released inmate for violation of any of the conditions of release and the released inmate is subsequently arrested in the state of Kansas, either pursuant to the warrant issued by the secretary of corrections or for any other reason, the released inmate's sentence shall not be credited with the period of time from the date of the issuance of the secretary's warrant to the date of the released inmate's arrest.

 If a released inmate for whom a warrant has been issued by the secretary of corrections for violation of the conditions of release is subsequently arrested in another state, and the released inmate has been authorized as a condition of such inmate's release to reside in or travel to the state in which the released inmate was arrested, and the released inmate has not absconded from supervision, the released inmate's sentence shall not be credited with the period of time from the date of the issuance of the warrant to the date of the released inmate's arrest. If the released inmate for whom a warrant has been issued by the secretary of corrections for violation of the conditions of release is subsequently arrested in another state for reasons other than the secretary's warrant and the released inmate does not have authorization to be in the other state or if authorized to be in the other state has been charged by the secretary with having absconded from supervision, the released inmate's sentence shall not be credited with the period of time from the date of the issuance of the warrant by the secretary to the date the released inmate is first available to be returned to the state of Kansas. If the released inmate for whom a warrant has been issued by the secretary of corrections for violation of a condition of release is subsequently arrested in another state pursuant only to the secretary's warrant, the released inmate's sentence shall not be credited with the period of time from the date of the issuance of the secretary's warrant to the date of the released inmate's arrest, regardless of whether the released inmate's presence in the other state was authorized or the released inmate had absconded from supervision.

 The secretary may issue a warrant for the arrest of a released inmate for violation of any of the conditions of release and may direct that all reasonable means to serve the warrant and detain such released inmate be employed including but not limited to notifying the federal bureau of investigation of such violation and issuance of warrant and requesting from the federal bureau of investigation any pertinent information it may possess concerning the whereabouts of the released inmate.

(f) Law enforcement officers shall execute warrants issued by the secretary of corrections pursuant to subsection (a) or (d), and shall deliver the inmate named therein to the jail used by the county where the inmate is arrested unless some other place is designated by the secretary, in the same manner as for the execution of any arrest warrant.

<< Repealed: KS ST §§ 21–3106, 21–4720, 22–3717, 75–5217 >>

Sec. 17. K.S.A. 21–3106, 21–4720 and 22–3717, as amended by section 8 of 1996 House Bill No. 2838, and K.S.A. 1995 Supp. 75–5217 are hereby repealed.

Sec. 18. This act shall take effect and be in force from and after its publication in the statute book.

Approved May 17, 1996

KS LEGIS 267 (1996)

---

**End of Document** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2006 Kansas Laws Ch. 183 (H.B. 2893)

KANSAS 2006 SESSION LAWS
REGULAR SESSION

Additions are indicated by Text; deletions by
~~Text~~ . Changes in tables are made but not highlighted.

Ch. 183 (H.B. 2893)
West's No. 153
HEALTH CARE COSTS—PROCEDURE, CIVIL—PROPERTY FORFEITURE AND SEIZURE

AN ACT concerning health care costs; relating to offenders in custody; declaring certain acts to be crimes and providing penalties for violations; state medicaid plan; medicaid fraud; obstruction of a medicaid fraud investigation; amending K.S.A. 21–3910, 60–4107, 60–4117 and 60–4119 and K.S.A. 2005 Supp. 21–3847 and 39–7,121d and K.S.A. 60–4104 as amended by section 9 of 2006 House Substitute for Senate Bill No. 196 and 60–4105 as amended by section 10 of 2006 House Substitute for Senate Bill No. 196 and repealing the existing sections.

Be it enacted by the Legislature of the State of Kansas:

New Section 1. (a) Except as otherwise provided in this section, a county, a city, a county or city law enforcement agency, a county department of corrections or the Kansas highway patrol shall be liable to pay a health care provider for health care services rendered to persons in the custody of such agencies the lesser of the actual amount billed by such health care provider or the medicaid rate. The provisions of this section shall not apply if a person in the custody of a county or city law enforcement agency, a county department of corrections or the Kansas highway patrol is covered under a current individual or group accident and health insurance policy, medical service plan contract, hospital service corporation contract, hospital and medical service corporation contract, fraternal benefit society or health maintenance organization contract.

(b) Nothing in this section shall prevent a county or city law enforcement agency, a county department of corrections, the Kansas highway patrol or such agencies authorized vendors from entering into agreements with health care providers for the provision of health care services at terms, conditions and amounts which are different than the medicaid rate.

(c) It shall be the responsibility of the custodial county or city law enforcement agency, county department of corrections or the Kansas highway patrol or such agencies' agents, to determine, under agreement with the Kansas health policy authority, the amount payable for the services provided and to communicate that determination along with the remittance advice and payment for the services provided.

(d) Nothing in this section shall be construed to create a duty on the part of a health care provider to render health care services to a person in the custody of a county or city law enforcement agency, a county department of corrections or the Kansas highway patrol.

(e) As used in this section:

(1) "County or city law enforcement agency" means a city police department, a county sheriff's department, a county law enforcement department as defined in K.S.A. 19–4401, and amendments thereto, or a law enforcement agency established pursuant to the consolidated city-county powers in K.S.A. 12–345, and amendments thereto.

(2) "Health care provider" means a person licensed to practice any branch of the healing arts by the state board of healing arts, a person who holds a temporary permit to practice any branch of the healing arts issued by the state board of healing arts, a person engaged in a postgraduate training program approved by the state board of healing arts, a licensed physician assistant, a person licensed by the behavioral sciences regulatory board, a medical care facility licensed by the department of health and environment, a podiatrist licensed by the state board of healing arts, an optometrist licensed by the board of examiners in optometry, a registered nurse, and advanced nurse practitioner, a licensed professional nurse who is authorized to practice as a registered nurse anesthetist, a licensed practical nurse, a licensed physical

therapist, a professional corporation organized pursuant to the professional corporation law of Kansas by persons who are authorized by such law to form such a corporation and who are health care providers as defined by this subsection, a Kansas limited liability company organized for the purpose of rendering professional services by its members who are health care providers as defined by this subsection and who are legally authorized to render the professional services for which the limited liability company is organized, a partnership of persons who are health care providers under this subsection, a Kansas not-for-profit corporation organized for the purpose of rendering professional services by persons who are health care providers as defined by this subsection, a dentist certified by the state board of healing arts to administer anesthetics under K.S.A. 65–2899, and amendments thereto, a psychiatric hospital licensed under K.S.A. 75–3307b, and amendments thereto, a licensed social worker or a mental health center or mental health clinic licensed by the secretary of social and rehabilitation services and any health care provider licensed by the appropriate regulatory body in another state that has a current approved provider agreement with the Kansas health policy authority.

(3) "Medicaid rate" means the terms, conditions and amounts a health care provider would be paid for health care services rendered pursuant to a contract or provider agreement with the Kansas health policy authority.

New Sec. 2. (a) A law enforcement officer having custody of a person shall not release such person from custody merely to avoid the cost of necessary medical treatment while the person is receiving treatment from a health care provider unless the health care provider consents to such release, or unless the release is ordered by a court of competent jurisdiction. When the law enforcement officer is satisfied that probable cause no longer exists to believe the suspect committed a crime based upon the ongoing investigation, or the prosecuting attorney gives notice that no prosecution will be forthcoming at this time, the law enforcement officer may release such person from custody. Upon the date of notification to the health care provider that the person is being released from custody because the ongoing investigation indicates that probable cause no longer exists or a decision by the prosecuting attorney that no charges will be filed, the law enforcement agency shall no longer be responsible for the cost of such person's medical treatment.

(b) As used in this section:

(1) "Law enforcement officer" has the meaning ascribed thereto in K.S.A. 22–2202, and amendments thereto.

(2) "Health care provider" has the meaning ascribed thereto in section 1, and amendments thereto.

New Sec. 3. (a) Obstruction of a medicaid fraud investigation is knowingly and intentionally engaging in one or more of the following during an investigation of any matter pursuant to K.S.A. 21–3844 et seq., and amendments thereto:

(1) Falsifying, concealing or covering up a material fact by any trick, misstatement, scheme or device; or

(2) making or causing to be made any materially false writing or document knowing that such writing or document contains any false, fictitious or fraudulent statement or entry.

(b) Obstruction of a medicaid fraud investigation is a severity level 9, nonperson felony.

(c) This section shall be part of and supplemental to the Kansas medicaid fraud control act.

Sec. 4. K.S.A. 2005 Supp. 21–3847 is hereby amended to read as follows:

<< KS ST § 21–3847 >>

21–3847. (a) No person nor recipient of medicaid benefits, family member of such person recipient or provider of medicaid services shall:

(1) Knowingly and intentionally solicit or receive any remuneration, including but not limited to any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind:

(A) In return for referring or refraining from referring an individual to a person for the furnishing or arranging for the furnishing of any goods, service, item, facility or accommodation for which payment may be made, in whole or in part, under the medicaid program; or

(B) in return for purchasing, leasing, ordering or arranging for or recommending purchasing, leasing or ordering any goods, service, item, facility or accommodation for which payment may be made, in whole or in part, under the medicaid program.

(2) Knowingly and intentionally offer or pay any remuneration, including, but not limited to, any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person:

(A) To refer or refrain from referring an individual to a person for the furnishing or arranging for the furnishing of any goods, service, item, facility or accommodation for which payment may be made, in whole or in part, under the medicaid program; or

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any goods, service, item, facility or accommodation for which payment may be made, in whole or in part, under the medicaid program.

(3) Knowingly divide or share any funds illegally obtained from the medicaid program.

(b) No medicaid recipient shall knowingly and intentionally trade a medicaid number for money or other remuneration, sign for services that are not received by the medicaid recipient or sell or exchange for value goods purchased or provided under the medicaid program.

~~(b)~~ (c) A violation of this section is a severity level 7, nonperson felony.

~~(c)~~ (d) This section shall not apply to a refund, discount, copayment, deductible, incentive or other reduction obtained by a provider in the ordinary course of business, and appropriately reflected in the claims or reports submitted to the medicaid program, or its fiscal agent, nor shall it be construed to prohibit deductibles, copayments or any other cost or risk sharing arrangements which are a part of any program operated by or pursuant to contracts with the medicaid program.

Sec. 5. K.S.A. 21–3910 is hereby amended to read as follows:

<< KS ST § 21–3910 >>

21–3910. (a) Misuse of public funds is knowingly using, lending or permitting another to use, ~~;~~ public money in a manner not authorized by law, by a custodian or other person having control of public money by virtue of such person's official position.

(b) As used in this section, "public money, ~~" means any money or negotiable instrument which belongs to the state of Kansas or any political subdivision thereof.

(c) ~~Misuse of public funds is a severity level 8, nonperson felony.~~ (1) Misuse of public funds where the aggregate amount of money paid or claimed in violation of this section is $100,000 or more is a severity level 5, nonperson felony.

(2) Misuse of public funds where the aggregate amount of money paid or claimed in violation of this section is at least $25,000 but less than $100,000 is a severity level 7, nonperson felony.

(3) Misuse of public funds where the aggregate amount of money paid or claimed in violation of this section is at least $1,000 but less than $25,000 is a severity level 9, nonperson felony.

(4) Misuse of public funds where the aggregate amount of money paid or claimed in violation of this section is less than $1,000 is a class A nonperson misdemeanor. Upon conviction of misuse of public funds, the convicted person shall forfeit the person's official position.

Sec. 6. K.S.A. 2005 Supp. 39–7,121d is hereby amended to read as follows:

<< KS ST § 39–7,121d >>

39–7,121d. (a) The state medicaid plan shall include provisions for a program of differential dispensing fees for pharmacies that provide prescriptions for adult care homes under a unit dose system in accordance with rules and regulations of the state board of pharmacy and that participate in the return of unused medications program under the state medicaid plan.

(b) The state medicaid plan shall include provisions for differential ingredient cost reimbursement of generic and brand name pharmaceuticals. The director of health policy and finance shall set the rates for differential cost reimbursement of generic and brand name pharmaceuticals by rules and regulations.

(c) On and after May 23, 2007, the state medicaid plan shall require that every pharmacy claim form under the plan include the prescriber's unique identification number.

Sec. 7. K.S.A. 60–4104 as amended by section 9 of 2006 House Substitute for Senate Bill No. 196 is hereby amended to read as follows:

<< KS ST § 60–4104 >>

60–4104. Conduct and offenses giving rise to forfeiture under this act, whether or not there is a prosecution or conviction related to the offense, are:

(a) All offenses which statutorily and specifically authorize forfeiture;

(b) violations of the uniform controlled substances act, K.S.A. 65–4101 et seq., and amendments thereto;

(c) theft which is classified as a felony violation pursuant to K.S.A. 21–3701, and amendments thereto, in which the property taken was livestock;

(d) unlawful discharge of a firearm, K.S.A. 21–4219, and amendments thereto;

(e) money laundering, K.S.A. 65–4142, and amendments thereto;

(f) gambling, K.S.A. 21–4303, and amendments thereto, and commercial gambling, K.S.A. 21–4304, and amendments thereto;

(g) counterfeiting, K.S.A. 2005 Supp. 21–3763, and amendments thereto;

(h) violations of section 1 of 2006 House Substitute for Senate Bill No. 196, and amendments thereto;

(i) medicaid fraud, K.S.A. 21–3844 et seq., and amendments thereto;

(i) (j) an act or omission occurring outside this state, which would be a violation in the place of occurrence and would be described in this section if the act occurred in this state, whether or not it is prosecuted in any state;

(j) (k) an act or omission committed in furtherance of any act or omission described in this section including any inchoate or preparatory offense, whether or not there is a prosecution or conviction related to the act or omission;

(k) (l) any solicitation or conspiracy to commit any act or omission described in this section, whether or not there is a prosecution or conviction related to the act or omission;

(m) furtherance of terrorism or illegal use of weapons of mass destruction, section 3 of 2006 Senate Bill No. 25, and amendments thereto.

Sec. 8. K.S.A. 60–4105 as amended by section 10 of 2006 House Substitute for Senate Bill No. 196 is hereby amended to read as follows:

<< KS ST § 60–4105 >>

60–4105. The following property is subject to forfeiture:

(a) Property described in a statute authorizing forfeiture;

(b) except as otherwise provided by law, all property, including  of every kind, including, but not limited to, cash and negotiable instruments and the whole of any lot or tract of land and any appurtenances or improvements to real property that is either:

(1) Furnished or intended to be furnished by any person in an exchange that constitutes conduct giving rise to forfeiture; or

(2) used or intended to be used in any manner to facilitate conduct giving rise to forfeiture, including, but not limited to, any computer, computer system, computer network or any software or data owned by the defendant which is used during the commission of a violation of section 1, and amendments thereto;

(c) all proceeds of any conduct giving rise to forfeiture;

(d) any  all property of every kind, including, but not limited to, cash and negotiable instruments derived from or realized through any proceeds which were obtained directly or indirectly from the commission of an offense listed in K.S.A. 60–4104, and amendments thereto;

(e) all weapons possessed, used, or available for use in any manner to facilitate conduct giving rise to forfeiture;

(f) ownership or interest in real property that is a homestead, to the extent the homestead was acquired with proceeds from conduct giving rise to forfeiture;

(g) contraband, which shall be seized and summarily forfeited to the state without regard to the procedures set forth in this act;

(h) all controlled substances, raw materials, controlled substance analogs, counterfeit substances, or imitation controlled substances that have been manufactured, distributed, dispensed, possessed, or acquired in violation of the laws of this state; and

(i) any items bearing a counterfeit mark.

Sec. 9. K.S.A. 60–4107 is hereby amended to read as follows:

<< KS ST § 60–4107 >>

60–4107. (a) Property may be seized for forfeiture by a law enforcement officer upon process issued by the district court. The court may issue a seizure warrant on an affidavit under oath demonstrating that probable cause exists for the property's forfeiture or that the property has been the subject of a previous final judgment of forfeiture in the courts of any state or of the United States. The court may order that the property be seized on such terms and conditions as are reasonable in the discretion of the court. The order may be made on or in connection with a search warrant. All real property is to be seized constructively or pursuant to a preseizure adversarial judicial determination of probable cause, except that this determination may be done ex parte when the attorney for the state has demonstrated exigent circumstances to the court.

(b) Property may be seized for forfeiture by a law enforcement officer without process on probable cause to believe the property is subject to forfeiture under this act.

(c) Property may be seized constructively by:

(1) Posting notice of seizure for forfeiture or notice of pending forfeiture on the property.

(2) Giving notice pursuant to K.S.A. 60–4109, and amendments thereto.

(3) Filing or recording in the public records relating to that type of property notice of seizure for forfeiture, notice of pending forfeiture, a forfeiture lien or a lis pendens. Filings or recordings made pursuant to this act are not subject to a filing fee or other charge.

(d) The seizing agency shall make reasonable effort to provide notice of the seizure to the person from whose possession or control the property was seized and any interest holder of record within 30 days of seizing the property. If no person is in possession or control, the seizing agency may attach the notice to the property or to the place of the property's seizure or may make a reasonable effort to deliver the notice to the owner of the property. The notice shall contain a general description of the property seized, the date and place of seizure, the name of the seizing agency and the address and telephone number of the seizing officer or other person or agency from whom information about the seizure may be obtained.

(e) A person who acts in good faith and in a reasonable manner to comply with an order of the court or a request of a law enforcement officer is not liable to any person on account of acts done in reasonable compliance with the order or request. No liability may attach from the fact that a person declines a law enforcement officer's request to deliver property.

(f) A possessory lien of a person from whose possession property is seized is not affected by the seizure.

(g) When property is seized for forfeiture under this act, the seizing agency shall, within 45 days of such seizure, forward to the county or district attorney in whose jurisdiction the seizure occurred, a written request for forfeiture which shall include a statement of facts and circumstances of the seizure, the estimated value of the property, the owner and lienholder of the property, the amount of any lien, and a summary of the facts relied on for forfeiture.

(h) Upon receipt of a written request for forfeiture from a local law enforcement agency, the county or district attorney shall have 15 days to accept the request. Should such county or district attorney decline such request, or fail to answer, the seizing agency may:

(1) Request a state law enforcement agency which enforces this act to adopt the forfeiture; or

(2) engage an attorney, approved by the county or district attorney, to represent the agency in the forfeiture proceeding.

(i) Upon receipt of a written request for forfeiture from a state law enforcement agency, the county or district attorney shall have 15 days to accept the request. Should such county or district attorney decline such request, or fail to answer, the seizing agency may engage an assistant attorney general or other attorney approved by the attorney general's office to represent the agency in the forfeiture proceeding.

(j) Nothing in this act shall prevent the attorney general, an employee of the attorney general or an authorized representative of the attorney general from conducting forfeiture proceedings under this act.

(k) Nothing in this act shall prevent a seizing agency from requesting federal adoption of a seizure. It shall not be necessary to obtain any order pursuant to K.S.A. 22–2512, and amendments thereto, to release any seized property to a federal agency should the county or district attorney approve of such transfer.

(k)  (l) Nothing in this act shall prevent a seizing agency, or the plaintiff's attorney on behalf of the seizing agency, from settling any alleged forfeiture claim against property before or during forfeiture proceedings. Such settlement shall be in

writing and shall be approved, if a local agency, by the county or district attorney or, if a state agency, by the attorney general's office and a district court judge. No hearing or other proceeding shall be necessary. The records of settlements occurring prior to commencement of judicial forfeiture proceedings in the district court shall be retained by the county or district attorney for not less than five years.

(l) (m) Settlements under this act shall not be conditioned upon any disposition of criminal charges.

Sec. 10. K.S.A. 60–4117 is hereby amended to read as follows:

<< KS ST § 60–4117 >>

60–4117. Except as provided in K.S.A. 65–7014, and amendments thereto: (a) When property is forfeited under this act, the law enforcement agency may:

(1) Retain such property for official use or transfer the custody or ownership to any local, state or federal agency, subject to any lien preserved by the court;

(2) destroy or use for investigative or training purposes, any illegal or controlled substances and equipment or other contraband, provided that materials necessary as evidence shall be preserved;

(3) sell property which is not required by law to be destroyed and which is not harmful to the public:

(A) All property, except real property, designated by the seizing agency to be sold shall be sold at public sale to the highest bidder for cash without appraisal. The seizing agency shall first cause notice of the sale to be made by publication at least once in an official county newspaper as defined by K.S.A. 64–101, and amendments thereto. Such notice shall include the time, place, and conditions of the sale and description of the property to be sold. Nothing in this subsection shall prevent a state agency from using the state surplus property system and such system's procedures shall be sufficient to meet the requirements of this subsection.

(B) Real property may be sold pursuant to subsection (A), or the seizing agency may contract with a real estate company, licensed in this state, to list, advertise and sell such real property in a commercially reasonable manner.

(C) No employee or public official of any agency involved in the investigation, seizure or forfeiture of seized property may purchase or attempt to purchase such property; or

(4) salvage the property, subject to any lien preserved by the court.

(b) When firearms are forfeited under this act, the firearms in the discretion of the seizing agency, shall be destroyed, used within the seizing agency for official purposes, traded to another law enforcement agency for use within such agency or given to the Kansas bureau of investigation for law enforcement, testing, comparison or destruction by the Kansas bureau of investigation forensic laboratory.

(c) The proceeds of any sale shall be distributed in the following order of priority:

(1) For satisfaction of any court preserved security interest or lien, or in the case of a violation, as defined by subsection (h) of K.S.A. 60–4104, and amendments thereto, the proceeds shall be remitted to the state treasurer in accordance with the provisions of K.S.A. 75–4215, and amendments thereto. Upon receipt of such remittance, the state treasurer shall deposit the entire amount into the state treasury to the credit of the medicaid fraud reimbursement fund;

(2) thereafter, for payment of all proper expenses of the proceedings for forfeiture and disposition, including expenses of seizure, inventory, appraisal, maintenance of custody, preservation of availability, advertising, service of process, sale and court costs;

(3) reasonable attorney fees:

(A) If the plaintiff's attorney is a county or district attorney, an assistant, or another governmental agency's attorney, fees shall not exceed 15% of the total proceeds, less the amounts of subsection (c)(1) and (2), in an uncontested forfeiture nor 20% of the total proceeds, less the amounts of subsection (c)(1) and (2), in a contested forfeiture. Such fees shall be deposited in the county or city treasury and credited to the special prosecutor's trust fund. Moneys in such fund shall not be considered a source of revenue to meet normal operating expenditures, including salary enhancement. Such fund shall be expended by the county or district attorney, or other governmental agency's attorney through the normal county or city appropriation system and shall be used for such additional law enforcement and prosecutorial purposes as the county or district attorney or other governmental agency's attorney deems appropriate, including educational purposes. All moneys derived from past or pending forfeitures shall be expended pursuant to this act. The board of county commissioners shall provide adequate funding to the county or district attorney's office to enable such office to

enforce this act. Neither future forfeitures nor the proceeds therefrom shall be used in planning or adopting a county or district attorney's budget; or

(B) if the plaintiff's attorney is the attorney general and the conduct and offense giving rise to forfeiture is pursuant to subsection (h) of K.S.A. 60–4104, and amendments thereto, fees shall not exceed 15% of the total proceeds, less the amounts of subsection (c)(1) and (2) in an uncontested forfeiture nor 20% of the total proceeds, less the amounts of subsection (c)(1) and (2) in a contested forfeiture. Such fees shall be remitted to the state treasurer in accordance with the provisions of K.S.A. 75–4215, and amendments thereto. Upon receipt of each such remittance, the state treasurer shall deposit the entire amount in the state treasury to the credit of the medicaid fraud prosecution revolving fund. Moneys paid into the medicaid fraud prosecution revolving fund pursuant to this subsection shall be appropriated to the attorney general for use by the attorney general in the investigation and prosecution of medicaid fraud and abuse; or

(C) if the plaintiff's attorney is a private attorney, such reasonable fees shall be negotiated by the employing law enforcement agency;

(4) repayment of law enforcement funds expended in purchasing of contraband or controlled substances, subject to any interagency agreement.

(d) Any proceeds remaining shall be credited as follows, subject to any interagency agreement:

(1) If the law enforcement agency is a state agency, the entire amount shall be deposited in the state treasury and credited to such agency's state forfeiture fund. There is hereby established in the state treasury the following state funds: Kansas bureau of investigation state forfeiture fund, Kansas attorney general's state medicaid fraud forfeiture fund, Kansas highway patrol state forfeiture fund, Kansas department of corrections state forfeiture fund and Kansas national guard counter drug state forfeiture fund. Expenditures from the Kansas bureau of investigation state forfeiture fund shall be made upon warrants of the director of accounts and reports issued pursuant to vouchers approved by the attorney general or by a person or persons designated by the attorney general. Expenditures from the Kansas attorney general's state medicaid fraud forfeiture fund shall be made upon warrants of the director of accounts and reports issued pursuant to vouchers approved by the attorney general or by a person or persons designated by the attorney general. Expenditures from the Kansas highway patrol state forfeiture fund shall be made upon warrants of the director of accounts and reports issued pursuant to vouchers approved by the superintendent of the highway patrol or by a person or persons designated by the superintendent. Expenditures from the Kansas department of corrections state forfeiture fund shall be made upon warrants of the director of accounts and reports issued pursuant to vouchers approved by the secretary of the department of corrections or by a person or persons designated by the secretary. Expenditures from the Kansas national guard counter drug state forfeiture fund shall be made upon warrants of the director of accounts and reports issued pursuant to vouchers approved by the adjutant general of Kansas or by a person or persons designated by the adjutant general. Each agency shall compile and submit a forfeiture fund report to the legislature on or before February 1 of each year. Such report shall include, but not be limited to: (A) The fund balance on December 1; (B) the deposits and expenditures for the previous 12–month period ending December 1. Upon the effective date of this act, the director of accounts and reports is directed to transfer each agency's balance in the state special asset forfeiture fund to the agency's new, state forfeiture fund. All liabilities of the state special asset forfeiture fund existing prior to such date are hereby imposed on the Kansas bureau of investigation state forfeiture fund, Kansas highway patrol state forfeiture fund and the Kansas department of corrections state forfeiture fund. The state special asset forfeiture fund is hereby abolished.

(2) If the law enforcement agency is a city or county agency, the entire amount shall be deposited in such city or county treasury and credited to a special law enforcement trust fund. Each agency shall compile and submit annually a special law enforcement trust fund report to the entity which has budgetary authority over such agency and such report shall specify, for such period, the type and approximate value of the forfeited property received, the amount of any forfeiture proceeds received, and how any of those proceeds were expended.

(3) Moneys in the Kansas bureau of investigation state forfeiture fund, Kansas highway patrol state forfeiture fund, Kansas department of corrections state forfeiture fund, the special law enforcement trust funds and the Kansas national guard counter drug state forfeiture fund shall not be considered a source of revenue to meet normal operating expenses. Such funds shall be expended by the agencies or departments through the normal city, county or state appropriation system and shall be used for such special, additional law enforcement purposes as the law enforcement agency head deems

appropriate. Neither future forfeitures nor the proceeds from such forfeitures shall be used in planning or adopting a law enforcement agency's budget.

(4) Moneys in the Kansas attorney general's medicaid fraud forfeiture fund shall defray costs of the attorney general in connection with the duties of investigating and prosecuting medicaid fraud and abuse.

Sec. 11. K.S.A. 60–4119 is hereby amended to read as follows:

<< KS ST § 60–4119 >>

60–4119. (a) If a person is or may be called to produce evidence at a deposition, hearing or trial under this act or at an investigation brought by the attorney under K.S.A. 60–4118, and amendments thereto, the district court for the county in which the deposition, hearing, trial, or investigation is or may be held, upon certification in writing of a request of the county or district attorney for the county, or the attorney general, shall issue an order, ex parte or after a hearing, requiring the person to produce evidence, notwithstanding that person's refusal to do so on the basis of the privilege against self-incrimination.

(b) The county or district attorney, or the attorney general, may certify in writing a request for an ex parte order under this section if in such county or district attorney's judgment:

(1) The production of the evidence may be necessary to the public interest; and

(2) the person has refused or is likely to refuse to produce evidence on the basis of such person's privilege against self-incrimination.

(c) If a person refuses, on the basis of such person's privilege against self-incrimination, to produce evidence in any proceeding described in this act, and the presiding officer informs the person of an order issued under this section, the person may not refuse to comply with the order. The person may be compelled or punished by the district court issuing an order for civil or criminal contempt.

(d) The production of evidence compelled by order issued under this section, and any information directly or indirectly derived from such evidence, may not be used against the person in a subsequent criminal case, except in a prosecution for perjury, K.S.A. 21–3805, and amendments thereto, making false writing, K.S.A. 21–3711, and amendments thereto, or an offense otherwise involving a failure to comply with the order. Nothing in this subsection shall be interpreted as preventing the use in a criminal action any evidence lawfully obtained independently of these procedures.

Sec. 12. K.S.A. 21–3910, 60–4107, 60–4117 and 60–4119 and K.S.A. 2005 Supp. 21–3847 and 39–7,121d and K.S.A. 60–4104 as amended by section 9 of 2006 House Substitute for Senate Bill No. 196 and 60–4105 as amended by section 10 of 2006 House Substitute for Senate Bill No. 196 are hereby repealed.

Sec. 13. This act shall take effect and be in force from and after its publication in the statute book.

Approved May 16, 2006

KS LEGIS 183 (2006)

End of Document          © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Berlin, Allen 7/20/2017

For Educational Use Only

216.2950 Self-referral restrictions; offenses, KY ST § 216.2950

---

> Baldwin's Kentucky Revised Statutes Annotated
>   Title XVIII. Public Health
>     Chapter 216. Health Facilities and Services (Refs & Annos)
>       Miscellaneous Health Care Provisions

KRS § 216.2950

216.2950 Self-referral restrictions; offenses

Currentness

(1) Except as otherwise provided in KRS 205.510 to 205.630, no provider shall knowingly solicit, receive, or offer any remuneration (including any kickback, bribe, or rebate) for furnishing medical assistance benefits or in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any goods, facility, service, or item for which payment may be received from Medicare or Medicaid.

