# EXHIBIT 177

## OIG June 10 Meeting Notes

## Current State Questions / Issues

### Speaker Programs:
Investigate utilization
-too many speakers only being used once?
-do we have a bell shaped curve of utilization?

Cannot verify that a speaker event took place

Field registered speakers are not validated

Is the purpose of speakers to be able to pay them?

### LCPs:
Role of the speaker?

Why should core team review?  Conflict of interest because of review of promotional materials?

### Preceptorships:
How many have been accepted and turned down? (should we being to track?)

Why is Marketing involved in the process at all? (funding has impact as to why)

Where do large/bigger institutional / academic 'training' preceptorships fall? Should they?

Why call it preceptorship?  Isn't it really training?

Impact of HIPPA?

How is this – should this be traced and reported?

### Grants / CME
To what degree do reps understand the impact of communications on grants? (e.g., e-mails) – not just at rep level (ongoing education need)

Are we getting honest answers on the questionnaire?

Mindset changes needed on why and when to use grants (e.g., should rarely be given – not part of toolbox – not common business practice)

Should there be an overall business plan upfront vs. ad hoc?

Issue of separation of grant giving function from Sales & Marketing function

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER
NPCLSV_LIT006448682

## OIG June 10 Meeting Notes

## OVERALL COMMENTS ON CURRENT STATE

- Should develop guidelines for ways Novartis does business ethically - - - vs. not just how to stay out of jail.
- Need Senior leader support for changes
- What is urgency to OIG guidelines?
- Must find the right line between no risk and some risk
- Be more deliberate with consistency (don't jump too fast, make change and back out later)
- Anne (compliance) needs resources
- When business gets tough we go back on guidelines - - - how do we prevent that from happening?
- OIG Taskforce recommendations in writing provide paper trail of good intent
- Seems to be more tolerance for violations of employees at higher levels (vs. no tolerance for employee violations at rep level)
- Hotline - - - how can we ask people what we should do about the issue? (not just record the complaint).
- What is physicians' risk?
- Impact of Basel requests (ROI) on OIG compliance and intent?

## OIG June 10 Meeting Notes

## OIG (D.C.) MEETING SUMMARY

**Impressions - - - - - - - Questions**

- ❏ Do NOT under estimate NOR demonize them (smart, devoted, good!) and doing it because they BELIEVE in it.

- ❏ Legal theories all fit together in ways that work (and will with a jury)

- ❏ Have more US attorneys dedicated to this now.

- ❏ A lot gets wrapped around "the big ugly wedge" - - can't predict what will be the wedge and don't want "the dressing" around it - must keep everything clean

- ❏ ✷ Risk is to the individual and the company – this needs to be pointed out to Sr. Management (best to come from leaders

- ❏ Lou Morris - - Corp Culture components (gov't will not give specifics - - - looking for judgment and intent)
    - ✷ Emphasized "suggestion" of separation of functions
    - ✷ Emphasized importance of compliance function and resources

    - ❏ Susan Winkler - -
        - ✷ Pointed out law enforcement effectiveness of prosecuting people in addition to companies
        - ✷ Focus on argument that payments taint doctors judgment
        - ✷ Patient is the victim
        - ✷ <u>Legal theory</u>: pick theme of case - - -
        - ✷ Charge conspiracy to defraud U.S.
        - ✷ Stealing Federal dollars (b/c federal program) and interfere with government agency by trickery (not just result - - but any action of intent)
        - ✷ They have discretion of what to charge

- ❏ Susan Winkler
    - ✷ Will evaluate effectiveness of program in assessing what / if to charge
    - ✷ If senior leader is involved in violation then will assume compliance program is ineffective

- ❏ <u>Preceptorships</u>: (Lou Morris)
    - ✷ they are not "illegal" - - - it depends (amount of dollars, selection criteria)
    - ✷ Use the "newspaper" test
    - ✷ Ability to make decisions / judgment is difficult to show (with the amount)

- ❏ <u>Speaker Programs</u>:
    - ✷ They are not "illegal"  it depends
    - ✷ Why are they picked, who picks them, etc.

- ❏ <u>Gifts / Expense</u>
    - ✷ e.g., providing textbooks "not a high risk"

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER                                    NPCLSV_LIT006448684

**OIG June 10 Meeting Notes**

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDERNPCLSV_LIT006448685

## OIG June 10 Meeting Notes

## OIG (D.C.) MEETING SUMMARY

- <u>Studies</u>
  - Placing studies can be a bribe

- <u>Quality of Care Off – Label Promotion</u>

    → Does not have to be government patient who is impacted

- Will competition become whistle blowers?

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER          NPCLSV_LIT006448686

## OIG June 10 Meeting Notes

## Draft Compliance Principles

- Must maintain guidelines through tough business environments
-Be consistant

- Balance compliance & competitiveness
-Take appropriate risks

- Paying doctors to listen to your message is NOT a good thing

- Newspaper test

- The 'patient' test

- Does this support our corporate culture of compliance?

- Make simple and objective rules (no deliberate ambiguity)

- Stay true to our goal of customer and patient focus

- Simple process (not onerous and time consuming)

- Apply market research principles to determine the value needed…articulate the purpose and be able to support it

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

NPCLSV_LIT006448687

**OIG June 10 Meeting Notes**

## RECOMMENDATION: LCP / CONSULTANTS

Risk Areas:
- Number of attendees 2003 - - 15K
- Variability of honoraria
- "Creative programs"
- Output from feedback (internally, communicate to consultant)
- Ambiguity of market research

- Field force involvement
- Number of programs
- Number of issues which are "local"

- Training / Culture

- Should we have speakers?

- Need resources / capacity to use feedback

**Recommendations:**

Should we have a policy "threshold" of number of consultants to go "whoa"
Len Kanavy View: Include Marketing and Sales in definition
- look at: structure, geography, number of doctors, topics

## RECOMMENDATION: SPEAKERS

Accept speaker recommendations brought by Susan Levinson

Trained and not utilized

Repeat training

Training meetings in general since dollars are paid

Track "status" of speakers

What's our policy / cap on number of speaking engagements?

## RECOMMENDATION: GRANTS

- Corporate compliance approval

- Remove field grant budget

- Current process (w/ modifications e.g., capture emails, etc) more detail and structure needed

    ✱ Model after off-label promotion methodology - - defensible

    ✱ What is financial classification - - pull out of PSME?

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER                                                    NPCLSV_LIT006448688

## OIG June 10 Meeting Notes

## **RECOMMENDATION: NCN**

Not viable as defined today

- New Criteria: New products / indication

　　　　　　　　Regional business issues

　　　　　　　　2 / Region / Year (not regular)

　　　　　　　　2 – 4000 doctors

OPTIONS:

1. Do not conduct any
2. Conduct just for launch
3. Build / keep relationships in other ways (e.g., affinity groups)
4. Link LCPs and NCN (control group – look at findings of LCPs validation)

## **RECOMMENDATION: PRECEPTORSHIP**

Maintain:　　　POC

　　　　　　　Current process (with slight modification)

Add:　　　　　Brand / Sales validation

　　　　　　　Link to corporate compliance

Define:　　　　New Reps (<12 months)

　　　　　　　New Product

　　　　　　　New Indication

　　　　　　　Speciality

　　——▶ Use group Preceptorships

- ✸ Every new rep needs this training
- ✸ Need resources in compliance to implement
- ✸ Budget moves to Sales Training
- ✸ This replaces oversight comm.

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER　　　　　　　　　　　　　　　　　　　　　NPCLSV_LIT006448689