# EXHIBIT 182



# NOVARTIS PHARMACEUTICALS CORPORATION

# COMPLIANCE PROGRAM EFFECTIVENESS REVIEW



*230 Park Avenue /21st Floor*
*New York, NY 10169*

***December 23, 2011***

Presented by

Saul B Helman MD
Managing Director
Healthcare and Life Sciences
Dispute, Compliance and Investigations

Navigant Consulting, Inc.
250 East 96th Street
Parkwood One, Suite 415
Indianapolis, IN 46240

317.294.1228 phone
317.217.5361 fax

www.navigant.com



Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

NPC OIG YR1 RPT 00750

**NPCLSV00017850**

# Table of Contents

Transmittal Letter ............................................................................................................... 3

Executive Summary ............................................................................................................ 5

High-Level Oversight .........................................................................................................13

Written Standards ..............................................................................................................23

Conducting Effective Training and Education ................................................................28

Developing Effective Lines of Communication .............................................................34

Auditing and Monitoring ..................................................................................................42

Enforcing Standards Through Well-Publicized Disciplinary Guidelines ...................49

Responding to Detected Problems and Developing Corrective Action Initiatives ..........53

Government Pricing – Class of Trade ..............................................................................59

General Medicines and Oncology Compliance Coordination .....................................77

Commercial and Medical Function Interactions ...........................................................83

Appendix A: Acronyms used Throughout the Report ..................................................87

Appendix B: Findings, Rationale, Recommendations, Management Responses .........89

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

# Transmittal Letter



250 East 96th Street
Parkwood One, Suite 415
Indianapolis, IN 46240
317.294.1228 phone
317.217.5361 fax

December 23, 2011

Robert Pelzer
Novartis Pharmaceuticals Corporation Board Chair
608 Fifth Avenue
New York, NY 10020

Dear Mr. Pelzer and Novartis Pharmaceuticals Corporation Board Members,

Navigant Consulting, Inc. ("Navigant") respectfully submits the attached report on our Year One (1) Compliance Program Effectiveness Review ("the review" or "Compliance Program Review") of Novartis Pharmaceuticals Corporation's ("NPC") Compliance Program, as required in Section III.A.3. of NPC's Corporate Integrity Agreement ("CIA") entered into on September 29th, 2010 with the Office of Inspector General of the Department of Health and Human Services ("OIG").

After a thorough review of the report, NPC management has prepared a response to the findings and recommendations, and this has been captured in Appendix B at the end of this report.

As described in this report, the review included but was not limited to:

- testing certain compliance program activities (e.g. investigation and documentation of compliance reports)
- reviewing certain reportable events letters and supporting documentation
- understanding controls to mitigate certain compliance risks related to promotional and product services
- following up on review recommendations and NPC corrective actions
- relying on the findings of NPC's IRO for their respective review areas, as required by the CIA.

The review covered NPC compliance program policies, procedures, and related activities present during the first reporting period of the CIA. In certain instances, we relied on representations and information provided by NPC personnel.

Transmittal Letter                                                                 Page 3 of 112
Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and
Office of Inspector General, US Department of Health and Human Services
Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00752

**FOIA EXEMPT - CONFIDENTIAL**

**NPCLSV00017852**

Reporting against the seven (7) elements of compliance, the structure of each section is as follows:

- an overview of the element from OIG compliance program guidance,
- a description of the relevant NPC Compliance program activities and related policies and procedures,
- a description of the results of the compliance effectiveness review and testing (if applicable)
- findings and recommendations for further improvement of the program (Appendix B)

The results of our review described in this report, the IRO report and reports to the Board from the CCO will form the basis for the NPC Board to consider the resolution required in Section III.A.3.d of the CIA.

Our work in performing the review was subject to the terms of Navigant's April 19th, 2011 General Services Agreement and Task Order #1 with NPC. NPC retains final responsibility for compliance with applicable laws, regulations and obligations under the CIA. Navigant has not and cannot make any guarantee or warranty that NPC is in compliance with all applicable laws, regulations or CIA requirements. Navigant's assistance did not include all matters that might be pertinent or necessary to NPC's compliance with applicable laws and regulations and cannot be relied on to detect illegal acts, such as fraud, should they exist.

Please contact me at (317) 294-1228 if you have any questions regarding this report or our review. Thank you for the opportunity to assist the NPC Board in performing this review and advising the Board.

Yours sincerely

Saul B. Helman MD
**Managing Director**

Transmittal Letter                                                                 Page 4 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00753

**FOIA EXEMPT - CONFIDENTIAL**                                        **NPCLSV00017853**

# Executive Summary

## OIG Guidance for Compliance Program Effectiveness Considerations

In addition to the 2003 OIG Compliance Program Guidance for Pharmaceutical Manufacturers, the OIG's Supplemental Compliance Program Guidance for Hospitals (published January 31, 2005), Section III provides considerations for the effectiveness of a compliance program. Although these considerations were originally published as part of hospital-related guidance, the questions asked are applicable to compliance programs regardless of industry or health care sector. As part of the review, these questions were modified appropriately and compared to our findings to assist the NPC Board in considering whether or not to pass the CIA-required resolution. In each of the seven element areas and industry risk areas described in this report, these OIG considerations are discussed as part of the effectiveness review of NPC's Compliance Program.

## Required Resolution Consideration

NPC's CIA requires the NPC Board to consider the following resolution:

> *"The Board of Directors has made a reasonable inquiry into the operations of Novartis' Compliance Program, including but not limited to evaluating its effectiveness and receiving updates about the performance and activities of the Chief Compliance Officer and other compliance personnel for the time period September 29, 2010 to September 28, 2011. In addition, the Board has retained a Compliance Expert with expertise in compliance with the Federal health care program and FDA requirements to support the Board's responsibilities. The Board also has arranged for the performance of, and reviewed the results of, the Compliance Program Review, including the Compliance Program Review Report. Based on all of these steps, the Board has concluded that, to the best of its knowledge, Novartis has implemented an effective Compliance Program to meet Federal health care program requirements, FDA requirements, and the obligations of the CIA."*

Considerations used for assessing the effectiveness of NPC's Compliance Program, based on the information gathered during the review, included but were not limited to:

- OIG Compliance Program Guidance for Pharmaceutical Manufacturers issued in May 2003, including but not limited to assessing NPC activities:
  - Related to the seven (7) elements of an effective compliance program; and
  - That address certain risk areas identified in the Compliance Program Guidance
- Compliance Program and Pharmaceutical/Life Science industry experience to evaluate the above-mentioned NPC activities as reasonable to address the seven (7) elements and/or risk areas
- Findings provided by the IROs required by NPC's CIA
- Implemented or proposed corrective actions to findings and recommendations identified during this review

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00754

**FOIA EXEMPT - CONFIDENTIAL**

**NPCLSV00017854**

## Scorecard / Dashboard

The following represents a high level qualitative summary dashboard for the compliance effectiveness review across the seven (7) elements of compliance:

| NOVARTIS PHARMACEUTICAL CORPORATION COMPLIANCE SCORECARD | | | | | | | |
|---|---|---|---|---|---|---|---|
| | High Level Oversight | Written Standards | Training | Communication | Auditing & Monitoring | Disciplinary Guidelines | Investigation and Corrective Action |
| Compliance Program Effectiveness | | | | | | | |

Code for colors:
Green - minimal risk and/or inefficiency
Yellow - some risk and/or inefficiency exists
Orange - considerable risk and/or inefficiency exists, but some evidence of progress
Red – considerable risk and/or inefficiency exists, significant improvement needed

Executive Summary                                                    Page 6 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**                                    **NPCLSV00017855**

## Observations

Based on the detailed review of NPC's Compliance Program, the following represents a summary of observations that are relevant to the determination of effectiveness in the program.

**High Level Oversight:**

- NPC has a Chief Ethics and Compliance Officer ("CCO").
- The CCO job responsibilities have been well described and are exclusively focused on the compliance program activities.
- The E&C Department is funded and staffed appropriately with personnel who can focus on each of the seven (7) element areas, along with personnel who can assist the CCO in directing NPC E&C activities. In addition, NPC organizations or BUs (e.g. NeuroPsych, MS) are assigned dedicated compliance personnel (referred to as BU Advisors) that direct, or are the point-persons for, compliance activities in those organizations or BUs / functions. In addition, select personnel who function primarily within the various NPC organizations and BUs are identified as Compliance Liaisons, who serve as a point person within those organizations and BUs.
- The CCO's job description and level within the organization (Vice President) allows her to effectuate change within the organization as necessary and appropriate. It is evident that she has the full support of the PEC.
- The NPC Compliance Committee is properly staffed and chartered to accomplish the objective of advising the CCO and supporting the implementation of the program. In addition, the US Oncology group has its own Oncology Compliance Committee. This committee mirrors the NPC Compliance Committee, has representation on the NPC Compliance Committee and is, in part, tasked with ensuring there is alignment within US Oncology and Gen Meds.
- Compliance Committee members are reminded during meetings as to their role and function on the Compliance committee. A review of the NPC and Oncology Charters was conducted with the respective Committee members after the CIA settlement. All Compliance Committee members have to comply with required compliance training.

**Written Standards**

- Prior to and pursuant to the CIA, NPC has developed and distributed a code of conduct, written principles, policies and procedures / practices. These written standards are available to employees on company websites, with links to these policies included in required training. Many of the procedures that govern NPC associates with their day-to-day responsibilities are documented within departmental WPDs and Global SOPs.
- Compliance policies are developed by the E&C Department and procedures developed in conjunction with functional areas (operational managers) that are affected by the policies and procedures. All US-based Compliance policies are reviewed by the Compliance Committee, prior to implementation. Implementation is secured through numerous training and communication channels. Where it is determined that additional training is required, this is secured through the iLearn process, where NPC employees receive the relevant new / updated Written Standard, review it and attest (sign) that they have read and understood the document. WPDs are developed by functional areas, and where appropriate, are reviewed and approved by a Compliance representative, which includes E&C department employees (including Business Unit advisors) and Compliance liaisons (who report to their functional unit).

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

NPC OIG YR1 RPT 00756

NPCLSV00017856

- Relevant policies and procedures, including the Code of Conduct, were provided to all Covered Persons (as defined by NPC's CIA), which includes but is not limited to employees and agents / contractors who perform Promotional and Product Services Related Functions, and who work more than 160 hours per year.
- The E&C Policy Manual states that "relevant excerpts of our polices may be distributed in a confidential manner to outside contractors, agencies and suppliers performing relevant tasks or assisting NPC personnel having responsibilities that are covered by this document [the E&C Policy Manual]".
- New employees receive all relevant Written Standards as part of the on-boarding process and related training. Annual training on the E&C Policy Manual and on the CIA is now required.

**Training**
- The required compliance trainings are communicated to all affected personnel through iLearn notifications and through the 'tone from the top'. The CIA training contains role-specific, practical examples for recognizing and addressing potential compliance issues. Training content has also been made available through the E&C website for download and reference.
- Training records related to completion of the CIA training, Written Standard updates and the annual Code of Conduct attestation are documented and archived.
- Training records are documented through iLearn and reports can be generated through the system. Copies of the compliance training materials are available electronically upon request.
- iLearn notifies managers if required training is not completed within the prescribed time period. This notification gets escalated if this deficiency persists. Failure to comply is reflected as a failure to complete E&C objectives in the performance management process and related evaluations (10% weighting of total performance objectives).

**Communication**
- An open-door policy is encouraged and employees report feeling comfortable going to their immediate supervisor if needed. However, the E&C Survey revealed an increase in concern that retaliation would take place in the event of a report. The E&C Department has established a robust action plan to reinforce the non-retaliation policy and the confidential nature of the Alertline process.
- The Alertline number and email is easily accessible and interviewees indicated they knew where to access it. The system worked very effectively when tested.
- The Alertline is well publicized and can be found on the Intranet homepage, as well as the E&C homepage. Posters are found in conference rooms that detail the Alertline. The number is regularly displayed on the Novartis TV system, a significant communication tool used across the East Hanover campus.
- The calls are tracked and the ability to analyze the nature of calls exists. Reports are provided to the CCO on a monthly basis. Whether substantiated or not, all calls are logged and tracked. Patterns are observed and training topics are derived from those patterns. It has been found that approximately half of the calls are unsubstantiated and many of those are related to interpersonal issues that don't require an investigation.
- The caller has the opportunity to call back and secure a limited understanding of the status of the investigation, using a unique reference number, which allows for anonymity.

Executive Summary                                                                 Page 8 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

- The Resolution Committee (which includes an E&C representative as a member) learns the facts of all internal investigations and is the governing body that makes a decision regarding the disciplinary action that is required. Access to the RC decisions is readily available within the E&C Department, and reported to the NPC Compliance Committee on a quarterly basis.
- Training topics are often determined from the trends in reporting.
- There are various alternative methods of communication, including active and passive methods. E&C Intranet updates, FAQs, access to E&C Policies, "Ask E&C" facility on the Intranet all represent passive methods. Active methods are represented in the E&C Communication plan, including brochures, letters, leadership communications, OHW updates relating to compliance, video presentations and town hall presentations. In addition, the E&C Department actively engages in opportunities to communicate with BUs / functional areas through BU Advisors and Compliance Liaisons.

**Auditing and Monitoring**
- There is an annual risk evaluation process and related compliance audit plan developed and implemented. The audit plan currently focuses largely on the CIA requirements. Monitoring is largely the responsibility of the business and less well defined, especially in the context of how monitoring findings are reported into the NPC Compliance Committee.
- Audits are well documented and reported and corrective actions and accountability for the corrective actions are well documented. Monitoring performed by the E&C audit group is equally well documented and reported. Monitoring conducted by the business is less clearly defined and reporting to the NPC Compliance Committee is less well defined.
- The audits are based on the E&C Policy Manual and related WPDs and SOPs. Any deficiency in the related Written Standards that is identified will result in a change to the particular Written Standard, with appropriate updates, approval and training through a "read and sign" attestation if warranted.

**Enforcing Standards Through Well-Publicized Disciplinary Guidelines**
- The NPC Code of Conduct specifically states that violations of the Code, which requires adherence to all NPC policies, could lead to disciplinary actions up to and including termination.
- Based upon the sample of cases that were reviewed in connection with this assessment, there appeared to be a consistent approach to termination decisions. The RC maintains a record of the manner in which each case has been resolved for the purpose, in part, of supporting consistency, to the extent that the unique facts of each case can be compared to earlier cases.
- As the RC evaluates allegations against the results of investigations, they appear to take into consideration evidence that demonstrates either intentional actions or gross negligence compared to inadvertent acts or oversights. This standard is not captured in a Written Standard, however, it appears to be embedded in the process that is employed by the RC.
- Observed sanctions included verbal warnings, written warnings, re-training, and termination.

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00758

**FOIA EXEMPT - CONFIDENTIAL**

**NPCLSV00017858**

**Responding to Detected Problems and Developing Corrective Action Initiatives**
- A review of all reports of compliance violation (Alertline and other sources of reports) is conducted by the BPO. Any potential fraud and abuse allegation is then investigated.
- In most cases, investigation assignment occurs within a few days of being communicated to the BPO. A test of the Alertline resulted in a same day response from the BPO office to gain an understanding of the allegation.
- The disciplinary action plan and corrective action plan come from the RC meeting. Reportable Events (as defined in the CIA) are reported to the OIG, per CIA requirements.
- BPO cases go through a formal close out process, which includes confirmation that the relevant corrective action has taken place. NPC has its own confirmation step that corrective action has taken place, and notifies BPO accordingly.

**Government Pricing – Class of Trade**
- The accuracy and completeness of NPC's reporting is secured / reinforced by the controls established through written standards and associated training described above. In addition, the certification and sub-certification process provides assurance that the CoT and resultant calculations are accurate.
- In the context of maintaining an accurate and representative CoT schema, NPC has established a robust and comprehensive technology platform and related maintenance process to ensure that the impact on prices and price reporting is accurate. NPC also has written standards for product returns from direct customers, product returns from indirect customers, and the determination of Fair Market Value for bona fide service fees in the context of patient programs i.e., vouchers, debit cards, and coupons.
- The NPC Medicaid Drug Rebate Program Compliance Policy describes how pricing concessions i.e., stocking allowances, price adjustments, service fees that are not bona-fide service fees, chargebacks, rebates (including PBM-owned mail order rebates and administrative fees), price concessions associated with Patient Coupon / Voucher transactions, price concessions associated with PAPs, and capitation arrangements are considered in the calculation of AMP and Best Price determination. NPC also mitigates this risk through written standards (which include treatment of product bundles and maintenance of its CoT schema) the Pricing and Contracting Strategy Oversight Committee, the sub-certification process, and a robust and comprehensive technology platform.

**Gen Meds : Oncology Compliance Coordination**
- The NPC Compliance Committee coordinates with the Oncology Compliance Committee through mutual representation. The US Oncology Compliance Committee has representation on the NPC Compliance Committee and is in part tasked with ensuring there is alignment within US Oncology and Gen Meds.
- NPC has implemented a company-wide Code of Conduct and E&C Policy Manual. Alignment across BU procedural documents is currently under review, with the stated objective of confirming consistent procedures where appropriate (e.g. establishing contractual arrangements with HCPs, reviewing and approving grants, etc.).
- The current BPO and RC process is applicable to both Gen Meds and Oncology.
- The E&C Department conducts compliance audits across Gen Meds and Oncology.

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

NPCLSV00017859

**Commercial and Medical Function Interactions**
- NPC has a consistent approach to the written standards between the commercial and medical groups in that both functions are subject to the company-wide E&C Policy Manual and the Code of Conduct. Specifically within the E&C polices there is a Policy titled "Appropriate Interactions between Medical and Commercial Associates", that details which interactions are acceptable vs. prohibited.
- Field ride-a-longs form part of the line management responsibilities, and this includes documenting on a Field Coaching Report any observations related to performance and compliance. In addition, E&C auditing of the field through audit ride-a-longs offer the opportunity to identify any policy violations as it relates to commercial and medical interactions.

## Navigant Consulting, Inc's Role
Navigant served as an Independent Advisor to the NPC Board, which included:
- creating a work plan for the Compliance Program Review
- overseeing the performance of the Compliance Program Review
- supporting the NPC Board's responsibility for reviewing and assessing NPCs Compliance Program

## Review Procedures and Methodology
The work steps performed were designed to:
- Understand NPC's Compliance Program activities in each of the OIG's seven (7) elements for an effective compliance program, as well as industry risk areas identified in OIG Compliance Program Guidance. These include:
  - Seven (7) Elements for an Effective Compliance Program:
    - High-Level Oversight
    - Written Standards
    - Training
    - Communication
    - Auditing and Monitoring
    - Enforcing Standards Through Well-Publicized Disciplinary Guidelines
    - Responding to Detected Deficiencies and Developing Corrective Action Initiatives
  - Risk Areas:
    - Government Pricing – Class of Trade
    - General Medicines and Oncology Compliance Coordination
    - Commercial and Medical Function Interactions
- Confirm the effectiveness of the Compliance Program by:
  - Comparing identified activities to generally accepted or industry practices
  - Testing certain program activities
- Identify opportunities for improvement of certain compliance program activities
- Obtain a level of information appropriate for reasonable and due inquiry by NPC's Board, thereby allowing the NPC Board to consider the compliance program resolution required by NPC's CIA.

Executive Summary                                                                 Page 11 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**                                   **NPCLSV00017860**

## Work Steps Performed

Navigant performed the following work steps, including but not limited to:

- creating a work plan for and overseeing the performance of the Compliance Program Review
- interviewing NPC Compliance Program personnel, certain management and business unit personnel, and certain personnel whose job responsibilities included compliance-related activities and/or responsibilities
- reviewing documentation, information and data provided by NPC
- attending NPC and selected management compliance committee meetings during the review period
- performing effectiveness testing procedures on selected compliance program activities
- providing recommendations for improvement opportunities regarding certain compliance program activities, and confirming NPC's corrective actions to these findings, whether implemented or planned

## Report Format

Our findings are organized by each of the seven (7) elements and certain industry risk areas identified in the OIG's Compliance Program Guidance for Pharmaceutical Manufacturers. Each section includes:

- an overview of the element from OIG compliance program guidance,
- a description of the relevant NPC Compliance program activities and related policies and procedures,
- a description of the results of the effectiveness review and testing (if applicable)
- findings and recommendations
- NPC corrective action implemented or proposed for improvement opportunities identified (Appendix B).

## Findings, Rationale, Recommendations and Corrective Actions

Compliance Program activities that were applicable to the OIG's Compliance Program Guidance and responses to certain OIG Compliance Program effectiveness considerations are described in the attached report sections. A summary of improvement opportunity findings, rationale, recommendations and NPC corrective actions (implemented or planned) is provided in Appendix B of this report.

Executive Summary                                                    Page 12 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

# High-Level Oversight

## Overview

OIG Compliance Program Guidance for Pharmaceutical Manufacturers indicates that every pharmaceutical manufacturer should designate a compliance officer to serve as the focal point for compliance activities. Designating a compliance officer with the appropriate authority is critical to the success of the program, necessitating the appointment of a high-level official with direct access to the company's president or CEO, BoD, all other senior management, and legal counsel. The compliance officer should have sufficient funding, resources, and staff to perform his or her responsibilities fully. The compliance officer should be able to effectuate change within the organization as necessary or appropriate and to exercise independent judgment.

The OIG recommends that a compliance committee be established to advise the compliance officer and assist in the implementation of the Compliance Program. When developing an appropriate team of people to serve as the pharmaceutical manufacturer's compliance committee, the company should consider a variety of skills and personality traits that are expected from the team members. The company should expect its compliance committee members and compliance officer to demonstrate high integrity, good judgment, assertiveness, and an approachable demeanor, while eliciting the respect and trust of company employees. These interpersonal skills are as important as the professional experience of the compliance officer and each member of the compliance committee.

Once a pharmaceutical manufacturer chooses the people who will accept the responsibilities vested in members of the compliance committee, the company needs to train these individuals on the policies and procedures of the Compliance Program, as well as how to discharge their duties. In essence, the compliance committee is an extension of the compliance officer and provides the organization with increased levels of oversight.

## Board of Directors Oversight

NPC's BoD oversees the Compliance Program. The Board consists of four (4) internal Directors:

| | |
|---|---|
| Robert Pelzer | President Novartis Corporation |
| Jon Symonds | Chief Financial Officer, Novartis AG |
| David Epstein | Head of Global Pharmaceuticals Division at Novartis AG |
| André Wyss | President of NPC |

Navigant personnel attended each of the NPC Board meetings since January 2011.

High Level Oversight                                                                 Page 13 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

The CCO provides a compliance update at each meeting that includes, and is not limited to:
- CIA Status Report, including:
  - Reportable Events under the CIA and related corrective actions
  - CIA implementation progress
- Compliance Program updates
  - Overview of the seven (7) elements of compliance
  - Auditing and monitoring results and related corrective actions
  - Investigations and related disciplinary actions
- External / Media updates

Other observations related to NPC Board meetings include:
- Compliance matters and the CCO report are given sufficient agenda time
- The NPC Board members engage in open and active discussion, and ask relevant and appropriate questions of NPC management present at the meeting
- During the first CIA reporting period, a new member was added to the NPC Board, and was provided with training and orientation to the Board and his role, and Board level CIA related training
- The committee members are provided with comprehensive pre-read information prior to the meetings. In addition, a planning call with the Novartis Corporation Vice President Ethics and Compliance is held prior to each meeting. Navigant personnel have joined each of the planning calls, and were provided with the pre-read information for review

### NPC Board By-Laws
The NPC Board By-Laws provide the basis for the structure and function of the Board, including:
- Director requirements
- Meeting schedule
- Oversight of the Executive Committee

## NPC CCO
NPC's CCO holds a position that is a Vice President level position, and is responsible for NPC's Ethics and Compliance, reports directly to the NPC President, has direct access to the NPC Board and has a "dotted-line" report to the Novartis Pharma AG CCO.

The CCO accountabilities have been described as follows:
- The development and implementation of policies, procedures, and practices designed to ensure compliance with the requirements set forth in the CIA and with Federal health care program and FDA requirements
- Delivery of periodic reports regarding compliance matters to the Board of Directors of NPC

Responsibilities include:
- Monitoring the day-to-day compliance activities engaged in by NPC as well as for any reporting obligations created under the CIA
- CIA administration
- State and Federal Law Reporting / NPC Aggregate Spend Reporting

High Level Oversight                                      Page 14 of 112
Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and
Office of Inspector General, US Department of Health and Human Services
Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

FOIA EXEMPT - CONFIDENTIAL                      NPCLSV00017863

- Compliance advisory Services
- Leadership and membership of oversight and governance committees (e.g., Compliance Committee)
- Compliance policy and procedure development and implementation
- Compliance training and communications
- Compliance audit and monitoring
- Internal Investigations & Disclosure inquiry oversight

## NPC Compliance Committee

The Committee meets monthly and consists of the CCO, the President of NPC and senior leaders representing company BUs, functional departments. The CCO serves as the Chairperson of the Committee.

The functions and responsibilities of the Compliance Committee members include:

- Providing guidance and direction on the Compliance Program design, development, and implementation throughout NPC, and supporting the CCO in his / her duties
- Reinforce the Written Standards, including the evaluation of revised or new policies and procedures
- Supporting specific compliance training and education programs for NPC associates
- Partnering with other senior management to establish and perpetuate a "tone at the top" that reflects the Company's commitment to ethical and legal business conduct
- Supporting the systems (e.g., AlertLine) which solicit, evaluate, and respond to complaints and concerns, and promote an environment in which associates can report violations without fear of retaliation
- Identifying and validating specific risk areas, and evaluating findings from internal and external audits of the Compliance Program
- Supporting, monitoring and demonstrating accountability for the effective and comprehensive implementation of NPC's CIA, including but not limited to continuous and timely policy, process, system or other improvements as necessary and identified via monitoring, investigations, IRO and other means.

