# Exhibit 2

Page 1

1                    VIRGINIA EVANS
2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    ------------------------------------x
     UNITED STATES OF AMERICA; the States :
4    of CALIFORNIA, COLORADO, CONNECTICUT,
     DELAWARE, FLORIDA, GEORGIA, HAWAII,  :  Case No.
5    ILLINOIS, INDIANA, LOUISIANA,
     MARYLAND, MASSACHUSETTS, MICHIGAN,   :  11 Civ. 0071
6    MINNESOTA, MONTANA, NEVADA,
     NEW HAMPSHIRE, NEW JERSEY, NEW       :  (PGG)
7    MEXICO, NEW YORK, NORTH
     CAROLINA, OKLAHOMA, RHODE            :
8    ISLAND, TENNESSEE, TEXAS, VIRGINIA,
     WISCONSIN; the DISTRICT OF COLUMBIA; :
9    the CITY OF CHICAGO, and the CITY OF
     NEW YORK, ex rel. OSWALD BILOTTA,    :
10
                 Plaintiffs and Relator,  :
11
                     v.                   :
12
     NOVARTIS PHARMACEUTICALS             :
13   CORPORATION,
                                          :
14           Defendant.
     ------------------------------------x
15   UNITED STATES OF AMERICA,            :
16           Plaintiff,                   :
17           v.                           :
18   NOVARTIS PHARMACEUTICALS CORP.,      :
19           Defendant.                   :
     ------------------------------------x
20      VIDEOTAPED DEPOSITION OF VIRGINIA EVANS
21             New York, New York
22             January 23, 2018
23   Reported by:
24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR
25   JOB NO. 136542

Page 10

VIRGINIA EVANS

A.   Yes.  I have actually published through the American Bar Association Health Law Litigation and Risk Management section a brief article on physician credentialing and the risks that can occur when a physician enters into an agreement with -- with respect to his or her competency and/or other agreement and how that can affect his status under the National Provider Database.

Q.   Okay.  We've also put before you DX3, which is the expert report of Heidi Sorensen which was prepared in response to your report.

Do you see that?

A.   I do.

Q.   And have you reviewed that report?

A.   I have.

Q.   What did you do to prepare for today's deposition?

A.   I reviewed the materials that Ms. Sorensen referenced in her report.  I reviewed the materials that I referenced in my report.  I read both of those reports.  I went back and looked at the PhRMA Code and the HHS OIG Guidance for Pharmaceutical Manufacturers.  I

Page 11

VIRGINIA EVANS

also discussed my testimony with counsel, Ms. Jude.

Q.   And when did you do that?

A.   I discussed my testimony on Friday for about two hours, three hours, and then again yesterday from 1 till about 6, so about five hours.

Q.   Okay.  When you say the HHS OIG Guidance, are you referring to the 2003 guidance?

A.   Yes, sir.  Uh-huh.

Q.   And I believe that's in front of you as Defendant's Exhibit 4; is that correct?

A.   Yes.

Q.   Why don't we open up your report, and to give you a preview of what we're going to do today, for most of the day we're just going to walk through your report, and I'm going to ask you questions.  Okay?

A.   Okay.

Q.   And then when I'm done with that, I'll likely ask you questions about Ms. Sorensen's report.  Okay?

A.   (Witness nods.)

Page 12

VIRGINIA EVANS

Q.   On page 1 of your report, we'll start with the Introduction.  You say that the U.S. Attorney's Office engaged you to perform a review of and offer an opinion on the effectiveness of NPC's compliance program with respect to certain promotional events.

Do you see that?

A.   Yes, sir.

Q.   What do you mean by "effectiveness"?

A.   When I talk about effectiveness in the context of this report, I'm referring back to the concept of effectiveness as that is described in the Sentencing Guidelines and as is understood in the compliance industry, not only the Sentencing Guidelines, but also the OIG pharma compliance for -- excuse me, compliance guidance for pharma manufacturers as well as the understanding in the industry as to what a compliance -- an effective compliance program is.

Q.   As far as understanding in the industry, is there other -- other written documents that you cite other than the OIG guidance and the Sentencing Guidelines that

Page 13

VIRGINIA EVANS

could help me understand what "effectiveness" means?

MS. JUDE:  Objection to form.

Q.   You can answer.

A.   Okay.  I'm sure that there are other documents that are referenced in these materials.  If you can point me to a particular document, I'd be happy to discuss it.

The concept of effectiveness is something that was enumerated, if you will, in the Sentencing Guidelines, outlined in the Sentencing Guidelines, and "effectiveness" has grown to mean since the time of the Sentencing Guidelines, which I think was 1991, to mean the -- whether or not a compliance program does what it's supposed to do in this sense:  That it not only sets forth a framework of standards, but those standards are tested and to see whether or not in fact they work.  So effectiveness is really a function of is the compliance program working.

Q.   Okay.  And were you retained by the U.S. Attorney's Office in this matter?

A.   Yes, I was.

VIRGINIA EVANS

1
2 Pharmaceutical Guidance was drafted.
3     Q.   Okay.
4         MS. JUDE:  I just want to put an
5 objection on the record to the extent that
6 this is using Ms. Evans' expertise in this
7 case to try to prove that certain elements
8 of the case are not met.
9         I mean, she is a lawyer so obviously
10 she can answer these questions.  I don't
11 think I need to make them as to form on the
12 record, but she's here purely to offer an
13 opinion about compliance and not about --
14         MR. GRUENSTEIN:  I understand that.
15         MS. JUDE:  -- this case.
16         MR. GRUENSTEIN:  I understand that.
17 BY MR. GRUENSTEIN:
18     Q.   I want to ask a question that I may
19 not have asked clearly before about your
20 methodology of determining whether a company has
21 an effective compliance program.
22         I assume you've considered other
23 companies and whether other companies have
24 effective compliance programs?
25     A.   Yes, I have.

VIRGINIA EVANS

1
2     Q.   And what is your methodology for that
3 consideration?
4     A.   Well, one of the first things that I
5 would do -- that I do is to take a look at the
6 policies and procedures.  The very first element
7 of the -- of an effective compliance program,
8 the first element that's enumerated, I would
9 take a look at those.
10         It would be my practice then, if there
11 were no depositions, to interview individuals in
12 the organization.  If there is -- if that's not
13 an option, the next thing I would do is look at
14 statements from the individuals, and based upon
15 those statements, I would then seek to review
16 documents.  And those could be e-mails, they
17 could be training materials, the documents could
18 be financial analysis, complaints, responses to
19 the hotline, investigations, and then any
20 remediations that occurred as a result of those
21 complaints and look to determine whether or not
22 the compliance program has an internal ability
23 to use information gleaned from all of these
24 sources in statements about risk, documents,
25 materials, e-mails, complaints, investigations,

VIRGINIA EVANS

1
2 take all of that information and wind it back
3 into their compliance policies and training and
4 education so that you have some ability to state
5 with confidence that there was a problem, the
6 problem -- a compliance problem, the problem was
7 reviewed, corrective action was drafted, and
8 then a testing after the corrective action was
9 determined and implemented to see if it's
10 working, basically.
11     Q.   So I want to take you out of the
12 context where you're doing that review and
13 litigation as an expert witness.
14     A.   Okay.
15     Q.   Because I assume as a consultant you
16 do this analysis for companies?
17     A.   That's correct.
18     Q.   Okay.  And when you do that analysis,
19 you typically will interview people?
20     A.   That's correct.
21     Q.   And presumably you interview key
22 people at the company who deal with the
23 compliance program, correct?
24     A.   Yes.
25     Q.   So, for example, you would interview

VIRGINIA EVANS

1
2 the chief compliance officer?
3     A.   That would -- yes, uh-huh.
4     Q.   And you interview other people in the
5 Compliance Department?
6     A.   Yes.
7     Q.   You interview people in Internal
8 Audit?
9     A.   Sometimes, yes.
10     Q.   And you interview people in Human
11 Resources, perhaps?
12     A.   Sometimes, yes.  It really depends on
13 whether or not the compliance program touches
14 those areas, and sometimes it does and sometimes
15 it doesn't.  That would be true of both Internal
16 Audit and HR.
17     Q.   And there may be other departments
18 that you would say touch on compliance like, for
19 example, Legal, Finance, maybe others, correct?
20     A.   That's correct.
21     Q.   And there may be times where for you
22 to do a thorough review of a compliance program
23 you have to interview dozens of people, correct?
24     A.   That's correct.
25     Q.   And you review -- you ask -- I'm

8  (Pages 26 to 29)