(2) (a) No provider shall knowingly make, offer, or receive a payment, a rebate of a fee, or a charge for referring a patient to another provider for furnishing of Medicare or Medicaid benefits.

(b) Any conduct or activity which does not violate or which is protected under the provisions of 42 U.S.C. sec. 1395nn or 42 U.S.C. sec. 1320A-7B(b), as amended, or federal regulations promulgated under those statutes, shall not be deemed to violate the provisions of this section and the conduct or activity shall be accorded the same protections allowed under federal law and regulation. Any conduct of activity by any provider which violates the provisions of 42 U.S.C. sec. 1395nn or 42 U.S.C. sec. 1320A-7B(b), as amended, where Medicare and Medicaid payment is involved, shall be deemed to violate the provisions of this section.

(3) Any person who violates subsection (1) or (2) of this section shall be guilty of a Class A misdemeanor unless the combination or aggregation of offenses is valued at three hundred dollars ($300) or more, in which case it shall be a Class D felony. In addition to any other penalty authorized by law, any person who violates the provisions of subsection (2)(a) of this section shall not be entitled to bill or collect from the patient or any third-party payor and shall repay any payments due the Commonwealth for services provided which were related to the referral.

**Credits**
HISTORY: 1996 c 371, § 22, eff. 7-15-96; 1994 c 512, § 18, eff. 7-15-94

KRS § 216.2950, KY ST § 216.2950
Current with emergency effective legislation through the end of the 2017 Reg. Sess.

---

**End of Document**        © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Berlin, Alec 7/20/2017
For Educational Use Only

§ 70.5. Fraudulent remuneration, LA R.S. 14:70.5

---

West's Louisiana Statutes Annotated
    Louisiana Revised Statutes
        Title 14. Criminal Law (Refs & Annos)
            Chapter 1. Criminal Code (Refs & Annos)
                Part III. Offenses Against Property
                    Subpart C. By Misappropriation Without Violence

LSA-R.S. 14:70.5

§ 70.5. Fraudulent remuneration

Currentness

A. Fraudulent remuneration is the intentional solicitation, receipt, offer, or payment of any remuneration, including but not limited to bribes, rebates, or bed hold payments, directly or indirectly, overtly or covertly, in cash or in kind, to or from a third party for the following:

(1) In return for the referral of an individual to a health care provider for the purpose of providing any good, service, or supply, billed to the Louisiana medical assistance program.

(2) In return for purchasing, leasing, or ordering, or for arranging or recommending for the purchasing, leasing, or ordering, of any good, supply, service, or facility billed to the Louisiana medical assistance program.

(3) For the recruitment of new patients for the purpose of providing any good, supply, service, or facility billed to the Louisiana medical assistance program.

(4) To any recipient or his representative, for goods, services, supplies, or facilities furnished to the recipient and billed to the Louisiana medical assistance program.

B. Normal business practices which fall within the "safe harbor" exemptions of R.S. 46:438.2 shall not be construed as an offense under the provisions of this Section.

C. Whoever commits the crime of fraudulent remuneration shall be imprisoned, with or without hard labor, for not more than five years, or may be fined not more than twenty thousand dollars, or both.

**Credits**
Added by Acts 1999, No. 450, § 1.

LSA-R.S. 14:70.5, LA R.S. 14:70.5

---

Berlin, Alec 7/20/2017
For Educational Use Only

**§ 70.5. Fraudulent remuneration, LA R.S. 14:70.5**

The Civil Code is current through the 2017 Regular Session, for all laws effective through December 31, 2017. All other statutes and codes are current through the 2017 First Extraordinary Session.

---

**End of Document**                                 © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Berlin, Aric 7/20/2017
For Educational Use Only

§ 438.2. Illegal remuneration, LA R.S. 46:438.2

West's Louisiana Statutes Annotated
   Louisiana Revised Statutes
      Title 46. Public Welfare and Assistance
      Chapter 3. Public Assistance
         Part VI-a. Medical Assistance Programs Integrity Law (Refs & Annos)
         Subpart B. Civil Causes of Action

LSA-R.S. 46:438.2

§ 438.2. Illegal remuneration

Currentness

A. No person shall solicit, receive, offer, or pay any remuneration, including but not limited to kickbacks, bribes, rebates, or bed hold payments, directly or indirectly, overtly or covertly, in cash or in kind, for the following:

(1) In return for referring an individual to a health care provider, or for referring an individual to another person for the purpose of referring an individual to a health care provider, for the furnishing or arranging to furnish any good, supply, or service for which payment may be made, in whole or in part, under the medical assistance programs.

(2) In return for purchasing, leasing, or ordering, or for arranging for or recommending purchasing, leasing, or ordering, any good, supply, or service, or facility for which payment may be made, in whole or in part, under the medical assistance programs.

(3) To a recipient of goods, services, or supplies, or his representative, for which payment may be made, in whole or in part, under the medical assistance programs.

(4) To obtain a recipient list, number, name, or any other identifying information.

B. An action brought pursuant to the provisions of this Section shall be instituted within one year of when the department knew that the prohibited conduct occurred. Such prohibited conduct shall be referred to in this Part as "illegal remuneration".

C. By rules and regulations promulgated in accordance with the Administrative Procedure Act, the secretary may provide for additional "safe harbor" exceptions to which the provisions of this Section shall not apply.

D. The following are "safe harbor" exceptions to which the provisions of this Section shall not apply:

(1) A discount or other reduction in price obtained by a health care provider under the medical assistance programs if the reduction in price is properly disclosed to the department and is reflected in the claim made by the health care provider.

Berlin, Ariel 7/20/2017
For Educational Use Only

§ 438.2. Illegal remuneration, LA R.S. 46:438.2

(2) Any amount paid by an employer to an employee, who has a bona fide employment relationship with such employer, for the provision of covered goods, services, or supplies.

(3) Any discount amount paid by a vendor of goods, services, or supplies to a person authorized to act as a purchasing agent for a group of health care providers who are furnishing goods, services, or supplies paid or reimbursed under the medical assistance programs provided the following criteria are met:

(a) The person acting as the purchasing agent has a written contract with each health care provider specifying the amount to be paid to the purchasing agent, which amount may be a fixed amount or a fixed percentage of the value of the purchases made by each such health care provider under the contract, or a combination of both.

(b) The health care provider discloses the information contained in the required written contract to the secretary in such form or manner as required under rules and regulations promulgated by the secretary in accordance with the Administrative Procedure Act.

(4) Any other "safe harbor" exception created by federal or state law or by rule.

**Credits**
Added by Acts 1997, No. 1373, § 1.

LSA-R.S. 46:438.2, LA R.S. 46:438.2
The Civil Code is current through the 2017 Regular Session, for all laws effective through December 31, 2017. All other statutes and codes are current through the 2017 First Extraordinary Session.

End of Document                                           © 2017 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.   2

Roberts, John 7/19/2017
For Educational Use Only

§ 43-13-207. Kickbacks, bribes, rebates prohibited, MS ST § 43-13-207

West's Annotated Mississippi Code
    Title 43. Public Welfare
        Chapter 13. Medical Assistance for the Aged; Medicaid
            Article 5. Medicaid Fraud Control Act

Miss. Code Ann. § 43-13-207

§ 43-13-207. Kickbacks, bribes, rebates prohibited

Currentness

A person shall not solicit, offer or receive a kickback or bribe in the furnishing of goods or services for which payment is or may be made in whole or in part pursuant to the Medicaid program, or make or receive any such payment, or receive a rebate of a fee or charge for referring an individual to another person for the furnishing of such goods or services.

**Credits**

Laws 1984, Ch. 503, § 4, eff. from and after passage (approved May 15, 1984).

Miss. Code Ann. § 43-13-207, MS ST § 43-13-207

The Statutes and Constitution are current with laws from the 2017 Regular Session effective upon passage as approved through July 1, 2017. The statutes are subject to changes provided by the Joint Legislative Committee on Compilation, Revision and Publication of Legislation.

**End of Document**                              © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Roberts, John 7/19/2017
For Educational Use Only

191.905. False statement to receive health care payment..., MO ST 191.905

---

Vernon's Annotated Missouri Statutes
  Title XII. Public Health and Welfare
    Chapter 191. Health and Welfare (Refs & Annos)
      Health Care Payment Fraud and Abuse

V.A.M.S. 191.905

191.905. False statement to receive health care payment prohibited--kickback, bribe, purpose, prohibited,
exceptions--abuse prohibited--penalty--prosecution, procedure--Medicaid fraud reimbursement
fund created--restitution--civil penalty--notification to disciplinary agencies--civil action authorized

Effective: January 1, 2017
Currentness

1. No health care provider shall knowingly make or cause to be made a false statement or false representation of a
material fact in order to receive a health care payment, including but not limited to:

(1) Knowingly presenting to a health care payer a claim for a health care payment that falsely represents that the health
care for which the health care payment is claimed was medically necessary, if in fact it was not;

(2) Knowingly concealing the occurrence of any event affecting an initial or continued right under a medical assistance
program to have a health care payment made by a health care payer for providing health care;

(3) Knowingly concealing or failing to disclose any information with the intent to obtain a health care payment to which
the health care provider or any other health care provider is not entitled, or to obtain a health care payment in an amount
greater than that which the health care provider or any other health care provider is entitled;

(4) Knowingly presenting a claim to a health care payer that falsely indicates that any particular health care was provided
to a person or persons, if in fact health care of lesser value than that described in the claim was provided.

2. No person shall knowingly solicit or receive any remuneration, including any kickback, bribe, or rebate, directly or
indirectly, overtly or covertly, in cash or in kind in return for:

(1) Referring another person to a health care provider for the furnishing or arranging for the furnishing of any health
care; or

(2) Purchasing, leasing, ordering or arranging for or recommending purchasing, leasing or ordering any health care.

---

Roberts, John 7/19/2017
For Educational Use Only

191.905. False statement to receive health care payment..., MO ST 191.905

3. No person shall knowingly offer or pay any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind, to any person to induce such person to refer another person to a health care provider for the furnishing or arranging for the furnishing of any health care.

4. Subsections 2 and 3 of this section shall not apply to a discount or other reduction in price obtained by a health care provider if the reduction in price is properly disclosed and appropriately reflected in the claim made by the health care provider to the health care payer, or any amount paid by an employer to an employee for employment in the provision of health care.

5. Exceptions to the provisions of subsections 2 and 3 of this section shall be provided for as authorized in 42 U.S.C. Section 1320a-7b(3)(E), as may be from time to time amended, and regulations promulgated pursuant thereto.

6. No person shall knowingly abuse a person receiving health care.

7. A person who violates subsections 1 to 3 of this section is guilty of a class D felony upon his or her first conviction, and shall be guilty of a class B felony upon his or her second and subsequent convictions. Any person who has been convicted of such violations shall be referred to the Office of Inspector General within the United States Department of Health and Human Services. The person so referred shall be subject to the penalties provided for under 42 U.S.C. Chapter 7, Subchapter XI, Section 1320a-7. A prior conviction shall be pleaded and proven as provided by section 558.021. A person who violates subsection 6 of this section shall be guilty of a class D felony, unless the act involves no physical, sexual or emotional harm or injury and the value of the property involved is less than five hundred dollars, in which event a violation of subsection 6 of this section is a class A misdemeanor.

8. Any natural person who willfully prevents, obstructs, misleads, delays, or attempts to prevent, obstruct, mislead, or delay the communication of information or records relating to a violation of sections 191.900 to 191.910 is guilty of a class E felony.

9. Each separate false statement or false representation of a material fact proscribed by subsection 1 of this section or act proscribed by subsection 2 or 3 of this section shall constitute a separate offense and a separate violation of this section, whether or not made at the same or different times, as part of the same or separate episodes, as part of the same scheme or course of conduct, or as part of the same claim.

10. In a prosecution pursuant to subsection 1 of this section, circumstantial evidence may be presented to demonstrate that a false statement or claim was knowingly made. Such evidence of knowledge may include but shall not be limited to the following:

(1) A claim for a health care payment submitted with the health care provider's actual, facsimile, stamped, typewritten or similar signature on the claim for health care payment;

Roberts, John 7/19/2017
For Educational Use Only

191.905. False statement to receive health care payment..., MO ST 191.905

(2) A claim for a health care payment submitted by means of computer billing tapes or other electronic means;

(3) A course of conduct involving other false claims submitted to this or any other health care payer.

11. Any person convicted of a violation of this section, in addition to any fines, penalties or sentences imposed by law, shall be required to make restitution to the federal and state governments, in an amount at least equal to that unlawfully paid to or by the person, and shall be required to reimburse the reasonable costs attributable to the investigation and prosecution pursuant to sections 191.900 to 191.910. All of such restitution shall be paid and deposited to the credit of the "MO HealthNet Fraud Reimbursement Fund", which is hereby established in the state treasury. Moneys in the MO HealthNet fraud reimbursement fund shall be divided and appropriated to the federal government and affected state agencies in order to refund moneys falsely obtained from the federal and state governments. All of such cost reimbursements attributable to the investigation and prosecution shall be paid and deposited to the credit of the "MO HealthNet Fraud Prosecution Revolving Fund", which is hereby established in the state treasury. Moneys in the MO HealthNet fraud prosecution revolving fund may be appropriated to the attorney general, or to any prosecuting or circuit attorney who has successfully prosecuted an action for a violation of sections 191.900 to 191.910 and been awarded such costs of prosecution, in order to defray the costs of the attorney general and any such prosecuting or circuit attorney in connection with their duties provided by sections 191.900 to 191.910. No moneys shall be paid into the MO HealthNet fraud protection revolving fund pursuant to this subsection unless the attorney general or appropriate prosecuting or circuit attorney shall have commenced a prosecution pursuant to this section, and the court finds in its discretion that payment of attorneys' fees and investigative costs is appropriate under all the circumstances, and the attorney general and prosecuting or circuit attorney shall prove to the court those expenses which were reasonable and necessary to the investigation and prosecution of such case, and the court approves such expenses as being reasonable and necessary. Any moneys remaining in the MO HealthNet fraud reimbursement fund after division and appropriation to the federal government and affected state agencies shall be used to increase MO HealthNet provider reimbursement until it is at least one hundred percent of the Medicare provider reimbursement rate for comparable services. The provisions of section 33.080 notwithstanding, moneys in the MO HealthNet fraud prosecution revolving fund shall not lapse at the end of the biennium.

12. A person who violates subsections 1 to 3 of this section shall be liable for a civil penalty of not less than five thousand dollars and not more than ten thousand dollars for each separate act in violation of such subsections, plus three times the amount of damages which the state and federal government sustained because of the act of that person, except that the court may assess not more than two times the amount of damages which the state and federal government sustained because of the act of the person, if the court finds:

(1) The person committing the violation of this section furnished personnel employed by the attorney general and responsible for investigating violations of sections 191.900 to 191.910 with all information known to such person about the violation within thirty days after the date on which the defendant first obtained the information;

(2) Such person fully cooperated with any government investigation of such violation; and

191.905. False statement to receive health care payment..., MO ST 191.905

(3) At the time such person furnished the personnel of the attorney general with the information about the violation, no criminal prosecution, civil action, or administrative action had commenced with respect to such violation, and the person did not have actual knowledge of the existence of an investigation into such violation.

13. Upon conviction pursuant to this section, the prosecution authority shall provide written notification of the conviction to all regulatory or disciplinary agencies with authority over the conduct of the defendant health care provider.

14. The attorney general may bring a civil action against any person who shall receive a health care payment as a result of a false statement or false representation of a material fact made or caused to be made by that person. The person shall be liable for up to double the amount of all payments received by that person based upon the false statement or false representation of a material fact, and the reasonable costs attributable to the prosecution of the civil action. All such restitution shall be paid and deposited to the credit of the MO HealthNet fraud reimbursement fund, and all such cost reimbursements shall be paid and deposited to the credit of the MO HealthNet fraud prosecution revolving fund. No reimbursement of such costs attributable to the prosecution of the civil action shall be made or allowed except with the approval of the court having jurisdiction of the civil action. No civil action provided by this subsection shall be brought if restitution and civil penalties provided by subsections 11 and 12 of this section have been previously ordered against the person for the same cause of action.

15. Any person who discovers a violation by himself or herself or such person's organization and who reports such information voluntarily before such information is public or known to the attorney general shall not be prosecuted for a criminal violation.

**Credits**

(L.1994, H.B. No. 1427, § A(§ 2). Amended by L.2002, H.B. No. 1888, § A; L.2007, S.B. No. 577, § A; L.2014, S.B. No. 491, § A, eff. Jan. 1, 2017.)

Notes of Decisions (11)

V. A. M. S. 191.905, MO ST 191.905
Statutes are current with emergency legislation approved through March 30, 2017, of the 2017 First Regular Session of the 99th General Assembly. Constitution is current through the November 8, 2016 General Election.

**End of Document**
© 2017 Thomson Reuters. No claim to original U.S. Government Works.

HEALTH CARE PROVIDERS—MEDICAL ASSISTANCE..., 1994 Mo. Legis. Serv...

Case 1:11-cv-00071-RGC  Document 237-105  Filed 08/31/18  Page 242 of 312

1994 Mo. Legis. Serv. H.B. 1427 (VERNON'S)

MISSOURI 1994 LEGISLATIVE SERVICE
Eighty-Seventh General Assembly, Second Regular Session

Additions are indicated by <<+ Text +>>; deletions by
<<- Text ->>. Changes in tables are made but not highlighted.

H.B. No. 1427
West's No. 129
HEALTH CARE PROVIDERS—MEDICAL ASSISTANCE PROGRAMS—FRAUD

AN ACT to repeal section 197.020, RSMo 1986, and section 191.227, RSMo Supp. 1993, relating to health care, and to enact in lieu thereof five new sections relating to the same subject, with penalty provisions.

Be it enacted by the General Assembly of the State of Missouri, as follows:

Section A. Section 197.020, RSMo 1986, and section 191.227, RSMo Supp. 1993, are repealed and five new sections enacted in lieu thereof, to be known as sections 191.227, 197.020, 1, 2, and 3, to read as follows:

<< MO ST 191.227 >>

191.227. 1. All physicians, chiropractors, <<+hospitals,+>> dentists, and other duly licensed practitioners in this state, herein called "providers", shall, upon written request of a patient, or guardian or legally authorized representative of a patient, furnish a copy of his record of that patient's health history and treatment rendered to the person submitting a written request, except that such right shall be limited to access consistent with the patient's condition and sound therapeutic treatment as determined by the provider. <<+Beginning August 28, 1994,+>> such record shall be furnished within a reasonable time of the receipt of the request therefor and upon payment of a <<-reasonable fee, which fee shall not exceed the actual cost of time and materials used to compile, duplicate and furnish such record.->> <<+handling fee of fifteen dollars plus a fee of thirty-five cents per page for copies of documents made on a standard photocopy machine.+>>

<<+2. Notwithstanding provisions of this section to the contrary, providers may charge for the reasonable cost of all duplications of medical record material or information which cannot routinely be copied or duplicated on a standard commercial photocopy machine.+>>

<<-2.->><<+3.+>> The transfer of the patient's record done in good faith shall not render the provider liable to the patient or any other person for any consequences which resulted or may result from disclosure of the patient's record as required by this section.

<< MO ST 197.020 >>

197.020. 1. "Governmental unit" means any county, municipality or other political subdivision or any department, division, board or other agency of any of the foregoing.

2. "Hospital" means a place devoted primarily to the maintenance and operation of facilities for the diagnosis, treatment or care for not less than twenty-four <<+consecutive+>> hours in any week of three or more nonrelated individuals suffering from illness, disease, injury, deformity or other abnormal physical conditions; or a place devoted primarily to provide for not less than twenty-four <<+consecutive+>> hours in any week medical or nursing care for three or more nonrelated individuals. The term "hospital" does not include convalescent, nursing, shelter or boarding homes as defined in chapter 198, RSMo.

3. "Person" means any individual, firm, partnership, corporation, company or association and the legal successors thereof.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.   1

<<+Section 1. As used in sections 1 to 3 of this act, the following terms mean:+>>

<<+(1) "Abuse", the infliction of physical, sexual or emotional harm or injury. Abuse includes the taking, obtaining, using, transferring, concealing, appropriating or taking possession of property of another person without such person's consent;+>>

<<+(2) "Claim", any attempt to cause a health care payer to make a health care payment;+>>

<<+(3) "False", wholly or partially untrue. A false statement or false representation of a material fact means the failure to reveal material facts in a manner which is intended to deceive a health care payer with respect to a claim;+>>

<<+(4) "Health care", any service, assistance, care, product, device or thing, provided pursuant to a medical assistance program, or for which payment is requested or received, in whole or part, pursuant to a medical assistance program;+>>

<<+(5) "Health care payer", a medical assistance program, or any person reviewing, adjusting, approving or otherwise handling claims for health care on behalf of or in connection with a medical assistance program;+>>

<<+(6) "Health care payment", a payment made, or the right under a medical assistance program to have a payment made, by a health care payer for a health care service;+>>

<<+(7) "Health care provider", any person delivering, or purporting to deliver, any health care, and including any employee, agent or other representative of such a person;+>>

<<+(8) "Medical assistance program", any program to provide or finance health care to recipients which is established pursuant to title 42 of the United States Code, any successor federal health insurance program, or a waiver granted thereunder. A medical assistance program may be funded either solely by state funds or by state and federal funds jointly. The term "medical assistance program" shall include the medical assistance program provided by section 208.151, RSMo et seq., and any state agency or agencies administering all or any part of such a program;+>>

<<+(9) "Person", a natural person, corporation, partnership, association or any legal entity.+>>

<<+Section 2. 1. No health care provider shall knowingly make or cause to be made a false statement or false representation of a material fact in order to receive a health care payment, including but not limited to:+>>

<<+(1) Knowingly presenting to a health care payer a claim for a health care payment that falsely represents that the health care for which the health care payment is claimed was medically necessary, if in fact it was not;+>>

<<+(2) Knowingly concealing the occurrence of any event affecting an initial or continued right under a medical assistance program, to have a health care payment made by a health care payer for providing health care;+>>

<<+(3) Knowingly concealing or failing to disclose any information with the intent to obtain a health care payment to which the health care provider or any other health care provider is not entitled, or to obtain a health care payment in an amount greater than that which the health care provider or any other health care provider is entitled;+>>

<<+(4) Knowingly presenting a claim to a health care payer that falsely indicates that any particular health care was provided to a person or persons, if in fact health care of lesser value than that described in the claim was provided.+>>

<<+2. No person shall knowingly solicit or receive any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for:+>>

<<+(1) Referring another person to a health care provider for the furnishing or arranging for the furnishing of any health care; or+>>

<<+(2) Purchasing, leasing, ordering or arranging for or recommending purchasing, leasing or ordering any health care.+>>

<<+3. No person shall knowingly offer or pay any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer another person to a health care provider for the furnishing or arranging for the furnishing of any health care.+>>

<<+4. Subsections 2 and 3 of this section shall not apply to a discount or other reduction in price obtained by a health care provider if the reduction in price is properly disclosed and appropriately reflected in the claim made by the health care provider to the health care payer, or any amount paid by an employer to an employee for employment in the provision of health care.+>>

<<+5. Exceptions to the provisions of subsections 2 and 3 of this subsection shall be provided for as authorized in 42 U.S.C. section 1320a–7b(3)(E), as may be from time to time amended and regulations promulgated pursuant thereto. +>>

<<+6. No person shall knowingly abuse a person receiving health care.+>>

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

HEALTH CARE PROVIDERS—MEDICAL ASSISTANCE..., 1994 Mo. Legis. Serv....

Case 1:11-cv-00071-RGC  Document 237-105  Filed 08/31/18  Page 244 of 312

<<+7. A person who violates subsections 1 to 4 of this section is guilty of a class D felony upon his first conviction, and shall be guilty of a class C felony upon his second and subsequent convictions. A prior conviction shall be pleaded and proven as provided by section 558.021, RSMo. A person who violates subsection 6 of this section shall be guilty of a class C felony, unless the act involves no physical, sexual or emotional harm or injury and the value of the property involved is less than one hundred fifty dollars, in which event a violation of subsection 6 of this section is a class A misdemeanor.+>>

<<+8. Each separate false statement or false representation of a material fact proscribed by subsection 1 of this section or act proscribed by subsection 2 or 3 of this section shall constitute a separate offense and a separate violation of this section, whether or not made at the same or different times, as part of the same or separate episodes, as part of the same scheme or course of conduct, or as part of the same claim.+>>

<<+9. In a prosecution under subsection 1 of this section, circumstantial evidence may be presented to demonstrate that a false statement or claim was knowingly made. Such evidence of knowledge may include but shall not be limited to the following:+>>

<<+(1) A claim for a health care payment submitted with the health care provider's actual, facsimile, stamped, typewritten or similar signature on the claim for health care payment;+>>

<<+(2) A claim for a health care payment submitted by means of computer billing tapes or other electronic means;+>>

<<+(3) A course of conduct involving other false claims submitted to this or any other health care payer.+>>

<<+10. Any person convicted of a violation of this section, in addition to any fines, penalties or sentences imposed by law, shall be required to make restitution to the federal and state governments, in an amount at least equal to that unlawfully paid to or by the person, and shall be required to reimburse the reasonable costs attributable to the investigation and prosecution pursuant to sections 1 to 3 of this act. All of such restitution shall be paid and deposited to the credit of the "Medicaid Fraud Reimbursement Fund", which is hereby established in the state treasury. Moneys in the medicaid fraud reimbursement fund shall be divided and appropriated to the federal government and affected state agencies in order to refund moneys falsely obtained from the federal and state governments. All of such cost reimbursements attributable to the investigation and prosecution shall be paid and deposited to the credit of the "Medicaid Fraud Prosecution Revolving Fund", which is hereby established in the state treasury. Moneys in the medicaid fraud prosecution revolving fund may be appropriated to the attorney general, or to any prosecuting or circuit attorney who has successfully prosecuted an action for a violation of sections 1 to 3 of this act and been awarded such costs of prosecution, in order to defray the costs of the attorney general and any such prosecuting or circuit attorney in connection with their duties provided by sections 1 to 3 of this act. No monies shall be paid into the medicaid fraud protection revolving fund pursuant to this subsection unless the attorney general or appropriate prosecuting or circuit attorney shall have commenced a prosecution pursuant to this section, and the court finds in its discretion that payment of attorneys' fees and investigative costs is appropriate under all the circumstances, and the attorney general and prosecuting or circuit attorney shall prove to the court those expenses which were reasonable and necessary to the investigation and prosecution of such case, and the court approves such expenses as being reasonable and necessary. The provisions of section 33.080, RSMo, notwithstanding, moneys in the medicaid fraud prosecution revolving fund shall not lapse at the end of the biennium.+>>

<<+11. A person who violates subsections 1 to 4 of this section shall be liable for a civil penalty of not less than five thousand dollars and not more than ten thousand dollars for each separate act in violation of such subsections, plus three times the amount of damages which the state and federal government sustained because of the act of that person, except that the court may assess not more than two times the amount of damages which the state and federal government sustained because of the act of the person, if the court finds:+>>

<<+(1) The person committing the violation of this section furnished personnel employed by the attorney general and responsible for investigating violations of sections 1 to 3 of this act with all information known to such person about the violation within thirty days after the date on which the defendant first obtained the information;+>>

<<+(2) Such person fully cooperated with any government investigation of such violation; and+>>

<<+(3) At the time such person furnished the personnel of the attorney general with the information about the violation, no criminal prosecution, civil action, or administrative action had commenced with respect to such violation, and the person did not have actual knowledge of the existence of an investigation into such violation.+>>

HEALTH CARE PROVIDERS—MEDICAL ASSISTANCE..., 1994 Mo. Legis. Serv...

Case 1:11-cv-00071-RGC  Document 237-105  Filed 08/31/18  Page 245 of 312

<<+12. Upon conviction under this section, the prosecution authority shall provide written notification of the conviction to all regulatory or disciplinary agencies with authority over the conduct of the defendant health care provider. +>>

<<+13. The attorney general may bring a civil action against any person who shall receive a health care payment as a result of a false statement or false representation of a material fact made or caused to be made by that person. The person shall be liable for up to double the amount of all payments received by that person based upon the false statement or false representation of a material fact, and the reasonable costs attributable to the prosecution of the civil action. All such restitution shall be paid and deposited to the credit of the medicaid fraud reimbursement fund, and all such cost reimbursements shall be paid and deposited to the credit of the medicaid fraud prosecution revolving fund. No reimbursement of such costs attributable to the prosecution of the civil action shall be made or allowed except with the approval of the court having jurisdiction of the civil action. No civil action provided by this subsection shall be brought if restitution and civil penalties provided by subsections 10 and 11 of this section have been previously ordered against the person for the same cause of action.+>>

<<+Section 3. 1. The attorney general shall have authority to investigate alleged or suspected violations of sections 1 to 3 of this act, and shall have all powers provided by sections 407.040 to 407.090, RSMo, in connection with investigations of alleged or suspected violations of sections 1 to 3 of this act, as if the acts enumerated in subsections 1 to 3 of section 2 of this act are unlawful acts proscribed by chapter 407, RSMo, provided that if the attorney general exercises such powers, the provisions of section 407.070, RSMo, shall also be applicable; and may exercise all of the powers provided by subsections 1 and 2 of section 578.387, RSMo, in connection with investigations of alleged or suspected violations of sections 1 to 3 of this act, as if the acts enumerated in subsections 1 to 3 of section 2 of this act involve "public assistance" as defined by section 578.375, RSMo. The attorney general and his authorized investigators shall be authorized to serve all subpoenas and civil process related to the enforcement of sections 1 to 3 of this act and chapter 407, RSMo. In order for the attorney general to commence a state prosecution for violations of sections 1 to 3 of this act, the attorney general shall prepare and forward a report of the violations to the appropriate prosecuting attorney. Upon receiving a referral, the prosecuting attorney shall either commence a prosecution based on the report by the filing of a complaint, information, or indictment within sixty days of receipt of said report or shall file a written statement with the attorney general explaining why criminal charges should not be brought. This time period may be extended by the prosecuting attorney with the agreement of the attorney general for an additional sixty days. If the prosecuting attorney commences a criminal prosecution, the attorney general or his designee shall be permitted by the court to participate as a special assistant prosecuting attorney in settlement negotiations and all court proceedings, subject to the authority of the prosecuting attorney, for the purpose of providing such assistance as may be necessary. If the prosecuting attorney fails to commence a prosecution and fails to file a written statement listing the reasons why criminal charges should not be brought within the appropriate time period, or declines to prosecute on the basis of inadequate office resources, the attorney general shall have authority to commence prosecutions for violations of section 1 to 3 of this act. In cases where a defendant pursuant to a common scheme or plan has committed acts which constitute or would constitute violations of sections 1 to 3 of this act in more than one state, the attorney general shall have the authority to represent the state of Missouri in any plea agreement which resolves all criminal prosecutions within and without the state, and such agreement shall be binding on all state prosecutors.+>>

<<+2. In any investigation, hearing or other proceeding pursuant to sections 1 to 3 of this act, any record in the possession or control of a health care provider, or in the possession or control of another person on behalf of a health care provider including but not limited to any record relating to patient care, business or accounting records, payroll records and tax records, whether written or in an electronic format, shall be made available by the health care provider to the attorney general or the court, and shall be admissible into evidence, regardless of any statutory or common law privilege which such health care provider, record custodian or patient might otherwise invoke or assert. The provisions of section 326.151, RSMo, shall not apply to actions brought pursuant to sections 1 to 3 of this act. The attorney general shall not disclose any record obtained pursuant to this section, other than in connection with a proceeding instituted or pending in any court or administrative agency. The access, provision, use, and disclosure of records or material subject to the provisions of 42 U.S.C. section 290dd–2 shall be subject to said section, as may be amended from time to time, and to regulations promulgated pursuant to said section.+>>

HEALTH CARE PROVIDERS—MEDICAL ASSISTANCE..., 1994 Mo. Legis. Serv...