NPC Compliance Committee membership includes representation from Gen Meds and Oncology:

- VP, Ethics & Compliance ("CCO") – Committee Chairperson
- NPC President, Head Pharma North America
- VP, Human Resources
- CFO, Finance, B&AS & IT
- VP, Legal
- SVP, Global Head, DS&E
- VP, Head, US Medical & DRA
- VP, Managed Markets & Market Access
- VP, BU Head of Primary Care
- VP, BU Head Psychiatry & Neuroscience
- VP, BU Head Multiple Sclerosis
- VP, BU Head Transplant, Respiratory, ID

High Level Oversight                                                                 Page 15 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

- VP, Head, CSO
- Executive VP, US Oncology
- Head, US Compliance Oncology
- NIBR Site Head, East Hanover

Navigant personnel attended each of the management Compliance Committee meetings during the first CIA reporting period, from January 2011. Observations of meetings attended include:
- Monthly meetings are held in the Board Room, with dial in facilities
- Occasional use of a delegate if the Compliance Committee member cannot attend
- Meetings are 60 minutes long
- The Agenda is provided at least one week before the meeting
- Agenda includes the following 'Action Values' which focuses the Compliance Committee on achieving one of these three outcomes and related action:
  - Decision Needed – Proposal / Recommendation presented for approval decision
  - Support Needed – Key initiative presented requiring management support
  - Informational – Key initiative status update
- Pre-read information is provided to committee members prior to meetings, usually at least one week prior. Navigant personnel have been provided with the pre-read information prior to the meetings
- Compliance Committee members are expected to have read all pre-reads prior to the meeting, and be prepared to discuss the topics concerned
- Standing items on the agenda include:
  - Compliance news external to NPC
  - Legislative update
  - Compliance update, with topics focused on current initiatives, for example:
    - Speaker infractions
    - Legal, Operations and Compliance committee update
    - NPC Risk Assessment
    - Compliance audit updates
    - E&C Integrity Award nominations
    - Speaker program redesign
    - Aggregate spend, Concerto
    - FMV updates
    - Compliance training curriculum
  - Policy updates:
    - Review and approve new / updates NPC Compliance Policies
    - Review new / updated Global compliance written standards, implementation plans, and evaluation of impact on the US organization, and identification of potential 'localization'
  - CIA implementation updates. This usually accounts for no more than 10 minutes of the meeting, the remainder committed to topics detailed above
- The CCO (Chair) is in control of agenda and meetings, rarely having to table a preplanned topic for a subsequent meeting, and completing the meeting within the allotted time

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

- The NPC President helps set the tone through:
  - reiteration of what will not be tolerated
  - expectation that division / BU leaders have accountability as it relates to compliance
  - emphasis on appropriate resourcing of the E&C Department
- There is open and candid discussion between the President of NPC, the CCO, committee members, and E&C Department personnel
- Evidence of effective interdepartmental / cross-functional engagement, shared learnings and sharing of perspectives on topics exists
- Oncology alignment and input is secured through Oncology Compliance Committee meetings that occur prior to the NPC Compliance Committee meeting, Oncology membership on the NPC Compliance Committee and active participation by Oncology representatives in the NPC Compliance Committee
- Compliance Committee Meeting Minutes are distributed after the meeting, or with pre-reads in anticipation of the next meeting
- Meeting minutes include the following:
  - Topic covered
  - Key presentation / discussion points
  - Action request

## Oncology Compliance Committee

The Oncology Compliance Committee meets monthly, usually a day in advance of the NPC Compliance Committee meeting. The Compliance Committee consists of the Head US Ethics and Compliance, Oncology, Executive Vice President & North American Region Head, Oncology, the CCO, and senior leaders representing Oncology BUs / Tumor Teams[1] and support functions. The Head US Ethics and Compliance, Oncology serves as the Chair of the Committee and the Director, Operations, Oncology E&C, serves as secretary.

The functions and responsibilities of the Compliance Committee members described in the Oncology Compliance Committee Charter include:
- Supporting the development, implementation and monitoring of the Compliance Program
- Reinforcing Oncology's commitment to the NPC Code of Conduct and related Written Standards
- Supporting the development and delivery of Compliance training
- Supporting open lines of communication
- Reviewing compliance audits and investigation results
- Oversee corrective action

The Oncology Compliance Committee membership includes:
- Head US Ethics and Compliance, Oncology (Chair)
- Executive Vice President & North American Region Head, Oncology
- North America Oncology Chief Commercial Officer
- US Oncology Business Franchise Head

---

[1] The US Oncology group reorganized their operating model from one of Product Teams to Tumor Type Teams during the reporting year

High Level Oversight                                                    Page 17 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00766

**FOIA EXEMPT - CONFIDENTIAL**

NPCLSV00017866

- US Hematology Business Franchise Head
- Vice President, Legal
- Vice President, E&C (NPC)
- Head of US Oncology Finance
- Head of US Oncology Affairs and Patient Advocacy
- Head of US Oncology CDMA
- Head of US Oncology New Products
- Head of US Oncology Human Resources

Navigant personnel attended each of the Oncology Compliance Committee meetings during the first CIA reporting period, from January 2011. Observations of meetings attended include:

- Monthly meetings are held, with dial in facilities
- Occasional use of a delegate if the Oncology Compliance Committee member cannot attend
- Meetings are generally 60 minutes long, and scheduled to flow into other oversight meetings, providing flexibility in use of time
- The Agenda is provided at least one week before the meeting
- Pre-read information is provided to committee members prior to meetings, usually at least one week prior. Navigant personnel have been provided with the pre-read information prior to the meetings
- Compliance Committee members are expected to have read all pre-reads prior to the meeting, and be prepared to discuss the topics concerned
- Standing items on the agenda include:
  - NPC Compliance Committee agenda review
    - This includes raising topics for upcoming NPC Compliance Committee meetings, and receiving feedback / decisions from previous NPC Compliance Committee meetings
  - Compliance update, with topics focused on current initiatives, for example:
    - Medical Expert Management Task Force
    - Commercial Cap Review
    - Compliance Training Update
    - Role of the Sales Representative at scientific sessions
    - Role of the medical representative at promotional meetings
    - Advertising & Promotion Compliance Update
    - Compliance training update
  - CIA implementation updates. This usually accounts for no more than 10 minutes of the meeting, the remainder committed to topics detailed above
- The Head US E&C (Chair) is in control of agenda and meetings, while allowing for open debate and issues identification
- The Executive Vice President & North American Region Head sets the tone by reinforcing Oncology US' commitment to compliance and aligning with the NPC Compliance Program

High Level Oversight                                                              Page 18 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00767

**FOIA EXEMPT - CONFIDENTIAL**                                        **NPCLSV00017867**

- Oncology alignment with the NPC Compliance Program and input into the decision making process at the NPC Compliance Committee meetings is secured through having the Oncology Compliance Committee meeting the day before. It should be noted that at times, this short period of time between meetings did not allow for internal discussion within Oncology to be fully aligned on a topic that was to be decided on the next day at the NPC Compliance Committee meeting
- Compliance Committee Meeting Minutes are distributed after the meeting, or with pre-reads in anticipation of the next meeting

## Ethics and Compliance Department Budget, Structure and Organization

The E&C department has been in existence for some time, and has seen growth in headcount and financial resources over the last two years. In addition, BUs have added compliance roles to operational employees, who fulfill the role of Compliance Liaison.

The following table reflects FTE changes over the last three years:

|           | 2009 | 2010 | 2011 |
|-----------|------|------|------|
| Gen Meds  | 16   | 23   | 31   |
| Oncology  | 2    | 2.25 | 5    |

The E&C budget was almost doubled from 2010 to 2011 to allow for implementation of the CIA and related expenses (Pre-IRO, IRO, Board Expert), and for growth in the E&C Department to further enhance the program within NPC.

| Description | 2010 Budget ($ Million) | 2011 Budget ($ Million) |
|-------------|-------------------------|-------------------------|
| CIA Implementation | 2.9 | 11.8 |
| E&C | 8.7 | 10.1 |

## Certifying Employees

In accordance with the CIA requirements, NPC has implemented a process for the annual certification by management, that activities in their respective areas of authority are monitored and overseen in the context of compliance with CIA obligations, the Federal health care program and FDA requirements.

Executive leadership, executive management, directors, associate directors and other relevant employees within NPC have been identified as 'Certifying Employees'. There are approximately 380 individuals that will certify this Reporting Period, and they cover the following functional areas:

- Oncology
- Primary Care
- Multiple Sclerosis
- Psychiatry & Neuroscience
- Respiratory and Transplant
- Managed Markets and Market Access
- CSO
- Clinical Development
- MA

High Level Oversight                                        Page 19 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00768

**FOIA EXEMPT - CONFIDENTIAL**

NPCLSV00017868

- DRA
- New Product Commercialization
- Licensing
- Finance
- E&C
- Executive leadership

Training has been made available to all 'Certifying Employees' to reinforce their obligations and describe the types of data points they should be monitoring as part of their oversight obligation.

## Compliance Program Effectiveness Considerations

*Has the company designated a compliance officer to serve as the focal point for compliance activities?*
Yes. NPC has a Chief Ethics and Compliance Officer ("CCO").

*Is the compliance officer able to dedicate adequate and substantive time and attention to the compliance functions?*
Partially. The CCO's job responsibility has been summarized in this report section, and is focused exclusively on compliance activities. A formal and detailed Job Description was not provided during the course of this review.

*Does the compliance officer have sufficient funding, resources, and staff to perform her responsibilities fully?*
Yes. The E&C Department is funded and staffed appropriately with personnel who can focus on each of the seven (7) element areas, along with personnel who can assist the CCO in directing NPC E&C activities. In addition, NPC BUs (e.g. NeuroPsych, MS) are assigned dedicated compliance personnel (referred to as BU Advisors) who support, or are the point-persons for, compliance activities in those BUs.

In addition, select personnel who function primarily within NPC are identified as Compliance Liaisons, and serve as a point person within those organizations and BUs.

*Is the compliance officer able to effectuate change within the organization as necessary / appropriate and exercise independent judgment?*
Yes. The CCO's job description and level within the organization (Vice President) allows her to effectuate change within the organization as necessary and appropriate. It is evident that she has the full support of the PEC.

*Has a compliance committee been established to advise the compliance officer and assist in the implementation of the Compliance Program?*
Yes. The NPC Compliance Committee described in this report section is properly staffed and chartered to accomplish this objective. In addition, the US Oncology group has its own Oncology Compliance Committee that mirrors the NPC Compliance Committee, has representation on the NPC Compliance Committee and is in part tasked with ensuring there is alignment within US Oncology and Gen Meds.

High Level Oversight                                                          Page 20 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

*Has the company trained the compliance committee members on the policies and procedures of the Compliance Program, as well as how to discharge their duties?*

Partially. Members have received the standard Compliance Program training required each year. In their context as members of a Compliance Committee, Members are reminded during meetings as to their role and function on the Compliance committee. A review of the NPC and Oncology Charters was conducted with the respective Committee members after the CIA settlement. There is no evidence of formal training on their role as members of the Compliance Committee.

## Findings, Rationale and Recommendations

Finding HLO_1:
The NPC Board has By-Laws that address the foundational requirements for the Board and its members. However, the roles and responsibilities of the Board members are not clearly addressed, especially as it relates to the Compliance Program. The NPC Board does not have a charter in place that would provide a more detailed description of the Board member roles and responsibilities.

Rationale HLO_1:
A Board charter detailing the structure, function and accountabilities of the Board members will establish a common understanding of expectations. This also provides a guide to members, and reinforces the member's accountabilities.

Recommendation HLO_1:
Consider developing and implementing a Board charter that includes a description of the Board member's roles and accountabilities as it relates to the Compliance Program.

Finding HLO_2:
The CCO's job description is not well described and does not provide for the ability to retain independent counsel to support internal investigations.

Rationale HLO_2:
The CCO job description provides the basis for the role, reporting lines, accountabilities and responsibilities. In addition, the ability for the CCO to retain independent counsel in support of internal investigations is a better practice in the industry, and reinforces independence from the legal department.

Recommendation HLO_2:
Establish a formal CCO job description, and consider incorporating the authority of the CCO to appoint independent counsel, into the job description.

Note: At the time of finalizing this report, a formal job description was being created to address this recommendation.

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and
Office of Inspector General, US Department of Health and Human Services
Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**                                    **NPCLSV00017870**

Finding HLO_3:
It is not clear that Compliance Committee members have had specific training on their roles and responsibilities.

Rationale HLO_3:
Training reinforces the roles and responsibilities of Compliance committee members and ensures a consistent approach to their function as Compliance committee members.

Recommendation HLO_3:
Finalize updates to Compliance Committee Charters; develop training based on these Charters and deliver training to the Compliance Committees.


Finding HLO_4:
The Oncology Compliance Committee meeting usually occurs the day before the NPC Compliance Committee meeting. It was identified by the Oncology E&C team and by Navigant in the attendance and related review of meetings, that there was insufficient time for Oncology to address certain issues / decisions before the next day's NPC Compliance Committee meeting.

Rationale HLO_4:
Appropriate Oncology representation could be compromised in the NPC Compliance Committee meeting and result in delays in decision. The coordination between Oncology and Gen Meds is critical to maintaining the effectiveness of the Compliance Program.

Recommendation HLO_4:
Consider conducting the Oncology Compliance Committee meeting earlier, allowing for sufficient time for issue resolution by the Oncology Compliance Committee.

High Level Oversight                                                      Page 22 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

# Written Standards
## Overview

OIG Compliance Program Guidance for Pharmaceutical Manufacturers indicates that in developing a Compliance Program, every pharmaceutical manufacturer should develop and distribute written compliance standards, procedures, and practices that guide the company and the conduct of its employees in day-to-day operations. These policies and procedures should be developed under the direction and supervision of the compliance officer, the compliance committee, and operational managers.

Per the 2003 OIG Guidance for Pharmaceutical Manufacturers: "the policies and procedures should be provided to all employees who are affected by these policies and to any agents or contractors who may furnish services that impact federal healthcare programs (e.g., contractors involved in the co-promotion of a manufacturer's products)."

In addition, the CIA between the OIG and NPC required the implementation and distribution of certain policies and procedures (Section III B). NPC reported on their compliance with this CIA requirement in its February 24, 2011 Implementation Report to the OIG and the subsequent response to OIG questions, dated April 25, 2011.

## General Policy and Procedure Development
### Code of Conduct

The Written Standards at NPC are grounded in the Global Code of Conduct and the NPC version of the Code of Conduct. The Code of Conduct represents the company's policy statements that define ethical standards for employees and agents, including interactions with HCPs. The Code provides an excellent summary of requirements of the organization and the laws that underpin this, including fraud and abuse, FCPA, conflicts of interest, SOX, taxes, privacy, insider trading, etc. The Code includes a statement describing the "Values To Live By":

- "ethical and legal behavior, including telling the truth;
- loyalty to Novartis in our business dealings; and
- fair and respectful treatment of fellow employees"

The Global Code of Conduct is reviewed by the Novartis AG Board on an annual basis, is updated as needed, and redistributed as appropriate. The NPC Version is updated accordingly and all employees have to review and attest to their review of the Code on an annual basis, regardless of whether there is an update or not.

The Code of Conduct supports setting the 'tone' of compliance and reflects the leadership's expectations of NPC employees and agents.

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and
Office of Inspector General, US Department of Health and Human Services
Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

NPC OIG YR1 RPT 00772

**NPCLSV00017872**

*Policies*

NPC's E&C Department has an E&C Policy Manual that provides an overview of company policies and compliance related laws, industry guidance and company rules.

The Policy Manual covers the key risk areas of HCP interactions, kick-back, and off-label promotion. The Policy Manual contains common scenarios that a NPC associate might encounter and includes the following chapters:

- Promotional & Other Materials
- Customer Interactions
- Appropriate Interactions Between Medical and Commercial Associates
- Advisory Boards & Medical Meetings
- Speaker Training
- Speaker Programs
- Conventions
- Patient Interactions
- Contractual Arrangements
- Educational Grants
- Public Affairs Grants & Other Funding
- Publications
- States Laws & Concerto
- Ethics & Compliance Obligations

The introduction is authored by both the CEO of NPC[2], and the US Regional Head of Oncology, reflecting coordination between the NPC US based organizations[3] and reflecting leadership's ownership of these policies. The introduction letter reinforces the company commitment to compliance, following the "highest ethical standards". It further makes reference to the expectation of an effective Compliance Program.

This Policy Manual is distributed to all NPC employees via the Ethics and Compliance intranet and was incorporated into the annual training program for all NPC employees.

The Policy Manual was updated to incorporate CIA related requirements, and these updates include:

- An update to the Introduction - with good reference to the Code Of Conduct
- Samples
- Compendia
- Proof of performance
- Transparency
- A substantial revision of the Grants section, including definitions and identification of which department manages each type of grant
- State Law
- Industry standards

---

[2] Head of Pharmaceuticals North America and President of NPC
[3] Gen Meds and US Oncology

Written Standards                                                                                 Page 24 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00773

**FOIA EXEMPT - CONFIDENTIAL**                                                              NPCLSV00017873

New and updated policies are reviewed and approved by the NPC Compliance Committee. Each update was communicated and distributed using various channels to all NPC employees, including channels such as the weekly sales bulletin, the E&C website, "What You Need To Know This Week", an internal weekly bulletin and through the reporting lines. The training tool, iLearn, will be leveraged for a "read and sign" attestation where specific training needs on policy have been identified.

The Policy Manual is easily accessed on the E&C intranet page, it is comprehensive and detailed. The Manual clearly applies to all US based NPC activity and individuals. The policies are well written and version control is managed through the E&C intranet link to the primary document. However, it was reported in interview that departments and individuals download the primary document and retain on their own e-room or computer, and tend to access that downloaded document if required.

*Procedures*

Procedure documents provide guidance on roles and responsibilities and fundamental steps that should be followed in day-to-day activities, and prescribe for repetitive use as a practice, in accordance with policy aimed at obtaining a desired outcome. At NPC, these procedure documents are captured in WPDs and SOPs. SOPs reflect Novartis Global procedural documents that describe the "What" and the "Who" of a process. Each BU or functional department might have its own WPD that reflects structural differences within that BU or functional department.

These WPDs address key risk activities as it relates to healthcare compliance, and provides the "How" for processes, including (but not limited to):

- EOC Review of events that include, but not limited to US HCP engagements, marketing-funded consulting or advisory events, all New Product Commercialization funded consulting or advisory events, all Speaker Training meetings, Speaker Programs, individual and group Preceptorship events, and all 'novel' promotional programs
- The approval processes for Materials used externally and internally
- Medical Inquiry management process, including approval process for materials used in response and the monitoring of Medical Inquiries
- Scientific Operations involvement in communications to HCPs and MM key stakeholders, modest meals, SciOps speaker requests, NPC sponsored promotional speaker programs, Grants, Investigator Initiated Trials, NPC sponsored outcomes studies, Adverse Event reporting and interactions with commercial colleagues
- Call plan process
- Approval of Specialty Inclusions in the Target List process
- Sample allocation and fulfillment process
- Developing and submitting requests for Compendia listing process
- Publication development process
- Incentive compensation process

Access to WPDs is primarily secured through the individual BUs or departmental intranet sites. The structure and content of these documents varies, depending on which department, product or activity is being considered.

Written Standards                                                                 Page 25 of 112
Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and
Office of Inspector General, US Department of Health and Human Services
Confidential

Contains confidential commercial and/or trade secret information exempt from disclosure under the Freedom of Information Act (FOIA) (5 U.S.C. 552) and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

WPDs are reviewed and approved by departmental / functional leads and appropriate personnel.

## Distribution, Training, Availability and Maintenance of Written Standards

All new hires in a commercial function receive training on the major elements of the E&C policies within the first 120 days of being hired. Additionally, the E&C Department must review the training materials at least on an annual basis for these policies. The training system, iLearn is occasionally used to ensure a "read and sign" attestation for new or updated policies that have been determined to require this additional implementation step. This was confirmed across all interviews and in the February 24, 2011 Implementation Report to the OIG and the subsequent response to OIG questions, dated April 25, 2011.

WPDs and SOPs are distributed by the relevant department or BU, and training on updates or new WPDs is provided through the relevant department or BU.

## Compliance Program Effectiveness Considerations

*Has NPC developed and distributed written compliance policies, procedures, and practices that guide the company and the conduct of its employees in day-to-day operations?*

Yes. As described above, both prior to and pursuant to the CIA, NPC has developed and distributed a code of conduct, written principles, policies and procedures / practices. These written standards are available to employees on company websites, with links to these policies included in required training. Many of the procedures that govern NPC associates with their day-to-day responsibilities are documented within departmental WPDs. Policy documents include procedural elements to various activities within the company.

*Are the policies and procedures pursuant to the Compliance Program developed under the direction and supervision of the compliance officer, the compliance committee, and operational managers?*

Yes. Compliance policies are developed by the E&C Department and procedures developed in conjunction with functional areas (operational managers) that are affected by the policies and procedures. All US-based Compliance policies are reviewed by the Compliance Committee, prior to implementation.

*Are the policies and procedures provided to all employees who are affected by these policies, including agents or contractors who may furnish services that impact federal healthcare programs?*

Yes. Relevant policies and procedures, including the Code of Conduct, were provided to all Covered Persons (as defined by NPC's CIA), which includes but is not limited to employees and agents / contractors who perform Promotional and Product Services Related Functions, and who work more than 160 hours per year.

The E&C Policy Manual states that "relevant excerpts of our polices may be distributed in a confidential manner to outside contractors, agencies and suppliers performing relevant tasks or assisting NPC personnel having responsibilities that are covered by this document [the E&C Policy Manual]".

New employees receive all relevant Written Standards as part of the on-boarding process and related training. Annual training on the E&C Policy Manual and on the CIA is now required.

Written Standards                                                           Page 26 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret information exempt from disclosure under the Freedom of Information Act (FOIA) (5 U.S.C. 552) and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00775

**FOIA EXEMPT - CONFIDENTIAL**

**NPCLSV00017875**

## Findings, Rationale and Recommendations

Finding WS_1:

There is no policy or procedural document that describes the US Written Standard architecture, the process for developing US Written Standards and the process for review, approval and distribution.

Rationale WS_1:

A consistent hierarchy across the organization provides clarity on the purpose and use of Written Standards, and supports the differentiation between a policy, a procedure and a practice. A defined architecture ensures appropriate connectivity (and reference) between policies and procedures and provides for easier updating, as needed.

Recommendation WS_1:

E&C should establish a compliance related policy and procedure for Written Standards, develop templates for policies, procedures and practices, and define the related Written Standard architecture. Leverage Global policy or procedure as appropriate.

Finding WS_2:

The Code of Conduct and E&C Policy Manual are available on the E&C website. Access to the documents is such that individuals find it more convenient to download these documents to their computer or departmental intranet / shared drive. WPDs and SOPs do not appear to be as centrally available as the E&C policies.

Rationale WS_2:

Version control and accessibility ensure Written Standards are current, and available as needed.

Recommendation WS_2:

Employees should be discouraged from downloading the Written Standards onto their desktop or departmental shared drive (or equivalent).
Introduce a mechanism to clearly identify any copies printed from the official website with the label of "uncontrolled copy" to reinforce this fact.

In addition to the notification of employees to take training on new and updated Written Standards, this notification should also instruct employees to destroy hard copies or delete previous versions from their computer, departmental shared drive, or any other form of repository.

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00776

**FOIA EXEMPT - CONFIDENTIAL**

NPCLSV00017876

# Conducting Effective Training and Education

## Overview

The appropriate education and training of officers, directors, employees, contractors, and agents, and the periodic retraining of personnel at all levels, are critical elements of an effective Compliance Program. A pharmaceutical manufacturer must take steps to communicate effectively its standards, procedures and expectations to all affected personnel by requiring participation in appropriate training programs and by other means, such as disseminating publications that explain specific requirements in a practical manner. These training programs should include general sessions summarizing the manufacturer's Compliance Program, written standards, and applicable federal healthcare program requirements. All employees and, where feasible and appropriate, contractors should receive the general training. More specific training on issues, such as (i) the anti-kickback statute and how it applies to pharmaceutical sales and marketing practices and (ii) the calculation and reporting of pricing information and payment of rebates in connection with federal healthcare programs, should be targeted at those employees and contractors whose job requirements make the information relevant. The specific training should be tailored to make it as meaningful as possible for each group of participants, and relevant to their function.

Managers and employees of specific departments / functions can assist in identifying specialized areas that require training, support compliance training development and carrying out the training. Additional areas for training may also be identified through the compliance audit and monitoring program, internal audits, investigations and from a review of any past compliance problems of the pharmaceutical manufacturer or similarly situated companies. A pharmaceutical manufacturer should regularly review its training and, where appropriate, update the training to reflect issues identified through audits or monitoring and any relevant changes in federal healthcare program requirements or company requirements, such as changes to written standards. Training instructors may come from outside or inside the organization, but must be qualified to present the subject matter involved and sufficiently experienced in the issues presented to adequately field questions and coordinate discussions among those being trained. Ideally, training instructors should be available for follow-up questions after the formal training session has been conducted.

The pharmaceutical manufacturer should train new employees soon after they have started working. Training programs and materials should be designed to take into account the skills, experience, and knowledge of the individual trainees. The compliance officer should document any formal training undertaken by the company as part of the Compliance Program. The company should retain adequate records of its training of employees, including attendance logs, descriptions of the training sessions, and copies of the material distributed at training sessions.

The OIG suggests that all relevant personnel (i.e., employees as well as agents of the pharmaceutical manufacturer) participate in the various educational and training programs of the company. For example, for sales representatives who are responsible for the sale and marketing of the company's products, periodic training in the anti-kickback statute and its safe harbors should be required. Employees should be required to have a minimum number of educational hours per year, as appropriate, as part of their employment responsibilities.

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00777

**FOIA EXEMPT - CONFIDENTIAL**                                    **NPCLSV00017877**

The OIG recognizes that the format of the training program will vary depending upon the size and resources of the pharmaceutical manufacturer. For example, a company with limited resources or whose sales force is widely dispersed may want to create a videotape or computer-based program for each type of training session so new employees and employees outside of central locations can receive training in a timely manner. If videos or computer-based programs are used for compliance training, the OIG suggests that the company make a qualified individual available to field questions from trainees. Also, large pharmaceutical manufacturers may find training via the Internet or video conference capabilities to be a cost-effective means of reaching a large number of employees. Alternatively, large companies may include training sessions as part of regularly scheduled regional meetings.

The OIG recommends that participation in training programs be made a condition of continued employment and that failure to comply with training requirements should result in disciplinary action. Adherence to the training requirements as well as other provisions of the Compliance Program should be a factor in the annual evaluation of each employee. In addition to OIG training recommendations in the Compliance Program Guidance, NPC's CIA includes specific training requirements (Section III C). Compliance with these requirements were reported in NPC's February 24, 2011 Implementation Report to the OIG, and summarized in this report section. In addition, a follow-up letter from NPC to the OIG dated April 25, 2011 provided additional information regarding compliance with these training requirements and the content of the training.