VIRGINIA EVANS

1
2  sorry.  Let me strike that.
3       You ask those people to provide you
4  with all relevant policies, correct?
5       A.   Yes.
6       Q.   And then you review those policies
7  thoroughly, correct?
8       A.   Yes.  Try to.
9       Q.   And you ask for documentation of
10 instances where there were violations of the
11 policies, correct?
12      A.   Sometimes, yes.  Uh-huh.
13      Q.   And you review the investigation
14 reports, if there are investigation reports?
15      A.   Yes.
16      Q.   And that all informs your decision as
17 to whether the company is or is not effective,
18 correct?
19      A.   It helps to -- helps me to come to a
20 conclusion as to whether or not it -- the
21 compliance program is working, yeah.
22      Q.   Okay.  Do you ever take proactive
23 steps like issuing a survey to employees?
24      A.   Yes, that is something that I have
25 been involved in with other organizations in the

VIRGINIA EVANS

1
2  past, uh-huh.
3       Q.   And is that helpful for you to
4  determine whether there is a culture of
5  compliance at the company?
6       A.   Yes.
7       Q.   And whether there's a culture of
8  compliance at the company is certainly something
9  that you consider when you're considering
10 whether there is an overall effective compliance
11 program?
12      A.   Yes, that is something that, although
13 culture of compliance is kind of difficult to --
14 to describe, you know, you --
15      Q.   You know it when you see it?
16      A.   You know it when you see it.
17      Q.   Okay.  I feel that way about a lot of
18 the --
19      A.   Right.
20      Q.   -- a lot of the factors that are
21 involved.
22      And when companies ask you to review
23 their compliance program, at the end of the day,
24 you give them suggestions for improvement?
25      A.   Yes.  Yes.  Or I may suggest to them

VIRGINIA EVANS

1
2  that they need to do a deeper dive into
3  particular areas because there is apparent risk.
4       Q.   And that itself is a suggestion for
5  improvement?
6       A.   Yes, sir.  Uh-huh.
7       Q.   And do you ever say to a company,
8  "Your compliance program is effective.  There's
9  nothing more that you need to do"?
10      A.   I have been involved with companies
11 that have excellent compliance programs that are
12 effective, that need very little adjustment.
13      Q.   Okay.  Unfortunately, those companies
14 never need to hire me because they never get
15 into any trouble, so I haven't encountered them,
16 but okay.
17      But it's fair to say that you also
18 have had clients -- I'm talking about consulting
19 clients, not legal clients -- I don't want to
20 tread on the privilege -- but you have had
21 clients where you would conclude that they had
22 effective compliance programs, but there was
23 still room for improvement?
24      A.   That's correct.
25      Q.   And then you've had other clients

VIRGINIA EVANS

1
2  that -- well, let me ask you, have you had other
3  clients where you have reached the conclusion
4  you have an ineffective compliance program?
5       A.   Absolutely.
6       Q.   Okay.  And you've given them room for
7  improvement -- you have given them ideas for
8  improvement?
9       A.   Yes, I have.
10      Q.   So it's possible that an effective
11 compliance program has room for improvement as
12 well as an ineffective compliance program,
13 correct?
14      A.   That is possible.
15      MS. JUDE:  Object to the form.
16      THE WITNESS:  I'm sorry.
17      MS. JUDE:  Objection to form.
18      THE WITNESS:  That is possible.
19 BY MR. GRUENSTEIN:
20      Q.   Of course, the ineffective program has
21 more room for improvement --
22      A.   Yes.
23      Q.   -- than the effective, correct?
24      A.   Yes.
25      Q.   How do you draw the line between an

Page 34

VIRGINIA EVANS

effective compliance program and an ineffective
compliance program?
    A.   If I'm observing a program and it
appears that there is a risk that laws are being
violated or that regulations are being violated
and that this is not an isolated instance, that
it is a pattern of behavior, and there doesn't
seem to be anything within the organization that
is an internal control or compliance control on
the activity, then at that point, I conclude
that it's ineffective and that the company needs
to address it, so...
    Q.   So you said, you know, first that
there's a risk of illegal activity happening?
    A.   That's correct.
    Q.   Is it fair to say that at every
company there is a risk of some sort of
misconduct happening.  The only question really
is how well-controlled that risk is?
    A.   I think that there are companies where
that risk is very, very limited because of the
way that their -- they operate their programs.
    Q.   Okay.  But I'm saying before -- well,
maybe I don't need to clarify it, so I'll move

Page 35

VIRGINIA EVANS

on.
    But you also said in your last answer
that where there are no controls that are
addressing the risk, you would determine that
the program was ineffective, correct?
    A.   Well, if it's a -- if it's a control
and it's not addressing the risk, then it's not
really a control as that is -- term is
understood in auditing.  It's not -- it's not an
accurate control.
    I'm not an auditor, but I understand
that concept, that there needs to be a check, if
you will, on an activity; and if there is no
check, then it's not adequately being controlled
and the risk is allowed to grow and continue and
is not being addressed.
    Q.   But how do you draw the line between a
company that has adequate controls that address
the risk and a company that does not have
adequate controls to address a risk?
    A.   One of the primary ways that you can
determine whether or not a company has adequate
controls to address the risk is by looking to
see whether it's testing those risks and testing

Page 36

VIRGINIA EVANS

the controls or testing the behavior, if you
will, and so you -- you isolate whatever
particular behavior it is that you're looking at
and then take a sample of the instances of that
behavior.
    And you might -- it might be a
targeted sample.  You might have information
from a different source from, you know, word on
the street or the hotline or whatever that
there's an issue with a particular individual or
there's a particular region.
    Then you take a look at that -- the
universe of claims or whatever it is you're
looking at and you determine if there is in fact
a risk, and if there is a risk, why isn't it put in place
being addressed and what could be put in place
that would prevent this behavior from happening.
    Then I think a competent compliance
officer would then take a look again at the
corrective actions and determine whether or not
the corrective actions have done what we were
hoping that they would do, which is address the
risk.
    And those corrective actions could be

Page 37

VIRGINIA EVANS

additional training.  It could be, you know,
asking for supervisory approval.  It could be
getting management pre-approval for behavior.
Whatever it is, you're looking to see that you
can address it through some control.
    Q.   Okay.  So, I mean, you have listed
several things that you would look at, but at
the end of the day, if you're asked to make the
determination is the compliance program
effective or is it not effective, how do you
decide if the program is on one side of the line
or another?
    A.   Do they have controls?  If they have
controls, are they being implemented?  If the
controls are being implemented, are they
effective?  Do they do what they were designed
to do?
    Q.   Okay.  So you have asked -- you have
asked three questions.  So do they have
controls?
    A.   Right.
    Q.   That's a question you would look at.
Well, are there policies and procedures in
place.  That would be what you would look at,

TSG Reporting - Worldwide    877-702-9580

Page 74

VIRGINIA EVANS

1
2    A.   Yes, sir, although I believe that
3    other folks participated in the policy drafting
4    later on.  By that I would say after 2005, and I
5    don't know how -- how many years into or past
6    2009, 2010 he remained in the policy-making
7    position.
8        Q.   So if Marty and others thought that
9    these policies were not ambiguous, but then the
10   people you cite thought that the policies were
11   ambiguous, why do you rely on those people and
12   not on Marty?
13           MS. JUDE:  Objection to form.
14       A.   Because when looking at the
15   effectiveness of the policies, it was apparent
16   to me based on subsequent e-mails and other
17   deposition testimony that the sales reps were
18   having a difficult time understanding what was
19   meant by some of the policies.
20       So they had a difficult time
21   understanding what was meant by "occasional" and
22   an "occasional meal."  They had a difficult time
23   understanding who was a legitimate attendee, for
24   example, so -- and then very simple policies
25   like the gifts policy.  No gifts?  Some gifts?