Case 1:11-cv-00071-RGG Document 237-105 Filed 08/31/18 Page 246 of 312

   <<+3. Sections 1 to 3 of this act shall not be construed to prohibit or limit any other criminal or civil action against a health care provider for the violation of any other law. Any complaint, investigation or report received or completed pursuant to sections 198.070 and 198.090, RSMo, subsection 2 of section 205.967, RSMo, sections 375.991 to 375.994, RSMo, section 578.387, RSMo, or sections 660.300 and 660.305, RSMo, which indicates a violation of sections 1 to 3 of this act, shall be referred to the attorney general. A referral to the attorney general pursuant to this subsection shall not preclude the agencies charged with enforcing the foregoing sections from conducting investigations, providing protective services or taking administrative action regarding the complaint, investigation or report referred to the attorney general, as may be provided by such sections; provided that all material developed by the attorney general in the course of an investigation pursuant to sections 1 to 3 of this act shall not be subject to subpoena, discovery, or other legal or administrative process in the course of any such administrative action. Sections 1 to 3 of this act take precedence over the provisions of sections 198.070 and 198.090, RSMo, subsection 2 of section 205.967, RSMo, sections 375.991 to 375.994, RSMo, section 578.387, RSMo, and sections 660.300 and 660.305, RSMo, to the extent such provisions are inconsistent or overlap.+>>

Approved July 6, 1994.

Effective 90 days after adjournment.

MO LEGIS H.B. 1427 (1994)

---

**End of Document**
© 2017 Thomson Reuters. No claim to original U.S. Government Works.

---

West's Montana Code Annotated
  Title 45. Crimes (Refs & Annos)
    Chapter 6. Offenses Against Property
      Part 3. Theft and Related Offenses

MCA 45-6-313

45-6-313. Medicaid fraud

Currentness

(1) A person commits the offense of medicaid fraud when:

(a) the person obtains a medicaid payment or benefit for the person or another person by purposely or knowingly making, submitting, or authorizing the making or submitting of a false or misleading medicaid claim, statement, representation, application, or document to a medicaid agency for a service or item that the person is not entitled to under applicable statutes or under rules adopted under Title 2, chapter 4;

(b) the person purposely or knowingly:

(i) solicits, accepts, offers, or provides any remuneration, including but not limited to a kickback, bribe, or rebate, other than an amount legally payable under the medical assistance program, for furnishing services or items for which payment may be made under the medicaid program or in return for purchasing, leasing, ordering, arranging for, or recommending the purchasing, leasing, or ordering of any services or items from a provider for which payment may be made under the medicaid program; or

(ii) makes, offers, or accepts a remuneration, a rebate of a fee, or a charge for referring a recipient to another provider for the furnishing of services or items for which payment may be made under the medicaid program; or

(c) the person, with respect to a managed care contract, health maintenance organization contract, or similar contract or subcontract under the medicaid program, purposely or knowingly fails or refuses to provide covered medically necessary services to eligible recipients as required by the contract.

(2) Any conduct or activity that does not violate or that is protected under the provisions of, or federal regulations adopted under, 42 U.S.C. 1395nn or 42 U.S.C. 1320a-7b(b), as may be amended, is not considered an offense under subsection (1)(b), and the conduct or activity must be accorded the same protections allowed under federal laws and regulations.

(3) In a prosecution for a violation of this section, it is a defense if the person acted in reliance upon the written authorization or advice of the department.

---

Roberts, John 7/19/2017
For Educational Use Only

(4)(a) A person convicted of the offense of medicaid fraud involving payments, benefits, or claims not exceeding $1,500 in value shall be fined an amount not to exceed $1,500 or be imprisoned in the county jail for a term not to exceed 6 months, or both. A person convicted of a second offense shall be fined $1,500 and be imprisoned in the county jail for a term not less than 10 days or more than 6 months. A person convicted of a third or subsequent offense shall be fined $1,500 and be imprisoned in the county jail for a term not less than 30 days or more than 1 year.

(b) A person convicted of the offense of medicaid fraud involving payments, benefits, or claims exceeding $1,500 in value shall be fined an amount not to exceed the greater of $50,000 or 10 times the value of the payments obtained or be imprisoned in the state prison for a term not to exceed 10 years, or both.

(c) For purposes of imposing sentence for a conviction under subsection (1)(b), the value of payments or benefits involved is the greater of the value of medicaid payments or benefits received as a result of the illegal conduct or activity or the value of the remuneration, rebate, or charge involved.

(d) Amounts involved in medicaid fraud committed pursuant to a common scheme or the same transaction may be aggregated in determining the value involved.

(e) A person convicted of the offense of medicaid fraud must be suspended from participation in the medicaid program:

(i) for any period of time not less than 1 year for a first offense, or the person may be permanently terminated from participation in the medical assistance program;

(ii) for any period of time not less than 3 years for a second offense, or the person may be permanently terminated from participation in the medical assistance program; or

(iii) permanently for a third offense.

(5) In addition to any other penalty provided by law, a person convicted of medicaid fraud is not entitled to bill or collect from the recipient, the medicaid program, or any other third-party payor for the services or items involved and shall repay to the medicaid program any payments or benefits obtained by any person for the services or items involved.

(6) The establishment of the criminal offenses specified in this section does not preclude the application of any other provision of law.

**Credits**

Enacted by Laws 1995, ch. 354, § 7. Amended by Laws 1999, ch. 397, § 9; amended by Laws 2005, ch. 185, § 1; amended by Laws 2009, ch. 473, § 9, eff. Oct. 1, 2009.

**45-6-313. Medicaid fraud, MT ST 45-6-313**

---

Notes of Decisions (6)

MCA 45-6-313, MT ST 45-6-313

Current through chapters effective, July 1, 2017 session. Statutory changes are subject to classification and revision by the Code Commissioner. Court Rules in the Code are current with amendments received through September 1, 2016.

---

1995 Montana Laws Ch. 354 (S.B. 293)

MONTANA 1995 SESSION LAWS
REGULAR SESSION OF THE 54TH LEGISLATURE

Additions are indicated by <<+ Text +>>; deletions by
<<- Text ->>. Changes in tables are made but not highlighted.

Ch. 354

S.B. No. 293

MEDICAID FRAUD AND ABUSE—RECOVERY OF OVERPAYMENTS, SANCTIONS

AN ACT GENERALLY REVISING THE LAWS RELATED TO MEDICAID FRAUD AND ABUSE, RECOVERY OF MEDICAID OVERPAYMENTS, AND IMPOSITION OF SANCTIONS FOR MEDICAID FRAUD AND ABUSE AND FOR FAILURE OF HEALTH CARE FACILITIES TO COMPLY WITH APPLICABLE STANDARDS AND REQUIREMENTS; ESTABLISHING A MEDICAID FRAUD CONTROL UNIT IN THE DEPARTMENT OF JUSTICE; SPECIFYING THE POWERS AND DUTIES OF THE UNIT; ESTABLISHING CRIMINAL OFFENSES RELATED TO MEDICAID FRAUD; SPECIFYING CERTAIN DUTIES OF MEDICAID APPLICANTS, RECIPIENTS, AND PROVIDERS WITH RESPECT TO THE TRUTH, COMPLETENESS, AND ACCURACY OF DOCUMENTS AND INFORMATION SUBMITTED FOR MEDICAID PURPOSES; SPECIFYING THE SANCTIONS THAT MAY BE APPLIED TO PROVIDERS AND OTHER PERSONS WHO ENGAGE IN MEDICAID FRAUD AND ABUSE AND TO HEALTH CARE FACILITIES THAT FAIL TO COMPLY WITH APPLICABLE STANDARDS AND REQUIREMENTS; AMENDING SECTIONS 45–2–101, 45–2–103, 45–2–104, 50–20–109, 53–6–106, 53–6–107, 53–6–108, 53–6–111, AND 61–5–405, MCA; AND PROVIDING EFFECTIVE DATES.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF MONTANA:

Section 1. Definitions. As used in this part, unless expressly provided otherwise, the following definitions apply:

(1) "Abuse" means conduct by an applicant, recipient, provider, or other person involving disregard of and an unreasonable failure to conform with the statutes, regulations, and rules governing the medical assistance program when the disregard or failure results or may result in an incorrect determination that a person is eligible for medical assistance or payment by a medicaid agency of medical assistance payments to which the provider is not entitled.

(2) "Applicant" means a person:

(a) who has submitted an application for determination of medicaid eligibility to a medicaid agency on the person's own behalf or on behalf of another person; or

(b) on whose behalf an application has been submitted.

(3) "Benefit" means the provision of anything of pecuniary value to or on behalf of a recipient under the medicaid program.

(4) "Claim" means a communication, whether in oral, written, electronic, magnetic, or other form, that is used to claim specific services or items as payable or reimbursable under the medicaid program or that states income, expense, or other information that is or may be used to determine entitlement to or the rate of payment under the medicaid program. The term includes any documents submitted as part of or in support of the claim.

(5) "Department" means the department of social and rehabilitation services provided for in 2–15–2201.

(6) "Document" means any application, claim, form, report, record, writing, or correspondence, whether in written, electronic, magnetic, or other form.

(7) "Fraud" means any conduct or activity prohibited by statute, regulation, or rule involving purposeful or knowing conduct or omission to perform a duty that results in or may result in medicaid payments or benefits to which the

applicant, recipient, or provider is not entitled. Fraud includes but is not limited to any conduct or omission under the medicaid program that would constitute a criminal offense under Title 45, chapter 6 or 7.

(8) "Medicaid" means the Montana medical assistance program established under Title 53, chapter 6.

(9) "Medicaid agency" means any agency or entity of state, county, or local government that administers any part of the medicaid program, whether under direct statutory authority or under contract with an authorized agency of the state or federal government. The term includes but is not limited to the department, the department of health and environmental sciences, the department of corrections and human services, county offices of human services and public welfare, and other local and state agencies and their agents, contractors, and employees, when acting with respect to medicaid eligibility, claims processing or payment, utilization review, case management, provider certification, investigation, or other administration of the medicaid program.

(10) "Misappropriation of patient property" means exploitation, deliberate misplacement, or wrongful use or taking of a patient's property, whether temporary or permanent, without authorization by the patient or the patient's designated representative. Misappropriation of patient property includes but is not limited to any conduct with respect to a patient's property that would constitute a criminal offense under Title 45, chapter 6, part 3.

(11) "Patient abuse" means the willful infliction of physical or mental injury of a patient or unreasonable confinement, intimidation, or punishment that results in pain, physical or mental harm, or mental anguish of a patient. Patient abuse includes but is not limited to any conduct with respect to a patient that would constitute a criminal offense under Title 45, chapter 5.

(12) "Patient neglect" means a failure, through inattentiveness, carelessness, or other omission, to provide to a patient goods and services necessary to avoid physical harm, mental anguish, or mental illness when an omission is not caused by factors beyond the person's control or by good faith errors in judgment. Patient neglect includes but is not limited to any conduct with respect to a patient that would constitute a criminal offense under 45–5–208.

(13) "Provider" means an individual, company, partnership, corporation, institution, facility, or other entity or business association that has enrolled or applied to enroll as a provider of services or items under the medical assistance program established under this part.

(14) "Recipient" means a person:

(a) who has been determined by a medicaid agency to be eligible for medicaid benefits, whether or not the person actually has received any benefits; or

(b) who actually receives medicaid benefits, whether or not determined eligible.

(15)(a) "Records" means medical, professional, business, or financial information and documents, whether in written, electronic, magnetic, microfilm, or other form:

(i) pertaining to the provision of treatment, care, services, or items to a recipient;

(ii) pertaining to the income and expenses of the provider; or

(iii) otherwise relating to or pertaining to a determination of eligibility for or entitlement to payment or reimbursement under the medicaid program.

(b) The term includes all records and documents, regardless of whether the records are required by medicaid laws, regulations, rules, or policies to be made and maintained by the provider.

Section 2. Medicaid fraud control unit. (1) There is a medicaid fraud control unit in the department of justice. The unit is under the supervision and control of the attorney general and, subject to the availability of appropriated funds, consists of the agents and employees of the department of justice whom the attorney general considers necessary and appropriate, including but not limited to:

(a) persons qualified by education, training, experience, and high professional competence in criminal and civil investigative procedures;

(b) at least one person licensed to practice law in Montana and qualified by education, training, experience, and high professional competence to prosecute crimes; and

(c) auditors and other additional professional and support staff.

(2) The medicaid fraud control unit is a criminal justice agency within the meaning of 44–5–103. Agents designated by the attorney general have peace officer status and authority, including but not limited to search, seizure, and arrest.

Section 3. Powers and duties of medicaid fraud control unit. (1) The medicaid fraud control unit shall:

(a) investigate and prosecute under applicable criminal statutes fraud and abuse by applicants, recipients, providers, or other persons under the medical assistance program established under this chapter, including but not limited to cases referred by the department;

(b) review any complaint of patient abuse, patient neglect, and misappropriation of patient property by providers or their employees or agents and, when appropriate, shall investigate and initiate criminal proceedings or refer the complaint to another state agency for action;

(c) refer to the department for collection and, when appropriate, consideration and imposition of appropriate recipient restrictions or provider sanctions cases involving recipient or provider overpayments, fraud, abuse, inappropriate use of services, or other improper activities discovered by the unit in carrying out its activities;

(d) communicate and cooperate with and, subject to applicable confidentiality laws, provide information to other state and federal agencies involved in the investigation and prosecution of health care fraud, abuse, and other improper activities related to the medicaid program;

(e) transmit to other state and federal agencies, in accordance with law reports of convictions, copies of judgments and sentences imposed and other information and documents for purposes of program exclusions or other sanctions or penalties under medicaid, medicare, or other state or federal benefit or assistance programs; and

(f) recommend to state agencies appropriate or necessary adoption or revision of statutes, regulations, rules, policies, and procedures to prevent fraud, abuse, and other improper activities under the medicaid program and to aid in the investigation and prosecution of fraud, abuse, and other improper activities under the medicaid program.

(2) The medicaid fraud control unit may:

(a) initiate criminal prosecutions related to the medicaid program in any court of competent jurisdiction in the state of Montana;

(b) upon written request, obtain information and records from applicants, recipients, and providers;

(c) exercise the authority granted to prosecutors with respect to criminal investigative subpoenas under Title 46, chapter 4, part 3;

(d) subject to applicable federal confidentiality laws and regulations and for purposes related to any investigation or prosecution related to the medicaid program, obtain from the department, county welfare and human services offices, and other local, county, or state government departments or agencies records and other information, including but not limited to applicant and recipient applications, provider enrollment forms, claims and reports, individual or entity tax returns, or other information provided to or in the possession of the department of revenue or the state auditor;

(e) refer appropriate cases to other state or federal agencies for investigation, prosecution, or imposition of penalties, restrictions, or sanctions;

(f) enter into agreements with the department and other state and federal agencies in furtherance of the unit's mission; and

(g) do all things necessary to comply with 42 U.S.C. 1396a(a)(61) and 42 U.S.C. 1396b(q) and any implementing federal regulations and policies that require the state to operate a medicaid fraud control unit.

Section 4. Cooperation of governmental agencies with medicaid fraud control unit. All local, county, and state departments and agencies shall cooperate with the medicaid fraud control unit and its agents and employees to effectuate the purposes of the unit.

Section 5. Permitted disclosure of information obtained in medicaid fraud control unit investigations. Records, documents, and other information obtained in the course of an investigation by the medicaid fraud control unit or its agents, employees, or attorneys may be disclosed:

(1) in accordance with the Montana Criminal Justice Information Act of 1979, as provided in Title 44, chapter 5; and

(2) to a medicaid agency for purposes related to administration of the medicaid program.

Section 6. Truthfulness, completeness, and accuracy of submissions to medicaid agencies. (1) A person who submits to a medicaid agency an application, claim, report, document, or other information that is or may be used to determine eligibility for medicaid benefits, eligibility to participate as a provider, or the right to or the amount of payment under the medicaid program is considered to represent to the department, to the best of the person's knowledge and belief, that the item is genuine and that its contents, including all statements, claims, and representations contained in the document, are true, complete, accurate, and not misleading.

(2)(a) A provider has a duty to exercise reasonable care to ensure the truthfulness, completeness, and accuracy of all applications, claims, reports, documents, and other information and of all statements and representations made or submitted, or authorized by the provider to be made or submitted, to the department for purposes related to the medicaid program. The duty applies whether the applications, claims, reports, documents, other information, statements, or representations were made or submitted, or authorized by the provider to be made or submitted, on behalf of the provider or on behalf of an applicant or recipient being served by the provider.

(b) A provider has a duty to exercise reasonable care to ensure that a claim made or submitted to the department or its agents or employees for payment or reimbursement under the medicaid program is one for which the provider is entitled to receive payment and that the service or item is provided and billed according to all applicable medicaid requirements, including but not limited to identification of the appropriate procedure code or level of service and provision of the service by a person, facility, or other provider entitled to receive medicaid payment for the particular service.

(3) A person is considered to have known that a claim, statement, or representation related to the medicaid program was false if the person knew, or by virtue of the person's position, authority, or responsibility should have known, of the falsity of the claim, statement, or representation.

(4) A person is considered to have made or to have authorized to be made a claim, statement, or representation if the person:

(a) had the authority or responsibility to:

(i) make the claim, statement, or representation;

(ii) supervise another who made the claim, statement, or representation; or

(iii) authorize the making of the claim, statement, or representation, whether by operation of law, business or professional practice, or office policy or procedure; and

(b) exercised or failed to exercise that authority or responsibility and, as a direct or indirect result, the false statement was made, resulting in a claim for a service or item when the person knew or had reason to know that the person was not entitled under applicable statutes, regulations, rules, or policies to medicaid payment or benefits for the service or item or for the amount of payment requested or claimed.

(5)(a) There is an inference that a person who signs or submits a document to a medicaid agency on behalf of or in the name of a provider is authorized by the provider to do so and is acting under the provider's direction.

(b) For purposes of this section, the term "signs" includes but is not limited to the use of facsimile, computer-generated and typed, or block-letter signatures.

(6) The department shall directly or by contract provide a program of instruction and assistance to persons submitting applications, claims, reports, documents, and other information to the department concerning the completion and submission of the application, claim, report, document, or other information in a manner determined necessary by the department. The program must include:

(a) clear directions for the completion of applications, claims, reports, documents, and other information;

(b) examples of properly completed applications, claims, reports, documents, and other information;

(c) a method by which persons submitting applications, claims, reports, documents, and other information may, on a case-by-case basis, receive accurate, complete, specific, and timely advice and directions from the department before the completed applications, claims, reports, documents, and other information must be submitted to the department; and

(d) a method by which persons submitting applications, claims, reports, documents, and other information may challenge the department's interpretation or application of the manner in which the applications, claims, reports, documents, and other information must be completed.

(7) This section applies only for the purpose of civil liability under Title 53 and does not apply in a criminal proceeding.

Section 7. Medicaid fraud. (1) A person commits the offense of medicaid fraud when:

(a) the person obtains a medicaid payment or benefit for the person or another person by purposely or knowingly:

(i) making, submitting, or authorizing the making or submitting of a false or misleading medicaid claim, statement, representation, application, or document to a medicaid agency for a service or item when the person knows or has reason to know that the person is not entitled under applicable statutes, regulations, rules, or policies to medicaid payment or benefits for the service or item or for the amount of payment requested or claimed; or

(ii) making, submitting, or authorizing the making or submitting of a medicaid claim, statement, representation, application, or document under the medicaid program for a service or item when the person knows or has reason to know that the person is not entitled under applicable statutes, regulations, rules, or policies to medicaid payment or benefit for the service or item or for the amount of payment requested or claimed;

(b) the person purposely or knowingly:

(i) solicits, accepts, offers, or provides any remuneration, including but not limited to a kickback, bribe, or rebate, other than an amount legally payable under the medical assistance program, for furnishing services or items for which payment may be made under the medicaid program or in return for purchasing, leasing, ordering, arranging for, or recommending the purchasing, leasing, or ordering of any services or items from a provider for which payment may be made under the medicaid program; or

(ii) makes, offers, or accepts a remuneration, a rebate of a fee, or a charge for referring a recipient to another provider for the furnishing of services or items for which payment may be made under the medicaid program; or

(c) the person, with respect to a managed care contract, health maintenance organization contract, or similar contract or subcontract under the medicaid program, purposely or knowingly fails or refuses to provide covered medically necessary services to eligible recipients as required by the contract.

(2) Any conduct or activity that does not violate or that is protected under the provisions of, or federal regulations adopted under, 42 U.S.C. 1395nn or 42 U.S.C. 1320a–7b(b), as may be amended, is not considered an offense under subsection (1)(b), and the conduct or activity must be accorded the same protections allowed under federal laws and regulations.

(3) In a prosecution for a violation of this section, it is a defense if the person acted in reliance upon the written authorization or advice of the department.

(4)(a) A person convicted of the offense of medicaid fraud involving payments, benefits, or claims not exceeding $500 in value shall be fined an amount not to exceed $500 or be imprisoned in the county jail for a term not to exceed 6 months, or both. A person convicted of a second offense shall be fined $500 and be imprisoned in the county jail for a term not less than 10 days or more than 6 months. A person convicted of a third or subsequent offense shall be fined $1,000 and be imprisoned in the county jail for a term not less than 30 days or more than 1 year.

(b) A person convicted of the offense of medicaid fraud involving payments, benefits, or claims exceeding $500 in value shall be fined an amount not to exceed the greater of $50,000 or 10 times the value of the payments obtained or be imprisoned in the state prison for a term not to exceed 10 years, or both.

(c) For purposes of imposing sentence for a conviction under subsection (1)(b), the value of payments or benefits involved is the greater of the value of medicaid payments or benefits received as a result of the illegal conduct or activity or the value of the remuneration, rebate, or charge involved.

(d) Amounts involved in medicaid fraud committed pursuant to a common scheme or the same transaction may be aggregated in determining the value involved.

(e) A person convicted of the offense of medicaid fraud must be suspended from participation in the medicaid program:

(i) for any period of time not less than 1 year for a first offense, or the person may be permanently terminated from participation in the medical assistance program;

(ii) for any period of time not less than 3 years for a second offense, or the person may be permanently terminated from participation in the medical assistance program; or

(iii) permanently for a third offense.

(5) In addition to any other penalty provided by law, a person convicted of medicaid fraud is not entitled to bill or collect from the recipient, the medicaid program, or any other third-party payor for the services or items involved and shall repay to the medicaid program any payments or benefits obtained by any person for the services or items involved.

(6) The establishment of the criminal offenses specified in this section does not preclude the application of any other provision of law.

Section 8. Section 45–2–101, MCA, is amended to read:

<< MT ST 45–2–101 >>

"45–2–101. General definitions. Unless otherwise specified in the statute, all words will be taken in the objective standard rather than in the subjective, and unless a different meaning plainly is required, the following definitions apply in this title:

(1) "Acts" has its usual and ordinary meaning and includes any bodily movement, any form of communication, and when relevant, a failure or omission to take action.

(2) "Administrative proceeding" means any proceeding the outcome of which is required to be based on a record or documentation prescribed by law or in which a law or a regulation is particularized in its application to an individual.

(3) "Another" means a person or persons, as defined in this code, other than the offender.

(4) "Benefit" means gain or advantage or anything regarded by the beneficiary as gain or advantage, including benefit to any other person or entity in whose welfare the beneficiary is interested. Benefit does not include an advantage promised generally to a group or class of voters as a consequence of public measures that a candidate engages to support or oppose.

(5) "Bodily injury" means physical pain, illness, or any impairment of physical condition and includes mental illness or impairment.

(6) "Cohabit" means to live together under the representation of being married.

(7) "Common scheme" means a series of acts or omissions motivated by a purpose to accomplish a single criminal objective or by a common purpose or plan that results in the repeated commission of the same offense or that affects the same person or the same persons or the property of the same person or persons.

(8) "Computer" means an electronic device that performs logical, arithmetic, and memory functions by the manipulation of electronic or magnetic impulses and includes all input, output, processing, storage, software, or communication facilities that are connected or related to that device in a system or network.

(9) "Computer network" means the interconnection of communication systems between computers or computers and remote terminals.

(10) "Computer program" means an instruction or statement or a series of instructions or statements, in a form acceptable to a computer, that in actual or modified form permits the functioning of a computer or computer system and causes it to perform specified functions.

(11) "Computer services" include but are not limited to computer time, data processing, and storage functions.

(12) "Computer software" means a set of computer programs, procedures, and associated documentation concerned with the operation of a computer system.

(13) "Computer system" means a set of related, connected, or unconnected devices, computer software, or other related computer equipment.

(14) "Conduct" means an act or series of acts and the accompanying mental state.

(15) "Conviction" means a judgment of conviction or sentence entered upon a plea of guilty or upon a verdict or finding of guilty of an offense rendered by a legally constituted jury or by a court of competent jurisdiction authorized to try the case without a jury.

(16) "Correctional institution" means the state prison, county or city jail, or other institution for the incarceration or custody of persons under sentence for offenses or awaiting trial or sentence for offenses.

(17) "Deception" means knowingly to:

(a) create or confirm in another an impression that is false and that the offender does not believe to be true;

(b) fail to correct a false impression that the offender previously has created or confirmed;

(c) prevent another from acquiring information pertinent to the disposition of the property involved;

(d) sell or otherwise transfer or encumber property without disclosing a lien, adverse claim, or other legal impediment to the enjoyment of the property, whether the impediment is or is not of value or is or is not a matter of official record; or

(e) promise performance that the offender does not intend to perform or knows will not be performed. Failure to perform, standing alone, is not evidence that the offender did not intend to perform.

(18) "Defamatory matter" means anything that exposes a person or a group, class, or association to hatred, contempt, ridicule, degradation, or disgrace in society or to injury to the person's or its business or occupation.

(19) "Deprive" means to withhold property of another:

(a) permanently;

(b) for such a period as to appropriate a portion of its value;

(c) with the purpose to restore it only upon payment of reward or other compensation; or

(d) to dispose of the property and use or deal with the property so as to make it unlikely that the owner will recover it.

(20) "Deviate sexual relations" means sexual contact or sexual intercourse between two persons of the same sex or any form of sexual intercourse with an animal.

(21) <<+"Document" means, with respect to offenses involving the medicaid program, any application, claim, form, report, record, writing, or correspondence, whether in written, electronic, magnetic, microfilm, or other form.+>>

<<+(22)+>> "Felony" means an offense in which the sentence imposed upon conviction is death or imprisonment in the state prison for any term exceeding 1 year.

<<-(22)->><<+(23)+>> "Forcible felony" means any felony that involves the use or threat of physical force or violence against any individual.

<<-(23)->><<+(24)+>> A "frisk" is a search by an external patting of a person's clothing.

<<-(24)->><<+(25)+>> "Government" includes any branch, subdivision, or agency of the government of the state or any locality within it.

<<-(25)->><<+(26)+>> "Harm" means loss, disadvantage, or injury or anything so regarded by the person affected, including loss, disadvantage, or injury to any person or entity in whose welfare the affected person is interested.

<<-(26)->><<+(27)+>> A "house of prostitution" means any place where prostitution or promotion of prostitution is regularly carried on by one or more persons under the control, management, or supervision of another.

<<-(27)->><<+(28)+>> "Human being" means a person who has been born and is alive.

<<-(28)->><<+(29)+>> An "illegal article" is an article or thing that is prohibited by statute, rule, or order from being in the possession of a person subject to official detention.

<<-(29)->><<+(30)+>> "Inmate" means a person who engages in prostitution in or through the agency of a house of prostitution.

<<-(30)->><<+(31)+>> "Intoxicating substance" means any controlled substance, as defined in Title 50, chapter 32, and any alcoholic beverage, including but not limited to any beverage containing 1/2 of 1% or more of alcohol by volume. Intoxicating substance does not include dealcoholized wine or any beverage or liquid produced by the process by which beer, ale, port, or wine is produced if it contains less than 1/2 of 1% of alcohol by volume.

<<-(31)->><<+(32)+>> An "involuntary act" means any act that is:

(a) a reflex or convulsion;

(b) a bodily movement during unconsciousness or sleep;

(c) conduct during hypnosis or resulting from hypnotic suggestion; or

(d) a bodily movement that otherwise is not a product of the effort or determination of the actor, either conscious or habitual.