## Description of NPC Training System
### Formal Training
The E&C Department has a training curriculum documented for each calendar year. Included on that annual document are the course name, audience, delivery method, and length of training. For 2011, the training curriculum includes the following additions:
- the deployed or target date
- the owner
- an indication of BU support required
- includes a 1-hour CIA General Training with the intended audience of all covered persons identified (as defined in NPC's CIA)
- includes the three (3) 1-hour CIA training modules with the intended audience of all relevant covered persons (as defined in NPC's CIA)

The curriculum is separated into E&C trainings and new hire trainings. New hire training has been significantly expanded to include the CIA related training, and further enhanced to address E&C needs.

|  | 2010 | 2011 |
|---|---|---|
| New Hire Training Hours | 6.25 | 11.25 |
| New Hire Training Courses | 11 | 17 |

Conducting Effective Training and Education                    Page 29 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret information exempt from disclosure under the Freedom of Information Act (FOIA) (5 U.S.C. 552) and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

## Technology Supporting Training

**iLearn**: the in-house Saba based LMS used by NPC, houses all online training programs, including the annual CIA training. This platform not only holds the training, but it also tracks who has and who has not completed the required trainings within a specified timeframe. Specifically, Cognizant, an outside vendor, developed a tool called CTS that is used to deliver results to the BUs. This tool links up with PeopleSoft which enables the reporting to be done in real time. This mechanism allows NPC, line managers and E&C to track and proactively pursue training gaps. Employees are notified about new trainings via e-mail and managers are notified if the employee has not completed a required training within the predetermined timeframe. This platform is leverage to reinforce training as determined necessary, through a "read and sign" attestation.

**Intuition**: a vendor provided LMS system specializing in CIA training, directed at NPC vendors who provide services, and are designated as covered persons (as defined in NPC's CIA). Record maintenance of the CIA training is housed in Intuition. Participant records are available to the vendor point of contact to verify compliance with training requirements.

Both iLearn and Intuition track and report on course statistics, individual records, and send alerts and reminders as needed to achieve compliance.

In addition to web-based trainings, there are live trainings that occur, specific to department or function. These trainings are organized and hosted by E&C or by departmental / functional employees. Compliance training is also provided as part of a broader training program, e.g. sales force training on products, disease states, etc. includes compliance training. Live trainings, as opposed to web-based training, provides for a more interactive discussion and a question and answer session.

For functional or departmental specific training, the selected business owners will help create and / or review the content. After sign off from the BU, it's then passed onto Legal for approval. Topics mentioned include:
- Diversity
- Data Integrity
- Conflict of Interests
- HR Velez Training
- E-mail and Texting

## Informal Training

In addition to the formal training plan, functional areas and departments have periodic training provided by the Compliance Liaison and / or BU Compliance Advisor, e.g. the Head of US Ethics and Compliance, Oncology provides case study examples to the Oncology sales force on a regular basis, and then reviews these case studies on a conference call to identify key controls and risks. Case studies are also used in Gen Meds compliance training.

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00779

**FOIA EXEMPT - CONFIDENTIAL**

**NPCLSV00017879**

## Overview of Training Content

### Feedback Loop

After E&C audits are completed, findings from those audits frequently become training topics. The intent is to remedy the audit findings through training exercises. Another catalyst for new training topics is the BPO investigation outcomes. These are tracked and any trends identified become training opportunities.

### CIA Training

The CIA training consists of four (4) 1-hour modules. These are:

- General CIA Training
- Interactions with HCPs: Content and Communications
- Interactions with HCPs: Compensation for Services, Meals, and the Provision of Educational Items
- Processes and Approval Mechanisms

The training was developed by the E&C Department's training team, and was provided online in iLearn. This training is required of all NPC (incl. Novartis Oncology US) employees, as mandated by NPC's CIA. Vendors that qualify under the CIA defined 'covered persons' are required to take the same formalized training.

For the most part, the employees found the training very relevant to their job functions and learned a lot that they didn't previously know or fully understand. Additionally, interviewees found the scenarios helpful and encourage more of those for Year 2 training. The Year 2 CIA training is anticipated to start in March 2012. The E&C Department is considering a phased approach to Year 2, where portions of the training will be done on a monthly basis, to be rolled out during 2012. This will be overseen by the CIA Implementation team[4].

The online training is structured in a way that does not allow the user to skip through the modules as CTS requires users to review and listen to all screens and sections of the training in order to proceed. Additionally, intermittent quizzes must be taken in order to proceed. There is no final test to certify. If the user answers a quiz question wrong, he / she is able to move on, with the correct answer and the reasoning provided.

Access to the content of these training modules was repeatedly requested throughout NPC and these were subsequently made available by the E&C Department through their intranet site. US based 'non-covered' persons were provided the CIA training if requested.

In addition to the formal CIA training, we are aware of at least one functional head requiring their team to read the CIA and criminal indictment in their entirety.

---

[4] The CIA Implementation Team is now referred to as the Government Compliance & Reporting Team

Conducting Effective Training and Education                                           Page 31 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

### CIA Certifier Training

Each CIA certifier has the opportunity to take non-mandatory training that outlines what being a certifier to the CIA means and requires. This training is a one (1) hour web-based module.

### Code of Conduct Training

There is an annual Code of Conduct online training and attestation. There was positive feedback regarding this training and its usefulness and relevancy to each person's job and their understanding of the Company's approach to business.

### On-boarding Training

New hires to NPC receive standard training which includes compliance training. Topics covered in this training include, but are not limited to:

- Mutual respect
- Off-label promotion
- Doing business with integrity
- Adverse event reporting and drug safety
- Privacy
- Corporate citizenship
- Information security
- Anti-trust

## Compliance Program Effectiveness Considerations

*Has the company effectively communicated its standards and procedures to all affected personnel by requiring participation in appropriate training programs and by other means, such as disseminating publications that explain specific requirements in a practical manner?*

Yes. The required trainings, as described above, are communicated to all affected personnel through iLearn notifications and through the 'tone from the top'. The CIA training contains role-specific, practical examples for recognizing and addressing potential compliance issues. Training content has also been made available through the E&C website for download and reference.

*Is formal training undertaken by the company, as part of the Compliance Program, documented?*

Yes. Training records related to completion of the CIA training, Compliance Policy updates and the annual Code of Conduct attestation are documented and archived.

*Does the company retain adequate records of its training of employees, including attendance logs, descriptions of the training sessions, and copies of the material distributed at training sessions?*

Yes. Training records are documented through iLearn and reports can be generated through the system. Copies of the compliance training materials are available electronically upon request.

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00781

**FOIA EXEMPT - CONFIDENTIAL**

**NPCLSV00017881**

*Does failure to comply with training requirements result in disciplinary action? Is adherence with training requirements a factor in the annual evaluation of each employee?*

Yes. iLearn notifies managers if required training is not completed within the prescribed time period. This notification gets escalated if this deficiency persists. Failure to comply is reflected as a failure to complete E&C objectives in the performance management process and related evaluations (10% weighting of total performance objectives).

## Findings, Rationale and Recommendations

Finding CT_1:

The compressed nature of Year 1 CIA training resulted in some disruption in the day-to-day activities of personnel. Interviewees reported high levels of anxiety and stress as a result of time pressure, and pressure to answer all questions correctly.

Rationale CT_1:

Severe time pressures can reduce the effectiveness of the training and compromise employee retention of the information.

Recommendation CT_1:

It is recognized that Year 1 CIA training has to be completed in a predetermined time frame. The E&C Department is considering a phased training plan for Year 2, and this is highly recommended.

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

# Developing Effective Lines of Communication

## Overview

In order for a Compliance Program to be effective, employees must be able to ask questions and report problems. Supervisors play a key role in responding to employee concerns and it is appropriate that they serve as a first line of communications. Pharmaceutical manufacturers should consider the adoption of open-door policies in order to foster dialogue between management and employees. In order to encourage communications, confidentiality and non-retaliation policies should also be developed and distributed to all employees.

Open lines of communication between the compliance officer and employees are equally important to the successful implementation of a Compliance Program and the reduction of any potential for fraud and abuse. In addition to serving as a contact point for reporting problems and initiating appropriate responsive action, the compliance officer should be viewed as someone to whom personnel can go to, to get clarification on the company's policies. Questions and responses should be documented and dated and, if appropriate, shared with other staff so that compliance standards or polices can be updated and improved to reflect any necessary changes or clarifications. Pharmaceutical manufacturers may also consider rewarding employees for appropriate use of established reporting systems as a way to encourage the use of such systems.

OIG Compliance Program Guidance for Pharmaceutical Manufacturers indicates that for a Compliance Program to work, employees must be able to ask questions and report problems. In order to encourage communications, confidentiality and non-retaliation policies should also be developed and distributed to all employees. Open lines of communication include:

- For the purpose of reporting misconduct or a compliance concern, employees are encouraged to contact:
  - Immediate manager
  - An Officer of the company
  - A BPO representative
  - Legal
  - HR
  - E&C Department
  - The Alertline
  - Employee Relations Hotline
- Methods of maintaining open lines of communication include:
  - Alertlines / Hotlines
  - Emails
  - Newsletters
  - Employee / sales representative surveys
  - Exit interviews
- On-going communication about policies, procedures, and regulatory updates.

Developing Effective Lines of Communication                              Page 34 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00783

**FOIA EXEMPT - CONFIDENTIAL**

NPCLSV00017883

## Description of NPC's Compliance Program

### Access to Supervisors and the CCO

The CCO maintains an open-door policy and is readily available for employees as needed. In addition, effective communication channels have been set up between the business and Compliance BU Advisors who focus on specific BUs / functions. The BU leadership also maintains an open-door policy for employees, and leverage Compliance Liaisons, who are BU / functional employees who have Compliance Program support as part of their objectives, as an additional route for two way communication.

NPC maintains a non-retaliation Policy that is reinforced through the Code of Conduct. In addition, NPC supervisors / employees are prohibited from recording conversations, in part to encourage open communication.

"Ask E&C" is a web-based tool that provides NPC employees direct access to the CCO for enquires related to the compliance program.

### The Alertline

NPC encourages an open-door policy, whereby employees feel comfortable reporting to their immediate management as appropriate. Interviewees reported that their first report of a potential compliance violation would be with their immediate supervisor, or E&C should the immediate supervisor be the subject of the report.

In addition, a confidential Hotline / email service is provided by a third party vendor, Global Compliance: The Alertline. When a caller calls in, he / she is offered the opportunity of anonymity, and made aware of NPC's policy regarding Alertline calls. The caller is then asked for the details of the allegation / complaint. These are forwarded to the BPO, and a determination of call type is made. If the call appears to be an adverse event related call – the details are forwarded to the pharmacovigilance group, if a product quality complaint, the details are forwarded to the Quality Assurance group. If the call is related to a potential compliance violation, BPO makes a determination as to whether an investigation is warranted. The caller then receives a reference number for future follow-up.

As of Q3, 2011, there were approximately 208 Alertline calls for NPC, year to date. Of those calls, 51% or 107 were directed to Employee Relations (employment related) and 34% or 70 were directed to Ethics & Compliance (compliance related). Approximately 100 were classified as "BPO Cases." 100% of the calls are followed up on in some manner either by the BU or via a BPO Investigation.

All employees interviewed knew where to find the Alertline number, even if they had not used it before. It's available on the Intranet homepage, the E&C homepage, as well as pamphlets that have been circulated to employees for awareness and encouragement. Posters are also displayed in many conference / meeting room, encouraging appropriate use and providing the number. The Alertline is also displayed regularly on the internal Novartis TV Network.

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and
Office of Inspector General, US Department of Health and Human Services
Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00784

**FOIA EXEMPT - CONFIDENTIAL**                                             **NPCLSV00017884**

*Employee Exit Interviews*

Employee exit interviews and surveys can provide a channel for communicating potential compliance violations to the company. The current survey and interview reminds employees that "If you are aware of a violation of Company policy and/or the law, we want to remind you of Novartis' Alert Line to report any allegations. This can be done anonymously, if you so choose. That number is: 1-800-543-6502."

Questions include indirect reference to the culture and tone at the company. However, there are no explicit questions asking about the Compliance program.

## E&C Communication Plans and Channels
### Ethics and Compliance Communication Plan

The E&C Department has established a number of initiatives to ensure there is consistent communication regarding compliance at NPC. This includes, but is not limited to:

- Developing and implementing a compliance brand
- Compliance introduction letter included in the interview package for prospective employees
- Slim Jim on compliance for newly hired employees
- Communication documents on E&C website, including meal FAQs
- Video series featuring NPC leadership discussing and presenting compliance best practices and highlighting the BPO process, posted to NPC One Health World intranet site, the home page on all employee computers
- New hire curriculum includes CIA requirements and Compliance Program details
- Alertline posters in all conference rooms to increase awareness
- Town Hall agendas include compliance topics

External communications to customers include:

- Update to NPC website
- CIA required communications
- Memo to Speakers

## Communication Channels
*Electronic (emails, blogs etc.)*

The CCO and Compliance Lead for Oncology have distributed multiple CIA update communications to the company and incorporated general compliance requirements. Readers are encouraged to "Take personal accountability by continually refreshing your knowledge of our Code of Conduct, policies, processes and regulatory requirements that affect your role and your business. Ask questions to gain clarification and prevent potential misconduct so we can drive continuous improvement." Additionally, readers are encouraged to submit questions regarding the CIA and / or the Compliance Program if they arise as a result of this communication, and an intranet portal is linked to do so.

Additional communication was sent to the field force by the CCO and Oncology Compliance Lead as a reminder about how NPC would be disclosing the fees paid, directly or indirectly, to US-based physicians on or after October 1, 2010 for speaker programs and speaker training as a part of the CIA. Reference to where to go if there are additional questions and a link to an FAQ page are also provided.

Developing Effective Lines of Communication                                    Page 36 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

The NPC President also sends out monthly communications to all NPC associates in the form of an email. In a similar fashion to the E&C Department, CIA updates and related announcements are provided. Within these messages, reference is made to the Code of Conduct and related tips on the proactive compliance approach that is desired.

*Agendas*

Agendas from various oversight bodies, departmental meeting and national sales meetings were provided. These all reflected some form of reference or dedicated time that was compliance related. While a compliance portion of the meeting may not be specifically assigned in all cases, there are clear examples where compliance is discussed and reinforced. For example, a 10 minute agenda item on "Social Media Guidelines" or a 40 minute slot on "Adverse Event Training" reinforces the culture of compliance.

Within the National Sales meeting examples, there was dedicated time for a compliance update, and dedicated time for review of case scenarios, breakout workshops and Q&A. It was reported to Navigant that these meetings were further supplemented by access to E&C personnel to answer any questions that might have arisen.

*Ad Hoc and Regularly Scheduled Calls / Meetings with Compliance BU Advisor*

Each BU / Medical function has an assigned E&C person to the team. This individual knows the BU, understands the functional elements and product elements (as appropriate), and is tasked to develop a close working relationship with the BU and any compliance liaisons (employees of the BU with a compliance element to their function) therein. The E&C representative can attend weekly leadership team meetings for that BU, as well as attend previously scheduled (by the sales management team) calls with the sales force to address key topics and take questions from the field.

Some BUs have set office hours with the E&C representative. This block of time (up to a half a day in some cases) is set aside for employees of that BU to bring any compliance related questions to E&C.

*Ethics & Compliance Survey*

NPC participates in an annual Global Survey, GES, that is designed to address a number of measures of employee morale and engagement. This survey includes aspects of E&C and the results of the 2011 survey have been widely communicated, including to the NPC Board by the CCO, to the Compliance Committees, the PEC, at Town Halls and at departmental meetings. It was evident during the Compliance Committee meetings that the leadership takes the results of these surveys seriously and is actively seeking initiatives to address areas of concern.

NPC conducted an E&C Survey in 2010. Within this survey, areas of concern identified included:
- Slight decline in comfort to raise issues of possible violations
- Decrease in perception of commitment to compliance for supervisor, Novartis as a whole, and Senior Management
- 12% decrease in employee belief that that NPC is "very successful in informing about commitment to code"; messages are not resonating

Developing Effective Lines of Communication                                      Page 37 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret information exempt from disclosure under the Freedom of Information Act (FOIA) (5 U.S.C. 552) and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

FOIA EXEMPT - CONFIDENTIAL

- Good / excellent understanding of procedures (87%) and obligation to report (96%), however, only 60% indicated that they would report. The reasons cited include:
  - fear of retaliation
  - a sense that no actions will be taken
  - fear of losing co-worker respect
  - concern about "whistleblower" status
- Though 15% of employees reported to have definitely witnessed a violation (or possible violation), only 58% of that 15% reported
- Slight decline in employees belief that they will not be retaliated against, are comfortable to speak freely, or are safe if they report

The E&C Department has responded to these findings with a detailed plan of action that includes reinforcing communication regarding non-retaliation and the importance of reporting suspected violations through various channels and throughout the life-cycle of new recruits, including:
- New hire letter enclosed in interview packet, explaining the Compliance Program and related reporting expectations
- New Hire orientation to include a focus on the need to "speak up" and the related Alertline
- Reinforcement to new hires and existing employees through various initiatives including a video series addressing the survey outcome and related actions to address identified concerns from the survey.

### Indirect Communications
*NPC Performance Management Process and Incentive Compensation Plan*
NPC has integrated compliance into the performance management process, and not meeting these objectives could impact decisions regarding:
- Merit increases
- Variable compensation (bonuses)
- Promotion decisions

Variable compensation of all NPC employees (including sales representatives) is subject to a claw back in the event there is a compliance violation that is substantiated.

Objectives are broken up into 5 different categories: Growth (30%), Innovation (20%), Productivity (20%), People (20%), and Ethics and Compliance (10%). The detailed objectives for E&C are "any objective related to our integrity including:
- Promote and adhere to Code of Conduct
- Implement / adhere to Corporate Integrity Agreement (CIA) milestones and measures
- Velez settlement[5] milestones and measures implemented
- Compliance with relevant functional SOX controls
- Full Support to NEM and HSE&BC Initiatives"

---

[5] Gender discrimination class action

Developing Effective Lines of Communication                                    Page 38 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

FOIA EXEMPT - CONFIDENTIAL

## Effectiveness Testing Results

### Test call to the Alertline

On July 27, 2011 a test call was made to the Alertline reporting a fictitious allegation of off-label promotion. This was a non-anonymous call, it was clearly identified as a test before the call started and the representative was asked to make a note that while this was a test, the appropriate follow-up was to take place.

The objective of the call was to:
- Experience what a reporter might experience when submitting a report
- Experience the timing between report and follow-up
- Determine if the process is aligned with the written standards

The representative taking the initial call explained the non-retaliation policy and confirmed as to whether the call was to be anonymous or not. The representative explained that all calls are then sent onto Novartis for review, essentially straight after the call is completed and related notes are entered into the system.

The Executive Director of the BPO called the complainant the same day the Alertline call was made, having received the report from the Alertline vendor. The Executive Director clearly defined the next steps, and confirmed that this test call would be closed out, as the call was unsubstantiated, including notification of the Alertline vendor that the claim was determined to be unsubstantiated and closed, so that a record was maintained at the Alertline, should the original caller call back for a status update.

The process described aligned with what has been outlined in various documents including the BPO Reporting and Management of Misconduct and Fraud SOP and BPO Process Flow Diagram.

### Test Off-label Inquiry Through Novartis Oncology Website

An off-label inquiry was submitted via e-mail on July 27, 2011. The inquiry included a potential side effect / adverse event.

A full electronic response that aligned with policy and provided the necessary information in fair balance, and with the appropriate disclaimers, was delivered via email the very same day of the request. Two weeks later, an adverse event report form was delivered via hard copy (in the mail) for completion and return in a prepaid envelope.

This experience aligned with the expected response, per WPD-MIC -001: Processing Medical Inquiries from Healthcare Professionals.

Developing Effective Lines of Communication                      Page 39 of 112
Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and
Office of Inspector General, US Department of Health and Human Services
Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00788

FOIA EXEMPT - CONFIDENTIAL                                    NPCLSV00017888

## Compliance Program Effectiveness Considerations

*Has the company fostered an organizational culture that encourages open communication, without fear of retaliation?*

Partially. An open-door policy is encouraged and employees report feeling comfortable going to their immediate supervisor if needed. However, the E&C Survey revealed an increase in concern that retaliation would take place in the event of a report. The E&C Department has established a robust action plan to reinforce the non-retaliation policy and the confidential nature of the Alertline process.

In interview, a number of employees expressed a concern that there's traceability of reporting through the Alertline, and that the Investigation Process is too secretive. It was reported that on a number of occasions, line management was not necessarily made aware that an investigation was being conducted related to a staff member on their team. In addition, people who were the subject of an investigation that was subsequently found to be unsubstantiated were not informed of the outcome, until they approached the BPO directly to ascertain the status of the investigation. The E&C team has recognized this dilemma, and are actively seeking ways to address the need for appropriate transparency, while maintaining the confidentiality of the investigation. (See Investigations section).

*Has the company established an anonymous Hotline or other similar mechanism so that employees, agents or contractors can report potential compliance issues?*

Yes. The number is easily accessible and interviewees indicated they knew where to access it. The system worked very effectively when tested.

*How well is the Alertline publicized; how many and what types of calls are received; are calls logged and tracked (to establish possible patterns); and is the caller informed of related company actions?*

The Alertline is well publicized and can be found on the Intranet homepage, as well as the E&C homepage. Posters are found in conference rooms that detail the Alertline. The number is regularly displayed on the Novartis TV system that is a significant communication tool across the East Hanover campus.

The calls are tracked and the ability to analyze the nature of calls exists. Formal BPO reports are provided to the CCO on a quarterly basis, however, the CCO is also notified daily on all cases as they are assigned, submitted to RC and as cases are closed out. Whether substantiated or not, all calls are logged and tracked. Patterns are observed and training topics are derived from those patterns. It has been found that approximately half of the calls are unsubstantiated and many of those are related to interpersonal issues that don't require an investigation.

The caller has the opportunity to call back and secure a limited understanding of the status of the investigation, using a unique case number, which allows for anonymity.

Developing Effective Lines of Communication                                                    Page 40 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

*Are the results of internal investigations shared with the governing body and relevant departments on a regular basis?*

Yes. The Resolution Committee (which includes an E&C representative as a member) learns the facts of all internal investigations and is the governing body that makes a recommendation regarding the disciplinary action based on previous experiences in similar cases. Access to the RC recommendations is readily available within the E&C Department, and reported to the NPC Compliance Committee on a quarterly basis.

*Is the governing body actively engaged in pursuing appropriate remedies to institutional or recurring problems?*

Yes. Training topics are often determined from the trends in reporting. Case studies are developed based on the investigation results. Actual scenarios are used to develop relevant case studies.

*Does the company utilize alternative communication methods, such as a periodic newsletter or compliance intranet website?*

Yes. As described above, there are various alternative methods of communication, including active and passive methods. E&C Intranet updates, FAQs, access to E&C Policies, "Ask E&C" facility on the Intranet all represent passive methods. Active methods are represented in the E&C Communication plan, including brochures, letters, leadership communications, OHW updates relating to compliance, video presentations and town hall presentations. In addition, the E&C Department actively engages in opportunities to communicate with BUs / functional areas through BU Advisors and Compliance Liaisons.

## Findings

Finding C_1:
There's still a fear of traceability through the phone and Internet Alertline.

Rationale C_1:
Fear of traceability may reduce the number of anonymous callers. Approximately 25% of all allegations that are designated a "BPO case" come through the channel of the Alertline.

Recommendation C_1:
The E&C Department and BPO need to continue to communicate and reinforce that a third party receives the Alertline calls and that they keep them anonymous if requested.

Finding C_2:
Exiting employee surveys and interviews do not include a question on compliance.

Rationale C_2:
The exit interview offers the last tangible opportunity for employees to report compliance concerns.

Recommendation C_2:
Consider incorporating a question related to any outstanding compliance concerns the exiting employee might have.

Developing Effective Lines of Communication                                    Page 41 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

# Auditing and Monitoring

## Overview

OIG Compliance Program Guidance for Pharmaceutical Manufacturers indicates that effective auditing and monitoring plans will help pharmaceutical manufacturers comply with Federal health care program laws and requirements. An effective compliance program should incorporate thorough monitoring of its implementation and an ongoing evaluation process.

Compliance reviews should focus on those divisions or departments that have substantive involvement with or impact on Federal health care programs (such as the government contracts and sales and marketing divisions) and on the risk areas identified in the guidance (i.e., integrity of data used by state and Federal governments to establish payment, kickbacks and other illegal remuneration, compliance with laws regulating drug samples). The compliance officer should document this ongoing monitoring, including reports of suspected noncompliance, and provide these assessments to company's senior management and the compliance committee. The extent and frequency of the compliance audits may vary depending on variables such as the pharmaceutical manufacturer's available resources, prior history of noncompliance, and the risk factors particular to the company. The nature of the reviews may also vary and could include a prospective systemic review of the manufacturer's processes, protocols, and practices or a retrospective review of actual practices in a particular area.

Although many assessment techniques are available, it is often effective to have internal or external evaluators who have relevant expertise perform regular compliance reviews. The reviews should focus on those divisions or departments of the pharmaceutical manufacturer that have substantive involvement with or impact on federal health care programs (such as the government contracts and sales and marketing divisions) and on the risk areas identified in this guidance. The reviews should also evaluate the company's policies and procedures regarding other areas of concern identified by the OIG (e.g., through Special Fraud Alerts) and federal and state law enforcement agencies. Specifically, the reviews should evaluate whether the: (1) Pharmaceutical manufacturer has policies covering the identified risk areas; (2) policies were implemented and communicated; and (3) policies were followed.

## NPC Risk Assurance and Reporting

There are a number of functions within NPC that support the risk assurance process. These include:

- Global Internal Audit
- North America Internal Audit
- Business Process Control (Finance, including SOX and government pricing)
- Pharmacovigilance (adverse events)
- Quality Assurance (GxPs)
- Health, Safety and Environment
- E&C Audit

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

The North American Internal Audit group has and will continue to review areas that might be considered (or include specifically) Compliance related, e.g. there is a planned audit of the system responsible for developing the annual aggregate spend on HCPs and HCIs (Concerto). These are planned in conjunction with the E&C Audit group to ensure alignment, prevent duplication and maximize relevance of the review.

## NPC's Compliance Risk Assessment Process

Each year, the E&C Department sends out a questionnaire to BU and functional department heads that is designed to identify potential compliance risks across the organization. This information, together with other information secured through investigations and other sources, including external review of industry trends, are analyzed and incorporated into the risk register. Both Legal and the E&C Department review and approve the risk register. The compliance auditing and monitoring plan is then established, based in part on this risk assessment, previous audit findings and the results of the BPO process.

During the course of this evaluation, it was evident that a more robust risk register and prioritization process was in development, to align with the Corporate-wide enterprise risk management process, including the risk ranking based on quantification of likelihood and impact of identified risks.