Page 75

VIRGINIA EVANS

1
2    Gifts under $100?  There were varying
3    interpretations of when it was appropriate to
4    provide gifts, and there were many occasions
5    that I saw in the materials where Mr. Putenis
6    even deferred to Sales and said, you know, let's
7    let Sales make that determination.
8        Q.   You didn't review any depositions of
9    sales reps, did you?
10       A.   I did not.
11       Q.   And if there were depositions of sales
12   reps where they gave the proper interpretation
13   of these policies, how would that influence your
14   analysis, if at all?
15           MS. JUDE:  Objection to form.
16       A.   In my opinion, based upon the policies
17   that I reviewed and the information that the
18   compliance folks had at the time and were
19   discussing and were discussing with senior
20   management, I think that the policies were
21   inadequate, as Mr. Hollasch said.  I think that
22   they could have been clearer.
23       Q.   And how does Mr. Hollasch's opinion
24   inform your opinion?
25       A.   At one point, they were talking about

Page 76

VIRGINIA EVANS

1
2    coming up with more specific modest meal
3    policies, and Mr. Hollasch in an e-mail, fairly
4    late in the review period, maybe it was 2009,
5    said let's push off this modest meal policy
6    effort because the policies that we have now are
7    clearly inadequate.
8        And that's someone at the time on the
9    scene who's writing about attempting to address
10   a problem that he was aware of because of the
11   earlier internal audit issues that occurred
12   during the 2008 field audit.
13       So, yeah, I -- at that point in time,
14   that slice in time, it looked to me like the
15   compliance officers were having difficulty
16   getting the sales reps to comprehend the
17   policies.
18       Q.   Okay.
19       A.   And maybe that's because the policies
20   were not very clear.
21       Q.   As a -- as a compliance consultant,
22   you are involved in helping companies draft
23   their policies, correct?
24       A.   Yes, sir.
25       Q.   And it's certainly the case that a

Page 77

VIRGINIA EVANS

1
2    policy cannot prescribe what an employee should
3    do in every situation; some amount is left to
4    the discretion of the employee, correct?
5        A.   That's generally true unless you have
6    an instance where you know that you're putting
7    individuals who are -- are going to be
8    conflicted because of their inherent role in a
9    position where they're making decisions, and
10   what -- it is often helpful in those
11   circumstances to give a couple of examples or to
12   further define what is meant by "occasional."
13       Q.   Okay.  So, in the last sentence of the
14   paragraph, you say, which I think is consistent
15   with what you just said, "In general, leaving
16   room for subjective interpretation of policies
17   designed to prevent fraud is antithetical to an
18   effective compliance program particularly where
19   interpretation is in the hands of sales reps or
20   managers who are compensated based on sales or
21   business goals, and thus are incentivized to
22   interpret policies in a sales-friendly manner."
23       Correct?
24       A.   That's correct.
25       Q.   And is that principle contained in any

Page 82

VIRGINIA EVANS

1
2  at speaker programs to your recollection?
3      A.  I know that one did.  I don't know
4  about the other ones.
5      Q.  Do you remember what the number was
6  with that one?
7      A.  No, I don't.
8      Q.  Okay.  Do you think it was higher than
9  three, or you don't recall?
10     A.  I don't recall.
11     Q.  And was there any -- is there any
12 guidance that you can point to that says that
13 the number of legitimate attendees is relevant
14 to AKS risk?
15         MS. JUDE:  Objection to form.
16     A.  Once again, I'd go back to the 2003
17 pharma.
18     Q.  OIG?
19     A.  OIG Guidance.  And also, there was
20 internal information and documents from
21 Novartis, from NPC, where the number 3 was
22 identified as being the target number that put
23 them in a position where they felt the risk was
24 acceptable and that they could legitimately
25 explain the speaker program as being a bona fide

Page 83

VIRGINIA EVANS

1
2  program where scientific information was
3  imparted to other physicians.
4      Q.  Let me just back up and ask you a --
5  kind of a methodological question.
6         Your overall opinion is that NPC's
7  compliance program was not effective as it
8  related to speaker programs?
9      A.  Uh-huh.
10     Q.  Correct?
11     A.  Right.
12     Q.  And now we're walking through the
13 seven elements of a compliance program, correct?
14     A.  Right.
15     Q.  Do you -- did you draw a conclusion
16 about the effectiveness of each one of those
17 elements?
18     A.  I did, but there's a caveat.  I looked
19 at them sequentially, so I looked -- rather than
20 breaking it down into individual elements at the
21 outset, I looked at the speaker program across
22 time and then went back and looked at the
23 individual elements, speaker program compliance
24 over time.  So, yes.
25     Q.  So the reason I ask is because on page

Page 84

VIRGINIA EVANS

1
2  10 you say on the first paragraph, the second
3  line, "NPC's minimum attendance policy was
4  deficient," and then you explain why.
5         Is "deficient" just another word for
6  saying "not effective"?
7      A.  Yes, that was just the choice of the
8  word that I used.
9      Q.  Okay.  If we look at the next
10 paragraph you -- you talk about a development or
11 developments in the -- in the policies as it
12 relates to legitimate attendees.
13         Do you see that?
14     A.  No, I -- where are you?
15     Q.  In the next paragraph.
16     A.  Uh-huh.
17     Q.  "Prior to 2003, NPC had no requirement
18 for a minimum number"?
19     A.  Oh, okay.  Uh-huh.
20     Q.  Then, starting in 2003, there had to
21 be at least three healthcare professionals?
22     A.  Yes, sir.
23     Q.  And the interpretation of healthcare
24 professionals was left up to the sales force,
25 you saw that?

Page 85

VIRGINIA EVANS

1
2      A.  Yes.
3      Q.  And then in 2004, "healthcare
4  professionals" was defined as those with
5  prescribing rights, but the minimum requirement
6  was loosened because -- by permitting speaker
7  programs to proceed without three legitimate
8  attendees if the sales rep had made a good faith
9  effort to ensure minimum attendance.  Do you see
10 that?
11     A.  Yes.
12     Q.  And in your opinion, or are you
13 expressing an opinion that there was something
14 problematic about having that good faith
15 exception?
16     A.  No, I was just pointing out that
17 factually that was what was occurring at that
18 point in time.  So the term "healthcare
19 professionals" was further refined in the
20 policies as those with prescribing rights.  So I
21 thought that was a positive effort.
22         "...the minimum required --
23 requirement was loosened by permitting Speaker
24 Programs to proceed without the three legitimate
25 attendees if the sales rep had made a 'good

22  (Pages 82 to 85)

VIRGINIA EVANS

1
2     MS. JUDE:  Objection to form.
3     A.   No, I wouldn't say speaker programs
4  specifically, but certainly promotion, promotion
5  by physicians.
6     Q.   And was there any written guidance
7  that suggested that this was a risk, having, you
8  know, prescribers of -- let me rephrase the
9  question.
10         Was there any sort of written guidance
11  that said, you know, there's a risk that, you
12  know, colorectal surgeons are going to show up
13  at Prozac speaker programs, you better watch
14  out?
15         MS. JUDE:  Objection.
16     Q.   Because, you know, there's -- you
17  know, those aren't the types of doctors that
18  prescribe Prozac?
19         MS. JUDE:  Objection to form.
20     Q.   Do you remember any written guidance
21  to that effect?
22         MS. JUDE:  Same objection.
23     Q.   Your counsel has an objection, but you
24  can answer.
25     A.   I don't recall the specific guidance.

VIRGINIA EVANS

1
2  I know that at the Healthcare Compliance
3  Association and American Health Law Association
4  meetings that I attended, the idea that speaker
5  programs and other meetings could be padded was
6  very much discussed, and the idea of off-label
7  and sort of benefits to being provided to
8  physician speakers without a business
9  justification was something that a lot of folks
10  were talking about.
11     Q.   Okay.  Let's look at the next page in
12  the final paragraph.  In the last sentence, you
13  say, "Until 2011, NPC's minimum attendance
14  policy for Speaker Programs was not effective at
15  managing the risk that promotional events could
16  be used to provide payments to HCPs for
17  illegitimate purposes."
18         Do you see that?
19     A.   Yes.
20     Q.   Earlier you testified that one of the
21  questions you asked in an effectiveness analysis
22  is, well, ultimately, what happened?
23         And is that what you're getting at
24  here?
25         MS. JUDE:  Objection to form.

VIRGINIA EVANS

1
2     A.   One second, please.
3     Q.   Yeah.
4     A.   Yeah, I think that -- I think that it
5  was not an effective policy.  It did not
6  necessarily ensure the idea that speaker
7  programs were going to be legitimate events that
8  were used to educate other physicians about the
9  benefits of a particular product, and so, yes, I
10  don't think that the program was effective.
11     Q.   And did you analyze any data about
12  whether, you know, either non-prescribers of the
13  drugs were showing up to pad numbers or that the
14  minimum three wasn't being met?
15     A.   I actually did, yes, I did look at
16  data and looked at information not only from the
17  third quarter 2008 audit that was conducted by
18  Natalie Nelson-Ling -- Lang -- and David
19  Hollasch, but I also looked at information from
20  Mr. Goldberg, Richard Goldberg, who was another
21  government expert, that showed that the minimum
22  attendance policy was in fact an issue, so...
23     Q.   Do you -- did you do anything to
24  benchmark those data analyses against how other
25  companies were doing at the time?