<<-(32)->><<+(33)+>> "Juror" means any person who is a member of any jury, including a grand jury, impaneled by any court in this state in any action or proceeding or by any officer authorized by law to impanel a jury in any action or proceeding. The term "juror" also includes a person who has been drawn or summoned to attend as a prospective juror.

<<-(33)->><<+(34)+>> "Knowingly"—a person acts knowingly with respect to conduct or to a circumstance described by a statute defining an offense when the person is aware of the person's own conduct or that the circumstance exists. A person acts knowingly with respect to the result of conduct described by a statute defining an offense when the person is aware that it is highly probable that the result will be caused by the person's conduct. When knowledge of the existence of a particular fact is an element of an offense, knowledge is established if a person is aware of a high probability of its existence. Equivalent terms, such as "knowing" or "with knowledge", have the same meaning.

<<-(34)->><<+(35) "Medicaid" means the Montana medical assistance program provided for in Title 53, chapter 6. +>>

<<+(36) "Medicaid agency" has the meaning in [section 1].+>>

<<+(37) "Medicaid benefit" means the provision of anything of pecuniary value to or on behalf of a recipient under the medicaid program.+>>

<<+(38)(a) "Medicaid claim" means a communication, whether in oral, written, electronic, magnetic, or other form: +>>

<<+(i) that is used to claim specific services or items as payable or reimbursable under the medicaid program; or+>>

<<+(ii) that states income, expense, or other information that is or may be used to determine entitlement to or the rate of payment under the medicaid program.+>>

<<+(b) The term includes any related documents submitted as a part of or in support of the claim.+>>

<<+(39)+>> "Mentally defective" means that a person suffers from a mental disease or defect that renders the person incapable of appreciating the nature of the person's own conduct.

<<-(35)->><<+(40)+>> "Mentally incapacitated" means that a person is rendered temporarily incapable of appreciating or controlling the person's own conduct as a result of the influence of an intoxicating substance.

<<-(36)->><<+(41)+>> "Misdemeanor" means an offense in which the sentence imposed upon conviction is imprisonment in the county jail for any term or a fine, or both, or in which the sentence imposed is imprisonment in the state prison for any term of 1 year or less.

<<-(37)->><<+(42)+>> "Negligently"—a person acts negligently with respect to a result or to a circumstance described by a statute defining an offense when the person consciously disregards a risk that the result will occur or that the circumstance exists or when the person disregards a risk of which the person should be aware that the result will occur or that the circumstance exists. The risk must be of a nature and degree that to disregard it involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation. "Gross deviation" means a deviation that is considerably greater than lack of ordinary care. Relevant terms, such as "negligent" and "with negligence", have the same meaning.

<<-(38)->><<+(43)+>> "Obtain" means:

(a) in relation to property, to bring about a transfer of interest or possession, whether to the offender or to another; and

(b) in relation to labor or services, to secure the performance of the labor or service.

<<-(39)->><<+(44)+>> "Obtains or exerts control" includes but is not limited to the taking, the carrying away, or the sale, conveyance, or transfer of title to, interest in, or possession of property.

<<-(40)->><<+(45)+>> "Occupied structure" means any building, vehicle, or other place suitable for human occupancy or night lodging of persons or for carrying on business, whether or not a person is actually present. Each unit of a building consisting of two or more units separately secured or occupied is a separate occupied structure.

<<-(41)->><<+(46)+>> "Offender" means a person who has been or is liable to be arrested, charged, convicted, or punished for a public offense.

<<-(42)->><<+(47)+>> "Offense" means a crime for which a sentence of death or of imprisonment or a fine is authorized. Offenses are classified as felonies or misdemeanors.

<<-(43)->><<+(48)+>> "Official detention" means imprisonment resulting from a conviction for an offense, confinement of an offense, confinement of a person charged with an offense, detention by a peace officer pursuant to arrest, detention for extradition or deportation, or any lawful detention for the purpose of the protection of the welfare of the person detained or for the protection of society. Official detention does not include supervision of probation or parole, constraint incidental to release on bail, or an unlawful arrest unless the person arrested employed physical force, a threat of physical force, or a weapon to escape.

<<-(44)->><<+(49)+>> "Official proceeding" means a proceeding heard or that may be heard before any legislative, judicial, administrative, or other governmental agency or official authorized to take evidence under oath, including any referee, hearing examiner, commissioner, notary, or other person taking testimony or deposition in connection with the proceeding.

<<-(45)->><<+(50)+>> "Other state" means any state or territory of the United States, the District of Columbia, and the Commonwealth of Puerto Rico.

<<-(46)->><<+(51)+>> "Owner" means a person other than the offender who has possession of or any other interest in the property involved, even though the interest or possession is unlawful, and without whose consent the offender has no authority to exert control over the property.

<<-(47)->><<+(52)+>> "Party official" means a person who holds an elective or appointive post in a political party in the United States by virtue of which the person directs or conducts or participates in directing or conducting party affairs at any level of responsibility.

<<-(48)->><<+(53)+>> "Peace officer" means any person who by virtue of the person's office or public employment is vested by law with a duty to maintain public order or to make arrests for offenses while acting within the scope of the person's authority.

<<-(49)->><<+(54)+>> "Pecuniary benefit" is benefit in the form of money, property, commercial interests, or anything else the primary significance of which is economic gain.

<<-(50)->><<+(55)+>> "Person" includes an individual, business association, partnership, corporation, government, or other legal entity and an individual acting or purporting to act for or on behalf of any government or subdivision of government.

<<-(51)->><<+(56)+>> "Physically helpless" means that a person is unconscious or is otherwise physically unable to communicate unwillingness to act.

<<-(52)->><<+(57)+>> "Possession" is the knowing control of anything for a sufficient time to be able to terminate control.

<<-(53)->><<+(58)+>> "Premises" includes any type of structure or building and any real property.

<<-(54)->><<+(59)+>> "Property" means any tangible or intangible thing of value. Property includes but is not limited to:

(a) real estate;

(b) money;

(c) commercial instruments;

(d) admission or transportation tickets;

(e) written instruments that represent or embody rights concerning anything of value, including labor or services, or that are otherwise of value to the owner;

(f) things growing on, affixed to, or found on land and things that are part of or affixed to any building;

(g) electricity, gas, and water;

(h) birds, animals, and fish that ordinarily are kept in a state of confinement;

(i) food and drink, samples, cultures, microorganisms, specimens, records, recordings, documents, blueprints, drawings, maps, and whole or partial copies, descriptions, photographs, prototypes, or models thereof;

(j) any other articles, materials, devices, substances, and any whole or partial copies, descriptions, photographs, prototypes, or models thereof that constitute, represent, evidence, reflect, or record secret scientific, technical, merchandising, production, or management information or a secret designed process, procedure, formula, invention, or improvement; and

(k) electronic impulses, electronically processed or produced data or information, commercial instruments, computer software or computer programs, in either machine- or human-readable form, computer services, any other tangible or intangible item of value relating to a computer, computer system, or computer network, and any copies thereof.

<<-(55)->><<+(60)+>> "Property of another" means real or personal property in which a person other than the offender has an interest that the offender has no authority to defeat or impair, even though the offender may have an interest in the property.

<<-(56)->><<+(61)+>> "Public place" means any place to which the public or any substantial group has access.

<<-(57)->><<+(62)+>> "Public servant" means any officer or employee of government, including but not limited to legislators, judges, and firefighters, and any person participating as a juror, advisor, consultant, administrator, executor, guardian, or court-appointed fiduciary. The term does not include witnesses. The term "public servant" includes one who has been elected or designated to become a public servant.

<<-(58)->><<+(63)+>> "Purposely"—a person acts purposely with respect to a result or to conduct described by a statute defining an offense if it is the person's conscious object to engage in that conduct or to cause that result. When a particular purpose is an element of an offense, the element is established although the purpose is conditional, unless the condition negatives the harm or evil sought to be prevented by the law defining the offense. Equivalent terms, such as "purpose" and "with the purpose", have the same meaning.

<<-(59)->><<+(64)+>>(a) "Serious bodily injury" means bodily injury that:

(i) creates a substantial risk of death;

(ii) causes serious permanent disfigurement or protracted loss or impairment of the function or process of any bodily member or organ; or

(iii) at the time of injury, can reasonably be expected to result in serious permanent disfigurement or protracted loss or impairment of the function or process of any bodily member or organ.

(b) The term includes serious mental illness or impairment.

<<-(60)->><<+(65)+>> "Sexual contact" means any touching of the sexual or other intimate parts of the person of another for the purpose of arousing or gratifying the sexual desire of either party.

<<-(61)->><<+(66)+>> "Sexual intercourse" means penetration of the vulva, anus, or mouth of one person by the penis of another person, penetration of the vulva or anus of one person by any body member of another person, or penetration of the vulva or anus of one person by any foreign instrument or object manipulated by another person for the purpose of arousing or gratifying the sexual desire of either party. Any penetration, however slight, is sufficient.

<<-(62)->><<+(67)+>> "Solicit" or "solicitation" means to command, authorize, urge, incite, request, or advise another to commit an offense.

<<-(63)->><<+(68)+>> "State" or "this state" means the state of Montana, all the land and water in respect to which the state of Montana has either exclusive or concurrent jurisdiction, and the air space above the land and water.

<<-(64)->><<+(69)+>> "Statute" means any act of the legislature of this state.

<<-(65)->><<+(70)+>> "Stolen property" means property over which control has been obtained by theft.

<<-(66)->><<+(71)+>> A "stop" is the temporary detention of a person that results when a peace officer orders the person to remain in the peace officer's presence.

<<-(67)->><<+(72)+>> "Tamper" means to interfere with something improperly, meddle with it, make unwarranted alterations in its existing condition, or deposit refuse upon it.

<<-(68)->><<+(73)+>> "Threat" means a menace, however communicated, to:

(a) inflict physical harm on the person threatened or any other person or on property;

(b) subject any person to physical confinement or restraint;

(c) commit any criminal offense;

(d) accuse any person of a criminal offense;

(e) expose any person to hatred, contempt, or ridicule;

(f) harm the credit or business repute of any person;

(g) reveal any information sought to be concealed by the person threatened;

(h) take action as an official against anyone or anything, withhold official action, or cause the action or withholding;

(i) bring about or continue a strike, boycott, or other similar collective action if the person making the threat demands or receives property that is not for the benefit of groups that the person purports to represent; or

(j) testify or provide information or withhold testimony or information with respect to another's legal claim or defense.

<<-(69)->><<+(74)+>>(a) "Value" means the market value of the property at the time and place of the crime or, if the market value cannot be satisfactorily ascertained, the cost of the replacement of the property within a reasonable time after the crime. If the offender appropriates a portion of the value of the property, the value must be determined as follows:

(i) The value of an instrument constituting an evidence of debt, such as a check, draft, or promissory note, is considered the amount due or collectible. The figure is ordinarily the face amount of the indebtedness less any portion of the indebtedness that has been satisfied.

(ii) The value of any other instrument that creates, releases, discharges, or otherwise affects any valuable legal right, privilege, or obligation is considered the amount of economic loss that the owner of the instrument might reasonably suffer by virtue of the loss of the instrument.

(iii) The value of electronic impulses, electronically produced data or information, computer software or programs, or any other tangible or intangible item relating to a computer, computer system, or computer network is considered to be the amount of economic loss that the owner of the item might reasonably suffer by virtue of the loss of the item. The determination of the amount of economic loss includes but is not limited to consideration of the value of the owner's right to exclusive use or disposition of the item.

(b) When it cannot be determined if the value of the property is more or less than $500 by the standards set forth in subsection <<-(69)(a)->> <<+ (74)(a)+>>, its value is considered to be an amount less than $500.

(c) Amounts involved in thefts committed pursuant to a common scheme or the same transaction, whether from the same person or several persons, may be aggregated in determining the value of the property.

<<(70)->><<+(75)+>> "Vehicle" means any device for transportation by land, water, or air or by mobile equipment, with provision for transport of an operator.

<<(71)->><<+(76)+>> "Weapon" means any instrument, article, or substance that, regardless of its primary function, is readily capable of being used to produce death or serious bodily injury.

<<(72)->><<+(77)+>> "Witness" means a person whose testimony is desired in any official proceeding, in any investigation by a grand jury, or in a criminal action, prosecution, or proceeding."

Section 9. Section 45–2–103, MCA, is amended to read:

<< MT ST 45–2–103 >>

"45–2–103. General requirements of criminal act and mental state. (1) Except for deliberate homicide as defined in 45–5–102(1)(b) or an offense <<- which->> <<+that+>> involves absolute liability, a person is not guilty of an offense unless, with respect to each element described by the statute defining the offense, <<-he->> <<+a person+>> acts while having one of the mental states <<-described->> <<+of knowingly, negligently, or purposely+>> <<-in subsections (33), (37), and (58) of 45–2–101->>.

(2) In deliberate homicide under 45–5–102(1)(b), the offender must act while having the mental state of purposely or knowingly only as to the underlying felony referred to in 45–5–102(1)(b).

(3) The existence of a mental state may be inferred from the acts of the accused and the facts and circumstances connected with the offense.

(4) If the statute defining an offense prescribes a particular mental state with respect to the offense as a whole without distinguishing among the elements <<-thereof->> <<+of the offense+>>, the prescribed mental state applies to each <<-such->> element.

(5) Knowledge that certain conduct constitutes an offense or knowledge of the existence, meaning, or application of the statute defining an offense is not an element of the offense unless the statute clearly defines it as <<- such->> << +an element+>>.

(6) A person's reasonable belief that <<-his->> <<+the person's+>> conduct does not constitute an offense is a defense if:

(a) the offense is defined by an administrative regulation or order <<- which->> <<+that+>> is not known to <<-him->> <<+the person+>> and has not been published or otherwise made reasonably available to <<- him->> <<+the person+>> and <<-he->> <<+if the person+>> could not have acquired <<-such->> <<+the+>> knowledge by the exercise of due diligence pursuant to facts known to <<-him->> <<+the person+>>;

(b) <<-he->> <<+the person+>> acts in reliance upon a statute <<- which->> <<+that+>> later is determined to be invalid;

(c) <<-he->> <<+the person+>> acts in reliance upon an order or opinion of the Montana supreme court or a United States appellate court later overruled or reversed; or

(d) <<-he->> <<+the person+>> acts in reliance upon an official interpretation of the statute, regulation, or order defining the offense made by a public officer or agency legally authorized to interpret <<- such->> <<+the+>> statute.

(7) If a person's reasonable belief is a defense under subsection (6), nevertheless <<-he->> <<+the person+>> may be convicted of an included offense of which <<-he->> <<+the person+>> would be guilty if the law were as <<-he->> <<+the person+>> believed it to be.

(8) <<-Any->> <<+A+>> defense based upon this section is an affirmative defense."

Section 10. Section 45–2–104, MCA, is amended to read:

<< MT ST 45–2–104 >>

"45–2–104. Absolute liability. A person may be guilty of an offense without having, as to each element <<-thereof->> <<+of the offense+>>, one of the mental states <<-described in subsections (33), (37), and (58)->> of <<+knowingly, negligently, or purposely+>> <<-45–2–101->> only if the offense is punishable by a fine not exceeding $500 or the statute defining the offense clearly indicates a legislative purpose to impose absolute liability for the conduct described."

Section 11. Section 50–20–109, MCA, is amended to read:

## << MT ST 50–20–109 >>

"50–20–109. Control of practice of abortion. (1) <<-No->> <<+An+>> abortion may <<+not+>> be performed within the state of Montana:

(a) except by a licensed physician;

(b) after the first 3 months of pregnancy, except in a hospital licensed by the department;

(c) after viability of the fetus, unless in appropriate medical judgment the abortion is necessary to preserve the life or health of the mother.

(2) An abortion under subsection (1)(c) may only be performed if:

(a) the foregoing judgment of the physician who is to perform the abortion is first certified in writing by <<-him->> <<+the physician,+>> setting forth in detail the facts upon which <<-he->> <<+the physician+>> relies in making <<-such->> <<+the+>> judgment; and

(b) two other licensed physicians have first examined the patient and concurred in writing with <<-such->> <<+the +>> judgment. The foregoing certification and concurrence <<-is->> <<+are+>> not required if a licensed physician certifies <<+that+>> the abortion is necessary to preserve the life of the mother.

(3) The timing and procedure used in performing an abortion under subsection (1)(c) of this section must be such that the viability of the fetus is not intentionally or negligently endangered, as the term "negligently" is defined in 45–2–101<<-(37)->>. The fetus may be intentionally endangered or destroyed only if necessary to preserve the life or health of the mother.

(4) <<-No->> <<+A+>> physician, facility, or other person or agency <<-shall->> <<+may not+>> engage in solicitation, advertising, or other form of communication <<-having->> <<+that has+>> the purpose of inviting, inducing, or attracting <<-any->> <<+a+>> person to come to <<-such->> <<+the+>> physician, facility, or other person or agency to have an abortion or to purchase abortifacients.

(5) Violation of subsection (1), (2), and (3) <<-of this section->> is a felony. Violation of subsection (4) <<-of this section->> is a misdemeanor."

Section 12. Section 53–6–106, MCA, is amended to read:

## << MT ST 53–6–106 >>

"53–6–106. Health care facility standards—definitions. (1) For purposes of 53–6–106 through 53–6–108, the following definitions apply:

(a) "Department" means the department of social and rehabilitation services.

(b) "Health care facility" means a health care facility as defined in 50–5–101.

(2) The department and the department of health and environmental sciences may enter into agreements with appropriate federal agencies for the purpose of certifying health care facilities for the Montana medicaid program.

(3) The department of health and environmental sciences <<-shall->> <<+ may+>> adopt rules <<-prescribing->> <<+as necessary to prescribe+>> minimum standards for the maintenance and operation of health care facilities<<-, including standards->><<+. Standards+>> for the quality of care provided by those facilities receiving reimbursement under the Montana medicaid program<<-. These standards->> must <<-include, as a minimum,->> <<+be consistent with+>> those requirements imposed upon health care facilities by Title XIX of the federal Social Security Act<<-, +>> <<-(->>42 U.S.C. 1396, et seq.<<-)->>, as may be amended, and by the implementing regulations contained in << +Title+>> 42 <<-CFR 430, et seq.->> <<+of the Code of Federal Regulations+>>, as may be amended. The authority to prescribe standards and adopt rules under 53–6–106 through 53–6–108 is in addition to the authority granted to the department of health and environmental sciences pursuant to Title 50, chapter 5.

Case 1:14-cv-00971-RGG—Document 237-105   Filed 08/31/18   Page 262 of 312

(4) Standards adopted by the department of health and environmental sciences may include but are not limited to requirements in the following areas: staffing, fire protection, health and safety, food and nutrition, environmental and sanitation, administration, admission policies, patient care planning, training, medication, health services, rehabilitation services, and social services and activities."

Section 13. Section 53–6–107, MCA, is amended to read:

<< MT ST 53–6–107 >>

"53–6–107. Sanctions—penalties. (1) The department may suspend, terminate, or refuse to renew an agreement with a health care facility that has failed to meet the requirements for certification <<-adopted->> for <<+or participation in+>> the Montana medicaid program under 53–6–106 through 53–6–108 <<+or other applicable law+>>. The department may also impose sanctions in the form of denial of medicaid payments for new admissions or other penalties <<+or sanctions+>> as described in 53–6–111 <<+or Title XIX of the Social Security Act, 42 U.S.C. 1396, et seq., as may be amended, and any implementing federal regulations and policies+>>.

(2) The department may impose a civil monetary penalty, with interest not to exceed 12% <<-per annum->> <<+a year +>>, for each day that a facility is substantially out of compliance with standards <<+or participation requirements provided by applicable state or federal laws, regulations, rules, or policies, including but not limited to standards+>> adopted by the department of health and environmental sciences under the authority of Title 50, chapter 5, or 53–6–106 through 53–6–108. Penalties must be collected by the department and may be applied to the protection of the health and property of residents of health care facilities that the department finds deficient, including <<+but not limited to+>> payment for the costs of relocation of residents to other facilities, operation of a facility pending correction of deficiencies or closure, and reimbursement of residents for personal funds lost.

(3) The department may appoint temporary management personnel to oversee the operation of the facility and to <<-assure->> <<+ensure+>> the health and safety of the facility's residents if there is a need for temporary management because:

(a) an orderly closure of the facility is necessary; or

(b) improvements are being made to bring the facility into compliance with applicable standards.

(4) The department shall, in the case of an emergency, close the facility or transfer residents in the facility to other facilities, or both."

Section 14. Section 53–6–108, MCA, is amended to read:

<< MT ST 53–6–108 >>

"53–6–108. Rules governing sanctions or remedies. The department shall adopt rules governing the application of sanctions or remedies imposed under 53–6–107, the amounts of any fines, and the severity of each of these sanctions or remedies. The rules must be designed for the imposition of incrementally more severe fines for repeated or uncorrected deficiencies. The civil penalty for violation of the <<-standards adopted by the department of health and environmental sciences or those federal standards established in 53–6–106->> <<+applicable standards imposed by state or federal laws, regulations, rules, or policies+>> may not exceed <<-$1,000->> <<+ $10,000+>> for each day <<+that+>> the deficiency remains uncorrected. A health care facility aggrieved by an action of the department may request a hearing pursuant to Title 2, chapter 4, part 6."

Section 15. Section 53–6–111, MCA, is amended to read:

<< MT ST 53–6–111 >>

"53–6–111. Department charged with <<-general->> administration <<+and supervision+>> of medical assistance <<+program—overpayment recovery—sanctions for fraudulent and abusive activities+>>—adoption of rules <<-to punish fraud->>. (1) The department of social and rehabilitation services <<-is hereby authorized and empowered to->> <<+may+>> administer and supervise a vendor payment program of medical assistance under the powers, duties, and functions provided in <<-chapter->> <<+Title 53, chapter+>> 2<<+,+>> <<-of this title, as amended,->> <<

+and this chapter+>> and <<-as contemplated by the provisions of->> <<+that is in compliance with+>> Title XIX of the <<-federal->> Social Security Act.

<<+(2)(a) The department is entitled to collect from a provider, and a provider is liable to the department for:+>>

<<+(i) the amount of a payment under this part to which the provider was not entitled, regardless of whether the incorrect payment was the result of department or provider error or other cause; and+>>

<<+(ii) the portion of any interim rate payment that exceeds the rate determined retrospectively by the department for the rate period.+>>

<<+(b) In addition to the amount of overpayment recoverable under subsection (2)(a), the department is entitled to interest on the amount of the overpayment at the rate specified in 31–1–106 from the date 30 days after the date of mailing of notice of the overpayment by the department to the provider, except that interest accrues from the date of the incorrect payment when the payment was obtained by fraud or abuse.+>>

<<+(c) The department may collect any amount described in subsection (2)(a) by:+>>

<<+(i) withholding current payments to offset the amount due;+>>

<<+(ii) applying methods and using a schedule mutually agreeable to the department and the provider; or+>>

<<+(iii) any other legal means.+>>

<<+(d) The department may suspend payments to a provider for disputed items pending resolution of a dispute.+>>

<<+(e) The fact that a provider may have ceased providing services or items under the medical assistance program, may no longer be in business, or may no longer operate a facility, practice, or business does not excuse repayment under this subsection (2).+>>

<<-(2)->><<+(3)+>> The department shall adopt rules establishing a system of <<-penalties and->> sanctions applicable to providers <<-of medical assistance services and supplies->> who engage in <<-fraudulent, abusive, or improper activities->> <<+fraud and abuse+>>. <<- The->> <<+Subject to the definitions in [section 1], the+>> department <<-shall define by rule those activities which are fraudulent, abusive, or improper->> <<+rules must include but are not limited to specifications regarding the activities and conduct that constitute fraud and abuse+>>.

<<-(3)->><<+(4)+>> <<-The penalties or->> <<+Subject to subsections (5) and (6), the+>> sanctions imposed <<+under rules adopted by the department under subsection (3) may+>> include but are not limited to:

(a) required courses of education in the rules governing the medicaid program;

(b) <<-withholding of payments to offset previous improper payments to a provider;->>

<<-(c) suspension of payments to a provider pending resolution of a dispute involving fraudulent, abusive, or improper activities;->>

<<-(d)->> suspension of participation in the program for a specified period of time; <<-and->>

<<-(e)->><<+(c)+>> permanent termination of participation in the medical assistance program<<+; and+>>

<<+(d) imposition of civil monetary penalties imposed under rules that specify the amount of penalties applicable to a specific activity, act, or omission involving intentional or knowing violation of specified standards.+>>

<<-(4) The department is entitled to recover from a provider all amounts paid as a result of fraudulent, abusive, or improper activities, together with interest at the rate set by 15–30–142 for tax deficiencies from the date of such payment.->>

(5) In all cases in which <<+the department may recover medicaid payments or impose+>> a <<-penalty or->> sanction <<-may be imposed->>, a provider is entitled to a hearing under the provisions of Title 2, chapter 4, part 6. <<+This section does not require that the hearing under Title 2, chapter 4, part 6, be granted prior to recovery of overpayment.+>>

<<+(6) The remedies provided by this section are separate and cumulative to any other administrative, civil, or criminal remedies available under state or federal law, regulation, rule, or policy.+>>"

Section 16. Section 61–5–405, MCA, is amended to read:

<< MT ST 61–5–405 >>

"61–5–405. Offenses furnishing ground for suspension or revocation of license—return to licensing jurisdiction of abstracts of court records and reports of conviction. (1) Items enumerated in Article IV(1), subsections (a), (b), (c), and

(d) of 61–5–401 refer specifically to 45–5–103, 45–5–104, 61–8–401, <<+the definition of felony as provided in+>> 45–2–101<<- (21)->>, and 61–7–103, respectively.

 (2) In addition to convictions mentioned <<-above->> <<+in subsection (1),+>> the department, for the purpose of suspension, revocation, or limitation of the license to operate a motor vehicle, shall give the same effect to the conduct reported as it would if <<-such->> <<+the+>> conduct had occurred in this state for:

 (a) convictions of perjury or the making of a false affidavit relating to the ownership or operation of a motor vehicle (61–5–303); and

 (b) three convictions of reckless driving committed within a period of 12 months (61–8–301).

 (3) Court abstracts or reports of conviction received by the department that name an individual licensed in another jurisdiction must be forwarded to the jurisdiction of licensure. The department may not take action against the driver's license or driving privilege of the individual as may be required elsewhere in this title."

 Section 17. Codification instruction. (1) [Sections 1 through 6] are intended to be codified as an integral part of Title 53, chapter 6, part 1, and the provisions of Title 53, chapter 6, part 1, apply to [sections 1 through 6].

 (2) [Section 7] is intended to be codified as an integral part of Title 45, chapter 6, part 3, and the provisions of Title 45, chapter 6, part 3, apply to [section 7].

 Section 18. Severability. If a part of [this act] is invalid, all valid parts that are severable from the invalid part remain in effect. If a part of [this act] is invalid in one or more of its applications, the part remains in effect in all valid applications that are severable from the invalid applications.

 Section 19. Effective dates. (1) [Sections 1 and 6 through 18 and this section] are effective on passage and approval.

 (2) [Sections 2 through 5] are effective July 1, 1995.

Approved April 11, 1995

MT LEGIS 354 (1995)

---

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

🟡 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's New Mexico Statutes Annotated
   Chapter 30. Criminal Offenses
     Article 44. Medicaid Fraud

N. M. S. A. 1978, § 30-44-7

§ 30-44-7. Medicaid fraud; defined; investigation; penalties

Currentness

A. Medicaid fraud consists of:

  (1) paying, soliciting, offering or receiving:

    (a) a kickback or bribe in connection with the furnishing of treatment, services or goods for which payment is or may be made in whole or in part under the program, including an offer or promise to, or a solicitation or acceptance by, a health care official of anything of value with intent to influence a decision or commit a fraud affecting a state or federally funded or mandated managed health care plan;

    (b) a rebate of a fee or charge made to a provider for referring a recipient to a provider;

    (c) anything of value, intending to retain it and knowing it to be in excess of amounts authorized under the program, as a precondition of providing treatment, care, services or goods or as a requirement for continued provision of treatment, care, services or goods; or

    (d) anything of value, intending to retain it and knowing it to be in excess of the rates established under the program for the provision of treatment, services or goods;

  (2) providing with intent that a claim be relied upon for the expenditure of public money:

    (a) treatment, services or goods that have not been ordered by a treating physician;

    (b) treatment that is substantially inadequate when compared to generally recognized standards within the discipline or industry; or

    (c) merchandise that has been adulterated, debased or mislabeled or is outdated;

(3) presenting or causing to be presented for allowance or payment with intent that a claim be relied upon for the expenditure of public money any false, fraudulent, excessive, multiple or incomplete claim for furnishing treatment, services or goods; or

(4) executing or conspiring to execute a plan or action to:

(a) defraud a state or federally funded or mandated managed health care plan in connection with the delivery of or payment for health care benefits, including engaging in any intentionally deceptive marketing practice in connection with proposing, offering, selling, soliciting or providing any health care service in a state or federally funded or mandated managed health care plan; or

(b) obtain by means of false or fraudulent representation or promise anything of value in connection with the delivery of or payment for health care benefits that are in whole or in part paid for or reimbursed or subsidized by a state or federally funded or mandated managed health care plan. This includes representations or statements of financial information, enrollment claims, demographic statistics, encounter data, health services available or rendered and the qualifications of persons rendering health care or ancillary services.

B. Except as otherwise provided for in this section regarding the payment of fines by an entity, whoever commits medicaid fraud as described in Paragraph (1) or (3) of Subsection A of this section is guilty of a fourth degree felony and shall be sentenced pursuant to the provisions of Section 31-18-15 NMSA 1978.

C. Except as otherwise provided for in this section regarding the payment of fines by an entity, whoever commits medicaid fraud as described in Paragraph (2) or (4) of Subsection A of this section when the value of the benefit, treatment, services or goods improperly provided is:

(1) not more than one hundred dollars ($100) is guilty of a petty misdemeanor and shall be sentenced pursuant to the provisions of Section 31-19-1 NMSA 1978;

(2) more than one hundred dollars ($100) but not more than two hundred fifty dollars ($250) is guilty of a misdemeanor and shall be sentenced pursuant to the provisions of Section 31-19-1 NMSA 1978;

(3) more than two hundred fifty dollars ($250) but not more than two thousand five hundred dollars ($2,500) is guilty of a fourth degree felony and shall be sentenced pursuant to the provisions of Section 31-18-15 NMSA 1978;

(4) more than two thousand five hundred dollars ($2,500) but not more than twenty thousand dollars ($20,000) shall be guilty of a third degree felony and shall be sentenced pursuant to the provisions of Section 31-18-15 NMSA 1978; and

(5) more than twenty thousand dollars ($20,000) shall be guilty of a second degree felony and shall be sentenced pursuant to the provisions of Section 31-18-15 NMSA 1978.