## NPC's Compliance Auditing Program

The E&C Department has a dedicated Compliance Audit group that implements against the compliance audit plan each year, and reports back to the E&C Department and NPC Compliance Committee.

The 2011 audit plan is largely focused on CIA requirements, including:
- Field Force Monitoring, including
  - Speaker programs
  - Records review of sales representatives
  - Ride-alongs with sales representatives
- Consultant arrangement activities
- Research-related activities
- Publication activities
- Medical education grants
- Monitoring of Medical Inquiries
- Compendia review
- Call plans & Sample distribution plans

In addition to these CIA requirements, the audit plan for 2011 includes:
- FCPA US Assessment
- NPC Events Oversight Committee
- Government Price Reporting
- Concerto (aggregate spend reporting) - data controls (input/output)
- Vendor Management
- Nevada & Massachusetts State Audits

Auditing and Monitoring                                             Page 43 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**                                      **NPCLSV00017892**

- Proactive Monitoring - using ACL software
  - Identify trends for further review
  - Review for compliance with policies
- Follow-up Audits

The Compliance Audit process is not defined in a Written Standard, nor does it align with the Novartis Internal Audit process per se, however, templates have been created that support the process, including:
- Audit plan, which includes:
  - Background
  - Scope
  - Sample selection procedure
  - Test procedure
  - Findings management
- Field Ride-Along Audit Check List
- Field Ride-Along Observation Report

Compliance audits are conducted by the Compliance Audit team, and rely on subject matter experts from the function / BU being audited for insight and understanding. The Compliance Audit team may also, in certain circumstances where permitted by the CIA, use external experts or rely upon external resources to complete the audit.

Audit reports are generated at the end of each audit and include the following:
- Executive summary
- Audit objectives
- Audit scope
- Audit findings
- Related risks to the finding(s)
- Recommendations associated with the finding(s)
- Management's corrective action plan and target date for implementation
- Responsible parties identified

Summary reports are provided to the NPC Compliance Committee, and in turn are provided by the CCO to the Board.

## Description of NPC's Compliance Monitoring Program
The compliance monitoring program is less well defined, but includes:
- Field force monitoring of sales representatives and medical representative by line management, including, but not limited to:
  - Effectiveness and compliance in the field
  - Meals provided and related compliance
  - Interactions with HCPs and HCIs
  - Record reviews
- Expense reporting
- Medical information requests
- Material approvals process

Auditing and Monitoring                                         Page 44 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

- Aggregate spend tracking

The majority of the monitoring is the responsibility of the business, and related line management, reinforcing accountability into the business.

In the case of field force monitoring, line managers of sales representatives have an electronic form, the Field Coaching Report that captures in a 'drop-down' format key elements of sales force effectiveness and performance, and six (6) compliance metrics. The compliance metrics have the following options to select:
- Not applicable
- Unmet
- Met

In the event "Unmet" is selected, this could trigger a BPO review and potential investigation, based on line management evaluation of the severity of the potential violation. It was reported in interviews that many people are concerned that identifying any nature of violation in the Field Coaching Report would result in an investigation and potential termination.

In a recent review of the Oncology sales force use of the Field Coaching Report (called Oncology Coaching Connection) and related compliance metrics, it was found that during the period May 2010 through October 2011, five (5) "Unmet" determinations were made across 2,753 ride-along interactions.

The results of this review have been reported to the Oncology and NPC Compliance Committees and management are implementing a number of corrective actions to address this and related findings, including:
- Reinforcement with ASMs regarding their responsibilities to identify and record potential violations
- Have Sales Directors review Field Coaching Reports in a structured fashion, on a regular basis, to identify and confirm that the compliance metrics are being recorded appropriately.

## Compliance Program Effectiveness Considerations

*Does the compliance program incorporate thorough monitoring of its implementation and an ongoing evaluation process?*
Partially. There is an annual risk evaluation process and related compliance audit plan developed and implemented. The audit plan currently focuses largely on the CIA requirements. Monitoring is largely the responsibility of the business and less well defined, especially in the context of how monitoring findings are reported into the NPC Compliance Committee.

*Is there documentation of audits and ongoing monitoring, including reports of suspected noncompliance, and are these provided to company's senior management and the compliance committee?*
Partially. Audits are well documented and reported and corrective actions and accountability for the corrective actions are well documented. Monitoring performed by the E&C audit group is equally well documented and reported. Monitoring conducted by the business is less clearly defined and reporting to the NPC Compliance Committee is less well defined.

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and
Office of Inspector General, US Department of Health and Human Services
Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

*Are the reviews focused on those divisions or departments that have substantive involvement with or impact on federal health care programs (such as the government contracts and sales and marketing divisions) and on the risk areas identified in the OIG guidance?*

Yes. Reviews are currently focused on CIA requirements, although not exclusively, and these CIA requirements mirror general OIG guidance.

*Do the reviews evaluate whether: (1) NPC has policies covering the identified risk areas; (2) policies were implemented and communicated; and (3) policies were followed?*

Yes. The audits are based on the E&C Policy Manual and related WPDs and SOPs. Any deficiency in the related Written Standards that is identified will result in a change to the particular Written Standard, with appropriate updates, approval and where determined necessary, additional training through "read and sign" attestation using iLearn.

## Findings, Rationale and Recommendations

Finding AM_1:

The risk assessment and related risk register process may not be identifying all the risks or prioritizing appropriately, especially with the CIA focus in year one of the CIA.

Rationale AM_1:

Independent of the CIA, the company and its employees continue to face potential compliance risks that evolve over time and are dependent on external, including changes in legislation, and internal factors, including organizational structural change and portfolio changes.

Recommendation AM_1:

Continue to refine the process and ensure the following are considered in the risk ranking process:

- External factors, including:
    - Legislative change – Federal and State, International
    - Guidance provided by OIG, CMS and other regulatory bodies
    - Government enforcement actions, including CIAs, DPAs and Consent Decrees
    - OIG annual work plan
- Internal factors, including:
    - CIA requirements
    - Refined risk register
    - Written Standard updates
    - Feedback loop from previous audits and monitoring activities
    - Feedback loop from the Alertline
    - Feedback loop from the investigations process
    - Pipeline, portfolio and related product profiles (including labels and related potential for off-label use)

Incorporate impact and level of risk control quantification to support ranking. Establish a formal review and sign off with the NPC Compliance Committee in anticipation of developing the annual auditing and monitoring plan.

Auditing and Monitoring                                                                 Page 46 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

Note: Recent activities within the E&C Department have incorporated many of these recommendations, including additional risk areas, prioritization process and definition of risks. In addition, the E&C Department will be engaging an external risk expert to assist in further refinement.

Finding AM_2:
There are no Written Standards that provide guidance on the risk assessment, auditing and monitoring process.

Rationale AM_2:
Written Standards provide the basis for why and how the risk assessment, auditing and monitoring process works, and supports a consistent approach, most importantly with reporting and follow-up.

Recommendation AM_2:
Establish Written Standards that define the process, controls and reporting requirements and incorporate the existing templates. Consider aligning the audit process and report structure to that of the North American Internal Audit process.

Finding AM_3:
It is unclear as to how the E&C Department defines compliance auditing vs. compliance monitoring and how responsibilities are assigned based on what is actually being done.

Rationale AM_3:
Compliance auditing represents a systematic and independent[6] examination to determine whether company activities comply with laws, regulations, Code of Conduct and related Written Standards, while compliance monitoring is a systematic and continuous examination to determine whether the local implementation of the compliance program complies with applicable laws and regulations and the Code of Conduct and whether related Written Standards are implemented effectively and are suitable to achieve objectives.

Recommendation AM_3:
Incorporate definitions into the Written Standards (AM_2). Compliance auditing should be and is being done by an independent group – the E&C audit team. Compliance monitoring needs to be better defined and incorporated into the annual plan to include the nature of monitoring and who / what function is responsible for it, and how results are reported into the E&C Audit team, NPC Compliance Committee and ultimately the Board. Compliance monitoring can be completed by the E&C Audit team as part of the follow-up to previous audits.

---

[6] Independent to the area being audited

Auditing and Monitoring                                                    Page 47 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00796

**FOIA EXEMPT - CONFIDENTIAL**                                    **NPCLSV00017896**

Finding AM_4 (ICA_3):

It was identified in E&C monitoring that line managers in the field were not always using the Field Coaching Report for documenting compliance violations, for fear of triggering an investigation. Identification of violations and immediate feedback and coaching might be occurring, but it is not being documented.

Rationale AM_4 (ICA_3):

The accountability for line management to be able to identify unintended compliance violations, and coach the field personnel at the time of the infraction is an important part of establishing an effective and sustainable Compliance Program. Management that have the ability and authority to evaluate violations and related severity provide a first line of defense in the identification and correction of compliance violations.

Recommendation AM_4 (ICA_3):

Implement ICA_2 recommendations, train line management on coaching and expand the Field Coaching Report to allow for more detailed categorization of the violations and recording of corrective actions.

Auditing and Monitoring                                                      Page 48 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00797

**FOIA EXEMPT - CONFIDENTIAL**

**NPCLSV00017897**

# Enforcing Standards Through Well-Publicized Disciplinary Guidelines

## Overview

OIG Compliance Program Guidance for Pharmaceutical Manufacturers indicates that an effective Compliance Program should include clear and specific disciplinary policies that set out the consequences of violating the law or the pharmaceutical manufacturer's code of conduct or policies and procedures. A pharmaceutical manufacturer should consistently undertake appropriate disciplinary action across the company in order for the disciplinary policy to have the required deterrent effect. Intentional and material noncompliance should subject transgressors to significant sanctions. Such sanctions could range from oral warnings to suspension, termination or other sanctions, as appropriate. Disciplinary action also may be appropriate where a responsible employee's failure to detect a violation is attributable to his or her negligence or reckless conduct. Each situation must be considered on a case-by-case basis, taking into account all relevant factors, to determine the appropriate response.

## Oversight

NPC relies upon the disciplinary standards outlined in its Code of Conduct, on which each employee must be trained annually, through reading and attestation of understanding. Discipline is overseen by the RC, which is jointly chaired by representatives of NPC E&C Investigations, Legal and Employee Relations. Members of the RC also include representatives from Human Resources, and the assigned investigator. The RC is responsible for considering all evidence found as a result of internal investigations and deciding whether allegations have been substantiated or not. Based upon its findings, the RC develops recommendations for corrective actions and / or discipline for each employee who were the subjects of the investigations. A record is maintained of each decision. The RC and the described process have been in place since January 2008.

All NPC employees are trained on the Code of Conduct and they are made aware that violations of company policies could lead to discipline up to and including termination. The training on the Code of Conduct, however, does not include a description of the RC, its membership, or its function as it relates to discipline.

## Written Standards

NPC has summarized its approach to disciplinary guidelines in its Ethics and Compliance policies and Code of Conduct. The NPC Code of Conduct includes the following guidance:

> "Adherence to this Code is a condition of employment at NPC. Any violation of your obligations under this Code of Conduct can subject you to serious disciplinary measures, including possible termination of your employment with NPC. Similarly, any manager, supervisor, or other employee who attempts to punish or otherwise retaliate against an employee for reporting a violation under this Code will be subject to disciplinary action up to and including dismissal."

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00798

**FOIA EXEMPT - CONFIDENTIAL**

NPCLSV00017898

This section of the Code is supported by additional requirements on the part of NPC employees that include:

- Knowledge of all NPC policies
- Compliance with all NPC policies
- Reporting of apparent or suspected violation of NPC policies and ethical standards
- Non-retaliation towards employees who report apparent or suspected violations of NPC policies

During employee interviews, mandatory training on the company's Code of Conduct was confirmed with each interviewee. Additionally, each interviewee articulated an understanding that violation of NPC policy could lead to some level of discipline that could include termination, based upon the specific surrounding circumstances and substantiated facts.

## NPC Disciplinary Model

Each investigation performed at NPC pursuant to an allegation is reviewed by the RC. Each investigation is different due to the nature of the allegations and the extent and complexity of the case. RC considers a number of factors when making recommendations to management. The RC does not rely upon an established disciplinary action model that has been documented; however, the RC has resolved cases using a range of approaches that have included:

- Verbal warnings
- Additional employee training
- Warning letters placed in employee files
- Terminations

The RC maintains documentation supporting each case, including a record of the manner in which each case was resolved. This can provide documentation of previous resolutions and support consistency in the resolution of cases, to the extent that the facts of each case may be similar or analogous.

## Exclusion Checks

Exclusion checks were completed in December 2010 for all existing employees and contractors. Four (4) potential Ineligible Persons (as defined in the CIA) were identified, and after further investigation one (1) was confirmed. This one individual was suspended from NPC. Following correction of the underlying issue and removal from the OIG exclusion list, this individual was reinstated with NPC.

## Compliance Program Effectiveness Considerations

*Are there clear and specific disciplinary policies that set out the consequences of violating the law or NPC's Code of Conduct or policies and procedures?*
Partially. The NPC Code of Conduct specifically states that violations of the Code, which requires adherence to all NPC policies, could lead to disciplinary actions up to and including termination. Not all violations of NPC policy or Code lead to termination, however, there is no specific guidance that documents violations that could lead to discipline that would not include termination (i.e., verbal warning, written warning, additional training, probation, etc.).

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and
Office of Inspector General, US Department of Health and Human Services
Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00799
**FOIA EXEMPT - CONFIDENTIAL**                                                    **NPCLSV00017899**

*Does NPC consistently undertake appropriate disciplinary action across the company?*
Partially. Based upon the sample of cases that were reviewed in connection with this assessment, there appeared to be a consistent approach to termination decision. The RC maintains a record of the manner in which each case has been resolved for the purpose, in part, of supporting consistency, to the extent that the unique facts of each case can be compared to earlier cases. It was reported to us that there are at times disciplinary results that are less consistently applied, especially as it relates to non-termination cases.

*Are there significant sanctions for intentional and material noncompliance?*
Yes, based upon the sample of cases that were reviewed in connection with this assessment. As the RC evaluates allegations against the results of investigations, they appear to take into consideration evidence that demonstrates either intentional actions or gross negligence compared to inadvertent acts or oversights. This standard is not captured in a Written Standard, however, it appears to be embedded in the process that is employed by the RC.

*Do the sanctions range from oral warnings to suspension, termination or other sanctions, as appropriate?*
Yes, based upon the sample of cases that were reviewed in connection with this assessment. Observed sanctions included verbal warnings, written warnings, re-training, and termination. There is however no guide or Disciplinary Action Model that provides guidance as to the appropriate type of sanction.

## Findings, Rationale and Recommendations

Finding DG_1:
Although sanctions that fall short of termination have been recommended by the RC and enforced by NPC management, the Code of Conduct does not specifically outline other possible sanctions short of termination, which may contribute to the impression that all policy violations will lead to termination, no matter how minor.

Rationale DG_1:
Employee fear and anxiety may be unnecessarily high when minor or inadvertent mistakes occur as a result of the impression created by the limited disciplinary guidance provided to date. Additionally, this impression could create a disincentive to self-report minor mistakes which can cause NPC to miss out on the opportunity to continuously improve its compliance and related processes.

Recommendation DG_1:
NPC management should consider updating the NPC Code of Conduct to include a limited list of additional sanctions that are possible for those offenses that fall short of termination as a consequence.

Note: The Global Code of Conduct has been updated and internally approved, and includes a broader description of the disciplinary sanctions used by the company. In addition, the posting of case studies to the E&C website supports a growing understanding of the types of disciplinary action that are enforced by NPC.

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and
Office of Inspector General, US Department of Health and Human Services
Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

NPC OIG YR1 RPT 00800

**NPCLSV00017900**

Finding DG_2:
There are currently no documented corrective action and / or disciplinary standards / guidelines.

Rationale DG_2:
Without clarity in policy, assumptions about the actual or potential disciplinary action could cause / reinforce fear and anxiety.

Recommendation DG_2:
NPC should consider establishing clear and specific disciplinary policies and procedures that include the definition of intentional and material noncompliance, and the related potential disciplinary actions. In addition, consideration should be given to the development of a Disciplinary Action Model that provides guidance on the management and related disciplinary action of substantiated violations.

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and
Office of Inspector General, US Department of Health and Human Services
Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00801

FOIA EXEMPT - CONFIDENTIAL

NPCLSV00017901

# Responding to Detected Problems and Developing Corrective Action Initiatives

## Overview

OIG Compliance Program Guidance for Pharmaceutical Manufacturers indicates that a violation of a pharmaceutical manufacturer's Compliance Program, failure to comply with applicable federal or state law, and other types of misconduct threaten the company's status as a reliable, honest, and trustworthy participant in the healthcare industry. Detected but uncorrected misconduct can endanger the reputation and legal status of the company. Consequently, upon receipt of reasonable indications of suspected noncompliance, it is important that the compliance officer or other management officials immediately investigate the allegations to determine whether a material violation of applicable law or the requirements of the Compliance Program has occurred and, if so, take decisive steps to correct the problem. The exact nature and level of thoroughness of the investigation will vary according to the circumstances, but the review should be detailed enough to identify the root cause of the problem. As appropriate, the investigation may include a corrective action plan, a report and repayment to the government, and / or a referral to criminal and / or civil law enforcement authorities.

## Description of NPC's Compliance Program Responding to Detected Deficiencies and Developing Corrective Action

### Overview of Investigations Process

The investigations process at NPC typically begins with either an allegation that may come from a number of different sources (i.e., Alertline, employees, management, or external sources), or in response to routine compliance auditing and monitoring that NPC engages in during its normal course of business. Regardless of the source of the initial concern, each potential issue is directed to the Business Practice Office ("BPO") whose responsibility it is to assign the investigation. The NPC CCO is informed of and has the opportunity to review each case assignment in order to re-direct assignment as warranted. Each investigation is assigned to one of the following groups:

- BPO
- Legal
- E&C
- Security
- Human Resources
- Employee Relations

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**                                        **NPCLSV00017902**

Upon completion of each investigation, a summary report is prepared and submitted to the BPO, RC and NPC CCO. The RC is responsible for reviewing the results of each investigation and making a determination as to whether the reported allegations have been "substantiated" or "unsubstantiated" based upon facts found during the investigation. In those instances where the RC concludes that allegations are "unsubstantiated", those cases are concluded and closed out. In those instances where the RC concludes that allegations have been "substantiated", the RC then makes a recommendation as to the disciplinary and corrective action that should be implemented by the applicable management team. BPO monitors the final results of the discipline being executed and once confirmation is received by BPO, BPO will issue the case close out.

## Centralization and Standardization

As outlined above, all investigations are coordinated through the BPO, with NPC CCO oversight, even in those instances where the BPO may not be the team assigned to perform the actual investigation. The BPO is charged with ensuring that each investigation is conducted within a reasonable timeframe and that each completed investigation is submitted to the RC for final resolution and conclusion.

The actual investigations process is not memorialized in Written Standards and there are no written policies or procedures that specifically address the process of conducting an investigation at NPC. Similarly, there are no written policies or procedures that standardize the process of reporting investigation results to the RC. The existing BPO Reporting and Management of Misconduct and Fraud SOP provides and overview of how all reports of misconduct and fraud are to be handled. There is an NPC "Pro Forma Report" template that includes embedded instructions that can be used to guide a number of potential investigation elements, however, this template is not required by each group that can potentially be required to perform and report on an investigation. Finally, there is a three slide presentation reflecting the high level process flow.

## NPC Discipline Model

A description of NPC's disciplinary model is included in the "Enforcement of Standards" section of this report.

## Close Out Process

BPO has a defined step that includes obtaining proof that corrective and disciplinary action has taken place prior to closing the case.

Within NPC, the HR business partner is required to provide to the RC coordinator confirmation that appropriate corrective and disciplinary action has taken place prior to close out in the NPC database. BPO relies in part on this step before a formal BPO close out.

## Reportable Events

NPC's CIA requires NPC to report to the OIG, within 30 days of making a determination of a matter that a reasonable person would consider a probable violation of criminal, civil, or administrative laws applicable to any Federal health care program and/or any FDA requirements relating to the promotion of NPC Government Reimbursed Products.

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and
Office of Inspector General, US Department of Health and Human Services
Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

NPC OIG YR1 RPT 00803

**NPCLSV00017903**

To assist in meeting the reportable events requirements, NPC has developed a monthly process for collection of data from:

| Function | Reportable Event Related To |
|---|---|
| Government Compliance | Pricing, rebating, reporting |
| PDMA Compliance | PDMA |
| Gen Meds DRA | Promotional activities |
| Oncology DRA | Promotional activities |
| E&C Investigations | Promotional activities<br>Fraud and Abuse<br>Ineligible persons |
| E&C Auditing and Monitoring | Promotional activities |
| Security | Ineligible persons |
| Finance | Ineligible persons (vendor) |
| Legal | Bankruptcy<br>Good manufacturing practices |

Each function has individuals identified as responsible for collection of the relevant information and presentation to a cross-functional team, including representatives of the E&C department and legal, for review and determination as to whether the event is indeed reportable. Reportable events are then incorporated into the monthly CIA report, including identification of corrective action taken.

## Compliance Program Effectiveness Considerations

*Are all instances of potential fraud and abuse investigated?*
Yes. A review of all reports of compliance violation (Alertline and other sources of reports) is conducted by the BPO. Any potential fraud and abuse allegation is then investigated accordingly by the relevant group.

*Does the compliance officer or other management officials immediately investigate allegations to determine whether a material violation of applicable law or the requirements of the Compliance Program has occurred?* Yes, based upon the sample of cases that were reviewed in connection with this assessment. In most cases, investigation assignment occurred within a few days of being communicated to the BPO. In addition, a test of the Alertline resulted in a same day response from the BPO office to gain an understanding of the allegation.

*Is the review detailed enough to identify the root cause of the problem?* Partially. The reports are merely a recitation of the facts that were uncovered during the investigation without the benefit of additional analysis. The discussion that occurs during the RC meetings may include a root-cause analysis; however, this is not documented. A Trend Analysis Tool is used to identify potential root causes.

Responding to Detected Problems and Developing Corrective Action Initiatives          Page 55 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and
Office of Inspector General, US Department of Health and Human Services
Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**                                            NPCLSV00017904

*If appropriate, does the investigation include a corrective action plan and a report to the government?*
It is not clear that there is a formal step in the investigation process that provides for the determination of an appropriate corrective plan. Consideration is given to whether policy or process needs to change, training needs to change or occur and what personal discipline is warranted. The disciplinary action plan and corrective action plan come from the RC meeting. Reportable Events (as defined in the CIA) are reported to the OIG, per CIA requirements.

## Findings, Rationale and Recommendations

Finding ICA_1:
The investigations process is not standardized and there are no policies or procedures that specifically address the process of conducting an investigation at NPC. Similarly, there are no policies or procedures that standardize the process of reporting investigation results to the RC. The current SOP for the BPO Reporting and Managing of Misconduct and Fraud covers how all reports of misconduct and fraud are to be handled. It does not address the investigation process, nor the resolution process.

Rationale ICA_1:
Variability either in the investigation of allegations or in the reporting of facts found during investigations could make it more difficult for the RC to apply a consistent standard across multiple cases.

Recommendation ICA_1:
NPC management should consider developing standard operating procedures that outline the process of an investigation at NPC, based upon factors that management deems important in order to foster consistency.

Finding ICA_2:
There is no formal triage process in place at NPC to determine which allegations warrant limited investigatory resources and those that do not warrant limited resources.

Rationale ICA_2:
During the first half of 2011, 252 investigations for Gen Meds and US Oncology were assigned to NPC. Failure to appropriately triage cases could cause undue delay in performing investigations and bringing cases to conclusion.

Recommendation ICA_2:
NPC management should consider developing a formal triage process at the point of receiving a BPO case, so that those cases that can be brought to a quick conclusion, can be so concluded and removed from the queue of cases for investigation. Assigning the substantiated claims in the context of self reported or unintentional cases to a lower priority, will further mitigate the potential volume of detailed investigations. Note: it is recommended that these lower priority cases should still be documented and incorporated into the reporting of cases and resultant disciplinary and corrective action.

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and
Office of Inspector General, US Department of Health and Human Services
Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00805

**FOIA EXEMPT - CONFIDENTIAL**                                    NPCLSV00017905

Finding ICA_3 (AM_4):

It was identified in E&C monitoring that line managers in the field were not always using the Field Coaching Report for documenting compliance violations, for fear of triggering an investigation. Identification of violations and immediate feedback and coaching might be occurring, but it is not being documented.

Rationale ICA_3 (AM_4):

The accountability for line management to be able to identify unintended compliance violations, and coach the field personnel at the time of the infraction is an important part of establishing an effective and sustainable Compliance Program. Management that have the ability and authority to evaluate violations and related severity provide a first line of defense in the identification and correction of compliance violations.

Recommendation ICA_3 (AM_4):

Implement ICA_2 recommendations, train line management on coaching and expand the Field Coaching Report to allow for more detailed categorization of the violations and recording of corrective actions. The outcome of Field Coaching events should be incorporated into the reporting of potential violations and related corrective action.

Finding ICA_4:

Confidentiality is applied uniformly across investigations, limiting Management's role in any review or related disciplinary action.

Rationale ICA_4:

Limiting Management's role does not provide for meaningful input on their own staff, neither in the investigation, or the corrective action.

Recommendation ICA_4:

Consideration should be given to having appropriate line management (e.g. third level manager) made aware of potential investigations and be incorporated into the related outcome, including the disciplinary process. Maintaining confidentiality must still remain paramount in the investigation process, however, appropriate levels of transparency will reinforce trust in the organization.

Finding ICA_5:

There is evidence that those investigated may not receive notification of outcome, or feedback in 'unsubstantiated' or 'self reported' cases.

Rationale ICA_5:

Failure to inform the subject of the investigation can leave an individual in a state of fear, making it difficult to accomplish daily tasks.

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00806

FOIA EXEMPT - CONFIDENTIAL

NPCLSV00017906

Recommendation ICA_5:

Ensure that appropriate feedback loops are in place when a report is found to be unsubstantiated, or when a report is self-reported. Reinforce this with individuals at the time they are being investigated, through explanation of the close out process and close out memo.

Responding to Detected Problems and Developing Corrective Action Initiatives          Page 58 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00807

FOIA EXEMPT - CONFIDENTIAL                                              NPCLSV00017907

# Government Pricing – Class of Trade

## Overview

Many federal and state health care programs establish or ultimately determine reimbursement rates for pharmaceuticals, either prospectively or retrospectively, using price and sales data directly or indirectly furnished by pharmaceutical manufacturers. The government sets reimbursement with the expectation that the data provided is complete and accurate. The knowing submission of false, fraudulent, or misleading information is actionable. At NPC, the Government Pricing Compliance Program is in place to manage the functions within the contracting lifecycle – including but not limited to pricing, disclosure, reporting, and payments.