VIRGINIA EVANS

1
2     A.   I did not.
3     Q.   Let's look at the next section,
4  "Policy Regarding Guests"?
5     A.   Excuse me.  I'm sorry.  I didn't mean
6  to interrupt, but I believe that Julie Kane
7  actually had done an analysis, and so I reviewed
8  an e-mail that she provided I believe to the CEO
9  analyzing the different policies that NPC had
10  against other pharmaceutical companies.
11         I don't know what those
12  pharmaceutical -- who those pharmaceutical
13  companies were, and I certainly didn't check her
14  data, but I used Novartis' own materials to that
15  extent.
16     Q.   Okay.  To be clear, in your report you
17  don't draw a conclusion as to whether Novartis'
18  compliance program was more or less effective
19  than other pharmaceutical companies' compliance
20  programs during this time, do you?
21     A.   I did not.
22     Q.   Let's look at the next section,
23  "Policies Regarding Guests."
24     A.   Okay.
25     Q.   You talk about the 2001 and 2003

Page 94

VIRGINIA EVANS

1
2  guidelines contain no general prohibition
3  against a guest or a spouse attending a speaker
4  program, and there's evidence that NPC regularly
5  allowed spouses to attend at that time.
6        Was there any guidance in 2001
7  prohibiting the attendance of a guest?
8        MS. JUDE:  Objection to form.
9     Q.  That you're aware of?
10    A.  Yes, but again, I would refer to the
11 HHS OIG 2003 Compliance Guidelines.  I would
12 also point out that the PhRMA Code at this --
13 back in 2002 stated that spouses and guests
14 should not be -- should not attend.
15    Q.  And did that guidance say they should
16 not attend, or if they attend, it should be not
17 be paid for by the company?
18    A.  I don't believe that there's any
19 business reason.  I mean, if the reason that
20 you're paying for the dinner and conferring a
21 benefit on a physician is because it is an
22 accommodation to that individual during the
23 course of a business meeting where he or she is
24 providing information about a particular drug
25 and its benefits and safety issues to other

Page 95

VIRGINIA EVANS

1
2  providers, there's no legitimate business reason
3  for a spouse or a guest to be there.  Therefore,
4  I would say that that benefit triggers an
5  anti-kickback violation -- or, sorry,
6  anti-kickback risk.
7     Q.  Okay.  But you're not testifying here
8  as a lawyer, correct?
9     A.  I'm sorry?
10    Q.  You're not testifying here as a
11 lawyer?
12    A.  No, sir.
13    Q.  But my question was not about what you
14 thought, but rather what the Pharma Guidance was
15 in 2002?
16    A.  Well, and --
17    Q.  PhRMA Code guidance.  Sorry.
18    A.  The PhRMA Code guidance, I don't know
19 whether it prohibited.  I believe it prohibited.
20 It said that spouses and guests should not be
21 invited.
22    Q.  Okay.  Let's look at "Repeat
23 Attendance," Section 3.
24    A.  Okay.
25    Q.  In the first sentence, "During the

Page 96

VIRGINIA EVANS

1
2  Review Period, NPC's Compliance Policies failed
3  to control for a serious AKS risk," and then you
4  describe repeat attendance.  Do you see that?
5     A.  Yes.
6     Q.  Are you familiar with any written
7  guidance that says that repeat attendance is a
8  serious AKS risk?
9        MS. JUDE:  Objection to form.
10    A.  Again, I would refer to the 2003 HHS
11 OIG pharma manufacturers -- compliance guidance
12 for pharma manufacturers, and also the PhRMA
13 Code.  I believe the 2009 code referred to
14 occasional meals.  And finally, to Novartis' own
15 policy, NPC's own policies, that talked about
16 occasional meals for healthcare providers and
17 occasional dinners in the context of speaker
18 programs.
19    Q.  Did you ever advise your pharma
20 clients about what "occasional" means for
21 purposes of the PhRMA Code guidance?
22    A.  Well, I certainly would not -- I'm
23 sorry.  Strike that.
24        Did I ever advise...
25        I -- I can -- I don't know if I ever

Page 97

VIRGINIA EVANS

1
2  used the word "occasional."  Sorry.  I don't
3  know if I ever used the word "occasional," but I
4  can state that I have advised pharma and other
5  entities who were providing -- who were in a
6  position to provide benefits to healthcare
7  providers that this is not something that should
8  be done outside of the context of a business
9  meeting on a regular basis.
10        So --
11    Q.  Okay.
12    A.  -- dinners and things of that nature,
13 repeated events.
14    Q.  Do you recall advising your clients
15 about repeat attendance by doctors at the same
16 program?
17        MS. JUDE:  Objection to form.
18    Q.  If you recall.
19    A.  And I am concerned because I don't
20 want to violate attorney-client privilege with
21 respect to some of my service as a compliance
22 officer and general counsel for Centra, so I'm
23 just thinking about how to answer this question.
24        So, I'm sorry, can you repeat the
25 question maybe?

25  (Pages 94 to 97)

Page 98

VIRGINIA EVANS

MR. GRUENSTEIN:  I'm sorry.  Can you
read it back?
(Record read.)
Q.   And I can limit it if it helps you on
the attorney-client privilege to your consulting
clients.
A.   No, I don't recall providing that
guidance.
Q.   Do you recall the testimony of Natasha
Nelson-Ling where she said -- she was asked
about repeat attendance and said, you know, I --
I wish I had looked into it, but I didn't know
that that was a risk until the U.S. Attorney's
Office brought this case in 2000 -- whatever it
was?
MS. JUDE:  Objection.
Q.   Do you recall that testimony?
A.   Yes, I do.
Q.   And what was your reaction to that, to
reading that testimony?
A.   I -- actually, I believed that Natalie
Nelson-Ling and others in the compliance program
had minimized this risk, and that was kind of
surprising to me because there was a lot of

Page 99

VIRGINIA EVANS

material in the e-mails and in other documents,
complaints, pharma -- CafePharma complaints,
where people were talking about these repeated
speaker events.
There was one particular instance
involving a Dr. ████ where the investigation
revealed that some of the doctors had gone to
a -- small group of doctors had gone to 23,
24, 25 events in a year, and that just did not
make sense to me from an anti-kickback risk
perspective.
Q.   But just to be clear, that's based on
Novartis internal materials, correct?
MS. JUDE:  Objection to form.
A.   I'm sorry, what is?
Q.   What you just answered is you were
surprised that compliance people didn't
recognize the risk given all of the internal
e-mails and findings that were going around
Novartis, correct?
A.   That's correct.
Q.   But what I'm asking is, were you
surprised that she hadn't heard, let's say, in a
CIA or in other written guidance that repeat

Page 100

VIRGINIA EVANS

attendance was a serious AKS risk?
MS. JUDE:  Objection.  Misstates
testimony.
A.   I'm sorry, I have forgotten the
question.
Q.   I'll ask a -- I'll ask a slightly
different question.
Was there any written guidance or
indication in a CIA during the review period
that repeat attendance by doctors at speaker
programs was an AKS risk?
A.   I don't know the answer to that
question.  I have not reviewed all of the CIAs.
There were many, many during the time period,
so...
Q.   Let's look at the next page, 13.
A.   Uh-huh.
Q.   In the first full paragraph, you say,
in the second sentence, "In my opinion, it is
also clear from the materials that NPC was aware
that repeat attendance prevented ser- --
presented serious compliance risks."
Do you see that?
A.   Yes.

Page 101

VIRGINIA EVANS

Q.   And what is your opinion there, if you
could explain it?
A.   Are you asking me to restate my
opinion, sir?
Q.   Well, I'm asking you to explain what
you're saying.  You say that NPC was aware.
Are you -- is that a conclusion about
the company's knowledge?
MS. JUDE:  Objection to form.
A.   No, I'm actually -- what I was
actually doing there is indicating a reference
factually that -- referencing some of the
information that I've talked about earlier that
not only Natalie Nelson-Ling, but the "do's and
don't's" document do not hold meetings on a
recurring basis.
There was another one.  Yes, it was
Maria Woods when she was talking about -- and I
think she had conducted an investigation and
concluded that there wasn't sufficient
information to substantiate the investigation as
a compliance violation, but she said it appears
that hosting the same individuals repeatedly at
the same time at the same presentations may be

Page 102

VIRGINIA EVANS

problematic because it creates the appearance of
providing honoraria to speakers for illegitimate
programs, kickback issues. So this was
something that came up.

Also, they -- they did add to this FLM
Dashboard information that, you know, to prevent
repeat attendance because that would not comply
with the occasional meals policy. So I think
the occasional meals policy itself is a
recognition that if you have repeated programs,
same speakers, same drug, same attendees, then
there may be an argument by some regulator or
other person looking at the risk that this
activity violates the Anti-Kickback Statute.

Q. Okay. But to be clear, I mean, you
say, "In my opinion it is clear from the
materials that NPC was aware."

It sounds like what you're saying now
is, in your -- based on your review of all the
documents and depositions cited in footnote 50,
it seems that people at NPC were aware of this
compliance risk; is that correct?

MS. JUDE: Objection to form.

A. I think that's right.

Page 103

VIRGINIA EVANS

I'm sorry.

MS. JUDE: Go ahead.

A. I think that's right, yes.

Q. Let's go to "Venue," which is on page
14.

A. Okay.

Q. And this section is called 4, "Venue
and Entertainment Policies."

A. Uh-huh.

Q. And what you -- in the first
paragraph, you say, "NPC's Speaker Program
policies did not properly manage the risk of
conferring this benefit," which is -- the
benefit that you're referring to is the -- the
entertainment?