Case 1:11-cv-00071-RGC   Document 237-195   Filed 08/31/18   Page 267 of 312

D. Except as otherwise provided for in this section regarding the payment of fines by an entity, whoever commits medicaid fraud when the fraud results in physical harm or psychological harm to a recipient is guilty of a fourth degree felony and shall be sentenced pursuant to the provisions of Section 31-18-15 NMSA 1978.

E. Except as otherwise provided for in this section regarding the payment of fines by an entity, whoever commits medicaid fraud when the fraud results in great physical harm or great psychological harm to a recipient is guilty of a third degree felony and shall be sentenced pursuant to the provisions of Section 31-18-15 NMSA 1978.

F. Except as otherwise provided for in this section regarding the payment of fines by an entity, whoever commits medicaid fraud when the fraud results in death to a recipient is guilty of a second degree felony and shall be sentenced pursuant to the provisions of Section 31-18-15 NMSA 1978.

G. If the person who commits medicaid fraud is an entity rather than an individual, the entity shall be subject to a fine of not more than fifty thousand dollars ($50,000) for each misdemeanor and not more than two hundred fifty thousand dollars ($250,000) for each felony.

H. The unit shall coordinate with the human services department, department of health and children, youth and families department to develop a joint protocol establishing responsibilities and procedures, including prompt and appropriate referrals and necessary action regarding allegations of program fraud, to ensure prompt investigation of suspected fraud upon the medicaid program by any provider. These departments shall participate in the joint protocol and enter into a memorandum of understanding defining procedures for coordination of investigations of fraud by medicaid providers to eliminate duplication and fragmentation of resources. The memorandum of understanding shall further provide procedures for reporting to the legislative finance committee the results of all investigations every calendar quarter. The unit shall report to the legislative finance committee a detailed disposition of recoveries and distribution of proceeds every calendar quarter.

## Credits

L. 1989, Ch. 286, § 7; L. 1997, Ch. 98, § 3; L. 2003, Ch. 291, § 1, eff. July 1, 2003.

Notes of Decisions (6)

NMSA 1978, § 30-44-7, NM ST § 30-44-7
Current through the end of the First Regular and Special Sessions of the 53rd Legislature (2017).

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.

1997 New Mexico Laws Ch. 98 (S.B. 267)

NEW MEXICO 1997 SESSION LAWS
FIRST REGULAR SESSION OF THE 43RD LEGISLATURE

Additions and deletions are not identified in this document.
Vetoed provisions within tabular material are not displayed.

Ch. 98
S.B. No. 267
HEALTH CARE—MEDICAID FRAUD ACT—MANAGED CARE FRAUD

AN ACT RELATING TO HEALTH CARE; AMENDING THE MEDICAID FRAUD ACT TO ADDRESS
MANAGED CARE FRAUD; PROVIDING PENALTIES.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF NEW MEXICO:

Section 1. Section 30–44–1 NMSA 1978 (being Laws 1989, Chapter 286, Section 1) is amended to read:

<< NM ST § 30–44–1 >>

§ 30–44–1. Short title

Chapter 30, Article 44 NMSA 1978 may be cited as the "Medicaid Fraud Act".

Section 2. Section 30–44–2 NMSA 1978 (being Laws 1989, Chapter 286, Section 2) is amended to read:

<< NM ST § 30–44–2 >>

§ 30–44–2. Definitions

As used in the Medicaid Fraud Act:

A. "benefit" means money, treatment, services, goods or anything of value authorized under the program;

B. "claim" means any communication, whether oral, written, electronic or magnetic, that identifies a treatment, good
or service as reimbursable under the program;

C. "cost document" means any cost report or similar document that states income or expenses and is used to determine
a cost reimbursement based rate of payment for a provider under the program;

D. "covered person" means an individual who is entitled to receive health care benefits from a managed health care
plan;

E. "department" means the human services department;

F. "entity" means a person other than an individual and includes corporations, partnerships, associations, joint-stock
companies, unions, trusts, pension funds, unincorporated organizations, governments and political subdivisions thereof
and nonprofit organizations;

G. "great physical harm" means physical harm of a type that causes physical loss of a bodily member or organ or
functional loss of a bodily member or organ for a prolonged period of time;

H. "great psychological harm" means psychological harm that causes mental or emotional incapacitation for a
prolonged period of time or that causes extreme behavioral change or severe physical symptoms or that requires
psychological or psychiatric care;

I. "health care official" means:

(1) an administrator, officer, trustee, fiduciary, custodian, counsel, agent or employee of a managed care health plan;

(2) an officer, counsel, agent or employee of an organization that provides, proposes to or contracts to provide services to a managed health care plan; or

(3) an official, employee or agent of a state or federal agency with regulatory or administrative authority over a managed health care plan;

J. "managed health care plan" means a government-sponsored health benefit plan that requires a covered person to use, or creates incentives, including financial incentives, for a covered person to use health care providers managed, owned, under contract with or employed by a health care insurer or provider service network. A "managed health care plan" includes the health care services offered by a health maintenance organization, preferred provider organization, health care insurer, provider service network, entity or person that contracts to provide or provides goods or services that are reimbursed by or are a required benefit of a state or federally funded health benefit program, or any person or entity who contracts to provide goods or services to the program;

K. "person" includes individuals, corporations, partnerships and other associations;

L. "physical harm" means an injury to the body that causes pain or incapacitation;

M. "program" means the medical assistance program authorized under Title XIX of the federal Social Security Act, 42 U.S.C. 1396, et seq. and implemented under Section 27–2–12 NMSA 1978;

N. "provider" means any person who has applied to participate or who participates in the program as a supplier of treatment, services or goods;

O. "psychological harm" means emotional or psychological damage of such a nature as to cause fear, humiliation or distress or to impair a person's ability to enjoy the normal process of his life;

P. "recipient" means any individual who receives or requests benefits under the program;

Q. "records" means any medical or business documentation, however recorded, relating to the treatment or care of any recipient, to services or goods provided to any recipient or to reimbursement for treatment, services or goods, including any documentation required to be retained by regulations of the program; and

R. "unit" means the medicaid fraud control unit or any other agency with power to investigate or prosecute fraud and abuse of the program.

Section 3. Section 30–44–7 NMSA 1978 (being Laws 1989, Chapter 286, Section 7, as amended) is amended to read:

<< NM ST § 30–44–7 >>

§ 30–44–7. Medicaid fraud; defined; penalties

A. Medicaid fraud consists of:

(1) paying, soliciting, offering or receiving:

  (a) a kickback or bribe in connection with the furnishing of treatment, services or goods for which payment is or may be made in whole or in part under the program, including an offer or promise to, or a solicitation or acceptance by, a health care official of anything of value with intent to influence a decision or commit a fraud affecting a state or federally funded or mandated managed health care plan;

  (b) a rebate of a fee or charge made to a provider for referring a recipient to a provider;

  (c) anything of value, intending to retain it and knowing it to be in excess of amounts authorized under the program, as a precondition of providing treatment, care, services or goods or as a requirement for continued provision of treatment, care, services or goods; or

  (d) anything of value, intending to retain it and knowing it to be in excess of the rates established under the program for the provision of treatment, services or goods;

(2) providing with intent that a claim be relied upon for the expenditure of public money:

  (a) treatment, services or goods that have not been ordered by a treating physician;

  (b) treatment that is substantially inadequate when compared to generally recognized standards within the discipline or industry; or

  (c) merchandise that has been adulterated, debased or mislabeled or is outdated;

(3) presenting or causing to be presented for allowance or payment with intent that a claim be relied upon for the expenditure of public money any false, fraudulent, excessive, multiple or incomplete claim for furnishing treatment, services or goods; or

(4) executing or conspiring to execute a plan or action to:

 (a) defraud a state or federally funded or mandated managed health care plan in connection with the delivery of or payment for health care benefits, including engaging in any intentionally deceptive marketing practice in connection with proposing, offering, selling, soliciting or providing any health care service in a state or federally funded or mandated managed health care plan; or

 (b) obtain by means of false or fraudulent representation or promise anything of value in connection with the delivery of or payment for health care benefits that are in whole or in part paid for or reimbursed or subsidized by a state or federally funded or mandated managed health care plan. This includes representations or statements of financial information, enrollment claims, demographic statistics, encounter data, health services available or rendered and the qualifications of persons rendering health care or ancillary services.

B. Except as otherwise provided for in this section regarding the payment of fines by an entity, whoever commits medicaid fraud as described in Paragraph (1) or (3) of Subsection A of this section is guilty of a fourth degree felony and shall be sentenced pursuant to the provisions of Section 31–18–15 NMSA 1978.

C. Except as otherwise provided for in this section regarding the payment of fines by an entity, whoever commits medicaid fraud as described in Paragraph (2) or (4) of Subsection A of this section when the value of the benefit, treatment, services or goods improperly provided is:

 (1) not more than one hundred dollars ($100) is guilty of a petty misdemeanor and shall be sentenced pursuant to the provisions of Section 31–19–1 NMSA 1978;

 (2) more than one hundred dollars ($100) but not more than two hundred fifty dollars ($250) is guilty of a misdemeanor and shall be sentenced pursuant to the provisions of Section 31–19–1 NMSA 1978;

 (3) more than two hundred fifty dollars ($250) but not more than two thousand five hundred dollars ($2,500) is guilty of a fourth degree felony and shall be sentenced pursuant to the provisions of Section 31–18–15 NMSA 1978;

 (4) more than two thousand five hundred dollars ($2,500) but not more than twenty thousand dollars ($20,000) shall be guilty of a third degree felony and shall be sentenced pursuant to the provisions of Section 31–18–15 NMSA 1978; and

 (5) more than twenty thousand dollars ($20,000) shall be guilty of a second degree felony and shall be sentenced pursuant to the provisions of Section 31–18–15 NMSA 1978.

D. Except as otherwise provided for in this section regarding the payment of fines by an entity, whoever commits medicaid fraud when the fraud results in physical harm or psychological harm to a recipient is guilty of a fourth degree felony and shall be sentenced pursuant to the provisions of Section 31–18–15 NMSA 1978.

E. Except as otherwise provided for in this section regarding the payment of fines by an entity, whoever commits medicaid fraud when the fraud results in great physical harm or great psychological harm to a recipient is guilty of a third degree felony and shall be sentenced pursuant to the provisions of Section 31–18–15 NMSA 1978.

F. Except as otherwise provided for in this section regarding the payment of fines by an entity, whoever commits medicaid fraud when the fraud results in death to a recipient is guilty of a second degree felony and shall be sentenced pursuant to the provisions of Section 31–18–15 NMSA 1978.

G. If the person who commits medicaid fraud is an entity rather than an individual, the entity shall be subject to a fine of not more than fifty thousand dollars ($50,000) for each misdemeanor and not more than two hundred fifty thousand dollars ($250,000) for each felony.

Section 4. Section 30–44–8 NMSA 1978 (being Laws 1989, Chapter 286, Section 8) is amended to read:

<< NM ST § 30–44–8 >>

§ 30–44–8. Civil penalties; created; enumerated; presumption; limitation of action

A. Any person who receives payment for furnishing treatment, services or goods under the program, which payment the person is not entitled to receive by reason of a violation of the Medicaid Fraud Act, shall, in addition to any other penalties or amounts provided by law, be liable for:

(1) payment of interest on the amount of the excess payments at the maximum legal rate in effect on the date the payment was made, for the period from the date payment was made to the date of repayment to the state;

(2) a civil penalty in an amount of up to three times the amount of excess payments;

(3) payment of a civil penalty of up to ten thousand dollars ($10,000) for each false or fraudulent claim submitted or representations made for providing treatment, services or goods; and

(4) payment of legal fees and costs of investigation and enforcement of civil remedies.

B. Penalties and interest amounts assessed under this section shall be remitted to the state treasurer for deposit in the general fund.

C. Any legal fees, costs of investigation and costs of enforcement of civil remedies recovered on behalf of the state shall be remitted to the state treasurer for deposit in the general fund.

D. A criminal action need not be brought against a person as a condition precedent to enforcement of civil liability under the Medicaid Fraud Act.

E. The remedies under this section are separate from and cumulative to any other administrative and civil remedies available under federal or state law or regulation.

F. The department may adopt regulations for the administration of the civil penalties contained in this section.

G. No action under this section shall be brought after the expiration of five years from the date the action accrues.

Approved April 8, 1997.

NM LEGIS 98 (1997)

---

**End of Document**    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

§ 30-41-1. Soliciting or receiving illegal kickback, NM ST § 30-41-1

---

West's New Mexico Statutes Annotated
    Chapter 30. Criminal Offenses
        Article 41. Kickback, Bribe or Rebate (Refs & Annos)

N. M. S. A. 1978, § 30-41-1

§ 30-41-1. Soliciting or receiving illegal kickback

Currentness

Whoever knowingly solicits or receives any remuneration in the form of any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind from a person:

A. in return for referring an individual to that person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part with public money; or

B. in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any goods, facilities, services, or items for which payment may be made in whole or in part with public money, shall be guilty of a fourth degree felony.

**Credits**
L. 1979, Ch. 384, § 1.

NMSA 1978, § 30-41-1, NM ST § 30-41-1
Current through the end of the First Regular and Special Sessions of the 53rd Legislature (2017).

---

**End of Document**                              © 2017 Thomson Reuters. No claim to original U.S. Government Works.

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.

§ 30-41-2. Offering or paying illegal kickback, NM ST § 30-41-2

---

West's New Mexico Statutes Annotated
   Chapter 30. Criminal Offenses
      Article 41. Kickback, Bribe or Rebate (Refs & Annos)

N. M. S. A. 1978, § 30-41-2

§ 30-41-2. Offering or paying illegal kickback

Currentness

Whoever knowingly offers or pays any remuneration in the form of any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person:

A. to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part with public money; or

B. to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any goods, facilities, services, or items for which payment may be made in whole or in part with public money, shall be guilty of a fourth degree felony.

**Credits**
L. 1979, Ch. 384, § 2.

NMSA 1978, § 30-41-2, NM ST § 30-41-2
Current through the end of the First Regular and Special Sessions of the 53rd Legislature (2017).

---

End of Document                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.                1

---

Baldwin's Ohio Revised Code Annotated
  Title XXIX. Crimes--Procedure (Refs & Annos)
    Chapter 2913. Theft and Fraud (Refs & Annos)
      Frauds

R.C. § 2913.40

2913.40 Medicaid fraud

Effective: September 29, 2013
Currentness

(A) As used in this section:

(1) "Statement or representation" means any oral, written, electronic, electronic impulse, or magnetic communication that is used to identify an item of goods or a service for which reimbursement may be made under the medicaid program or that states income and expense and is or may be used to determine a rate of reimbursement under the medicaid program.

(2) "Provider" means any person who has signed a provider agreement with the department of medicaid to provide goods or services pursuant to the medicaid program or any person who has signed an agreement with a party to such a provider agreement under which the person agrees to provide goods or services that are reimbursable under the medicaid program.

(3) "Provider agreement" has the same meaning as in section 5164.01 of the Revised Code.

(4) "Recipient" means any individual who receives goods or services from a provider under the medicaid program.

(5) "Records" means any medical, professional, financial, or business records relating to the treatment or care of any recipient, to goods or services provided to any recipient, or to rates paid for goods or services provided to any recipient and any records that are required by the rules of the medicaid director to be kept for the medicaid program.

(B) No person shall knowingly make or cause to be made a false or misleading statement or representation for use in obtaining reimbursement from the medicaid program.

(C) No person, with purpose to commit fraud or knowing that the person is facilitating a fraud, shall do either of the following:

(1) Contrary to the terms of the person's provider agreement, charge, solicit, accept, or receive for goods or services that the person provides under the medicaid program any property, money, or other consideration in addition to the amount of reimbursement under the medicaid program and the person's provider agreement for the goods or services and

---

**For Educational Use Only**

any cost-sharing expenses authorized by section 5162.20 of the Revised Code or rules adopted by the medicaid director regarding the medicaid program.

(2) Solicit, offer, or receive any remuneration, other than any cost-sharing expenses authorized by section 5162.20 of the Revised Code or rules adopted by the medicaid director regarding the medicaid program, in cash or in kind, including, but not limited to, a kickback or rebate, in connection with the furnishing of goods or services for which whole or partial reimbursement is or may be made under the medicaid program.

(D) No person, having submitted a claim for or provided goods or services under the medicaid program, shall do either of the following for a period of at least six years after a reimbursement pursuant to that claim, or a reimbursement for those goods or services, is received under the medicaid program:

(1) Knowingly alter, falsify, destroy, conceal, or remove any records that are necessary to fully disclose the nature of all goods or services for which the claim was submitted, or for which reimbursement was received, by the person;

(2) Knowingly alter, falsify, destroy, conceal, or remove any records that are necessary to disclose fully all income and expenditures upon which rates of reimbursements were based for the person.

(E) Whoever violates this section is guilty of medicaid fraud. Except as otherwise provided in this division, medicaid fraud is a misdemeanor of the first degree. If the value of property, services, or funds obtained in violation of this section is one thousand dollars or more and is less than seven thousand five hundred dollars, medicaid fraud is a felony of the fifth degree. If the value of property, services, or funds obtained in violation of this section is seven thousand five hundred dollars or more and is less than one hundred fifty thousand dollars, medicaid fraud is a felony of the fourth degree. If the value of the property, services, or funds obtained in violation of this section is one hundred fifty thousand dollars or more, medicaid fraud is a felony of the third degree.

(F) Upon application of the governmental agency, office, or other entity that conducted the investigation and prosecution in a case under this section, the court shall order any person who is convicted of a violation of this section for receiving any reimbursement for furnishing goods or services under the medicaid program to which the person is not entitled to pay to the applicant its cost of investigating and prosecuting the case. The costs of investigation and prosecution that a defendant is ordered to pay pursuant to this division shall be in addition to any other penalties for the receipt of that reimbursement that are provided in this section, section 5164.35 of the Revised Code, or any other provision of law.

(G) The provisions of this section are not intended to be exclusive remedies and do not preclude the use of any other criminal or civil remedy for any act that is in violation of this section.

**CREDIT(S)**

(2013 H 59, eff. 9-29-13; 2011 H 86, eff. 9-30-11; 2007 H 119, eff. 9-29-07; 2005 H 66, eff. 9-29-05; 2002 S 261, eff. 6-5-02; 1999 H 471, eff. 7-1-00; 1995 S 2, eff. 7-1-96; 1989 H 672, eff. 11-14-89; 1986 H 340)

Ohs, Michael 7/20/2017
**For Educational Use Only**

**2913.40 Medicaid fraud, OH ST § 2913.40**

Notes of Decisions (29)

R.C. § 2913.40, OH ST § 2913.40
Current through 2017 File 13, 15 of the 132nd General Assembly (2017-2018).

| End of Document | © 2017 Thomson Reuters. No claim to original U.S. Government Works. |
|---|---|

1989 Ohio Laws File 117

OHIO
1989 SESSION LAWS AND RESOLUTIONS
118th Ohio General Assembly

Additions are indicated by <<+ UPPERCASE +>>
Deletions by <<- Lowercase ->>

File 117
Substitute House Bill Number 672
MEDICAID—ELIGIBILITY—TRANSFER OF PROPERTY

Eff. November 14, 1989

AN ACT to amend sections 109.85, 2301.351, 2913.40, 3701.023, 3702.01, 4123.27, 4734.09, 5101.14, 5101.18, 5101.36, 5111.02, 5111.021, 5111.023, 5111.04, 5111.20, 5111.21, 5111.25, 5111.28, 5113.16, and 5117.10; and to enact sections 5111.01, 5111.011, and 5111.012 of the Revised Code to establish a period of Medicaid ineligibility for persons who transfer property within 30 months of entering a nursing facility or of applying for Medicaid while in the facility, and to declare an emergency.

Be it enacted by the General Assembly of the State of Ohio:

OH ST § 109.85

SECTION 1. That sections 109.85, 2301.351, 2913.40, 3701.023, 3702.01, 4123.27, 4734.09, 5101.14, 5101.18, 5101.36, 5111.02, 5111.021, 5111.023, 5111.04, 5111.20, 5111.21, 5111.25, 5111.28, 5113.16, and 5117.10 be amended and sections 5111.01, 5111.011, and 5111.012 of the Revised Code be enacted to read as follows:

Sec. 109.85. (A) Upon the written request of the governor, the general assembly, the auditor of state, the director of human services, the director of health, or the director of budget and management, or upon the attorney general's becoming aware of criminal or improper activity related to Chapter 3721. and <<+THE MEDICAL ASSISTANCE PROGRAM ESTABLISHED UNDER+>> section <<-5111.02->> <<+5111.01+>> of the Revised Code, the attorney general shall investigate any criminal or civil violation of law related to Chapter 3721. <<-or section 5111.02->> of the Revised Code <<+OR THE MEDICAL ASSISTANCE PROGRAM.+>>

(B) When it appears to the attorney general, as a result of an investigation under division (A) of this section, that there is cause to prosecute for the commission of a crime or to pursue a civil remedy, he may refer the evidence to the prosecuting attorney having jurisdiction of the matter, or to a regular grand jury drawn and impaneled pursuant to sections 2939.01 to 2939.24 of the Revised Code, or to a special grand jury drawn and impaneled pursuant to section 2939.17 of the Revised Code, or he may initiate and prosecute any necessary criminal or civil actions in any court or tribunal of competent jurisdiction in this state. When proceeding under this section, the attorney general, and any assistant or special counsel designated by him for that purpose, have all rights, privileges, and powers of prosecuting attorneys. The attorney general shall have exclusive supervision and control of all investigations and prosecutions initiated by him under this section. Nothing in this section shall prevent a county prosecuting attorney from investigating and prosecuting criminal activity related to Chapter 3721. <<-and section 5111.02->> of the Revised Code <<+AND THE MEDICAL ASSISTANCE PROGRAM.+>>

OH ST § 2301.351

Sec. 2301.351. (A) Each child support enforcement agency established under section 2301.35 of the Revised Code shall report to the director of human services or to the county director of human services the amounts of support payments

required to be made to each person whose name or social security number or other identification number is the same as that of a recipient of public assistance, whose name is submitted to the agency by the director under section 5101.36 of the Revised Code. The agency also shall report the name and social security number or other identification number of the person responsible for the support payments and the amounts of support payments made to third parties on behalf of such persons, except for payments made to the county department of human services. The agency shall comply with the rules of the department of human services restricting the disclosure of information concerning recipients of public assistance.

 (B) Each court that issues an order for the payment of support pursuant to Chapter 3115. or section 2151.23, 3105.18, 3105.21, 3109.05, 3111.13, 3113.04, or 3113.31 of the Revised Code shall report to the director of human services the name, address, and social security number or other identification number of each person responsible for the support payments under the support order, regardless of whether the person to whom payments are to be made is a recipient of public assistance. The report also shall indicate whether the support order is being administered by the child support enforcement agency.

 (C) The reports sent to the director pursuant to divisions (A) and (B) of this section shall be maintained in accordance with section 5101.311 of the Revised Code in an alphabetical list of support orders by the bureau of child support in the department of human services.

 (D) For the purposes of this section, "public assistance" means medical assistance under section <<-5111.02->> << +5111.01+>> of the Revised Code, aid to dependent children, or general assistance.


OH ST § 2913.40


Sec. 2913.40. (A) As used in this section:

 (1) "Statement or representation" means any oral, written, electronic, electronic impulse, or magnetic communication that is used to identify an item of goods or a service for which reimbursement may be made under the medical assistance program or that states income and expense and is or may be used to determine a rate of reimbursement under the medical assistance program.

 (2) "Medical assistance program" means the program established by the department of human services to provide medical assistance under section <<- 5111.02->> <<+5111.01+>> of the Revised Code and the medicaid program of Title XIX of the "Social Security Act," 49 Stat. 620 (1935), 42 U.S.C. 301, as amended.

 (3) "Provider" means any person who has signed a provider agreement with the department of human services to provide goods or services pursuant to the medical assistance program or any person who has signed an agreement with a party to such a provider agreement under which the person agrees to provide goods or services that are reimbursable under the medical assistance program.

 (4) "Provider agreement" means an oral or written agreement between the department of human services and a person in which the person agrees to provide goods or services under the medical assistance program.

 (5) "Recipient" means any individual who receives goods or services from a provider under the medical assistance program.

 (6) "Records" means any medical, professional, financial, or business records relating to the treatment or care of any recipient, to goods or services provided to any recipient, or to rates paid for goods or services provided to any recipient and any records that are required by the rules of the department of human services to be kept for the medical assistance program.

 (B) No person shall knowingly make or cause to be made a false or misleading statement or representation for use in obtaining reimbursement from the medical assistance program.

 (C) No person, with purpose to commit fraud or knowing that he is facilitating a fraud, shall do either of the following:

 (1) Contrary to the terms of his provider agreement, charge, solicit, accept, or receive for goods or services that he provides under the medical assistance program any property, money, or other consideration in addition to the amount of reimbursement under the medical assistance program and his provider agreement for the goods or services and any deductibles or co-payments authorized by section 5111.02 of the Revised Code or by any rules adopted pursuant to that section.

(2) Solicit, offer, or receive any remuneration, other than any deductibles or co-payments authorized by section 5111.02 of the Revised Code or by any rules adopted pursuant to that section, in cash or in kind, including, but not limited to, a kickback or rebate, in connection with the furnishing of goods or services for which whole or partial reimbursement is or may be made under the medical assistance program.

(D) No person, having submitted a claim for or provided goods or services under the medical assistance program, shall do either of the following for a period of at least six years after a reimbursement pursuant to that claim, or a reimbursement for those goods or services, is received under the medical assistance program:

(1) Knowingly alter, falsify, destroy, conceal, or remove any records that are necessary to fully disclose the nature of all goods or services for which the claim was submitted, or for which reimbursement was received, by the person;

(2) Knowingly alter, falsify, destroy, conceal, or remove any records that are necessary to disclose fully all income and expenditures upon which rates of reimbursements were based for the person.

(E) Whoever violates this section is guilty of medicaid fraud, a felony of the fourth degree. If the value of the property, services, or funds obtained in violation of this section is five thousand dollars or more, medicaid fraud is a felony of the third degree.

(F) Upon application of the governmental agency, office, or other entity that conducted the investigation and prosecution in a case under this section, the court shall order any person, who is convicted of a violation of this section for receiving any reimbursement for furnishing goods or services under the medical assistance program to which he is not entitled, to pay to the applicant its cost of investigating and prosecuting the case. The costs of investigation and prosecution that a defendant is ordered to pay pursuant to this division shall be in addition to any other penalties for the receipt of that reimbursement that are provided in this section, section 5111.03 of the Revised Code, or any other provision of law.

(G) The provisions of this section are not intended to be exclusive remedies and do not preclude the use of any other criminal or civil remedy for any act that is in violation of this section.

OH ST § 3701.023

Sec. 3701.023. The department of health shall:

(A) Administer funds received from the "Maternal and Child Health Block Grant," Title V of the "Social Security Act," 95 Stat. 818, (1981), 42 U.S.C.A. 701, as amended, for programs including the program for services to medically handicapped children;

(B) Review applications for eligibility for the program for medically handicapped children that are submitted to the department by physician providers approved in accordance with division (D) of this section, and shall determine whether or not the applicants meet the medical and financial eligibility requirements established by the public health council pursuant to division (A)(1) of section 3701.021 of the Revised Code, and by the department in the manual of operational procedures and guidelines for the program for services to medically handicapped children developed pursuant to division (B) of section 3701.021 of the Revised Code. Referrals of potentially eligibile children for the program may be submitted to the department on behalf of the child by parents, guardians, public health nurses, or any other interested person. The department of health may designate a local health department or other agency to refer applicants to the department of health.

(C) Authorize a provider or providers to provide to any Ohio resident under twenty-one years of age, without charge and without restriction as to the economic status of the resident or his family, diagnostic services necessary to determine whether or not he suffers from a medically handicapping or potentially medically handicapping condition;

(D) In accordance with standards set forth in rules adopted by the public health council pursuant to division (A)(2) of section 3701.021 of the Revised Code, review the applications of professional personnel, hospitals, medical equipment suppliers, and other individuals, groups, or agencies that make application to become providers. The department shall enter into a written agreement with each applicant who is determined to be eligible to be a provider in accordance with the provider agreement required by the medical assistance program established under section <<-5111.02->><< +5111.01+>> of the Revised Code.

(E) Evaluate applications from approved physician providers for authorization to provide treatment services and related goods to children determined to be eligible for the program pursuant to division (B) of this section. The department

shall authorize necessary treatment services and related goods for each eligible child in accordance with an individual plan of treatment for the child.

(F) Pay, from appropriations to the department, any necessary expenses, including but not limited to, expenses for diagnosis, treatment, supportive services, transportation, and accessories and their upkeep, provided to medically handicapped children, provided that the provision of the goods or services is authorized by the department under division (C) or (E) of this section. Money appropriated to the department may also be expended for reasonable administrative costs incurred by the program. Payments made by the department pursuant to this division for inpatient hospital care, outpatient care, and all other medical assistance furnished by hospitals to eligible recipients shall be in accordance with methods established by rules of the public health council. Until such rules are adopted, the department shall make payments to hospitals in accordance with reasonable cost principles for reimbursement under the medicare program established under Title XVIII of the "Social Security Act," 79 Stat. 286 (1965), 42 U.S.C.A. 1395, as amended. Payments to providers for goods or services other than inpatient or outpatient hospital care shall be made in accordance with rules adopted by the public health council pursuant to division (A) of section 3701.021 of the Revised Code.