A critical starting point for computing and reporting accurate government pricing factors i.e., Average Manufacturer Price ("AMP"), Best Price ("BP"), Average Sales Price ("ASP"), and Non-federal Average Manufacturers Price ("Non-FAMP"), is the transactional data as it is filtered based on the functional characteristics, or Class of Trade ("CoT"), of customers that purchase the manufacturer's products, either directly from the manufacturer, or indirectly, through a wholesaler or distributor. It is critical to the outcome of government pricing calculations to ensure that customers and related sales transactions are properly assigned and allocated based on a robust and structured process that reflects the government pricing needs of the manufacturer. This process involves establishing protocols for researching the functional characteristics of individual customers, documenting the research and decision process for assigning a CoT, and continuing to monitor and maintain trade class definitions and assignments as customer characteristics change.

As this is the first year of a Compliance Effectiveness review, it was determined that the CoT process was an appropriate area on which to focus, as this first step in the process has a significant impact on the outcome of government pricing factor calculations. In addition, Navigant conducted a high level review of the Government Pricing Compliance Program in general, including the treatment of product returns, and Fair Market Value determination for bona fide service fees. The review of the NPC Government Pricing Compliance Program did not include transaction testing or a review and testing of required calculations and related methodologies.

## Government Pricing Compliance Program Review

The purpose of this review was to assess and evaluate any potential risk in the context of the Government Pricing Compliance Program for the following areas:

- the CoT determination process,
- treatment of product returns, and
- determination of Fair Market Value for bona fide service fees,

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

NPC OIG YR1 RPT 00808

**NPCLSV00017908**

The following steps were performed to evaluate government pricing operations:

- Review of written policies and procedures
- Interviews with key personnel involved in government pricing calculations
- Interview with key personnel involved in researching direct and indirect customer CoT,
- Review of selected operational documents related to CoT assignment, determination of Fair Market Value, and product returns
- Follow-up interviews with senior government pricing / contracting staff.

## Description of the NPC Government Pricing Compliance Program

Information regarding the NPC Government Pricing Compliance Program is provided in the context of the seven (7) elements of an effective Compliance Program[7] including the following:

### High-level Oversight (Organizational Structure)

The following positions at NPC provide oversight to the CoT assignment process and related government pricing and reporting:

- Director, Government Pricing Compliance (reports to the Vice President of Managed Markets Finance, who in turn reports to the CFO, NPC)
- Director, Government Pricing, Contracting, and Analytics (reports to the Executive Director, Healthcare Contract Administration)
  Direct reports include:
  - o Associate Director, Government Pricing
  - o Associate Director, Government Rebate Programs
  - o Associate Director, Government Contracts
- Director, Specialty / Acute Care Contracts & Analysis (reports to the Executive Director, Healthcare Contract Administration)
- Director, Sales Operations, Trade Customer Service

### Government Mandated Pricing Certifications

Medicare Part B regulations[8] require manufacturers to certify each quarterly ASP reported on the ASP Certification Form (Addendum B—Rev. 2009)[9]. This form must be signed by the manufacturer's CEO[10], CFO, or an individual who has delegated authority to sign for, and who reports directly to, the manufacturer's CEO or CFO[11] and is included with the manufacturers ASP submission to CMS.

---

[7] "OIG Compliance Program Guidance for Pharmaceutical Manufacturers (Notice)", Federal Register 68:86 (May 5, 2003) pp 23731-22743; Available from GPO Access.

[8] "Medicare Program; Manufacturer Submission of Manufacturer's Average Sales Price Data for Medicare Part B Drugs and Biologicals( Interim Final Rule), Federal Register 69:66 (April 6, 2004) pp 17935-17941. Available from GPO Access.

[9] https://www.cms.gov/McrPartBDrugAvgSalesPrice/Downloads/aspdata_addendumb.pdf

[10] For the purposes of this section of the Report, CEO = NPC President, Head Pharma North America and Head, US Compliance Oncology

[11] https://www.cms.gov/McrPartBDrugAvgSalesPrice/Downloads/aspdata_addendumb.pdf

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

Medicaid Drug Rebate Program regulations[12] require manufacturers to certify each monthly AMP report, and the quarterly AMP and BP report. Each report must be certified to CMS by one of the following: 1) the manufacturer's CEO; 2) the manufacturer's CFO; 3) an individual other than the CEO or CFO who has authority equivalent to a CEO or CFO, or 4) an individual with the directly delegated authority to perform the certification on behalf of an individual described in 1) through 3). This certification takes place via the Drug Data Reporting ("DDR") System, a web-based application developed by CMS for manufacturers to report their monthly and quarterly data submissions.

### NPC Sub-certification Process
In addition to and in conjunction with the certifications mandated by regulations, NPC has implemented a sub-certification process managed by the Director of Government Pricing Compliance. This sub-certification process requires the functional lead of any commercial process or pricing strategy that may impact government price reporting (e.g., commercial pricing strategies that may be considered "bundles" as that term is defined by regulation) to identify and report all existing and newly implemented initiatives to ensure such processes or initiatives are accurately reflected in government pricing calculations and reporting.

The NPC Sub-certification Process serves to provide a continuous monitoring program through on-going evaluation of the required price report certification processes.

At NPC, the Vice President of Managed Markets Finance (who reports directly to the NPC CFO) is authorized to certify the quarterly ASP report, the monthly AMP report, and the quarterly AMP and BP report. These reports are certified by NPC based on a review of sub-certifications, and the recommendation of the Director, Government Pricing Compliance.

### Written Standards (Policies and Procedures)
The OIG guidance recommends that every pharmaceutical manufacturer should develop and distribute written compliance standards, procedures, and practices that guide the company and the conduct of its employees in day-to-day operations.

The following written compliance standards directly related to the day-to-day operations of CoT assessment and government pricing calculations and reporting were provided by NPC and reviewed for this assessment:

| Title/File Name | Description/Purpose |
|---|---|
| Ethics and Compliance Policies | NPC Ethics and Compliance Policies |
| Code of Conduct: values to live by | NPC Code of Conduct |

[12] "OIG Compliance Program Guidance for Pharmaceutical Manufacturers (Notice)", Federal Register 68:86 (May 5, 2003) pp 23731-22743; Available from GPO Access.

Government Pricing – Class of Trade                                    Page 61 of 112
Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and
Office of Inspector General, US Department of Health and Human Services
Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00810

**FOIA EXEMPT - CONFIDENTIAL**                                    NPCLSV00017910

| Title (File Name) | Description / Purpose |
|---|---|
| Medicaid Drug Rebate Program Compliance Policy | Comprehensive document that represents the formal corporate policy of NPC with respect to compliance with all facets of the Medicaid Drug Rebate Program |
| Medicare Modernization Act Medicare Part B ASP Calculation Compliance Policy | Comprehensive document that represents the formal corporate policy of NPC with respect to compliance with all facets of the Medicare Part B ASP Calculation |
| Customer Master Setup- Standard | Provides direction for creating a new direct customer in the SAP system |
| Direct Customer Add Process Flow | Process flow diagram for the Direct Customer Add process |
| SAP COTs_051011 Spreadsheet | The CoT schema for direct customers, including their mapping and filtering within the GP system |
| Assignment of CoT & New CoT Creation; Sub-Process of Contract Load and Maintenance. | Outlines the steps required for the assignment of CoT to indirect customers by the Managed Care Contract Management Department; describes all aspects of assigning a COT to a contracted customer, the identification of new contracted customer, and how to enter the CoT in the contracting system |
| Master CoT Mapping Spreadsheet | The CoT schema for indirect customers, including mapping to IMS Trade Class, IMS Outlet Type, and IMS Outlet Sub-category code, including their mapping to and filters applied by the GP system |
| Trade Class Processing for Government Pricing. | Assists Government Pricing group with the processing of new trade class and trade class change alerts to update or modify policies in the GP system to ensure government pricing and Sarbanes-Oxley compliance |

Government Pricing – Class of Trade                                    Page 62 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00811

**FOIA EXEMPT - CONFIDENTIAL**

NPCLSV00017911

| Brief Title Name | Description of Purpose |
| --- | --- |
| **Monthly AMP Calculation Methodology** | Methodology assumptions used by NPC in the monthly AMP calculation to comply with the requirements of the DRA 2005 Final Rule[13] (the "Final Rule").; encompasses the use of a 12 month rolling average estimation methodology for lagged data, the exclusion of customary prompt payment discounts extended to wholesalers, and the inclusion of authorized generic sales data in the calculation of the brand product's AMP; used in conjunction with the Medicaid Drug Rebate Program Compliance Policy |

The following written compliance standards are not directly related to the day-to-day operations of CoT assessment. However, the processes described in these written standards are related to, and do impact compliance with government pricing calculations and reporting, including customer returns and establishing Fair Market Value for bona fide services. Therefore, these documents were also reviewed for this assessment:

| Brief Title Name | Description of Purpose |
| --- | --- |
| **Review / Approval of Coupon, Voucher, Debit Card Programs and Associated Vendor Agreements** | Describes the process and steps followed by a Brand Team for a patient transaction program such as a debit card, coupon, voucher, etc. and the process by which the Brand Team has the details of such programs properly reviewed against the criteria of Patient Transaction, Bona-fide Service Fees, and Fair Market Value outlined in the Final Rule. It also describes the process by which the Strategic Sourcing Department analyzes new or amended agreements with vendors against the Bona-fide Service Fee criteria in the Final Rule, and the corresponding Fair Market Analysis performed |
| **Coupon Voucher Debit Card Process Flow** | Process flow diagram for the Coupon, Voucher, Debit Card process |
| **Patient Transaction Submission Form** | Form that must be completed before the approval and launch of any Patient Transaction card program |

---

[13] 42 C.F.R. §447.510

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and
Office of Inspector General, US Department of Health and Human Services
Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

NPC OIG YR1 RPT 00812

NPCLSV00017912

| Section / Title Name | Description / General Purpose |
|---|---|
| Sub-certification of Contract Product Bundles | Outlines the roles and responsibilities and work steps involved in the identification of product bundles as part of the strategy setting and contract offer development process; it governs the process by which contracting arrangement s are reviewed for possible product bundles, and how those contracting initiatives that are identified as bundles are communicated to the Specialty Pharmacy / Acute Care Contract Management (SPACCM) group and the Managed Care Contract Management (MCCM) group |
| Bundling Process Flows | Process flow diagram associated with assessment of contract bundles |
| Returns from Direct Accounts | Policies and procedures applicable to direct customers (those customers that purchase directly from of NPC) for product returns |
| Returns from Indirect Accounts | Policies and procedures applicable to indirect customers (those entities that do not purchase product directly from NPC) for product returns |
| Review / Approval of Financial Deductions and Write-Offs | Outlines the process steps followed by the Accounts Receivable Department to review, process, and manage financial deductions, disputes, and write-offs and how the data is reviewed for its effect on government price calculations |
| Financial Deductions Write-Off Process Flow | Process flow diagram for the Financial Deductions and Write-Offs Review / Approval process |
| Ophthalmics Over-the-Counter Products Unsaleable (sic) Policy | Policies and procedures applicable to product returns for NPC Ophthalmics and Over-the-Counter products |
| Sub-certification Process Flow | The process flow diagram applicable to any sub-certification process |

Government Pricing – Class of Trade                                  Page 64 of 112
Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and
Office of Inspector General, US Department of Health and Human Services
Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00813

**FOIA EXEMPT - CONFIDENTIAL**                                    **NPCLSV00017913**

The NPC Medicaid Drug Rebate Program Compliance Policy describes the CoT and transaction type treatment for AMP and BP for the following customers:

- Manufacturer Re-labelers
- Manufacturer Non-relabelers
- Drug Wholesalers
- Distributors
- Retail Pharmacies
- Mail-Order Pharmacies
- Specialty Pharmacies
- Hospital Outpatient Pharmacies
- Retail Outlets
- Long-Term Care
- Home Health Care
- Home Infusion Pharmacies
- Outpatient Facilities
- Hospitals—Inpatient Pharmacy
- Physicians
- Patients
- Health Maintenance Organizations—Non-possession takers
- Health Maintenance Organizations—Possession Takers
- Federal Supply Schedule (FSS) Sales
- 340B Covered Entities
- City / County / State Entities
- Veterinarians
- Prisons
- Pharmacy Benefit Managers (PBMs) Non-Mail Order
- State Pharmacy Assistance Programs
- State Children's Health Insurance Programs
- Medicare Part D
- Medicaid Drug Rebate Program
- Tricare Sales
- State Veterans Homes

The Written Standards at NPC are both comprehensive and provide sufficient detail for the users to understand and perform the processes and responsibilities described therein. The process for assigning CoT to direct and indirect customers is well-defined, and utilizes external reference sources. Effective controls are in place to prevent duplication of customer records and subjective determination of CoT.

CoT assignments are mapped from source systems to the government pricing system where the appropriate filters for inclusion / exclusion for the government pricing factor calculations are applied. These systems are described below (see "Information Systems").

Government Pricing – Class of Trade                                            Page 65 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

FOIA EXEMPT - CONFIDENTIAL

NPC has documented CoT assignments for the AMP calculations (monthly and quarterly) post Final Rule, and post-Affordable Healthcare Act of 2010, including the calculations for so-called "5i" products (applicable to products that are inhaled, infused, instilled, implanted, or injected).

## Training and Education

Relevant training documents provided by NPC (in addition to the written compliance standards described above) included:

- "Verifying Member Information—Managed Markets Finance Membership Training Manual, Volume 2", NPC, December 2010
- "Overview of the Deficit Reduction Act and Recent Changes to the Medicaid Drug Rebate Program; Training for NPC", Alice Valder Curran, Partner, Hogan & Hartson[14], May 21, 2008.
- "Patient Transaction Oversight Committee (PTOC) Training for Marketers, Version 1", NPC, November 1, 2009

In addition to the subject matter content of these training guides, training in CoT assignment and government pricing calculations is supplemented during day-to-day activity by the Director of Government Pricing Compliance, the Director of Government Pricing, Contracting and Analytics, the Director of Specialty Pharmacy / Acute Care Contract Management, the new associate's direct supervisor, and if applicable, an assigned training mentor that is typically a peer of the training recipient.

The training provided for government pricing subject matter to other departments not directly involved with CoT assignments or government pricing calculations (e.g., brand management, field sales) is provided and / or coordinated by the Director of Government Pricing Compliance. The depth and breadth of the content is tailored to the audience at the discretion of the Director of Government Pricing Compliance and the head of the department that is the requestor or recipient of the training.

## Auditing and Monitoring

The OIG states that "it is often effective to have internal or external evaluators who have relevant expertise to perform regular compliance reviews. The reviews should focus on those divisions that have substantive involvement with or impact on federal health care programs (such as the government contracts and sales and marketing divisions). The reviews should also evaluate the company's policies and procedures regarding other areas of concern identified by the OIG…and whether 1) the pharmaceutical manufacturer has policies covering the identified risk areas, 2) policies were implemented and communicated, and 3) policies were followed."

To assist with internal auditing and monitoring applicable to government pricing and reporting, NPC has established a dedicated resource, the Director of Government Pricing Compliance. The responsibilities of this position include 1) ensuring policies and procedures are in place and enforced, 2) managing a sub-certification process (described above) 3) communicating, advising, and training personnel in other departments (e.g., sales, marketing, commercial contracting) that impact government pricing calculations and reporting, and 4) advising the person authorized by the CEO to certify the NPC government pricing report submissions.

---

[14] The law firm formerly known as Hogan & Hartson became Hogan Lovells effective May 1, 2010.

Government Pricing – Class of Trade                                           Page 66 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

FOIA EXEMPT - CONFIDENTIAL

It is also the responsibility of the Director of Government Pricing Compliance to interact closely with the Director of Government Pricing, Contracting and Analytics to identify and act on any lack of adherence with current policies and procedures. This interaction contributes to the risk mitigation of any unintended impact on government pricing calculations prior to their submission to the government.

NPC has also utilized external evaluators with expertise in government pricing calculations and reporting, as well as internal evaluators to monitor compliance in this area.

## Use of External Monitors

NPC utilizes outside counsel (e.g., Hogan Lovells) in conjunction with its internal law department in the interpretation and implementation of statutes, regulations, and regulatory guidance impacting government pricing calculations and reporting on an on-going basis. Guidance from legal counsel is also utilized to review NPC Standard Operating Procedures and Policy documents, and development of training programs specific to government pricing and reporting. Most recently, NPC has utilized the law firm of Hogan Lovells, along with Huron Consulting, Inc. to assist in the implementation of the Final Rule. In addition, the government pricing function is reviewed in conjunction with the annual financial audits performed by PriceWaterhouseCoopers.

## Internal Monitoring

NPC reported that the government pricing function was reviewed by the internal audit team in Q4, 2008. It was also represented by NPC that the government pricing function is audited internally on a regular schedule, or upon implementation of new government regulations, and that Sarbanes-Oxley controls are monitored on an ongoing basis by the internal audit department.

## *Information Systems*

The systems utilized by NPC for customer CoT and government pricing factor calculation processes are:

- SAP—the system used by NPC to process and invoice orders for its direct customers. The database, or Customer Master, for all entities that purchase directly from NPC, along with the CoT designation for those customers, are stored and maintained in SAP. Cash receipts from customers are also applied within SAP, and this system also functions as the company's general ledger.

- CPCC—the system used by NPC which supports healthcare contracts and services, including chargeback processing, group purchasing organization and managed care organization membership, and contract pricing and terms. CPCC is an acronym for Contracts, Pricing, and Chargeback Component. CoT designations for indirect customers are maintained within CPCC, and the CoT for new indirect customers is researched using the Membership Verification Tool component of CPCC.

Government Pricing – Class of Trade                                          Page 67 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

- GP—the system utilized by NPC to calculate government pricing factors. This system was built by iMANY, Inc. according to NPC specifications and business requirements. iMANY, Inc. subsequently commercialized this system as iMANY Government Pricing, and is widely used by other pharmaceutical manufacturers in the calculations of government pricing factors.

Both CPCC and SAP are seamlessly integrated into GP. Daily feeds from CPCC and SAP are provided to GP, where CoT, transaction type (e.g, sale, chargeback, rebate), and attribution date filtering occur. This allows NPC to identify and research any transaction-based data irregularities, identify any changes in commercial business practices that are reflected in the data, and to determine the impact on government pricing factor calculations well in advance of the regulatory mandated deadline for submission to government agencies.

## Government Pricing Compliance Program Effectiveness Considerations

The OIG's Compliance Program Guidance for Pharmaceutical Manufacturers includes considerations related to pricing and reporting risks. These considerations are described below, along with findings from the review of related NPC activities:

*A pharmaceutical manufacturer may be liable under the False Claims Act ("FCA") if government reimbursement (including, but not limited to, reimbursement by Medicare and Medicaid) for the manufacturer's product depends, in whole or in part, on information generated or reported by the manufacturer, directly or indirectly, and the manufacturer has knowingly failed to generate or report such information completely and accurately. Manufacturers may also be liable for civil money penalties under various laws, rules and regulations. Moreover, in some circumstances, inaccurate or incomplete reporting may be probative of liability under the federal anti-kickback statute.*

The accuracy and completeness of NPC's reporting is secured / reinforced by the controls established through written standards and associated training described above. In addition, the certification and sub-certification process provides assurance that the CoT and resultant calculations are accurate.

*Where appropriate, manufacturers' reported prices should accurately take into account price reductions, cash discounts, free goods contingent on a purchase agreement, rebates, up-front payments, coupons, goods in kind, free or reduced-price services, grants, or other price concessions or similar benefits offered to some or all purchasers. Any discount, price concession, or similar benefit offered on purchases of multiple products should be fairly apportioned among the products (and could potentially raise anti-kickback issues). Underlying assumptions used in connection with reported prices should be reasoned, consistent, and appropriately documented, and pharmaceutical manufacturers should retain all relevant records reflecting reported prices and efforts to comply with federal health care program requirements.*

In the context of maintaining an accurate and representative CoT schema, NPC has established a robust and comprehensive technology platform and related maintenance process to ensure that the impact on prices and price reporting is accurate. NPC also has written standards for product returns from direct customers, product returns from indirect customers, and the determination of Fair Market Value for bona fide service fees in the context of patient programs i.e., vouchers, debit cards, and coupons.

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and
Office of Inspector General, US Department of Health and Human Services
Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00817

**FOIA EXEMPT - CONFIDENTIAL**

NPCLSV00017917

*Given the importance of the Medicaid Rebate Program, as well as other programs that rely on Medicaid Rebate Program benchmarks (such as the 340B Program), manufacturers should pay particular attention to ensuring that they are calculating Average Manufacturer Price and Best Price accurately and that they are paying appropriate rebate amounts for their drugs. Pharmaceutical manufacturers are responsible for ensuring the integrity of data they generate that is used for government reimbursement purposes. Any remuneration from a manufacturer provided to a purchaser that is expressly or impliedly related to a sale potentially implicates the anti-kickback statute and should be carefully reviewed.*

NPC mitigates this risk through an established government pricing compliance function, written standards, the sub-certification process, and a robust and comprehensive technology platform.

*Discounting arrangements are prevalent in the pharmaceutical industry and deserve careful scrutiny particularly because of their potential to implicate the Best Price requirements of the Medicaid Rebate Program. Because the Medicaid Rebate Program in many instances requires that states receive rebates based on the Best Price offered by a pharmaceutical manufacturer to other purchasers, manufacturers have a strong financial incentive to hide de facto pricing concessions to other purchasers to avoid passing on the same discount to the states. Because of the potential direct and substantial effect of such practices on federal health care program expenditures and the interest of some manufacturers in avoiding price concessions that would trigger rebates to the states, any remuneration from a manufacturer to a purchaser, however characterized, should be carefully scrutinized.*

The NPC Medicaid Drug Rebate Program Compliance Policy describes how pricing concessions i.e., stocking allowances, price adjustments, service fees that are not bona-fide service fees, chargebacks, rebates (including PBM-owned mail order rebates and administrative fees), price concessions associated with Patient Coupon / Voucher transactions, price concessions associated with PAPs, and capitation arrangements [15] are considered in the calculation of AMP and Best Price determination. NPC also mitigates this risk through written standards (which include treatment of product bundles and maintenance of its CoT schema) the Pricing and Contracting Strategy Oversight Committee, the sub-certification process, and a robust and comprehensive technology platform.

Specific to product returns, the impact on AMP related to remunerations from manufacturers for is described in the Final Rule [16]. Specifically, returned or replacement goods are *ineligible* for inclusion in the AMP calculation "when accepted or replaced in good faith." In the Final Rule, CMS stated that it considers that goods are being returned in "good faith" when they are being returned pursuant to manufacturers' policies which are not designed to manipulate or artificially inflate or deflate AMP. CMS goes on to state that "good faith" must be demonstrated on the part of the manufacturer, not the returning entity, and that returns made in "good faith" should be made in accordance with pre-existing manufacturer policies that comply with customary acceptable business practices, and applicable laws and regulations.

---

[15] Capitation is defined by NPC as a contractual arrangement between a manufacturer and a customer (typically a health plan) whereby the customer shifts the risk related to the cost for a particular drug or therapeutic category to the manufacturers. Typically, the customer will make a lump sum payment to the manufacturer for all expected costs associated with a drug or therapeutic category for a defined period of time. The manufacturer is then responsible for supplying all drug product required by the health plan during that period.

[16] 42 C.F.R. §447.510

Government Pricing – Class of Trade                                    Page 69 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

NPC documents in its Medicaid Drug Rebate Compliance Policy that it considers all returns made in compliance with its returns policy to meet this standard and therefore, not included in AMP. In addition, NPC states that due to system limitations, product returns cannot be tracked back to the original sale, and, that NPC "assumes as a general matter, that all refunds to customers for in-policy returns are not in excess of the customer's original acquisition cost."

With respect to BP, the Final Rule states that BP "shall be net of…returns", but does not provide any other explanation of how returns are to be accounted for in BP. The NPC Medicaid Drug Rebate Compliance Policy notes that "returns by themselves are not eligible to set a Best Price; it is only as they (the returns) apply to specific transactions that returns are utilized in the Best Price determination." NPC states that it is unable to tie returns transactions to the original sales transactions because of system limitations.

*Public policy favors open and legitimate price competition in health care. Thus, the anti-kickback statute contains an exception for discounts offered to customers that submit claims to the federal health care programs, if the discounts are properly disclosed and accurately reported. See 42 U.S.C. 1320a–7b(b)(3)(A); 42 CFR 1001.952(h). However, to qualify for the exception, the discount must be in the form of a reduction in the price of the good or service based on an arms-length transaction. In other words, the exception covers only reductions in the product's price. Moreover, the regulations provide that the discount must be given at the time of sale or, in certain cases, set at the time of sale,* NPC mitigates this risk through its Pricing and Contracting Strategy Oversight Committee, written policy, written standards, the sub-certifications process, and a robust and comprehensive technology platform.

*Manufacturers offering discounts should thoroughly familiarize themselves, and have their sales and marketing personnel familiarize themselves, with the discount safe harbor at 42 CFR 1001.952(h) (and, if relevant, the safe harbors for price reductions in the managed care context, 42 CFR 1001.952(m), (t), and (u)). In particular, manufacturers should pay attention to the discount safe harbor requirements applicable to "sellers" and "offerors" of discounts. Under the safe harbor, sellers and offerors have specific obligations that include (i) informing a customer of any discount and of the customer's reporting obligations with respect to that discount, and (ii) refraining from any action that would impede a customer's ability to comply with the safe harbor. To fulfill the safe harbor requirements, manufacturers will need to know how their customers submit claims to the federal health care programs (e.g., whether the customer is a managed care, cost-based, or charge-based biller). Compliance with the safe harbor is determined separately for each party.*
NPC mitigates this risk through its Pricing and Contracting Strategy Committee, written policy, written standards, and the sub-certifications process.

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00819

**FOIA EXEMPT - CONFIDENTIAL**                                                    NPCLSV00017919

*Pharmaceutical manufacturers sometimes offer purchasers certain support services in connection with the sale of their products. These services may include billing assistance tailored to the purchased products, reimbursement consultation, and other programs specifically tied to support of the purchased product. Standing alone, services that have no substantial independent value to the purchaser may not implicate the anti-kickback statute. However, if a manufacturer provides a service having no independent value (such as limited reimbursement support services in connection with its own products) in tandem with another service or program that confers a benefit on a referring provider (such as a reimbursement guarantee that eliminates normal financial risks), the arrangement would raise kickback concerns. For example, the anti-kickback statute would be implicated if a manufacturer were to couple a reimbursement support service with a promise that a purchaser will pay for ordered products only if the purchaser is reimbursed by a federal health care program.*

In its Medicaid Drug Rebate Compliance Policy, NPC defines "Administrative and Service Fees" as payments made to an entity which NPC has entered into a contractual relationship for services related to the negotiation, development, administration, maintenance, and communication of the contract. The Final Rule defines AMP and BP to INCLUDE administrative and service fees EXCEPT bona fide service fees. NPC defines "bona fide service fees" consistent with the definition in the Final Rule, which is "fees paid by manufacturers to an entity; that represent fair market value for a bona fide, itemized service actually performed on behalf of the manufacturer that the manufacturer would otherwise perform (or contract for) in the absence of the service arrangement; and that are not passed on in whole or in part to a client or customer of an entity, whether or not the entity takes title to the drug".