A. Uh-huh. Yes, sir.

Q. "...because entertainment was
permitted for some types of events until 2008
and because sales representatives were allowed
to apply their own judgment."

Do you see that?

A. Yes.

Q. And when you say "did not properly
manage the risk," is that another way of saying

Page 104

VIRGINIA EVANS

was ineffective?

A. I believe, yes, that is the same thing
as saying it's not an effective compliance
program.

Q. Okay. And then in the next paragraph,
you say at the end of the paragraph that the
decision to permit sales reps to exercise their
judgment about proper -- about appropriate
entertainment when their comp was based on
volume of drugs prescribed by attending HCPs was
a poor way to control anti-kickback risk.

Again, when you say "poor way to
control anti-kickback risk," that's another way
of saying ineffective, correct?

A. That's correct, uh-huh.

Q. You, in the next paragraph, you talk
about how, in 2003, NPC's policy, these
healthcare compliance guidelines, incorporated
language from the PhRMA Code that promotional
events should be held at "venues conducive to an
exchange of medical information but also allowed
modest entertainment such as golf."

Do you see that?

A. Yes.

Page 105

VIRGINIA EVANS

Q. As you're measuring the effectiveness
of the compliance program, does it fall on the
positive side of the ledger that Novartis'
policies were at least incorporating the
language and the guidance from the PhRMA Code?

MS. JUDE: Objection to form.

A. I think it's positive to the extent
that NPC was using language from the code and
trying to conform its policies to the code, yes.

Q. Okay. And then you say, "Later NPC
policies provided modest entertainment may be
appropriate if approved by the Events Oversight
Committee. The rationale supporting these
exceptions to the no-entertainment rule is
unclear."

Do you see that?

A. Yes.

Q. And when you say the rationale is
unclear, do you mean that you weren't able to
find anything in the record explaining why there
might be exceptions approved?

A. Yes, that's correct. Mr. Putenis
seemed to state that, in certain circumstances,
entertainment would be appropriate and then in

27 (Pages 102 to 105)

Page 106

VIRGINIA EVANS

1
2  other circumstances, it would not be appropriate
3  and there seemed to be a distinction made for
4  golf.
5        So it was -- it was not clear to me
6  reading the compliance policies and reading the
7  PhRMA Code, the 2002 PhRMA Code, and then later
8  the 2009 PhRMA Code, why there were some
9  exceptions for entertainment.  That was just not
10 made clear.
11       And I put myself in the position of a
12 sales rep trying to comply with the rules and,
13 you know, was -- was unclear what Mr. Putenis
14 and the Compliance Department was telling me to
15 do.
16    Q.   Do you know --
17    A.   Sounded like golf was okay sometimes
18 but it wasn't okay other times.
19    Q.   Do you know how common it was for the
20 Events Oversight Committee to approve these
21 exceptions?
22    A.   Well, the Events Oversight Committee
23 did not approve the standard garden-variety
24 speaker program dinners that I think we're
25 talking about.  I think the Events Oversight

Page 107

VIRGINIA EVANS

1
2  Committee was really focused on speaker training
3  and what benefits were -- entertainment were
4  provided during the course of the speaker
5  training, and also what Mr. Putenis and others
6  described as exceptional or, you know, larger
7  events as opposed to -- I remember seeing a
8  PowerPoint as well as other information that
9  indicated that NPC exempted regular dinner
10 speaker programs or roundtables, for example,
11 from oversight by the Events Oversight
12 Committee.
13    Q.   Okay.  Just going back to my question.
14 Do you know how common it was for the Events
15 Oversight Committee to approve exceptions to the
16 no-entertainment rule?
17    A.   I do not know.
18    Q.   You then, in the next paragraph, you
19 say, "NPC generally left determination of what
20 venues were appropriate up to sales
21 representatives."
22        Do you see that?
23    A.   Yes.
24    Q.   Do you know, the other companies that
25 you provided consulting advice for, do you know

Page 108

VIRGINIA EVANS

1
2  how they restricted venue choices during this
3  period?
4     A.   No, I do not.
5     Q.   To be clear, the two companies that
6  you provided -- the two pharma companies that
7  you provided compliance advice to, what years
8  was that roughly?  Again, I'm not asking the
9  identity, but what years?
10    A.   One second.
11    Q.   Or if it's easier, where were you
12 working?
13    A.   KPMG, Daylight, and Ober.
14    Q.   The next section 5 is on "Modest Meals
15 and Aggregate Spend Policies?"
16    A.   Uh-huh.
17    Q.   And your finding looks like -- it
18 looks like you have two negative findings, if
19 I'm reading correctly.  One, the policy failed
20 to define modest; and, two, it did not address
21 the practice of splitting bills to circumvent
22 the -- what was ultimately put in, which was a
23 cap on per-person spending.
24        Do you see that?
25    A.   Yes.

Page 109

VIRGINIA EVANS

1
2     Q.   Do you know how other companies were
3  defining "modest" during this period?
4     A.   I actually do know that $125 per
5  person was a range that was not out of the
6  ballpark at that point.
7     Q.   Okay.
8     A.   For meals outside of the office.
9     Q.   And how do you know that?
10    A.   From my general knowledge and
11 experience in the business, so...
12    Q.   And in the early period, where it says
13 NPC's early policies, I assumed you were
14 referring to the first few years of the review
15 period, you say that they failed to define
16 "modest."
17        Do you know whether other companies
18 were defining "modest" at that time?
19    A.   I do not know the answer to that
20 question.
21    Q.   Let's look at -- the next section is
22 "Honoraria Amounts"?
23    A.   Right.
24    Q.   And if you look on the bottom of the
25 page 17, you're talking about fair market value?

VIRGINIA EVANS

1
2   A.   Yes.
3   Q.   And is it accurate to say that in 2010
4   Novartis changed the policy to reflect the
5   development in 2009, which you cite in footnote
6   82?
7       MS. JUDE:  Objection to form.
8   A.   Yes, they did change the policy to
9   reflect the fact that they were not counting the
10  compensation paid towards speaker training,
11  which was also to be counted not only, as I
12  understand it, for state law reporting purposes,
13  but also to get a fix internally in terms of
14  compliance and finance on how much they were
15  actually paying the speakers.
16  Q.   Let's talk about the next Section 7,
17  "Speaker Selection and Performance"?
18  A.   Okay.
19  Q.   In the second paragraph, you say, "In
20  the absence of policies, the Compliance
21  Department deferred to Sales on these matters."
22      Which is a reference to speaker
23  selection, correct?
24  A.   Yes, and also speaker performance.
25  Q.   Okay.  And I notice, despite your very

VIRGINIA EVANS

1
2   impressive number of footnotes, you don't have a
3   footnote for that sentence, so I was wondering
4   what are you relying on for that factual
5   assertion?
6   A.   Well, I would have to go back and go
7   through all of the footnotes, which I don't
8   think we need to do at this point, but to
9   explain the -- the lack of effectiveness, the
10  speaker policies did not address speaker
11  selection until later on, and I think -- well,
12  throughout the sales -- throughout the review
13  period, the sales reps were permitted to
14  nominate healthcare professionals to serve as
15  speakers and that can be and was, in fact, a
16  real benefit to some of the speakers?
17      (Knock on the door.)
18  A.   Continue?
19  Q.   Yes, please.
20      Maybe -- maybe I should ask another
21  question because I think maybe you lost your
22  train of thought, as did I.
23  A.   Okay.
24  Q.   Yeah, go ahead.
25  A.   And also, with respect to performance.