(G) Pay for authorized goods or services, up to the amount determined under division (F) of this section for the authorized goods or services, only to the extent that payment for the authorized goods or services is not made through third-party benefits. The department shall pay for the goods or services only after all available third-party benefits, except for third-party benefits payable under the "Maternal and Child Health Block Grant," Title V of the "Social Security Act," 95 Stat. 818, (1981) 42 U.S.C.A. 701, as amended, are received and applied to the amount determined under division (F) of this section. Third-party payments for goods and services not authorized under division (C) or (E) of this section shall not be applied to payment amounts determined under division (F) of this section. Payment made by the department shall be considered payment in full of the amount determined under division (F) of this section. Medicaid payments for persons eligible for medical assistance under Title XIX of the "Social Security Act," 49 Stat. 620, (1935), 42 U.S.C.A. 301, as amended, shall be considered payment in full of the amount determined under division (F) of this section.

(H) Require a medically handicapped child who receives services from the program or his parents or guardians to apply for all third-party benefits for which they may be eligible and require the child, parents, or guardians to apply all third-party benefits received to the amount determined under division (F) of this section;

(I) Determine, under a procedure established by the rules of the public health council pursuant to division (A)(3) of section 3701.021 of the Revised Code, the amount each county shall provide annually for the program for medically handicapped children, based on a proportion of the county's total general property tax duplicate, not to exceed three-tenths of a mill, and charge the county, up to the amount so determined, for any part of expenses incurred under this section for treatment services on behalf of medically handicapped children having legal settlement in the county that is not paid from federal funds or paid <<+THROUGH THE MEDICAL ASSISTANCE PROGRAM ESTABLISHED +>> under section <<-5111.02->> <<+5111.01+>> of the Revised Code. Prior to any increase in the millage charged to a county, the public health council shall hold a public hearing on the proposed increase and shall give notice of the hearing to each board of county commissioners that would be affected by the increase at least thirty days prior to the date set for the hearing. Any county commissioner may appear and give testimony at the hearing. Any increase in the millage any county is required to provide for the program for medically handicapped children shall be determined, and notice of the amount of the increase shall be provided to each affected board of county commissioners, no later than the first day of June of the fiscal year next preceding the fiscal year in which the increase will take effect. All amounts collected by the department under this division shall be deposited in the state treasury to the credit of the medically handicapped children-county assessment fund, which is hereby created. The fund shall be used by the director of health to comply with sections 3701.021 to 3701.025 of the Revised Code.

(J) Administer a program to provide services to Ohio residents who are twenty-one or more years of age who are suffering from cystic fibrosis and who meet the eligibility requirements established by the rules of the public health council pursuant to division (A)(4) of section 3701.021 of the Revised Code, subject to all provisions of this section other than division (I);

(K) Provide for appeals in accordance with Chapter 119. of the Revised Code for applications for medically handicapped children under division (B) or (E) of this section that have been denied by the department or of amounts paid under division (F) of this section.

Case 1:11-cv-00071-PGG Document 237-105 Filed 08/31/18 Page 281 of 312

OH ST § 3702.01

Sec. 3702.01. As used in sections 3702.01 to 3702.07 of the Revised Code:

(A) "Hospital" means a nonfederal hospital registered under section 3701.07 of the Revised Code as a general medical and surgical hospital or as a pediatric general hospital, other than a hospital operated by a health maintenance organization that has been issued a certificate of authority under section 1742.05 of the Revised Code or a hospital that does not charge patients for services.

(B) "Medical assistance program" means the program of medical assistance established under section <<-511.02->><< +5111.01+>> of the Revised Code and under Title XIX of the "Social Security Act," 49 Stat. 620 (1935), 42 U.S.C. 301, as amended.

(C) "Bad debt," "charity care," "courtesy care," and "contractual allowances" have the meanings given these terms under regulations adopted under Title XVIII of the "Social Security Act," 49 Stat. 620 (1935), 42 U.S.C. 301, as amended.

OH ST § 4123.27

Sec. 4123.27. Information contained in the annual statement provided for in section 4123.26 of the Revised Code, and such other information as may be furnished to the bureau of workers' compensation by employers in pursuance of that section, is for the exclusive use and information of the bureau in the discharge of its official duties, and shall not be open to the public nor be used in any court in any action or proceeding pending therein unless the bureau is a party to the action or proceeding; but the information contained in the statement may be tabulated and published by the bureau in statistical form for the use and information of other state departments and the public. No person in the employ of the bureau or of the department of industrial relations, except such as are authorized by the administrator of workers' compensation or the director of industrial relations, shall divulge any information secured by him while in the employ of the bureau or the department of industrial relations in respect to the transactions, property, claim files, records, or papers of the bureau or department of industrial relations or in respect to the business or mechanical, chemical, or other industrial process of any company, firm, corporation, person, association, partnership, or public utility to any person other than members of the workers' compensation board, the administrator, or to the superior of such employee of the bureau or of the department of industrial relations.

Notwithstanding the restrictions imposed by this section, the governor, select or standing committees of the general assembly, the auditor of state, the attorney general, or their designees, pursuant to the authority granted in this chapter and Chapter 4121. of the Revised Code, may examine any records, claim files, or papers in possession of the industrial commission or the bureau. They also are bound by the privilege that attaches to these papers.

The administrator shall report to the director of human services or to the county director of human services the name, address, and social security number or other identification number of any person receiving workers' compensation whose name or social security number or other identification number is the same as that of a person required by a child support enforcement agency to provide support payments to a recipient of public assistance, and whose name is submitted to the administrator by the director under section 5101.36 of the Revised Code. The administrator shall also inform the director of the amount of workers' compensation paid to the person during such period as the director specifies.

Within fourteen days after receiving from the director of human services a list of the names and social security numbers of recipients of public assistance pursuant to section 5101.181 of the Revised Code, the administrator shall inform the auditor of state of the name, current or most recent address, and social security number of each person receiving workers' compensation pursuant to this chapter whose name and social security number are the same as that of a person whose name or social security number was submitted by the director. The administrator shall also inform the auditor of state of the amount of workers' compensation paid to the person during such period as the director specifies.

The bureau and its employees shall, except for purposes of furnishing the auditor of state with information required by this section, preserve the confidentiality of recipients of public assistance in compliance with division (A) of section 5101.181 of the Revised Code.

For the purposes of this section, "public assistance" means medical assistance <<+PROVIDED THROUGH THE MEDICAL ASSISTANCE PROGRAM ESTABLISHED+>> under section <<-5111.02->> <<+5111.01+>> of the Revised Code, aid to dependent children, or general assistance.

### OH ST § 4734.09

Sec. 4734.09. The license provided for in this chapter shall entitle the holder thereof to practice chiropractic in this state. For the purpose of this chapter "practice of chiropractic" or "practice as a chiropractor" means utilization of the relationship between the musculo-skeletal structures of the body, the spinal column and the nervous system, in the restoration and maintenance of health, in connection with which patient care is conducted with due regard for first aid, hygienic, nutritional, and rehabilitative procedures and the specific vertebral adjustment and manipulation of the articulations and adjacent tissues of the body. The chiropractor is authorized to examine, diagnose, and assume responsibility for the care of patients.

The practice of chiropractic does not permit the chiropractor to treat infectious, contagious, or venereal disease, to perform surgery or acupuncture, or to prescribe or administer drugs for treatment, and roentgen rays shall be used only for diagnostic purposes. The practice of chiropractic does not include the performance of abortions.

An individual holding a valid, current certificate of registration to practice chiropractic is entitled to use the title "doctor" or "doctor of chiropractic" and is a "physician" for the purposes of Chapter 4123. of the Revised Code, and the program established under section <<-5111.02->> <<+ 5111.01+>> of the Revised Code.

### OH ST § 5104.14

Sec. 5101.14. (A) Within available funds, the department of human services shall make payments to the counties within thirty days after the beginning of each calendar quarter for a part of their costs for services to children performed pursuant to Chapter 5153. of the Revised Code.

The funds available for distribution under this division for each fiscal year shall be allocated to the counties as follows:

(1) One-third in the ratio that the total number of residents of the county under eighteen years of age bears to the total number of such persons residing in this state;

(2) One-third in the ratio that the total number of children residing in the county who receive aid to dependent children under Chapter 5107. of the Revised Code bears to the total number of such persons residing in this state;

(3) One-third in the ratio that the total number of children who are residents of the county who received services during the previous calendar year under Chapter 5153. of the Revised Code bears to the total number of such persons residing in this state.

Funds provided to the county under this section shall be deposited in a special fund in the county treasury, known as the children services fund, and shall be used for no other purpose than to meet expenses of the children services program.

(B) The funds distributed under this section shall be used to provide home-based services to children and families; to provide protective services to children; to find, develop, and approve adoptive homes; and to provide short-term, out-of-home care and treatment for children. No funds shall be used for the costs of maintaining a child in a children's home owned and operated by the county.

(C)(1) As used in this division, "services to children" includes only children's protective services, home-based services to children and families, foster home services, residential treatment services, adoptive services, and independent living services.

(2) Except as otherwise provided in this section, the allocation of funds for a fiscal year to a county under this section shall be reduced by the department if in the preceding calendar year the total amount expended for services to children from local funds and funds distributed to the county under section 5101.462 of the Revised Code was less than the total expended from those sources in the second preceding calendar year. The reduction shall be equal to the difference between the total expended in the preceding calendar year and the total expended in the second preceding calendar year.

The determination of whether the amount expended for services to children was less in the preceding calendar year than in the second preceding calendar year shall not include a difference due to any of the following factors to the extent that the difference does not exceed the amount attributable to that factor:

Case 1:11-cv-00071-PGG   Document 237-105   Filed 08/31/18   Page 283 of 312

(a) An across-the-board reduction in the county budget as a whole;

(b) A reduced or failed levy specifically earmarked for children services;

(c) A reduced allocation of funds to the county under section 5101.462 of the Revised Code;

(d) The closure of, or a reduction in the operating capacity of, a children's home owned and operated by the county.

(3) Funds withheld under this division may be reallocated by the department to other counties. The department may grant whole or partial waivers of the provisions of this division.

(D) No funds shall be paid to any county under this section until the director of human services has approved a plan for services to children submitted by the county department of human services or the county children services board for the current calendar year. The department of human services shall adopt rules prescribing the general content of the county children services plan and the general content of the evaluation required by division (O) of section 5153.16 of the Revised Code.

(E) Children who are in the temporary or permanent custody of a certified public or private nonprofit agency or institution, or who are in adoptions subsidized under division (N) of section 5153.16 of the Revised Code are eligible for medical assistance <<+THROUGH THE MEDICAL ASSISTANCE PROGRAM ESTABLISHED+>> under section <<-5111.02->> <<+5111.01+>> of the Revised Code.

(F) Within ninety days after the end of each fiscal year, each county shall return any unspent funds to the department.

(G) The department shall prepare an annual report detailing on a county-by-county basis the services provided with funds distributed under this section. The report shall be submitted to the general assembly by the thirtieth day of September each year and also shall be made available to the public.

(H) In accordance with Chapter 119. of the Revised Code, the director shall adopt, and may amend and rescind, rules prescribing reports on expenditures to be submitted by the counties as necessary for the implementation of this section.

## OH ST § 5101.18

Sec. 5101.18. (A) The director of human services shall determine what payments to any individual applying for or receiving aid under Chapter 5107. or 5113. of the Revised Code shall be regarded as income or resources. In making this determination, the director shall consider:

(1) The source of the payment;

(2) The amount of the payment;

(3) The purpose for which the payment was made;

(4) Whether regarding the payment as income would be in the public interest.

(B) The director shall also take into consideration whether treating the payment as income would be detrimental to any of the programs administered in whole or in part by the department of human services and whether such determination would jeopardize the receipt of any federal grant or payment by the state or any receipt of aid under Chapter 5107. of the Revised Code. The director shall establish such rules as are necessary for carrying out this section and shall revise such rules at such times as he finds it necessary.

Any recipient of aid under Chapter 5107. of the Revised Code or Title XVI of the "Social Security Act," 49 Stat. 620 (1935), 42 U.S.C. 301, as amended, whose money payment is discontinued as the result of a general increase in old-age, survivors, and disability insurance benefits under such act, shall remain a recipient of aid for the purpose of receiving medical assistance <<+THROUGH THE MEDICAL ASSISTANCE PROGRAM ESTABLISHED+>> under section <<- 5111.02->> <<+5111.01+>> of the Revised Code.

## OH ST § 5101.36

Sec. 5101.36. Any application for public assistance gives a right of subrogation to the department of human services for any workers' compensation benefits payable to a person who is subject to a support order, as defined in section 2301.34 of the Revised Code, on behalf of the applicant, to the extent of any public assistance payments made on the applicant's behalf. If the director of human services, in consultation with a child support enforcement agency and the administrator of the bureau of workers' compensation, determines that a person responsible for support payments to a recipient of

public assistance is receiving workers' compensation, he shall notify the administrator of the amount of the benefit to be paid to the department of human services.

 For purposes of this section, "public assistance" means medical assistance <<+PROVIDED THROUGH THE MEDICAL ASSISTANCE PROGRAM ESTABLISHED+>> under section <<-5111.02->> <<+5111.01+>> of the Revised Code, aid to dependent children, or general assistance.

OH ST § 5111.01

 <<+SEC. 5111.01. (A) THE DEPARTMENT OF HUMAN SERVICES MAY PROVIDE MEDICAL ASSISTANCE UNDER THE MEDICAID PROGRAM, TITLE XIX OF THE "SOCIAL SECURITY ACT," 49 STAT. 620 (1935), 42 U.S.C. 301, AS AMENDED, AS LONG AS FEDERAL FUNDS ARE PROVIDED FOR SUCH ASSISTANCE, TO THE FOLLOWING:+>>
 <<+(1) RECIPIENTS AND POTENTIAL RECIPIENTS OF AID UNDER CHAPTER 5107. OF THE REVISED CODE;+>>
 <<+(2) AGED, BLIND, AND DISABLED PERSONS WHO MEET THE FOLLOWING CONDITIONS:+>>
 <<+(A) RECEIVE FEDERAL AID UNDER TITLE XVI OF THE "SOCIAL SECURITY ACT," OR ARE ELIGIBLE FOR BUT ARE NOT RECEIVING SUCH AID, PROVIDED THAT THE INCOME FROM ALL OTHER SOURCES FOR INDIVIDUALS WITH INDEPENDENT LIVING ARRANGEMENTS SHALL NOT EXCEED ONE HUNDRED SEVENTY–FIVE DOLLARS PER MONTH. THE INCOME STANDARDS HEREBY ESTABLISHED SHALL BE ADJUSTED ANNUALLY AT THE RATE THAT IS USED BY THE DEPARTMENT OF HEALTH AND HUMAN SERVICES TO ADJUST THE AMOUNTS PAYABLE UNDER TITLE XVI.+>>
 <<+(B) DO NOT RECEIVE AID UNDER TITLE XVI, BUT MEET ONE OR BOTH OF THE FOLLOWING CRITERIA:+>>
 <<+(I) WOULD BE ELIGIBLE TO RECEIVE SUCH AID, EXCEPT THAT THEIR INCOME, OTHER THAN THAT EXCLUDED FROM CONSIDERATION AS INCOME UNDER TITLE XVI, EXCEEDS THE MAXIMUM UNDER DIVISION (A)(2)(A) OF THIS SECTION, AND INCURRED EXPENSES FOR MEDICAL CARE, AS DETERMINED UNDER FEDERAL REGULATIONS APPLICABLE TO SECTION 209(B) OF THE "SOCIAL SECURITY AMENDMENTS OF 1972," 86 STAT. 1381, 42 U.S.C.A. 1396A(F), AS AMENDED, EQUAL OR EXCEED THE AMOUNT BY WHICH THEIR INCOME EXCEEDS THE MAXIMUM UNDER DIVISION (A)(2)(A) OF THIS SECTION;+>>
 <<+(II) RECEIVED AID FOR THE AGED, AID TO THE BLIND, OR AID FOR THE PERMANENTLY AND TOTALLY DISABLED PRIOR TO JANUARY 1, 1974, AND CONTINUE TO MEET ALL THE SAME ELIGIBILITY REQUIREMENTS.+>>
 <<+(3) PERSONS TO WHOM FEDERAL LAW REQUIRES, AS A CONDITION OF STATE PARTICIPATION IN THE MEDICAID PROGRAM, THAT MEDICAL ASSISTANCE BE PROVIDED;+>>
 <<+(4) PERSONS UNDER AGE TWENTY–ONE WHO MEET THE FINANCIAL ELIGIBILITY STANDARDS IN EFFECT UNDER SECTIONS 5107.02 TO 5107.15 OF THE REVISED CODE, BUT DO NOT MEET THE REQUIREMENTS OF DIVISION (A) OF SECTION 5107.03 OF THE REVISED CODE.+>>
 <<+(B) IF FUNDS ARE APPROPRIATED FOR SUCH PURPOSE BY THE GENERAL ASSEMBLY, THE DEPARTMENT MAY PROVIDE MEDICAL ASSISTANCE TO PERSONS IN GROUPS DESIGNATED BY FEDERAL LAW AS GROUPS TO WHICH A STATE, AT ITS OPTION, MAY PROVIDE MEDICAL ASSISTANCE UNDER THE MEDICAID PROGRAM.+>>

OH ST § 5111.011

 <<+SEC. 5111.011. (A) AS USED IN THIS SECTION:+>>
 <<+(1) "NURSING FACILITY" MEANS A FACILITY DEFINED AS A NURSING FACILITY UNDER SEC. 1919 OF THE "SOCIAL SECURITY ACT," 49 STAT. 620 (1935), 42 U.S.C. 1396R, AS AMENDED.+>>

&lt;&lt;+(2) "INSTITUTIONALIZED INDIVIDUAL" MEANS AN INDIVIDUAL WHO IS A PATIENT IN A NURSING FACILITY OR WHO RECEIVES HOME–AND COMMUNITY–BASED SERVICES UNDER A FEDERAL WAIVER GRANTED THE DEPARTMENT OF HUMAN SERVICES UNDER 42 U.S.C. 1396A(10)(A)(II)(VI).+&gt;&gt;

&lt;&lt;+(B) SUBJECT TO THIS SECTION, THE DEPARTMENT OF HUMAN SERVICES SHALL, PURSUANT TO SECTION 111.15 OF THE REVISED CODE, ADOPT RULES ESTABLISHING ELIGIBILITY REQUIREMENTS FOR THE MEDICAL ASSISTANCE PROGRAM AND DEFINING, CONSISTENT WITH FEDERAL LAW, THE TERM "RESOURCES" AS USED IN THIS SECTION.+&gt;&gt;

&lt;&lt;+(C) IN DETERMINING ELIGIBILITY FOR MEDICAL ASSISTANCE, THE VALUE OF REAL PROPERTY OF AGED, BLIND, OR DISABLED PERSONS USED AS A HOMESTEAD BY SUCH PERSONS SHALL BE THE MAXIMUM ALLOWED UNDER TITLE XVI OF THE "SOCIAL SECURITY ACT."+&gt;&gt;

&lt;&lt;+(D) NO PERSON IS ELIGIBLE FOR MEDICAL ASSISTANCE IF ON OR PRIOR TO DECEMBER 31, 1989, HE HAS TRANSFERRED REAL OR PERSONAL PROPERTY FOR THE PURPOSE OF SECURING MEDICAL ASSISTANCE UNDER SECTION 5111.01 OF THE REVISED CODE AND THE TRANSFER OCCURRED DURING THE TWO YEARS PRECEDING HIS APPLICATION. IN ORDER TO SECURE COMPLIANCE WITH THIS DIVISION, THE DIRECTOR OF HUMAN SERVICES SHALL REQUIRE ALL APPLICANTS FOR ASSISTANCE TO SUBMIT TRUE AND CORRECT COPIES OF ANY FEDERAL INCOME OR GIFT TAX FORM OR SCHEDULE FILED, SINGLY OR JOINTLY, BY THE APPLICANT DURING THE PRECEDING FIVE TAXABLE YEARS. SUCH COPIES, AND THE INFORMATION DISCLOSED THEREON, SHALL BE USED SOLELY FOR THE PURPOSE OF DETERMINING THE PROBABILITY OF WHETHER THE APPLICANT HAS TRANSFERRED ASSETS IN VIOLATION OF THIS DIVISION. THE DIRECTOR SHALL PROVIDE FOR THE CONFIDENTIALITY AND RETURN OF ANY COPIES OF FORMS OR SCHEDULES SUBMITTED UNDER THIS DIVISION. WHERE SUCH COPIES REVEAL THE PROBABILITY THAT AN APPLICANT HAS TRANSFERRED ASSETS IN VIOLATION OF THIS DIVISION, A PRESUMPTION ARISES THAT THE APPLICANT HAS TRANSFERRED ASSETS IN VIOLATION OF THIS DIVISION, AND THE DIRECTOR SHALL DENY THE APPLICATION UNTIL THE APPLICANT SUBMITS A TRUE AND ACCURATE EXPENDITURE STATEMENT TO THE DIRECTOR THAT SHOWS THE APPLICANT DID NOT VIOLATE THIS DIVISION. THE DIRECTOR OF HUMAN SERVICES SHALL ADOPT RULES TO IMPLEMENT THIS PROVISION.+&gt;&gt;

&lt;&lt;+(E)(1) AN INSTITUTIONALIZED INDIVIDUAL WHO IS OTHERWISE ELIGIBLE FOR MEDICAL ASSISTANCE SHALL BE INELIGIBLE FOR NURSING FACILITY SERVICES OR SERVICES PROVIDED UNDER A HOME–AND COMMUNITY–BASED WAIVER FOR A PERIOD SPECIFIED IN DIVISION (E)(2) OF THIS SECTION IF HE, ON OR AFTER JANUARY 1, 1990, TRANSFERS RESOURCES FOR LESS THAN FAIR MARKET VALUE AT ANY TIME DURING OR AFTER THE THIRTY–MONTH PERIOD IMMEDIATELY PRIOR TO EITHER OF THE FOLLOWING:+&gt;&gt;

&lt;&lt;+(A) THE DATE HE BECOMES AN INSTITUTIONALIZED INDIVIDUAL IF HE IS ELIGIBLE FOR MEDICAL ASSISTANCE ON THAT DATE;+&gt;&gt;

&lt;&lt;+(B) THE DATE HE APPLIES FOR MEDICAL ASSISTANCE WHILE AN INSTITUTIONALIZED INDIVIDUAL.+&gt;&gt;

&lt;&lt;+(2) THE PERIOD OF INELIGIBILITY SHALL BEGIN WITH THE MONTH IN WHICH THE RESOURCES WERE TRANSFERRED. THE NUMBER OF MONTHS IN THE PERIOD SHALL BE THE LESSER OF THE FOLLOWING:+&gt;&gt;

&lt;&lt;+(A) THIRTY MONTHS;+&gt;&gt;

&lt;&lt;+(B) A NUMBER OF MONTHS EQUAL TO THE RESULT OBTAINED BY DIVIDING THE TOTAL UNCOMPENSATED VALUE OF THE TRANSFERRED RESOURCES BY THE AVERAGE MONTHLY COST OF SERVICES, AT THE TIME OF THE APPLICATION FOR MEDICAL ASSISTANCE, FOR A PRIVATE PATIENT IN A NURSING FACILITY.+&gt;&gt;

&lt;&lt;+THE DEPARTMENT SHALL DETERMINE THE AVERAGE MONTHLY COST OF SERVICES USING, AT ITS DISCRETION, EITHER COST FIGURES FOR NURSING FACILITIES IN THE ENTIRE STATE OR

COST FIGURES FOR NURSING FACILITIES IN THE COMMUNITY IN WHICH THE INDIVIDUAL IS INSTITUTIONALIZED.+>>

<<+(3) THE DEPARTMENT OF HUMAN SERVICES SHALL ALLOW EXCEPTIONS TO THE PERIOD OF INELIGIBILITY TO THE EXTENT THAT EXCEPTIONS ARE PERMITTED BY FEDERAL LAW. AN EXCEPTION BASED ON UNDUE HARDSHIP TO THE INSTITUTIONALIZED INDIVIDUAL SHALL BE ALLOWED ONLY SO LONG AS THE INDIVIDUAL COOPERATES WITH THE DEPARTMENT OR THE COUNTY DEPARTMENT OF HUMAN SERVICES IN SECURING THE RETURN OF TRANSFERRED RESOURCES.+>>

<<+TO SECURE COMPLIANCE WITH THIS DIVISION, THE DEPARTMENT MAY REQUIRE APPLICANTS FOR AND RECIPIENTS OF MEDICAL ASSISTANCE, AS A CONDITION OF ELIGIBILITY, TO PROVIDE DOCUMENTATION OF THEIR INCOME AND RESOURCES UP TO FIVE YEARS PRIOR TO THE TIME OF APPLICATION. DOCUMENTATION MAY INCLUDE, BUT IS NOT LIMITED TO, TAX RETURNS, RECORDS FROM FINANCIAL INSTITUTIONS, AND REAL PROPERTY RECORDS.+>>

<<+(F) THE DEPARTMENT SHALL, BY RULE ADOPTED IN ACCORDANCE WITH SECTION 111.15 OF THE REVISED CODE, ESTABLISH STANDARDS CONSISTENT WITH FEDERAL LAW FOR ALLOCATING INCOME AND RESOURCES AS INCOME AND RESOURCES OF THE SPOUSE, CHILDREN, PARENTS, OR STEP–PARENTS OF A RECIPIENT OF OR APPLICANT FOR MEDICAL ASSISTANCE. NOTWITHSTANDING ANY PROVISION OF STATE LAW, INCLUDING STATUTES, ADMINISTRATIVE RULES, COMMON LAW, AND COURT RULES, REGARDING REAL OR PERSONAL PROPERTY OR DOMESTIC RELATIONS, THE STANDARDS ESTABLISHED UNDER THIS DIVISION SHALL BE USED TO DETERMINE ELIGIBILITY FOR MEDICAL ASSISTANCE.+>>

OH ST § 5111.012

<<+SEC. 5111.012. THE COUNTY DEPARTMENT OF HUMAN SERVICES OF EACH COUNTY SHALL ESTABLISH THE ELIGIBILITY FOR MEDICAL ASSISTANCE OF PERSONS LIVING IN THE COUNTY, AND SHALL NOTIFY THE DEPARTMENT OF HUMAN SERVICES IN THE MANNER PRESCRIBED BY THE DEPARTMENT. THE COUNTY SHALL BE REIMBURSED FOR ADMINISTRATIVE EXPENDITURES IN ACCORDANCE WITH SECTIONS 5101.16 AND 5101.161 OF THE REVISED CODE. EXPENDITURES FOR MEDICAL ASSISTANCE SHALL BE MADE FROM FUNDS APPROPRIATED TO THE DEPARTMENT OF HUMAN SERVICES FOR PUBLIC ASSISTANCE SUBSIDIES. THE PROGRAM SHALL CONFORM TO THE REQUIREMENTS OF THE "SOCIAL SECURITY ACT," 49 STAT. 620 (1935), 42 U.S.C. 301, AS AMENDED.+>>

OH ST § 5111.02

Sec. 5111.02. (A) <<-The department of human services may provide medical assistance under Title XIX of the "Social Security Act," 49 Stat. 620 (1935), 42 U.S.C. 301, as amended, as long as federal funds are provided for such assistance, to recipients and potential recipients of aid under Chapter 5107. of the Revised Code, individuals under twenty-one years of age who meet the financial eligibility standards in effect under sections 5107.02 to 5107.15 of the Revised Code, but do not meet the requirements of division (A) of section 5107.03 of the Revised Code, and aged, blind, and disabled persons who meet the following conditions:->>

<<-(1) Receive federal aid under Title XVI of the "Social Security Act," or are eligible for but are not receiving such aid, provided that the income from all other sources for individuals with independent living arrangements shall not exceed one hundred seventy-five dollars per month. The income standards hereby established shall be adjusted annually at the rate that is used by the department of health and human services to adjust the amounts payable under Title XVI.->>

<<-(2) Do not receive aid under Title XVI, but meet one or both of the following criteria:->>

<<-(a) Would be eligible to receive such aid, except that their income, other than that excluded from consideration as income under Title XVI, exceeds the maximum under division (A)(1) of this section, and incurred expenses for medical care, as determined under federal regulations applicable to section 209(b) of the "Social Security Amendments of 1972,"

86 Stat. 1381, 42 U.S.C.A. 1396a(f), as amended, equal or exceed the amount by which their income exceeds the maximum under division (A)(1) of this section;->>

 <<-(b) Received aid for the aged, aid to the blind, or aid for the permanently and totally disabled prior to January 1, 1974, and continue to meet all the same eligibility requirements.->>

 <<-(3) Are not included under division (A)(1) or (2) of this section, but whose inclusion in the program is a condition of federal participation under Title XIX or federal regulations.->>

 <<-(B)(1) In determining eligibility for medical assistance, the value of real property of aged, blind, or disabled persons used as a homestead by such persons shall be the maximum allowed under Title XVI.->>

 <<-(2) No person shall be eligible for medical assistance under division (A)(1) or (2)(a) of this section if he has transferred real or personal property during the two years preceding his application for the purpose of securing medical assistance under this section. In order to secure compliance with division (B)(2) of this section, the director of human services shall require all applicants for assistance under division (A) of this section to submit true and correct copies of any federal income or gift tax form or schedule filed, singly or jointly, by the applicant during the preceding five taxable years. Such copies, and the information disclosed thereon, shall be used solely for the purpose of determining the probability of whether the applicant has transferred assets in violation of this division. The director shall provide for the confidentiality and return of any copies of forms or schedules submitted under this division. Where such copies reveal the probability that an applicant has transferred assets in violation of this division, a presumption arises that the applicant has transferred assets in violation of this division, and the director shall deny the application until such time as the applicant submits a true and accurate expenditure statement to the director that shows the applicant did not violate this division. The director of human services shall establish rules to implement this provision.->>

 <<-(3) To the extent that federal laws and regulations with respect to children who are receiving aid under Title IV A of the "Social Security Act," 49 Stat. 627 (1935), 42 U.S.C.A. 601, as amended, permit the implementation of such a policy, the income of stepparents shall be considered available to their stepchildren in determining the eligibility of children for medical assistance.->>

 <<-(4) The director of human services shall establish by rule such other eligibility requirements as he considers necessary to the operation of the medical assistance program.->>

 <<-(C)->> Under the medical assistance program authorized by <<- division (A) of this->> section <<+5111.01 OF THE REVISED CODE:+>>

 (1) Reimbursement by the department of human services to a medical provider for any medical service rendered under the medicaid program shall not exceed the authorized reimbursement level for the same service under the medicare program established under Title XVIII of the "Social Security Act," 49 Stat. 620 (1935), 42 U.S.C. 301, as amended.