For AMP, it is the policy of NPC to review Administrative and Service Fees on a case-by-case basis to determine if they meet the definition of a bona fide service fee. Bona fide service fees are INELIGIBLE for AMP. Fees that do not meet the definition of a bona fide service fees are ELIGIBLE for AMP if paid to an AMP-eligible entity. These transactions must be estimated using the Lagged Price Concessions Estimation Methodology based on the date the fees are paid. Non-bona fide fee-for-service discounts to wholesalers must be pro-rated based on the ratio of Net Eligible Wholesale Sales to wholesale Gross Sales fore including these discounts in the numerator of the Lagged Price Concession Ration so that only those discounts attributable to the retail CoT[17] are included in AMP.

In the case of administrative fees paid to a GPO, NPC examines the fees on a case-by-case basis to determine if they meet the definition of a bona fide service fee. If NPC concludes that the fee is a bona fide service fee, it is INELIGIBLE for the AMP calculation. NPC treats all non-bona fide GPO administrative service fees as price reductions that are eligible for AMP where the GPO has AMP-eligible members. NPC does not pro-rate these fees because it can identify them at the member level and so can quantify them specifically as retail or non-retail.

---

[17] The section of the Final Rule on the determination of AMP, including the definition of "retail CoT" was withdrawn from regulation by CMS on November 15, 2010 (see FR 75,219 pp 69591-69597). CMS advised manufacturers to rely on the statutory language found at section 1927(k)(1) of the Social Security Act, as amended by the Affordable Care Act, and regulations (except those regulations or portions thereof have been withdrawn). Regulations implementing the provisions of the Affordable Care Act pertaining to the calculation of AMP were not published as of September 1, 2011.

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA                    NPC OIG YR1 RPT 00820

**FOIA EXEMPT - CONFIDENTIAL**                                                       NPCLSV00017920

In the case of administrative fees paid to Pharmacy Benefit Managers ("PBMs"), that are associated with utilization of mail-order pharmacy owned by the PBM and such utilization is quantifiable, NPC considers the fees associated with such sales to be ELIGIBLE for the AMP calculation if they do not meet the definition of a bona fide service fee, and INELIGIBLE for the AMP calculation if they do meet that definition.

For Best Price, NPC reviews Administrative and Service Fees on a case-by-case basis to determine if they meet the definition of a bona fide service fee. Bona fide service fees are INELIGIBLE for Best Price. Fees that do not meet the definition of a bona fide service fee are ELIGIBLE for Best Price if they are paid to an entity that is eligible for the Best Price calculation.

For payments or discounts to individual patients (e.g., vouchers, coupons, debit cards), the Final Rule specifies that such discounts must meet four conditions for those arrangements to be excluded from AMP and BP: 1) the arrangement is not contingent upon any purchase requirement to individuals, 2) the manufacturer establishes a benefit amount to be given to individual patients without any negotiation between the manufacturer and any other third party, 3) the entire amount of the free product or coupon amount is made available to the individual patient, without any opportunity for the retail pharmacy or any third party to reduce the benefit amount, or take a portion of it for its own purposes, and 4) the pharmacy collects no additional payment, other than the benefit amount and a bona fide service fee, from the coupon.

NPC has written standards that outline the process steps that must be followed to have a patient transaction program (the "Program") such as debit cards, vouchers, coupons, etc., properly reviewed against the criteria of patient transactions, bona fide service fees, and fair market value described in the Final Rule. Specifically, it is the responsibility of the Brand Team to identify the business need for a new Program, or the need for changes to an existing Program or vendor agreement. Once this need is identified, the Brand Team coordinates with the Customer Interaction Center and Strategic Sourcing department to identify the best vendor and vendor arrangement to adjudicate the Program. Strategic Sourcing also works with IT to determine data interface requirements of the proposed Program. The Brand Team Manager then submits a Patient Transaction Submission Form to the PTOC along with other required documents which may include business rules, and financial analyses.

The Brand Team Manager or other Sponsor must also indicate whether or not NPC has established the amount of the subsidy to be given to individual patients independently, without any negotiation between NPC and any other third party (such as an insurer or PBM).

As part of the review process, the PTOC, using the business rules of the program, evaluates the Program to understand if 1) the coupon, voucher, or debit card is contingent upon any purchase requirement by individuals, 2) if the entire amount of the free product or subsidy is made available to the individual patient, without any opportunity for the retail pharmacy or any third party (such as an insurer or PBM) to reduce that subsidy, or take a portion of it for its own purpose, and 3) if the pharmacy collects no additional payment, other than the benefit amount and a bona fide service fee from the patient assistance program.

Government Pricing – Class of Trade                                          Page 72 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00821

**FOIA EXEMPT - CONFIDENTIAL**

NPCLSV00017921

As part of the review of the potential vendor arrangement to adjudicate the Program, the Customer Interaction Center, using the Vendor Fee Master File in coordination with Strategic Sourcing, will verify that all fees are documented, are itemized, and have been evaluated for fair market value. For new vendors, the Customer Interaction Center Manager will obtain a task order and work with Strategic Sourcing to update the Vendor Master File. As the Final Rule specifies that the pharmacy or vendor collect no additional payment, other than the benefit amount and a bona fide service fee from the Program, all fees paid to vendors and pharmacies that adjudicate the Program must be reviewed against the criteria of a bona fide service fee. It is the responsibility of the Strategic Sourcing Manager to identify if the services and fees outlined in the vendor agreement represent bona fide service fees that satisfy the following criteria: 1) the fees paid to vendors (specifically purchasers of product) and pharmacies for adjudication of the Program are explicitly outlined and itemized in the vendor agreement, 2) the entity receiving the fee does not pass the fee on, in whole or in part, to a client or customer, and 3) the fee represents fair market value for the services.

For the purpose of valuation of vendor services, NPC defines "fair market value" based on the American Society of Appraisers Businesses Valuation Standards Glossary and adopted by the American Institute of Certified Public Accountants, the American Society of Appraisers, the Canadian Institute of Chartered Business Valuators, the National Associate of Certified Valuation Analysts, and the Institute of Business Appraisers. "FMV is the price, expressed in terms of cash equivalents, and which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arm's-length in an open and unrestricted market, when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts".

In its determination of FMV, the Strategic Sourcing Manager may choose at his or her discretion among three commonly accepted valuation approaches in consideration of the types of willing buyers and sellers of the services, and the general market characteristics in which the services are bought and sold: 1) the Income Approach, 2) the Market Approach, or 3) the Cost Approach. The Strategic Service Manager will utilize one of these approaches to value each itemized service or set of services and sure that the associated fees are aligned with the FMV of the service fee.

The Strategic Service Manager will also utilize the definition of bona fide service fee in the Final Rule to determine if the Program's service fees meet the criteria. The Final Rule defines a bona fide service fee as fees paid by a manufacturer to an entity, which represent fair market value for a bona fide, itemized service actually performed on behalf of the manufacturer that the manufacturer would otherwise perform (or contract for) in the absence of the service arrangement, and which are not passed in whole or in part to a client or customer of an entity, whether or not the entity takes title to the drug.

The Brand Team Manager (Project Manager) sends the completed Patient Transaction Submission Form and the task order details to Government Pricing, where it is evaluated by the Associate Director of Government Pricing and the Government Pricing Compliance Director to determine if the Program impacts government pricing, and whether or not the transactional data associated with the Program needs to be captured. When implemented, the Program is subject to the NPC sub-certification process on a quarterly basis, which certifies that all Programs and agreements have been accurately and completely communicated to the Government Pricing department.

Government Pricing – Class of Trade                                    Page 73 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00822

FOIA EXEMPT - CONFIDENTIAL

*Any remuneration from a manufacturer provided to a purchaser related to a sale that is expressly, or potentially, implicates the anti-kickback statute should be carefully reviewed. Examples of remuneration in connection with a sale include, but are not limited to, "prebates" and "upfront payments," other free or reduced-price goods or services, and payments to cover the costs of "converting" from a competitor's product. Selective offers of remuneration (i.e., offers made to some but not all purchasers) may increase potential risk if the selection criteria relate directly or indirectly to the volume or value of business generated. In addition, manufacturers may contract with purchasers to provide services to the manufacturer, such as data collection services. These contracts should be structured whenever possible to fit in the personal services safe harbor; in all cases, the remuneration should be fair market value ("FMV") for legitimate, reasonable, and necessary services.*

NPC mitigates this risk through the application of its Medicaid Drug Rebate Compliance Policy, which defines "Administrative and Service Fees" as payments made to an entity which NPC has entered into a contractual relationship for services related to the negotiation, development, administration, maintenance, and communication of the contract. The Final Rule defines AMP and BP to INCLUDE administrative and service fees EXCEPT bona fide service fees. NPC defines "bona fide service fees" consistent with the definition in the Final Rule, which is "fees paid by manufacturers to an entity; that represent fair market value for a bona fide, itemized service actually performed on behalf of the manufacturer that the manufacturer would otherwise perform (or contract for) in the absence of the service arrangement; and that are not passed on in whole or in part to a client or customer of an entity, whether or not the entity takes title to the drug". It is the policy of NPC to review contractual arrangements that provide for Administrative Service Fees on a case-by-case basis to determine if they meet the definition of a bona fide service fee.

Any rebates or other payments by drug manufacturers to PBMs that are based on, or otherwise related to, the PBM's customers' purchases potentially implicate the anti-kickback statute. Protection is available by structuring such arrangements to fit in the GPO safe harbor at 42 CFR 1001.952(j). That safe harbor requires, among other things, that the payments be authorized in advance by the PBM's customer and that all amounts actually paid to the PBM on account of the customer's purchases are disclosed in writing at least annually to the customer. In addition, arrangements with PBMs that assume risk may raise different issues; depending on the circumstances, protection for such arrangements may be available under the managed care safe harbors at 42 CFR 1001.952(m), (t) and (u).

*Lump sum payments for inclusion in a formulary or for exclusive or restricted formulary status are problematic and should be carefully scrutinized. In addition, some manufacturers provide funding for purchasers' or PBMs' formulary support activities, especially communications with physicians and patients. While the communications may indirectly benefit the manufacturer, the primary economic beneficiary is typically the formulary sponsor. In other words, the manufacturer's dollars appear to replace dollars that would or should be spent by the sponsor. To the extent the manufacturers' payments are linked to drug purchases directly or indirectly, they potentially implicate the anti-kickback statute. Among the questions that should be examined by a manufacturer in connection with these activities are:*

- *Is the funding tied to specific drugs or categories? If so, are the categories especially competitive?*
- *Is the formulary sponsor funding similar activities for other drug categories?*
- *Has funding of PBM activities increased as rebates are increasingly passed back to PBM customers?*

Government Pricing – Class of Trade                                      Page 74 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**                                            **NPCLSV00017923**

NPC mitigates this risk through the application of its Medicaid Drug Rebate Compliance Policy. In the case of administrative fees paid to PBMs, that are associated with utilization of mail-order pharmacy owned by the PBM and such utilization is quantifiable, NPC considers the fees associated with such sales to be ELIGIBLE for the AMP calculation if they do not meet the definition of a bona fide service fee, and INELIGIBLE for the AMP calculation if they do meet that definition. It is the policy of NPC to review contractual arrangements that provide for Administrative Service Fees on a case-by-case basis to determine if they meet the definition of a bona fide service fee.

## Findings, Rationale and Recommendations

Finding GP_1:
Certain Written Standards are designated for review on a scheduled basis (either annually or every three years), but the versioning or change history of the document indicates otherwise.

| Written Standard | Date of Last Review | Next Revision Specified |
| --- | --- | --- |
| Medicare Modernization Act Medicare Part B ASP Calculation Compliance Policy | 12 / 17 / 2009 | 2010 |
| Trade Class Processing for Government Pricing | 4 / 10 / 2008 | 4 / 8 / 2011 |
| Medicaid Drug Rebate Program Compliance Policy | 12 / 17 / 2009 | 2010 |
| Monthly AMP Calculation Methodology | 12 / 17 / 2009 | 2010 |

Rationale GP_1:
Written Standards that are not regularly maintained could result in incorrect guidance or requirements in the context of an evolving Government Pricing legislative and oversight environment.

Recommendation GP_1:
Review Written Standards to ensure compliance with scheduled internal reviews. Determine if Written Standards are consistent with current business practices and update Written Standards to conform.

Finding GP_2:
While the CoT schema used in government pricing factor calculations are updated to reflect the assumptions of NPC for changes implemented by the Affordable Care Act of 2010, training programs are not yet updated.

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and
Office of Inspector General, US Department of Health and Human Services
Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00824

FOIA EXEMPT - CONFIDENTIAL                                     NPCLSV00017924

**Rationale GP_2:**
Training that is out of date, or that does not address new legislation, will result in professionals that are potentially not aligning with current requirements of the government or of any updated written standards.

**Recommendation GP_2:**
Revise training documents to reflect changes implemented by the Affordable Healthcare Act of 2010 and update when subsequent regulations or regulatory guidance transpires.

**Finding GP_3:**
Although the requirements to establish FMV for certain bona fide service fees associated with Patient Transaction Programs i.e., coupons, vouchers, and debit cards, are documented by SOP, those standards are not applied on a consistent basis throughout NPC.

**Rationale GP_3:**
The Final Rule requires that all fees paid to AMP and BP eligible customers be included in the calculation of AMP and determination of BP, except those fees paid for bona fide services. Bona fide services means fees paid by a manufacturer to an entity, which represent *fair market value* for a bona fide, itemized service actually performed on behalf of the manufacturer that the manufacturer would otherwise perform (or contract for) in the absence of the service arrangement, and which are not passed in whole or in part to a client or customer of an entity, whether or not the entity takes title to the drug. Medicare Part B also adopted this definition in its Final Rule that implemented the ASP provisions enacted in the Medicare Prescription Drug, Improvement, and Modernization Act of 2003.

While CMS does define "bona fide service fee", it does NOT provide a definition for "fair market value". In the preamble to the Final Rule, CMS states" we have not further defined "fair market value" so that manufacturers have the flexibility to determine fair market value consistent with industry accepted methods. This is consistent with our adoption of the discussion in the 2007 final ASP reporting rule (see 71 FR 69668, December 1, 2006."

**Recommendation GP_3:**
Consider documenting and consistently applying the methodology defined and used by NPC in determining fair market value in situations where fees and payments for services are made that must be evaluated as "bona fide" for exclusion from AMP and ASP calculations, and BP determination.

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and
Office of Inspector General, US Department of Health and Human Services
Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00825

**FOIA EXEMPT - CONFIDENTIAL**

**NPCLSV00017925**

# General Medicines and Oncology Compliance Coordination

## Background

OIG guidance indicates that, a pharmaceutical manufacturer should consider the following activities when establishing an effective fraud and abuse Compliance Program:

- Coordination and communication with other individuals or business units that represent key functions of the compliance officer with regard to planning, implementing or enhancing, and monitoring the Compliance Program.
- A compliance committee is established to advise the compliance officer and assist in the implementation of the Compliance Program.
- In developing a Compliance Program, every pharmaceutical manufacturer should develop and distribute written compliance standards, procedures, and practices that guide the company and the conduct of its employees in day-to-day operations. These policies and procedures should be developed under the direction and supervision of the compliance officer, the compliance committee, and operational managers.
- The proper education and training of officers, directors, employees, contractors, and agents, and periodic retraining of personnel at all levels are critical elements of an effective Compliance Program. A pharmaceutical manufacturer must take steps to communicate effectively its standards and procedures to all affected personnel by requiring participation in appropriate training programs and by other means, such as disseminating publications that explain specific requirements in a practical manner.
- In order for a Compliance Program to work, employees must be able to ask questions and report problems. Supervisors play a key role in responding to employee concerns and it is appropriate that they serve as a first line of communications. Pharmaceutical manufacturers should consider the adoption of open-door policies in order to foster dialogue between management and employees. In order to encourage communications, confidentiality and non-retaliation policies should also be developed and distributed to all employees.
- The OIG believes that every effective Compliance Program must begin with a formal commitment by the pharmaceutical manufacturer's board of directors or other governing body. Communications from the leadership team should reinforce the culture of compliance and foster an environment of 'doing the right thing'.
- A comprehensive ongoing process of compliance risk assessment is important to the Board's awareness of new challenges to the organization and its evaluation of management's priorities and program resource allocation.
- An effective Compliance Program should incorporate thorough monitoring of its implementation and an ongoing evaluation process.
- It is often effective to have internal or external evaluators who have relevant expertise perform regular compliance reviews. The reviews should focus on those divisions or departments of the pharmaceutical manufacturer that have substantive involvement with or impact on federal healthcare programs (such as the government contracts and sales and marketing divisions) and on the risk areas identified in the OIG guidance.

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

- An effective Compliance Program should include clear and specific disciplinary policies that set out the consequences of violating the law or the pharmaceutical manufacturer's code of conduct or policies and procedures. A pharmaceutical manufacturer should consistently undertake appropriate disciplinary action across the company in order for the disciplinary policy to have the required deterrent effect. Intentional and material noncompliance should subject transgressors to significant sanctions. Such sanctions could range from oral warnings to suspension, termination or other sanctions, as appropriate. Disciplinary action also may be appropriate where a responsible employee's failure to detect a violation is attributable to his or her negligence or reckless conduct. Each situation must be considered on a case-by-case basis, taking into account all relevant factors, to determine the appropriate response.
- Detected but uncorrected misconduct can endanger the reputation and legal status of the company. Consequently, upon receipt of reasonable indications of suspected noncompliance, it is important that the compliance officer or other management officials immediately investigate the allegations to determine whether a material violation of applicable law or the requirements of the Compliance Program has occurred and, if so, take decisive steps to correct the problem. The exact nature and level of thoroughness of the investigation will vary according to the circumstances, but the review should be detailed enough to identify the root cause of the problem. As appropriate, the investigation may include a corrective action plan, a report and repayment to the government, and / or a referral to criminal and / or civil law enforcement authorities.

## General Compliance Program Effectiveness Considerations

### *High-Level Oversight*

NPC consists of General Medicines, which includes Primary Care, Neuro Psychiatry, Multiple Sclerosis and Transplant and Respiratory BUs (collectively referred to as Gen Meds). Oncology is a global organization, all US based Oncology employees are NPC employees. The senior leader of US Oncology reports to the Global Head of Oncology, other members of the US Oncology organization report to US Oncology personnel. For the purposes of the US Compliance Program and CIA, and this report, US Oncology and Gen Meds are collectively referred to as NPC.

The Gen Meds business is run by André Wyss who is the President of NPC. US Oncology group is run by Christi Shaw, Executive Vice President & North American Region Head, Oncology.

The NPC Compliance Committee provides oversight to the NPC Compliance Program for both Gen Meds and Oncology. The Oncology Compliance Committee provides oversight to the implementation of the NPC Compliance Program within US Oncology. The Head, US E&C, Oncology reports to the Executive Vice President & North American Region Head, Oncology, and has a "dotted-line" report to the NPC CCO.

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and
Office of Inspector General, US Department of Health and Human Services
Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

Coordination between Oncology and NPC is secured through the CCO attendance at the Oncology Compliance Committee meeting, and representatives from the Oncology Compliance Committee who sit on the NPC Compliance Committee (see High-Level Oversight section). Coordination is also secured through the participation of Oncology E&C personnel in the E&C Leadership Team, CIA Governance Team, Business Unit Advisors Team, Business Policy Committee and other E&C Committees and Subcommittees, as well as frequent communication with members of the GenMeds E&C organization on a diverse array of strategic and tactical topics related to policy and procedure development and implementation.

Oversight committees that provide coordinated review and action on issues across Gen Meds and Oncology include:

- Events Oversight Committees, which review proposed speaker programs and advisory boards and many other events that involve the engagement of US healthcare professionals to provide contracted services
- Legal, Operations, Compliance Committee, which oversees the implementation of promotional speaker programs and promotional speaker training
- Patient Transaction Oversight Committee, overseeing coupons and patient support services
- Innovation Pathways Committee, which provides a cross-functional assessment of novel uses of technology to support advertising and promotion or other interactions with external stakeholders

Examples of other oversight committees that are specific to either Gen Meds or Oncology include:

| Gen Meds | Oncology | Purpose |
|---|---|---|
| Material Approval Process Committee ("MAP") | Oncology Material Approval Process ("oMAP") | Review of promotional material to be used outside of NPC |
| Material Review Oversight Committee ("MROC") | Oncology Promotional Review Team Oversight Committee ("PRTOC", "PTOC") | Escalation committee for promotional materials and GRP Reprints disseminated used outside of NPC |
| Novartis Office of Grants and Education ("NOGE") | Oncology Office of Grants and Education ("OGE") | Review of requests for medical education grants |
| Pricing and Contract Strategy Committee | Oncology Contract Operations Team | Oversight of Government Pricing and related activities |

These committees serve the same purpose, however may in some cases follow somewhat different procedures to fulfill their responsibilities.

## Written Standards

The US E&C policies state in chapter 1, section 1.3 that "these policies apply to all Novartis employees, including General Medicines and all business units (e.g. Oncology)." This reinforces that the US Oncology employees are subject to the US policies and procedures.

WPDs are developed at a BU level, and hence are not necessarily consistent across Gen Meds (and the BUs within) and Oncology.

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

### Conducting Effective Training and Education

Compliance training is provided to Gen Meds and Oncology in a consistent fashion, through the LMS system established in NPC. CIA-related training has been provided to both Gen Meds and US based Oncology personnel.

### Developing Effective Lines of Communication

Communication to Gen Meds and Oncology on compliance matters via 'Ask E&C' (an online communications tool) and the AlertLine is managed by the E&C Department.

Communication between E&C and the Oncology E&C group is secured through a number of channels:
- Cross Compliance Committee representation
- Active involvement of Oncology E&C personnel in E&C Department activities, initiatives and implementation activities

### Auditing and Monitoring

Auditing is a centralized function managed by the E&C Department. Monitoring is managed within BUs. Line managers are tasked to monitor their direct reports and results are captured in the performance management process. Compliance with company policy is part of what is being evaluated in these monitoring activities.

### Enforcing Standards Through Well-Publicized Disciplinary Guidelines

The RC covers the determination of disciplinary action across Gen Meds and Oncology, in a consistent fashion.

### Responding to Detected Problems and Developing Corrective Action

The BPO covers investigations across Gen Meds and Oncology. The RC covers corrective action across Gen Meds and Oncology.

## Specific Considerations for Pharmaceutical Manufacturers

*Has NPC established coordinated oversight between Gen Meds and Oncology?*

Yes. The NPC Compliance Committee, described in the High-Level Oversight section of this report, coordinates with the Oncology Compliance Committee through mutual representation. The US Oncology Compliance Committee has representation on the NPC Compliance Committee and is in part tasked with ensuring there is alignment within US Oncology and Gen Meds.

*Has NPC established an alignment in the Compliance Program requirements across all Business Units, departments and across Gen Meds and Oncology, including oversight and implementation of written standards?*

Yes. NPC has implemented a company-wide Code of Conduct and E&C Policy Manual. Alignment across BU procedural documents is currently under review, with the stated objective of confirming consistent procedures where appropriate (e.g. establishing contractual arrangements with HCPs, reviewing and approving grants, etc.).

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00829

**FOIA EXEMPT - CONFIDENTIAL**                              NPCLSV00017929

*Has NPC instituted and implemented corrective action and disciplinary policies applicable to Gen Meds and Oncology personnel who engage in improper interactions and / or promotion?*
Yes. The current BPO and RC process is applicable to both Gen Meds and Oncology.

*Has NPC established an effective system for auditing and monitoring compliance effectiveness across Gen Meds and Oncology?*
Yes. The E&C Department conducts compliance audits across Gen Meds and Oncology.

## Findings, Rationale and Recommendations

Finding GM:O_1:
Written Standard architecture for procedural documents is not consistent across Oncology and Gen Med BUs.

Rationale GM:O_1:
A common architecture supports a consistent application of procedure, where necessary.

Recommendation GM:O_1:
Implementation of WS_1 across Gen Meds and Oncology will address this.

Finding GM:O_2:
The Oncology Compliance Committee meeting usually occurs the day before the NPC Compliance Committee meeting. It was identified by the Oncology E&C team and by Navigant in the attendance and related review of meetings, that there was insufficient time for Oncology to address certain issues / decisions before the next day's NPC Compliance Committee meeting.

Rationale GM:O_2:
Appropriate Oncology representation could be compromised in the NPC Compliance Committee meeting and result in delays in decision. The coordination between Oncology and Gen Meds is critical to maintaining the effectiveness of the Compliance Program.

Recommendation GM:O_2:
Consider conducting the Oncology Compliance Committee meeting earlier, allowing for sufficient time for issue resolution by the Oncology Compliance Committee (see HLO_4).

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and
Office of Inspector General, US Department of Health and Human Services
Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**                                  **NPCLSV00017930**

Finding GM:O_3:
On occasion, it appears that decisions regarding the Compliance Program and related implementation are made without adequate consultation with the US Oncology team, e.g. development of orientation pack letter regarding Compliance Program requirements.

Rationale GM:O_3:
Coordination and consideration for Oncology US and other BUs within Gen Meds when implementing new initiatives associated with the Compliance Program will reinforce the effectiveness of the related initiatives and hence the Program in general.

Recommendation GM:O_3:
Ensure that all new compliance initiatives, be they generated in Gen Meds (and any of the BUs therein) or US Oncology, are addressed in the context of the entire US organization. Continue to leverage the NPC and Oncology Compliance Committee meetings for this purpose, with reinforcement through team meetings. As the BU Advisor and Compliance Liaison structure evolves, consider establishing a 'Compliance Network' across all BUs (including Oncology), for the purpose of sharing information, better practices and in support of decision making regarding Compliance Program initiatives.

Note: The E&C Department have a number of initiatives under consideration at the time of finalizing this report.