VIRGINIA EVANS

1
2   The speaker performance issues were really left
3   to the sales reps for throughout the bulk of the
4   review period.  They had to deal with speakers
5   who weren't showing, speakers who deviated from
6   the slides, speakers who did ten minutes.
7       It was really left up to them, which
8   is a hard position to put them in given that
9   their compensation is determined in part by how
10  many speaker programs they had as well as the
11  prescriptions.
12  Q.   So then on the top of 20, you say, "In
13  my opinion, sales associates should have been
14  taken out of the speaker program -- speaker
15  selection process entirely.  HCP requests for
16  speaking engagements should have been referred
17  elsewhere in the organization."
18      Do you know whether other companies
19  were doing that at this time?
20  A.   I do not know the answer to that
21  question.
22  Q.   And then in the next paragraph, at the
23  end of the paragraph, you say, "The best way to
24  avoid this risk would have been for someone
25  other than the sales associates to select

VIRGINIA EVANS

1
2   speakers."
3       When you say "the best way," that's
4   like saying the best practice would have been?
5   A.   Yes, I think so.  It would have been a
6   better practice and maybe the best practice to
7   have an outside group, not necessarily the
8   speakers, selecting -- I'm sorry, not
9   necessarily the sales reps selecting the
10  speakers.
11      That way you would have been able to
12  make sure that you're meeting the criteria
13  enumerated in the PhRMA Code and the HHS OIG
14  Guidance, you know, having someone who is known
15  in the field, someone who is experienced,
16  someone who is a good speaker, who is reliable,
17  who shows up.
18  Q.   Okay.  And do you know of any written
19  guidance that says that that would be the best
20  practice?
21      MS. JUDE:  Objection to form.
22  A.   No, I don't.  Not off the top of my
23  head, I don't.
24  Q.   And going back to a question I've been
25  asking you a lot, which is your opinions about

VIRGINIA EVANS

1
2  effectiveness, saying that something was not the
3  best practice, that's not equivalent to saying
4  that it was ineffective, was it?
5      A.   No, that's correct.
6      MR. GRUENSTEIN:  Okay.  Now may be a
7  good time for a break, if we can go off the
8  record.
9      THE VIDEOGRAPHER:  The time is 12:01
10 p.m.  We're going off the record.
11     (Recess.)
12     THE VIDEOGRAPHER:  The time is 12:14
13 p.m.  We're back on the record, video number
14 3.
15 BY MR. GRUENSTEIN:
16     Q.   Ms. Evans, just to follow up on a
17 point you made earlier about the sales reps had
18 incentive-based compensation, what do you know
19 about the compensation of sales reps during this
20 review period?
21     MS. JUDE:  Objection.
22     At Novartis?
23     MR. GRUENSTEIN:  Yes.
24     THE WITNESS:  I reviewed materials
25 that were provided about the sales reps'

VIRGINIA EVANS

1
2  compensation, including presentations that
3  were made to them to explain their
4  compensation, and so I understand that it
5  was pretty complex, but there was a
6  component of their compensation during the
7  review period that had to do with whether or
8  not they were using up the money that was
9  allocated to them for the speaker programs,
10 that they were having the appropriate number
11 of speaker programs, and that their
12 compensation was also based on the number of
13 sales, including prescriptions by the
14 speakers and other folks who were in
15 attendance at the programs.
16 BY MR. GRUENSTEIN:
17     Q.   And do you have a sense of how those
18 various components were divvied up?
19     A.   I really don't off the top of my head.
20 I would have to look at the document.
21     Q.   Okay.
22     A.   And I'm happy to do that if you'd like
23 to do that.
24     Q.   Let's go to page 21.  We're now on --
25 we're off of policies and on to the compliance

VIRGINIA EVANS

1
2  departments and officers.  Do you see that?
3      A.   Yes, sir.
4      Q.   And we can go to the second sentence,
5  which says that, "An effective compliance
6  program begins with a formal commitment by the
7  Board of Directors or other governing body,
8  including the allocation of adequate resources,"
9  and then it goes on.
10     Do you see that?  Do you see that
11 sentence?
12     A.   Yes, sir.
13     Q.   And did you for purposes of your
14 review consider the resources that Novartis put
15 towards its compliance program?
16     A.   I -- the answer to that would be yes,
17 to the extent that I looked at the number of
18 folks who were assigned to address compliance
19 issues within NPC.
20     Q.   And did you look at, for example, how
21 many millions of dollars Novartis spent on
22 compliance during this period?
23     A.   No, I did not.
24     Q.   Let's go to page 25, footnote 111.
25 And just to orient you, you're talking about

VIRGINIA EVANS

1
2  that Novartis had an OIG Readiness Task Force,
3  but not -- but it did not serve as a compliance
4  committee.
5      Do you see that?
6      A.   Yes.
7      Q.   And then later down in the footnote,
8  you say, "In my opinion, the OIG Readiness Task
9  Force appeared to be mainly 'window dressing' in
10 the event of review by government regulators."
11     What are you saying there and what did
12 you base that statement on?
13     MS. JUDE:  Objection to form.
14     A.   As I understand from my review of the
15 documents and the depositions, but mostly the
16 documents, the OIG Readiness Task Force was a
17 group that was put together in response to the
18 drafting of the HHS OIG, or the -- I'm sorry,
19 the implementation of the HHS OIG Compliance
20 Guidance for Pharmaceutical Manufacturers, and I
21 understood based on the documents that there was
22 a meeting in Washington, D.C., and at the
23 conclusion of that meeting, I don't know who was
24 present at that meeting, I just reviewed notes
25 from the meeting, and at the conclusion of the

Page 122

VIRGINIA EVANS

1
2  meeting, NPC compliance personnel came back to
3  their offices, wherever that was, and put
4  together some efforts to address some of the
5  items that had been raised at the meeting, the
6  OIG meeting, and those were particularly in
7  response to the 2003 guidance.
8       So one of the things that they did was
9  create this OIG Readiness Task Force, which had
10  various components and folks assigned to it.  It
11  did not really appear to me to be a compliance
12  committee as is described in the OIG guidance,
13  although, excuse me, I did -- I did see a
14  reference to the OIG Readiness Task Force then
15  became the Commercial Compliance Committee
16  around the time of the Novartis report.
17       Q.   But when you say that it appeared to
18  be mainly window dressing in the event of review
19  by government regulators, did you mean that the
20  people who put it together did so not for really
21  legitimate reasons, but just to have it in case
22  they needed to show regulators down the road?
23       A.   That was my sense, that this was an
24  effort to have something in place because they
25  knew that HHS OIG had these guidelines and they

Page 123

VIRGINIA EVANS

1
2  were going to scrutinize the performance of
3  pharmaceutical manufacturers based upon the
4  guidelines.  So they needed to have something in
5  place, and this was how they were starting to do
6  that.
7       Q.   Let's look at the next page, and
8  there's a sentence -- it's in the middle of that
9  first top paragraph that starts with "Mr.
10  Putenis."
11       A.   Yes, sir.
12       Q.   You say, "Mr. Putenis testified that
13  sales reps were told not to use speaker programs
14  as a reward for prescribing or induce physicians
15  to prescribe, but did not acknowledge that using
16  high prescribers as speakers presented a serious
17  compliance risk, instead emphasizing the
18  importance of permitting NPC to use speakers
19  with 'experience with the product' for effective
20  marketing."
21       Do you see that?
22       A.   No, actually, I don't.
23       Q.   I read the whole thing and you didn't
24  even see it.
25       Page 26.

Page 124

VIRGINIA EVANS

1
2       A.   Sorry.
3       Q.   The top.
4       A.   Okay.
5       Q.   The middle of that first --
6       A.   "Mr. Putenis testified."
7       Q.   Yeah.
8       A.   Okay.  I got it.
9       Q.   So what I'm going to do -- and you
10  cite to footnote 117, pages 210 to 214, which
11  I'm going to give you the transcript of that.
12       A.   Okay.
13       Q.   And what I want to do, if we can just
14  look at what you rely on for a minute.
15       A.   Okay.
16       Q.   And I'd like to understand your
17  statement that he did not acknowledge that using
18  high prescribers presented compliance risk in
19  light of a few paragraphs that I'm going to
20  point you to.
21       A.   Okay.
22       Q.   So if you look at 211, at line 4, Mr.
23  Putenis says --
24       Do you see it?
25       A.   Uh-huh.

Page 125

VIRGINIA EVANS

1
2       Q.   "Sales reps would be instructed that
3  they cannot use speaker training initiatives as
4  a vehicle for rewarding people for prescribing
5  or by inducing them to prescribe any particular
6  product."
7       Then on the bottom of 212, it says,
8  "We emphasized to our salespeople that they may
9  not utilize invitation to a speaker training
10  event or contracting with an individual
11  healthcare professional to serve as a speaker as
12  a reward for past prescribing or as an
13  inducement to get them to prescribe our
14  product."
15       A.   Uh-huh.
16       Q.   And then on page 214, starting with
17  line 15 -- this is actually after the part that
18  you cite.  There's a question -- I won't read
19  the question.  I'll just go to the line 23.
20       Mr. Putenis said, "The requirement was
21  that they may not select people to serve as
22  speakers or to participate in speaker training
23  for the purpose of rewarding them for past
24  prescribing or inducing them for future
25  prescribing."