 (2) Reimbursement for the cost of services provided by a skilled nursing facility, intermediate care facility, or dual skilled nursing and intermediate care facility shall be as provided in sections 5111.20 to 5111.32 of the Revised Code. Such reimbursement shall include payments, at a rate equal to the percentage of the per diem per patient rate that the department of human services has established for the facility under sections 5111.23, 5111.24, 5111.25, and 5111.27 of the Revised Code for the year for which the cost of services is reimbursed, to facilities to reserve a bed for a recipient during a temporary absence under conditions prescribed by the department, to include hospitalization for an acute condition, visits with relatives and friends, and participation in therapeutic programs outside the facility, when the recipient's plan of care provides for such absence and federal participation in the payments is available. The maximum period during which payments may be made to reserve a bed shall not exceed the maximum period specified under federal regulations, and shall not be more than thirty days during any twelve-month period for hospital stays, visits with friends and relatives and participation in therapeutic programs. Recipients who have been identified by the department or its designee as requiring the level of care of an intermediate care facility for the mentally retarded shall not be subject to a maximum period during which payments may be made to reserve a bed if prior authorization of the department is obtained for hospital stays, visits with relativesand friends, and participation in therapeutic programs. The department shall adopt rules under division <<-(E)->> <<+(B)+>> of this section establishing conditions under which prior authorization may be obtained.

 (3) Reimbursement for freestanding medical laboratory charges shall not exceed the customary and usual fee for laboratory profiles.

(4) The department may deduct from payments for services rendered by a medicaid provider under the medical assistance program any amounts the provider owes the state as the result of incorrect medical assistance payments the department has made to him.

(5) The department may conduct final fiscal audits in accordance with the applicable requirements set forth in federal laws and regulations and determine any amounts the provider may owe the state. The final fiscal audits shall be conducted in accordance with generally accepted auditing standards, which include the use of statistical sampling.

(6) To the maximum extent that federal laws and regulations permit the implementation of such a policy, the department may institute a copayment program for all services provided under the medical assistance program. The program shall be administered in accordance with the applicable requirements set forth in federal laws and regulations.

(7) The number of days of inpatient hospital care for which reimbursement is made on behalf of a recipient of medical assistance shall not exceed thirty days during a period beginning on the day of the recipient's admission to a hospital and ending sixty days after the termination of that hospital stay, whether or not completed in the same hospital, except that the department of human services may make exceptions to this limitation and that the limitation shall not apply to children participating in the crippled children program under section 3701.023 of the Revised Code.

<<-(D) The county department of human services of each county shall establish the eligibility for medical assistance of persons living in the county, and shall notify the department of human services in the manner prescribed by the department. The county shall be reimbursed for administrative expenditures in accordance with sections 5101.16 and 5101.161 of the Revised Code. Expenditures for medical assistance shall be made from funds appropriated to the department of human services for public assistance subsidies. The program shall conform to the requirements of the "Social Security Act," 49 Stat. 629 (1935), 42 U.S.C. 301, as amended.->>

<<-(E)->><<+(B)+>> The director of human services may adopt, amend, or rescind rules under Chapter 119. of the Revised Code establishing the amount, duration, and scope of medical services to be included in the medical assistance program. Such rules shall establish the conditions under which services are covered and reimbursed, the method of reimbursement applicable to each covered service, and the amount of reimbursement or, in lieu of such amounts, methods by which such amounts are to be determined for each covered service.

<<-(F)->><<+(C)+>> No health maintenance organization that has a contract to provide health care services to recipients of medical assistance shall restrict the availability to its enrollees of any prescription drugs included in the Ohio medicaid drug formulary as established under rules of the department.

OH ST § 5111.021

Sec. 5111.021. Under the medical assistance program authorized by <<- division (A) of->> section <<-5111.02->> <<+5111.01+>> of the Revised Code, any amount determined to be owed the state by a final fiscal audit conducted pursuant to division <<-(C)->><<+(A)+>>(5) of section 5111.02 of the Revised Code, upon the issuance of an adjudication order pursuant to Chapter 119. of the Revised Code that contains a finding that there is a preponderance of the evidence that the provider will liquidate assets or file bankruptcy in order to prevent payment of the amount determined to be owed the state, becomes a lien upon the real and personal property of the provider. Upon failure of the provider to pay the amount to the state, the director of human services shall file notice of the lien, for which there shall be no charge, in the office of the county recorder of the county in which it is ascertained that the provider owns real or personal property. The director shall notify the provider by mail of the lien, but absence of proof that the notice was sent does not affect the validity of the lien. The lien is not valid as against the claim of any mortgagee, pledgee, purchaser, judgment creditor, or other lienholder of record at the time the notice is filed.

If the provider acquires real or personal property after notice of the lien is filed, the lien shall not be valid as against the claim of any mortgagee, pledgee, subsequent bona fide purchaser for value, judgment creditor, or other lienholder of record to such after-acquired property unless the notice of lien is refiled after the property is acquired by the provider and before the competing lien attaches to the after-acquired property or before the conveyance to the subsequent bona fide purchaser for value.

When the amount has been paid, the provider may record with the recorder notice of the payment. For recording such notice of payment, the recorder shall charge and receive from the provider a fee of one dollar.

In the event of a distribution of a provider's assets pursuant to an order of any court under the law of this state including any receivership, assignment for benefit of creditors, adjudicated insolvency, or similar proceedings, amounts then or thereafter due the state under this chapter have the same priority as provided by law for the payment of taxes due the state and shall be paid out of the receivership trust fund or other such trust fund in the same manner as provided for claims for unpaid taxes due the state.

If the attorney general finds after investigation that any amount due the state under this chapter is uncollectable, in whole or in part, he shall recommend to the director the cancellation of all or part of the claim. The director may thereupon effect the cancellation.

## OH ST § 5111.023

Sec. 5111.023. (A) The department of human services may provide medical assistance under Title XIX of the "Social Security Act," 49 Stat. 620 (1935), 42 U.S.C. 301, as amended, in addition to such assistance provided under section <<-5111.02->> <<+5111.01+>> of the Revised Code, as long as federal funds are provided for such assistance, to each former recipient of assistance under Chapter 5107. of the Revised Code who meets all of the following requirements:

(1) Is ineligible for assistance under Chapter 5107. of the Revised Code solely as a result of increased income due to employment;

(2) Is not covered by, and does not have access to, medical insurance coverage through the employer with benefits comparable to those provided under this section, as determined in accordance with rules adopted by the department of human services under division (B) of this section;

(3) Meets any other requirement established by rule adopted under division (B) of this section.

(B) The department of human services shall adopt such rules under Chapter 119. of the Revised Code as are necessary to implement and administer the medical assistance program under this section.

(C) A person seeking to participate in a program of medical assistance under this section shall apply to the county department of human services in the county in which the applicant resides. The application shall be made on a form prescribed by the state department of human services and furnished by the county department.

(D) If the county department of human services determines that a person is <<-eligible->> <<+ELIGIBLE+>> to receive medical assistance under this section, the department shall provide assistance, to the same extent and in the same manner as medical assistance is provided to a person eligible for assistance under Chapter 5107. of the Revised Code, for no longer than eighteen months, beginning the month after the date the recipient's medical assistance under Chapter 5107. of the Revised Code is terminated.

## OH ST § 5111.04

Sec. 5111.04. (A) As used in this section:

(1) "Outpatient health facility" means a facility, other than an outpatient hospital facility, which provides comprehensive primary health services by or under the direction of a physician at least five days per week on a forty-hour per week basis to outpatients, is operated by the board of health of a city or general health district or another public agency or by a nonprofit private agency or organization under the direction and control of a governing board that has no health-related responsibilities other than the direction and control of one or more such outpatient health facilities, and receives at least seventy-five per cent of its operating funds from public sources.

(2) "Comprehensive primary health services" means preventive, diagnostic, therapeutic, rehabilitative, or palliative items or services that include all of the following:

(a) Services of physicians, physician's assistants, and nurse practitioners;

(b) Diagnostic laboratory and radiological services;

(c) Preventive health services, such as children's eye and ear examinations, perinatal services, well child services, and family planning services;

(d) Arrangements for emergency medical services;

(e) Transportation services.

(3) "Nurse practitioner" means a registered professional nurse who:

(a) Is currently certified as a primary care nurse practitioner by the American nurses' association or by the national board of pediatric nurse practitioners and associates;

(b) Is in the process of meeting eligibility requirements for certification as a primary care nurse practitioner by the American nurses' association or by the national board of pediatric nurse practitioners and associates;

(c) Has successfully completed a formal educational program for preparing registered nurses in the delivery of primary care and provided primary care during not less than twelve of the eighteen months immediately preceding July 1, 1979.

(B) Outpatient health facilities are a separate category of medical care provider under the rules governing the administration of the medical assistance program established under section <<-5111.02->> <<+5111.01+>> of the Revised Code. Rates of reimbursement for items and services provided by an outpatient health facility under this section shall be prospectively determined by the department of human services not less often than once each year, shall not be subject to retroactive adjustment based on actual costs incurred, and shall not exceed the maximum fee schedule or rates of payment, limitations based on reasonable costs or customary charges, and limitations based on combined payments received for furnishing comparable services, as are applicable to outpatient hospital facilities under Title XVIII of the "Social Security Act." In determining rates of reimbursement prospectively, the department shall take into account the historic expenses of the facility, the operating requirements and services offered by the facility, and the geographical location of the facility, shall provide incentives for the efficient and economical utilization of the facility's resources, and shall ensure that the facility does not discriminate between classes of persons for whom or by whom payment for items and services is made.

(C) A facility does not qualify for classification as an outpatient health facility under this section unless it:

(1) Has health and medical care policies developed with the advice of and subject to review by an advisory committee of professional personnel, including one or more physicians, one or more dentists if dental care is provided, and one or more registered professional nurses;

(2) Has a medical director, a dental director if dental care is provided, and a nursing director, responsible for the execution of such policies, and has physicians, dentists, nursing, and ancillary staff appropriate to the scope of services provided;

(3) Requires that the care of every patient be under the supervision of a physician, provides for medical care in case of emergency, has in effect a written agreement with one or more hospitals and one or more other outpatient facilities, and has an established system for the referral of patients to other resources and a utilization review plan and program;

(4) Maintains clinical records on all patients;

(5) Provides nursing services and other therapeutic services in compliance with applicable laws and rules and under the supervision of a registered professional nurse, and has a registered professional nurse on duty at all times when the facility is in operation;

(6) Follows approved methods and procedures for the dispensing and administration of drugs and biologicals;

(7) Maintains the accounting and record-keeping system required under federal laws and regulations for the determination of reasonable and allowable costs.

OH ST § 5111.20

Sec. 5111.20. As used in sections 5111.20 to 5111.32 of the Revised Code:

(A) "Allowable costs" are those costs determined by the department to be reasonable and do not include fines paid under section 5111.99 of the Revised Code.

(B) "Home" means a skilled nursing facility, intermediate care facility, intermediate care facility for the mentally retarded, or dual skilled nursing and intermediate care facility certified as in compliance with applicable standards for the medical assistance program by the director of health in accordance with Title XIX of the "Social Security Act," 49 Stat. 620 (1935), 42 U.S.C. 301, as amended.

(C) "Patient" includes "resident."

(D) "Provider agreement" means a contract between the department of human services and a home for the provision of skilled nursing or intermediate care services under the medical assistance program established by section <<- 5111.02->> <<+5111.01+>> of the Revised Code, referred to as the medicaid program.

OH ST § 5111.21

Sec. 5111.21. (A) Subject to <<-section->> <<+SECTIONS 5111.01, 5111.011, 5111.012, AND+>> 5111.02 of the Revised Code, the department of human services shall pay, as provided in sections 5111.20 to 5111.32 of the Revised Code, the reasonable costs of services provided to an eligible medicaid recipient by an eligible home.

In order to be eligible for medical assistance payments, a home shall do all of the following:

(1) Enter into a provider agreement with the department of human services as provided in section 5111.22 of the Revised Code;

(2) Apply for and maintain a valid license to operate if so required by law;

(3) Comply with all applicable state and federal laws and rules.

(B) Any skilled nursing facility or dual skilled nursing and intermediate care facility shall obtain and maintain eligibility for medicare payments under Title XVIII of the "Social Security Act," 49 Stat. 620 (1935), 42 U.S.C. 301, as amended. Any home that fails to obtain and maintain the eligibility required by this division shall not be certified as a skilled nursing facility or dual skilled nursing and intermediate care facility, or shall have such certification revoked. Homes failing to meet the eligibility required by this division may be certified as intermediate care facilities, provided such homes comply with applicable state and federal laws and rules for such certification.

OH ST § 5111.25

Sec. 5111.25. (A) The department of human services shall pay each eligible home for its reasonable property costs, other than for property taxes and utilities, a per diem per patient rate established annually for each home and based on the actual, allowable costs for the previous year following the departmental audit as provided in section 5111.27 of the Revised Code.

"Reasonable property costs" means the actual costs of depreciation of the cost of the buildings on a straight line method over forty years and on components and equipment over a period designated by the department consistent with the guidelines of the internal revenue service of the United States department of the treasury, and interest paid on money borrowed for construction or the purchase of real property and equipment. Depreciation for costs paid or reimbursed by any government agency shall not be included in reasonable property costs unless that part of the payment is used to reimburse the government agency.

Before the audit and final settlement under section 5111.27 of the Revised Code, the department may make a preliminary or interim settlement to effect the following adjustments:

(1) The department shall collect from each home any amount due under division <<-(C)->><<+(A)+>>(4) of section 5111.02 of the Revised Code and pay to the home any amounts due to the home.

(2) The department shall pay to each home an efficiency incentive equal to fifty per cent of the difference between any desk audited actual and allowable costs of depreciation and interest as determined under this division and the applicable limit on property cost payments under divisions (B) and (C) of this section. For purposes of computing the efficiency incentive, depreciation for costs paid or reimbursed by any government agency shall be considered as reasonable property costs.

(B) Except as otherwise provided in division (C) of this section, property cost payments to homes shall not exceed the following limits:

(1) For homes constructed and subsequently originally licensed prior to January 1, 1958, not exceeding two dollars and fifty cents per patient day;

(2) For homes constructed and subsequently originally licensed after December 31, 1957, but prior to January 1, 1968, not exceeding:

(a) Three dollars and fifty cents per patient day if the cost of construction was three thousand five hundred dollars or more per bed;

(b) Two dollars and fifty cents per patient day if the cost of construction was less than three thousand five hundred dollars per bed.

(3) For homes constructed and subsequently originally licensed after December 31, 1967 but prior to January 1, 1976, not exceeding:

 (a) Four dollars and fifty cents per patient day if the cost of construction was five thousand one hundred fifty dollars or more per bed;

 (b) Three dollars and fifty cents per patient day if the cost of construction was less than five thousand one hundred fifty dollars per bed, but exceeds three thousand five hundred dollars per bed;

 (c) Two dollars and fifty cents per patient day if the cost of construction was three thousand five hundred dollars or less per bed.

 (4) For homes constructed and subsequently originally licensed after December 31, 1975 but prior to January 1, 1979, not exceeding:

 (a) Five dollars and fifty cents per patient day if the cost of construction was six thousand eight hundred dollars or more per bed;

 (b) Four dollars and fifty cents per patient day if the cost of construction was less than six thousand eight hundred dollars per bed but exceeds five thousand one hundred fifty dollars per bed;

 (c) Three dollars and fifty cents per patient day if the cost of construction was five thousand one hundred fifty dollars or less per bed, but exceeds three thousand five hundred dollars per bed;

 (d) Two dollars and fifty cents per patient day if the cost of construction was three thousand five hundred dollars or less per bed.

 (5) For homes constructed and subsequently originally licensed after December 31, 1978 but prior to January 1, 1981, not exceeding:

 (a) Six dollars per patient day if the cost of construction was seven thousand six hundred twenty-five dollars or more per bed;

 (b) Five dollars and fifty cents per patient day if the cost of construction was less than seven thousand six hundred twenty-five dollars per bed but exceeds six thousand eight hundred dollars per bed;

 (c) Four dollars and fifty cents per patient day if the cost of construction was six thousand eight hundred dollars or less per bed but exceeds five thousand one hundred fifty dollars per bed;

 (d) Three dollars and fifty cents per patient day if the cost of construction was five thousand one hundred fifty dollars or less but exceeds three thousand five hundred dollars per bed;

 (e) Two dollars and fifty cents per patient day if the cost of construction was three thousand five hundred dollars or less per bed.

 (6) Beginning January 1, 1981 and annually thereafter, for homes constructed and subsequently originally licensed in 1981 and in each year thereafter, not exceeding the property cost payments for the construction costs given in division (B)(5) of this section, provided, however, that in 1981 and annually thereafter, the property cost payment limit in division (B)(5)(a) of this section shall be adjusted for fluctuations in construction costs shown in the "Dodge building cost index for northeastern and north central states" published by the McGraw–Hill information systems company, using 1980 as the base year;

 (7) Beginning January 1, 1981, regardless of the original date of licensure, for the capitalized costs of renovations to homes more than ten thousand dollars but less than one million five hundred thousand dollars made after January 1, 1981, not exceeding six dollars per patient day using 1980 as the base year and adjusting the amount annually for fluctuations in construction costs shown in the "Dodge building cost index for northeastern and north central states" published by the McGraw–Hill information systems company. The payment provided for in this division is the only payment that shall be made for the capitalized costs of renovation.

 The department may adopt rules allowing property costs for a home or part of a home to be calculated according to the date of renovations rather than the date of original construction and licensure if renovation costs exceed one million five hundred thousand dollars but are significantly less than the cost of replacement beds.

 (C) Property cost payments to intermediate care facilities for the mentally retarded shall be determined as follows:

 (1) For such facilities originally licensed by the department of mental retardation and developmental disabilities and certified by the department of health prior to January 1, 1980, not exceeding the property cost payments to other homes under division (B) of this section.

(2) For such facilities originally licensed by the department of mental retardation and developmental disabilities and certified by the department of health January 1, 1980, and thereafter, for cost reporting periods for which final audit settlements with the department of human services have been executed and for which periods all rights of appeal have been exhausted before July 1, 1983, not exceeding the property cost payments to other homes under division (B) of this section.

(3) For such facilities originally licensed by the department of mental retardation and developmental disabilities and certified by the department of health January 1, 1980, and thereafter, for cost reporting periods for which final audit settlements with the department of human services have not been executed or for which periods all rights of appeal have not been exhausted on July 1, 1983, not exceeding twelve dollars per patient day.

(4) Beginning January 1, 1984, and annually thereafter, for such facilities constructed and subsequently originally licensed by the department of mental retardation and developmental disabilities and certified by the department of health in 1984 and thereafter, not exceeding the property cost payments for the construction costs under division (C)(3) of this section, except that in 1984 and annually thereafter, the property cost payment limit in division (C)(3) of this section shall be adjusted for fluctuations in construction costs shown in the "Dodge building cost index for northeastern and north central states," published by McGraw–Hill information systems company, using 1983 as the base year.

(D) After June 30, 1980, the owner of a home operating under a provider agreement shall provide written notice to the department of human services at least forty-five days prior to entering into any contract of sale for the home. After the date on which the transaction of sale for the home is closed, the owner shall refund to the department the amount of excess depreciation paid to the home by the department for each year the owner has operated the home under a provider agreement and prorated according to the number of medicaid patient days for which the home has received payment. If a home is sold after five or less years of operation under a provider agreement, the refund to the department shall be equal to the excess depreciation paid to the home. If a home is sold after more than five years but less than ten years of operation under a provider agreement, the refund to the department shall equal excess depreciation paid to the home multiplied by twenty per cent, multiplied by the number of years less than ten that a home was operated under a provider agreement. If a home is sold after ten or more years of operation under a provider agreement, the owner shall not refund any excess depreciation to the department. For the purposes of this division, "depreciation paid to the home" means the amount paid to the home for property costs pursuant to this section less any amount paid for interest costs. For the purposes of this division, "excess depreciation" is the home's depreciated basis, which is the owner's cost less accumulated depreciation, subtracted from the purchase price but not exceeding the amount of depreciation paid to the home.

A cost report shall be filed with the department within ninety days after the date on which the transaction of sale is closed for a home subject to this division. The report shall show the accumulated depreciation, the sales price, and other information required by the department. The amount of the last two monthly payments to a home made pursuant to division (A)(1) of section 5111.22 of the Revised Code before a sale shall be held in escrow by a bank, trust company, or building and loan or savings and loan association. The department shall, within sixty days following the filing of the cost report, audit the report and report its findings and the amount of any money owed to the department by the home. No later than fifteen days after the owner agrees to a settlement, the funds held in escrow less any amounts due to the department shall be released to the owner and amounts due to the department shall be paid to the department. If the amounts in escrow are less than the amounts due to the department, the balance shall be paid to the department within fifteen days after the owner agrees to a settlement. For the purposes of this section, a transfer of corporate stock or the merger of one corporation into another does not constitute a sale.

If a home is not sold after notice is provided to the department under this division, the department shall order the payments held in escrow released to the home upon receiving written notice from the owner that there will be no sale. After written notice is received from a home that a sale will not take place, the home shall provide notice to the department of human services at least forty-five days prior to entering into any contract of sale at any future time.

(E) The department of human services shall pay each eligible proprietary home a return on the home's net equity computed at the rate of one and one-half times the average of interest rates on special issues of public debt obligations issued to the federal hospital insurance trust fund for the cost reporting period or a lower rate established by the department and approved by the controlling board. No home's return on net equity paid under this division shall exceed one dollar per patient day or a lesser amount established by the department and approved by the controlling board.

(F) This section does not apply to homes reimbursed under section 5111.222 of the Revised Code.

## OH ST § 5111.28

 Sec. 5111.28. Operators of homes shall refund to the department of human services all parts of payments received that exceed actual, allowable costs, any payments that exceed the amounts permitted under division <<- (C)->><< +(A)+>>(1) of section 5111.02 of the Revised Code, any amounts required under division (C) of section 5111.23 of the Revised Code, and all parts of payments received that are attributable to unreasonable or nonallowable costs as determined by federal or state regulations following audit, except that the amount paid under section 5111.24 of the Revised Code to a home that exceeds actual, allowable costs for administration and general services as determined by audit, shall be refunded only to the extent that it exceeds actual, allowable costs plus the efficiency incentive. As used in this section, "efficiency incentive" means two dollars and fifty cents or the equivalent of what two dollars and fifty cents would purchase, using the July, 1989 consumer price index for all items for all urban consumers published by the United States department of labor as a base.

 Before the audit and final settlement under section 5111.27 of the Revised Code, the department may make a preliminary or interim settlement under division <<-(C)->><<+(A)+>>(4) of section 5111.02 of the Revised Code of the amount by which the rate calculated pursuant to section 5111.24 of the Revised Code exceeds the home's actual allowable costs for administration and general services plus two dollars and fifty cents or the equivalent of what two dollars and fifty cents would purchase, using the July, 1989 consumer price index for all items for all urban consumers as a base. Any preliminary or interim settlement made under this section shall be subject to final settlement when the department completes the audit required by section 5111.27 of the Revised Code and is subject to appeal as provided under section 5111.06 of the Revised Code as part of the final settlement.

 The department shall transmit refunds to the treasurer of state for deposit in the general revenue fund.

## OH ST § 5113.16

 Sec. 5113.16.(A) The department of human services shall establish a disability advocacy program unit, and shall require each county department of human services to establish a disability advocacy program unit or to join with other county departments of human services to establish a joint county disability advocacy program unit. Each disability advocacy program unit shall:

 (1) Identify applicants for and recipients of general assistance who might be eligible for supplemental security income and assist them in applying for such benefits;

 (2) Assist applicants for and recipients of general assistance in securing documentation of disabling conditions;

 (3) Inform applicants for and recipients of general assistance of available sources of representation, which may include the disability advocacy program unit, and of their right to represent themselves in reconsiderations and appeals of social security administration decisions that deny them supplemental security income benefits. The unit may require the applicants and recipients, as a condition of eligibility for general assistance, to pursue reconsiderations and appeals of social security administration decisions that deny them supplemental security income benefits, and shall assist applicants and recipients as necessary to obtain such benefits.

 (4) Require applicants for and recipients of general assistance who, in the judgment of the unit, are or may be aged, blind, or disabled, to apply for medical assistance <<+THROUGH THE MEDICAL ASSISTANCE PROGRAM ESTABLISHED+>> under section <<-5111.02->><<+5111.01+>> of the Revised Code, make determinations when appropriate as to eligibility for medical assistance, and refer their applications when necessary to the disability determination unit established in accordance with division (C) of this section for expedited review;

 (5) Require each applicant for and each recipient of general assistance, as a condition of eligibility for general assistance, to execute a written authorization for the secretary of health and human services to withhold benefits due that individual and pay to the director of human services or the director's designee an amount sufficient to reimburse the state and county shares of interim assistance furnished to the individual. For the purposes of division (D)(5) of this section, "benefits" and "interim assistance" have the meanings given these terms in Title XVI of the "Social Security Act," 86 Stat. 1475 (1972), 42 U.S.C. 1383, as amended.

(6) Enter into a written contract, if necessary, with a private organization, a nonprofit organization, or a public agency, including any other county department of human services, to provide all or a portion of the assistance required under this division to a recipient of poor relief. The county department shall provide to the party with whom it contracts all records relevant to the application for supplemental security income benefits.

(B) The department of human services shall:

(1) Adopt rules pursuant to Chapter 119. of the Revised Code for the effective administration of disability advocacy programs. The rules shall include:

(a) Methods to be used in collecting information from and disseminating it to county departments of human services, including but not limited to the following information:

(i) The number of disabled recipients of poor relief in the county;

(ii) The final decision made either by the social security administration or by a court for each application or reconsideration in which the recipient was assisted pursuant to this section.

(b) The type and process of training to be provided by the department of human services to the employees of the county department of human services who perform duties under this section;

(c) Requirements for the written authorization required by division (A)(5) of this section.

(d) Requirements for contracting under division (A)(6) of this section.

(2) Provide basic and continuing training to employees of the county department of human services who perform duties under this section. Training shall include but not be limited to all processes necessary to obtain federal disability benefits, and methods of advocacy.

(3) Adopt rules in accordance with Chapter 119. of the Revised Code establishing an incentive formula that does both of the following:

(a) Enables counties that achieve savings in the costs of medical services under Chapter 5113. of the Revised Code to reduce the amounts of funds they must transfer to the public assistance fund under section 5101.161 of the Revised Code to meet the county shares of expenditures pursuant to Chapters 5107. and 5113. of the Revised Code;

(b) Provides that the amount of any reduction in the county shares that a county receives under division (D)(1) of this section must be included in the calculations of county shares under division (E) of this section.

(C) The department of human services shall establish a disability determination unit. On or before January 1, 1988, the department shall develop guidelines for expediting reviews of applications for medical assistance <<+ THROUGH THE MEDICAL ASSISTANCE PROGRAM ESTABLISHED+>> under section <<- 5111.02->> <<+5111.01+>> of the Revised Code for persons who have been referred to the unit under division (A)(4) of this section. On and after January 2, 1988, the department shall make determinations of eligibility for medical assistance for any such person within the time prescribed by federal regulations.

## OH ST § 5117.10

Sec. 5117.10. (A) On or before the fifteenth day of January, the tax commissioner shall pay each applicant determined eligible for a payment under divisions (A) and (B) of section 5117.07 of the Revised Code one hundred twenty-five dollars.

(B) The tax commissioner may withhold from any payment to which a person would otherwise be entitled under division (A) of this section any amount that the tax commissioner determines was erroneously received by such person in a preceding year under this or the program established under Am.Sub.H.B. 230, as amended by Am.H.B. 937, Am.Sub.H.B. 1073, Am.Sub.S.B. 493, and Am.Sub.S.B. 523 of the 112th general assembly, provided the tax commissioner has employed all other legal methods reasonably available to obtain reimbursement for the erroneous payment or credit prior to the commencement of the current program year.

(C) Payments made under this section and credits granted under section 5117.09 of the Revised Code shall not be considered income for the purpose of determining eligibility or the level of benefits or assistance under <<- sections->> <<+SECTION+>> 329.042<<-, 5111.02->> or Chapters 5107.<<+, 5111.+>>, and 5113. of the Revised Code<<-,->><<+;+>> supplemental security income payments under Title XVI of the "Social Security Act," 49 Stat. 620 (1935), 42 U.S.C. 301, as amended<<-,->><<+;+>> or any other program under which eligibility or the level of benefits or assistance is based upon need measured by income.

MEDICAID ELIGIBILITY—TRANSFER OF PROPERTY, 1989 Ohio Laws File 98...

Case 1:11-cv-00071-PGG   Document 237-105   Filed 08/31/18   Page 296 of 312

 SECTION 2. That existing sections 109.85, 2301.351, 2913.40, 3701.023, 3702.01, 4123.27, 4734.09, 5101.14, 5101.18, 5101.36, 5111.02, 5111.021, 5111.023, 5111.04, 5111.20, 5111.21, 5111.25, 5111.28, 5113.16, and 5117.10 of the Revised Code are hereby repealed.

 SECTION 3. This act is hereby declared to be an emergency measure necessary for the immediate preservation of the public peace, health, and safety. The reason for such necessity is that Ohio will lose federal Medicaid funds if this bill does not become effective immediately. Therefore, this act shall go into immediate effect.