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00831

FOIA EXEMPT - CONFIDENTIAL                                                     NPCLSV00017931

# Commercial and Medical Function Interactions

## Background

OIG guidance indicates that, a pharmaceutical manufacturer should consider the following activities when establishing an effective fraud and abuse Compliance Program:

- Coordination and communication with functional groups that represent key functions of the compliance officer with regard to planning, implementing or enhancing, and monitoring the Compliance Program.

- In developing a Compliance Program, every pharmaceutical manufacturer should develop and distribute written compliance standards, procedures, and practices that guide the company and the conduct of its employees in day-to-day operations. These policies and procedures should be developed under the direction and supervision of the compliance officer, the compliance committee, and operational managers.

- The proper education and training of officers, directors, employees, contractors, and agents, and periodic retraining of personnel at all levels are critical elements of an effective Compliance Program. A pharmaceutical manufacturer must take steps to communicate effectively its standards and procedures to all affected personnel by requiring participation in appropriate training programs and by other means, such as disseminating publications that explain specific requirements in a practical manner. Specific training should be tailored to make it as meaningful as possible for each group of participants.

- In order for a Compliance Program to work, employees must be able to ask questions and report problems. Supervisors play a key role in responding to employee concerns and it is appropriate that they serve as a first line of communications. Pharmaceutical manufacturers should consider the adoption of open-door policies in order to foster dialogue between management and employees. In order to encourage communications, confidentiality and non-retaliation policies should also be developed and distributed to all employees.

- The OIG believes that every effective Compliance Program must begin with a formal commitment by the pharmaceutical manufacturer's board of directors or other governing body. Communications from the leadership team should reinforce the culture of compliance and foster an environment of 'doing the right thing'.

- An effective Compliance Program should incorporate thorough monitoring of its implementation and an ongoing evaluation process. The nature of the reviews may also vary and could include a prospective systemic review of the manufacturer's processes, protocols, and practices or a retrospective review of actual practices in a particular area, or across functional operations.

- An effective Compliance Program should include clear and specific disciplinary policies that set out the consequences of violating the law or the pharmaceutical manufacturer's code of conduct or policies and procedures.

- The exact nature and level of thoroughness of the investigation will vary according to the circumstances, but the review should be detailed enough to identify the root cause of the problem. As appropriate, the investigation may include a corrective action plan, a report and repayment to the government, and / or a referral to criminal and / or civil law enforcement authorities.

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00832

**FOIA EXEMPT - CONFIDENTIAL**

NPCLSV00017932

## General Compliance Program Effectiveness Considerations

### High-Level Oversight

The commercial and medical organizations are represented on the NPC Compliance Committee and Oncology Compliance Committee, and the Gen Meds organization has Compliance Liaisons within their reporting function.

### Written Policies and Procedures

The E&C Policy Manual contains extensive guidance on some of the interactions between commercial and medical. Examples include:

The policy on Customer Interactions describes the various scenarios where field based commercial and medical might interact. The general policy is that there is no joint commercial and medical call on HCPs or HCIs. The exception to this rule applies to the Management Markets environment, where HCIs might request a portfolio presentation and commercial presentation to the same committee at the same time. The Policy further clarifies the respective roles in this scenario. In the event there is a need to introduce a field medical representative to an HCP, the commercial representative can facilitate the introduction, and then leave the discussion. The policy states "Under no circumstance shall a Sales associate participate in a meeting in which a Field Medical colleague will respond to a previously received unsolicited request for off-label information from a HCP".

The Policy for advisory boards and medical meetings states: "Field Sales associates may not be present at Advisory Board or Medical Meetings not may they 'meet and greet' consultants about to participate in an Advisory Board or Medical Meeting".

The Policy for conventions states: "Novartis [NPC] may have the need for a separate Medical information section. This can be accomplished by either purchasing a separate exhibit space or by clearly delineating a separate portion of the promotional space through a suitable physical barrier or reasonable distance. An attendee should not be able to view promotional materials or hear promotional communication while in the medical area and vice versa."

Promotional Speaker programs that are managed by commercial field representatives and conducted outside of the HCI can have a field medical representative present. According to policy, "Field Medical colleagues may not answer off-label questions whether initiated by the Speaker or another HCP attendee during the formal presentation". It was reported during interviews that field medical representative can answer off-label questions in this setting, but the answer needs to be provided in a private setting, separate from the Speaker Program.

The commercial and medical field personnel do not coordinate around customers and call plans. During interviews with field personnel, it was evident that in some cases, they did not know who the counterpart was in their territory.

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

NPC OIG YR1 RPT 00833

NPCLSV00017933

Headquarter interactions between commercial and medical are limited to strategic discussions. Any tactical initiatives are developed and implemented independent of each other. Brand team medical plans are developed by the medical team. The commercial lead on the brand team can participate in the capacity of observer, in these medical strategy meetings.

The Oncology and Gen Meds E&C Department collaborated on the development of a "Cross Functional Collaboration Model" that describes the appropriate points of interaction for both field and headquarters, and provides an excellent summary of the requirements detailed above.

### Conducting Effective Training and Education

Compliance training is provided to both the commercial and medical parts of the organization in a consistent fashion, through the LMS system established in NPC. CIA related training has been provided across commercial and medical groups.

It should be noted that while Global Development were not considered as Covered Persons under the CIA, the US based employees in Clinical Development were instructed by leadership to complete the training.

### Developing Effective Lines of Communication

Commercial and medical communications are governed by the Policies described above. Cross functional communication on strategic matters is appropriate, while tactical matters are managed separately and any communication between commercial and medical in the tactical arena is limited to leadership.

It was reported to us that functional team meetings have been used to address the cross-functional interactions and related appropriateness.

### Auditing and Monitoring

The E&C Department actively audits field activity through field ride-alongs. Monitoring of field activity is completed by line management, who in turn have to complete a certain number of field ride-alongs with each member of their team during the course of the year. In the case of the sales force, Field Coaching Reports include the opportunity to identify if a compliance violation has taken place, and to characterize the nature of the violation in a small free text field. The medical field force is monitored by line management through quarterly ride-alongs.

## Compliance Program Effectiveness Considerations

*Has NPC developed a consistent approach to the written standards governing Commercial and Medical function interactions?*

Yes. NPC does have a consistent approach to the written standards between the commercial and medical groups in that both functions are subject to the company wide E&C Policy Manual and the Code of Conduct. Specifically within the E&C polices there is a Policy titled "Appropriate Interactions between Medical and Commercial Associates", that details which interactions are acceptable vs. prohibited.

Commercial and Medical Function Interactions                                            Page 85 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00834

**FOIA EXEMPT - CONFIDENTIAL**                                                          NPCLSV00017934

*Has NPC instituted and implemented corrective action and disciplinary policies applicable to Commercial and Medical functions who engage in improper interactions and / or promotion?*
Yes. A policy violation will result in a BPO investigation and RC determination of disciplinary action, including any corrective action.

*Has NPC established an effective system for tracking, compiling, and reviewing information about Commercial and Medical function interactions, including, if appropriate, random spot checking?*
Field ride-a-longs form part of the line management responsibilities, and this includes documenting on a Field Coaching Report any observations related to performance and compliance. In addition, E&C auditing of the field through audit ride-a-longs offer the opportunity to identify any policy violations as it relates to commercial and medical interactions.

## Findings, Rationale and Recommendations

Finding C:M_1:
The Oncology and Gen Meds E&C team have developed a "Cross Functional Collaboration Model" that describes the appropriate points of interaction for both field and headquarters. This is an excellent guidance document that supports the E&C Policy. This Model is not being leveraged in Gen Meds as a communication device.

Rationale C:M_1:
Shared learning helps support an effective Compliance Program. Identification of better practices and implementation across the organization reinforces the philosophy, tone and implementation of the Compliance Program.

Recommendation C:M_1:
Consider incorporating the "Cross Functional Collaboration Model" into Gen Meds guidance.

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**                                   **NPCLSV00017935**

# Appendix A: Acronyms used Throughout the Report

Average Manufacturer Price ("AMP")
Average Sales Price ("ASP")
Best Price ("BP")
Board of Directors ("BoD")
Business & Administrative Services ("B&AS")
Business Practices Officer ("BPO")
Business Unit ("BU")
Centers for Medicare and Medicaid Services ("CMS")
Chief Ethics and Compliance Officer / Vice President Ethics & Compliance ("CCO")
Chief Executive Officer ("CEO")
Chief Financial Officer ("CFO")
Class of Trade ("CoT")
Commercial Support Organization ("CSO")
Corrective and Preventative Action plan ("CAPA")
Corporate Integrity Agreement ("CIA")
Deferred Prosecution Agreements ("DPA")
Drug Safety & Epidemiology ("DS&E")
Drug Data Reporting System ("DDR")
Drug Regulatory Affairs ("DRA")
Ethics & Compliance ("E&C")
Events Oversight Committee ("EOC")
Fair Market Value ("FMV")
False Claims Act ("FCA")
Food and Drug Administration ("FDA")
Foreign Corrupt Practices Act ("FCPA")
Frequently Asked Question ("FAQ")
General Medicines ("Gen Meds")
Global Employee Survey ("GES")
Good Practices Quality guidelines, including clinical, regulatory and manufacturing ("GxP")
Group Purchasing Organization ("GPO")
Health, Safety, Environment & Business Continuity ("HSE&BC")
Healthcare Institution ("HCI")
Healthcare Professional ("HCP")
Human Resources ("HR")
Infectious Diseases ("ID")
Information Technology ("IT")
Learning Management System ("LMS")
Managed Markets ("MM")
Medical Affairs ("MA")
Non-federal Average Manufacturers Price ("Non-FAMP")
Novartis Emergency Management ("NEM")
Novartis Institutes for BioMedical Research ("NIBR")

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**                                    **NPCLSV00017936**

Novartis Pharmaceuticals Corporation ("NPC") = Gens Meds + US Oncology
Office of Inspector General ("OIG")
One Health World intranet page ("OHW")
Prescription Drug Marketing Act ("PDMA")
Pharmaceutical Executive Committee ("PEC")
Patient Assistance Programs ("PAP")
Patient Transaction Oversight Committee ("PTOC")
Pharmacy Benefits Manager ("PBM")
Resolution Committee ("RC")
Sarbanes-Oxley Act ("SOX")
Scientific Operations Personnel ("SciOp")
Standard Operating Procedure ("SOP")
Working Practices Documents ("WPD")

Appendix A: Acronyms                                    Page 88 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

# Appendix B: Findings, Rationale, Recommendations, Management Responses

The following represents a summary of finding, rationale and recommendations across the entire report, and includes management responses secured October through December 2011. The NPC E&C Department is maintaining a list of action plans, implementation dates and related owners (by name and title) for follow-up.

## High-Level Oversight

Finding HLO_1:
The NPC Board has By-Laws that address the foundational requirements for the Board and its members. However, the roles and responsibilities of the Board members are not clearly addressed, especially as it relates to the Compliance Program. The NPC Board does not have a charter in place that would provide a more detailed description of the Board member roles and responsibilities.

Rationale HLO_1:
A Board charter detailing the structure, function and accountabilities of the Board members will establish a common understanding of expectations. This also provides a guide to members, and reinforces the member's accountabilities.

Recommendation HLO_1:
Consider developing and implementing a Board charter that includes a description of the Board member's roles and accountabilities as it relates to the Compliance Program.

**Management Response HLO_1:**
*On or before March 31, 2012, a NPC Board charter will be developed that outlines Board members' roles and responsibilities associated with the NPC Compliance Program.*

| Role | Department |
|------|------------|
| Owner | Legal |
| Owner | Ethics & Compliance |

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and
Office of Inspector General, US Department of Health and Human Services
Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00838

**FOIA EXEMPT - CONFIDENTIAL**

**NPCLSV00017938**

Finding HLO_2:
The CCO's job description is not well described and does not provide for the ability to retain independent counsel to support internal investigations.

Rationale HLO_2:
The CCO job description provides the basis for the role, reporting lines, accountabilities and responsibilities. In addition, the ability for the CCO to retain independent counsel in support of internal investigations is a better practice in the industry, and reinforces independence from the legal department.

Recommendation HLO_2:
Establish a formal CCO job description, and consider incorporating the authority of the CCO to appoint independent counsel, into the job description.

Note: At the time of finalizing this report, a formal job description was being created to address this recommendation.

**Management Response HLO_2:**
*A formal CCO job description is currently under development and will be implemented by January 31, 2012. This job description will include the ability of the CCO, in consultation with the General Counsel, to retain independent outside counsel or experts as deemed necessary.*

| Role | Department |
|---|---|
| Owner | Ethics & Compliance |
| Additional Contact | Legal |
| Additional Contact | Human Resources |

Finding HLO_3:
It is not clear that Compliance Committee members have had specific training on their roles and responsibilities.

Rationale HLO_3:
Training reinforces the roles and responsibilities of Compliance committee members and ensures a consistent approach to their function as Compliance committee members.

Recommendation HLO_3:
Finalize updates to Compliance Committee Charters; develop training based on these Charters and deliver training to the Compliance Committees.

Appendix B: Findings, Rationale, Recommendations, Management Responses          Page 90 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

**Management Response HLO_3:**
*The NPC Compliance Committee Charter has been updated and was reviewed by the NPC Compliance Committee in December 2011. The Oncology Compliance Committee will be aligned with the NPC Compliance Committee Charter. By April 30, 2012, Compliance Committee members will be trained to ensure a common understanding and consistent approach to their role on the Committee.*

| Role | Department |
|------|-----------|
| Owner | Ethics & Compliance |
| Owner | Oncology Ethics & Compliance |
| Additional Contacts | Ethics & Compliance |

Finding HLO_4:
The Oncology Compliance Committee meeting usually occurs the day before the NPC Compliance Committee meeting. It was identified by the Oncology E&C team and by Navigant in the attendance and related review of meetings, that there was insufficient time for Oncology to address certain issues / decisions before the next day's NPC Compliance Committee meeting.

Rationale HLO_4:
Appropriate Oncology representation could be compromised in the NPC Compliance Committee meeting and result in delays in decision. The coordination between Oncology and Gen Meds is critical to maintaining the effectiveness of the Compliance Program.

Recommendation HLO_4:
Consider conducting the Oncology Compliance Committee meeting earlier, allowing for sufficient time for issue resolution by the Oncology Compliance Committee.

**Management Response HLO_4:**
*In general, the 2012 Oncology Compliance Committee meetings will take place one week before the NPC Compliance Committee meetings and the NPC Compliance Committee pre-reads will be distributed at least 11 days before the NPC Compliance Committee meetings. This will take effect starting with the January 2012 Oncology Compliance Committee.*

| Role | Department |
|------|-----------|
| Owner | Oncology Ethics & Compliance |
| Owner | Ethics & Compliance |

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and
Office of Inspector General, US Department of Health and Human Services
Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**                                    **NPCLSV00017940**

## Written Standards

**Finding WS_1:**
There is no policy or procedural document that describes the US Written Standard architecture, the process for developing US Written Standards and the process for review, approval and distribution.

**Rationale WS_1:**
A consistent hierarchy across the organization provides clarity on the purpose and use of Written Standards, and supports the differentiation between a policy, a procedure and a practice. A defined architecture ensures appropriate connectivity (and reference) between policies and procedures and provides for easier updating, as needed.

**Recommendation WS_1:**
E&C should establish a compliance related policy and procedure for Written Standards, develop templates for policies, procedures and practices, and define the related Written Standard architecture. Leverage Global policy or procedure as appropriate.

> **Management Response WS_1:**
> *On or before March 31, 2012, the Ethics & Compliance Department will establish an Ethics & Compliance related policy (e.g., non-GxP) for written standards related to the Compliance Program consistent with Novartis global standards and practices. A defined format will also be developed for any WPDs designed by the business/functions to implement the E&C policy.*

| Role | Department |
|------|------------|
| *Owner* | *Ethics & Compliance* |
| *Additional Contact* | *US Medical Compliance* |
| *Additional Contact* | *Oncology Ethics & Compliance* |
| *Additional Contact* | *Commercial Support Organization Compliance* |

**Finding WS_2:**
The Code of Conduct and E&C Policy Manual are available on the E&C website. Access to the documents is such that individuals find it more convenient to download these documents to their computer or departmental intranet / shared drive. WPDs and SOPs do not appear to be as centrally available as the E&C policies.

**Rationale WS_2:**
Version control and accessibility ensure Written Standards are current, and available as needed.

**Recommendation WS_2:**
Employees should be discouraged from downloading the Written Standards onto their desktop or departmental shared drive (or equivalent).
Introduce a mechanism to clearly identify any copies printed from the official website with the label of "uncontrolled copy" to reinforce this fact.

Appendix B: Findings, Rationale, Recommendations, Management Responses        Page 92 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**                                                NPCLSV00017941

In addition to the notification of employees to take training on new and updated Written Standards, this notification should also instruct employees to destroy hard copies or delete previous versions from their computer, departmental shared drive, or any other form of repository.

**Management Response WS_2:**

*Ethics and Compliance currently communicates policy updates and new information to field-based commercial associates via the Weekly Sales Bulletin (GenMeds) and the Weekly Field Alert (Oncology) and to headquarters based personnel via "What You Need to Know This Week", special bulletins, blogs and other vehicles. These communications tools are variously produced by Corporate Communications, Ethics & Compliance and Commercial Operations, among other groups.*

*In addition, links to the CSO, US Medical, US CD&MA, and Samples WPDs are available at the CIA portion of the E&C website. Additionally, a link to the portion of the Legal Department website that contains current contract templates is also available at the E&C website.*

*On or before, March 31, 2012 Ethics and Compliance is planning a pilot of BlackBerry(R) and iPad (R) applications to facilitate access to the E&C website, the E&C Policy Document, certain WPDs and other relevant documents and information which will be implemented in a phased approach in 2012. Ethics & Compliance is currently involved in a cross-functional collaboration to develop an electronic repository for policies that will help ensure version control and store the most current version of the E&C Policy Document. Such a system will be in place on or before March 31, 2012.*

*In addition, on or before March 31, 2012, Ethics & Compliance will insert language in the policy document discouraging downloading and local storage and encouraging employees to continuously access the document in the electronic repository or via the other easy-reference tools described above. This language will also be incorporated into E&C Policy updates. If employees nevertheless download the E&C Policy Document, the document will download with a watermark that states that the document is an "uncontrolled copy." The implications of that status as well as instructions to destroy or delete any previously saved or stored versions will also be provided.*

| Role | Department |
|------|------------|
| *Owner* | *Ethics & Compliance* |
| *Additional Contacts* | *Ethics & Compliance* |

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret information exempt from disclosure under the Freedom of Information Act (FOIA) (5 U.S.C. 552) and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

## Training and Education

Finding CT_1:
The compressed nature of Year 1 CIA training resulted in some disruption in the day-to-day activities of personnel. Interviewees reported high levels of anxiety and stress as a result of time pressure, and pressure to answer all questions correctly.

Rationale CT_1:
Severe time pressures can reduce the effectiveness of the training and compromise employee retention of the information.

Recommendation CT_1:
It is recognized that Year 1 CIA training has to be completed in a predetermined time frame. The E&C Department is considering a phased training plan for Year 2, and this is highly recommended.

**Management Response CT_1:**
*Ethics & Compliance will deploy Year 2 CIA training in a phased approach. The first set of training modules is scheduled for release in March-May 2012 and the remaining modules are scheduled to be released in May-July 2012. Learners will have up to 60 days to complete each CIA training course. The "general" module will be issued in two 30-minute segments (1 hour total). The other three "specific" training modules will each be 1 hour in length.*

| Role | Department |
|------|------------|
| *Owner* | *Ethics & Compliance* |

Appendix B: Findings, Rationale, Recommendations, Management Responses          Page 94 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

## Communication

Finding C_1:
There's still a fear of traceability through the phone and Internet Alertline.

Rationale C_1:
Fear of traceability may reduce the number of anonymous callers. Approximately 25% of all allegations that are designated a "BPO case" come through the channel of the Alertline.

Recommendation C_1:
The E&C Department and BPO need to continue to communicate and reinforce that a third party receives the Alertline calls and that they keep them anonymous if requested.

**Management Response C_1:**

*The BPO manages the relationship with the third party vendor responsible for managing the Novartis AlertLine. Several communication efforts relating to the Alertline, Employee Relations Hotline and an associate's discretion to remain anonymous are under development. When NPC communicates about anonymity, it must communicate that anonymity may constrain the Company's ability to investigate.*

*In addition, as part of its commitment to ethical and legal behavior, NPC requires its employees and contractors to report to the Company any actual or apparent violations of law or ethical standards so that they can be investigated and dealt with appropriately. This obligation extends to any instance where one suspects, but is uncertain whether a violation has occurred or may be occurring. Employees and contractors also should raise with the Company any concern they may have whether proper procedures are being followed, even though they are not certain whether legal or ethical standards are being violated. Employees and contractors are encouraged to let the Company know whenever they believe adequate resources or training are not being provided so as to enable NPC to comply with the ethical and legal standards applicable to the Company. Employees and contractors may satisfy their obligation to bring issues forward by speaking with the BPO, a supervisor, Human Resources, any president or vice president of the Company, any member of the Legal Department, any member of the Ethics and Compliance Department, or the AlertLine (1-800-543-6502).*

*Additionally, NPC has placed Alertline posters in many conference rooms across the organization and on the homepage of NPC's website to broadcast the available disclosure mechanism. Furthermore, NPC maintains a Novartis Information Channel ("NIC"). The NIC refers to a series of large-format LCD screens in various locations on the East Hanover and Florham Park sites for broadcast of video, animation, and photographic images. The network also distributes targeted messages (e.g., Compliance relevant messages) to specific locations. These Alertline and NIC communications highlight the ability to report anonymously.*

*A number of recent initiatives address this finding, including:*
*1) An Employee Relations webinar relating to roles and responsibilities in Investigations will be launched by the end of December 2011; and*

Appendix B: Findings, Rationale, Recommendations, Management Responses          Page 95 of 112
Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and
Office of Inspector General, US Department of Health and Human Services
Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

*2) A comprehensive brochure entitled "Understanding the Novartis Pharmaceuticals Corporation's Investigative Process" will be launched by the end of December 2011."*

| Role | Department |
| --- | --- |
| *Owner* | *Ethics & Compliance* |
| *Owner* | *Employee Relations* |
| *Additional Contact* | *Business Practices Officer* |
| *Additional Contact* | *Ethics & Compliance* |

Finding C_2:
Exiting employee surveys and interviews do not include a question on compliance.

Rationale C_2:
The exit interview offers the last tangible opportunity for employees to report compliance concerns.

Recommendation C_2:
Consider incorporating a question related to any outstanding compliance concerns the exiting employee might have.

**Management Response C_2:**
*NPC has reviewed the current process and has determined the Alertline and Employee Relations(ER) Hotline provides a more effective mechanism to respond to compliance concerns for individuals that have participated in the exit interview process (i.e. survey). NPC will continue to remind departing employees in exit interviews that NPC has an AlertLine and an Employee Relations Hotline that may be used to report any potential violation of Company policy and/or the law. Additionally, NPC will continue to remind departing employees that they may do this anonymously.*

*On or before March 31, 2012, NPC will add a statement in the verbatim section of the survey (e.g. "If you wish to disclose a compliance concern at this time, please do so by contacting the Alertline, ER Hotline, or NPC Chief Compliance Officer."). Employee Relations personnel will continue to review any and all "verbatim" statements received from exiting employees. In addition, any exit interview conducted by phone, the interviewer will be trained to ask each exiting employee, "if you wish to disclose a compliance concern at this time please do so by contacting the Alertline, ER Hotline, or NPC Chief Compliance Officer."*

| Role | Department |
| --- | --- |
| *Owner* | *Employee Relations* |
| *Additional Contact* | *Legal* |

## Auditing and Monitoring

Finding AM_1:

Appendix B: Findings, Rationale, Recommendations, Management Responses          Page 96 of 112
Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and
Office of Inspector General, US Department of Health and Human Services
Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

The risk assessment and related risk register process may not be identifying all the risks or prioritizing appropriately, especially with the CIA focus in year one of the CIA.

Rationale AM_1:

Independent of the CIA, the company and its employees continue to face potential compliance risks that evolve over time and are dependent on external, including changes in legislation, and internal factors, including organizational structural change and portfolio changes.

Recommendation AM_1:

Continue to refine the process and ensure the following are considered in the risk ranking process:

- External factors, including:
  - Legislative change – Federal and State, International
  - Guidance provided by OIG, CMS and other regulatory bodies
  - Government enforcement actions, including CIAs, DPAs and Consent Decrees
  - OIG annual work plan
- Internal factors, including:
  - CIA requirements
  - Refined risk register
  - Written Standard updates
  - Feedback loop from previous audits and monitoring activities
  - Feedback loop from the Alertline
  - Feedback loop from the investigations process
  - Pipeline, portfolio and related product profiles (including labels and related potential for off-label use)

Incorporate impact and level of risk control quantification to support ranking. Establish a formal review and sign off with the NPC Compliance Committee in anticipation of developing the annual auditing and monitoring plan.

Note: Recent activities within the E&C Department have incorporated many of these recommendations, including additional risk areas, prioritization process and definition of risks. In addition, the E&C Department will be engaging an external risk expert to assist in further refinement.

**Management Response AM_1:**

*NPC has engaged a consultant, KPMG, to help execute a comprehensive healthcare compliance risk assessment project. The project will develop and implement a structured process for NPC that evaluates General Medicine and Oncology business activities and controls in U.S. operations and support functions. The project team will develop a risk register reflecting industry risks; identify NPC-specific risks; and establish an agreed-upon language and structured process for evaluating those risks for impact and risk control. When completed, the risk assessment will enable NPC leadership to better prioritize and manage key legal and healthcare compliance risks associated with NPC's business activities, processes and systems. It will also support the development of annual auditing and monitoring plans.*

Appendix B: Findings, Rationale, Recommendations, Management Responses                Page 97 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

*This formal healthcare compliance risk assessment project began in Q2 2011. A vendor to support this initiative was selected in November 2011 and the project is scheduled to be completed by June 30, 2012. The specific activities include: establishing baseline assessment of existing healthcare compliance risk assessment activities; various workstreams to identify industry and NPC-specific risks and to develop risk assessment tools; development of future state healthcare compliance risk assessment program for NPC; a pilot risk assessment; development of a final, annual risk assessment process and road map for ongoing assessments. NPC has established a cross-functional Steering Committee of senior business, Legal and Ethics & Compliance leaders who will provide overall direction, guidance and input into critical decisions and facilitate the assessment process. In addition, key business contacts will be engaged as owners of compliance and their business activities to identify risk content and provide active input on compliance related activities, deliverables and information needs.*

| Role | Department |
|------|------------|
| *Owners* | *Ethics & Compliance* |
| *Owner* | *Oncology Ethics & Compliance* |

**Finding AM_2:**
There are no Written Standards that provide guidance on the risk assessment, auditing and monitoring process.