32  (Pages 122 to 125)

Page 126

VIRGINIA EVANS

1
2          So, in light of those paragraphs, what
3    did you mean when you said that Mr. Putenis
4    didn't acknowledge this compliance risk?
5          A.   Well, if you go back to page 211, Mr.
6    Putenis also said -- stated that he understood,
7    or, "We understood that the credibility of a
8    speaker is enhanced if they have experience with
9    our product, and that credibility is lost if
10   they stand before an audience that have no
11   experience in prescribing the product.  So that
12   is a relevant measure of the attractiveness of a
13   particular person to serve in a speaker role for
14   Novartis.  It stands to reason that we would
15   consider whether or not a doctor was a
16   prescriber or -- whether a doctor was a
17   prescriber or not when selecting them to serve
18   on our speaker bureau."
19         So -- so then -- and then there were
20   also a series of questions where the attorney
21   who was doing the deposition asks about whether
22   or not, as long as the speaker's reps -- I'm
23   sorry.  Strike that.  As long as the sales reps
24   are not selecting a speaker as an inducement,
25   it's okay for a sales rep to select a speaker

Page 127

VIRGINIA EVANS

1
2    simply because the speaker is a high-volume
3    prescriber of Novartis drugs, and Mr. Putenis
4    would not agree with that.
5          And then when they asked is it not
6    okay, and he wouldn't agree with that either.
7    So he also said high prescribing would never be
8    the sole basis on which the person is selected,
9    so -- and then the person who asked the question
10   said: "Well, if it was, would that be a
11   violation of Novartis' guidelines?"  The answer
12   was, "Not necessarily."  "Under what
13   circumstances would it not be a violation?"  And
14   again, Mr. Putenis said, "Because there are
15   speakers that are preferable for us who have
16   experience with the product, and that is a
17   determination that's based on whether or not
18   they prescribe."
19         Q.   So would you agree with me that, in
20   these five or six pages, he does say that it's
21   okay to rely on the fact that a doctor has
22   prescribed the drug to choose them to be a
23   speaker?
24         A.   Yes, he does say that, that experience
25   with the product is something that they were

Page 128

VIRGINIA EVANS

1
2    looking for.
3          Q.   And he also says that people were told
4    that they could not choose the speaker as a way
5    of rewarding people for having been high
6    prescribers, correct?
7          A.   That's correct.
8          Q.   But is what you're saying in the
9    report that, based on your reading, it looks
10   like he did not emphasize the compliance risk
11   associated with rewarding high prescribers for
12   prescribing by choosing them to be speakers?
13         A.   That's correct.  I did not feel like
14   he recognized the risk, or if he recognized it,
15   did not describe it adequately to the sales
16   reps.
17         Q.   Let's look at section B, Julie Kane.
18         A.   Okay.
19         Q.   And as a consultant, are you asked to
20   consider the effectiveness of compliance
21   officers?
22         A.   To the extent that I'm looking at the
23   effectiveness of a particular compliance
24   program, and there are issues with respect to
25   the leadership or competence or enthusiasm of

Page 129

VIRGINIA EVANS

1
2    the compliance officer or the manner in which he
3    or she presents the compliance communication
4    message, yes, I do look at -- at the compliance
5    officers and the department in general,
6    departments in general.
7          Q.   And presumably when you do that, you
8    interview the compliance officer?
9          A.   Yes, sir.
10         Q.   And do you presumably interview the --
11   some of the people that report to the compliance
12   officer?
13         A.   Usually.  Uh-huh.
14         Q.   And you try to find out about the
15   background and qualifications of the compliance
16   officer?
17         A.   Yes.  Uh-huh.
18         Q.   And you try to get a sense of how well
19   they understand compliance principles?
20         A.   Yes.  Uh-huh.
21         Q.   Do you have a sense of what Julie
22   Kane's background was before she served in this
23   role?
24         A.   Yes, I did.  I'm not sure that I can
25   recall it at this point.  I remember that she

33 (Pages 126 to 129)

VIRGINIA EVANS

1
2  see anything in the documents or the materials
3  that indicated to whom she raised that, whether
4  she raised that with Mr. Gorsky or someone else,
5  maybe somebody in Sales.  I didn't see anything
6  in the materials indicating to whom she raised
7  that.
8      Q.   Okay.  In the next sentence of your
9  report, it says, "Under Ms. Kane's supervision,
10  speaker programs were approved at questionable
11  venues such as casinos and resorts."
12          And you cite to an instance where Mr.
13  Putenis approved the use of a restaurant at a
14  casino.
15          Do you recall Mr. Putenis' rationale
16  for approving the restaurant at the casino?
17      A.   No, I don't recall -- I don't recall
18  his rationale about approving a restaurant at a
19  casino.
20      Q.   Do you recall his testimony that the
21  reason he approved it was because it was
22  during -- it was after Hurricane Katrina and
23  there was a shortage of available restaurants to
24  do these events in?
25      A.   I have some vague recollection of

VIRGINIA EVANS

1
2  that, yes.
3      Q.   Okay.  And does that testimony impact
4  your view on whether it was an appropriate
5  choice of a restaurant given those
6  circumstances?
7      A.   It really does not affect -- it would
8  not affect my opinion one way or the other,
9  frankly.
10      Q.   Meaning that, in your mind, it would
11  still be inappropriate to hold a speaker program
12  event at a restaurant within a casino?
13      A.   Yes.  Uh-huh.
14      Q.   And why is that?
15      A.   Because there were other venues that
16  were available.  I -- I'm familiar with the New
17  Orleans area, and I don't believe that the
18  casino was the only place that could have been
19  used to house a speaker meeting or to have a
20  speaker meeting.
21      Q.   Okay.
22      A.   So, I mean, maybe in this one
23  circumstance he's making an exception, but my
24  observation of Mr. Putenis is that there were a
25  number of exceptions that he -- he would raise

VIRGINIA EVANS

1
2  and really defer to Sales as to whether or not
3  it was an appropriate location.
4      Q.   Uh-huh.  At the end of the paragraph
5  in your report, you wrote, "She believed," and
6  this is Ms. Kane, "She believed that there were
7  'better ways to manage the risk' than a blanket
8  prohibition on high-end restaurants, but she did
9  not implement any."
10      A.   Right.
11      Q.   And if we could look at pages of the
12  testimony, which is actually around the -- what
13  you cite for -- in 135, page 223.
14      A.   Okay, 223.
15      Q.   It's actually -- it starts at the
16  beginning of 222, and I can read it.
17      A.   Okay.
18      Q.   It says at line 22, "So, again, I
19  think what we realized upon revisiting is that
20  it wasn't so much whether or not the event was
21  occurring at a Morton's or at a Ruth's Chris,"
22  which is the point you made in your report,
23  correct?
24          MS. JUDE:  Objection to form.
25      Q.   That I --

VIRGINIA EVANS

1
2      A.   That's what she said.
3      Q.   Right.
4      A.   She said that she thought there were
5  better ways to manage the risk than a
6  prohibition on high-end restaurants.
7      Q.   Right.  And then she continues, "It
8  was whether we had sufficient and adequate
9  controls around the events," and that's the next
10  point you made is that she said there were
11  better ways to manage the risk, correct?  That's
12  consistent with all of what you have said?
13          MS. JUDE:  Objection to form.
14      A.   That is what she said, yes.
15      Q.   Right, what your description of what
16  she said?
17      A.   Yes.
18      Q.   And then you say, "But she did not
19  implement any better ways," and but what she
20  says at line 6 is, "And so, for example, I think
21  at some point we realized the better control
22  might be enhancements to the programs in
23  general, like having a third party help us
24  manage them so that going into a meeting we
25  might have a fixed menu, even if it was at a

Page 182

VIRGINIA EVANS

1 documents that were referred to, I got those
2 documents, and from those I tried to find other
3 documents.
4       So that's what I looked at.
5    Q.   And then you tried to weave all of the
6 different sources of information together to
7 explain to the reader what you saw happening
8 during this period?
9    A.   Yes, I think that's accurate.
10    Q.   Let's look at page 57.
11    A.   Uh-huh.
12    Q.   The third paragraph on the page.
13    A.   Okay.  An example, uh-huh.
14    Q.   No, the third paragraph.  Sorry, the
15 bottom paragraph.  "Instead."
16    A.   "Instead."
17    Q.   It's where you're talking about an
18 exception report.
19       So what is an exception report?
20    A.   As I understand it, an exception
21 report was a report that was run using Concerto
22 data and NEC data to show instances where
23 programs, speaker programs, were non-compliant,
24 and those reports were run through Concerto and

Page 183

VIRGINIA EVANS

1 then they were provided to the compliance
2 officer or other folks in the Compliance
3 Department, not necessarily Ms. Kane.
4    Q.   Is the exception report an industry
5 term or something that you saw for the first
6 time with Novartis documents?
7    A.   The first time I ever saw that phrase
8 in my experience was this particular case, so...
9    Q.   Okay.  And you say, three lines from
10 the bottom, "Exception reporting was not a
11 regular process assigned to the Compliance
12 Department."
13       Do you see that?
14    A.   Yes.
15    Q.   Do you recall the testimony of David
16 Hollasch, who said that Beth Margerison was in
17 charge of exception reporting?
18    A.   Yes, I do remember him saying that she
19 would -- that Ms. Margerison would pull reports
20 from Concerto and provide them to the Compliance
21 Department for further auditing or
22 investigation.  I remember him saying that.
23    Q.   Right.  So what do you mean when you
24 say that exception reporting was not a regular