Approved November 14, 1989

OH LEGIS 117 (1989)

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Berin, Abd 7/20/2017

For Educational Use Only

§ 1407. Provider prohibited acts, criminal penalties and civil..., PA ST 62 P.S. § 1407

---

Purdon's Pennsylvania Statutes and Consolidated Statutes
    Title 62 P.S. Poor Persons and Public Welfare (Refs & Annos)
        Chapter 1. Human Services Code (Refs & Annos)
            Article XIV. Fraud and Abuse Control (Refs & Annos)

62 P.S. § 1407

§ 1407. Provider prohibited acts, criminal penalties and civil remedies

Currentness

(a) It shall be unlawful for any person to:

(1) Knowingly or intentionally present for allowance or payment any false or fraudulent claim or cost report for furnishing services or merchandise under medical assistance, or to knowingly present for allowance or payment any claim or cost report for medically unnecessary services or merchandise under medical assistance, or to knowingly submit false information, for the purpose of obtaining greater compensation than that to which he is legally entitled for furnishing services or merchandise under medical assistance, or to knowingly submit false information for the purpose of obtaining authorization for furnishing services or merchandise under medical assistance.

(2) Solicit or receive or to offer or pay any remuneration, including any kickback, bribe or rebate, directly or indirectly, in cash or in kind from or to any person in connection with the furnishing of services or merchandise for which payment may be in whole or in part under the medical assistance program or in connection with referring an individual to a person for the furnishing or arranging for the furnishing of any services or merchandise for which payment may be made in whole or in part under the medical assistance program.

(3) Submit a duplicate claim for services, supplies or equipment for which the provider has already received or claimed reimbursement from any source.

(4) Submit a claim for services, supplies or equipment which were not rendered to a recipient.

(5) Submit a claim for services, supplies or equipment which includes costs or charges not related to such services, supplies or equipment rendered to the recipient.

(6) Submit a claim or refer a recipient to another provider by referral, order or prescription, for services, supplies or equipment which are not documented in the record in the prescribed manner and are of little or no benefit to the recipient, are below the accepted medical treatment standards, or are unneeded by the recipient.

---

Berlin, Mad 7/20/2017
For Educational Use Only

§ 1407. Provider prohibited acts, criminal penalties and civil..., PA ST 62 P.S. § 1407

(7) Submit a claim which misrepresents the description of services, supplies or equipment dispensed or provided; the dates of services; the identity of the recipient; the identity of the attending, prescribing or referring practitioner; or the identity of the actual provider.

(8) Submit a claim for reimbursement for a service, charge or item at a fee or charge which is higher than the provider's usual and customary charge to the general public for the same service or item.

(9) Submit a claim for a service or item which was not rendered by the provider.

(10) Dispense, render or provide a service or item without a practitioner's written order and the consent of the recipient, except in emergency situations, or submit a claim for a service or item which was dispensed, or provided without the consent of the recipient, except in emergency situations.

(11) Except in emergency situations, dispense, render or provide a service or item to a patient claiming to be a recipient without making a reasonable effort to ascertain by verification through a current medical assistance identification card, that the person or patient is, in fact, a recipient who is eligible on the date of service and without another available medical resource.

(12) Enter into an agreement, combination or conspiracy to obtain or aid another to obtain reimbursement or payments for which there is not entitlement.

(13) Make a false statement in the application for enrollment as a provider.

(14) Commit any of the prohibited acts described in section 1403(d)(1), (2), (4) and (5) [1] .

(b)(1) A person who violates any provision of subsection (a), excepting subsection (a)(11), is guilty of a felony of the third degree for each such violation with a maximum penalty of fifteen thousand dollars ($15,000) and seven years imprisonment. A violation of subsection (a) shall be deemed to continue so long as the course of conduct or the defendant's complicity therein continues; the offense is committed when the course of conduct or complicity of the defendant therein is terminated in accordance with the provisions of 42 Pa.C.S. § 5552(d) (relating to other offenses). Whenever any person has been previously convicted in any state or Federal court of conduct that would constitute a violation of subsection (a), a subsequent allegation, indictment or information under subsection (a) shall be classified as a felony of the second degree with a maximum penalty of twenty-five thousand dollars ($25,000) and ten years imprisonment.

(2) In addition to the penalties provided under subsection (b), the trial court shall order any person convicted under subsection (a):

Berlin, Aïda 7/20/2017
For Educational Use Only

§ 1407. Provider prohibited acts, criminal penalties and civil..., PA ST 62 P.S. § 1407

(i) to repay the amount of the excess benefits or payments plus interest on that amount at the maximum legal rate from the date payment was made by the Commonwealth to the date repayment is made to the Commonwealth;

(ii) to pay an amount not to exceed threefold the amount of excess benefits or payments.

(3) Any person convicted under subsection (a) shall be ineligible to participate in the medical assistance program for a period of five years from the date of conviction. The department shall notify any provider so convicted that the provider agreement is terminated for five years, and the provider is entitled to a hearing on the sole issue of identity. If the conviction is set aside on appeal, the termination shall be lifted.

(4) The Attorney General and the district attorneys of the several counties shall have concurrent authority to institute criminal proceedings under the provisions of this section.

(5) As used in this section the following words and phrases shall have the following meanings:

"Conviction" means a verdict of guilty, a guilty plea, or a plea of nolo contendere in the trial court.

"Medically unnecessary or inadequate services or merchandise" means services or merchandise which are unnecessary or inadequate as determined by medical professionals engaged by the department who are competent in the same or similar field within the practice of medicine.

(c)(1) If the department determines that a provider has committed any prohibited act or has failed to satisfy any requirement under section 1407(a) [2], it shall have the authority to immediately terminate, upon notice to the provider, the provider agreement and to institute a civil suit against such provider in the court of common pleas for twice the amount of excess benefits or payments plus legal interest from the date the violation or violations occurred. The department shall have the authority to use statistical sampling methods to determine the appropriate amount of restitution due from the provider.

(2) Providers who are terminated from participation in the medical assistance program for any reason shall be prohibited from owning, arranging for, rendering or ordering any service for medical assistance recipients during the period of termination. In addition, such provider may not receive, during the period of termination, reimbursement in the form of direct payments from the department or indirect payments of medical assistance funds in the form of salary, shared fees, contracts, kickbacks or rebates from or through any participating provider.

(3) Notice of any action taken by the department against a provider pursuant to clauses (1) and (2) will be forwarded by the department to the Medicaid Fraud Control Unit of the Department of Justice and to the appropriate licensing board of the Department of State for appropriate action, if any. In addition, the department will forward to the Medicaid Fraud Control Unit of the Department of Justice and the appropriate Pennsylvania licensing board of the Department of State any cases of suspected provider fraud.

Berlin, Alec 7/20/2017
For Educational Use Only

§ 1407. Provider prohibited acts, criminal penalties and civil..., PA ST 62 P.S. § 1407

**Credits**

1967, June 13, P.L. 31, No. 21, art. 14, § 1407, added 1980, July 10, P.L. 493, No. 105, § 3, effective in 60 days.

Notes of Decisions (10)

Footnotes

| | |
|---|---|
| 1 | 62 P.S. § 1403(d)(1), (2), (4), (5). |
| 2 | 62 P.S. § 1407(a). |

62 P.S. § 1407, PA ST 62 P.S. § 1407

Current through 2017 Regular Session Act 9

---

**End of Document**                                      © 2017 Thomson Reuters. No claim to original U.S. Government Works.

**For Educational Use Only**

§ 1101.75. Provider prohibited acts., 55 PA ADC § 1101.75

---

West's Pennsylvania Administrative Code
   Title 55. Human Services
     Part III. Medical Assistance Manual
      Chapter 1101. General Provisions
       Fees and Payments

55 Pa. Code § 1101.75

§ 1101.75. Provider prohibited acts.

Currentness

(a) An enrolled provider may not, either directly or indirectly, do any of the following acts:


(1) Knowingly or intentionally present for allowance or payment a false or fraudulent claim or cost report for furnishing services or merchandise under MA, knowingly present for allowance or payment a claim or cost report for medically unnecessary services or merchandise under MA, or knowingly submit false information, for the purpose of obtaining greater compensation than that to which the provider is legally entitled for furnishing services or merchandise under MA.


(2) Knowingly submit false information to obtain authorization to furnish services or items under MA.


(3) Solicit, receive, offer or pay a remuneration, including a kickback, bribe or rebate, directly or indirectly, in cash or in kind, from or to a person in connection with furnishing of services or items or referral of a recipient for services and items.


(4) Submit a duplicate claim for services or items for which the provider has already received or claimed reimbursement from a source.


(5) Submit a claim for services or items which were not rendered by the provider or were not rendered to a recipient.


(6) Submit a claim for services or items which includes costs or charges which are not related to the cost of the services or items.


(7) Submit a claim or refer a recipient to another provider by referral, order or prescription, for services, supplies or equipment which are not documented in the record in the prescribed manner and are of little or no benefit to the recipient, are below the accepted medical treatment standards, or are not medically necessary.


(8) Submit a claim which misrepresents the description of the services, supplies or equipment dispensed or provided, the date of service, the identity of the recipient or of the attending, prescribing, referring or actual provider.

---

Berlin, Aled 7/20/2017
For Educational Use Only

§ 1101.75. Provider prohibited acts., 55 PA ADC § 1101.75

---

(9) Submit a claim for a service or item at a fee that is greater than the provider's charge to the general public.

(10) Except in emergency situations, dispense, render or provide a service or item without a practitioner's written order and the consent of the recipient or submit a claim for a service or item which was dispensed or provided without the consent of the recipient.

(11) Except in emergency situations, dispense, render or provide a service or item to a patient claiming to be a recipient without first making a reasonable effort to verify by a current Medical Services Eligibility card that the patient is an eligible recipient with no other medical resources.

(12) Enter into an agreement, combination or conspiracy to obtain or aid another in obtaining payment from the Department for which the provider or other person is not entitled, that is, eligible.

(13) Make a false statement in the application for enrollment or reenrollment in the program.

(14) Commit a prohibited act specified in § 1102.81(a) (relating to prohibited acts of a shared health facility and providers practicing in the shared health facility).

(b) A provider or person who commits a prohibited act specified in subsection (a), except paragraph (11), is subject to the penalties specified in §§ 1101.76, 1101.77 and 1101.83 (relating to criminal penalties; enforcement actions by the Department; and restitution and repayment).

**Credits**
Adopted Nov. 19, 1983.

Current through Pennsylvania Bulletin, Vol. 47, Num. 27, dated July 8, 2017

55 Pa. Code § 1101.75, 55 PA ADC § 1101.75

---

**End of Document**                               © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Berlin, Alec 7/20/2017
For Educational Use Only

§ 40-8.2-3. Prohibited acts, RI ST § 40-8.2-3

---

> West's General **Laws** of Rhode Island Annotated
>   Title **40**. Human Services
>     Chapter 8.2. Medical Assistance Fraud (Refs & Annos)

Gen.Laws 1956, § **40**-**8.2**-**3**

§ **40**-**8.2**-**3**. Prohibited acts

Currentness

(a) It shall be unlawful for any person intentionally to:

(1) Present or cause to be presented for preauthorization or payment to the Rhode Island Medicaid program:

(i) Any materially false or fraudulent claim or cost report for the furnishing of services or merchandise; or

(ii) Present or cause to be presented for preauthorization or payment, any claim or cost report for medically unnecessary services or merchandise; or

(iii) To submit or cause to be submitted materially false or fraudulent information, for the intentional purpose(s) of obtaining greater compensation than that to which the provider is legally entitled for the furnishing of services or merchandise; or

(iv) Submit or cause to be submitted materially false information for the purpose of obtaining authorization for furnishing services or merchandise; or

(v) Submit or cause to be submitted any claim or cost report or other document which fails to make full disclosure of material information.

(2)(i) Solicit, receive, offer, or pay any remuneration, including any kickback, bribe, or rebate, directly or indirectly, in cash or in kind, to induce referrals from or to any person in return for furnishing of services or merchandise or in return for referring an individual to a person for the furnishing of any services or merchandise for which payment may be made, in whole or in part, under the Rhode Island Medicaid program.

(ii) Provided, however, that in any prosecution under this subsection, it shall not be necessary for the state to prove that the remuneration returned was taken from any particular expenditure made by a person.

**For Educational Use Only**

§ 40-8.2-3. Prohibited acts, RI ST § 40-8.2-3

---

(3) Submit or cause to be submitted a duplicate claim for services, supplies, or merchandise to the Rhode Island Medicaid program for which the provider has already received or claimed reimbursement from any source, unless the duplicate claim is filed

  (i) For payment of more than one type of service or merchandise furnished or rendered to a recipient for which the use of more than one type of claim is necessary; or

  (ii) Because of a lack of a response from or a request by the Rhode Island Medicaid program; provided, however, in such instance a duplicate claim will clearly be identified as such, in writing, by the provider; or

  (iii) Simultaneous with a claim submission to another source of payment when the provider has knowledge that the other payor will not pay the claim.

(4) Submit or cause to be submitted to the Rhode Island Medicaid program a claim for service or merchandise which was not rendered to a recipient.

(5) Submit or cause to be submitted to the Rhode Island Medicaid program a claim for services or merchandise which includes costs or charges not related to the provision or rendering of services or merchandise to the recipient.

(6) Submit or cause to be submitted a claim or refer a recipient to a person for services or merchandise under the Rhode Island Medicaid program which are intentionally not documented in the provider's record and/or are medically unnecessary as that term is defined by § **40**-8.2-2(7).

(7) Submit or cause to be submitted to the Rhode Island Medicaid program a claim which materially misrepresents:

  (i) The description of services or merchandise rendered or provided to a recipient;

  (ii) The cost of the services or merchandise rendered or provided to a recipient;

  (iii) The dates that the services or merchandise were rendered or provided to a recipient;

  (iv) The identity of the recipient(s) of the services or merchandise; or

  (v) The identity of the attending, prescribing, or referring practitioner or the identity of the actual provider.

For Educational Use Only

§ 40-8.2-3. Prohibited acts, RI ST § 40-8.2-3

(8) Submit a claim for reimbursement to the Rhode Island Medicaid program for service(s) or merchandise at a fee or charge, which exceeds the provider's lowest fee or charge for the provision of the service or merchandise to the general public.

(9) Submit or cause to be submitted to the Rhode Island Medicaid program a claim for a service or merchandise which was not rendered by the provider, unless the claim is submitted on behalf of:

  (i) A bona fide provider employee of such provider; or

  (ii) An affiliated provider entity owned or controlled by the provider; or

  (iii) Is submitted on behalf of a provider by a third party billing service under a written agreement with the provider, and the claims are submitted in a manner which does not otherwise violate the provisions of this chapter.

(10) Render or provide services or merchandise under the Rhode Island Medicaid program unless otherwise authorized by the regulations of the Rhode Island Medicaid program without a provider's written order and the recipient's consent, or submit or cause to be submitted a claim for services or merchandise, except in emergency situations or when the recipient is a minor or is incompetent to give consent. The type of consent to be required hereunder can include verbal acquiescence of the recipient and need not require a signed consent form or the recipient's signature, except where otherwise required by the regulations of the Rhode Island Medicaid program.

(11) Charge any recipient or person acting on behalf of a recipient, money or other consideration in addition to, or in excess of the rates of remuneration established under the Rhode Island Medicaid program.

(12) Enter into an agreement, combination or conspiracy with any party other than the Rhode Island Medicaid program to obtain or aid another to obtain reimbursement or payments from the Rhode Island Medicaid program to which the person, recipient, or provider seeking reimbursement or payment is not entitled.

(13) Make a material false statement in the application for enrollment as a provider under the Rhode Island Medicaid program.

(14) Refuse to provide representatives of the Medicaid fraud control unit and/or the office of program integrity, upon reasonable request, access to information and data pertaining to services or merchandise rendered to eligible recipients, and/or former recipients while recipients under the Rhode Island Medicaid program.

(15) Obtain any monies by false pretenses through the use of any artifice, scheme, or design prohibited by this section.

Berlin, Mitch 7/20/2017

**For Educational Use Only**

§ 40-8.2-3. Prohibited acts, RI ST § 40-8.2-3

(16) Seek or obtain employment with or as a provider after having actual or constructive knowledge of a then existing exclusion issued under the authority of 42 U.S.C. § 1320a-7.

(17) Grant or offer to grant employment in violation of a then existing exclusion issued under the authority of 42 U.S.C. § 1320a-7, having actual or constructive knowledge of the existence of such exclusion.

(18) File a false document to gain employment in a Medicaid funded facility or with a provider.

(b)(1) A provider or person who violates any provision of subsection (a), excepting subsection (a)(14), (a)(16), or (a)(18), is guilty of a felony for each violation, and upon conviction therefor, shall be sentenced to a term of imprisonment not exceeding ten (10) years, nor fined more than ten thousand dollars ($10,000), or both.

(2) A provider or person who violates the provisions of subsection (a)(14), (a)(16), or (a)(18), shall be guilty of a misdemeanor for each violation and, upon conviction, be fined not more than five hundred dollars ($500).

(3) Any provider who knowingly and willfully participates in any offense either as a principal or as an accessory, or conspirator shall be subject to the same penalty as if the provider had committed the substantive offense.

(c) The provisions of subsection (a)(2) shall not apply to:

(1) A discount or other reduction in price obtained by a person or provider of services or merchandise under the Rhode Island Medicaid program, if the reduction in price is properly disclosed and appropriately reflected in the costs claimed or charges made by the person or provider under the Rhode Island Medicaid program.

(2) Any amount paid by an employer to an employee, who has a bona fide employment relationship with the employer, for employment in the provision of covered services or merchandise furnished under the Rhode Island Medicaid program.

(3) Any amounts paid by a vendor of services or merchandise to a person authorized to act as a purchasing agent for a group of individuals or entities who are furnishing services or merchandise which are reimbursed by the Rhode Island Medicaid program, as long as:

(i) The purchasing agent has a written agreement with each individual or entity in the group that specifies the amount the agent will be paid by each vendor (where the sum may be a fixed sum or a fixed percentage of the value of the purchases made from the vendor by the group under the contract between the vendor and the purchasing agent); and

(ii) In the case of an entity that is a provider of services to the Rhode Island Medicaid program, the agent discloses in writing to the individual or entity in accordance with regulations to be promulgated by the executive office, and

Berlin, Marc 7/20/2017
For Educational Use Only

§ 40-8.2-3. Prohibited acts, RI ST § 40-8.2-3

to the office of program integrity upon request, the amount received from each vendor with respect to purchases made by or on behalf of the entity.

**Credits**
P.L. 1989, ch. 501, § 3; P.L. 1990, ch. 492, § 17; P.L. 1993, ch. 232, § 1; P.L. 2015, ch. 141, art. 5, § 12, eff. June 30, 2015.

**Editors' Notes**

**CROSS REFERENCES**

Common **law** offenses, punishment not prescribed, see § 11-1-1.

**Gen**. **Laws**, 1956, § **40**-**8.2**-**3**, **RI** ST § **40**-8.2-**3**
The statutes and Constitution are current through Chapter 37, and includes chapters 39, 40, 42, 44-46, 48-54, and 56-61 of the January 2017 session.

End of Document                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

1993 Rhode Island Laws Ch. 93-232 (93-S 917)

RHODE ISLAND 1993 SESSION LAWS
1993 REGULAR SESSION

Additions are indicated by <<+ Text +>>; deletions by
<<- Text ->>. Changes in tables are made but not highlighted.

Ch. 93–232
93–S 917
MEDICAL ASSISTANCE FRAUD

AN ACT RELATING TO MEDICAL ASSISTANCE FRAUD

It is enacted by the General Assembly as follows:

SECTION 1. Sections 40–8.2–2 and 40–8.2–3 of the General Laws in Chapter 40–8.2 entitled "Medical Assistance Fraud" are hereby amended to read as follows:

<< RI ST § 40–8.2–2 >>

40–8.2–2. Definitions.—Whenever used in this chapter:

(a) "Rhode Island medicaid program" means a state-administered, medical assistance program which is funded by the state and federal governments under title XIX, Social Security Act, (42 U.S.C. section 1396 et seq.)

(b) "Benefit" means pecuniary benefit as herein defined.

(c) "Pecuniary benefit" means benefit in the form of money, property, commercial interests, or anything else the primary significance of which is economic gain.

(d) "Department" means the Rhode Island department of human services.

(e) "Kickback" means a return in any form by any individual of a part of an expenditure made by a provider:

(1) To the same provider,

(2) To an entity controlled by the provider or,

(3) To an entity which the provider intends to benefit whenever the expenditure is reimbursed, or reimbursable, or claimed by a provider as being reimbursable by the Rhode Island medicaid program and when the sum or value returned is not credited to the benefit of the Rhode Island medicaid program.

(f) "Provider" means any individual, individual medical vendor, firm, corporation, professional association, partnership, organization, or other legal entity that provides goods or services under the Rhode Island medicaid program or the employee of any person or entity who, on his or her own behalf or on the behalf of his or her employer, knowingly performs any act or is knowingly responsible for an omission prohibited by this chapter.

(g) "Records" means all documents developed by a provider and related to the provision of services reimbursed or claimed as reimbursable by the Rhode Island medicaid program.

(h) "Fee schedule" means a list of goods or services to be recognized as properly compensable under the Rhode Island medicaid program and applicable rates of reimbursement.

(i) "Recipient" means any person receiving medical assistance under the Rhode Island medicaid program.

(j) "Person" means any person or individual, natural or otherwise and includes those person(s) or entities defined by the term "provider".

(k) "Medicaid fraud control unit" means a duly certified medicaid fraud control unit under federal regulation authorized to perform those functions as described by section 1903(q) of the Social Security Act [42 U.S.C. section 1396b(q) ].

(l) "Medically unnecessary services or merchandise" are services or merchandise provided to recipients intentionally without any expectation that the services or merchandise will alleviate or aid the recipient's medical condition.

<<+(m) "Claim" shall mean any request for payment, electronic or otherwise, and shall also include any data commonly known as encounter data, which is used or is to be used for the development of a capitation fee payable to a provider of managed health care goods, merchandise or services.+>>

<< RI ST § 40–8.2–3 >>

40–8.2–3. Prohibited acts.—

(A) It shall be unlawful for any person knowingly or intentionally to:

(1) Present or cause to be presented for preauthorization or payment to the Rhode island medicaid program:

(a) Any materially false or fraudulent claim or cost report for the furnishing of services or merchandise; or

(b) Present or cause to be presented for preauthorization or payment, any claim or cost report for medically unnecessary services or merchandise; or

(c) To submit or cause to be submitted materially false or fraudulent information, for the intentional purpose(s) of obtaining greater compensation than that to which the provider is legally entitled for the furnishing of services or merchandise; or

(d) Submit or cause to be submitted materially false information for the purpose of obtaining authorization for furnishing services or merchandise; or

(e) Submit or cause to be submitted any claim or cost report or other document which fails to make full disclosure of material information.

(2)(a) Solicit or receive or to offer, or pay any renumeration, including any kickback, bribe, or rebate, directly or indirectly, in cash or in kind, to induce referrals from or to any person in return for furnishing of services or merchandise or in return for referring an individual to a person for the furnishing of any services or merchandise for which payment may be made, in whole or in part, under the Rhode Island medicaid program.

(b) Provided, however, that in any prosecution under this subsection, it shall not be necessary for the state to prove that the remuneration returned was taken from any particular expenditure made by a person.

(3) Submit or cause to be submitted a duplicate claim for services, supplies, or merchandise to the Rhode Island medicaid program for which the provider has already received or claimed reimbursement from any source, unless the duplicate claim is filed:

(a) For payment of more than one type of service or merchandise furnished or rendered to a recipient for which the use of more than one type of claim is necessary; or

(b) Because of a lack of a response from or a request by the Rhode Island medicaid program, provided however, in such instance duplicate claim will clearly be identified as such, in writing, by the provider; or

(c) Simultaneous with a claims submission to another source of payment when the provider has knowledge that the other payor will not pay the claim.

(4) Submit or cause to be submitted to the Rhode Island medicaid program a claim for service or merchandise which were not rendered to a recipient.

(5) Submit or cause to be submitted to the Rhode Island medicaid program a claim for service or merchandise which includes costs or charges not related to services or merchandise to the recipient.

(6) Submit or cause to be submitted a claim or refer a recipient to a person for services or merchandise under the Rhode Island medicaid program which are intentionally not documented in the provider's record and/or are medically unnecessary as that term is defined by section 40–8.2–1(1).

(7) Submit or cause to be submitted to the Rhode Island medicaid program a claim which materially misrepresents:

(a) The description of services or merchandise rendered or provided to a recipient;

(b) The cost of the services or merchandise rendered or provided to a recipient;

(c) The dates that the services or merchandise were rendered or provided to a recipient;

(d) The identity of the recipient(s) of such services or merchandise; or

(e) The identity of the attending, prescribing, or referring practitioner or the identity of the actual provider.

(8) Submit a claim for reimbursement to the Rhode Island medicaid program for service(s) or merchandise at a fee or charge which exceeds the provider's lowest fee or charge for the provision of the service or merchandise to the general public.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

(9) Submit or cause to be submitted to the Rhode Island medicaid program a claim for a service or merchandise which was not rendered by the provider, unless the claim is submitted on behalf of:

(a) A bona fide provider employee of such provider; or

(b) An affiliated provider entity owned or controlled by the provider; or

(c) Is submitted on behalf of a provider by a third party billing service under a written agreement with the provider, and the claims are submitted in a manner which does not otherwise violate the provisions of this chapter.

(10) Render or provide services or merchandise under the Rhode Island medicaid program unless otherwise authorized by the regulations of the Rhode Island medicaid program without a provider's written order and the recipient's consent, or submit or cause to be submitted a claim for a services or merchandise, except in emergency situations or when the recipient is a minor or is incompetent to give consent. The type of consent to be required hereunder can include verbal acquiescence of the recipient and need not require a signed consent form or the recipient's signature, except where otherwise required by the regulations of the Rhode Island medicaid program.

(11) Charge any recipient or person acting on behalf of a recipient, money or other consideration in addition to, or in excess of the rates of renumeration established under the Rhode Island medicaid program.

(12) Enter into an agreement, combination or conspiracy with any party other than the Rhode Island medicaid program to obtain or aid another to obtain reimbursement or payments from the Rhode Island medicaid program to which the person, recipient, or provider seeking reimbursement or payment is not entitled.

(13) Make a false statement in the application for enrollment as a provider under the Rhode Island medicaid program.

(14) Refuse to provide representatives of the medicaid fraud control unit upon reasonable request, access to information and data pertaining to services or merchandise rendered to eligible recipients, and/or former recipients while recipients under the Rhode Island medicaid program.

(15) Obtain any monies by false pretenses through the use of any artifice, scheme, or design prohibited by this section.

<<+(16) Seek or obtain employment with or as a provider after having actual or constructive knowledge of a then existing exclusion issued under the authority of 42 U.S.C. Section 1320a–7.+>>

<<+(17) Grant or offer to grant employment in violation of a then existing exclusion issued under the authority of 42 U.S.C. Section 1320a–7, having actual or constructive knowledge of the existence of such exclusion.+>>

<<+(18) File a false document to gain employment in a medicaid funded facility or with a provider.+>>

(B)(1) A provider <<+or person+>> who violates any provisions of subsection (A), excepting subsection (A)(14), <<+(A)(16), or (A)(18),+>> is guilty of a felony for each violation, and upon conviction therefor, shall be sentenced to a term of imprisonment not exceeding ten (10) years, nor fined more than ten thousand dollars ($10,000.00), or both.

(2) A provider <<+or person+>> who violates the provisions of subsection (A)(14), <<+(A)(16) or (A)(18)+>> shall be guilty of a misdemeanor for each violation and, upon conviction, be fined not more than five hundred dollars ($500.00).

(3) Any provider who knowingly and willfully participates in any offense either as a principal or as an accessory, or conspirator shall be subject to the same penalty as if the provider had committed the substantive offense.

(C) The provisions of subsection (A)(2) shall not apply to:

(1) A discount or other reduction in price obtained by a person or provider of services or merchandise under the Rhode Island medicaid program, if the reduction in price is properly disclosed and appropriately reflected in the costs claimed or charges made by the person or provider under the Rhode Island medicaid program.

SECTION 2. This act shall take effect upon passage.

Approved July 22, 1993.

<div align="center">

EXPLANATION BY THE LEGISLATIVE COUNCIL OF
AN ACT RELATING TO MEDICAL ASSISTANCE FRAUD

</div>

This act would define the term claim, so as to include the submission of encounter data which is used in the development of a capitation fee for managed health care providers. This act would create criminal offenses for seeking or obtaining employment after having been sanctioned and excluded under 42 U.S.C. Section 1320a–7 and for employing a person who was subject to such sanction. It would also create a criminal offense for filing a false document in order to gain employment in a medicaid funded facility or with a provider.

This act would take effect upon passage.

RI LEGIS 93-232

---

**End of Document**                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Berlin, Alex 7/20/2017
For Educational Use Only

§ 44-113-60. Kickback defined; misdemeanor; penalty., SC ST § 44-113-60

---

> Code of Laws of South Carolina 1976 Annotated
>   Title 44. Health
>     Chapter 113. Provider Self-Referral

Code 1976 § 44-113-60

§ 44-113-60. Kickback defined; misdemeanor; penalty.

Currentness

(A) As used in this section, the term "kickback" means a remuneration or payment back pursuant to an investment interest, compensation arrangement, or otherwise by a provider of health care services or items of a portion of the charges for services rendered to a referring health care provider as an incentive or inducement to refer patients for future services or items when the payment is not tax deductible as an ordinary and necessary expense.

(B) It is unlawful for a health care provider or a provider of health care services to offer, pay, solicit, or receive a kickback, directly or indirectly, overtly or covertly, in cash or in kind, for referring or soliciting patients.

(C) A person who violates this section is guilty of a misdemeanor and, upon conviction, must be fined not more than one thousand dollars or imprisoned for not more than thirty days.

**Credits**
HISTORY: 1993 Act No. 71, § 3.

COPYRIGHT (C) 2017 BY THE STATE OF SOUTH CAROLINA
Code 1976 § 44-113-60, SC ST § 44-113-60
Current through 2017 Act No. 86, and 88, 90 to 92, and 95, subject to technical revisions by the Code Commissioner as authorized by law before official publication.

---

End of Document                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.