**Rationale AM_2:**
Written Standards provide the basis for why and how the risk assessment, auditing and monitoring process works, and supports a consistent approach, most importantly with reporting and follow-up.

**Recommendation AM_2:**
Establish Written Standards that define the process, controls and reporting requirements and incorporate the existing templates. Consider aligning the audit process and report structure to that of the North American Internal Audit process.

**Management Response AM_2:**
*As described in AM1, NPC has engaged KPMG, a consultant, to assist in the development of a comprehensive risk assessment process for healthcare compliance and legal risks. As we work with them to develop and document the risk assessment process, we also will ensure that the Ethics & Compliance Annual Plan for auditing and monitoring activities is informed by this documented, annual risk assessment, including input from senior management and the Board of Directors. We will develop written standards for all phases of auditing and monitoring work, and will align with the Novartis Enterprise Risk Management (ERM) and Internal Audit (IA) processes where applicable by June 30, 2012.*

Appendix B: Findings, Rationale, Recommendations, Management Responses          Page 98 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

NPCLSV00017947

*In addition, written standards will be developed to define the risk assessment process and development of the auditing and monitoring plans. In addition, written standards will be developed for the compliance auditing and monitoring processes, including reporting and follow-up. The written standards will align with Novartis ERM and North American IA process where applicable.*

| Role | Department |
|------|------------|
| Owners | Ethics & Compliance |

Finding AM_3:
It is unclear as to how the E&C Department defines compliance auditing vs. compliance monitoring and how responsibilities are assigned based on what is actually being done.

Rationale AM_3:
Compliance auditing represents a systematic and underlined [18] examination to determine whether company activities comply with laws, regulations, Code of Conduct and related Written Standards, while compliance monitoring is a systematic and continuous examination to determine whether the local implementation of the compliance program complies with applicable laws and regulations and the Code of Conduct and whether related Written Standards are implemented effectively and are suitable to achieve objectives.

Recommendation AM_3:
Incorporate definitions into the Written Standards (AM_2). Compliance auditing should be and is being done by an independent group – the E&C audit team. Compliance monitoring needs to be better defined and incorporated into the annual plan to include the nature of monitoring and who / what function is responsible for it, and how results are reported into the E&C Audit team, NPC Compliance Committee and ultimately the Board. Compliance monitoring can be completed by the E&C Audit team as part of the follow-up to previous audits.

**Management Response AM_3:**
*On or before June 30, 2012, as part of the risk assessment process, NPC will document the monitoring of internal controls performed by functional areas and how the results of that monitoring influence the risk assessment and annual audit plan. In addition, the Ethics & Compliance Annual Audit Plan will include follow-up audits to ensure corrective actions were implemented by management in a timely and effective manner.*

---

[18] Independent to the area being audited

Appendix B: Findings, Rationale, Recommendations, Management Responses         Page 99 of 112
Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and
Office of Inspector General, US Department of Health and Human Services
Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

*In addition, the written standards developed in response to AM_2 will delineate auditing and monitoring responsibilities and identify how auditing, monitoring and risk assessment results are aggregated and reported into the E&C Audit team, NPC Compliance Committee and the Board.*

| Role | Department |
|------|------------|
| Owner | Ethics & Compliance |
| Additional Contact | Oncology Ethics & Compliance |
| Additional Contact | US Medical Compliance |
| Additional Contact | Commercial Support Organization Compliance |

**Finding AM_4 (ICA_3):**
It was identified in E&C monitoring that line managers in the field were not always using the Field Coaching Report for documenting compliance violations, for fear of triggering an investigation. Identification of violations and immediate feedback and coaching might be occurring, but it is not being documented.

**Rationale AM_4 (ICA_3):**
The accountability for line management to be able to identify unintended compliance violations, and coach the field personnel at the time of the infraction is an important part of establishing an effective and sustainable Compliance Program. Management that have the ability and authority to evaluate violations and related severity provide a first line of defense in the identification and correction of compliance violations.

**Recommendation AM_4 (ICA_3):**
Implement ICA_2 recommendations, train line management on coaching and expand the Field Coaching Report to allow for more detailed categorization of the violations and recording of corrective actions.

**Management Response AM_4 (ICA_3):**
*General Medicines and Oncology have completed an evaluation of the Field Coaching Report and The Coaching Connection, respectively, and have recommendations for alignment of language to ensure that coaching opportunities can be documented, potential policy infractions can be timely reported and where appropriate, investigated in accordance with established Company processes. Enhanced training on the changes will be done by January 31,2012 for The Coaching Connection (Oncology) and by March 31,2012 for the Field Coaching Report (General Medicines).*

| Role | Department |
|------|------------|
| Owner | Commercial Support Organization Compliance |
| Owner | U.S. Oncology Ethics & Compliance |
| Additional Contacts | Ethics & Compliance |
| Additional Contact | Employee Relations |
| Additional Contact | Oncology Ethics & Compliance |

Appendix B: Findings, Rationale, Recommendations, Management Responses          Page 100 of 112
Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and
Office of Inspector General, US Department of Health and Human Services
Confidential

Contains confidential commercial and/or trade secret information exempt from disclosure under the Freedom of Information Act (FOIA) (5 U.S.C. 552) and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**                                   NPCLSV00017949

## Disciplinary Guidelines

Finding DG_1:
Although sanctions that fall short of termination have been recommended by the IRC and enforced by NPC management, the Code of Conduct does not specifically outline other possible sanctions short of termination, which may contribute to the impression that all policy violations will lead to termination, no matter how minor.

Rationale DG_1:
Employee fear and anxiety may be unnecessarily high when minor or inadvertent mistakes occur as a result of the impression created by the limited disciplinary guidance provided to date. Additionally, this impression could create a disincentive to self-report minor mistakes which can cause NPC to miss out on the opportunity to continuously improve its compliance and related processes.

Recommendation DG_1:
NPC management should consider updating the NPC Code of Conduct to include a limited list of additional sanctions that are possible for those offenses that fall short of termination as a consequence.

Note: The Global Code of Conduct has been updated and internally approved, and includes a broader description of the disciplinary sanctions used by the company. In addition, the posting of case studies to the E&C website supports a growing understanding of the types of disciplinary action that are enforced by NPC.

**Management Response DG_1:**
*The revised Global Code of Conduct with NPC Supplemental Requirements was issued in November 2011 with certifications completed November 30, 2011 by all NPC employees and contractors. These documents and numerous other materials referenced elsewhere in the management responses (e.g., DG_2) highlight a broader description of disciplinary sanctions used by the Company.*

| Role | Department |
|---|---|
| Owner | Ethics & Compliance |
| Additional Contact | Ethics & Compliance |
| Additional Contact | Corporate Compliance |

Finding DG_2:
There are currently no documented corrective action and / or disciplinary standards / guidelines.

Rationale DG_2:
Without clarity in policy, assumptions about the actual or potential disciplinary action could cause / reinforce fear and anxiety.

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and
Office of Inspector General, US Department of Health and Human Services
Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

NPC OIG YR1 RPT 00850

**NPCLSV00017950**

Recommendation DG_2:

NPC should consider establishing clear and specific disciplinary policies and procedures that include the definition of intentional and material noncompliance, and the related potential disciplinary actions. In addition, consideration should be given to the development of a Disciplinary Action Model that provides guidance on the management and related disciplinary action of substantiated violations.

**Management Response DG_2:**

*A number of recent initiatives address this finding and provide greater clarity into Disciplinary policies and procedures, including:*

*1) An Employee Relations webinar relating to roles and responsibilities in Investigations will be launched by the end of December 2011;*

*2) A comprehensive brochure entitled "Understanding the Novartis Pharmaceuticals Corporation's Investigative Process" will be launched by the end of December 2011."; and*

*3) WPDs relating to the investigative process and Internal Review Committee are being prepared to help ensure greater consistency in the internal processes.*

*4) Case studies provided on the E&C website for employee review and for training purposes reflect the range of potential disciplinary actions. These will continue to be updated.*

*5) Ongoing consideration is being given to a structured disciplinary action model and the related human resource, legal and compliance implications.*

| Role | Department |
|------|------------|
| Owner | Ethics & Compliance |
| Owner | Employee Relations |
| Additional Contact | Legal |
| Additional Contact | Appropriate Business Department Leads |

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00851

**FOIA EXEMPT - CONFIDENTIAL**

NPCLSV00017951

## Investigations and Corrective Action

**Finding ICA_1:**

The investigations process is not standardized and there are no policies or procedures that specifically address the process of conducting an investigation at NPC. Similarly, there are no policies or procedures that standardize the process of reporting investigation results to the IRC. The current SOP for the BPO Reporting and Managing of Misconduct and Fraud covers how all reports of misconduct and fraud are to be handled. It does not address the investigation process, nor the resolution process.

**Rationale ICA_1:**

Variability either in the investigation of allegations or in the reporting of facts found during investigations could make it more difficult for the IRC to apply a consistent standard across multiple cases.

**Recommendation ICA_1:**

NPC management should consider developing standard operating procedures that outline the process of an investigation at NPC, based upon factors that management deems important in order to foster consistency.

**Management Response ICA_1:**

*Several business functions may be engaged to conduct investigations at NPC, (e.g., E&C, Employee Relations, NPC Security and Novartis Corporate Security, and Legal.) The investigations process is generally consistent within each of these functions. However, the nature and extent of each investigation varies with the nature of the allegations and the facts and information obtained during the investigation. Each case is reviewed by the Internal Review Committee (IRC). The IRC considers a number of factors when making disposition recommendations to management, including, but not limited to, whether additional information is needed, what training on relevant policy and procedures may have been provided, and whether the subject was previously disciplined for a similar policy violation. If the IRC believes that additional information is necessary to help its members arrive at a recommendation that is consistent with similar past cases, it can request from the BPO that additional investigation be conducted.*

*By March 31, 2012, NPC will have developed WPDs relating to the investigative process and Internal Review Committee, that, when adopted, will help ensure greater consistency in the internal processes.*

| Role | Department |
|---|---|
| Owner | Ethics & Compliance |
| Additional Contact | Business Practices Officer (BPO) |
| Additional Contact | Employee Relations |
| Additional Contact | Legal |
| Additional Contact | Appropriate Business Department Leads |

Appendix B: Findings, Rationale, Recommendations, Management Responses          Page 103 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

Finding ICA_2:
There is no formal triage process in place at NPC to determine which allegations warrant limited investigatory resources and those that do not warrant limited resources.

Rationale ICA_2:
During the first half of 2011, 252 investigations for Gen Meds and US Oncology were assigned to NPC. Failure to appropriately triage cases could cause undue delay in performing investigations and bringing cases to conclusion.

Recommendation ICA_2:
NPC management should consider developing a formal triage process at the point of receiving a BPO case, so that those cases that can be brought to a quick conclusion can be so concluded and removed from the queue of cases for investigation. Assigning the substantiated claims in the context of self reported or unintentional cases to a lower priority will further mitigate the potential volume of detailed investigations. Note: it is recommended that these lower priority cases should still be documented and incorporated into the reporting of cases and resultant disciplinary and corrective action.

**Management Response ICA_2:**
*BPO management currently assesses all cases coming in to determine whether the case requires a formal investigation. If it is determined that additional facts need to be gathered the BPO management will assign the allegation to the appropriate business to obtain additional information.*

*In addition, by April 30, 2012 a team consisting of representatives from the BPO, NPC E&C, Legal, and Employee Relations will review this recommendation and consider developing a documented method for evaluating whether some allegations do not warrant a formal investigation based on coaching provided and appropriate documentation of the action taken.*

| Role | Department |
|------|-----------|
| Owner | Ethics & Compliance |
| Additional Contact | Business Practices Officer (BPO) |
| Additional Contact | Employee Relations |
| Additional Contact | Legal |
| Additional Contact | Appropriate Business Department Leads |

Finding ICA_3 (AM_4):
It was identified in E&C monitoring that line managers in the field were not always using the Field Coaching Report for documenting compliance violations, for fear of triggering an investigation. Identification of violations and immediate feedback and coaching might be occurring, but it is not being documented.

Appendix B: Findings, Rationale, Recommendations, Management Responses          Page 104 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

FOIA EXEMPT - CONFIDENTIAL                                                    NPCLSV00017953

Rationale ICA_3 (AM_4):
The accountability for line management to be able to identify unintended compliance violations, and coach the field personnel at the time of the infraction is an important part of establishing an effective and sustainable Compliance Program. Management that have the ability and authority to evaluate violations and related severity provide a first line of defense in the identification and correction of compliance violations.

Recommendation ICA_3 (AM_4):
Implement ICA_2 recommendations, train line management on coaching and expand the Field Coaching Report to allow for more detailed categorization of the violations and recording of corrective actions. The outcome of Field Coaching events should be incorporated into the reporting of potential violations and related corrective action.

**Management Response ICA_3:**
*General Medicines and Oncology have completed an evaluation of the Field Coaching Report and The Coaching Connection, respectively, and have recommendations for alignment of language to ensure that coaching opportunities can be documented, potential policy infractions can be timely reported and where appropriate, investigated in accordance with established Company processes. Enhanced training on the changes will be done by January 31,2012 for The Coaching Connection (Oncology) and by March 31,2012 for the Field Coaching Report (General Medicines).*

| Role | Department |
|---|---|
| Owner | Commercial Support Organization Compliance |
| Owner | U.S. Oncology Ethics & Compliance |
| Additional Contacts | Ethics & Compliance |
| Additional Contact | Employee Relations |
| Additional Contact | U.S. Oncology Ethics & Compliance |

Finding ICA_4:
Confidentiality is applied uniformly across investigations, limiting Management's role in any review or related disciplinary action.

Rationale ICA_4:
Limiting Management's role does not provide for meaningful input on their own staff, neither in the investigation, or the corrective action.

Recommendation ICA_4:
Consideration should be given to having appropriate line management (e.g. third level manager) made aware of potential investigations and be incorporated into the related outcome, including the disciplinary process. Maintaining confidentiality must still remain paramount in the investigation process, however, appropriate levels of transparency will reinforce trust in the organization.

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and
Office of Inspector General, US Department of Health and Human Services
Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

NPC OIG YR1 RPT 00854

NPCLSV00017954

**Management Response ICA_4:**

*To protect those involved in the investigation, ensure the integrity of the investigation, and mitigate the risk of retaliation, managers are informed about ongoing investigations on an as-needed basis. When necessary, managers are interviewed as part of the investigation process. After the Internal Review Committee meeting where the investigation is discussed, the appropriate Human Resources Business Partner (HRBP) briefs the subject's manager on the facts of the case and the Committee's recommendation regarding disciplinary/corrective action. If the manager has additional information that the IRC should consider, or if the manager disagrees with the recommendation, then he/she may ask for a rehearing of the case. On rehearing, the manager's information and opinions are evaluated along with the information adduced in the investigation.*

*For additional perspective at the IRC meeting, NPC is evaluating the addition of a representative from Field Leadership to the IRC.*

| Role | Department |
|------|------------|
| Owner | Ethics & Compliance |
| Additional Contact | Employee Relations |
| Additional Contact | Legal |

**Finding ICA_5:**

There is evidence that those investigated may not receive notification of outcome, or feedback in 'unsubstantiated' or 'self reported' cases.

**Rationale ICA_5:**

Failure to inform the subject of the investigation can leave an individual in a state of fear, making it difficult to accomplish daily tasks.

**Recommendation ICA_5:**

Ensure that appropriate feedback loops are in place when a report is found to be unsubstantiated, or when a report is self-reported. Reinforce this with individuals at the time they are being investigated, through explanation of the close out process and close out memo.

**Management Response ICA_5:**

*There is an on-going existing process in place at NPC for notifying the subject(s), that have been interviewed, of an unsubstantiated investigation that the investigation is complete regardless of the source of the reporting (e.g. self-reported). At the conclusion of IRC, a close out email is sent to the subject advising him/her that the matter has been thoroughly investigated, found to be unsubstantiated and the matter is considered closed.*

| Role | Department |
|------|------------|
| Owner | Ethics & Compliance |
| Additional Contact | Ethics & Compliance |
| Additional Contact | Employee Relations |

Appendix B: Findings, Rationale, Recommendations, Management Responses          Page 106 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and

Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

## Class of Trade

**Finding GP_1:**

Certain Written Standards are designated for review on a scheduled basis (either annually or every three years), but the versioning or change history of the document indicates otherwise.

| Written Standard | Date of Last Review | Next Revision Specified |
|---|---|---|
| Medicare Modernization Act Medicare Part B ASP Calculation Compliance Policy | 12 / 17 / 2009 | 2010 |
| Trade Class Processing for Government Pricing | 4 / 10 / 2008 | 4 / 8 / 2011 |
| Medicaid Drug Rebate Program Compliance Policy | 12 / 17 / 2009 | 2010 |
| Monthly AMP Calculation Methodology | 12 / 17 / 2009 | 2010 |

**Rationale GP_1:**

Written Standards that are not regularly maintained could result in incorrect guidance or requirements in the context of an evolving Government Pricing legislative and oversight environment.

**Recommendation GP_1:**

Review Written Standards to ensure compliance with scheduled internal reviews. Determine if Written Standards are consistent with current business practices and update Written Standards to conform.

**Management Response GP_1:**

*On or before March 31, 2012, the Written Standards referenced in the Finding will be updated to conform to current business practices and legal requirements. Going forward, all Written Standards will be reviewed in accordance with their designated schedule.*

| Role | Department |
|---|---|
| Owner | Government Pricing |
| Additional Contact | Government Pricing |

Appendix B: Findings, Rationale, Recommendations, Management Responses          Page 107 of 112

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and Office of Inspector General, US Department of Health and Human Services

Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

Finding GP_2:

While the CoT schema used in government pricing factor calculations are updated to reflect the assumptions of NPC for changes implemented by the Affordable Care Act of 2010, training programs are not yet updated.

Rationale GP_2:

Training that is out of date, or that does not address new legislation, will result in professionals that are potentially not aligning with current requirements of the government or of any updated written standards.

Recommendation GP_2:

Revise training documents to reflect changes implemented by the Affordable Healthcare Act of 2010 and update when subsequent regulations or regulatory guidance transpires.

**Management Response GP_2:**

*Training will be updated to reflect changes made by Health Care Reform legislation and any final regulations affecting government price reporting by June 30, 2012.*

| Role | Department |
|------|------------|
| Owner | Government Pricing |

Finding GP_3:

Although the requirements to establish FMV for certain bona fide service fees associated with Patient Transaction Programs i.e., coupons, vouchers, and debit cards, are documented by SOP, those standards are not applied on a consistent basis throughout NPC.

Rationale GP_3:

The Final Rule requires that all fees paid to AMP and BP eligible customers be included in the calculation of AMP and determination of BP, except those fees paid for bona fide services. Bona fide services means fees paid by a manufacturer to an entity, which represent *fair market value* for a bona fide, itemized service actually performed on behalf of the manufacturer that the manufacturer would otherwise perform (or contract for) in the absence of the service arrangement, and which are not passed in whole or in part to a client or customer of an entity, whether or not the entity takes title to the drug. Medicare Part B also adopted this definition in its Final Rule that implemented the ASP provisions enacted in the Medicare Prescription Drug, Improvement, and Modernization Act of 2003.

Appendix B: Findings, Rationale, Recommendations, Management Responses          Page 108 of 112
Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and
Office of Inspector General, US Department of Health and Human Services
Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

While CMS does define "bona fide service fee", it does NOT provide a definition for "fair market value". In the preamble to the Final Rule, CMS states" we have not further defined "fair market value" so that manufacturers have the flexibility to determine fair market value consistent with industry accepted methods. This is consistent with our adoption of the discussion in the 2007 final ASP reporting rule (see 71 FR 69668, December 1, 2006."

Recommendation GP_3:

Consider documenting and consistently applying the methodology defined and used by NPC in determining fair market value in situations where fees and payments for services are made that must be evaluated as "bona fide" for exclusion from AMP and ASP calculations, and BP determination.

**Management Response GP_3:**

*NPC has developed procedures to determine fair market value (FMV) in the areas of Speaker Programs/Consulting and Patient Transaction Programs (i.e. Co-Pay, Free Goods and Voucher programs).  NPC will create a FMV Guidance document which will be used to apply consistent procedures to determine fair market value in patient transactions and other relevant areas affecting government pricing calculations by March 31, 2012.*

| Role | Department |
|------|------------|
| Owner | Government Pricing |
| Additional Contact | Strategic Sourcing |
| Additional Contact | Ethics & Compliance |

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and
Office of Inspector General, US Department of Health and Human Services
Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00858

**FOIA EXEMPT - CONFIDENTIAL**                                    **NPCLSV00017958**

**Gen Meds : Oncology Compliance Coordination**

Finding GM:O_1:
Written Standard architecture for procedural documents is not consistent across Oncology and Gen Med BUs.

Rationale GM:O_1:
A common architecture supports a consistent application of procedure, where necessary.

Recommendation GM:O_1:
Implementation of WS_1 across Gen Meds and Oncology will address this.

> **Management Response GM:O_1:**
>
> *The implementation of WS_1 by Ethics & Compliance will provide a common WPD format for GenMeds and Oncology Ethics & Compliance related procedures.*

| Name | Role | Department |
|------|------|------------|
| Richard Eschle | Owner | Ethics & Compliance |
| Lisa Goldman | Additional Contact | Oncology Ethics & Compliance |

Finding GM:O_2:
The Oncology Compliance Committee meeting usually occurs the day before the NPC Compliance Committee meeting. It was identified by the Oncology E&C team and by Navigant in the attendance and related review of meetings, that there was insufficient time for Oncology to address certain issues / decisions before the next day's NPC Compliance Committee meeting.

Rationale GM:O_2:
Appropriate Oncology representation could be compromised in the NPC Compliance Committee meeting and result in delays in decision. The coordination between Oncology and Gen Meds is critical to maintaining the effectiveness of the Compliance Program.

Recommendation GM:O_2:
Consider conducting the Oncology Compliance Committee meeting earlier, allowing for sufficient time for issue resolution by the Oncology Compliance Committee (see HLO_4).

> **Management Response GM:O_2:**
>
> *In general, the 2012 Oncology Compliance Committee meetings will take place one week before the NPC Compliance Committee meetings and the NPC Compliance Committee pre-reads will be distributed at least 11 days before the NPC Compliance Committee meetings. This will take effect starting with the January 2012 Oncology Compliance Committee.*

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and
Office of Inspector General, US Department of Health and Human Services
Confidential

Contains confidential commercial and/or trade secret information exempt from disclosure under the Freedom of Information Act (FOIA) (5 U.S.C. 552) and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00859

**FOIA EXEMPT - CONFIDENTIAL**

NPCLSV00017959

| Role  | Department                    |
|-------|-------------------------------|
| Owner | Oncology Ethics & Compliance  |
| Owner | Ethics & Compliance           |

**Finding GM:O_3:**
On occasion, it appears that decisions regarding the Compliance Program and related implementation are made without adequate consultation with the US Oncology team, e.g. development of orientation pack letter regarding Compliance Program requirements.

**Rationale GM:O_3:**
Coordination and consideration for Oncology US and other BUs within Gen Meds when implementing new initiatives associated with the Compliance Program will reinforce the effectiveness of the related initiatives and hence the Program in general.

**Recommendation GM:O_3:**
Ensure that all new compliance initiatives, be they generated in Gen Meds (and any of the BUs therein) or US Oncology, are addressed in the context of the entire US organization. Continue to leverage the NPC and Oncology Compliance Committee meetings for this purpose, with reinforcement through team meetings. As the BU Advisor and Compliance Liaison structure evolves, consider establishing a 'Compliance Network' across all BUs (including Oncology), for the purpose of sharing information, better practices and in support of decision making regarding Compliance Program initiatives.

Note: The E&C Department have a number of initiatives under consideration at the time of finalizing this report.

**Management Response GM:O_3:**
*New NPC compliance initiatives will be evaluated, structured and implemented to meet the needs/requirements of all BUs. To promote close collaboration between the General Medicines and Oncology business units, the Chief Compliance Officer is a member of the Oncology Compliance Committee, and the Executive Vice President of the North America Oncology business and Executive Director of US Oncology Ethics & Compliance are members of the NPC Compliance Committee. In addition, Oncology E&C personnel and/or other representatives are included in key compliance and compliance-related committees, including the NPC Chief Compliance Officer's Leadership Team, CIA Governance Team, Business Policy Committee, BU Advisors Group. Company communications on critical initiatives and compliance updates are jointly drafted and often, a single communication is disseminated to all associates.*

| Role               | Department                    |
|--------------------|-------------------------------|
| Owner              | Ethics & Compliance           |
| Owner              | Oncology Ethics & Compliance  |
| Additional Contact | Ethics & Compliance           |

Appendix B: Findings, Rationale, Recommendations, Management Responses          Page 111 of 112
Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and
Office of Inspector General, US Department of Health and Human Services
Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

**FOIA EXEMPT - CONFIDENTIAL**

## Commercial : Medical Interactions

Finding C:M_1:
The Oncology and Gen Meds E&C team have developed a "Cross Functional Collaboration Model" that describes the appropriate points of interaction for both field and headquarters. This is an excellent guidance document that supports the E&C Policy. This Model is not being leveraged in Gen Meds as a communication device.

Rationale C:M_1:
Shared learning helps support an effective Compliance Program. Identification of better practices and implementation across the organization reinforces the philosophy, tone and implementation of the Compliance Program.

Recommendation C:M_1:
Consider incorporating the "Cross Functional Collaboration Model" into Gen Meds guidance.

**Management Response C:M_1:**

*NPC has specific policies in the E&C Policies, Chapter 4, entitled "Appropriate Interactions between Medical and Commercial Associates."  By March 31, 2012, GenMeds will develop additional communication tools in support of the policy.*

| Role | Department |
|------|------------|
| Owner | Ethics & Compliance |
| Owner | Oncology Ethics & Compliance |
| Additional Contact | Ethics & Compliance |
| Additional Contact | Legal |
| Additional Contact | US Medical Compliance |
| Additional Contact | Oncology Ethics & Compliance |

Prepared at the Request of the Novartis Pharmaceuticals Corporation Board of Directors and
Office of Inspector General, US Department of Health and Human Services
Confidential

Contains confidential commercial and/or trade secret
information exempt from disclosure under
the Freedom of Information Act (FOIA) (5 U.S.C. 552)
and Section V.D. of the Novartis Pharmaceuticals Corporation CIA

NPC OIG YR1 RPT 00861

**FOIA EXEMPT - CONFIDENTIAL**                                    **NPCLSV00017961**