Page 184

VIRGINIA EVANS

1 process assigned to the Compliance Department?
2    A.   Well, it was my understanding based on
3 Ms. Margerison's testimony as well as Ms. Cetani
4 and Mr. Hollasch that the exception reporting
5 was not something that was done on a regular
6 basis, that there wasn't an exception report run
7 every month or every quarter to show how far off
8 they were in -- they were in terms of spending.
9       They had to run the reports, I guess,
10 for certain states.  So that's what Concerto was
11 being used for, but exception reporting was
12 something that was done on a more sporadic
13 basis.
14    Q.   So are you saying that the controls
15 around exception reports were ineffective
16 because exception reports weren't done on a
17 regular enough basis?
18    A.   Well, I think once that they had the
19 opportunity to gather that information, NPC
20 could have and should have set up an exception
21 reporting process whereby, on a regular basis,
22 the exception reports were brought to the
23 attention of the compliance officer.  The
24 compliance officer then, perhaps, or someone at

Page 185

VIRGINIA EVANS

1 his or her direction or even an outside
2 investigator or auditor could take a look at
3 what was causing -- what was the root cause for
4 there being so many instances of policy
5 violations, especially with respect to the
6 modest meal policies and other attendance
7 policies and things like that.  That didn't
8 appear to be happening.
9    Q.   And did the failure to do so render
10 this control ineffective?
11    A.   I think, in part, it diminished its
12 effectiveness, yes.
13    Q.   To the point of ineffective?
14       MS. JUDE:  Objection to form.
15    A.   Well, I'm not sure you could really
16 call it a control if it was -- not to quibble,
17 but it was something that they were looking at,
18 but they weren't effectively dealing with it
19 until I think 2010 or so.
20    Q.   Do you know whether other companies
21 during the review period were doing exception
22 reporting?
23    A.   I do not.
24    Q.   Let's look at the next page, 58.

47 (Pages 182 to 185)

VIRGINIA EVANS

1
2    A.   Okay.
3    Q.   You say on the first full paragraph,
4  "In my opinion, Compliance should have used
5  Concerto and its predecessor systems to
6  data-mine much earlier in the Review Period, and
7  should have used it more broadly."
8         Do you see that?
9    A.   Yes.
10   Q.   And you felt that Novartis' compliance
11  program would have been stronger if it had done
12  more data analysis, correct?
13   A.   Not -- yes, not only data analysis,
14  but taking the information in the data and, as I
15  testified earlier, folding that back into or
16  incorporating it back into their compliance
17  program in the form of additional audits,
18  drilling down on particular audit areas, setting
19  up a monitoring program, engaging in education,
20  things of that nature.
21        So, you know, if you know that a
22  particular geographic region is having a
23  difficult time staying in compliance with
24  policies and procedures, maybe what you do is
25  you target specific training to that geographic

VIRGINIA EVANS

1
2  region or that pod and then test them again in
3  two or three months after the training and
4  seeing -- to see where they are in terms of
5  compliance at that point.
6         And that just -- they didn't seem to
7  use any of that information, except with respect
8  to honoraria and the aggregate spend on the
9  physicians.  That was really how Concerto was
10  used, but it could have been used on a much
11  broader scale.
12   Q.   So, like in footnote 330, you
13  recognize that Ms. Cetani noted that it was used
14  for gift tracking, tracking specialties of the
15  event attendees, venues and number of attendees,
16  correct?
17   A.   Right.
18   Q.   But you thought there were other
19  things that could have been tracked at that
20  time?
21   A.   Attendance I think would have been one
22  thing to track.  Meal spend would have been
23  another one.  So I just -- and they could have
24  used it earlier.  They had the capability to use
25  Concerto from about 2007 onward, but they also

VIRGINIA EVANS

1
2  had other systems like NEC and Report Central
3  that could have been used to generate data that
4  would have done the same thing, and they just --
5  there wasn't any organized effort on the part of
6  the Compliance Department to collect and use the
7  information in that way, which would have
8  actually been a big help to them.  It would have
9  streamlined their efforts and helped them spend
10  in the right direction, and it just didn't seem
11  to be doing that.
12   Q.   And you don't know whether other
13  pharma companies during the review period were
14  doing that sort of data analysis, do you?
15   A.   I know some were.
16   Q.   And how do you know that?
17   A.   From my general experience, so...
18   Q.   What does that mean, "general
19  experience"?
20   A.   From my experience working for
21  Daylight, KPMG, looking at other compliance
22  programs, reading cases.
23   Q.   But specifically with pharma companies
24  doing not just the sort of tracking that Ms.
25  Cetani said was done, but the additional

VIRGINIA EVANS

1
2  tracking that you say should have been done --
3         MS. JUDE:  Objection to form.
4    Q.   -- do you know with that level of
5  granularity?
6         MS. JUDE:  Objection to form.
7    A.   I do not.
8    Q.   Do you draw any conclusion about
9  Novartis' -- let me start again.
10        Based on the fact that Novartis didn't
11  do these things, like data analysis that you say
12  they should have, do you draw any conclusion
13  about Novartis' intent to comply?
14        MS. JUDE:  Objection to the extent
15    that it calls for a legal conclusion.
16   A.   No, and I was not asked to make -- to
17  determine intent, and I wouldn't really feel
18  comfortable doing that, so...
19   Q.   How about whether Novartis was acting
20  in good faith to put in place an effective
21  compliance program?
22        MS. JUDE:  Same objection.
23   A.   Once again, I didn't focus on issues
24  of good faith.  I just looked at the compliance
25  program and tried to determine whether or not,

Page 198

VIRGINIA EVANS

now if you've got a thousand employees, you need
three people in your Compliance Department.  I
just don't know.
 Q.   But those benchmarks do exist?
 A.   I believe that they do.  I haven't
seen them.
 Q.   And do they -- when you say you
haven't seen them, that's not something that you
use when you review compliance programs?
 A.   No.
 Q.   But wouldn't that be helpful to
determine, you know, a given company if they
have 100 people that work in Compliance, you
know, that's pretty good if the benchmark is
only 30, say?
 A.   Well, I think it depends on how big
the company is.  I think it depends on their
culture.  I think it depends on how strong their
policies and procedures are.
      You may not need 50 inside compliance
people if you've got a strong compliance officer
and a system that works and you've got other
methods of keeping the company in compliance,
like a robust auditing and monitoring program,

Page 199

VIRGINIA EVANS

you know, maybe you outsource it.  I don't know,
so it really depends.
 Q.   Sitting here today, you don't know how
Novartis during this period measured up against
those benchmarks?
 A.   No, I don't.
 Q.   Let's look at page 64.
 A.   Okay.
 Q.   You say, "Not surprisingly" -- this is
on the fifth line.  "Not surprisingly, given the
staffing, NPC conducted a small number of
investigations in speaker programs -- speaker
program-related compliance violations relative
to the total number of programs it conducted
during the review period."
      Do you see that?
 A.   Yes.
 Q.   Did you identify both the number of
investigations of speaker program related
compliance violations that NPC conducted as well
as the total number of programs that it
conducted during the review period?
 A.   I used the report of Mr. Goldberg, the
other government expert, to come up with the

Page 200

VIRGINIA EVANS

number of programs.  I then went back and looked
at some reports that Ann Harmon had put together
trying to determine whether or not the
program -- I think she actually used the words
"had teeth" or how effective it was back during
the October 2004 through March 2005 time period,
and I was pretty surprised at how few speaker
program investigations, compliance-related
investigations had occurred given the other
information in the documents about what the
apparent risks were.
 Q.   Do you recall what the numbers of
investigations were and what the total number of
programs were?
 A.   I don't.  I really don't.  I would
have to go back and look at the documents.
 Q.   And how were you able to determine
that it was a small number?
 A.   Well, because there were thousands of
speaker programs, and the number that were
investigated during the time period were looked
at -- the time period that was looked at by Ms.
Harmon was really small, so...
 Q.   And do you -- do you have any

Page 201

VIRGINIA EVANS

benchmarks of what other companies were doing as
far as number of investigations to total number
of speaker programs?
 A.   No, I don't.
 Q.   On the next page, you talk about the
lack of proactive investigations.  Do you see
that?
      The top of the page.  It says, "And
the Compliance Department" --
 A.   Oh, yeah.
 Q.   -- "largely refused to proactively
investigate potential misconduct, instead
waiting for an HPC or NPC employee to report
misconduct."
      Do you see that?
 A.   Yes.
 Q.   And at the last sentence, you wrote,
"This hobbled Compliance's ability to prevent
and detect misconduct."
      Is there any guidance from OIG or
otherwise about doing investigations in the
absence of reported misconduct?
      MS. JUDE:  Objection to form.
 A.   I believe that the 2003 guidance talks

51 (Pages 198 to 201)